## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| STUDENT FINANCE CORPORATION, | ) | Case No. 02-11620 (WS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| CHARLES A. STANZIALE, JR., | ) | |
| CHAPTER 7 TRUSTEE OF STUDENT | ) | Adversary Proceeding No. 04-58003 |
| FINANCE CORPORATION, | ) | |
| | ) | District Court Case No. 1:05-CV-00072-JJF |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| McGLADREY & PULLEN, LLP, and | ) | |
| MICHAEL AQUINO, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**RESPONSE OF CHARLES A. STANZIALE, JR., CHAPTER 7 TRUSTEE
OF STUDENT FINANCE CORPORATION, IN OPPOSITION TO MOTION TO DISMISS OF
McGLADREY & PULLEN, LLP AND MICHAEL AQUINO**

THE BAYARD FIRM
Anthony Saccullo (No. 4141)
222 Delaware Avenue
Suite 900
Wilmington, DE 19899
(302) 655-5000

- and -

SCHWARTZ TOBIA & STANZIALE, P.A.
Donald J. Crecca
Jeffrey T. Testa
22 Crestmont Road
Montclair, NJ 07042
(973) 746-6000
*Attorneys for Charles A. Stanziale, Jr.,
Chapter 7 Trustee of Student Finance
Corporation*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ........................................................................................................... 1

STANDARD OF REVIEW .............................................................................................. 3

STATEMENT OF FACTS ............................................................................................... 4

   A.   SFC's Scheme ................................................................................................ 4

   B.   Aquino's and McGladrey's Knowledge of the Fraudulent Scheme ................... 5

   C.   McGladrey's False and Misleading Reports ...................................................... 5

       1.   McGladrey's Knowingly False 2001 Audit Report ................................... 5

       2.   McGladrey's Knowingly False 2001 Accountants' Report ......................... 7

SUMMARY OF ARGUMENT .......................................................................................... 9

ARGUMENT .................................................................................................................. 10

   I.   *IN PARI DELICTO* IS NOT A BASIS TO DISMISS THE TRUSTEE'S COMPLAINT ........................................................................... 10

       A.   The Court Should Not Consider *In Pari Delicto* in the Context of a Motion to Dismiss........................................................................................... 11

       B.   The Trustee's Claims Are Not Barred by the *In Pari Delicto* Doctrine ......... 12

          1.   *In Pari Delicto* is inapplicable to claims under Section 544 of the Bankruptcy Code ................................................................. 13

          2.   *In Pari Delicto* is inapplicable to claims by the innocent Trustee ........... 13

          3.   *In Pari Delicto* is inapplicable because Defendants are insiders ............ 15

          4.   The defense would not be applicable as of commencement of the case ............ 17

   II.   THE TRUSTEE HAS STANDING TO ASSERT THE CLAIMS IN THE COMPLAINT ............................................................................................... 18

       A.   The Trustee May Assert General Causes of Actions for the Benefit of All Creditors ............................................................................................ 18

       B.   The Trustee has All of the Rights and Powers of A Creditor Under Section 544 of the Bankruptcy Code ............................................................ 19

C.   Section 544 of the Bankruptcy Code Applies to the Trustee's Claims in
the Complaint..................................................................................................23

III.  THE TRUSTEE HAS STATED A CLAIM FOR FRAUD, AIDING AND
ABETTING FRAUD AND FRAUDULENT CONCEALMENT ...................................23

IV.  THE TRUSTEE HAS STATED A CLAIM FOR AIDING AND
ABETTING BREACH OF FIDUCIARY DUTY ............................................................26

V.   THE TRUSTEE HAS STATED A CLAIM FOR NEGLIGENT
MISREPRESENTATION....................................................................................................28

VI.  THE TRUSTEE HAS STATED A CLAIM FOR FRAUDULENT
TRANSFER ........................................................................................................................28

CONCLUSION...........................................................................................................................30

## TABLE OF AUTHORITIES

### CASES

*In re Aluminum Mills Corp.*, 132 B.R. 869 (Bankr. N.D. Ill. 1991) .................................29

*Anderson v. Airco, Inc.*, No. Civ.A. 02C-12-091KDR, 2004 WL 1551484 (Del. Sup. June 30, 2004) ..................................................................................................26

*Baker O'Neal Holdings v. Ernst & Young*, No. 1:03-CV-0132-DFH, 2004 WL 771230 (S.D. Ind. Mar. 24, 2004) .......................................................................10, 11

*In re Ben Franklin*, No. 97C7934, 2000 U.S. Dist. LEXIS 276 (N.D. Ill. Jan. 12, 2000) ........................................................................................................................20

*Blatstein v. Blatstein*, No. Civ A 98-5947, 1999 WL 424296 (E.D. Pa. June 23, 1999) ................................................................................................................. 17-18

*Branchburg Plaza Associates, L.P. v. Fesq*, 153 F.3d 113 (3d Cir. 1998) .......................22

*Brennan v. Reed Smith, Shaw & McClay*, 450 A.2d 740 (Pa. Super. 1982) .....................11

*In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d Cir. 1997) .........11

*Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416 (1972) .........18, 20

*Committee of Unsecured Creditors of Specialty Plastic v. Doemling*, 113 B.R. 915 (Bankr. W.D. Pa. 1990 ) ....................................................................................20

*Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480 (D. Conn. 2002) .........27

*E.F. Hutton V. Pappas*, 609 F. Supp. 1465 (D. Md. 1988) ................................................25

*In re Exide Technologies, Inc.*, 299 B.R. 732 (Bankr. D. Del. 2003) ...............................11

*Feld and Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick and Cabot*, 458 A.2d 545 (Pa. Super. 1983) ..................................................................................................11

*Ford v. Schering-Plough Corp.*, 145 F.3d 601 (3d Cir. 1998) .........................................11

*In re Francis Edward McGillick Foundation*, 594 A.2d 322 (Pa. Super. 1991), *rev'd in part on other grounds*, 642 A.2d 467 (1994) .........................................18

*Geyer v. Ingersoll Publications Co.* , 621 A.2d 784 (Del. Ch. 1992) ...............................27

*Grand Lodge of Del. v. Odd Fellows Cemetery of Milford*, No. 1461-K, 2002 Del. Ch. LEXIS 136 (Del. Ch. Nov. 18, 2002)...................................................................11,12

*In re Granite Partners, L.P.*, 194 B.R. 318 (Bankr. S.D.N.Y. 1996) ....................12, 15, 23

*Hirsch v. Arthur Anderson & Co.*, 72 F.3d 1085 (2d Cir. 1995) ........................19

*In re Insulfoams, Inc.*, 184 B.R. 694 (Bankr. W.D. Pa. 1995)................................... *passim*

*Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487 (3d Cir. 1997) ........................................................................................22

*In re Jack Greenberg*, 240 B.R. 486 (Bankr. E.D. Pa. 1997) .............................................14

*Kalb, Voorhis & Co. v. American Financial Corp.*, 8 F.3d 130 (2d Cir. 1993) ..........19, 21

*Knauer v. Jonathan Roberts Financial Group, Inc.*, 348 F.3d 230 (7th Cir. 2003) ..........10

*Koch Refining v. Farmers Union Central Exch., Inc.*, 831 F.2d 1339 (7th Cir. 1987) ..................................................................................................19

*Koken v. Steinberg,* , 825 A.2d 723 (Pa. Commw. Ct. 2003) ......................................26, 27

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993)..........................................................................................3

*Leibersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.)*, 280 B.R. 103 (Bankr. E.D. Pa. 2002)........................................................................29

*Lyons v. Benney*, 79 A. 250 (Pa. 1911)..............................................................18

*In re Main, Inc.*, 1999 WL. 424296 (E.D. Pa. 1999) .........................................20

*Marion v. TDI, Inc., et al.*, No. 02-7032, 2004 U.S. Dist. LEXIS 9754 (E.D. Pa. May 27, 2004)................................................................................................14

*Matter of Roach*, 824 F.2d 1370 (3d Cir. 1987) ................................................22

*McNamara v. PFS (In re The Personal and Business Insurance Agency)*, 334 F.3d 239 (3d Cir. 2003)...........................................................................13, 14, 21

*In re Montantino*, 15 B.R. 307 (Bankr. D. N.J. 1981) ......................................16

*In re Mortgage America Corp.*, 714 F.2d 1266 (5th Cir. 1983) ........................20

*O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79 (1994)...................................17, 22

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir. 2001)............................................................................................... *passim*

*Official Comm. Of Unsecured Creditors of the IT Group v. Brandywine Apts.*, 313 B.R. 370 (Bankr. D. Del. 2004) ........................................................29

*PHP Liquidating, LLC v. Robbins*, 291 B.R. 603 (D. Del. 2003) .................13, 19, 20, 23

*Pereira v. Cogan, Sherman, et al.*, No. 00 Civ. 619 (RWS), 2001 U.S. LEXIS 2461 (S.D.N.Y. Mar. 8, 2001) ........................................................19, 20, 23

*Peyton v. Margiotti*, 156 A.2d 865 (Pa. 1959)..................................................18

*In re Porter McLeod, Inc.*, 231 B.R. 786 (D. Col. 1999)........................13, 20, 21

*Production Resources Group, LLC v. NCT Group, Inc.*, 863 A.2d 772 (Del. Ch. 2004) ........................................................................................................18

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589 (D. N.J. 2001) ........................................................................................................25

*In re Rent-Way Sec. Lit.*, 209 F. Supp. 2d 493 (W.D. Pa. 2002) ................................24, 25

*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1955)...............................................14

*Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) ......................19

*Sicardi v. Keystone Oil Co.*, 24 A. 163 (Pa. 1892) ...........................................18

*Skipworth v. Lead Industries Associate*, 690 A.2d 169 (Pa. 1997)...................................26

*St. Paul Fire and Marine Insurance Co. v. Pepsico, Inc.*, 884 F.2d 688 (2d Cir. 1989) ........................................................................................................19, 23

*In re Three Flint Hill Ltd. Partnership*, 213 B.R. 292 (D. Md. 1997)..............................16

*Travelers Indemnity Co. v. Lake*, 594 A.2d 38 (Del. 1991)..................................26

*United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235 (3d Cir. 2004)......................3

*Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 244 A.2d 10 (Pa. 1968) 10,12, 14, 18

*In re UVAS Farming Corp.*, 89 B.R. 889 (D. N.M. 1998)..................................16

*Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir. 1988)........................................20

*Wooten v. Loshbough*, 951 F.2d 768 (7th Cir. 1991)........................................19

584277v1

*Zilkha Energy Company v. Leighton*, 920 F.2d 1520 (10th Cir. 1990) ................13, 21, 22

## STATUTES

6 *Del. C.* § 1304 ..............................................................................................29

6 *Del. C.* § 1304(a)(1) .....................................................................................28

6 *Del. C.* § 1304(a)(i) ......................................................................................28

6 *Del. C.* § 1309 ..............................................................................................29

11 U.S.C. § 101(31) ...........................................................................................15

11 U.S.C. § 541 ..........................................................................................*passim*

11 U.S.C. § 544..........................................................................................*passim*

11 U.S.C. § 544(a) .......................................................................................21, 22

11 U.S.C. § 548(a)(1)(A) ..............................................................................28, 29

## RULES

FED. R. CIV. P. 12(b)(6) .................................................................................3, 11

## MISCELLANEOUS

5 COLLIER ON BANKRUPTCY ¶ 544.02 (15th ed. 2004) .......................................22

3A FLETCHER CYCLOPEDIA OF LAW OF PRIVATE CORPORATIONS § 1035.60 (1998)...18, 20

RESTATEMENT (SECOND) OF CONFLICTS, § 145 ..................................................26

RESTATEMENT (SECOND) OF CONFLICTS, § 146 ..................................................26

RESTATEMENT (SECOND) OF TORTS, § 876 .......................................................26

584277v1

## INTRODUCTION

The Trustee has brought this action on behalf of all creditors of debtor Student Finance Corporation ("SFC") against defendants McGladrey and Pullen LLP ("McGladrey") and its partner, Michael Aquino ("Aquino"), because Defendants knowingly assisted and participated in defrauding SFC's creditors. Defendants did not merely fail to adequately perform their professional duties as outside accountants and auditors to SFC. Defendants knew that SFC was operated as a fraudulent, Ponzi-like scheme and knowingly aided that scheme.

Aquino knew since 1998 that SFC falsely and misleadingly reported the default rates on the loans it securitized and sold, and that it did so to deceive its creditors. Despite this knowledge, over the next four years, until approximately April 2002, Aquino continued to represent SFC, all the while collecting substantial fees through maintaining his relationship with the mastermind of the fraud scheme, Andrew N. Yao ("Yao"). Aquino joined McGladrey in 2000, and in 2001 Defendants issued two sets of knowingly false financial reports that were essential to the success of the scheme: the 2001 Auditor's Report and the 2001 Accountant's Report. Both reports were issued with Defendants' knowledge of Yao's SFC fraud. Both reports contained knowingly false representations made by Defendants. Both reports also ratified knowingly false and misleading statements about SFC's loan default rates. Most importantly, without the McGladrey-issued reports, SFC could neither have appeared to the outside world as a legitimate business, nor continued to stay in business, harming all of SFC's creditors.

Defendants seek to dismiss the complaint on the grounds that the Trustee is prohibited by law, under *in pari delecto* and standing doctrines, from bringing this action, and on the grounds that the McGladrey reports disclosed the fraud. None of Defendants' arguments have merit, particularly at this stage in the litigation, where all factual allegations are deemed true and where all inferences favor the Trustee. First, Defendants' *in pari delicto* arguments ignore that, at this stage of the proceeding, resolution of such a fact-specific affirmative defense is, at best, premature. Defendants also misstate or ignore recent Third Circuit *in pari delecto* law acknowledging the ability of a trustee to bring claims such as those at issue here where the fraudfeasor will not benefit. Second, the law is likewise clear that the

584277v1

1

Trustee has standing to bring claims, as he does here, on behalf of all creditors. Finally, the McGladrey reports did not, as Defendants claim, disclose SFC's misconduct; to the contrary, the reports were essential to perpetuating the fraud. Defendants claim that because the single word "forbearance"—SFC insider's code word for their secret loan default-masking payments—appeared in the 2001 Audit Report, Defendants disclosed the SFC insider's practice of making loan payments to mask soaring loan default rates. The opposite is true: Defendants' use in the 2001 Audit Report of the SFC insiders' code word for payments made to mask student defaults showed both Defendants' awareness of this impropriety and Defendants' desire to mask and obscure discovery thereof. At a minimum, and in any event, none of these factual arguments can be resolved at this time, on a motion to dismiss, and before any discovery.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits dismissal only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 240 (3d Cir. 2004).  The Court must accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff.  *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

## STATEMENT OF FACTS[1]

### A.  The SFC Scheme

SFC ostensibly was in the student loan business. (Compl. ¶ 2.) SFC would purchase or generate student loans, predominately for trucking schools, and bundle and sell pools of loans to investors. (*Id.* ¶¶ 16-18.) For loans SFC generated, SFC would first fund the loan—that is, pay the student's tuition at the school—holding some portion of the funding in reserve and pay the school the remainder subsequent to the student's completing the related educational program. SFC would then purchase credit insurance for the loan and bundle and sell the loans in securitized transactions to investors. (*Id.* ¶ 21.) Once the loans were sold, the borrowers' loan payments were made to SFC's loan servicing entity, which in turn was to forward the loan payments on to the investors who purchased the loan pools. (*Id.* ¶ 24.)

In reality, SFC, as run and managed by Yao, was little more than a loan mill that moved money from the sales of later loan pools to make loan payments on behalf of defaulting students in earlier loan pools. (*Id.* ¶¶ 25, 30.) Many of the underlying loans SFC was selling were fraudulent, that is, there was no credit-worthy borrower associated with the underlying "loan." Once a pool was sold, when the borrower defaulted, SFC was to report the default to the insurer and the insurer was to pay on defaulted loans above a certain percentage of loan defaults. Instead, when a loan defaulted, SFC would make the payment to the purchaser of the loan pool, even though SFC had no obligation to do so. (*Id.*) SFC would then report the loan as current to the purchaser of the loan pool and in the financial reporting on the loan pool. (*See Id.* ¶¶ 58-61; 76-77.) The insurer received no notice of the defaulted loan, from SFC or anyone else. By so doing, SFC artificially suppressed the loan default rate in the loan pools. (*Id.* ¶¶ 52-56.) In turn, SFC then used the false default rate to lure creditors to issue more credit—including particularly credit insurance on the student loans—to the SFC program. (*Id.* ¶ 4.) The continued credit allowed SFC to securitize and sell more student loans, which in turn, provided more money to make

---

[1] The following statement of facts summarizes the facts in the Trustee's Complaint. The entire Complaint is hereby incorporated by reference.

584277v1

default masking payments on the defaulted loans. (*Id.* ¶¶ 4,6.) SFC insiders' code words for the payments SFC made to mask the student defaults were "forbearance payments." (*Id.* ¶ 3.)

**B.    Aquino's and McGladrey's Knowledge of the Fraudulent Scheme**

In addition to the evidence in McGladrey's reports themselves reflecting Defendants' knowledge of SFC's fraudulent scheme, as early as 1998 Aquino knew about the manipulation and masking of defaults in SFC loan pools and the necessity of deceptive financial reports in sustaining the fraud. (*Id.* ¶¶ 51-56.) Aquino began acting as SFC's independent accountant in 1998 and represented SFC continuously through several firms until 2001. (*Id.* ¶ 51.) Aquino became a partner with defendant McGladrey no later than 2000. (*Id.*) Since at least 1998, Aquino knew that SFC made secret payments to both cover student defaults and to avoid notifying the student loan insurer that loans were defaulting. (*Id.* ¶¶ 52-56.) Specifically, an associate of Aquino's wrote in 1998 that:

> [SFC] has made a payment on behalf of two of the students tested in 1996. The effect of this is that the certificate holders receive a better yield than they would have, had the loan defaulted and the claim been filed. Also the insurance company does not have to pay on a claim at that time. **Another effect of the practice is that it distorts the delinquency and default ratios of the pool.**

(*Id.* ¶ 53 (emphasis added).) This statement succinctly summarizes SFC's deceptive practices, yet was never disclosed to any SFC creditor by Aquino or McGladrey.

**C.    McGladrey's False and Misleading Reports**

SFC issued, sought insurance for, sold, and serviced hundreds of millions of dollars of student loans. As such, it needed seemingly legitimate financial reports to legitimize SFC's business and ensure that creditors would continue to loan SFC money and insure the student loans. (*Id.* ¶¶ 4,6.) SFC relied on Defendants for these reports because Defendants were aware of the fraudulent loan scheme and ensured the fraud would not be disclosed. (*Id.* ¶¶ 4-6.)

**1.    McGladrey's Knowingly False 2001 Audit Report**

On April 6, 2001, McGladrey issued its 2001 Independent Auditor's Report ("2001 Audit Report") that provided McGladrey's "opinion" that SFC's financial statements and notes "present[ed] fairly, in all material respects" SFC's financial position. (*Id.* ¶57.) In fact, as Aquino's team noted three

years earlier, Aquino knew that SFC's financial statements incorporated "distorted" pool "delinquency and default ratios." (*Id.* ¶53.) McGladrey knew of the falsity of its statement that the financial statements were "materially" accurate. (*Id.* ¶ 57.)

While only SFC insiders knew and understood the term "forbearance" to mean payments made by SFC to mask student defaults, McGladrey adopted the term in the 2001 Audit Report. (*Id.* ¶¶ 62.) While amongst SFC and Defendants "forbearance" meant payments made by SFC to purchasers of student loans *in lieu* of payments made by the borrowers themselves, normally, in the student loan context, forbearance is a cessation of payments pursuant to an agreement between the lender and the borrower. (*Id.* ¶¶62-65.) McGladrey's use of the term "forbearance" in the 2001 Audit Report bears no relationship to its commonly understood meaning, even by the most astute reader, and nowhere in the notes to 2001 financial statements is the term explained.[2] (*Id.* ¶¶ 62-70.)

"Forbearance" appears in three places in the 2001 Audit Report but is never explained. The only attempt to define the term "forbearance" was in the notes on school reserves:

> The school reserve may include additional amounts designated to absorb forbearance made in accordance with school borrower agreements and potential credit losses for sold loans based upon the deemed credit quality of the borrower.

(*Id.* ¶ 68; *see also* McGladrey Br. at 7.) This statement is misleading and false, as Defendants knew at the time they issued the 2001 Audit Report. (Compl. ¶¶ 67-68.) First, the "school reserve" refers to funds that SFC owes the schools the borrowers were supposedly attending. While there was some relationship between loan funds that SFC owed the schools and loan payments SFC was making to purchasers of the student loans on behalf of defaulting borrowers, the "forbearance" payments made by SFC far exceeded any school "reserves." Second, the "forbearance" payments that SFC made on behalf of defaulting borrowers to mask the defaults were not "made in accordance with school borrower agreements." (*See Id.* ¶¶ 3,64.) These payments were made to disguise and perpetuate SFC's massive fraud. (*Id.*) This was not a case of Defendants simply failing to do an adequate job as professionals.

---

[2] The use of the term "forbearance" allowed Defendants to assist SFC in its fraud while simultaneously allowing Defendants to retroactively argue, as they do now, that SFC's practice of making payments to mask student defaults was "disclosed" in Defendants' 2001 Audit Report. (*See* McGladrey's Br. at 7-8.)

584277v1

Defendants knew that these statements were false and yet issued the 2001 Audit Report certifying the statements and, in the process, advancing the SFC fraud.[3] (*See Id.* ¶¶ 52-56.)

In addition to the misleading use of "forbearance," the 2001 Audit Report also provided false and misleading information on the predicted performance of SFC's loan pools. (*Id.* ¶¶ 58-61.) The 2001 Audit Report disclosed a 10% "Allowance for Credit Losses" for loan pools SFC currently had available for sale, "based upon . . . the historical credit loss experience" of previous SFC loans. (*Id.* ¶ 59.) This statement translates into an anticipated 10% default rate for the loans SFC had available for sale, allegedly based on the previous performance of SFC loan pools. (*Id.*) In fact, default rates were much higher and now over 80% are in default. Defendants knew this number was material to anyone reading the 2001 Audit Report and Defendants knew the number was materially inaccurate and false. (*Id.* ¶¶ 60-61.) As discussed, Aquino knew since 1998 that SFC was making payments to mask student defaults. (*Id.* ¶¶ 52-56.) As such, the 10% predicted default rate was woefully low and "distorted," to use Defendants' term. (*Id.* ¶ 53.) Likewise, Defendants knew that the "historical credit loss performance" was likewise "distorted" by SFC's fraud. (*Id.* ¶ 59.) Again, despite knowledge of these knowingly false and materially misleading statements, Defendants endorsed SFC's financial statements and, in the process, knowingly assisted and participated in the scheme.

### 2. McGladrey's Knowingly False 2001 Accountants' Report

As part of SFC's reporting requirements under various agreements, SFC issued Monthly Servicer Reports ("MSRs") that were to reflect, among other things, current and accurate default rates of loans SFC was servicing. (*Id.* ¶ 76.) Defendants were engaged to issue the 2001 Accountants' Report, verifying the accuracy of the MSRs. (*Id.*) Like Defendants' 2001 Audit Report, the MSRs also contained the "distorted" default rate for the SFC loans, that is, the default rates listed in the MSRs reflected SFC's secret payments on defaulted loans to mask the defaults. (*Id.* ¶¶ 76-77.) Defendants knew this was SFC's practice. (*Id.* ¶ 77.) Nonetheless, Defendants did not disclose that the MSRs were materially misleading in the 2001 Accountants' Report. (*Id.*) Defendants were obligated to do so by the AICPA standards

---

[3] The two other misleading references to forbearance are discussed in Complaint paragraphs 62-70.

584277v1

under which Defendants claimed to be issuing the 2001 Accountants' Report. (*Id.*)  Defendants falsely claimed the 2001 Accountants' Report complied with AICPA standards when they knew it did not. (*Id.*) This was not simply professional malpractice.  Defendants did not accidentally, despite due diligence, fail to determine that SFC was a fraud scheme.  Defendants knew that SFC was a fraud scheme and purposely and knowingly committed fraud themselves, and assisted SFC in its fraud, by issuing the 2001 Accountants' Report.

## SUMMARY OF ARGUMENT

Defendants' motion to dismiss relies on several mistaken facts. First, Defendants urge this Court to assume that an equitable defense—the *in pari delicto* doctrine—will ultimately bar the claims of the innocent Trustee against those participating in and assisting SFC's massive fraud scheme. As set forth below, such an equitable defense should not properly be considered in the context of a motion to dismiss, and cannot in any event serve as a basis to arrive at the dramatically inequitable, and frankly absurd, result that Defendants assert.

Second, Defendants challenge the Trustee's standing to assert the claims in the Complaint, principally by trying to recast those claims as garden variety accounting malpractice claims. Defendants no doubt wish that this case was simply an accounting malpractice case. However, as made clear in the Complaint, Defendants' wrongful conduct is significantly more purposeful and serious than a mere malpractice claim. Defendants' attempt to rely on principles of accounting malpractice law in support of their motion to dismiss is misplaced and unavailing, where, as here, the Trustee has pled counts based on fraud.

Finally, McGladrey wrongly asserts that various of the Trustee's specific claims in the Complaint are legally or factually deficient. As set forth below, all of those claims—just as all of the other claims in the Trustee's complaint—are properly and adequately plead, and are supported by the detailed factual allegations in the Complaint.

## ARGUMENT

## I.    *IN PARI DELICTO* IS NOT A BASIS TO DISMISS THE TRUSTEE'S COMPLAINT

The defense of *in pari delicto* "is an affirmative equitable defense and generally dependent on the facts, and so often not an appropriate basis for dismissal." *Baker O'Neal Holdings v. Ernst & Young,* No. 1:03-CV-0132-DFH, 2004 WL 771230, *9 (S.D. Ind. Mar. 24, 2004) (citing *Knauer v. Jonathan Roberts Financial Group, Inc.,* 348 F.3d 230, 237 n. 6 (7th Cir. 2003)). Because the application of *in pari delicto* is so fact-specific, it is inappropriate to consider its application to a factually complex case such as this one prior to discovery.

The proposed application of the equitable defense of *in pari delicto* as urged by Defendants in this case would also result in a dramatically inequitable result. Through the device of *in pari delicto,* Defendants seek to insulate themselves from liability for their own serious wrongdoing in this massive fraud scheme simply by alleging that their co-conspirator and client in that venture was the debtor. As the *Baker O'Neal Holdings* court aptly noted in rejecting *in pari delicto* as a basis for dismissing a company's complaint against its former auditors:

> The risk of a liberal application of *in pari delicto* is that tortfeasors preparing to defraud an entity could potentially immunize themselves from liability simply by enlisting the help of an executive in the victim-corporation....Outside of a fraudulent conveyance scenario, the best case for **not** applying the *in pari delicto* defense is where the insider and the third party tortfeasor were essentially acting as co-conspirators.

*Id.* at *10 (emphasis in original). Indeed, under the rationale of *Baker O'Neal Holdings,* the instant case presents the "best case for **not** applying the *in pari delicto* defense," since the Complaint alleges that Defendants acted as co-conspirators with the debtor in the perpetration of its massive fraud scheme.

Equitable defenses, such as *in pari delicto,* cannot be applied to produce inequitable results. As the Pennsylvania Supreme Court noted in *Universal Builders, Inc. v. Moon Motor Lodge, Inc.,* 244 A.2d 10, 14 (Pa. 1968) in discussing the equitable defense of unclean hands: "[w]here the rights of innocent parties are involved, the doctrine should be applied cautiously...and the doctrine should not be invoked if its application will produce an inequitable result." Rather, through the exercise of the court's inherent equitable discretion, the scope and effect of an equitable defense may be tailored to reflect the facts and

584277v1

circumstances of a particular case and to avoid an inequitable result. *Grand Lodge of Del. v. Odd Fellows Cemetery of Milford,* No. 1461-K, 2002 Del. Ch. LEXIS 136, \*35 (Del. Ch. Nov. 18, 2002).[4]

For all of these reasons, and as set forth more fully below, the affirmative equitable defense of *in pari delicto* does not apply to the facts of this case, and in any event provides no basis for the requested dismissal of the Trustee's complaint.

## A.    The Court Should Not Consider *In Pari Delicto* in the Context of a Motion to Dismiss

As a threshold matter, the Court should refuse to consider any of Defendants' arguments concerning *in pari delicto* in the context of a motion to dismiss. Because *in pari delicto* is an affirmative defense that is generally dependent on the facts of the particular case, it is not often an appropriate basis for dismissal. *See, e.g., Baker O'Neal Holdings, Inc.,* 2004 WL 771230 at \*9. Indeed, the dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6) is appropriate only when "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ford v. Schering-Plough Corp.,* 145 F.3d 601, 604 (3d Cir. 1998). When considering a 12(b)(6) Motion, the Court must accept as true all allegations in the pleading and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff. *See, e.g., In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1420 (3d Cir. 1997). In addition, "a plaintiff is not required to plead in the complaint all requirements for a claim as well as contemplate and plead in anticipation of all affirmative defenses that may lie against such claim." *In re Exide Technologies, Inc.,* 299 B.R. 732, 752 (Bankr. D. Del. 2003).

In this case, the Trustee has made ample allegations in the Complaint that support a finding that Defendants were "insiders" of the debtor. (*See* Compl. ¶¶ 51-56, 71-75.) For purposes of ruling on Defendants' motion to dismiss, the Court is constrained to accept those allegations, like all of the other allegations in the Complaint, as true. As "insiders" of the debtor, Defendants are not entitled to the

---

[4] While Defendants cite to Pennsylvania law in their brief, the Trustee does not concede that Pennsylvania law applies to the multi-state fraud perpetrated by SFC and Defendants. However, since in most cases Pennsylvania law is not in conflict with Delaware law—the law of the state with the most compelling interest in SFC's multi-state fraud run out of Delaware—the Trustee will cite to both Pennsylvania and Delaware law as applicable.

584277v1

11

protections of an *in pari delicto* defense in any event. *See, e.g. In re Granite Partners, L.P.*, 194 B.R. 318, 332 (Bankr. S.D.N.Y. 1996) (*in pari delicto* bars claims against third parties, but does not apply to corporate insiders or partners). Therefore, in ruling on Defendants' motion to dismiss, the Court should not consider Defendants' *in pari delicto* arguments at all, since the allegations in the Complaint establish that Defendants were insiders of the debtor who, for that reason, cannot legally assert the protection of that affirmative defense now or at any stage of this action.

Moreover, the Court should also refuse to consider Defendants' *in pari delicto* arguments at this early stage of the case and prior to the initiation of any discovery, since the application of this equitable doctrine is discretionary under Delaware and Pennsylvania law, and since its applicability to this case will ultimately depend on the facts that are developed through discovery. *Feld and Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick and Cabot*, 458 A.2d 545, 552 (Pa. Super. 1983) (avoiding use of doctrine where case does not easily lend itself to its use); *Brennan v. Reed Smith, Shaw & McClay*, 450 A.2d 740 (Pa. Super. 1982) (allowing malpractice action against attorney to proceed where client guilty of securities fraud). *See also Universal Builders, Inc.*, 244 A.2d at 14 (application of equitable defense is discretionary); *Grand Lodge of Del.*, 2002 Del. Ch. LEXIS 136, *35 (scope and effect of an equitable defense may be tailored to avoid an unjust result).

### B.    The Trustee's Claims Are Not Barred by the *In Pari Delicto* Doctrine

Even if the Court were inclined to consider the Defendants' *in pari delicto* arguments at this stage of the case, their contention that the Trustee's claims are barred by that affirmative defense is wrong. First, that affirmative defense does not apply to claims brought under section 544 of title 11 of the United States Code (the "Bankruptcy Code"), such as the claims against Defendants. Second, *in pari delicto* should not act as a bar in any event to claims asserted by the innocent Trustee, as opposed to the fraudfeasor debtor. Third, *in pari delicto* is unavailable to insiders of the debtor, such as Defendants. Fourth, under the undisputed facts of this case, there would be no legal or public policy justification for the Court to exercise its discretion to permit Defendants to interpose that affirmative defense.

1. ***In Pari Delicto* is inapplicable to claims under Section 544 of the Bankruptcy Code**

Defendants' various *in pari delicto* arguments all rely upon the Third Circuit's decision in *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir. 2001). However, the Third Circuit has explicitly limited its holding in *Lafferty* to cases in which the trustee is acting under section 541 of the Bankruptcy Code. *McNamara v. PFS (In re The Personal and Business Insurance Agency)*, 334 F.3d 239, 246 (3d Cir. 2003) (the holding in *Lafferty* does not extend to actions brought under Bankruptcy Code sections other than section 541). In pursuing actions to recover property for the general benefit of all creditors of the estate, the Trustee is not limited to acting under section 541 of the Bankruptcy Code. Rather, the Trustee has the authority to prosecute general claims of the debtor's creditors (claims that are common to all creditors, as opposed to claims that accrue only to an individual creditor or group of creditors) under section 544 of the Bankruptcy Code. *See, e.g., PHP Liquidating, LLC v. Robbins*, 291 B.R. 603, 609 (D. Del. 2003); *see also Zilkha Energy Company v. Leighton*, 920 F.2d 1520, 1523 (10th Cir. 1990); *In re Porter McLeod, Inc.*, 231 B.R. 786, 792 (D. Col. 1999).

The Complaint makes clear that the Trustee is bringing these claims against the Defendants under section 544 of the Bankruptcy Code "on behalf of, and for the benefit of, SFC's creditors." (Compl. ¶ 8.) Consequently, neither the holding in *Lafferty* nor the *in pari delicto* defense are applicable to the Trustee's claims asserted under section 544.

2. ***In Pari Delicto* is inapplicable to claims by the innocent Trustee**

In relying solely on *Lafferty*, Defendants completely fail to acknowledge other recent decisions, both by that same court and by other courts within the Third Circuit, which refuse to apply *in pari delicto* or similar equitable defenses in cases where an action is being prosecuted by an innocent plaintiff for the benefit of a corporation's innocent creditors.

In *McNamara* (decided two years **after** *Lafferty*), the Third Circuit described the equitable arguments in support of **not** applying the *in pari delicto* defense to bar a claim brought by a bankruptcy trustee as the innocent successor to the claims of a fraudfeasor debtor, stating that:

> A number of courts have applied these arguments in concluding that the defense of *in pari delicto* should not be applied when a bad actor has been removed and the defense is serving only to bar the claims of an innocent successor....Likewise, in *Scholes v. Lehmann,* 56 F.3d 750, 754 (7th Cir. 1955), the Court noted that 'the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated.' Similar equitable considerations apply here as the bad actor, [former officer of the debtor], has been eliminated and the Trustee comes to us with clean hands, representing the interests of innocent creditors.

334 F.3d at 246.

In support of its conclusions in *In re McNamara*, the Third Circuit noted with approval and quoted extensively from *In re Jack Greenberg,* 240 B.R. 486 (Bankr. E.D. Pa. 1997), in which the bankruptcy court refused to apply an equitable defense to bar the bankruptcy trustee's action against the debtor's former accountants, observing that:

> The refusal of Pennsylvania's highest court in *Universal Builders* to allow the invocation of the equitable defense of unclean hands against a bankruptcy trustee when its application would produce an inequitable result (*i.e.*, application of the defense would result in harm to innocent third parties) convinces me that there are circumstances when the trustee's position as plaintiff is different from that of the corporation, even when bringing the corporation's claim. Accordingly, while the true and oft stated maxim that a trustee standing in the shoes of the corporation takes no greater rights than the debtor is certainly the beginning of my analysis, my inquiry does not end there. I perceive that under Pennsylvania law equitable defenses such as the doctrine of imputation that may be sustainable against the corporation may fail to act as a total bar to recovery when the beneficiaries of the action are the corporation's innocent creditors....

*Id.* at 505-06.

Likewise, in *Marion v. TDI, Inc., et al.,* No. 02-7032, 2004 U.S. Dist. LEXIS 9754 (E.D. Pa. May 27, 2004), the court refused to apply *in pari delicto* to bar the claims of a plaintiff-receiver who was bringing an action against various defendants as an innocent successor-in-interest to certain corporate entities that had been at the heart of a multi-billion dollar Ponzi scheme. In reaching its decision, the *Marion* court cited the *Lafferty* decision, but went on to base its conclusion that *in pari delicto* should not be applied upon the Third Circuit's rationale from *McNamara* that "the defense of *in pari delicto* 'loses its sting' when the bad actor is eliminated." *Id.* at *10.

584277v1

Thus while Defendants focus solely on *Lafferty*, the Third Circuit recognizes that *in pari delicto* is an equitable defense which should not be applied to reach an inequitable result, as would be the case here if this Court accepted Defendants' position.

### 3.   *In Pari Delicto* is inapplicable because Defendants are insiders

Corporate insiders may not avail themselves of the equitable defense of *in pari delicto* because "otherwise, a trustee could never sue the debtor's insiders on account of their own wrongdoing." *In re Granite Partners,* 194 B.R. at 332.  The allegations in the Complaint describe both the longstanding and close relationship between Aquino, McGladrey and Yao, as well as the extent of Defendants' efforts to scheme with the debtor to try and hide the fraudulent scheme from discovery by the outside world. (*See* Compl. ¶¶ 51-78.)  Based upon those allegations, the Complaint amply establishes that the Defendants should be considered insiders of SFC, and thus not entitled to assert the equitable defense of *in pari delicto* in any event.

The enumerated list of persons and entities identified as  "insiders" in section 101(31) of the Bankruptcy Code is not exclusive.  Moreover, under the undisputed facts of this case, it is clear that McGladrey and Aquino were "insiders" of SFC.  As alleged and reasonably inferred, their status as insiders derives, *inter alia*, from their pervasive involvement with SFC's business and the instrumental role they played in SFC's financing scheme.

Aquino's involvement with SFC and its principal, Andrew Yao, dates back to at least 1998, when Aquino was retained to perform audit and accounting services for SFC. (Compl. ¶ 51.)  While Aquino changed employers several times during the period from 1998 through 2001, he consistently provided audit and accounting services to SFC throughout that period.  (*Id.*)  During 1998, in connection with furnishing those services to SFC, Aquino reviewed various loan servicer reports that were prepared by SFC for distribution to SFC's creditors. (Compl. ¶ 52.)  In connection with that review, on May 22, 1998, Aquino's associate Jeff Westad sent a report to SFC that shows conclusively that Aquino already knew (i) that SFC was making concealed loan payments on behalf of student/borrowers; and (ii) that such payments distorted the true delinquency and default rates of SFC's student loan pools. (Compl. ¶ 53.)  As

584277v1

15

the Complaint goes on to describe in great detail, the events that followed the release of that May 22, 1998 memo reflect that Aquino was actively involved for several years in working with SFC to conceal the true state of its financial affairs from its creditors and from the potential new investors that were the lifeblood of the Ponzi scheme that swirled around SFC. (Compl. ¶¶ 54-78.)

The facts in the Complaint, which must be accepted as true for the purposes of ruling on the Defendants' motion, amply establish that the relationship between Defendants and SFC was far from a typical, arm's-length relationship between an accountant and client. Instead, the relationship was close enough that Aquino was apparently willing to trade off his responsibilities as an auditor—which would have required him either to force SFC to disclose the true state of its financial affairs or to resign the representation—to benefit a long-time client from which he and his various employers had reaped millions in fees, and no doubt hoped to continue to do so. Thus, the facts in the Complaint compel the conclusion that Defendants are "insiders" of SFC who are, therefore, unable to assert the defense of *in pari delicto* in this action.

An insider "is one who has such a relationship with the debtor that their dealings with one another cannot be characterized as an arms-length transaction." *In re Montantino,* 15 B.R. 307, 310 (Bankr. D. N.J. 1981). The Bankruptcy Code's definition of "insider" is flexible, and insider status must be determined on a case by case basis. *In re UVAS Farming Corp.,* 89 B.R. 889, 892 (D. N.M. 1988). The determination of a party's insider status does not require a finding that the party actually controlled the debtor. *In re Three Flint Hill Ltd. Partnership,* 213 B.R. 292, 300 (D. Md. 1997). Rather, a court need only find that "given the relationship and conduct of the parties, the relevant transaction or arrangement was entered into based on that relationship rather than an independent purpose or motivation." *Id.* Finally, insider status may be based upon a professional or business relationship with the debtor, where the court finds that the conduct in question was the result of the affinity of the relationship between the parties, rather than their course of business dealings. *Id.* at 300-01.

The allegations in the Complaint establish that the relationship between Aquino and McGladrey on the one hand, and SFC on the other, was not simply an arm's-length professional relationship. Indeed

they demonstrate that Aquino and McGladrey were willing to compromise their duties and responsibilities as outside auditors to advance the interests of a client who had generated millions in professional service fees for the firm. That relationship fairly qualifies Aquino and McGladrey as "insiders," who are not entitled to assert the defense of *in pari delicto* in this action.

Moreover, in the context of a motion to dismiss, as discussed *supra*, it is clear that the Trustee should at least be entitled to discovery to determine the full extent of the relationship that Aquino and McGladrey had with SFC, to prove their status as insiders.

### 4.    The defense would not be applicable as of commencement of the case

Further, even if Defendants were not insiders, they provide no analysis concerning whether, **as of the commencement date**, the *in pari delicto* defense would be applicable in this case. In that important regard, *Lafferty* is clearly distinguishable from the present matter. In *Lafferty*, the creditors committee brought claims on behalf of a debtor alleging that the debtor's accountants had fraudulently induced the corporations to issue debt securities in the engineering of a Ponzi scheme. The debtor's accountants asserted that the committee's claims were barred by the doctrine of *in pari delicto*. In response, the committee's sole argument was that certain **post-petition** events (the removal of management and its status as innocent successor), made the application of the defense untenable as against public policy. *Lafferty*, 267 F.3d at 355. The Court disagreed, reasoning that the extent of the available defenses must be evaluated as of the petition date. Because section 541 of the Bankruptcy Code requires evaluation of defenses as of the petition date, the Court reasoned that it could not look at events that occurred after the petition date. 267 F.3d at 356.

There is a critical distinction between *Lafferty* and this case in that, unlike the debtor in *Lafferty*, the Trustee has alleged that SFC was **already insolvent as of the commencement date**. Thus, under either Pennsylvania or Delaware law,[5] the Trustee was acting **not for itself but for the benefit of SFC's creditors as of the commencement date**. *See Blatstein v. Blatstein*, No. Civ. A 98-5947, 1999 WL

---

[5] *In pari delicto* is an equitable defense; and the question of whether it can be raised is a matter of state, rather than federa,l law. *See O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 84-85 (1994).

424296 (E.D. Pa. June 23, 1999) (directors of insolvent Pennsylvania corporation hold their powers in trust for corporation's creditors); *In re Insulfoams*, 184 B.R. 694, 704 (Bankr. W.D. Pa. 1995); *Sicardi v. Keystone Oil Co.*, 24 A. 163 (Pa. 1892); 3A FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 1035.60 (1998); *see also Production Resources Group, LLC v. NCT Group, Inc.,* 863 A.2d 772, 798 (Del. Ch. 2004) (directors of an insolvent Delaware corporation take on a fiduciary relationship to the company's creditors). Application of the *in pari delicto* defense in the present matter, **as of the commencement date**, would harm creditors. Accordingly, the defense is not available to Defendants, as application of the defense would frustrate the public policy in favor of compensating creditors and punishing wrongdoers. *See Universal Builders*, 244 A.2d at 14; *Lyons v. Benney*, 79 A. 250, 251 (Pa. 1911); *see also In re Francis Edward McGillick Foundation*, 594 A.2d 322 (Pa. Super. 1991), *rev'd in part on other grounds*, 642 A.2d 467 (1994); *Peyton v. Margiotti*, 156 A.2d 865, 868 (Pa. 1959). *Accord Lyons*, 79 A. at 251 ("when an act has been done in fraud of the rights of the creditors of the insolvent corporation the receiver may sue for their benefit, even though the defense set up might be valid as against the corporation itself"). Applying the defense now would free Defendants from any obligation to compensate SFC creditors who were harmed by Defendants' own actions.

## II.    THE TRUSTEE HAS STANDING TO ASSERT THE CLAIMS IN THE COMPLAINT

Just as Defendants' arguments regarding *in pari delicto* all rely on a single case—*Lafferty*—so does their argument that the Trustee lacks standing to assert the claims in the Complaint. In particular, Defendants rest their entire argument as to the Trustee's alleged lack of standing on the 1972 decision of the United States Supreme Court in *Caplin v. Marine Midland Grace Trust Co. of New York,* 406 U.S. 416 (1972). However, just as they do with respect to their *in pari delicto* argument, Defendants ignore more recent cases from the Third Circuit and elsewhere that confirm the Trustee's standing to bring the claims in the Complaint.

### A.    The Trustee May Assert General Causes of Actions for the Benefit of All Creditors

Defendants assert that the Trustee lacks standing to assert general claims on behalf of all creditors. However, the only authorities cited for this proposition are readily distinguishable cases

584277v1

holding that a trustee may not assert a claim that belongs to a **specific** creditor. None of the cases cited by Defendants holds that a trustee does not have standing to assert a **general** claim for the benefit of **all** creditors, which is the situation here.

Contrary to Defendants' unsupported assertions, case law from this Court establishes the Trustee's standing to assert claims stemming from harm suffered by all creditors, like those in the Complaint. *PHP Liquidating, LLC v. Robbins*, 291 B.R. 603, 609 (D. Del. 2003) (adopting the reasoning of the Seventh Circuit in *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339 (7th Cir. 1987), cert. denied, 485 U.S. 906 (1988)).

### B.    The Trustee has All of the Rights and Powers of A Creditor Under Section 544 of the Bankruptcy Code

The Defendants' section 544 standing argument is a red herring; the Trustee does not dispute that he lacks standing to bring an action on behalf of an **individual** creditor with a particularized injury.[6] Indeed, Royal Indemnity Company, one of SFC's creditors, also has alleged such particularized injury in a filed action. By contrast, however—and consistent with the facts of this case—where Defendants' actions also effectively injured all creditors, a trustee may bring a claim based on that injury. *See Pereira v. Cogan, Sherman, et al.*, No. 00 Civ. 619 (RWS), 2001 U.S. LEXIS 246, *351 (S.D.N.Y. Mar. 8, 2001); *PHP Liquidating, LLC v. Robbins*, 291 B.R. at 609 (holding section 544 of the Bankruptcy Code allows trustee to pursue general claims); *Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d 130, 132-33 (2d Cir. 1993*)* (applying Texas law and holding, in context of alter ego claim, that trustee has exclusive standing where alleged acts "harmed all creditors equally, [and] such claims are property of the bankruptcy estate and are not ascertainable by individual creditors"); *Wooten v. Loshbough*, 951 F.2d 768, 770 (7th Cir. 1991) (trustee had exclusive standing to assert RICO claim against bankrupt corporation looted by officers and third-party accounting firm for personal gain); *St. Paul Fire and Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688, 696-99 (2d Cir. 1989) (analyzing appellate decisions regarding trustee's

---

[6] Defendants cite cases that merely state the undisputed proposition that a trustee cannot assert specific claims belonging to specific creditors. *See Hirsch v. Arthur Anderson & Co.*, 72 F.3d 1085, 1089 (2d Cir. 1995); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991).

standing on alter ego claims and holding claims could be asserted exclusively by trustee under Ohio law due to generalized nature of injury); *In re Mortgage America Corp.,* 714 F.2d 1266, 1275 (5th Cir. 1983) (trustee, not bank creditor, had standing to assert claim for fiduciary's fraudulent transfers).

In the present matter, the Trustee asserts claims that could have been asserted by any of SFC's creditors, which means they are general claims. *See PHP Liquidating,* 291 B.R. at 610 (a general claim belongs to the trustee).[7] For example, the Trustee asserts that McGladrey and Aquino aided and abetted SFC in the breach of its fiduciary duty to its creditors. When a corporation operates in the zone of insolvency, it owes a fiduciary duty to all creditors. *In re Main, Inc.,* 1999 WL 424296 (E.D. Pa. 1999); *Committee of Unsecured Creditors of Specialty Plastic v. Doemling,* 113 B.R. 915 (Bankr. W.D. Pa. 1990); *In re Insulfoams, Inc.,* 184 B.R. at 704. *See also* 3A FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 1035.60 (1998). SFC became insolvent no later than September 2001, and hence thereafter clearly owed a fiduciary duty to all of its creditors. (Compl. ¶¶ 99-105, 127, 250) While operating in the zone of insolvency, SFC breached its fiduciary duty to creditors and McGladrey and Aquino assisted with respect to that breach. (*Id.* ¶¶ 249-259) Because the injuries flowing from Defendants' misconduct affected all creditors of SFC, and thus, all creditors could seek redress for the misconduct, the Trustee may do so on their collective behalf. *See, e.g., Pereira,* 2001 U.S. LEXIS at *351; *In re Ben Franklin,* No. 97C7934, 2000 U.S. Dist. LEXIS 276, *21 (N.D. Ill. Jan. 12, 2000); *Insulfoams,* 184 B.R. at 703.

Arguments similar to those made by Defendants here were raised and rejected in favor of a trustee's broad authority to pursue claims consistent with section 544 of the Bankruptcy Code in *In re Porter McLeod,* 231 BR 786 (D. Colo. 1999). There, the trustee brought an action, pursuant to section 544 of the Bankruptcy Code, alleging that defendant law firms committed malpractice and aided and abetted a breach of fiduciary duty in their relationship with the debtor. As in this case, the law firm

---

[7]   *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416 (1972), cited by Defendants, which was decided under the Bankruptcy Act as opposed to the Bankruptcy Code, is inapposite, as it stands for the proposition that a trustee does not have standing to assert claims that are specific and personal to creditors. *Id.* at 434; *see Williams v. California 1st Bank,* 859 F.2d 664, 666 (9th Cir. 1988).

584277v1

20

defendants in *Porter McLeod* alleged that the trustee did not have standing to assert claims under section 544 of the Bankruptcy Code and that the trustee's authority to bring the claims was limited to section 541 of the Bankruptcy Code. However, the court disagreed, ruling specifically that through section 544 of the Bankruptcy Code Congress had crafted a legal fiction that allows the trustee to assume the guise of a creditor along with the creditor's ability to invoke any available state law remedies. *Id.* at 792 (citing *Zilkha Energy Co. v. Leighton, et al.*, 920 F.2d 1520, 1523 (10th Cir. 1990)). Accordingly, it is evident that a trustee may bring claims such as those asserted in the Complaint against defendants under either section 541 of the Bankruptcy Code or section 544(a) of the Bankruptcy Code. *Id.* at 792.

Relying on *dicta* from *Lafferty*,[8] Defendants contend that section 544 of the Bankruptcy Code does not provide an appropriate avenue to pursue the claims asserted in the Complaint and that section 544 of the Bankruptcy Code applies only to avoidance actions. This argument is flawed for several reasons. First, the Third Circuit has confirmed that *Lafferty's* holding is limited to matters brought under section 541 of the Bankruptcy Code. *See In re Personal and Business Ins. Agency*, 334 F.3d at 245. *Lafferty*, therefore, is inapplicable to actions brought under section 544 of the Bankruptcy Code, a code section not discussed in *Lafferty*, and renders the *in pari delicto* defense inapplicable to actions brought under section 544 of the Bankruptcy Code. *See Porter McLeod, supra*; *see also Kalb, supra*.

Second, McGladrey's contention is contrary to the plain language of section 544(a) of the Bankruptcy Code, which provides in pertinent part:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, **the rights and powers of**, …
>
> (1) **a creditor** that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

---

[8] Further, *Lafferty* is distinguishable, as the injury involved accrued not to the creditor but to the corporation itself. Because the injury was to the debtor corporation, the cause of action described in *Lafferty* clearly belonged to the estate. *Lafferty*, 267 F.3d 348. The discussion centered on who owned the claim, the debtor or its creditors. *Id.* Consistent with *Lafferty*, the Trustee seeks to assert general claims, which belong to the estate.

584277v1

> (2) **a creditor** that extends credit to the debtor at the time of the commencement
> of the case, and obtains, at such time and with respect to such credit, an execution against
> the debtor that is returned unsatisfied at such time, whether or not such a creditor exists;
> or …

11 U.S.C. § 544 (emphasis added.).  Thus, section 544 of the Bankruptcy Code is not limited solely to

avoidance actions as Defendants assert.  Rather, it also imbues trustees in bankruptcy with all of the

**rights and powers** of either:  (i) a hypothetical creditor a holding a judicial lien against the Debtor; or (ii)

a hypothetical creditor whose execution against the debtor has been returned unsatisfied.  *Porter McLeod*,

231 B.R. at 792.  Defendants' contrary reading would effectively require this Court to excise the phrase

"rights and powers" from section 544 of the Bankruptcy Code.  That result would be contrary to the

canons of statutory construction which require that each phrase within a statute be giving meaning.

*Branchburg Plaza Assocs., L.P. v. Fesq*, 153 F.3d 113, 115 (3d Cir. 1998).

Because the Bankruptcy Code does not define the phrase "rights and powers" as used in section

544 of the Bankruptcy Code, state law must provide its meaning and import.  Unless expressly provided

otherwise, the Bankruptcy Code is construed to adopt, rather than displace, state law.  *See O'Melveny &*

*Myers v. F.D.I.C.,* 512 U.S. 79, 85 (1994); *BFP v. RTC*, 511 U.S. 531, 544 (1994); *Integrated Solutions,*

*Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 491 (3d Cir. 1997); *Matter of Roach*, 824 F.2d

1370, 1374 (3d Cir. 1987).  Under section 544(a) of the Bankruptcy Code, therefore, a trustee assumes the

guise of a creditor with a judgment against the debtor and may invoke whatever remedies are provided by

state law to that creditor.  *See Zilkha,* 920 F.2d at 1523 (because, under state law, judgment lien creditors

had right to look to any "equitable interest" of judgment debtor for satisfaction of judgment, trustee could

enforce creditor's rights).  *See also Insulfoams*, 184 B.R. at 704 (trustee may assert breach of fiduciary

duty claims on behalf of creditors as provided by state law); 5 COLLIER ON BANKRUPTCY ¶ 544.02 (15th

ed. 2004).  Here, the rights and powers being exercised by the Trustee in bringing claims such as aiding

and abetting, deepening insolvency and negligent misrepresentation, are those which creditors could have

exercised consistent with the laws of Delaware and Pennsylvania, and are thus claims that can

appropriately be brought by the Trustee under section 544 of the Bankruptcy Code.

C.    **Section 544 of the Bankruptcy Code Applies to the Trustee's Claims in the Complaint**

McGladrey next tries unsuccessfully to argue that section 544 of the Bankruptcy Code cannot apply to tort claims. In support of that effort, McGladrey misconstrues and misapplies the holding of *In re Granite Partners, L.P.*, which merely provides that the trustee, pursuant to section 544 of the Bankruptcy Code, cannot pursue personal claims belonging to select creditors. *Id.* at 324. (section 544 of the Bankruptcy Code … does not permit the trustee to assert the personal, direct claims of creditors). In the matter at hand the Trustee is not asserting personal, direct claims belonging to specific creditors. Rather, he asserts general claims that all creditors could have asserted. It is these general creditor claims, whether or not founded in tort, that belong solely to the Trustee. *PHP Liquidating*, 291 B.R. at 610; *Pereira*, 2001 U.S. Dist. LEXIS at *37 (citing *St. Paul*, 884 F.2d at 701). Thus it is not surprising that Defendants are unable to cite to a single case which squarely supports their proposition that section 544 of the Bankruptcy Code "applies only to avoidance actions and does not grant the Trustee authority to bring tort claims on behalf creditors of SFC." (Def. Br. at 20-21).

Defendants' aiding and abetting the SFC scheme harmed all of SFC's creditors because, without Defendants' assistance, SFC could not have remained in business. The same is true of Defendants' aiding and abetting SFC's breach of the fiduciary duty to its creditors. Both claims give rise to general, non-specific claims that any SFC creditor has, by definition, because the damage caused by SFC's continuing business caused damage to all of SFC's creditors, and not just particular, identifiable creditors. *See Pereira,* 2001 U.S. Dist. LEXIS at *37; *Insulfoams*, 184 B.R. at 704.

III.    **THE TRUSTEE HAS STATED A CLAIM FOR FRAUD, AIDING AND ABETTING FRAUD AND FRAUDULENT CONCEALMENT**

The Trustee has specifically pled claims against Defendants for fraud, aiding and abetting fraud and fraudulent concealment. The Trustee has alleged that Defendants knew about SFC's fraudulent scheme since at least 1998; that Defendants made knowingly false material statements and deliberately concealed material information in the 2001 Audit Report and the 2001 Accountants' Report; that Defendants' intent was to mislead the creditors of SFC; and that the creditors of SFC relied on

584277v1

Defendants' misrepresentations and omissions and were injured by their reliance. The Trustee also has alleged that Defendants' offered substantial and knowing assistance to SFC and its officers and directors in defrauding the creditors of SFC.

Defendants challenge the trustee's fraud claims on three bases, none of which have merit.[9] First, Defendants wrongly claim they disclosed SFC's fraud in the 2001 Audit Report. As discussed *supra*, at pages 4 to 6, Defendants alleged "disclosures"—the oblique and misleading references to "forbearance" in the 2001 Audit Report—are one of the key elements of the Trustee's allegation that Defendants both knew of, and actively assisted, the SFC fraud.[10] "Forbearance" was SFC's insiders' term for secret, default-masking payments used to perpetuate the massive fraud. Defendants' knowledge of how SFC insiders used the term and Defendants' certification of the term in financials, without any truthful or coherent explanation of its meaning in the financials, is proof that Defendants, along with SFC, intended to deceive SFC's creditors. To those outside SFC's inner circle, "forbearance" in the student loan context had a completely different meaning. As used by Defendants and SFC in the 2001 Audit Report, "forbearance" was by definition misleading.

Second, Defendants allege that violations of generally accepted accounting practices ("GAAP") and generally accepted auditing standards ("GAAS"), while sufficient for a malpractice claim, are insufficient, without more, to establish fraud *scienter*. (Def. Br. at 24.) This argument is a red herring. As Defendants know, the Trustee has alleged far more than violations of GAAP and GAAS. The Trustee has alleged (allegations Defendants completely ignore in their brief) that Defendants knew that SFC was defrauding creditors since at least 1998, that Defendants knew how SFC defrauded creditors (through the masking of student defaults) and that Defendants, armed with such knowledge, participated in the SFC

---

[9] Defendants do not address the Trustees' aiding and abetting fraud claim.

[10] Defendants inappropriately reference the Trustee's **allegations** from a now-dismissed complaint against Royal regarding Defendants' "forbearance" references in the 2001 Audit Report. (Def. Br. at 5-6.) The Trustee did not rely in any way on that now-dismissed pleading in the instant Complaint and, as such, Defendants' references to such pleading should be ignored by the Court. *In re Rent-Way Securities Lit.*, 209 F. Supp. 2d 493, 498 (W.D. Pa. 2002) (court may consider factual allegations in documents other than complaint only where "plaintiffs' claims are based on those documents"). Further, the Trustee's allegations in a now-dismissed complaint where there was no discovery and no factual findings have no bearing here.

584277v1

scheme by certifying financial reporting that Defendants knew was false and misleading and by making

their own fraudulent representations. None of the cases cited by Defendants control here since each of

those cases involved alleged GAAP and/or GAAS violations and nothing more.[11] Where, as here, there

are specific allegations of knowledge of, and participation in, the actual fraud, fraud claims against

professionals are considered adequately pled:

> While it is true that a violation of GAAP will generally not be sufficient to establish
> fraud, when combined with other circumstances suggesting fraudulent intent, allegations
> of improper accounting may support a strong inference of scienter. Other circumstances
> suggesting fraudulent intent can include the presence of 'red flags' or warning signs that
> the financial reports are fraudulent *as well as the magnitude of the fraud*.

*In re Rent-Way Sec. Lit.*, 209 F. Supp. 2d 493, 511 (W.D. Pa. 2002) (citations omitted) (emphasis in

original); *see also P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 609-10 (D.

N.J. 2001). Here, the Trustee has alleged that Defendants knew the massive SFC fraud scheme that

resulted in hundreds of millions of dollars in losses to SFC's creditors and issued knowingly false and

misleading financial reports that intentionally obfuscated the "red flags" Defendants had known about

since 1998. Such allegations are more than sufficient to sustain the Trustee's fraud counts. *Id.*

Finally, Defendants claim that the Trustee cannot claim reliance on behalf of the third-party

creditors. Defendants argument ignores the unique role of the Trustee in bankruptcy, discussed *supra*,

and the way in which the SFC fraud functioned. None of the cases cited by Defendants on this issue

involved an action brought by a Trustee on behalf of creditors. Likewise, Defendants' fraud and

substantial assistance to SFC to sustain the fraud, were essential to SFC's survival: without the 2001

Audit Report and 2001 Accountants' Report SFC would not have continued in its fraudulent scheme. As

such, by definition, any creditors of SFC, which was a Ponzi-like scheme and not a legitimate business,

relied on and were damaged by, Defendants' intentional assistance of, and participation in, SFC's fraud.

---

[11] For example, in *E.F. Hutton v. Pappas*, 690 F. Supp. 1465 (D. Md. 1988), which Defendants wrongly
state is "strikingly similar" to the Trustee's action, there is neither an allegation, nor evidence, that the
accountants knew of the underlying fraud, or, for that matter, was there even a finding that **anyone**
committed fraud. *Id.* at 1471-72. All that was alleged was that the accountants failed to comply with
GAAP and GAAS. *Id.* The facts in *E.F. Hutton* and the rest of Defendants' cases alleging GAAP and
GAAS violations, and nothing more, have no similarity to Defendants' knowing participation in
defrauding SFC's creditors.

584277v1

IV.    **THE TRUSTEE HAS STATED A CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

Defendants' claim that the Trustee cannot bring a cause of action for aiding and abetting breach of fiduciary duty because: (i) Pennsylvania law does not recognize such a cause of action; and (ii) the Trustee has not properly plead the cause of action. Defendants' claims are without merit.

First, the Trustee does not concede that Pennsylvania law applies to the Trustee's action against Defendants. SFC was a massive, interstate fraud, centered in Delaware. Under Delaware choice of law principles, Delaware law, not Pennsylvania law, would apply, where, as here, Delaware has the most significant relationship to this case. *Travelers Indemnity Co. v. Lake*, 594 A.2d 38, 47-48 (Del. 1991) (adopting RESTATEMENT (SECOND) OF CONFLICTS §§ 145-146 "most significant relationship" test). Here, SFC was a Delaware-headquartered business, the fraudulent representations were made in Delaware and eminated from Delaware, and, in many instances, were relied on in Delaware. As such, to the extent there is a conflict between Delaware law and Pennsylvania law, Delaware law controls.[12] However, with regard to aiding and abetting breach of fiduciary duty, both Delaware and Pennsylvania law recognize such a cause of action and there is no conflict. *Anderson v. Airco, Inc.*, No. Civ.A. 02C-12-091KDR, 2004 WL 1551484 at *8 (Del. Sup. June 30, 2004) (discussing aiding and abetting tort liability under Delaware law); *Koken v. Steinberg*, 825 A.2d 723, 731-32 (Pa. Commw. Ct. 2003) (discussing viability of aiding and abetting breach of fiduciary duty claim in Pennsylvania). Likewise, the Pennsylvania Supreme Court has adopted the RESTATEMENT (SECOND) OF TORTS, § 876, the section of the Restatement governing "concert of action" and aiding and abetting claims. *Skipworth v. Lead Industries Assoc.*, 690 A.2d 169, 174 (Pa. 1997) (expressly adopting "concert of action" theory under RESTATEMENT (SECOND) OF TORTS § 876); *Koken*, 825 A.2d at 731-32 (discussing *Skipworth* and finding it supports of adoption of aiding and abetting liability in Pennsylvania). Pennsylvania courts refer to such claims as "concert of action" claims, but they are in essence aiding and abetting claims, finding liability where a party either

---

[12] If the Court finds that choice of law issues could be, or are, dispositive of any issue in this case, the Trustee requests the opportunity to separately brief choice of law in more detail.

584277v1

"does a tortious act in concert with the other or pursuant to a common design with him." *Id.*[13] Defendants are wrong to state that Pennsylvania courts do not, and will not, recognize aiding and abetting claims. As the cases above make clear, such claims and analogous claims, are already recognized in Pennsylvania, and, of course, Delaware.

Second, the Trustee has properly pled that SFC breached its fiduciary duties to its creditors, that Defendants knew of SFC's breaches and that Defendants substantially assisted SFC in its breaches. SFC was a fraudulent, Ponzi-like scheme. (*See* Compl. ¶¶ 2-3, 25-31.) As such, and by definition, SFC was insolvent from its inception, or at least from the time it functioned as a Ponzi-like scheme. *See Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 486 n.17 (D. Conn. 2002) (citing numerous cases holding that business engaged in a Ponzi scheme is insolvent from its inception).[14] An insolvent corporation, as a matter of law, has a fiduciary duty to **all** its creditors from the point of insolvency. *See Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 790-791 (Del. Ch. 1992) ("insolvency . . . causes fiduciary duties to creditors to arise"). SFC, then, had a fiduciary duty to all its creditors since its inception and certainly before McGladrey issued its reports.

Contrary to Defendants' arguments, the Trustee's allegations regarding Defendants' knowledge and substantial assistance of SFC's breaches of fiduciary duty are far more than "conclusory." Defendants knew since at least 1998 that SFC was making secret payments to cover student defaults that "distorted" the financial reporting of default rates and kept SFC's creditors from discovering the truth about SFC's scheme. (Compl. ¶¶ 51-75.) Armed with this knowledge, Defendants certified SFC's facially fraudulent and misleading MSR reports and SFC's fraudulent financial statements. Defendants' adopted SFC's insider term for the secret default-masking payments, "forbearance," knowing that it did

---

[13] To the extent there is a material difference between the Trustee's "aiding and abetting" claims and a "concert of action" claim, the Trustee requests leave to re-plead its aiding and abetting counts as "concert of action" counts in the alternative.

[14] SFC was also insolvent on a balance sheet basis since at least May 2001, a month after McGladrey issued the 2001 Audit Report. Defendants are not insulated from an aiding and abetting breach of fiduciary duty claim simply because the 2001 Audit Report was issued a month before SFC's balance sheet insolvency. Given Defendants' knowledge of SFC's scheme, Defendants knew long before May 2001 that SFC was insolvent.

584277v1

not adequately disclose SFC's fraudulent activities and knowing it would mislead creditors.  As the long-time auditors of SFC, Defendants also knew the importance and necessity of legitimate-seeming financial reports to the survival of SFC's massive fraud scheme involving hundreds of millions of dollars.  The specific facts describing Defendants' involvement with the SFC fraud are far beyond mere "routine" or "ordinary" services, as Defendants' claim.  Defendants knew SFC was a fraud scheme and knew exactly how a material aspect of it operated (masking and distorting student loan default rates) and provided knowing, substantial and vital assistance—the issuance of knowingly false and misleading financial reports—without which, the fraud scheme would not have survived.

## V.  THE TRUSTEE HAS STATED A CLAIM FOR NEGLIGENT MISREPRESENTATION

Defendants' objection to the Trustee's claim for negligent misrepresentation is the same as their objection to the Trustee's action generally:  the Trustee allegedly does not have standing to bring actions on behalf of individual creditors.  As discussed, *supra*, Defendants are wrong.  The negligent misrepresentation claim that the Trustee brings is one that is general to all SFC creditors and not to any one particular creditor.  It is based on the theory that, as the long-time auditors of SFC, with an intimate knowledge of both how SFC's business ran and who SFC's creditors were, Defendants' knew that their reports would be relied by all of SFC's creditors in extending credit to SFC because the reports were essential to SFC's existence.  SFC's business involved hundreds of millions of dollars in student loans and accompanying insurance.  No creditor would extend credit to a business of such size without a favorable credit history.  Without certified financials, such credit standing could never have been achieved by SFC.  As a major accounting firm, McGladrey understood this.  As such, the reports generated by Defendants effectively harmed all creditors of SFC, not just some, by ensuring the continued existence of SFC, a Ponzi-like scheme.  Under Defendants' own cases, claims of all creditors, not just certain creditors, are properly brought by the Trustee, not individual creditors.

## VI.  THE TRUSTEE HAS STATED A CLAIM FOR FRAUDULENT TRANSFER

Counts VI and VII of the Complaint properly set forth claims for avoidance of SFC's fraudulent transfers to McGladrey under section 548(a)(1)(A) of the Bankruptcy Code and 6 *Del. C.* § 1304(a)(1),

584277v1

28

respectively. SFC's total payments of more than $2 million in fees to McGladrey are the quintessence of transfers made with actual intent to defraud entities to which SFC was already or would become indebted. Section 548(a)(1)(A) of the Bankruptcy Code provides that a trustee may avoid a transfer made by the debtor where the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay or defraud" creditors. *Id.* Likewise, 6 *Del. C.* § 1304(a)(i) permits the avoidance of transfers made with actual intent to "defraud any creditor of the debtor" for up to four years before the filing of the case. 6 *Del. C.* §§ 1304, 1309.

As set forth throughout the Complaint and described *supra,* the Trustee has established a compelling case that the payments from SFC to McGladrey were an integral part of the massive Ponzi scheme that swirled around SFC, and were intended to hinder, delay or defraud creditors of SFC. *Official Comm. of Unsecured Creditors of the IT Group v. Brandywine Apartments*, 313 B.R. 370, 373-74 (Bankr. D. Del. 2004); *In re Aluminum Mills Corp.*, 132 B.R. 869, 883 (Bankr. N.D. Ill. 1991). McGladrey and Aquino were active co-conspirators in the massive fraud, and McGladrey was rewarded for its cooperation in the scheme by receiving millions in fees from SFC.

Courts faced with less evidence of a debtor's actual fraudulent intent have inferred actual intent to defraud from the mere fact that a debtor's business operated as a Ponzi or pyramid scheme, as is alleged here. *Leibersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.)*, 280 B.R. 103, 110 (Bankr. E.D. Pa. 2002). When such a scheme is shown, actual intent to defraud will normally be presumed. *Id.*

Thus, the Complaint properly sets forth claims for avoidance of the fees paid to McGladrey by SFC as fraudulent transfers, both under the Bankruptcy Code and Delaware state law.

## CONCLUSION

For the reasons stated herein and for the reasons stated in the Trustee's Complaint against Defendants, the Trustee respectfully requests that this Court deny the Defendants' Motion to Dismiss in its entirety.

Dated: April 15, 2005                    Respectfully submitted,


                                         THE BAYARD FIRM

                                         By  /s/ Anthony M. Saccullo (I.D. No. 4141)
                                             Anthony M. Saccullo (I.D. No. 4141)
                                             222 Delaware Avenue, Suite 900
                                             P.O. Box 25130
                                             Wilmington, DE  19899
                                             Telephone (302) 655-5000
                                             Facsimile (302) 658-6395
                                             e-Mail asaccullo@bayardfirm.com

                                                    - and -

                                         SCHWARTZ TOBIA & STANZIALE, P.A.
                                         Donald J. Crecca
                                         Jeffrey T. Testa
                                         22 Crestmont Road
                                         Montclair, NJ  07042
                                         (973) 746-6000

                                         *Attorneys for Charles A. Stanziale, Jr.,*
                                         *Chapter 7 Trustee of Student Finance*
                                         *Corporation*

584277v1