2003 WL 22316772 (E.D.Pa.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
N. Douglas FLUKE
v.
HEIDRICK & STRUGGLES, INC.
No. Civ.A. 02-CV-8385.
Aug. 27, 2003.

*MEMORANDUM AND ORDER*

KAUFFMAN, J.
 *1 Plaintiff N. Douglas Fluke brings this diversity action against Defendant Heidrick & Struggles, Inc., alleging various state law tort claims arising out of Defendant's assessment of Plaintiff's suitability for advancement to the presidency of one of his employer's corporate divisions. Now before the Court is Defendant's Motion to Dismiss. For the reasons set forth below, the Motion to Dismiss will be granted in part and denied in part.
I. *Background*
Viewed in the light most favorable to Plaintiff, the relevant facts are as follows. Plaintiff was employed on an at-will basis as a vice-president of Cognis, a chemical company that was a division of Henkel Corporation ("Henkel"). (Compl.¶¶ 7, 61.) In 2001, Henkel was in the process of negotiating the sale of Cognis to a group of investors (the "investors"). (Compl.¶ 11.) During that negotiation process, either Cognis or the investors or both sought to determine whether any of the three vice-presidents of Cognis' North American offices were capable of taking over the post of president of North American operations. (Compl.¶ 12.) The investors stated repeatedly that they wanted an American to hold this position, and Plaintiff was the only American among the three vice-presidents of Cognis' North American offices. (Compl.¶ 13.)
Either Cognis or the investors or both retained Defendant to evaluate Cognis' inside personnel, including Plaintiff. (Compl.¶ 14.) Plaintiff was directed by company e-mail to meet representatives of Defendant for a "strategic leadership initiative". (Compl.¶ 15.) Plaintiff was told to bring a current resume but not to prepare otherwise. (Id.) On or about October 16, 2001, Plaintiff met with Defendant's representatives. (Compl. ¶ 17 .) Although not asked to do so, he presented a summary of his accomplishments at Cognis and prepared a hypothetical case study. (Compl.¶ 19.) The meeting lasted for two hours, approximately twenty minutes of which was consumed by introductory "small talk" and the balance of which consisted of general conversation about the industry and Plaintiff's work. (Compl.¶ 18.) No objective tests were administered and no hypothetical questions were posed to Plaintiff. (Compl.¶¶ 21-22.) This two-hour meeting was the sole opportunity for Plaintiff to have contact with any representative of Defendant. (Compl.¶ 25.) Neither of Defendant's representatives had any training in psychology or other disciplines that would aid them in assessing personality traits beyond the ability of an average layman. (Compl.¶ 23.)
After the meeting, Plaintiff received a copy of a written assessment which included the following conclusions:
"His ability to learn is likely inhibited by his somewhat underdeveloped listening skills. He will work a problem long and may have a tendency to overwork it, trading analysis for action. His vision is average and medium termed. He does not display a long term, creative vision of his own. His ability to create buy-in therefore could be somewhat limited as well. He maybe will not be able to contribute too much with his own ideas and concepts to develop the company further."
 *2 (Compl.¶¶ 26-27.)
Subsequently, Plaintiff was informed by Cognis that he would not be offered the position of president. Instead, he was given a copy of a flow chart that revealed that his oversight responsibilities would be reduced from two divisions to one. (Compl.¶ 28.) The presidency was filled by an outsider, recruited out of retirement by Defendant. (Compl.¶¶ 29-30.) [FN1] Defendant's assessment of Plaintiff not only ruined his opportunity for advancement, but also caused Cognis to reduce his responsibilities.

(Compl.¶ 27.) He was humiliated and, after executing a severance package, left Cognis in May 2002. (Compl.¶ 33.)

> FN1. Defendant had a financial interest in placing an outsider, since it would receive a sizeable "headhunting" commission. (Compl.¶ 31.)

## II. *Legal Standard*

When deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994).* The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. *Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir.1985).* A Rule 12(b)(6) motion will be granted only when it is certain that no relief could be granted under any set of facts that could be proved by the plaintiff. *Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir.1988).*

## III. *Analysis*

### A. *Negligence*

In Count I, Plaintiff claims that Defendant is liable for negligence because it breached the duty it owed to Cognis and Plaintiff to conduct an assessment of Plaintiff's abilities in a fair, competent, and professional manner. "[T]he elements of a negligence-based cause of action are a duty, a breach of that duty, a causal relationship between the breach and the resulting injury, and actual loss." *Campo v. St. Luke's Hosp., 755 A.2d 20, 23-24 (Pa.Super.2000); see also In re TMI, 67 F.3d 1103, 1117 (3d Cir.1995); Philadelphia v. Beretta USA Corp., 126 F.Supp.2d 882, 898 (E.D.Pa.2001).*

Defendant argues that Plaintiff's negligence claim must fail because it owed no duty of care to Plaintiff. The Court disagrees. Whether a duty exists is a matter of law. *In re TMI, 67 F.3d at 1117.* The determination of whether a duty should be imposed upon an alleged tortfeasor involves a balancing of the following factors: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution. *Althaus v. Cohen, 756 A.2d 1166, 1169 (Pa.2000). See also Lindstrom v. City of Corry, 763 A.2d 394 (Pa.2000).*

It is clear that a sufficient relationship existed between Plaintiff and Defendant to support the imposition of a duty on Defendant to Plaintiff to exercise reasonable care. *See Sharpe v. St. Luke's Hospital, 821 A.2d 1215, 1219 (Pa.2003)* (finding a duty of reasonable care between a hospital and a plaintiff alleging that she was negligently screened and given a false positive result for the presence of cocaine because "a sufficient relationship exists between the Hospital and [plaintiff] to justify the imposition of a duty upon the Hospital to exercise reasonable care in the collection and handing of the urine specimen, despite the absence of a contract between the two parties. Specifically, plaintiff personally presented herself to the Hospital, which was aware of the purpose of the screening; the Hospital, in turn, should have realized that any negligence with respect to the handling of the specimen could harm [plaintiff's] employment."). [FN2] Defendant's representatives should have foreseen the inevitable harm to Plaintiff's career if his evaluation was performed negligently. Regarding the other *Althaus* factors, while Defendant's service is certainly socially useful, the Court sees no overridding public policy interest in protecting consulting services from liability for negligent performance.

> FN2. *Accord Merrick v. Thomas, 522 N.W.2d 402 (Neb.1994)* (finding that merit commission owed plaintiff a duty of care in examining her for suitability for employment with sheriff's department when the negligent party could foresee that its negligence could cause harm to plaintiff);
>
> *Reed v. Bojarski, 764 A.2d 433, 442-43 (N.J.2001)* (stating that "[a] professionally unreasonable examination that is detrimental to the examinee is not immunized from liability because a third-party authorized or paid for the exam").

*3 Defendant also argues that there is no cause of action for negligent evaluation under Pennsylvania law. However, the only cases cited in support of this proposition involved evaluation by the plaintiff's employer. *See, e.g., Mann v. J.E. Baker Co., 733 F.Supp. 885, 889 (M.D.Pa.1990)* (holding that a supervisor could not be found liable for a negligent performance review that led to the at-will employee-plaintiff's termination because "absent a showing otherwise, her employment could have been ended by [Defendant] at any time for any reason if not proscribed by statute or public policy."). As Defendant is not Plaintiff's employer, these cases are inapposite. Accordingly, the Court will deny the Motion to Dismiss as to Plaintiff's negligence claim. [FN3]

> FN3. Defendant also argues that Plaintiff's negligence claim should be dismissed because he has not alleged that he was harmed by Defendant's negligence. However, it is clear from the face of the Complaint that Plaintiff alleges that he was denied the promotion he sought as a result of Defendant's unfavorable assessment. *See* Compl. ¶ 27.

*B. Fraud*

In Counts II, IIA, [FN4] and III, Plaintiff alleges fraud, intentional misrepresentation, and negligent misrepresentation. In order to state a claim for fraud and fraudulent misrepresentation, Plaintiff must show "(1) a material representation of fact; (2) which was false; (3) that the maker was aware of the falsity or reckless as to whether it was true or false; (4) that the statement was made with the intent of misleading another into relying on it; (5) there existed a justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Kerrigan v. Vellei,* 22 F.Supp.2d 419, 428-29 (E.D.Pa.1998); *see also Delahanty v. First Pa. Bank,* 464 A.2d 1243, 1252-53 (Pa.Super.1983). Negligent misrepresentation similarly contains requirements of "false information, justifiable reliance, causation and pecuniary loss." *Kerrigan,* 22 F.Supp.2d at 429. [FN5]

> FN4. The Complaint lists two counts, both labeled "Count II". For the purposes of differentiation between the two, the Court will refer to Plaintiff's claim of "Fraud-- Intentional Misrepresentation" as Count IIA.

> FN5. The only differences between intentional fraudulent misrepresentation and negligent misrepresentation are "the state of mind of
>
> the person making the representation and the standard of proof that must be met by the plaintiff." *Kerrigan,* 22 F.Supp.2d at 429.

Defendant argues that Plaintiff's claims of fraud, intentional misrepresentation, and negligent misrepresentation should be dismissed because he has failed to allege reliance upon the statements made by Defendant. In *KBT Corporation, Inc. v. Ceridian Corporation,* 966 F.Supp. 369 (E.D.Pa.1997), the court faced a similar issue. [FN6] In *KBT,* the owners of a radio station brought suit against a ratings company that conducted surveys on listener habits. These surveys were published in quarterly reports and advertising purchases were based on them. Plaintiffs in that case contended that the defendants' surveys were compiled using a method known to be biased and that they therefore had knowingly published false and misleading information that damaged plaintiffs' share of advertising revenues. *Id.* at 372. The court dismissed the plaintiffs' fraud claims because of their failure to allege reliance: "[A]ccepting KBT's allegations as true, it is the *advertisers* (1) who Defendants intended to act on their statements and (2) who did in fact act on them, not to their own damage, but to [Plaintiff's].... If, in fact, Defendants' statements were fraudulent, only the advertisers would have a claim, and only to the extent that the advertisers themselves incurred damage." *Id.* at

377. *See also Michelson v. Exxon Research & Engineering* Co., 629 F.Supp. 418, 423-24 (W.D.Pa.1986) (holding that a cause of action for fraud "is available to those who receive misrepresentations and rely on such misrepresentations to their injury.... Plaintiff thus may not invoke this cause of action because he cannot ... satisfy the requirement that he himself must detrimentally rely on the alleged misrepresentation.").

FN6. In *KBT,* the plaintiffs were KBT Corporation, Inc. and W. Cody Anderson, its sole shareholder; the defendants were Ceridian Corporation and Arbitron Company. *KBT Corporation, Inc., 966 F.Supp. 369*.

*\*4* The Complaint in the present action alleges that Cognis--not Plaintiff-- relied upon the statements made by Defendant in deciding not to promote Plaintiff. Thus, Plaintiff has failed to allege that he relied on Defendant's allegedly fraudulent and negligent statements. *See Berda v. CBS, Inc.,* 800 F.Supp. 1272, 1276 (W.D.Pa.1992) (noting that fraudulent misrepresentation requires a showing of "justifiable reliance by the plaintiff"); *Delhanty, 464 A.2d 1243, 1252-53 (Pa.Super.1983)* (fraud requires a showing of "justifiable reliance by the recipient upon the misrepresentation"). *See also Eisenberg v. Gagnon, 766 F.2d 770, 778 (3d Cir.1985)* (reliance is a required element of negligent misrepresentation); *In re Prudential Ins. Co. of America Sales Practices Litigation, 975 F.Supp. 584, 619 (D.N.J.1996)* ("The common law tort of negligent misrepresentation shares all the components of fraud ..."). Accordingly, Plaintiff's claims of fraud, intentional misrepresentation, and negligent misrepresentation will be dismissed. [FN7]

FN7. *See Mellon Bank Corp. v. First Union,* 951 F.2d 1399, 1411-12 (3d Cir.1991) (affirming summary judgment on fraudulent misrepresentation claim because plaintiff failed to present evidence of justifiable reliance on the alleged misrepresentation); *Huddleston v. Infertility Ctr. of Amer., 700 A.2d 453, 461 (Pa.Super.1997)* (dismissing fraud claims; explaining that a "complaint must provide sufficient facts to support a plaintiff's contention that the defendant intended to induce him to act based on the misrepresentation").

*C. Tortious Interference*

In Count IV, Plaintiff alleges tortious interference. Although it is not explicitly labeled as such, Count IV states allegations which support a claim for tortious interference with prospective or future contractual relations. To articulate such a claim, Plaintiff must allege: "(1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 925 (3d Cir.1990).

Defendant argues that Plaintiff's claim of tortious interference should be dismissed because it was acting as an agent of Cognis, and an agent of a corporation cannot interfere with the corporation's relationships with its own employees. *See Michelson v. Exxon Research & Engineering Co.,* 808 F.2d 1005, 1007-08 (3d Cir.1987). As previously discussed, this argument assumes facts not alleged in the Complaint or its attachments. The Complaint does not allege that Defendant was hired by Cognis to assess Plaintiff; rather, it alleges that Defendant was hired by either Cognis *or the prospective buyers of Cognis* for that purpose. Thus, Plaintiff may have a cause of action for tortious interference if he can support his allegation that Defendant's interference was not justified or privileged. "The privilege determination is not susceptible of precise definition but is informed by ... the area of socially acceptable conduct which the law regards as privileged." *U.S. Healthcare, 898 F.2d at 925* (internal quotations omitted). Accordingly, if Defendant's alleged interference with Plaintiff's prospective relations resulted from its socially valuable function of providing accurate evaluations, it would be regarded as privileged. If, however, Plaintiff can prove his allegation that Defendant provided an intentionally false negative evaluation solely in order to gain a headhunter's fee for placing an outsider in the position, its conduct would not be privileged.

*5 Defendant also argues that Plaintiff's tortious interference claim should be dismissed because Plaintiff has failed to allege that he had any likelihood of receiving the promotion but for Defendant's assessment. Before a future contract can be the basis of a claim, the prospective contract must have been something more than a "mere hope," and there must have been a "reasonable probability" that a plaintiff would have entered into a contract for employment in the position but for the defendant's interference. *U.S. Healthcare,* 898 F.2d at 925; *Fresh Made Inc. v. Lifeway Foods, Inc.,* 2002 WL 31246922, *12 (E.D.Pa.2002)* (The complaint "must allege facts that, if true, would give rise to a reasonable probability that particular anticipated contracts would have been entered into."). Viewed in the light most favorable to Plaintiff, the Complaint alleges that he was a leading candidate for the presidency and that the statements made by Defendant were intentionally negative in order to eliminate him from consideration so that Defendant could place an outsider in the position and thereby earn a large "headhunter" commission. *See* Compl. ¶¶ 41, 66. Accordingly, Defendant's Motion to Dismiss will be denied as to Plaintiff's tortious interference claim.

*D. Defamation*

In Count V, Plaintiff alleges that Defendant's circulation of its evaluation to Cognis executives and the investors constitutes defamation. In order to state a claim for defamation, Plaintiff must allege: "(1) a defamatory communication; (2) pertaining to the plaintiff; (3) published by the defendant to a third party; (4) who understands the communication to have defamatory meaning with respect to plaintiff; and (5) that results in plaintiff's injury. *Smith v. School District of Phila.,* 112 F.Supp.2d 417, 429 (E.D.Pa.2000); *Russoli v. Salisbury Township,* 126 F.Supp.2d 821, 872 (E.D.Pa.2000); *D'Errico v. Defazio,* 763 A.2d 424, 432 (Pa.Super.2000). Defendant argues that Plaintiff's defamation claim should be dismissed because the statements are incapable of defamatory meaning and because the statements at issue are protected by privilege. [FN8]

> FN8. Defendant also argues that the allegedly defamatory statements were not publicized, as they were only disseminated to Cognis personnel and the investors who were purchasing the company. However, "publication" is defined merely as "the communication of a defamatory matter either intentionally or by a negligent act to one other than the person defamed." *Laniecki v. Polish Army Veterans Assn.,* 486 A.2d 1101 (Pa.Super.1984). *See also Feldman v. Lafayette Green Condominium Assn.,* 806 A.2d 497, 500 (Pa.Com.Pl.2002). Plaintiff clearly alleges that Defendant disseminated its evaluation to Cognis executives and the investors.


In order to determine whether a statement is capable of defamatory meaning, the Court must look to whether the statements would harm Plaintiff's reputation in the community or "deter third persons from associating with him" or ascribe to him "conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession." *D'Errico,* 763 A.2d at 432. *See also Wilson v. Slatalla,* 970 F.Supp. 405, 415 (E.D.Pa.1997) ("Injury to reputation is judged by the reaction of other persons in the community and not by the party's self-estimation."). Plaintiff has alleged that Defendant stated that he possessed an "inhibited" ability to learn and "underdeveloped" listening skills, both of which may prove to characterize him in a way that would affect his fitness for the proper conduct of his business as a high-level corporate executive. *See Walker v. Grand Central Sanitation, Inc.,* 634 A.2d 237, 244 (Pa.Super.1993) (statements made about person seeking a particular employment position which question his ability to handle the responsibilities attendant to the position can be capable of having a defamatory meaning); *Maier v. Maretti,* 671 A.2d 701, 704 (Pa.Super.1995) (where a statement is capable of a defamatory meaning and a non-defamatory meaning, the matter should proceed to trial; only where the statements are incapable of a defamatory meaning should the matter be dismissed on motion).

*6 In the alternative, Defendant argues that the statements at issue are protected by privilege because the only individuals who viewed the statements were those who had a direct interest in Plaintiff's leadership potential with regard to the position of president:

"Statements are conditionally privileged if some interest of the person who published defamatory matter is involved, some interest of the person to whom the matter is published or some other third person is involved or a recognized interest of the public is involved. Communications among managers regarding employee job performance, discipline and termination are privileged when the

publisher of the defamatory communication shares an interest in the employee's performance with the recipients."

*Puchalski v. School Dist. of Springfield,* 161 F.Supp.2d 395, 409 (E.D.Pa.2001). "To show abuse of the conditional privilege, a plaintiff must show the statements were actuated by malice or negligence, [or] were made for a purpose other than that for which the privilege is given ..." *Puchalski,* 161 F.Supp.2d at 409-10 n.8.

In the present case, Plaintiff has alleged that Defendant's statements were made not for the purpose of serving Cognis' interest and the investors' interest in finding out whether Plaintiff was the best candidate for the position, but for the purpose of causing Cognis to hire an outside candidate so that Defendant would receive a large commission. *See* Compl. ¶¶ 29-31. Plaintiff has, therefore, alleged facts which, if true, would support a finding of abuse of any conditional privilege. Accordingly, the Court will deny Defendant's Motion as to Plaintiff's defamation claim.

*E. Invasion of Privacy*

In Count VI, Plaintiff alleges that Defendant's distribution of the assessment to the investors (who did not yet own Cognis) constituted an intrusion upon seclusion. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B. *See also Chicarella v. Passant,* 494 A.2d 1109, 1114 (Pa.Super.1985) (noting that Pennsylvania law follows this section of the Restatement).

Defendant argues that this claim should be dismissed because Plaintiff consented to being assessed by Defendant. The Court agrees. "[A]n actor commits an intentional intrusion only if he believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act." O'Donnell v. United States, 891 F.2d 1079, 1083 (3d Cir.1989). Plaintiff has alleged that he was directed by Cognis to meet with Defendant's representatives. Defendant therefore reasonably believed that it had the necessary permission to engage in the interview and assessment of Plaintiff. *See also* Harris v. Easton Publishing Co., 483 A.2d 1377, 1383 (Pa.Super.1984) ("The defendant is subject to liability ... only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs."); *Woodside v. New Jersey Higher Ed. Assistance Authority,* 1993 WL 56020, at *6 (E.D.Pa.1993). Accordingly, Plaintiff's claim for invasion of privacy based on intrusion of seclusion will be dismissed.

*F. Breach of Contract*

*7 In Count VII, Plaintiff alleges that he is a third-party beneficiary to the contract between Defendant and Cognis, and that Defendant breached that contract by failing to carry out its evaluations in a fair, ethical, and unbiased manner. Defendant argues that the parties never intended to benefit Plaintiff by entering into the contract and, therefore, that this claim should be dismissed. "[A] party becomes a third-party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, ... *unless* the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Scarpitti v. Weborg,* 609 A.2d 147, 150-51 (Pa.1992). *See also Two Rivers Terminal, L.P. v. Chevron USA, Inc.,* 96 F.Supp.2d 432, 449-50 (M.D.Pa.2000); *Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc.,* 246 F.Supp.2d 394 (E.D.Pa.2002).

The Court finds that, on the face of his allegations, Plaintiff is not a third-party beneficiary to the contract because he has not alleged that the parties intended the contract to benefit him. [FN9] *See* Hammond v. City of Philadelphia, 164 F.Supp.2d 481, 483 n.3 (E.D.Pa.2001) (stating that employee could not claim breach of contract where her employer had contracted with a laboratory to test her for the presence of illegal drugs because "there is no suggestion that both [the laboratory] and [her employer] intended to benefit plaintiff"). [FN10]

FN9. As described in the Complaint, the contract's beneficiaries were Defendant and Cognis and/or the investors. Specifically, Cognis and/or the investors would receive Defendant's evaluations of various personnel and Defendant would receive a fee in return. Plaintiff does not allege that the contract between Cognis and Defendant specified that the evaluations produced would be positive or helpful to those being evaluated. Accordingly, the terms of the contract did not provide for a benefit to Plaintiff, but allowed for a range of outcomes which may have had a positive, negative, or neutral

effect on his career.

> FN10. *See also* *Sharpe,* 821 A.2d at 1219, 1220 n.3 (differentiating between a duty of reasonable care in the context of a negligence claim and a duty owing to a party as a third-party beneficiary to a contract); *Prost v. Caldwell Store, Inc.,* 187 A .2d 273, 276 (Pa.1963) (distinguishing between a duty imposed by law and a duty self-imposed by contract).

IV. *Conclusion*

For the foregoing reasons, the Motion to Dismiss will be granted with regard to Plaintiff's claims of fraud (Count II), intentional misrepresentation (Count IIA), negligent misrepresentation (Count III), invasion of privacy (Count VI), and breach of contract (Count VII). The Motion to Dismiss will be denied with regard to Plaintiff's claims of negligence (Count I), tortious interference (Count IV), and defamation (Count V). An appropriate Order follows.

E.D.Pa.,2003.

Fluke v. Heidrick & Struggles, Inc.

2003 WL 22316772 (E.D.Pa.)

### Motions, Pleadings and Filings (Back to top)

- 2:02CV08385 (Docket) (Nov. 08, 2002)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1632574 (Pa.Com.Pl.)
Only the Westlaw citation is currently available.

Court of Common Pleas of Pennsylvania, Philadelphia County.
Jules LICHTMAN and Webnet Entertainment, Inc., Plaintiffs,
v.
Paul TAUFER, Esquire, Piper Rudnick, LLP, Schnader, Harrison, Segal and Lewis,
LLP, Adrianne Lewis and Adtraction, Inc. T/A ad Traction, Defendants.
Nos. 005560MARCHTERM 2004, CONTROL 041919, CONTROL 051697, CONTROL 051602.
July 13, 2004.

MEMORANDUM OPINION

JONES, J.
*1 Presently before the court are three sets of Preliminary Objections filed by the respective
defendants in this action. For the reasons that follow, the court will Sustain in part and Overrule in
part the parties' objections.

BACKGROUND

On or about August 25, 2000, Jules Lichtman and Adrianne Lewis entered into a Joint Venture
Agreement ("Agreement") in regard to the development and exploitation of internet website projects
and related businesses. The Joint Venturers developed and intended on developing internet web
based games which they agreed to own on a 50/50 basis including all rights, title, interest,
copyrights, trademarks, domain names, licensing rights and merchandising rights. Additionally, the
parties agreed to share similar ownership rights in other projects which they from time to time
created together under the agreement. The agreement additionally provides that in the event the
Joint Venturers form a corporation or LLC for the purpose of conducting their business, they will each
own equal shares in any such entity. Litchman and Lewis formed Webnet Entertainment, Inc.
("Webnet").
The Agreement also contains an Arbitration provision. The provision provides that any disputes or
claims under the Agreement are to be submitted to arbitration before the American Arbitration
Association in the city (or closest office) in which the Joint Venturers' home office is located or before
such arbitrator as the parties may mutually agree. The arbitrator's decision is to be final and binding.
In July 2001, Defendant Paul Taufer, Esquire, ("Taufer") while a partner at Schnader, Harrison, Segal
and Lewis ("Schnader"), along with other members of the firm were retained to represent Webnet,
Lichtman and Lewis in patent matters and other corporate and legal matters.
Lichtman and Webnet ("Plaintiffs") claim that while Taufer and Schnader represented them, Taufer
and Schnader allegedly removed Lichtman's name from the provisional patent application.
Additionally, plaintiffs claim that on or about October 17, 2001, Taufer and Schnader filed a patent
application solely on behalf of Lewis, despite their alleged knowledge that Lichtman was a co-
inventor/co-creator. Thereafter, Taufer and Schnader continued to represent Lewis in marketing and
selling the product to the exclusion of Lichtman. Lewis allegedly conducted business as Adtraction,
Inc., a/k/a ad Traction in which she was a shareholder and officer.
In March 2004, Plaintiffs instituted suit against Lewis and Adtraction alleging breach of fiduciary duty
and conversion (Count I) and against Taufer, Schnader and Piper Rudnick, LLP [FN1] for breach of
fiduciary duty and aiding and abetting defendants Lewis and Adtraction's breach of fiduciary duty
(Count II). The respective parties have filed preliminary objections to the complaint.

   FN1. Taufer allegedly became a partner in Piper Rudnick LLP in or after January 2003 and
   continued to represent Lewis and Adtraction.


DISCUSSION

I. Plaintiffs Claims Against Lewis and AdTraction Are Not Subject To Arbitration.
Defendant Lewis and Adtraction argue that Plaintiffs' claims are subject to the arbitration provision
contained within the Agreement and therefore the claims against them must be dismissed. In
response, plaintiffs argue that the dispute at bar does not fall within the arbitration provision and that

defendants Lewis and Adtraction are not parties to the agreement and therefore not subject to arbitration.

*2 When one party to an agreement seeks to prevent another from proceeding to arbitration, judicial inquiry is limited to determining (1) whether a valid agreement to arbitrate exists between the parties and, if so, (2) whether the dispute involved is within the scope of the arbitration provision. *Smith v. Cumberland Group, Ltd., 455 Pa.Super. 276, 687 A.2d 1167, 1171 (Pa.Super.1997)*(citing *Messa v. State Farm Ins. Co., 433 Pa.Super. 594, 597, 641 A.2d 1167, 1168 (Pa.Super.1994)*). If a valid arbitration agreement exists between the parties and plaintiffs claim is within the scope of the agreement, the controversy must be submitted to arbitration. *Id.*

In order to determine the intent of the parties to a contract, a court should look to the four corners of the document and its express language. *Midomo Co. Inc. v. Presbyterian Housing Development Co., 739 A.2d 180, 186 (Pa.Super.1999).* The law favors settlement of disputes by arbitration and seeks to promote swift and orderly disposition of claims. *Id.* At the same time, a court must be careful not to extend an arbitration agreement by implication beyond the clear, express and unequivocal intent of the parties as manifested by the writing itself. *Id.* To resolve this tension, courts should apply the rules of contractual construction, adopting an interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable and natural conduct to the parties. *Id.* All parts of the contract should be interpreted together, with the goal of giving effect to each of its provisions. *Id.* at 191.

The Agreement at issue contains the following arbitration provision:

6. Governing Law: Arbitration

This Agreement will be construed in accordance with the laws of the State where the Joint Venture's home office is located at the time of the bringing of any claim or dispute for resolution. In the event of any disputes or claims under this Agreement, the parties agree to submit such claims to arbitration before the American Arbitration Association in the city (or closest office) in which the Joint Venture's home office is located, or before such other arbitrator as the parties may mutually agree, whose decision will be final and binding and which may be entered as a judgment in any court of competent jurisdiction. The prevailing party in any such dispute or claim will be entitled to recover his or her reasonable attorneys' fees.

Lewis and Lichtman are signatories to the Agreement and therefore subject to the terms of the arbitration provision. Webnet is also subject to the terms of the Arbitration provision since it is an intended beneficiary under the Agreement. Under Pennsylvania law, a party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself. *Scarpitti v. Weborg, 530 Pa. 366, 372-3, 609 A.2d 147, 150-151 (Pa.1992).* The Agreement specifically contemplated the formation of a corporation or LLC for the purposes of conducting their business. The pertinent provision provides:

*3 6. Ownership

The Joint Ventures will jointly own, on a 50/50 basis, all right, title and interest in the Game, including all copyrights, trademarks, domain names, licensing rights and merchandising rights. They will share similar ownership rights in other projects which they may time to time create under this Agreement. *In the event the Joint Venturers form a corporation or LLC for the purposes of conducting their business, they will each own equal interests in any such entity.*

Webnet is a corporation formed by the Joint Venturers for the purpose of conducting their business. The Joint Venturers specifically expressed an intention to form a corporation to conduct their business which grants Webnet third party beneficiary status. Since Webnet is a third party beneficiary under the Agreement, a fair reading of the Agreement also subjects Webnet to the terms of the Arbitration Agreement. Hence, Webnet by virtue of its third party beneficiary status is also a signatory to the Agreement.

The same does not hold true for Adtraction. "A corporation is to be treated as a separate and independent entity even if its stock is owned entirely by one person." *Sigmund v. Phillips & Brooke, P.C., 2003 WL 1848573, *10 (Pa.Com.Pl.2003)* (J. Sheppard)(quoting *Com. v. Vienna Health Products., Inc., 726 A.2d 432, 434 (Pa.Cmwlth.1999)).* [FN2] The allegations within the complaint state that Lewis is a shareholder and officer of Adtraction which markets, uses and sells the software which was allegedly co-created and invented by plaintiff. (Plaintiff's complaint ¶ 3, 11, 15). Adtraction is a separate entity not contemplated by the Agreement. "It is a well established principle of law that a contract cannot impose obligations upon one who is not a party to the contract." *Manchel v. Hockberg, 2000 WL 33711078, *3 (Pa.Com.Pl.2000)* (J. Sheppard) (quoting *Juniata Valley Bank v. Martin Oil Co., 736 A.2d 650, 663 (Pa.Super.1999)).* Adtraction has not agreed to submit itself to

arbitration and therefore cannot be made to do so. See *Hatboro Manor, Inc. v. Local Joint Executive Bd. of Philadelphia, 426 Pa. 53, 231 A.2d 160, 164 (1967)*(holding "that arbitration, a matter of contract, should not be compelled of a party unless such party, by contract, has agreed to such arbitration ...").

> FN2. The court is mindful that an officer of a corporation may be
>
> subject to liability for the acts of the corporation. Here, there are no allegations within the complaint to suggest imposing liability upon Lewis for the acts of her corporation.

Since Adtraction is not a party to the Agreement, requiring Lewis to arbitrate matters pertaining to the loss of corporate opportunity alone would be pointless. The arbitrator cannot make determinations affecting Adtraction and cannot compel Adtraction to submit to an accounting. Enforcement of the arbitration provision would frustrate the public policy interest in efficient dispute resolution. *School Dist. of Philadelphia v. Livingston-Rosenwinkel, P.C., 690 A.2d 1321, 1322 (Pa.Cmmw.1997).* Adtraction is not subject to the arbitration agreement between Lewis, Lichtman and Webnet. Therefore, enforcement of the arbitration provision against Lewis alone would create two cases, one in court against Adtraction and one in arbitration against Lewis. This would cause plaintiffs to relitigate the same liability and damage claim in two separate forums and before two separate fact finders creating repetitive, piecemeal litigation. Thus, in this case the arbitration's goal of "swift and orderly disposition of claims" would not be served by sending the case to arbitration. See *School Dist. of Philadelphia v. Livingston-Rosenwinkel, P.C., 690 A.2d 1321, 1322 (Pa.Cmmw.1997);* see also, *University Mechanical & Engineering Contractors Inc. v. Insurance Co. of North America, 2002 WL 31428913 (Pa.Com.Pl.2002)* (J. Sheppard). Accordingly, defendants Lewis and Adtraction's preliminary objection is Overruled.

II. The Preliminary Objections of Defendants Paul Taufer, Esquire and Piper Rudnick, LLP and the Preliminary Objections of Schnader Harrison Segal and Lewis.

*\*4* Defendants Paul Taufer and Piper Rudnick LLP filed Preliminary Objections to plaintiffs' complaint seeking dismissal of the complaint in its entirety. Specifically, Taufer and Piper Rudnick, LLP maintain that plaintiffs' complaint should be dismissed since 1) plaintiffs lack standing to bring the claim, 2) the court lacks subject matter jurisdiction, 3) plaintiff failed to conform to a rule of court by attaching a copy of a retention agreement, 4) lack of factual specificity and 5) lack of legal sufficiency. [FN3]

> FN3. Additionally, Taufer and Piper Rudnick LLP also raise as objections the doctrine of laches and failure to conform to Pa. R. Civ. P. 1042.2. Although these objections were raised, Defendants failed to address these objections within their memorandum of law.

Defendant Schnader Harrison Segal and Lewis ("Schnader") also filed Preliminary Objections to Plaintiffs' complaint seeking dismissal of the complaint in its entirety. Specifically, Schnader maintains that plaintiffs' complaint should be dismissed since 1) Webnet lacks capacity to sue, 2) the court lacks subject matter jurisdiction, 3) the complaint should be stricken since plaintiff failed to identify each defendant against whom plaintiffs are asserting a professional liability claim or in the alternative lack of specificity, 4) failure to attach a writing, and 5) laches. Schnader also requests that this action be certified to the law side of the court since an adequate remedy at law exists.

Each of these objections will be considered below.

A. A Legitimate Controversy Exists To Create Standing To Sue.

Defendants Taufer and Piper Rudnick, LLP maintain that no legitimate controversy exists that would create standing to sue in plaintiffs. In support thereof, defendants contend that since plaintiffs' complaint is based entirely on allegations regarding a patent application and the alleged marketing of the invention which is the subject of the patent application and since the patent has not been issued and in fact has been denied by the Patent and Trademark Office several times, a legitimate controversy creating standing to sue does not exist. The court is not persuaded.

The Supreme Court has held that a plaintiff has standing if (1) the plaintiff has substantial interest in

the controversy, (2) that interest is direct and (3) that interest is immediate. *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh, 464 Pa. 168, 346 A.2d 269 (Pa.1975).* The requirement of substantial interest simply means that the individual's interest must have substance. There must be some discernable adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law. *Id.* The requirement that the interest be direct simply means that the person claiming to be aggrieved must show causation of the harm to his interest by the matter of which he complains. *Id.* The remaining requirements of the traditional formulation test are that the interest be "immediate" and "not a remote consequence of the judgment." *Id.*

Under the applicable test summarized above, this court finds that plaintiffs have standing to bring this present action. Defendants argue that plaintiffs suffered absolutely no harm as a result of Lichtman's name being omitted from the patent application since a patent application has never been issued. That may be true however plaintiffs allege that defendants Taufer and Piper Rudnick, LLP breached their fiduciary duty to plaintiffs which caused plaintiffs to suffer harm in the patent matter *as well as other corporate legal matters.* (Plaintiff's complaint ¶ 6)(emphasis added). The harm alleged by plaintiffs includes but is not limited to lost revenue from the marketing, using and selling the software and other related items which were jointly owed by plaintiffs and defendant Lewis. (Plaintiffs' complaint ¶ 15). At this juncture, the court finds that plaintiffs do have standing to sue. Accordingly, defendant Piper and Rudnick's preliminary objection as it pertains to standing is Overruled. [FN4]

> FN4. The parties did not raise and the court did not address whether plaintiff Lichtman has standing to sue defendants Taufer and Schnader for breach of fiduciary duty and for aiding and abetting Lewis' breach of fiduciary duty.

B. Webnet Does Not Lack Capacity to Sue.

*\*5* Defendants Piper Rudnick LLP and Schnader maintain that Webnet lacks capacity to sue since it is not a valid corporation in the State of Delaware. In support thereof defendants rely upon plaintiffs' failure to file a timely response to preliminary objections thereby admitting that Webnet is not a valid corporation and the Delaware Department of State records which reflect that Webnet's corporate status is void. While it is true that a failure to answer preliminary objections endorsed with a notice to plead constitutes an admission, defendants' objection is nonetheless overruled.

Pa. R. Civ. P. 1026(a) requires that "every pleading subsequent to the complaint shall be filed within twenty days after service of the preceding pleading, but no pleading need be filed unless the preceding pleading contains a notice to defend or is endorsed with a notice to plead." Pa. R. Civ. P. 1026(a). Preliminary objections and answers thereto are considered "pleadings" under the rules. Pa. R. Civ. P. 1017(a).

Additionally, Philadelphia Local Rule * 1028(C) provides:

(C) (1) An answer to preliminary objections (as opposed to a responsive filing with the Motion Court under Philadelphia Civil Rule * 206.1) is required only to preliminary objections raising an issue under Pa. R. Civ. P. 1028(a)(1), (5) and (6) provided a notice to plead is attached to the preliminary objections. An answer need not be filed to preliminary objections raising an issue under Pa. R. Civ. P. 1028(a)(2), (3) and (4).

(2) An answer to preliminary objections shall be filed with the Prothonatary in accordance with Pa. R.C.P. 1026(a) and thereafter with the Motion Court together with the other documents required by Philadelphia Civil Rule *206.1 (D).

Philadelphia Local Rule * 1028(C).

In the case at bar, the preliminary objections filed by defendants were endorsed with a notice to plead. Plaintiffs failed to file a response with the prothonatary. Since plaintiffs have not filed an answer to the preliminary objections, which were endorsed with a notice to plead, the allegations of fact made by the objections constitute an admission. *Action Industries, Inc. v. Wiedman, 236 Pa.Super. 447, 346 A.2d 798 (Pa.Super.1975).* It does not follow however that the preliminary objections must be sustained; that depends upon the facts that have been admitted. *Id .* Furthermore, there is no admission of conclusions of law as distinct from allegations of fact. *Id.* Accepting as true the uncontradicted factual allegations of plaintiffs' complaint and the additional factual allegations of defendants' preliminary objections, the court finds that although the corporate status of Webnet is void and non existing under Delaware Law, Webnet has capacity to sue.

Under Pennsylvania law, the capacity of a corporation to sue is determined by the law of the state in which the corporation is organized. Webnet is a Delaware corporation. Under the Delaware Code, corporations exist for purposes of suit for three years after dissolution.

*6 All corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct, bodies corporate for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them … With respect to any action, suit or proceeding begun by or against the corporation either prior to or within 3 years after the date of its expiration or dissolution, the action shall not abate by reason of the dissolution of the corporation …

Del.Code Ann. Tit. 8 § 278.

Here, plaintiffs' claim that even though the corporate structure of Webnet was marked void, under Delaware law, Webnet has capacity to sue since the three year period from the date of dissolution to the institution of this lawsuit has not yet elapsed. A review of the exhibits provided by the parties fails to provide the court with evidence as to when Webnet's corporate structure was marked void. As such the court is unable to make a ruling at this time and therefore will hold its decision on this preliminary objection in abeyance for a period of ten days so the parties may provide the court with evidence as to when the corporate status of Webnet was marked void. [FN5]

FN5. The court sees no need for the investigation to be extensive. Indeed an inquiry to the Delaware Department of State may resolve the issue.

C. The Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims.

Defendants Taufer and Piper Rudnick, LLP maintain that this court lacks subject jurisdiction. Defendants contend that the Patent and Trademark Office has exclusive jurisdiction over this matter since plaintiffs' claims and all the relief requested by plaintiffs are predicated upon whether Lichtman was incorrectly omitted as an inventor from the patent and the patent application.

The mere mention of a patent in a cause of action will not automatically vest the federal courts with exclusive jurisdiction. *Ogantz Controls Co. v. Pirkle,* 346 Pa.Super. 253, 499 A.2d 593, 595 (Pa.Super.1985). While this Commonwealth has long recognized the exclusive jurisdiction of the federal courts in civil actions arising under the patent laws, the Pennsylvania Supreme Court has held that where patent rights are only indirectly involved, "jurisdiction is properly in the courts of the Commonwealth." *Id* (quoting *Van Products Co. v. General Welding & Fabricating Co.,* 419 Pa. 248, 254, 213 A.2d 769, 772 (1965)). Patent rights are incidental or indirectly involved when the "cause of action [is for] the breach of contract or wrongful disregard of confidential relations", and thus the state courts properly have jurisdiction over the matter. *Id* (quoting *Becher v. Contoure Laboratories,* 279 U.S. 388, 391, 49 S.Ct. 356, 357, 73 L.Ed. 752 (1929)).

A review of the complaint in this regard demonstrates that plaintiffs' cause of action against defendants is based solely on Pennsylvania law for breach of fiduciary duty. The issue of whether Lichtman was wrongfully omitted from the application is incidental to the main issue of the case. The relief requested by plaintiffs includes directing defendants to cease and desist their representation of Lewis and Adtraction, to prohibit any further dissemination of material, seeks an accounting for any activities they have been engaged in and seeks money damages for the breach of fiduciary duty. Accordingly, the court finds that the issue of patents is incidental to the claims made by plaintiffs within the complaint and overrules defendants' preliminary objection in this regard.

*7 Schnader also maintains that this court lacks subject matter jurisdiction. Schnader claims that since no patent has issued, plaintiffs have unrestricted use of such product and therefore have not suffered an "injury in fact". As stated supra, plaintiffs' cause of action against defendants is based solely on Pennsylvania law for breach of fiduciary duty. The issue of whether Lichtman's name was omitted from the patent application is incidental to this claim. The harm which plaintiffs allege was caused by defendants' breach of fiduciary duty arising from lost revenue derived from marketing, using and selling software and other related items which are allegedly jointly owned by plaintiffs and Lewis. The court finds that an injury in fact has been alleged. Accordingly, Schnader's preliminary objection as to subject matter jurisdiction is overruled.

D. Count II Alleging Breach of Fiduciary Duty Against Piper Rudnick is Legally Insufficient.

Defendant Piper Rudnick maintains that plaintiffs' complaint is legally insufficient. In support thereof defendant contends that the complaint fails to allege any basis upon which Piper Rudnick could be found to owe plaintiffs any duty and therefore the complaint should be dismissed against it.

For purposes of reviewing preliminary objections based upon legal insufficiency, "all well-pleaded material, factual averments and all inferences fairly deducible therefrom" are presumed to be true. *Levin v. Gauthier,* 2002 WL 372949, *4 (Pa.Com.Pl.2002) (J. Sheppard). When presented with preliminary objections whose end result would be the dismissal of a cause of action, a court should sustain the ojections only where "it is clear and free from doubt from all the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish [its] right to relief." *Id.* Furthermore, it is essential that the face of complaint indicate that its claims may not be sustained and that the law will not permit recovery. If there is any doubt, it should be resolved by the overruling of the demurrer. Put simply, the question presented by demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. *Baily v. Storlazz* i, 729 A.2d 1206, 1211 (Pa.Super.1999).

Under Pennsylvania law, a fiduciary relationship exists "when one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side or weakness, dependence or justifiable trust, on the other." *Levin v. Gauthier,* 2002 WL 372949, *5 (Pa.Com.Pl.2002) (J. Sheppard) (quoting *Com.,Dept. of Transp. v. E-Z Parks, Inc.,* 153 Pa. Cmmwlth. 258, 267, 153 Pa.Cmwlth. 258, 620 A.2d 712, 717 (Pa.Cmwlth.1993)).

In the case at bar, plaintiffs have not alleged the existence of an attorney client relationship with Piper Rudnick and therefore have not alleged facts to show that Piper Rudnick owed them a fiduciary duty. They have not alleged an express contract, nor have they offered facts to show an implied attorney client relationship under which Piper Rudnick owed them a duty which was breached.

*8 An implied attorney-client relationship will be found if 1) the purported client sought advice or assistance from the attorney; 2) the advice sought was within the attorney's professional competence; 3) the attorney expressly or impliedly agreed to render such assistance; and 4) it is reasonable for the putative client to believe the attorney was representing him. *Romy v. Burke,* 2003 WL 21205975 *2 (Pa.Com.Pl.2003)(quoting *Cost v. Cost,* 450 Pa.Super. 685, 692, 677 A.2d 1250, 1254 (Pa.Super.1996)). Here, plaintiffs neither sought nor received advice or assistance from Piper Rudnick. Accordingly, the claim for breach of fiduciary duty against Piper Rudnick fails as a matter of law.

In addition to the breach of fiduciary duty claim, plaintiffs also assert a claim for aiding and abetting defendant Lewis in violating his fiduciary duty to plaintiffs. In order to state a claim for aiding and abetting a breach of fiduciary duty under Pennsylvania law, the following elements must be alleged: 1) a breach of a fiduciary duty owed to another; 2) knowledge of the breach by the aider and abettor; and 3) substantial assistance or encouragement by the aider and abettor in effecting that breach. *Koken v. Steinberg,* 825 A.2d 723, 732 (Pa.Cmwlth.2003) (quoting Restatement (Second) Torts § 876 (1079)).

In the case at bar, although plaintiffs complaint alleges a breach of fiduciary duty by Lewis and Ad Traction, the complaint does not allege that Piper Rudnick knew of Lewis' and Adtraction's duties and their breach of those duties. The complaint also fails to allege that Piper Rudnick rendered substantial assistance or encouragement in effecting the alleged breach by Lewis and that said assistance and encouragement was the cause of the damage to plaintiffs. Accordingly, the court will sustain plaintiffs' preliminary objection to the aiding and abetting the breach of fiduciary duty claim against Piper Rudnick. In the event plaintiffs are capable of repleading such a claim, plaintiffs are granted leave to amend the complaint to solely allege facts as they pertain to the aiding and abetting the breach of fiduciary duty claim. [FN6]

FN6. The court will not address the preliminary objection concerning punitive damages since the court has sustained defendant Piper Rudnick, LLP objections on other grounds. Thus, the preliminary objection on punitive damages is moot. Additionally, Piper Rudnick's LLP's preliminary objection based on a failure to attach the retainer agreement is also moot.

E. Count II Alleging Breach of Breach of Fiduciary Duty Against Schnader is Factually Sufficient.
Schnader filed a preliminary objection based upon Pa. R. Civ. P. 1042.2(a) for failing to identify each
defendant against whom the plaintiffs are asserting a professional liability claim. In the alternative,
defendant Schnader maintains that the facts set forth in the complaint are not sufficiently specific to
enable it to determine the legal basis of the claims. This court finds that the claims presented within
the complaint do not allege professional liability but rather allege claims for breach of fiduciary duty
and aiding and abetting defendant Lewis to breach their fiduciary duty to plaintiffs. To determine if a
pleading meets Pennsylvania's specificity requirements, a court must ascertain whether the
allegations are "sufficiently specific so as to enable [a] defendant to prepare [its] defense." Smith v.
Wagner, 403 Pa.Super. 316, 319, 588 A.2d 1308, 1310 (Pa.Super.1991). See also In re the Barnes
Found., 443 Pa.Super. 369, 381, 661 A.2d 889, 895 (Pa.Super.1995) ("a pleading should … fully
summarize[e] the material facts, and as a minimum, a pleader must set forth concisely the facts upon
which [a] cause of action is based").
*9 Count II of the complaint alleges that Schnader breached its fiduciary duty to plaintiffs and that it
aided and abetted defendants Lewis and Ad Traction in breaching their fiduciary duty to plaintiffs. The
court finds that plaintiffs' complaint is sufficiently specific to state a claim for breach of fiduciary duty
and for aiding and abetting the breach of fiduciary duty claim. Accordingly, defendant Schnader's
preliminary objections are overruled.
F. The Complaint Should Not Be Stricken For Failure To Attach Writings.
Schnader maintains that the complaint should be stricken for failure to attach the alleged retainer
agreement, the provisional patent application and the patent application which were referred to within
the complaint. Pa. R. Civ. P. 1019(i) requires a plaintiff to attach a copy of a writing on which his or
her claim is based. A review of the prothonatary file in this matter demonstrates that the plaintiffs
filed a praecipe to annex the retainer agreement between plaintiffs and Schnader to the complaint.
Additionally, the retainer agreement was also supplied to opposing counsel. Based on the foregoing,
defendants preliminary objection with respect to failure to attach the retainer agreement is moot.
[FN7]

> FN7. Defendant Schnader argues that the praecipe was not docketed. A review of the
> prothonatary file demonstrates that it is marked "Not Docketed Forwarded to Record."

Additionally, Schnader argues that the provisional patent application and the patent application have
not been attached to the complaint and therefore the complaint must be stricken. There is no need to
attach the provisional patent application and the patent application since they do not form the basis
for plaintiffs' suit. See Pa. R. Civ. P. 1019(1) ("when any claim or defense is based upon a writing, the
pleader shall attach a copy of the writing"). If the document does not form the basis of the claim the
document need not be attached. See Com., Dept. of Transp. v. Bethlehem Steel Corp., 33 Pa.Cmwlth.
1, 15, 380 A.2d 1308, 1315 (Pa.Cmwlth.1977). Accordingly, Defendant's preliminary objection for
failure to attach the provisional patent application and the patent application is Overruled.
G. Plaintiffs Claims Are Not Barred By the Doctrine of Laches
Schnader maintains that plaintiffs' complaint should be dismissed since its claims are barred by the
doctrine of laches. Laches may be raised by preliminary objection in an equity action. Pa. R. Civ. P.
1509(b). "While the defense of laches may be raised by preliminary objections, laches should never
be declared unless the existence thereof is clear on the face of the record." Ritter v. Theodore
Pendergrass Teddy Bear Productions, Inc., 356 Pa.Super. 422, 514 A.2d 930 (Pa.Super.1986)
(quoting Estate of Marushak, 488 Pa. 607, 610, 413 A.2d 649, 651 (1980)). This means that the
party asserting laches must show, first, a delay arising from the other party's failure to exercise due
diligence and second prejudice from the delay. Id. Whether this burden has been met is a factual
question, answered by examining the circumstances of the particular case. Id.
*10 Here, this court finds that the existence of laches is not clear from the face of the record since
factual issues exist as to the circumstances surrounding the alleged delay in filing the complaint and
any resultant prejudice arising from the delay. Accordingly, Schnader's preliminary objection is
Overruled.
H. Schnader's Preliminary Objection Seeking to Transfer the Case to the Law Side of the Court is
Overruled.

Defendant Schnader argues that plaintiffs' action should be certified to the law side of the court since plaintiffs have a full, complete and adequate remedy at law. This court is vested with the full jurisdiction of the whole court and may sit in equity and in law. *Indymac Bank, FSB v. Bey,* 2002 WL 31082395, *2 (Pa.Com.Pl. September 12, 2002) (J. Sheppard) (citing 42 Pa.C.S. § 952). Where the action is in equity and seeks both equitable relief and legal relief (for which an action at law is an adequate remedy), the court will adjudicate all such claims in the equity action in order to do complete justice and avoid piecemeal litigation. *Com. v. Kitchen Appliances Distributors, Inc.,* 27 Pa. D. & C.3d 91, 95 (Pa.Com.Pl.1981). "Equity has jurisdiction to do complete justice between the parties ...... equity will itself proceed to round out the whole circle of controversy, by deciding every other contention connected with the subject matter of the suit, including the amount of damages to which plaintiff is entitled because of injuries sustained." *Id.* (quoting Wortex 11, 13, citations omitted). "The equity side of court shall always be open." *Indymac Bank,* supra. *Id;* (quoting Pa. R.Civ. P. 1502). Furthermore, there is no procedural mechanism to transfer a matter from the civil to the equity side of court. *Id;* (citing *Lustig v. Lustig,* 438 Pa.Super. 320, 321, 652 A.2d 393, 394 (Pa.Super.1995)). Accordingly, Schnader's preliminary objection is overruled.

## CONCLUSION

For the foregoing reasons, the court sustains in part and overrules in part Defendants' Preliminary Objections as follows:

1. The Preliminary Objection of Defendants Lewis and Adtraction pursuant to Pa. R. Civ. P. 1028(a)(6) is Overruled.

2. The Preliminary Objections of Defendant Schnader Harrison Segal and Lewis and Defendants Taufer and Piper Rudnick, LLP as to Webnet's lack of capacity to sue is held under advisement for ten days so the parties may provide the court with evidence as to when the corporate status of Webnet was dissolved.

3. The remaining Preliminary Objections of Defendant Schnader Harrison Segal and Lewis are Overruled.

4. The Preliminary Objection of Defendants Taufer and Piper Rudnick, LLP as it pertains to Count II (Breach of Fiduciary Duty) is Sustained.

5. The Preliminary Objection of Defendants Taufer and Piper Rudnick, LLP as it pertains to Count II (Aiding and Abetting Breach of Fiduciary Duty) is Sustained. Plaintiffs are granted leave to amend the complaint as it pertains to this claim within twenty days from the date of this order. All other preliminary objections are Overruled. A contemporaneous Order will be filed with this Memorandum Opinion.

## ORDER

*11 AND NOW, this 13th day of July, 2004, upon consideration of the Preliminary Objections of Defendants Adrianne Lewis and Adtraction, Inc., t/a ad Traction (cn 041919), the Preliminary Objections of Paul Taufer, Esquire and Piper Rudnick, LLP (cn 051697) and the Preliminary Objections of Schnader, Harrison, Segal & Lewis LLP (cn 051602), plaintiffs' response in opposition, Memoranda, all matters of record and in accord with the contemporaneous Memorandum Opinion filed of record, it hereby is ORDERED and DECREED that

1. The Preliminary Objection of Defendants Lewis and Adtraction pursuant to Pa. R. Civ. P. 1028(a)(6) is Overruled.

2. The Preliminary Objections of Defendant Schnader Harrison Segal and Lewis and Defendants Taufer and Piper Rudnick, LLP as to Webnet's lack of capacity to sue is held under advisement for ten days so the parties may provide the court with evidence as to when the corporate status of Webnet was dissolved.

3. The remaining Preliminary Objections of Defendant Schnader Harrison Segal and Lewis are Overruled.

4. The Preliminary Objection of Defendants Taufer and Piper Rudnick, LLP as it pertains to Count II (Breach of Fiduciary Duty) is Sustained.

5. The Preliminary Objection of Defendants Taufer and Piper Rudnick, LLP as it pertains to Count II (Aiding and Abetting Breach of Fiduciary Duty) is Sustained. Plaintiffs are granted leave to amend the complaint as it pertains to this claim within twenty days from the date of this order. All other preliminary objections are Overruled.

Pa.Com.Pl.,2004.

Lichtman v. Taufer

2004 WL 1632574 (Pa.Com.Pl.)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1175740 (E.D.Pa.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
David H. MARION, as Receiver for Bentley Financial Services, Inc.
v.
TDI, INC. (f/k/a Traders and Dealers, Inc., f/k/a The Trading Desk, Inc. and
f/k/a U.S. Central Securities, Inc.), Southeastern Securities, Inc., SFG
Financial Services, Inc., Peninsula Bank, Theodore Benghiat, Casto Edwin
Rivera, Jerry Manning, John Strine, Jeffrey Wilson and Joseph Marzouca
No. Civ.A. 02-7032.
May 27, 2004.

David L. Grove, David D. Langfitt, Frank A. Mayer, III, John H. Lewis, Jr., Montgomery, McCracken,
Walker & Rhoads LLP, Philadelphia, PA, for Plaintiff.
TDI, Inc., Aurora, CO, pro se.
Marc J. Sonnenfeld, Morgan, Lewis & Bockius, LLP, Steven Arbittier, Thomas B. Roberts, Ballard Spahr
Andrews & Ingersoll, LLP, Philadelphia, PA, for Defendants.
Jerry Manning, Aurora, CO, pro se.
John Strine, Littleton, CO, pro se.
Jeffrey Wilson, Littleton, CO, pro se.

*MEMORANDUM AND ORDER*

FULLAM, J.
 *1 The Securities and Exchange Commission brought suit against Robert L. Bentley, Bentley Financial
Services, Inc. and Entrust Group, alleging serious violations of the securities laws, and obtained the
appointment of a receiver for those entities (C.A. No. 01-5366). David H. Marion, Esquire, was
appointed Receiver, and given "complete jurisdiction over, and control of all property, real, personal
or mixed, including any assets or funds, wherever located, of all defendants" (Order dated November
7, 2001).
Briefly summarized, Robert L. Bentley and his corporations, Bentley Financial Services, Inc. and
Entrust Group, conducted an elaborate financial swindle which eventuated into a Ponzi-scheme.
Investors were led to believe that they were purchasing from BFS federally-insured certificates of
deposit (CD's), whereas actually they were purchasing unregistered IOU's of BFS. Some $4 billion
dollars worth of these unregistered securities were sold, far in excess of BFS's ability to repay. Funds
received from current investors were used to keep the scheme afloat as long as possible, but, like all
Ponzi schemes, the arrangement collapsed.
In his capacity as Receiver of Bentley Financial Services, Inc., Mr. Marion has brought this action
against various entities and individuals whose wrongful conduct allegedly helped to perpetuate the
scheme, and thus damaged BFS by increasing its liabilities to defrauded investors. The defendants
are:
1. Southeastern Securities, Inc., SFG Financial Services, Inc., Theodore Benghiat, and Casto Edwin
Rivera (the "Benghiat Defendants"). Southeastern Securities is a registered broker-dealer which acted
as co-broker in many of the sales of unregistered securities; Benghiat was President of Southeastern
Securities and its related company "SFG," and Rivera was compliance officer.
2. Peninsula Bank and Joseph Marzouca, its executive vice president. Peninsula Bank purported to be
acting as escrow agent holding the legitimate CD's which the securities sold by BFS were supposed to
represent (i.e., in which the investors supposedly obtained an interest).
3. TDI, Inc. ("TDI") and various related entities (hereinafter collectively referred as "TDI") was a
broker-dealer registered with NASD, which employed Mr. Bentley for a time, and was allegedly
involved in many of the fraudulent sales. Defendant Jerry Manning was CEO and compliance officer
for TDI. Defendants John Strine and Jeffrey Wilson were, respectively, vice president and president of
TDI, and also compliance officers.
Plaintiff's claims are set forth in a first amended complaint, 64 pages in length, containing 271

paragraphs. Plaintiff is proceeding on several theories, set forth in 20 separate counts. The Benghiat Defendants and Peninsula Bank and its vice president Joseph Marzouca have filed motions to dismiss under Fed.R.Civ.P. 12(b)(6). Peninsula Bank and Mr. Marzouca also seek dismissal for lack of jurisdiction.

The amended complaint includes the following claims: Count I, violation of the Securities Exchange Act, § 20(a), 15 U.S.C. § 78t(a); Count II, respondeat superior liability under § 20(a) of the Securities Exchange Act; Count III, respondeat superior liability for failure to supervise registered representatives of a securities broker; Counts IV and V, negligence; Count VI, negligent supervision; Count VII, deepening insolvency; Counts VIII and IX, breach of fiduciary duty; Count X, fraud; Count XI, breach of contract; Count XII, conversion; Count XIII, violation of Pennsylvania securities law (70 P.S. §§ 1-501, 1-503); Count XIV, aiding and abetting fraud; Count XV, aiding and abetting constructive fraud; Count XVI, aiding and abetting breach of fiduciary duty; Count XVII, aiding and abetting conversion; Count XVIII, aiding and abetting deepening insolvency; Count XIX, negligent misrepresentation; and, Count XX, unjust enrichment.

*2* Since I am required, at this stage, to accept as true all factual averments of the amended complaint, and since dismissal is improper unless it is clear that plaintiff cannot possibly prove the claim asserted; and since the amended complaint has obviously been prepared with great care and skill, I am satisfied that, except for the issues discussed below, the motions to dismiss lack arguable merit. Plaintiff may well be unable to prove the claims being asserted, but he is entitled to proceed with the attempt.

The potentially dispositive issues do require discussion. They are: (1) whether this court has jurisdiction over the claims being asserted against Peninsula Bank and Joseph Marzouca, in view of a forum-selection clause in the document setting forth Peninsula Bank's role as escrow agent; (2) whether plaintiff has standing to assert claims for conduct which allegedly increased BFS's liability to defrauded investors; and (3) whether plaintiff's claims are barred by the doctrine of *in pari delicto.*

I. *The Forum-Selection Clause*

Entrust, one of the Bentley receivership entities, entered into three "custodian agreements" with the defendant Peninsula Bank, setting forth the terms under which the Bank was to maintain a custody account for federally-insured CD's. Each of these agreements contained the following forum-selection clause:

"This agreement is governed by the laws of the state of Florida and by applicable federal law. This agreement binds you and your heirs, personal representatives, successors and assigns. You and [Peninsula State Bank] agree that any legal action related to this agreement shall be solely determined by the federal or state courts sitting in Date County, Florida. You and PSB agree to irrevocably waive the right to trial by jury in any action arising from this agreement."

It is clear that this lawsuit is not an "action arising from this agreement." A closer question is whether this lawsuit constitutes a "legal action related to this agreement." Peninsula contends that this action is "related to" the escrow agreement because, in its view, certain provisions of that agreement provide a complete defense against the claims now being asserted by the Receiver. According to Peninsula, the escrow agreements required Peninsula to carry out the instructions of Entrust, without any obligation to inquire into the propriety of Entrust's requests.

I have concluded that the forum-selection clause should not be enforced, for several reasons. In the first place, the language "any legal action related to this agreement" is less precise than the language "any action arising from this agreement," and it is reasonable to suppose that the contracting parties intended the two phrases to have the same meaning. I am thus led to conclude that this lawsuit is not covered by the forum-selection clause. Ambiguities should be resolved against PSB, which drafted it. I note also that, in *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.,* 709 F.2d 190 (3d Cir.1983), the Court stated "a forum-selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable." If, as plaintiff alleges, the escrow arrangements between Entrust and the Peninsula Bank were an integral part of the fraudulent activities of the Bentley entities, and Peninsula Bank tortiously aided and abetted in the execution and prolongation of the fraudulent scheme, it would be contrary to public policy (of this or any other forum) to permit the wrongdoers to select the forum in which their liability would be determined.

*3* Finally, it is at least arguable that Peninsula Bank should be deemed to have submitted to the jurisdiction of this court by submitting a claim letter demanding attorneys' fees (pursuant to

paragraph 8 of the custodian agreement) for defending this action. *See Travellers Int'l AG v. Robinson, 982 F.2d 96, 99 & n. 5 (3d Cir.1992); Langenkamp v. Culp, 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990).*

The motion of the Peninsula Bank defendants to dismiss for lack of jurisdiction will therefore be denied.

II. *Standing*

The defendants argue that plaintiff's claims for securities law violations, fraud, etc., are really the claims of the defrauded investors. It is undoubtedly true that persons who were directly victimized by the alleged sale of unregistered securities under false pretenses, the alleged fraud, etc. have claims against the parties directly involved, BFS, Entrust and Robert Bentley. And, presumably, they would have claims which they might assert against these defendants, for alleged participation in the fraudulent scheme and in its continuation. But this does not mean that the plaintiff, as Receiver for BFS, should be precluded from asserting that the defendants' wrongful conduct has rendered BFS liable to the defrauded investors, thus increasing the liabilities of BFS. So long as double recoveries are avoided, I see no reason why the Receiver should be precluded from proceeding against wrongdoers who damaged BFS by increasing its liabilities, merely because, eventually, any recovery by the Receiver would enure to the benefit of the defrauded investors.

The Receiver has been authorized to take control of all of the assets of the receivership entities. As pleaded in the amended complaint, the assets of the receivership entities include their claims against these defendants. The Receiver has control of these assets, and may seek to realize upon them. Of course, any recovery which is ultimately distributed to the defrauded investors will be credited against their claims, just as any direct recoveries by the defrauded investors against these defendants would be credited against the claims asserted by plaintiff in this action.

III. *In Pari Delicto*

The defendants, understandably, contend that since Robert Bentley and his companies, BFS and Entrust Group conceived and carried out the fraudulent plan, they are precluded by the doctrine of *in pari delicto* from complaining against other alleged participants in the scheme. I conclude, however, that the plaintiff Receiver, as an innocent successor-in-interest, does not suffer from the same handicap. As the Third Circuit Court of Appeals has stated, the defense of *in pari delicto* "loses its sting" when the bad actor is eliminated. *See In re Personal & Bus. Ins. Agency, 334 F.3d 239, 246 (3d Cir.2003); Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 358 (3d Cir.2001); FDIC v. O'Melveny & Meyers, 61 F.3d 17, 19* (9th Cir.1994); *but see Knauer v. Jonathan Roberts Fin. Group, Inc. ., 348 F.3d 230* (7th Cir.2003).

*Conclusion*

*\*4* For all of the foregoing reasons, defendants' motions to dismiss the complaint will be denied, without prejudice to a properly supported motion for summary judgment, if justified by the facts.

*ORDER*

AND NOW, this day of May 2004, upon consideration of defendants' motions to dismiss, IT IS ORDERED:

That the respective motions of Southeastern Securities Inc., SFG Financial Services Inc., Theodore Benghiat and Casto Edwin Rivera, and Peninsula Bank and Joseph Marzouca to dismiss plaintiff's first amended complaint are DENIED.

E.D.Pa.,2004.

Marion v. TDI, Inc.

2004 WL 1175740 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:02CV07032 (Docket) (Aug. 28, 2002)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1993 WL 197031 (E.D.Pa.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
B. Ray THOMPSON, Jr., et al.
v.
GLENMEDE TRUST COMPANY, et al.
No. CIV. A. 92-5233.
June 8, 1993.

MEMORANDUM AND ORDER

HUTTON.
 *1 Presently before the Court is a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 23.1, 12(b)(6) and 9(b), the plaintiffs' response and the defendants' reply. The Motion is filed on behalf of defendants Glenmede Trust Company, Glenmede Corporation, Thomas W. Langfitt, Albert E. Piscopo, J. Howard Pew, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, John G. Pew, Jr., G. Thompson Pew, Jr., Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris, Sr..
I. BACKGROUND

A. *Parties*
The plaintiffs in this matter include seven individual members of the Thompson family. [FN1] In addition, three plaintiffs have sued in their capacity as trustees of five Thompson family trusts. [FN2] The individual plaintiffs, in addition to their common bond in the Thompson family name, all hold shares of stock in Oryx Energy Corporation ("Oryx"). In addition, the five Thompson family trusts each hold shares of Oryx stock for the benefit of members of the Thompson family. Collectively, the plaintiffs were the second largest shareholder of Oryx. All plaintiffs shall be commonly referred to as the "Thompson Family" or "plaintiffs."
The plaintiffs have named as defendants the Glenmede Trust Company ("Glenmede Trust") and its parent Glenmede Corporation. Glenmede Trust is Glenmede Corporation's wholly owned subsidiary. The plaintiffs have also named J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, John G. Pew, Jr., and G. Thompson Pew, Jr., as defendants (hereinafter "Pew Defendants"). These defendants are shareholders of Glenmede Corporation and have for the most part been directors of one or both of Glenmede Corporation and Glenmede Trust during the times relevant to the events complained of in the complaint. John G. Pew, Jr. was also a director of Oryx.
The complaint also names Thomas W. Langfitt. Mr. Langfitt is the president, chief executive officer and a director of both Glenmede Corporation and Glenmede Trust. Mr. Langfitt is also the president of seven trusts commonly known as the Pew Charitable Trusts. [FN3] In addition, the plaintiffs have named Albert E. Piscopo. Mr. Piscopo is the executive vice president and chief financial officer of Glenmede Corporation and Glenmede Trust. He was also a director of Oryx.
The plaintiffs have also named Glenmede Trust in its capacity as trustee of nine trusts. These trusts include the seven Pew Charitable Trusts and The Waldorf Educational Foundation, and The J. Howard Pew Fund for Presbyterian Uses. The remaining trustees of these trusts have also been named in the capacity as trustee. Defendants, J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, and R. Anderson Pew, have been members of the board that assists in managing the Pew Charitable Trusts. Francis M. Richard, Jr. is sued in his capacity as co-trustee for the Medical Trust, one of the Pew Charitable Trusts. Karin E. Myrin and Samuel W. Morris, Sr. are sued in their capacities as co-trustees for the Waldorf Educational Foundation. The plaintiff has referred to all these trusts and trustees as the "Defendant Trusts."
 *2 Finally, the plaintiffs have named Robert P. Hauptfuhrer. Mr. Hauptfuhrer is the chairman of the board, a director, and chief executive officer of Oryx.
B. Plaintiffs' Claims
The triggering event which prompted the filing of this diversity action involves a stock buy-back transaction in which Oryx purchased approximately 25.3 million shares held by the trusts of which Glenmede Trust was trustee. Glenmede Trust held shares of Oryx as trustee for the previously named nine trusts. Oryx purchased the 25.3 million shares for $1.36 billion. As a result of the purchase, the

market for Oryx shares began to fall. From the date of the purchase, September 11, 1990 to the filing of the complaint on December 7, 1992, Oryx stock fell from a high of approximately $54 a share to the low to mid $20 range. The Thompson Family alleges a loss of approximately $80 million as a result of the buy-back transaction.

The plaintiffs contend that the goals of the transaction were: (1) to divert funds improperly out of Oryx and into the Defendant Trusts; (2) to liquidate or diversify the Defendant Trusts' holdings of Oryx stock and to maximize the value received for the Defendant Trusts' holdings in Oryx; (3) to entrench and protect defendant Hauptfuhrer in his executive position at Oryx; and (4) to allay his concerns that the Glenmede/Pew defendants might act unilaterally in a way that would threaten his position.

Plaintiffs have alleged that the transaction was instigated, devised and executed by Glenmede Trust, its parent, defendant Glenmede Corporation, and the Pew Defendants and the Defendant Trusts. (Complaint ¶¶ 3, 34). The plaintiffs allege that Glenmede Trust and Glenmede Corporation are controlled by the Pew family. Allegedly, the stock transaction was detrimental to Oryx and the plaintiffs and was extremely lucrative for Glenmede Corporation, Glenmede Trust, the Defendant Trusts and the Pew Defendants. (Complaint ¶ 43). Plaintiffs allege that Glenmede Trust failed to advise them before and after the transaction of its consequences to Oryx.

According to the allegations of the complaint, Glenmede owed fiduciary duties to plaintiffs (the Thompson family interests) at the same time as it owed duties to the Pew family interests. Plaintiffs allege that Glenmede and the Pew family interests are commonly controlled and indivisible, making the duties owed to plaintiffs even clearer. Those duties were allegedly breached when the Pew family interests were advanced by the buy-back transaction, and the Thompsons were ignored by Glenmede and harmed by the transaction it precipitated.

All defendants named in this action with the exception of defendant Robert P. Hauptfuhrer have collectively joined in this motion to dismiss.

## II. DISCUSSION

Federal Rule of Civil Procedure 8(a) requires that a plaintiff's complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief … " Fed.R.Civ.P. 8(a). Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering this motion, the Court shall take all allegations in the complaint as true and construe them in the light most favorable to the plaintiffs. *H.J. Inc. v. Northwest Bell Tel. Co.,* 109 S.Ct. 2893, 2906 (1989). The complaint shall only be dismissed if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

*\*3* As a special pleading matter, a count for fraud must be stated with particularity. Fed.R.Civ.P. 9(b). Rule 9(b) provides:

(b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b). To meet the requirement of Rule 9(b), the complaint must allege sufficient detail as to the circumstances of the alleged fraud so that the defendant will have notice of the precise misconduct charged. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,* 469 U.S. 1211 (1985); *In re Scott Paper Securities Litigation,* 138 F.R.D. 56, 58 (E.D.Pa.1991); *Antinoph v. Laverell Reynolds Securities, Inc.,* 703 F.Supp. 1185, 1188 (E.D.Pa.1989) (Hutton, J.).

The defendants have also moved to dismiss pursuant to Federal Rule of Civil Procedure 23.1. The defendants contend that some of the plaintiffs' claims are derivative and must be filed on behalf of Oryx. However, they argue that since the plaintiffs have not complied with the pleading requirements of a derivative action under Rule 23.1, these "derivative claims" must be dismissed. Rule 23.1, entitled "Derivative Actions by Shareholders," in pertinent part provides:

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable

authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

The Court will address each count separately.

A. *Count One: Breach of Fiduciary Duty*

Count one alleges violations of fiduciary duties owed to the Thompson Family. The count seeks relief against Glenmede Corporation, Glenmede Trust, the Pew Defendants, the Defendant Trusts, Defendant Langfitt and Defendant Piscopo. The plaintiffs' fiduciary allegations can be classified as: (1) the fiduciary relationship arising from Glenmede Trust's oral and written agreement to provide financial guidance to the Thompson Family (Complaint ¶ 21); and (2) the fiduciary relationship arising from the defendants' status as dominant and controlling shareholders and/or directors of Oryx. (Complaint ¶ 24).

*\*4* The plaintiffs have asserted that the defendants violated their fiduciary duties by:

(a) failing to advise plaintiffs that Oryx shares should be sold prior to the buy-back transaction;

(b) participating in the scheme and conspiracy [improperly diverting funds out of Oryx to the benefit of the Defendant trusts and entrenching defendant Hauptfuhrer at Oryx];

(c) entering into the buy-back transaction; and

(d) failing to advise plaintiffs at the time of or following the transaction of the detrimental effect of the transaction on Oryx and plaintiffs and to advise plaintiffs to sell their Oryx stock.

(Complaint ¶ 44).

1. Agreement for Financial Guidance--*Defendant Glenmede Trust Company*

The plaintiffs contend that Glenmede Trust owed fiduciary duties to them in its capacity as the plaintiffs' investment advisor. (Complaint ¶¶ 1 and 20). This contractual fiduciary relationship allegedly covered the plaintiffs' ownership interest in Oryx. The defendant Glenmede Trust does not challenge the plaintiffs' claim of violation of this particular fiduciary relationship in this motion.

2. Defendant Glenmede Corporation, Defendant Trusts, Defendant Langfitt, Defendant Piscopo and the *Pew Defendants*

The plaintiffs' complaint, although recognizing a distinction between Glenmede Trust and Glenmede Corporation, has commonly referred to both Glenmede Trust and Glenmede Corporation. The plaintiffs' reasoning behind this common reference is the allegation that "[b]oth entities have substantially similar management and directors and have each acted interchangeably … " (Complaint ¶ 11). Although not entirely clear, it is apparent from the complaint and the parties' briefs that the fiduciary relationship with respect to the investment agreement is solely between defendant Glenmede Trust and the plaintiffs. (Complaint ¶¶ 1 and 20). The complaint states that the professional fiduciary is Glenmede Trust. (Complaint ¶ 1).

Nevertheless, with respect to Glenmede Corporation as well as the Pew defendants, the Defendant Trusts, Defendant Piscopo, and Defendant Langfitt, the plaintiffs have not alleged a fiduciary relationship. "A fiduciary relationship exists where there is 'a relationship involving trust and confidence, and the proof must show confidence reposed by one side and domination and influence exercised by the other." *Antinoph v. Laverell Reynolds Sec. Inc., 703 F.Supp. 1185, 1188 (E.D.Pa.1988)*, (Hutton, J.), (*quoting, Lehner v. Crane Co., 448 F.Supp. 1127, 1131 (E.D.Pa.1978)*); *See also City of Harrisburg v. Bradford Trust, 621 F.Supp. 463, 473 (M.D. Pa.1985)*. "It is not enough to show that the plaintiff reposed its trust in the defendant; the latter must also have accepted the fiduciary relationship." *City of Harrisburg, 621 F.Supp. at 473; Antinoph, 703 F.Supp. at 1188.*

The plaintiffs' complaint does not allege that plaintiffs have reposed their trust in these particular defendants nor does it allege that these particular defendants accepted a fiduciary relationship with the plaintiffs. *Antinoph, 703 F.Supp at 1188; Bradford Trust, 621 F.Supp. at 473-474.* The plaintiffs have only alleged the investment advisory fiduciary relationship with respect to Glenmede Trust. Accordingly, the plaintiffs' complaint does not allege a claim against these defendants for violation of a fiduciary duty.

3. *Status as Shareholder and Director of ORYX*

*\*5* To the extent that the plaintiffs have raised claims for breach of fiduciary duties arising from the defendants' status as dominant and controlling shareholder and/or directors of Oryx in count one, the plaintiffs' claim must be dismissed. The plaintiffs freely admit that they have not complied with the requirements of Fed.R.Civ.P. 23.1. (Plaintiffs' Memorandum in Opposition at 9). In particular, the plaintiffs have not alleged that they have made efforts to obtain the desired action from the directors or comparable authority and from the shareholders or members, or the reasons for the failure to obtain the action or for not making the effort. Instead, they contend that Rule 23.1 does not apply to their complaint because it only seeks relief for claims which are individual. The defendants contend

that these claims are derivative.

Under Delaware law, the state of incorporation of Oryx, the court must examine the nature of wrongs alleged in the body of the complaint rather than the plaintiffs' designation or stated intention in determining whether a claim is derivative or individual. [FN4] *Brug v. The Enstar Group, Inc.,* 755 F.Supp. 1247, 1257 (D.Del.1991), (*citing, Lipton v. News Int'l, Plc,* 514 a.2d 1075, 1078 (Del.1986)). A stockholder can maintain an individual action if he has sustained a "special injury." *Lipton,* 514 A.2d at 1078. A special injury is defined as a wrong inflicted upon a stockholder alone or a wrong affecting any particular right which he is asserting such as preemptive rights, rights involving control of the corporation, or a wrong affecting the stockholders and not the corporation. *Id. (quoting Elster v. American Airlines, Inc.,* 100 A.2d 219, 223 (Del.Ch.1953)). "A shareholder who suffers an injury peculiar to itself should be able to maintain an individual action, even though the corporation also suffers an injury from the same wrong." *Lipton,* 514 A.2d at 1079. However, "[w]hen an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively on behalf of the corporation." *Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (Del.1970).

The plaintiffs' claims arising from the particular breach of the fiduciary duty existing as a result of the defendants' status as dominant and controlling shareholder and/or directors of Oryx are not individual. These claims are derivative. *See MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.,* 1985 WL 21129 (Del.Ch.), (*citing, Gearhart Industries, Inc. v. Smith International,* 741 F.2d 707, 721 (5th Cir.1984); *Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (Del.Sup.1970).

The plaintiffs have not identified any wrong peculiar to them with respect to this violation. The plaintiffs' injuries are common to all shareholders of Oryx and to Oryx itself. The complaint states that the buy-back transaction was "inimical to the best interests of Oryx and its remaining shareholders, including the Thompson plaintiffs … " (Complaint ¶ 36). The plaintiffs' complaint primarily articulates that the fiduciary breach of the defendants resulted in the decline in value of their shareholdings in Oryx. (Complaint ¶ 47). The best summary of the plaintiffs' injuries appears in the plaintiffs' complaint at paragraph 4. It provides:

*\*6* As a result of the buy-back transaction, the Oryx shareholders remaining after the transaction (including plaintiffs) have seen the apparent value of their company shares plummet from a high of over $53 per share on the day of the transaction, to the low to mid-$20's per share today. The loss in value of the plaintiffs' Oryx shares since the buy-back transaction is over $80 million.

Further, the relief which the plaintiffs are requesting in their complaint confirms this determination. The relief sought may be an indicator as to the derivative nature of a claim. *Kramer v. Western Pac. Indus., Inc.,* 546 A.2d 348, 352 (Del.1988). The complaint in this case includes the request for the following relief with respect to count one:

B) … Rescission of the buy-back transaction;

\* \* \*

D) … Disgorgement of any consideration derived by any defendant from the buy-back transaction, and imposition of a constructive trust on any such consideration.

Rescission of a contract as a remedy is only available to a party to the contract. *Paul S. Mullin & Assocs., Inc. v. Bassett,* 632 F.Supp. 532, 537 (D.Del 1986). The plaintiffs were not a party to the buy-back transaction between Glenmede Trust and Oryx. Rescission could only be available to one of those parties. Further, the plaintiffs recognized that they would not be personally entitled to disgorgement consideration by requesting a constructive trust. These remedies are the type of remedies expected to be pled in a derivative action seeking relief on behalf of the corporation.

Since the violation of this fiduciary relationship is derivative, the plaintiffs may not maintain this claim without first complying with Federal Rule of Civil Procedure 23.1. Plaintiffs have admitted that they have not complied with the rule's requirements. Accordingly, this claim is dismissed with respect to all defendants who have been named in this count for failure to meet the requirements of Rule 23.1.

B. *Count Two*

1. *Civil Conspiracy*

Count two seeks liability for civil conspiracy against all defendants. In *Burnside v. Abbott Laboratories,* 505 A.2d 973 (Pa.Super.1985), the Pennsylvania court stated:

To state a cause of action for civil conspiracy under Pennsylvania law, a complaint must allege the existence of all elements necessary to such a cause of action. A cause of action for conspiracy requires that two or more persons combine or enter an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice is an essential part of a cause of action for conspiracy.

*Id.* at 980. (citations omitted). *See also Murphy v. Villanova Univ.,* 547 F.Supp. 512, 522 (E.D.Pa.1982), *aff'd without op.,* 707 F.2d 1402 (3d Cir.1983); *Swartzbauer v. Lead Industries Ass'n, Inc.,* 794 F.Supp. 142 (E.D.Pa.1992).

The plaintiffs' complaint provides:

The primary goals of the scheme and conspiracy were:

(a) to divert funds improperly out of Oryx into the Defendant Trusts; to liquidate or diversify the Defendant Trusts' holdings of Oryx stock out of Oryx, preferably into cash or other diversified assets; and to maximize the value received for the Defendant Trusts' holdings in Oryx; and

*7* (b) to entrench and protect Hauptfuhrer in his executive position at Oryx and allay his concerns that the Glenmede/Pew defendants might act unilaterally in a way that would threaten his position. (Complaint ¶ 32). The complaint fails to plead a cause of action for civil conspiracy. Noticeably absent from the plaintiffs' conspiracy allegations is the essential element of malice. The complaint is devoid of any allegation that the defendants acted with the intent to injure the plaintiffs. Accordingly, the plaintiffs' conspiracy allegations are dismissed.

2. *Aiding and Abetting*

Count two of the plaintiffs' complaint alleges aiding and abetting against all defendants. In support of their claim, the plaintiffs cite section 876 of the Restatement (Second) of Torts. Section 876, entitled "Persons Acting in Concert," provides:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876. The plaintiffs contend that the defendants are jointly and severely liable for the fiduciary breach of Glenmede Trust because they acted in concert. Apparently, the plaintiffs are proceeding under 876(b).

A claim for aiding and abetting in a breach of a fiduciary duty as described by § 876(b) of the Restatement, although not specifically provided for by the Pennsylvania Supreme Court, has been recognized as a cognizable claim in the Eastern District of Pennsylvania. In *Pierce v. Rossetta Corp.,* Civil Action No. 88-5873, 1992 WL 165817 (E.D. Pa. June 12, 1992), anticipating the acceptance of the claim by Pennsylvania courts the district court held:

the elements for a claim for aiding and abetting breach of a fiduciary duty under Pennsylvania law would be: (1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting that breach.

*Id.* at *8 (*citing,* Restatement (Second) Torts § 876 (1979); *Kranzdorf v. Green,* 582 F.Supp. 335, 337 (E.D.Pa.1983)). The *Pierce* court based the decision on a thorough examination of relevant Pennsylvania authority.

The defendants do not take issue with the *Pierce* decision. However, the defendants' contend that this aiding and abetting liability does not extend to the officers or directors of a corporation for a breach committed by the corporation. The defendants contend that the reasoning which bars a claim of conspiracy between officers and directors of a corporation and the corporation itself necessarily prevents the plaintiffs' aiding and abetting claim.

*8* It is clear that officers and directors of a corporation cannot conspire with a corporation. *Nix v. Temple Univ,* 596 A.2d 1132, 1137 n.3 (Pa.Super 1991) (*citing, Daniel Adams Assoc. v. Rimbach Pub., Inc.,* 519 A.2d 997 (Pa.Super.1987)); *Accord, e.g., Scott v. Township of Bristol,* Civil Action No. 1412, 1990 WL 178556 (E.D.Pa.1990), (Hutton, J.). Generally, the acts of the agents of a corporation are the acts of the corporation itself. Since a individual cannot conspire without another party, a corporation cannot conspire with its agents, officers and directors. *Jaqielski v. Package Mach. Co.,* 489 F.Supp. 232, 233 (E.D.Pa.1980).

The plaintiffs have not cited any Pennsylvania authority for the proposition that a director or officer of a corporation could be liable for aiding and abetting a fiduciary breach by the corporation. However, this is not surprising given that no Pennsylvania court has yet held any individual liable for aiding and abetting a fiduciary breach. Nor do the cases which the plaintiffs cite support the conclusion that officers and directors of a corporation can be liable for aiding and abetting a breach of a fiduciary duty by the corporation.

The plaintiffs' reliance on *Seaboard Industries, Inc. v. Monaco,* 276 A.2d 305 (1971), is not persuasive. *Seaboard* involved the liability of a director for joint participation of, approving of, acquiescing in, or concealing a breach of a fiduciary of another director owed to the corporation. *Id.* Thus, it involved a breach committed by a director. It did not involve liability of a director for a corporate breach of a fiduciary duty. Nothing in the opinion would lead this court to the conclusion that aiding and abetting could be established against a director for assisting the corporation in a fiduciary breach.

Plaintiffs' remaining cases are also not persuasive. *Kransdorf v. Green,* 582 F.Supp. 335 (E.D.Pa.1983) (aiding and abetting liability claim permitted against a non-agent of the corporation); *Ging v. Parker-Hunter Inc.,* 544 F.Supp. 49 (W.D. Pa.1982) (permitting corporation to be liable for aiding and abetting securities fraud of a third party); *Hickman v. Taylor,* 75 F.Supp. 528 (E.D.Pa.1947) (non-agent alleged to have participated in corporation's negligence).

Nevertheless, under existing Pennsylvania law it appears that the Pennsylvania Supreme Court would not permit an "aiding and abetting" claim against the officers and directors of a corporation for the wrong of the corporation. A claim for a breach of a fiduciary duty although arising from a contract, is an allegation of tortious conduct. *See Zimmer v. Guntal & Co. Inc.,* 732 F.Supp. 1330, 1336 (W.D.Pa.1989); Restatement (Second) of Torts, § 874 (1979). Under Pennsylvania law, officers and directors are not liable for tortious conduct of the corporation in the absence of affirmative participation in the conduct. *Wicks v. Milzoco Builders, Inc.,* 470 A.2d 86, 90 (Pa.1983); *Chester-Cambridge Bank & Trust Co. v. Rhodes,* 31 A.2d 128, 131 (Pa.1943). Under this participation theory, the defendant directors and officers can be liable for knowingly participating in the tortious act. *Wicks,* 470 A.2d at 90; *Chester-Cambridge Bank & Trust Co.,* 31 A.2d at 131; *see also Newman v. Forward Lands, Inc.,* 418 F.Supp. 134, 137 (E.D.Pa.1976).

*\*9* In *Chester-Cambridge Bank & Trust Co. v. Rhodes,* the Supreme Court of Pennsylvania, in addressing the issue of officer and director liability stated:

It is true that a director or officer of a corporation may have personal liability for damages suffered by third persons when he knowingly participates in a wrongful act. *See Malone v. Pierce,* 231 Pa. 534, 80 A. 979; *Warner v. McMullin,* 131 Pa. 370, 18 A. 1056. But where, as in this case, directors or officers are charged with nonfeasance, no individual liability attaches. This has always been the rule in this jurisdiction. *See Spering's Appeal,* 71 Pa. 11, 10 Am.Rep. 684; *Swentzel v. Penn Bank,* 147 Pa. 140, 23 a. 405, 415, 15 L.R.A. 305, 30 Am.St.Rep. 718; *Cohen, et al. v. Maus, et al.,* 297 Pa. 454, 147 A.103. In the latter case we held that directors of a corporation could not be charged with individual liability for conversion of property by the corporation of which they had no actual knowledge. However (297 Pa. at page 458, 147 A. 103), Justice Schaffer, afterwards Chief Justice, pointed out that a director who participated actively in the conversion would have been personally liable. 31 A.2d at 131. The Court in a more recent discussion of the participation theory stated:

Pennsylvania law recognizes the participation theory as a basis of liability. The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein. (citations omitted)

*Wicks,* 470 A.2d at 90.

Accordingly, this Court will apply Pennsylvania's participation theory to the plaintiffs' aiding and abetting claim in Count II with respect to the acts of directors and officers of Glenmede Trust. Therefore, if the plaintiffs have alleged that the directors and officers knowingly participated in, cooperated or directed the corporation's breach of fiduciary duty, Count II against these individuals will survive a motion to dismiss.

With respect to the defendant directors and officers of the corporation, the plaintiffs have not specifically alleged that these individuals have participated in the breach of the fiduciary duty. The plaintiffs must plead that each defendant director or officer "active[ly] participat[ed] in a positively wrongful act intendedly and directly operating injuriously to the prejudice of the [plaintiffs]." *See Newman v. Forward Lands Inc.,* 418 F.Supp. 134, 136 (E.D.Pa.1976).

In addition, the Court recognizes that a claim for aiding and abetting a breach of a fiduciary duty would exist against non-agents of Glenmede Trust under Pennsylvania law. *Pierce v. Rossetta Corp.,* Civil Action No. 88- 5873, 1992 WL 165817 (E.D. Pa. June 12, 1992). However, the Court finds that based upon the allegations in the complaint, plaintiffs have not sufficiently stated claims for aiding

and abetting with respect to the remaining defendants. The plaintiffs have not alleged the requirements of aiding and abetting as set forth in *Pierce v. Rossetta Corp., 1992 WL 165817 at *8*. The complaint does allege a breach of a fiduciary duty by Glenmede Trust as discussed above. The complaint also alleges that all the defendants had knowledge of the fiduciary relationship. (Complaint ¶ 46). However, the plaintiffs have not alleged substantial assistance or encouragement in effecting the breach by the remaining defendants who were not acting as officers and directors of the Glenmede Trust. Accordingly, Count II with respect to non-agents of Glenmede Trust is dismissed.

3. *Glenmede Corporation*

*\*10* The plaintiffs seek to extend liability to Glenmede Corporation as the parent for the acts of Glenmede Trust on the basis of aiding and abetting liability. The defendant Glenmede Corporation contends that it cannot be liable for aiding and abetting a breach of a fiduciary duty owed by its wholly owned subsidiary for the same reasons that a director or officer cannot be liable for aiding and abetting the corporation of which they control. Glenmede Corporation, citing *Copperweld Corp. v. Independance Tube Corp., 467 U.S. 752, 777 (1984)*, contends that a parent corporation cannot conspire with a wholly-owned subsidiary because they have a single conscience and are run by a "single driver." Thus, it argues that it cannot be liable for aiding and abetting its subsidiary. Pennsylvania law provides the circumstances for which a parent corporation may be liable for the acts of its subsidiary within the doctrine of piercing the corporate veil. *Parker v. Bell Asbestos Mines, Ltd., 607 F.Supp. 1397 (D.C. Pa.1985); McCarthy v. Ference, 58 A.2d 49 (Pa.1948)*. In *First Realvest Inc. v. Avery Builders, Inc., 600 A.2d 601 (Pa.Super.1991)*, the court stated:

The Pennsylvania Supreme Court has held that the corporate form "will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime." In applying the test (for piercing the corporate veil), … any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception … Care should be taken on all occasions to avoid making "the entire theory of the corporate entity … useless … "

*Id.* at 604, (citations omitted). In determining whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholder's traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting a facade for the operation of the dominant shareholder. *Carpenter's Health and Welfare Fund v. Ambrose, 727 F.2d 279 (3d Cir.1983); Village at Camelback Property Owners Assn. Inc. v. Carr, 538 A.2d 528 (Pa.Super.1988); Wicks v. Milzoco Builders Inc., 470 A.2d 86, 90- 91 (Pa.1983)*.

In this case, Glenmede Trust is the wholly owned subsidiary of Glenmede Corporation. The plaintiffs have alleged that the entities have "substantially similar management and directors and have each acted interchangeably with the other with respect to the matters described in [the] complaint." (Complaint ¶ 11). However, this alone is not sufficient to allege that Glenmede Trust is a sham or alter ego of the Glenmede Corporation. Allegations of joint action is not sufficient to justify piercing the corporate veil between a parent and subsidiary corporation. *Nobers v. Crucible, Inc., 602 F.Supp. 703 (W.D. Pa.1985)*. The complaint must allege facts sufficient to support a finding that Glenmede Trust was dominated by Glenmede Corporation to an extent that Glenmede Trust was a sham or alter ego. Relevant facts for piercing under an alter ego theory would be:

*\*11* (a) insufficient capitalization;

(b) intermingling of funds;

(c) other officers and directors were not functioning;

(d) failure to observe corporate formalities;

(e) failure to pay dividends;

(f) the fact that the corporation is a facade for the operations of the dominant stockholder; *Nobers v. Crucible, Inc., 602 F.Supp. at 707; Village at Camelback Property Owners Assn. Inc., 538 A.2d at 535; United States v. Pisani, 646 F.2d 83, 88 (3d Cir.1981)*. The complaint does not meet these requirements.

However, the plaintiffs contend that the existence of fraud in the complaint is sufficient for purposes of piercing the corporate veil. The complaint has alleged that Glenmede Trust was used to perpetrate common law fraud. *See infra*, at 23-24. Considering the complaint in light most favorable to the plaintiffs as the Court must do, the plaintiffs may have the potential for piercing the corporate veil of Glenmede Trust for this fraud. Accordingly, Glenmede Corporation's motion to dismiss count two is denied.

C. *Count Three*

In count three, the plaintiffs allege common law fraud against all defendants. A claim for common-law

fraud requires a misrepresentation made for the purpose of inducing reliance on the false statement. *Antinoph v. Laverell Reynolds Securities Inc., 703 F.Supp. 1185, 1187 n.1.* A claim of fraud based upon failure to disclose information is actionable if there exists a confidential or fiduciary relationship. *See Id.; City of Harrisburg v. Bradford Trust Co., 621 F.Supp. 463, 473 (D.C. Pa.1985); see e.g. Federal Land Bank of Baltimore v. Fetner, 410 A.2d 344 (Pa.Super.1979), cert. denied, 446 U.S. 918 (1980).*

As the Court has previously discussed, the plaintiffs' complaint has alleged a confidential/fiduciary relationship with respect to Glenmede Trust. The complaint provides that the "[d]efendants concealed the pendency of the buy-back transaction until it was consummated and announced on September 11, 1990." (Complaint ¶ 37). The defendants also allegedly concealed knowledge and information regarding Oryx's inability to generate capital needed to ultimately allow Oryx to create value for its shareholders and their knowledge that the buy-back transaction would operate to depress the value of the plaintiffs' stock. (Complaint ¶¶ 37, 38). Therefore, the complaint states a common law claim against Glenmede Trust.

However, the complaint does not allege a claim against defendants, Glenmede Corporation, the Pew Defendants, the Defendant Trusts, Defendants Piscopo and Defendant Langfitt. As explained in the Court's discussion of count one, no fiduciary relationship between these defendants and the plaintiffs has been alleged. Accordingly, the plaintiffs' common law fraud claim is dismissed against these defendants.

D. *Count Four*

Count four seeks relief against Glenmede Trust, Glenmede Corporation and the Defendant Trusts for unjust enrichment. In *Burgettstown-Smith Township Joint Sewage Authority v. Langeloth Townsite Company, 588 A.2d 43 (Pa.Super.1991),* the court noted that:

*\*12* [e]ssential elements of "unjust enrichment" are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.

*Id.* at 44, (quoting, *Wolf v. Wolf,* 514 a.2d 901, 905-06 (Pa.Super.1986), *overruled on other grounds by Van Buskirk v. Van Buskirk, 590 A.2d 4, 8 (Pa.1991)).* "A necessary element of unjust enrichment is that a benefit must have been conferred for which no compensation was given." *Meyers Plumbing & Heating Supply Co. v. West End Fed. Sav. & Loan Ass'n, 498 A.2d 966, 969 (Pa.Super.1985).* The plaintiffs' complaint fails to allege the requisites of such a claim. Accordingly, Count four of the complaint is dismissed.

E. *Count Five*

The fifth count of the plaintiffs' complaint alleges breach of contract by both Glenmede Trust and Glenmede Corporation. As the Court has previously discussed, the complaint alleges an investment advisory agreement in which Glenmede Trust accepted the position as the plaintiffs' professional fiduciary. (Complaint ¶¶ 1, 17 and 20). Glenmede Trust does not oppose the claim in the motion. However, Glenmede Corporation contends that it is not a party to the investment advisory contract and, therefore, it can not be liable on the contract simply due to its parent subsidiary relationship. The plaintiffs contend that liability extends pursuant to the equitable doctrine of piercing the corporate veil. As the Court has found that the complaint alleges a claim for piercing the corporate veil, Glenmede Corporations motion to dismiss count five is denied.

F. *Count Six*

The last count of the plaintiffs' complaint alleges negligence against both Glenmede Trust and Glenmede Corporation. The plaintiffs are contending that Glenmede Trust is liable for professional negligence with respect to its oral and written agreement to act as the plaintiffs' investment advisor and that the Glenmede Corporation is liable for both its participation in the negligence and under the plaintiffs' theory of piercing the corporate veil.

To state a claim for professional negligence, the plaintiffs must allege: (1) employment by a person or entity giving rise to a duty to the plaintiffs; (2) the failure of the defendant to exercise ordinary skill and knowledge; and (3) that this negligence proximately caused damages to the plaintiff. *See Schenkel v. Nonheit, 405 A.2d 493, 494 (Pa.Super.1979),* (Essential elements for cause of action against attorney for professional negligence).

The plaintiffs' complaint alleges that the plaintiffs contracted with Glenmede Trust to provide investment advise and guidance with respect to the plaintiffs' holdings in Oryx stock. Allegedly, the defendants breached their duty to exercise ordinary skill and knowledge by:

(a) failing to advise plaintiffs that Oryx shares should be sold prior to the buy-back transaction;

*13 (b) participating in the scheme and conspiracy [improperly diverting funds out of Oryx to the benefit of the Defendant trusts and entrenching defendant Hauptfuhrer at Oryx];
(c) entering into the buy-back transaction; and
(d) failing to advise plaintiffs at the time of or following the transaction of the detrimental effect of the transaction on Oryx and plaintiffs and to advise plaintiffs to sell their Oryx stock.
(Complaint ¶ 44). Finally, the plaintiffs contend that their injuries were proximately caused by Glenmede Trust. Accordingly, the complaint states a claim for negligence against the defendant Glenmede Trust.
However, Glenmede Trust contends that its agreement with the plaintiffs specifically excludes liability for negligence. Glenmede Trust cites an exculpatory clause of its agreement with the plaintiffs. The clause provides:
Glenmede shall not be liable for any loss or damage or any costs and expenses associated with such loss or damage resulting from any act, omission or mistake or judgment in the course of, or connected with, the performance of its responsibilities hereunder, or that of its representatives, agents or employees, except for its own gross negligence or bad faith.
(Complaint ¶ 23).
In *Topp Copy Products Inc. v. Singletary,* 591 A.2d 298 (Pa.Super.1991), the Pennsylvania court recently discussed the issue of the application of exculpatory clauses under Pennsylvania law. The Court stated:
Our Supreme Court has held that an exculpatory clause is generally valid where three conditions are satisfied. The three conditions are: (1) the clause "does not contravene any policy of law, that is, … it is not a matter of interest to the public or State"; (2) the "contract is between persons relating entirely to their own private affairs"; and (3) "each party is a free bargaining agent … [in that the agreement] is not in effect a mere contract of adhesion."
If these conditions are met, and the clause is determined to be valid, the contract must still meet four additional standards in order to be "interpreted and construed to relieve a person of liability for his own … acts of negligence." The four standards are: (1) the contract immunizing a party from liability for negligence must be construed strictly, "since they are not favorites of the law"; (2) the contract must state the intention of the parties "with the greatest particularity, … beyond doubt by express stipulation, [and] no inference from words of general import can establish it"; (3) the contract must be construed against the party seeking immunity from liability; and (4) the burden of establishing the immunity is upon the party seeking protection of the clause.
These seven considerations demonstrate that contracts providing for the immunity of parties from their own negligent acts are not regarded positively under the law of the Commonwealth.
*Id.* at 301 (citations omitted).
*14 While Glenmede Trust may be immune from liability for negligence pursuant to the clause, the Court cannot determine from the face of the complaint the specific application of the clause under Pennsylvania's teachings. Therefore, Glenmede Trust's motion to dismiss count six is denied.
With respect to Glenmede Corporation, it is clear that the plaintiffs' complaint does not allege that the corporation was the professional advisor of the plaintiffs. However, the plaintiffs contend that Glenmede Corporation as the parent of Glenmede Trust is liable for the negligence under the piercing theory discussed above. Since the Court has found that the plaintiffs may have a claim against Glenmede Corporation under the Pennsylvania doctrine, the plaintiffs' claim for negligence shall not be dismissed against Glenmede Corporation.
An appropriate Order follows.

                                              ORDER
AND NOW, this 8th day of June, 1993, upon consideration of the Defendants' Motion to Dismiss, the Plaintiffs' Response and the Defendants' Reply, IT IS HEREBY ORDERED that:
(1) Count I of the Plaintiffs' Complaint against Glenmede Corporation, J. Howard Pew, II, J. N. Pew, III., J. N. Pew, IV., R. Anderson Pew, John G. Pew, Jr., G. Thompson Pew, Jr., Thomas W. Langfitt, Albert E. Piscopo, Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris Sr. is DISMISSED;
(2) Count II of the Plaintiffs' Complaint for civil conspiracy against all defendants is DISMISSED;
(3) Count II of the Plaintiffs' Complaint for aiding and abetting a breach of fiduciary duty against Glenmede Trust, J. Howard Pew, II, J. N. Pew, III., J. N. Pew, IV., R. Anderson Pew, John G. Pew, Jr., G. Thompson Pew, Jr., Thomas W. Langfitt, Albert E. Piscopo, Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris Sr. is DISMISSED;
(4) Count III of the Plaintiffs' Complaint against Glenmede Corporation, J. Howard Pew, II, J. N. Pew, III., J. N. Pew, IV., R. Anderson Pew, John G. Pew, Jr., G. Thompson Pew, Jr., Thomas W. Langfitt,

Albert E. Piscopo, Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris Sr. is DISMISSED;
(5) Count IV of the Plaintiffs' Complaint against Glenmede Trust, Glenmede Corporation, J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris Sr. is DISMISSED; and
(6) The Motion to Dismiss Count V and Count VI of the Plaintiffs' Complaint is DENIED.
IT IS FURTHER ORDERED that Plaintiffs are granted leave to file an amended complaint within twenty (20) days of the date of this Order.

FN1. The plaintiffs are as follows: B. Ray Thompson, Jr., Juanne J. Thompson, Catherine V. Thompson, Adella S. Thompson, B. Ray Thompson, III, Sarah Thompson Tarver, Rebekah L. Thompson.

FN2. The trustees of the five trusts are as follows: B. Ray Thompson, Jr., Juanne J. Thompson, Dale A. Keasling.

FN3. The seven trusts are as follows: the Pew Memorial Trust, the J. Howard Pew Freedom Trust, The Mabel Pew Myrin Trust, The J. N. Pew Jr. Charitable Trust, The Medical Trust, Mary Anderson Trust, and The Knollbrook Trust.

FN4. In a diversity action, state law applies to the determination of whether an action is individual or derivative under Federal Rule of Civil Procedure 23.1. *Sax v. World Wide Press, Inc.,* 809 F.2d 610, 613

(9th Cir.1987); *Brown v. Ferro Corp.* 763 F.2d 798, 803 (6th Cir.) ("Shareholder's derivative actions are governed by Rule 23.1 of the federal Rules of Civil Procedure, and federal courts apply the law of the state in which the company is incorporated."), *cert. denied,* 474 U.S. (1985).

E.D.Pa. 1993.
Thompson v. Glenmede Trust Co.
1993 WL 197031 (E.D.Pa.)

## Motions, Pleadings and Filings (Back to top)

• 2:92CV05233 (Docket) (Sep. 10, 1992)
END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Source: My Sources > / . . . / > NY Federal District Courts ⓘ
Terms: **name(pereira and cogan)**  (Edit Search)

☞ Select for FOCUS™ or Delivery
☐

*2001 U.S. Dist. LEXIS 2461,  ***

JOHN S. **PEREIRA,** as Trustee of Trace International Holdings, Inc. and Trace Foam Sub,
Inc., Plaintiff, -against- MARSHALL S. **COGAN,** SAUL S. SHERMAN, ANDREA FARACE,
FREDERICK MARCUS, ROBERT H. NELSON, PHILIP SMITH, KARL WINTERS, TAMBRA KING,
Defendants.

00 Civ. 619 (RWS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2001 U.S. Dist. LEXIS 2461

March 8, 2001, Decided
March 13, 2001, Filed

**DISPOSITION:  [*1]**  Defendants' motions to dismiss denied.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Bankruptcy trustee for corporate debtor sued defendant
directors and defendant chief executive officer and controlling shareholder alleging
multiple breaches of fiduciary duty. Defendants moved to dismiss trustee's second
amended complaint.

**OVERVIEW:** Defendants argued that dismissal of plaintiff trustee's lawsuit was required
because plaintiff failed to comply with the notice and hearing requirement of 11 U.S.C.S.
§ 363(b)(1) of the Bankruptcy Code. The court rejected defendants' argument. The court
held that notice and a hearing were not required because (1) the trustee's pursuit of the
litigation was an ordinary use of estate property; and (2) 11 U.S.C.S. § 323 of the
Bankruptcy Code and Fed. R. Bank. P. 6009 governed this issue, not § 363(b)(1). The
court ruled that the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure
provided adequate safeguards against the unreasonable use of estate property in
connection with litigation by the trustee. Further, with regard to defendants' director and
officers insurance policies, plaintiff's pursuit of the litigation satisfied the standard for an
ordinary use of an estate asset vis-a-vis these insurance policies. Seeking recovery for
the estate through these policies comported with the reasonable expectations of a
hypothetical creditor.

**OUTCOME:** The court denied defendants' motions. Lawsuit by plaintiff trustee against
defendants for multiple breaches of fiduciary duty did not require notice and a hearing in
order for trustee to prosecute lawsuit.

**CORE TERMS:** breach of fiduciary duty, insolvency, notice, alter ego, shareholder, insolvent,
business judgment rule, stockholder, duty, bankruptcy trustee, corporate veil, self-dealing,
renewal, veil-piercing, pierce, disinterested, court approval, fiduciary duty, dividend, statute
of limitations, hearing requirement, bankruptcy estate, injustice, plead, prosecute, course of
business, estate asset, exculpatory provision, breach of fiduciary, standing to bring

**LexisNexis(R) Headnotes** ◆ Hide Headnotes

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss

*HN1* On a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendant. Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss

*HN2* As with a Fed. R. Civ. P. 12(b)(6) motion, in deciding a Fed. R. Civ. P. 12(b)(1) motion all well-pleaded facts must be accepted as true and the complaint must be construed in the light most favorable to the plaintiff. More Like This Headnote

Bankruptcy Law > Property Lease, Sale & Use

*HN3* See 11 U.S.C.S. § 363(b)(1).

Bankruptcy Law > Property Lease, Sale & Use

*HN4* See 11 U.S.C.S. § 102(1)(A).

Bankruptcy Law > Practice & Proceedings > Adversary Proceedings
Bankruptcy Law > Property Lease, Sale & Use

*HN5* See 11 U.S.C.S. § 323(b).

Bankruptcy Law > Practice & Proceedings > Adversary Proceedings

*HN6* See Fed. R. Bank. P. 6009.

Bankruptcy Law > Practice & Proceedings > Adversary Proceedings

*HN7* 11 U.S.C.S. § 323(b) must be read with Fed. R. Bank. P. 6009. Rule 6009 has a single and straightforward purpose. It permits a trustee to prosecute or defend any action on behalf of the estate in any tribunal without the need to obtain bankruptcy court approval. Rule 6009's authority stems from the § 323(b), which gives the trustee the power to sue and be sued. More Like This Headnote

Bankruptcy Law > Examiners & Trustees > Duties
Bankruptcy Law > Practice & Proceedings > Adversary Proceedings

*HN8* The trustee is authorized under Fed. R. Bank. P. 6009 to commence and prosecute any action or proceeding in behalf of the estate before any tribunal without court approval. More Like This Headnote

Bankruptcy Law > Examiners & Trustees > Duties
Bankruptcy Law > Practice & Proceedings > Adversary Proceedings

*HN9* Fed. R. Bank. P. 6009 clarifies that the trustee has standing to, and may, litigate appropriate actions on behalf of the estate without prior approval of the bankruptcy court, although this rule does not trump automatic stay pursuant to 11 U.S.C.S. § 362 of Bankruptcy Code. More Like This Headnote

Bankruptcy Law > Estate Property > Debtor Interests

*HN10* A cause of action is a form of property of a bankruptcy estate. More Like This Headnote

Bankruptcy Law > Examiners & Trustees > Duties 📖
Bankruptcy Law > Estate Property > Debtor Interests 📖
*HN11* ⬇ The trustee's authority to retain and pay counsel is inherent in the trustee's authority to pursue litigation. Moreover, no fees or disbursements are paid by a trustee without a prior order of the court that allows and awards fees in an amount determined by the court to be reasonable, 11 U.S.C.S. § 503(b), and after filing of a fee application, notice to all interested parties, and a hearing. 11 U.S.C.S. §§ 330, 331; Fed. R. Bankr. P. 2002(a)(6), 2016(a). Thus, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure provide adequate safeguards against the unreasonable use of estate property in connection with litigation by the trustee. More Like This Headnote

Bankruptcy Law > Estate Property > Contractual Rights 📖
*HN12* ⬇ Directors and Officers' liability insurance policies are property of the bankruptcy estate. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss 📖
*HN13* ⬇ A complaint must be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities 📖
*HN14* ⬇ Under Delaware law, the fiduciary duty owed to creditors arises at a point short of actual insolvency, that is, when the corporation is in the vicinity of insolvency. More Like This Headnote

Bankruptcy Law > Estate Property
*HN15* ⬇ A condition of insolvency shown to exist at a particular time will be presumed to continue in the absence of a showing to the contrary. More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities 📖
*HN16* ⬇ So long as any such liability-limitation provision does not extend to liability to third parties, shareholders should be permitted -- except when important societal values are at stake -- to decide how to allocate the economic risk of the directors' conduct between the corporation and the directors. Thus, the development of exculpatory clauses for directors was premised on the rationale that shareholders should have the ability to contract with the corporation and its directors, via the articles of incorporation, regarding the directors' liability to the corporation or the shareholders. More Like This Headnote

Bankruptcy Law > Examiners & Trustees > Limitations 📖
*HN17* ⬇ A bankruptcy trustee lacks standing to bring an action on behalf of an individual creditor with a particularized injury. More Like This Headnote

Bankruptcy Law > Examiners & Trustees > Duties 📖
*HN18* ⬇ Though trustee has no right to enforce entitlements of a creditor, he represents the unsecured creditors of the corporation; and in that sense when he is suing on behalf of the corporation he is really suing on behalf of the creditors of the corporation. More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities 📖
*HN19* ⬇ Under Delaware law, in order to bring a claim for breach of fiduciary duty, a plaintiff must allege (1) the existence of a fiduciary duty and (2) a breach by the fiduciary of that duty. A breach may consist of a failure to comply with the

fiduciary's obligations to exercise reasonable supervision and control over a corporation. *More Like This Headnote*

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities
HN20 Under the business judgment rule, corporate directors are entitled to the presumption of proper business judgment. *More Like This Headnote*

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities
HN21 The Delaware General Corporation Law commands that the business and affairs of every corporation shall be managed by or under the direction of a board of directors. Del. Code Ann. tit. 8, § 141(a). It has been noted with respect to the management obligations of corporate directors under various state corporation codes that: An important theme in recent cases has been the need for directors to exercise reasonable supervision and control over the policies and practices of a corporation. The institutional integrity of a corporation depends on the proper discharge by directors of those duties. These cases make clear that sustained patterns of inattention to obligations by directors or officers or unreasonable blindness to problems that later cause substantial harm will create exposure to liability. *More Like This Headnote*

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities
HN22 The duty of due care requires that a director's decision be made on the basis of reasonable diligence in gathering and considering material information. In short, a director's decision must be an informed one. *More Like This Headnote*

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities
HN23 It is a fundamental precept of Delaware corporation law that it is the board of directors that has ultimate responsibility for management of the enterprise. One of the prime responsibilities of directors is to supervise and evaluate the CEO. While powers may be delegated to a CEO or other officers of the company, the board may not either formally or effectively abdicate its statutory power and fiduciary duty to manage and direct the management of the business and affairs of the corporation. *More Like This Headnote*

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities
HN24 It should be noted that the business judgment rule operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act. *More Like This Headnote*

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities
HN25 Good faith is a key ingredient of the business judgment rule. *More Like This Headnote*

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities
HN26 Delaware law provides that a loan or other assistance may be provided by a corporation to an officer or employee when in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation. Del. Code Ann. tit. 8, § 143. *More Like This Headnote*

Business & Corporate Entities > Corporations > Finance > Dividends & Reacquisition of Shares
HN27 No corporation shall purchase or redeem its own shares of capital stock when the capital of the corporation is impaired. Del. Code Ann. tit. 8, § 160(a)(1). *More Like This Headnote*

Commercial Law (UCC) > Negotiable Instruments (Article 3)

*HN28* A non-recourse loan is a loan that allows the lender to attach only the collateral, and not the borrower's personal assets, if the loan is not repaid. More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities

*HN29* Section 174 of the Delaware General Corporation Code renders directors jointly and severally liable to creditors, among others for wilful or negligent violations of Section 160 of the Delaware General Corporation Code. Del. Code Ann. tit. 8, § 174. The purpose of this provision is to protect creditors against corporate expenditures that impair the integrity of the corporation's capital because capital constitutes a fund for the payment of indebtedness. More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities

*HN30* Self-dealing contracts are not strictly prohibited by Delaware law. However, where such a contract is involved the proponents of that contract have the burden of demonstrating the entire fairness of the transaction to an independent body, whether it be a court, disinterested directors, or disinterested ratifying shareholders. More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities

*HN31* Under Delaware law, director's self-interested transaction is not protected by the business judgment rule absent approval of the transaction by a majority of disinterested directors. Entire fairness test, rather than business judgment rule, applies to self-dealing transactions. More Like This Headnote

Business & Corporate Entities > Corporations > Governance > Articles of Incorporation & Bylaws

*HN32* Delaware law provides that whenever a board of directors acts without a formal meeting such action must be evidenced by a writing or writings filed with the minutes of proceedings of the board. Del. Code ann. tit. 8, § 141 (f). More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities

*HN33* Where transaction renders corporation insolvent, creditors' rights become paramount, and recovery may be had from directors who thereby breached fiduciary duties notwithstanding shareholder consent. More Like This Headnote

Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Shareholder Duties & Liabilities
Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities

*HN34* Shareholder ratification of a self-dealing transaction must be done by a majority of "disinterested" shareholders. More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities

*HN35* N. Y. C. P. L. R. § 213(7) applies to breach of fiduciary claim asserted by bankruptcy trustee on behalf of Delaware corporation even though statute does not contemplate actions commenced by a bankruptcy trustee per se. More Like This Headnote

Bankruptcy Law > Practice & Proceedings > Jurisdiction

*HN36* In a case based on diversity jurisdiction, a federal court exercising its "related to" bankruptcy jurisdiction over state law claims applies the choice of law rules of the forum state in order to determine the applicable statute of limitations. 28 U.S.C.S. § 1334(b). More Like This Headnote

Bankruptcy Law > Practice & Proceedings > Jurisdiction
Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship
*HN37* New York's choice of law rule for statutes of limitation is set forth in its borrowing statute, which provides that where a plaintiff is a New York resident the New York statute of limitations applies, and where a plaintiff is not a New York resident the court should apply the shorter of (1) New York's period of limitations or (2) the statute of limitations applicable where the plaintiff resides. N.Y. C.P.L.R. § 202 (McKinney 2000). When a bankruptcy trustee sues as a representative of the estate of a bankrupt corporation it is the residency of the corporation which is applicable. More Like This Headnote

Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship
*HN38* The residence of a corporation for purposes of New York's borrowing statute is the corporation's principal place of business. More Like This Headnote

Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally
*HN39* Under New York law, the statute of limitations is an affirmative defense, which means that the defendant bears the burden of establishing by prima facie proof that the statutory period has expired. More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities
*HN40* Delaware General Corporation Law prohibits a corporation from paying dividends or redeeming its shares when its capital is impaired, Del. Code. Ann. tit. 8, §§ 160, 170, 173, and imposes liability for "wilful or negligent" violation of these provisions on directors under whose administration the same may happen, Del. Code. Ann. tit. 8, § 174. More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements
*HN41* The requirement of Fed. R. Civ. P. 8(a)(2) is that all that must be contained in a complaint is a short and plain statement of the claim. Fed. R. Civ. P. 8(a)(2). More Like This Headnote

Business & Corporate Entities > Corporations > Finance > Dividends & Reacquisition of Shares
*HN42* Dividends are not declared without board action. Del. Code Ann. tit. 8, § 170(a). More Like This Headnote

Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity
*HN43* A trustee of a corporate debtor has standing to pierce the corporate veil, based on an alter ego theory, as against the controlling stockholder if: (1) under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil; and; (2) the claim is a general one which could be brought by any creditor. More Like This Headnote

Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity
*HN44* A corporate debtor may pierce its own corporate veil. The acts which give rise to a veil-piercing claim are also acts which give rise to a claim for breach of the fiduciary duties of loyalty and fair dealing. More Like This Headnote

Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity
*HN45* Alter ego claim factors include whether the corporation was adequately capitalized

for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder. More Like This Headnote

Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity

HN46 A veil-piercing claim is a general one which could be brought by any creditor and, therefore, that a party with standing to bring the claim is the bankruptcy trustee. Granting the bankruptcy trustee exclusive standing to assert alter ego claims furthers the bankruptcy policy of ensuring that all similarly situated creditors are treated fairly; the alter ego action is based upon allegations that if proven would benefit all the debtor's creditors, i.e., making more assets available to satisfy the debtor's debts. If the individual creditor's action is not stayed it would collect its claim from a pool of assets that should be available to all creditors. More Like This Headnote

Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity

HN47 It may seem strange to allow a corporation to pierce its own veil, since it cannot claim to be either a creditor that was deceived or defrauded by the corporation fiction, or an involuntary tort creditor. However piercing the corporate veil and alter ego actions are allowed to prevent unjust or inequitable results; they are not based solely on a policy of protecting creditors. Therefore it is not incompatible with the purposes of the doctrines to allow a debtor corporation to pursue a claim based upon such a theory. More Like This Headnote

Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity

HN48 Delaware law permits a court to pierce the corporate veil of a company where there is fraud or where it is in fact a mere instrumentality or alter ego of its owner. Thus, under an alter ego theory, there is no requirement of a showing of fraud. To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness is present. In other words, veil-piercing may occur where, first, alter ego factors are shown, including a lack of corporate formalities, commingling of assets between the shareholders and the corporation, and undercapitalization, and second, there is an element of injustice or unfairness. More Like This Headnote

Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity

HN49 The element of injustice would be satisfied if shown that corporate directors siphoned off corporate assets to themselves. More Like This Headnote

**COUNSEL:** For Plaintiff: JOHN P. CAMPO, ESQ., THEODORE J. FISCHKIN, ESQ., AMY S. ZABETAKIS, ESQ., Of Counsel, LeBOEUF, LAMB, GREENE, & MacRAE, L.L.P., New York, NY.

For Marshall S. Cogan, Defendant: CHESTER B. SALOMON, Of Counsel, SALOMON GREEN & OSTROW, P.C., New York, NY.

For Andrea Farace, Saul S. Sherman, Frederick Marcus, Defendants: ANDREW J. LEVANDER, ESQ., SHALOM JACOB, ESQ., ADAM B. ROWLAND, ESQ., LORRI STAAL ROSEN, ESQ., Of

Counsel, SWIDLER BERLIN SHEREFF FRIEDMAN, LLP, New York, NY.

For Robert H. Nelson, Philip Smith, Karl Winters, Tambra King, Defendants: THEODORE ALTMAN, ESQ., ROBERT A. MEISTER, ESQ., Of counsel, PIPER MARBURY RUDNICK & WOLFE, LLP, New York, NY.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINIONBY:** ROBERT W. SWEET

**OPINION:**

**Sweet, D.J.,**

Defendants Saul S. Sherman ("Sherman"), Andrea Farace ("Farace"), Frederick Marcus ("Marcus") (collectively the "Directors") have moved to dismiss the Second Amended Complaint filed by plaintiff John S. Pereira, as trustee (the "Trustee") of debtors Trace International Holdings, Inc. and Trace Foam Sub, Inc. (collectively, "Trace"), for lack of notice and a hearing, pursuant to Section **[*2]** 363 of the Bankruptcy Code, 11 U.S.C. § 363 (b)(1), and to dismiss Counts IV and V for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), and defendant Marshall S. Cogan ("Cogan") has moved to dismiss Counts II, IV, n1 and VI for failure to state a claim, pursuant to Rule 12(b)(6), and to dismiss Count VI for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1). For the reasons set forth below, the motions are denied.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Cogan seeks dismissal of certain portions of Count IV only, namely, those entitled "Imprudent Loans And Gifts To Insiders," "Cogan Employment Agreement," and "The Cogan Loans."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**The Parties**

The Trustee is the Chapter 7 bankruptcy trustee for Trace.

Cogan was at all relevant times the majority and controlling shareholder and Chief Executive Officer ("CEO") of Trace and Chairman of Trace's Board of Directors (the "Board").

Sherman, Farace, and Marcus were at all relevant times members of the Board.

**Prior Proceedings  [*3]**

On July 21, 1999, Trace filed for protection under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York. On or about August 6, 1999, the Office of the United States Trustee appointed an official unsecured Creditors' Committee. See 11 U.S.C. § 1102(a) and (b). On October 18, 1999, the Creditors Committee, with permission of the Bankruptcy Court, initiated an adversary proceeding by filing a complaint asserting certain causes of action belonging to Trace against Cogan, the Directors, and other parties. On January 18, 2000, the Directors moved to dismiss that complaint. On January 24, 2000, the Bankruptcy Court converted Trace's Chapter 11 case to

a Chapter 7 case. On January 25, 2000, the Trustee was appointed. Shortly thereafter, the parties agreed to extend the time for the Trustee to respond to the pending motion to dismiss and, subsequently, that the Trustee would respond by filing an amended complaint.

On January 28, 2000, the Directors filed a motion to withdraw the bankruptcy reference of the adversary proceeding from the Bankruptcy Court, pursuant to 28 U.S.C. § 157 **[*4]** (d). On May 15, 2000, the Trustee filed an amended complaint, and on July 31, 2000, the Trustee filed the Second Amended Complaint. On or about August 28, 2000, the motion to withdraw the bankruptcy reference was granted, pursuant to a stipulation by the parties.

The instant motions to dismiss were filed on August 23, 2000, and oral argument was heard on October 11, 2000, at which time the matter was deemed fully submitted.

**Facts**

The following facts are as alleged in the Second Amended Complaint and do not constitute findings by the Court.

Trace has been insolvent since at least 1995. Trace's audited financial statements show that it had incurred net losses of $ 11.2 million and $ 51.7 million in 1994 and 1995, respectively. The Trace 1995 audited financial statements show a negative stockholders' equity of approximately $ 29.6 million, and the 1996 audited financial statements reflect a net loss that year of approximately $ 72 million and negative stockholders' equity of approximately $ 104 million. At the time Trace filed its Chapter 11 proceedings, according to its own summary of schedules filed on October 25, 1999, Trace's liabilities exceeded its assets by approximately **[*5]** $ 121 million. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 Documents of which judicial notice can be taken, such as the Chapter 11 filings, may be considered in determining a motion to dismiss on the pleadings. See Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Cogan was the majority common stockholder and CEO of Trace, chairman of the Board, and the beneficiary of voting trusts relating to the stock. Through these positions, Cogan controlled the management and operations of Trace. The Directors were all members of the Board. The Directors attained their positions by virtue of the authority exercised by Cogan. They uncritically supported Cogan with respect to the decisions which are the subject of the Second Amended Complaint, failed to exercise independent judgment and to keep themselves informed about the affairs of Trace as required of corporate directors under Delaware law, and failed to exercise reasonable supervision and control over Trace's policies and practices. The last time the Board convened for a **[*6]** meeting was in September of 1995.

Farace and Marcus have also been officers of Trace, position which they held by virtue of the authority exercised by Cogan and board members appointed by Cogan. Farace and Marcus uncritically supported Cogan and engaged in actions or made decisions that were not supported by business judgment but, instead, personally benefitted directors, officers or employees of Trace without justification.

Count I, which is not attacked in the present motions, seeks recovery against Cogan on $ 14 million of unsecured promissory notes borrowed from Trace, and as to which Cogan is in

default.

Counts II asserts a breach of fiduciary duty claim and Count III asserts a fraudulent conveyance claim against Cogan based on the August 1997 ten-year renewal of Cogan's employment agreement (the "Cogan Employment Agreement") and millions of dollars in excessive compensation accorded Cogan by that agreement.

The Cogan Employment Agreement, originally entered into in 1987, had a ten-year "Initial Term" and provided for four additional ten-year "Renewal Terms" through 2037 (at which time Cogan would be 100 years old). Under the terms of the agreement each Renewal Term became **[*7]** effective at each ten-year interval unless the Board voted to the contrary or Cogan declined to renew. The process for blocking renewal was burdensome, requiring a super-majority vote of the Board members. When the agreement came up for its first renewal in 1997, Cogan did not decline renewal and the Board did nothing, failing even to consider the matter. This occurred even though Trace, under Cogan's leadership, had been insolvent since 1995. Due to the renewal, Cogan's status and excessive compensation were perpetuated for another ten years without regard to performance.

Once renewed, the Cogan Employment Agreement imposed severe financial penalties upon Trace if the Board, in the exercise of its otherwise customary discretion, should terminate Cogan or even reduce or otherwise change his duties at any time during the ten-year renewal term. For example, if during the first year the Board discharged Cogan or terminated the contract by changing his duties, Trace was nonetheless obligated to pay him for each of the next nine years at an annual salary of $ 3.6 million. This sum included a 50% increase which Cogan had previously awarded to himself. Furthermore, even if Cogan were terminated **[*8]** for cause he was still entitled under the agreement to five years' salary.

Count IV asserts a claim for multiple breaches of fiduciary duty against all the Defendants.

The Defendants inter alia allowed Trace, at a time when Trace was insolvent: to be treated by Cogan as his personal bank; to make imprudent loans and/or gifts to corporate insiders, Cogan family members and Cogan's cook, without a proper business purpose, including by using corporate funds to pay his daughter a six-figure salary for a non-existent job, paying a $ 558,000 "bonus" to Cogan's secretary, making a $ 14 million loan to Cogan, and throwing a $ 1 million birthday party for Cogan; to increase Cogan's compensation in 1991 and subsequent years; to renew the Cogan Employment Agreement; and to make a $ 3 million non-recourse loan to Cogan to redeem certain of Trace's preferred shares held by Dow Chemical Company ("Dow").

Count V asserts a claim under the Delaware General Corporation Law for the Defendants' approval of the payment of dividends and redemption of Trace shares. Although Trace was insolvent, Trace regularly paid quarterly dividends to Dow and redeemed shares of its preferred and common stock **[*9]**

Count VI seeks to pierce Trace's corporate veil and to hold Cogan individually liable for Trace's legitimate obligations, based on an alter ego theory. Cogan used Trace as his personal bank, not only for himself but for his wife, daughter, and cook. The Cogan officers and directors did not function properly, but instead subordinated the interests of Trace and its creditors to Cogan's personal interests. Under Cogan's dominance, Trace ignored or attempted to evade the requirements of Delaware law concerning corporate governance and corporate formalities, and Trace was insolvent and inadequately capitalized. n3

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 These allegations are further detailed by making reference to certain allegations made

pursuant to Counts I-V, and described herein.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## Discussion

The Defendants seek dismissal of the Second Amended Complaint on the grounds that: the Trustee failed to comply with the notice and hearing requirement of § 363(b) of the Bankruptcy Code; insolvency, which the Defendants contend is a required **[*10]** element for the breach of fiduciary claim, has not been properly plead; the breach of fiduciary claim is barred by the Trace certificate of incorporation and the statute of limitations; the claim for violation of the Delaware General Corporation Law has been inadequately pled; and the Trustee lacks standing to assert an alter ego claim.

## I. The Legal Standard

*HN1* On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendant. See Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989); Dwyer v. Regan, 777 F.2d 825, 828-29 (2d Cir. 1985).

Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249-50, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989) (citation omitted); Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984); **[*11]** Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). n4

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 Cogan's motion to dismiss Count VI for lack of standing is brought pursuant to Rule 12(b)(1). *HN2* As with a 12(b)(6) motion, in deciding such a motion all well-pleaded facts must be accepted as true and the complaint must be construed in the light most favorable to the plaintiff. Hirsch, 72 F.3d at 1088.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

"The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules requires is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993) (quoting Conley, 355 U.S. at 47; see Fed. R. Civ. P. 8(a)(1).

## II. Notice And A Hearing Were Not Required  [*12]  In Order For The Trustee To Prosecute This Action

The Directors contend that dismissal is required because the Trustee failed to provide notice of the instant lawsuit to creditors and other interested parties, pursuant to § 363 of the Bankruptcy Code, which provides in relevant part:

*HN3* 
The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

11 U.S.C. § 363(b)(1); *HN4* see also 11 U.S.C. § 102(1)(A) ("After notice and a hearing . . . means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances . . . .")

According to the Directors, the Trustee was required to comply with § 363(b)(1) because a cause of action is a form of property of the debtor's estate, and a trustee's decision to prosecute the cause of action constitutes a "use . . . other than in the ordinary course of business." 11 U.S.C. § 363(b)(1).

The Trustee, for his part, points to § 323(b) of the Bankruptcy Code and Rule 6009 of the Federal Rules of Bankruptcy **[*13]** Procedure as support for his contention that notice and a hearing were not required in order to initiate this suit. *HN5* Section 323(b) provides that "the trustee in a case under this title has capacity to sue and be sued." 11 U.S.C. § 323(b). *HN6* Rule 6009 provides that:

> With or without court approval, the trustee or debtor in possession may prosecute or may enter an appearance and defend any pending action or proceeding by or against the debtor, or commence and prosecute any action or proceeding in behalf of the estate before any tribunal.

Fed. R. Bankr. P. 6009; see also 3 Collier On Bankruptcy P 323.03, at 323-6 (Lawrence P. King ed., 15th ed. 2000) (*HN7* Section 323(b) "must be read with . . . Bankruptcy Rule 6009"); 15 id. P 6009.01, at 6009-1 to 6009-2 ("Rule 6009 has a single and straightforward purpose. It permits a trustee . . . to prosecute or defend any action on behalf of the estate in any tribunal without the need to obtain bankruptcy court approval. Rule 6009's authority stems from the Bankruptcy Code section 323(b), which gives the trustee the power to sue and be sued."). n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Although Rule 6009 refers to "court approval," rather than to the concepts of notice and a hearing, those concepts will be discussed interchangeably here because court approval is the necessary concomitant of a notice and hearing requirement.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*14]**

The case law in this area is sparse. Indeed, neither the Directors nor the Trustee have identified a case that explicitly addresses whether the § 363(b)(1) notice and hearing requirement applies to a bankruptcy trustee's commencement of litigation on behalf of the estate. The Trustee's position finds sufficient support, however, in the existing case law.

Most similar to the situation here is In re Al-Cam Dev. Corp., 99 B.R. 573, 578-79 (Bankr. S.D.N.Y. 1989). In that case, a creditor sought to prevent the trustee from continuing an arbitration proceeding regarding a claim against the debtor, and which had commenced before the bankruptcy filing. Id. at 574. The basis for the creditor's motion was the

contention that the bankruptcy court, as compared with an arbitration, was the proper forum for the dispute, rather than a lack of notice and a hearing. See id. at 574-75. However, those steps had not, in fact, been undertaken. See id. Most importantly, in denying the motion the court relied on the rule that "*HN8* the trustee . . . is authorized under Bankruptcy Rule 6009 'to commence and prosecute any action or proceeding in behalf of the **[*15]** estate before any tribunal' without court approval." Id. at 578.

In addition, several decisions have recognized a bankruptcy trustee's authority to commence litigation without court approval, as set forth in Rule 6009. See Parker v. Bain, 68 F.3d 1131, 1136 (9th Cir. 1995) (*HN9* Rule 6009 "clarifies that the trustee . . . has standing to, and may, litigate appropriate actions on behalf of the estate without prior approval of the bankruptcy court," although this rule "does not trump" automatic stay pursuant to § 362 of Bankruptcy Code); In re El San Juan Hotel Corp., 841 F.2d 6, 8-9 (1st Cir. 1988) (stating in dicta that bankruptcy court acted without authority in reassigning trustee's power to sue on behalf of estate to someone else, given trustee's authority to sue on behalf of the estate with or without court approval, pursuant to § 323(b) and Rule 6009); In re Capgro Leasing Assocs., 169 B.R. 305, 312-13 (Bankr. E.D.N.Y. 1994) (Rule 6009 "plainly furnishes a trustee with the discretion to decide whether to litigate actions as it sets forth, and to do so with or without court approval," though § 362 automatic **[*16]** stay provision "properly leaves with the bankruptcy judge the discretion and authority to decide when to let such action go forward") (emphasis in original). n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 The Directors maintain that the fact that courts have held that a Trustee is bound by the automatic stay provision, which has its own notice and hearing requirement, see 11 U.S.C. § 362, means that § 323(b) applies. However, the Directors' motion is addressed to whether the Trustee may bring the instant suit without court approval. Thus, this contention obviates the distinction between a rule governing when suit may be brought and a rule governing whether it may be brought. See In re Capgro Leasing, 169 B.R. at 312-13.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Furthermore, § 323 of the Bankruptcy Code and Rule 6009 are derived from former Bankruptcy Rule 610, which was itself adopted to eliminate the previously-existing requirement of the Bankruptcy Act of 1898 that a trustee obtain court approval in order to prosecute or defend an action **[*17]** in which the estate has an interest. In re Capgro Leasing, 169 B.R. at 312; 3 Collier On Bankruptcy P 323.LH[2][a], at 323-12.1 (Lawrence P. King ed., 15th ed. 2000); 10 id. P 6009.RH, at 6009-8. This legislative history, together with the repeal of the Bankruptcy Act of 1898, is inconsistent with the proposition that in order to commence a lawsuit on behalf of a bankruptcy estate the trustee must first obtain court approval, after notice and a hearing pursuant to § 363(b)(1).

The Directors insist, however, that the Trustee's commencement of this suit constitutes a use of an estate asset "other than in the ordinary course of business," and therefore that notice and hearing requirement must apply. 11 U.S.C. § 353(b)(1).

*HN10* A cause of action is a form of property of a bankruptcy estate, see United States v. Whiting Pools, Inc., 462 U.S. 198, 205 n.9, 76 L. Ed. 2d 515, 103 S. Ct. 2309 (1983); In re Betty Owens Schs., Inc., 1997 U.S. Dist. LEXIS 5877, No. 96 Civ. 3576, 1997 WL 188127, at *2 (S.D.N.Y. Apr. 17, 1997), and at least one court has characterized the pursuit of an estate's cause of action by a trustee as "use" of that **[*18]** asset within the meaning of § 363. See In re Olympia Holding Corp., 188 B.R. 287, 295 (M.D. Fl. 1994) ("It is . . . without

question that the trustee is able to 'use' those assets by pursuing the causes of action in court as section 363(l) would protect."), aff'd on other grounds, 68 F.3d 1304 (11th Cir. 1995). n7

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 In re Olympia Holding did not touch on whether such use is "outside of the ordinary course of business." See 188 B.R. at 295. Indeed, in referring to the trustee's "use" of an estate asset through the commencement of litigation, the court cited § 323 and Rule 6009, which provisions, as just discussed, speak of the trustee's authority to commence litigation with or without court approval. See id.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The Trustee has not directly addressed the contention that his pursuit of the instant litigation is a "use" of an estate asset under § 323. Assuming that it is, however, whether or not such use is outside the course of ordinary business within **[*19]** the meaning of that provision is another question. The authorities relied upon by the Directors fail to demonstrate that commencement of the instant lawsuit is such a use and indeed, are not on point. See In re Lavigne, 114 F.3d 379, 384-85 (2d Cir. 1997) (discussing two tests of whether a transaction is "ordinary," and concluding that debtor's cancellation of liability policy was not); In re Kashani, 190 B.R. 875, 885-85 (9th Cir. 1995) ("Section 323 . . . indicates the proper party to sue for purposes of standing" but does not contravene general rule that court approval required for trustee to be sued, absent limited exception under 28 U.S.C. § 959(a)); In re DeLorean Motor Co., 991 F.2d 1236, 1241 (6th Cir. 1993) (same). n8

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 The Directors also contend that § 323 and Rule 6009 do no more than confer standing on the Trustee to bring suit -- or to be the object of suit. Therefore, they maintain, § 323 does not obviate any otherwise applicable requirement for court approval. However, the language of Rule 6009 and Collier On Bankruptcy, a leading academic authority, supports a contrary view. On the one hand, Collier explains that, while § 323(b) provides that the trustee has the capacity to be sued, generally suit may not be maintained against trustee without leave of the bankruptcy court. 3 Collier On Bankruptcy P 323.03[3], at 323-9 (Lawrence P. King ed., 15th ed. 2000). On the other hand, this same authority explains that Rule 6009, the "explanatory rule" for § 323(b), id. P 323.LH[2][a], at 323-12.1, "permits a trustee . . . to prosecute or defend any action on behalf of the estate in any tribunal without the need to obtain bankruptcy court approval"), 15 id. P 6009.01, at 6009-1 to 6009-2. To the extent there is some tension between these views, it may be explainable in part by the language of Rule 6009, which is phrased in terms of the trustee's authority to choose to bring suit -- or to defend one -- rather than others' rights to sue the trustee. Fed. R. Bankr. R. 6009.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*20]**

In sum, the case law as well as the text and legislative history of § 323 and Rule 6009 lead to the conclusion that the § 363(b) notice and hearing requirement does not bar the instant suit. There are two theories upon which this conclusion could be based: one, that the Trustee's pursuit of this litigation is an ordinary use of estate property; two, that the § 363 provisions governing the use of estate property are inapposite, and the relevant provisions are § 323 and Rule 6009 only. The former theory is the one adopted herein.

The Directors also assert that the fact that the Trustee is incurring attorney's fees and disbursements in connection with this litigation renders it a transaction outside the ordinary course of business. However, *HN11* the authority to retain and pay counsel is inherent in the authority to pursue litigation. Moreover, no fees or disbursements are paid by a trustee without a prior order of the court that allows and awards fees in an amount determined by the court to be reasonable, see 11 U.S.C. § 503(b), and after filing of a fee application, notice to all interested parties, and a hearing, see 11 U.S.C. §§ 330, **[*21]** 331; Fed. R. Bankr. P. 2002(a)(6), 2016(a). Thus, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure provide adequate safeguards against the unreasonable use of estate property in connection with litigation by the Trustee.

Finally, the Directors aver that the Trustee's prosecution of this action is a "use" outside the ordinary course of business of Trace's officers and directors liability insurance policies (the "D&O Policies"). The D&O Policies purportedly provide coverage to reimburse the defendants' defense costs and to satisfy any judgment the Trustee may seek to obtain in this action. Through this lawsuit, the Directors maintain, the Trustee is forcing this estate asset to be depleted because he is causing each of the Defendants to incur defense costs which, when reimbursement is provided under the D&O Policies, will reduce the amounts available thereunder.

The Trustee concedes that *HN12* the D&O Policies are property of the bankruptcy estate. See, e.g., In re Minoco Group of Companies, Ltd., 799 F.2d 517, 519 (9th Cir. 1986) (D&O policy is property of bankruptcy estate because it increases value of estate); see also MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 92 (2d Cir. 1988) **[*22]** (debtor's insurance policies are property of bankruptcy estate). However, the Trustee avers that, because the proceeds will not be available to pay creditors' claims except to the extent that there is a recovery from the Defendants, he is engaging in an ordinary "use" of these policies by seeking such recovery through this action. Thus, the § 363(b) notice and hearing requirement does not apply. See 11 U.S.C. § 363(b) (non-ordinary use) and (c) (ordinary use).

The Trustee's pursuit of this litigation satisfies the standard for an ordinary use of an estate asset vis-a-vis the D&O Policies. The touchstone of this standard is "the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business." In re Lavigne, 114 F.3d at 384-85 (describing two-part analysis, involving "creditor's expectation test" and "industry-wide test," of ordinariness) (citation omitted). Seeking recovery for the estate through these policies comports with the reasonable expectations of a hypothetical creditor, because it does not "subject[] [him] to economic risks of a nature different from **[*23]** those he accepted when he decided to enter into a contract with the debtor," id. at 385 (describing "creditor's expectation test") (internal quotation marks and citation omitted), but, indeed, accrues to his benefit, see Federal Ins. Co. v. Sheldon, 167 B.R. 15, 19 (Bankr. S.D.N.Y. 1994) (where trustee had obtained judgment against officers and directors, if determination made that D&O policy covered that liability then proceeds would pay portion of their liability to bankruptcy estate, which would otherwise be unsatisfied); cf. In re Weisser Eyecare, 245 B.R. 844, 849-50 (Bankr. N.D. Ill. 2000) (agreement between trustee and debtor's former officer/shareholder to litigate jointly debtor's liability causes of action and share litigation proceeds equally was not ordinary use of estate asset but rather was "extraordinary transaction[] which might harm the positions of unsecured creditors" requiring notice and hearing). n9 Similarly, this effort is of a type of transaction that similar businesses could be expected to engage in. See In re Lavigne, 114 F.3d at 385 (describing "industry-wide test"). Therefore, notice and **[*24]** a hearing pursuant to § 363(b) were not required based on the Trustee's "use" of the D&O Policies.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n9 The Directors do not concede that Trace's estate has an interest in the proceeds of the D&O Policies. No conclusion is reached regarding that issue here.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -


## III. The Complaint Satisfies Rule 12(b)(6) and Rule 12(b)(1)

### A. Trace's Insolvency Since 1995 Has Been Adequately Pleaded

The Directors contend that the Trustee has failed to adequately plead Trace's insolvency, an essential fact underlying both Count IV, the breach of fiduciary duty claim, and Count V, the Delaware General Corporation Law claim, and therefore that these counts must be dismissed. Although the Directors' argument is less than entirely clear, they appear to raise two objections: first, that the Trustee was obligated to, and has not, alleged insolvency with sufficient particularity, and second, that the Trustee has not adequately alleged that Trace was insolvent at the time of the Directors' alleged misdeeds.

With respect **[*25]** to the first objection, the Directors contend that the Trustee has only conclusorily alleged that Trace was insolvent, while instead he is required to allege that Trace was insolvent within the meaning of § 101(32) of the Bankruptcy Code, i.e., that its liabilities exceeded its assets, see 11 U.S.C. § 101(32), or that Trace was unable to pay its debts as they matured, and to set forth specific facts supporting such allegations.

This argument overlooks the basic tenet that HN13 a complaint must be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. The Trustee's allegations regarding insolvency meet this standard. See Thomson Kernaghan & Co. v. Global Intellicom, Inc., 2000 U.S. Dist. LEXIS 6650, *41, 99 Civ. 3005, 99 Civ. 3015, 2000 WL 640653, at *13 (S.D.N.Y. May 17, 2000) (accepting plaintiff's explicit allegations concerning insolvency even though "allegations which would support the argument that [the defendant] was insolvent at the time . . . are implicit at best" because the court must "take [] the allegations in the light most favorable to the plaintiff"); Contempri Homes, Inc. v. Ameritik Real Estate & Dev. Corp., 1989 U.S. Dist. LEXIS 14636, 88 Civ. 8408, 1989 WL 153030, **[*26]** at *1-*2 (S.D.N.Y. Dec. 5, 1989) (accepting allegation of fraudulent asset transfers as satisfying requirement to plead insolvency although plaintiff did not explicitly allege insolvency and no other facts relating to allegation set forth). Moreover, Counts IV and V do not assert a cause of action which is required to be pled with particularity. See Fed. R. Civ. P. 9 (setting forth particularity requirement for inter alia fraud claims).

Moreover, there is no requirement that the Trustee plead insolvency within the meaning of the Bankruptcy Code. The Trustee maintains, and the Directors do not dispute, that Count IV is governed by Delaware law because Trace is a Delaware corporation. See Walton v. Morgan Stanley & co., 623 F.2d 796, 798 n.3 (2d Cir. 1980) ("New York law dictates that the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation"). HN14 Under Delaware law, the fiduciary duty owed to creditors arises at a point short of actual insolvency, that is, when the corporation is "in the vicinity of insolvency." See Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp., 1991 Del. Ch. LEXIS 215, Civ. A. No. 12150, 1991 WL 277613, **[*27]** at *34 (Del. Ch. Dec. 30, 1991); see also Weaver v. Kellogg, 216 B.R. 563, 583-84 (Bankr. S.D. Tex. 1997) (under Delaware law fiduciary duty of corporate insiders to corporation's creditors may arise even where corporation not insolvent but is at the time of wrongful transactions in the vicinity of insolvency) (citing Credit Lyonnaise, 1991 WL 277613). Delaware law does not define insolvency in this context as "insolvency due to a statutory filing," such as a bankruptcy

proceeding. Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 787 (Del. Ch. 1992). n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n10 In their reply brief, the Directors change their argument, asserting that their position is
not that the Trustee has failed to meet a requirement to plead insolvency within the meaning
of the Bankruptcy Code but, rather, that he has failed to plead insolvency under any
definition. In any event, as explained here, the insolvency allegations are sufficient under the
relevant definition.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In addition, the Second **[*28]**  Amended Complaint sets forth specific facts relating to the
allegation of insolvency, including inter alia that Trace's 1995 audited financial statements
showed a negative stockholder's equity of approximately $ 29.6 million and that by the next
year the negative equity increased to $ 72 million. These factual allegations are sufficient to
show that Trace was in the vicinity of insolvency. n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 In their reply brief the Directors raise the argument that the Trustee's allegations are
insufficient because they are based on consolidated financial statements for Trace and its
many subsidiaries, and cite authorities for the proposition that consolidated financial
statements are not sufficient to prove the insolvency, for purposes of bankruptcy
proceedings, of any one entity included in such a statement. See In re Goodman Indus. Inc.,
21 B.R. 512, 520-21 (Bankr. D. Mass. 1982); In re Total Technical Servs., 150 B.R. 893,
899-900 (Bankr. D. Del. 1993); see also Askanase v. Fatjo, 130 F.3d 657, 670 (5th Cir.
1997). None of these authorities concern insolvency as it is defined under Delaware law, and
none of them involve the generous standard applicable on a 12(b)(6) motion to dismiss.
Thus, this argument is unavailing.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*29]**

Finally, with respect to the issue of whether Trace was insolvent at the time of the Directors'
alleged wrongdoing, the Second Amended Complaint alleges not only that Trace was
insolvent since at least 1995 but also, more specifically, that Trace was insolvent at various
points at which the Defendants' alleged misdeeds occurred. Moreover, the Trustee is entitled
to the favorable inferences that Trace's unhealthy financial condition continued until it went
into bankruptcy. See Dunbar v. Commissioner of Internal Revenue, 119 F.2d 367, 370 (7th
Cir. 1941) *HN15* ("[A] condition of insolvency shown to exist at a particular time will be
presumed to continue in the absence of a showing to the contrary.") Therefore, Counts IV
and V will not be dismissed for failure to adequately plead insolvency.

**B. Count IV Is Adequately Pleaded**

**1. The Claim For Breach Of Fiduciary Duty Is Not Barred By The Exculpatory; Clause
In Trace's Articles of Incorporation**

The Defendants contend that insofar as Count IV asserts a claim for breach of the fiduciary
duty of care it is barred by an exculpatory provision (the "Exculpatory Clause") contained in
Trace's Restated **[*30]**  Certificate of Incorporation (the "Certificate of Incorporation"): n12

To the fullest extent permitted by the General Corporation Law, as the same presently exists or may hereafter be amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law; (iii) under Section 174 of the General corporation Law, or (iv) for any transaction from which the director derived an improper benefit. Any repeal or modification of this Article IX shall not adversely affect any right or protection of a director of the corporation with respect to any act or omission occurring prior to such repeal or modification.

Certificate of Incorporation, Art. IX (emphasis added). n13

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 Cogan, though not the Directors, distinguishes between that aspect of the claim which is based on breach of the duty of care and that aspect which is based breach of the duty of loyalty, as appropriate under the Exculpatory Clause. **[*31]**

n13 This language tracks 8 Del. Code Ann. tit. 8, § 102(b)(7).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

According to the Defendants, the Second Amended Complaint does not allege facts from which any of the four exceptions to the shield from liability could be inferred. The Trustee points out, however, that the Exculpatory Clause only shields the Defendants from liability to the corporation or its stockholders, and contends that the clause is inapplicable by its own terms because he has brought this action for the benefit of Trace's creditors.

Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.), 2000 U.S. Dist. LEXIS 276, No. 97C7934, 97 C6043, 2000 WL 28266 (N.D. Ill. Jan. 11, 2000), is directly on point. In that case, the court, applying Delaware law, held that an exculpatory provision identical in relevant part to the Trace Exculpatory Clause did not preclude a Chapter 7 trustee from bringing breach of fiduciary duty claims against the directors of the corporate debtor. Id. at *7-*8 (analyzing articles of incorporation provision that "[a] director of the Corporation shall not be personally liable to the Corporation or **[*32]** its stockholders for monetary damages"). The court reasoned that the trustee was bringing these claims for the benefit of the creditors, and the "creditors should not be bound by the exculpatory provision because they were not parties to the contract," i.e., the articles of incorporation. Id. at *8. The court also noted that the exculpatory provision was addressed only to claims brought by the corporation or its stockholders, that "no mention [was] made of the potential liability to creditors that directors may incur, and that "nothing in the exculpatory provision prevents suits brought by the creditors or those acting on their behalf." Id. Under the reasoning of In re Ben Franklin, 2000 U.S. Dist. LEXIS 276, *24, 2000 WL 28266, the claim against the Defendants for breach of the duty of care, brought for the benefit of Trace's creditors, is not barred by the Exculpatory Clause.

This conclusion finds further support in Section 102(b)(7) of the Delaware General

Corporation Law, which is the statutory basis for the Exculpatory Clause, and is itself based on Section 2.02(b)(4) of the Model Business Corporation Act. See Del. Code Ann. tit. 8, § 102 (b)(7); Model Business Corporation Act **[*33]** Annotated § 2.02 at 2-16, official comment i (3d ed. 1997); see generally R. Franklin Balotti and Jesse A. Finkelstein, The Delaware Law of Corporations and Business Organizations § 4.19 (discussing enactment of and purposes behind section 102(b)(7) (1988). Section 2.02 of the Model Business Corporation Act was developed in response to Smith v. Van Gorkom, 488 A.2d 858 (Del. 1985), in which the directors of a corporation were held personally liable to shareholders for a breach of the fiduciary duty of due care. See Smith, 488 A.2d at 864; Model Business Corporation Act Annotated § 2.02 at 2-16, official comment i (3d ed. 1997). This decision was viewed as creating reluctance on the part of qualified individuals to serve as corporate directors, and the solution developed was to allow corporations to shield directors from such suits by including liability limitation or exculpatory provisions in their articles of incorporation. See Model Business Corporation Act Annotated § 2.02 at 2-16, official comment i (3d ed. 1997). Inclusion of these clauses was justified on the ground that:

*HN16*

So long as any such liability-limitation **[*34]** provision does not extend to liability to third parties, shareholders should be permitted -- except when important societal values are at stake -- to decide how to allocate the economic risk of the directors' conduct between the corporation and the directors.

Id. Thus, the development of such clauses was premised on the rationale that shareholders should have the ability to contract with the corporation and its directors, via the articles of incorporation, regarding the directors' liability to the corporation or the shareholders. See id.; see also Morris v. American Pub. Utils. Co., 14 Del. Ch. 136, 122 A. 696, 700 (Del. Ch. 1923) ("[A] corporate charter is a contract . . . [is] a dual contract -- one between the state and the corporation and its stockholders, the other between the corporation and its stockholders.") (internal citation and quotation marks omitted).

Thus, the Exculpatory Clause, both by its terms and in accordance with the underlying policy rationale, allocates the risk of loss between the parties to the articles of incorporation, i.e., the shareholders and directors. The clause does not allocate this risk with respect to third parties, **[*35]** such as the creditors for whose benefit the Trustee has brought the instant suit.

The Defendants insist that the Trustee cannot escape the Exculpatory Provision because he stands in the shoes of the corporation, Trace, and lacks standing to bring suit on behalf of the third-party creditors. However, the case law relied upon by the Defendants is inapposite.

*HN17* A bankruptcy trustee lacks standing to bring an action on behalf of an individual creditor with a particularized injury. See, e.g., Steinberg v. Buczynski, 40 F.3d 890 (7th Cir. 1994) (trustee lacked standing to bring claim where only injured party was specific creditor, not corporation and, in that sense, creditors as class); Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991) (claim against third party, a brokerage house, for defrauding corporation with cooperation of corporate management, accrued only to creditors and trustee lacked standing). However, where the injury is to all creditors as a class, it is the creditors who lack standing and the Trustee who may bring a claim based on that generalized injury. See Kalb, Voorhis & Co. v. American Fin. Corp., 8 F.3d 130, 132-33 (2d Cir. 1993) **[*36]** (applying Texas law and holding, in context of alter ego claim, that bankruptcy trustee has exclusive standing because acts alleged "harmed all creditors equally, [and] such

claims are property of the bankruptcy estate and are not assertable by individual creditors");
St. Paul Fire and Marine Ins. Co. v. Pepsico, Inc., 884 F.2d 688, 696-99 (2d Cir. 1989)
(analyzing various circuit court decisions regarding standing of bankruptcy trustee to bring
alter ego claims, and holding that such claim could be asserted exclusively by trustee under
Ohio law because of generalized nature of injury). Indeed, In re Ben Franklin relied on this
doctrine, observing that "the Trustee is vested with the power to bring suit which represents
the interests of the creditors as a class," though not "the personal claims, those claims that
allege the creditor has suffered a unique harm," and that the trustee therefore had standing
because the breach of fiduciary claim was general rather than personal. See 2000 U.S. Dist.
LEXIS 276, *21, 2000 WL 28266, at *7-*8. n14

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n14 The Defendants point out that the bankruptcy court's decision reveals that the creditors
had specifically assigned their claims to the trustee, see In re Ben Franklin Retail Stores,
Inc., 225 B.R. 646, 649 n.3 (Bankr. N.D. Ill. 1998), aff'd in part and rev'd in part, In re Ben
Franklin, 2000 U.S. Dist. LEXIS 276, 2000 WL 28266, and maintain that this was the reason
the trustee had standing. However, the district court's holding did not rely on this peculiarity.
See In re Ben Franklin, 2000 WL 28266, at *7-*8.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*37]**

Finally, although Kalb and St. Paul both pertain to alter ego claims, their reasoning is not
limited to such claims. See Kalb, 8 F.3d at 132-33; St. Paul, 884 F.2d at 696-701. As the
Second Circuit observed in St. Paul:

> this reasoning extends to common claims against the debtor's alter ego or others
> who have misused the debtor's property in some fashion. If a claim is a general
> one . . . and if that claim could by brought by any creditor of the debtor, the
> trustee is the proper person to assert the claim.

884 F.2d at 701.

This doctrine is grounded in the underlying policy goals of the bankruptcy law, which is to
protect the estate property from being distributed to creditors on a first-come, first-
serve basis, i.e., based simply on the fact that certain creditors may act before others to obtain
payment of their claims, even where the claim is common to all creditors. See St. Paul, 884
F.2d at 700-01; see also Steinberg, 40 F.3d at 892-94 ( HN18 though trustee "has no right to
enforce entitlements of a creditor [,] he represents the unsecured creditors of the
corporation; and in **[*38]** that sense when he is suing on behalf of the corporation he is
really suing on behalf of the creditors of the corporation").

Therefore, Count IV is not barred by the Exculpatory Clause.

**(2) Breach Of Fiduciary Duty Has Been Adequately Pleaded As To The Directors**

HN19 Under Delaware law, in order to bring a claim for breach of fiduciary duty, a plaintiff
must allege (1) the existence of a fiduciary duty and (2) a breach by the fiduciary of that

duty. York Linings v. Roach, 1999 Del. Ch. LEXIS 160, No. 16622-NC, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999). n15 A breach may consist of a failure to comply with the fiduciary's obligations to exercise reasonable supervision and control over a corporation. See Lutz v. Boas, 39 Del. Ch. 585, 171 A.2d 381, 395-96 (Del Ch. 1961) (outside directors liable for breach of fiduciary duty where misdeeds committed by president of corporation and outside directors "gave scant attention to the [company's] management," thereby "failing to discharge their duties and responsibilities as directors").

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n15 The Directors, citing Rabkin v. Philip A. Hunt Chem. Corp., 547 A.2d 963 (Del. Ch. 1986) contend that the elements of a breach of fiduciary claim under Delaware law are (1) existence of the duty, (2) breach of the duty, and (3) knowing participation in the breach. Id. at 967. However, this formulation pertains to the elements of a claim for aiding and abetting a breach of fiduciary duty, or otherwise facilitating and participating in the breach of a fiduciary duty owed by someone else. See, e.g., Nash v. Schock, 1998 Del. Ch. LEXIS 139, No. 14721-NC, 1998 WL 474161, at *2 (Del. Ch. July 23, 1998) (elements of claim for aiding and abetting breach of fiduciary duty are (1) existence of fiduciary relationship, (2) breach by fiduciary, (3) knowing participation by non-fiduciary defendant in the breach); Gilbert v. The El Paso Co., 490 A.2d 1050, 1057 (Del. Ch. 1984) (stating same elements in relation to claim against non-fiduciary for civil conspiracy to participate in breach of fiduciary duty). Rabkin's formulation is not crystal clear on this point, but the case itself is consistent with the distinction just made, as it involved a claim that an acquiring corporation was "secondarily liable" for a breach of fiduciary duty by a majority stockholder. See 547 A.2d at 967. Moreover, the authority relied upon by Rabkin concerned a claim, not against the holder of the fiduciary duty, but rather against other parties for allegedly joined with the fiduciary in committing the breach. See id. at 968 (citing Penn Mart Realty Co. v. Becker, 298 A.2d 349, 351 (1972)).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*39]**

The Directors contend that the breach of fiduciary duty claim has been inadequately pleaded as to them because the alleged misdeeds were actually committed by Cogan, and it is not alleged that the Directors knew of and approved those acts, i.e., that they knowingly participated. They further contend that, even if they had actually approved any of the alleged transactions, liability would be barred because the allegations in the Second Amended Complaint fail to give rise to an inference of bad faith or other basis for overcoming the business judgment rule. See Brehm v. Eisner, 746 A.2d 244 (Del. 2000) ([HN20]under business judgment rule, corporate directors entitled to the presumption of proper business judgment).

As just stated, the contention that the Directors must have knowingly participated in Cogan's alleged breach misapprehends the elements required to prove the claim. Indeed, [HN21]the Delaware General Corporation Law commands that "the business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors." Del. Code Ann. tit. 8, § 141(a). It has been noted with respect to the management obligations of corporate directors under various state [*40] corporation codes, such as the one at issue here, that:

An important theme in recent cases has been the need for directors "to exercise reasonable supervision and control over the policies and practices of a

corporation. The institutional integrity of a corporation depends on the proper discharge by directors of those duties." These cases make clear that sustained patterns of inattention to obligations by directors or officers or unreasonable blindness to problems that later cause substantial harm will create exposure to liability.

American Law Institute, Principles of Corporate Governance: Analysis and Recommendations § 401 at 155 (1994) (citations omitted); see also Hanson Trust PLC v. ML SCM Acquisition, Inc., 781 F.2d 264, 274 (2d Cir. 1986) (applying New York law and stating, "HN22⬆the duty of due care requires that a director's decision be made on the basis "of 'reasonable diligence' in gathering and considering material information. In short, a director's decision must be an informed one.").

HN23⬆It is "[a] fundamental precept of Delaware corporation law . . . that it is the board of directors . . . that has ultimate responsibility for management [*41] of the enterprise." Grimes v. Donald, 1995 Del. Ch. LEXIS 3, *25, No. Civ. A. 13358, 1995 WL 54441, at *8 (Del. Ch. Jan. 11, 1995). One of the prime responsibilities of directors is to supervise and evaluate the CEO. See Abercrombie v. Davies, 35 Del. Ch. 599, 611, 123 A.2d 893, 899-900 (Del. Ch. 1956). While powers may be delegated to a CEO or other officers of the company, "the board may not either formally or effectively abdicate its statutory power and fiduciary duty to manage and direct the management of the business and affairs of the corporation." Grimes, 1995 WL 54441, at *9.

Thus, the fact that it is Cogan who is alleged to have committed the improper acts does not warrant dismissal of Count IV as to the Directors. Just as Cogan had a duty not to engage in self-dealing. so the Directors had a duty to exercise due care to prevent self-dealing from happening. Dismissal is not warranted on the ground that the Second Amended Complaint fails to allege that the Directors knew about Cogan's improper acts and affirmatively approved them.

Nor is it required that the Directors be alleged to have acted in bad faith. The Directors rely for this proposition on [*42] Lippe v. Bairnco Corp., 230 B.R. 906 (S.D.N.Y. 1999), which held under the New York version of the business judgment rule that the business judgment rule protects corporate directors from liability absent fraud or bad faith. Id. at 916-17. n16 As Lippe itself notes, the business judgment rule applies to "actions of corporate directors" or "business decisions" that they make. Id. at 916. Here, however, the claim is not that the Directors made bad decisions but, rather, that they neglected to carry out, or abdicated, their responsibility to make management decisions in the first place. Under Delaware law, the business judgment rule does not apply in such a situation:

> HN24⬆It should be noted that the business judgment rule operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act.

Rabkin v. Philip A. Hunt Chem. Corp., 1987 Del. Ch. LEXIS 522, *3, Civ. A. No. 7547, 1987 WL 28436, at *1 (Del. Ch. Dec. 17, 1987) (quoting Aronson v. Lewis, 473 A.2d 805, 813 (Del. 1984) (overruled on other grounds [*43] by Brehm v. Eisner, 746 A.2d 244, 253

(Del. 2000))). Thus, the Directors may not seek the protection of the business judgment rule on the ground that they made no decisions and took no actions, rendering the "bad faith" standard they invoke inapposite. n17

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n16 Although the Directors rely on New York, rather than Delaware, law, a bad faith standard has also been articulated in this context by the Delaware supreme court. See Brehm, 746 A.2d at 264 and n.66 ("HN25 Good faith . . . is a key ingredient of the business judgment rule.").

n17 In their reply brief the Directors raise the argument that, where the theory for a breach of fiduciary duty claim is abdication of management responsibilities, there must be allegations of "gross negligence." The fact that this argument is raised for the first time in a reply brief is alone grounds for disregarding it. Moreover, the Directors misstate the law. Although some commentators have observed that "gross negligence is probably the law of Delaware" in this context, R. Franklin Balotti and Jesse A. Finkelstein, The Delaware Law of Corporations and Business Organizations § 4.8 (1988) (emphasis added), the Court of Chancery, after analyzing the Delaware case law in depth, has applied an ordinary negligence standard to a claim alleging director abdication or neglect of managerial duties, see Rabkin, 1987 WL 28436, at *2-*3. The issue of the proper negligence standard not having been fully briefed, the better course is not to resolve it if possible. Resolution is not required because the allegations in the Second Amended Complaint satisfy either negligence standard under the liberal reading required by Rule 12(b)(6).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*44]**

An examination of the specific allegations further exposes the shortcomings of the Directors' position.

### (a) Imprudent Loans And Gifts To Insiders

The Second Amended Complaint alleges that the Defendants allowed Trace to make imprudent loans and/or gifts to corporate insiders, Cogan family members and Cogan's cook, without a proper business purpose, including a $ 14 million loan to Cogan himself. The Directors' response is that they cannot be held liable because they played no part in considering or determining to make these loans.

HN26 Delaware law provides that a loan or other assistance may be provided by a corporation to an officer or employee when "in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation." Del. Code Ann. tit. 8, § 143. As explained above, the Directors are not protected from liability for failing to exercise their duties as directors by admitting that they did not do so.

### (b) The Dow Preferred Stock Redemption

The Second Amended Complaint alleges a sham transaction between Trace and Cogan to evade the statutory requirement that HN27 "no corporation shall . . . purchase or redeem its **[*45]** own shares of capital stock . . . when the capital of the corporation is impaired." Del. Code Ann. tit. 8, § 160(a)(1). Specifically, it is alleged that in 1998, at a time when Trace's capital was already impaired, Trace made a $ 3 million non-recourse loan to Cogan, n18 and that he used this $ 3 million to satisfy a redemption obligation that Trace had to

Dow concerning the Trace preferred shares held by Dow. It is further alleged that, after Cogan obtained the shares with Trace's funds, he gave the shares in pledge to Trace, which thus had not only possession of the shares but also the right to any dividends.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n18 *HN28* A non-recourse loan is a loan that allows the lender to attach only the collateral, and not the borrower's personal assets, if the loan is not repaid. Black's Law Dictionary 947 (7th ed. 1999).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

*HN29* Section 174 of the Delaware General Corporation Code renders directors "jointly and severally liable" to creditors, among others for "wilful or negligent" violations of Section 160. Del. Code Ann. tit. **[*46]** 8, § 174. The purpose of this provision is to protect creditors against corporate expenditures that impair the integrity of the corporation's capital because capital constitutes a fund for the payment of indebtedness. See Johnston v. Wolf, 487 A.2d 1132, 1134-35 (Del. 1985) (construing Section 174).

The Directors contend that they cannot be held liable because it was Cogan, and not Trace, that redeemed the shares. However, they have cited no authority for the proposition that the Delaware Court of Chancery, a court of equity, would permit the statute to be evaded by the subterfuge of the nominal purchase by Cogan, using funds provided by Trace. The Directors further contend that they cannot be held liable absent an allegation that they knew of the Dow transaction. However, the claim may be sustained at this pleading stage on the theory that they knew or should have known of this alleged illegal redemption transaction, and either participated in or failed in their duty to prevent it. n19

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n19 The Directors also maintain, based on an unsworn affirmation of counsel, that Farace was not a Board member when the Dow shares redemption took place. Such material is not competent in the context of a 12(b)(6) motion, and to the extent there is a dispute regarding this or similar issues it is a matter for a motion under Rule 56. The same is true for the Directors' contention that Sherman and Marcus were not directors during the second half of 1999 and therefore cannot be held liable for events occurring during that period.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*47]**

Finally, this transaction also involves an allegation that the Directors failed to satisfy their responsibility to evaluate the propriety of a sizable, non-recourse loan to Cogan, which is itself a basis for liability. See Del. Code Ann. tit. 8, § 143.

## (c) The Renewal of Cogan's Employment Contract

The Second Amended Complaint alleges that the Directors abdicated their responsibilities by allowing the ten-year renewal, in August 1997, of Cogan's employment contract. The Directors respond that there was no practical means for them to prevent the renewal because it was "automatic" and because of the severe financial penalties for Trace that would have resulted. The Directors also maintain that, even accepting the Trustee's allegations, there was no reasonable basis prior to August 1997 for terminating the agreement.

The Directors' first argument is misplaced because, while the initial 1987-97 term may have already been established, any subsequent "Renewal Term" was subject to veto by the Board. Moreover, the financial penalties to which the Directors allude were associated, not with a failure to renew, but, rather, with termination of the agreement after its renewal. **[*48]** Thus, according to the allegations in the Second Amended Complaint, there was in fact a means available to the Directors to prevent the renewal.

The Directors' second argument also fails. *HN30* Self-dealing contracts, such as the one alleged here, are not strictly prohibited by Delaware law. However, where such a contract is involved the proponents of that contract have the burden of demonstrating the "entire fairness" of the transaction to an independent body, whether it be a court, disinterested directors, or disinterested ratifying shareholders. Merritt v. Colonial Foods, Inc., 505 A.2d 757, 763-65 (Del. Ch. 1986) (citing Del. Code. Ann. tit. 8, § 144); see Delta Star, Inc. v. Patton, 76 F. Supp. 2d 617, 632-34 (W.D. Pa. 1999) (Delaware law requires "complete fairness" of self-dealing contract) (citing Merritt, 505 A.2d at 764).

The Second Amended Complaint alleges inter alia that the agreement perpetuated Cogan in office for an inordinate period of time without regard to performance, and in spite of Trace's financial troubles under his leadership, afforded Cogan an extremely high salary, imposed severe financial penalties upon **[*49]** Trace for termination of Cogan, deprived the Board of its customary discretion regarding a CEO, and imposed overly burdensome processes for blocking automatic renewal. These allegations are strikingly similar to the facts of Delta Star, in which a CEO was held liable for breach of fiduciary duty where he unilaterally determined his own salary increases and bonuses, and caused the adoption of generous retirement benefit plans, but failed to demonstrate the complete fairness of these self-dealing transactions. 76 F. Supp. 2d at 632-33. Thus, the allegations are sufficient to support the inference that the "entire fairness" test cannot be met and, therefore, that dismissal is not warranted.

### (d) Other Improper Uses Of Trace Funds

The Second Amended Complaint also alleges other improper uses of Trace funds, including to pay extravagant salaries and bonuses, and to make gifts, to Cogan and his family members, cook, and secretary. The Directors object that they were not involved in these transactions. It is their very lack of supervisory involvement, however, which provides the basis for the breach of fiduciary claim, and which precludes dismissal.

### (3) Breach  [*50]  Of Fiduciary Duty Has Been Adequately Pleaded As To Cogan

Counts II and IV assert breach of fiduciary duty claims against Cogan based on numerous acts of alleged self-dealing. Cogan contends, first, that the complaint reveals that these transactions were approved by a majority of disinterested board members, and second, that the business judgment rule therefore applies and bars the claims. See Healthco Int'l, Inc. v. Hicks, Muse & Co., Inc., 208 B.R. 288, 302 (Bankr. D. Mass 1997) (*HN31* under Delaware law, director's self-interested transaction "is not protected by the business judgment rule . . . absent approval of the transaction by a majority of disinterested directors"); Nixon v. Blackwell, 626 A.2d 1366, 1375-76 (Del. 1993) (entire fairness test, rather than business judgment rule, applies to self-dealing transactions).

With respect to the issue of board approval, the Second Amended Complaint alleges that the Directors uncritically supported Cogan with respect to the decisions challenged, and utterly failed to exercise reasonable supervision and control. It is also alleged, variously, that there was "no indication" of Board approval, or "no **[*51]**  Board approval," of Cogan's self-dealing transactions.

The allegation that the Directors uncritically supported Cogan is not tantamount to an

allegation that a majority of disinterested directors approved the transaction and, therefore, such an allegation does not trigger the business judgment rule. Indeed, the inference to be drawn from the Second Amended Complaint is that four out the five Board members were not disinterested, because they consisted of Cogan and three Trace officers and employees -- Nelson, Farace, and Marcus -- who held their positions by virtue of Cogan's authority.

In addition, *HN32* Delaware law provides that whenever a board of directors acts without a formal meeting such action must be evidenced by a "writing or writings . . . filed with the minutes of proceedings of the board," Del. Code ann. tit. 8, § 141(f), and the Trustee maintains without contradiction that Trace's by-laws contain an equivalent requirement. Therefore, under both Delaware law and Trace's by-laws, "no indication" of Board action is equivalent to no action at all, rather than implying that the Board actually approved the transactions. The business judgment rule is thus inapposite.

Finally, **[*52]** Cogan contends that Count II must be dismissed insofar as it seeks to recover alleged excess compensation paid on or after July 31, 1993, but before 1995 when Trace's insolvency is alleged to have begun. Cogan's theory is that shareholder ratification precludes recovery for compensation - even if excessive -- paid during a period when Trace was solvent. Cf. Healthco., 208 B.R. at 300 (*HN33* where transaction renders corporation insolvent, creditors' rights become paramount, and recovery may be had from directors who thereby breached fiduciary duties notwithstanding shareholder consent) (citing McCandless v. Furlaud, 296 U.S. 140, 159-60, 80 L. Ed. 121, 56 S. Ct. 41 (1935) ("No consent of shareholders could make . . . conduct [whereby corporation rendered insolvent] lawful . . . .")). Shareholder ratification occurred in that Cogan himself was the majority shareholder.

*HN34* Shareholder ratification of a self-dealing transaction, however, must be done by a majority of "disinterested" shareholders. Fliegler v. Lawrence, 361 A.2d 218, 221 (Del. 1976). Cogan was not disinterested with respect to a transaction involving compensation to himself. **[*53]** Moreover, Cogan's ratification argument is an affirmative defense that goes beyond the allegations of the complaint, and therefore does not support dismissal under Rule 12(b)(6). Therefore, dismissal of this aspect of Count II is not warranted.

## C. Count IV Is Not Barred On Statute Of Limitations Grounds

The Defendants urge dismissal of the claims for breach of fiduciary duty to the extent they accrued prior to July 21, 1996, i.e., more than three years before the filing of Trace's Chapter 11 petition on July 21, 1999, pursuant to Delaware's three-year statute of limitations for such claims. See Del. Code. Ann. tit. 10, § 8106; In re Dean Witter P'ship Litig., 1998 Del. Ch. LEXIS 133, No. Civ. A. 14816, 1998 WL 442456, at *14 (Del. Ch. July 17, 1998), aff'd, 725 A.2d 441 (Del. 1999). n20 The Trustee objects that New York's six-year statute of limitations for breach of fiduciary duty claims is the applicable rule, and that therefore a claim for breach of fiduciary duty may include conduct as far back as July 21, 1993. See N.Y. C.P.L.R. § 213 (7) (McKinney 2000); Pereira v. Centel Corp. (In re Argo Communications Corp.), 134 B.R. 776, 785-89 (Bankr. S.D.N.Y. 1991) **[*54]** (*HN35* C.P.L.R. § 213(7) applies to breach of fiduciary claim asserted by bankruptcy trustee on behalf of Delaware corporation even though statute "does not contemplate actions commenced by a bankruptcy trustee per se"); see also Lippe, 230 B.R. at 913-14 (accord).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -



n20 There is no dispute that the period of limitations is measured from when Trace filed its Chapter 11 petition on July 21, 1999.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The parties concur that, as [HN36] in a case based on diversity jurisdiction, a federal court exercising its "related to" bankruptcy jurisdiction over state law claims applies the choice of law rules of the forum state in order to determine the applicable statute of limitations. See 28 U.S.C. § 1334(b) ("related to" jurisdiction); Whitney Holdings, Ltd. v. Givotovsky, 988 F. Supp. 732, 741 n.53 (S.D.N.Y. 1997) (applying New York borrowing statute to diversity jurisdiction case).

[HN37] New York's choice of law rule for statutes of limitation is set forth in its "borrowing statute, [*55] " which provides that where a plaintiff is a New York resident the New York statute of limitations applies, and where a plaintiff is not a New York resident the court should apply the shorter of (1) New York's period of limitations or (2) the statute of limitations applicable where the plaintiff resides. N.Y. C.P.L.R. § 202 (McKinney 2000). When a bankruptcy trustee sues as a representative of the estate of a bankrupt corporation it is the residency of the corporation which is applicable. See Allegaert v. Warren, 480 F. Supp. 817, 820 n.7 (S.D.N.Y. 1979).

The parties also concur that Trace is incorporated in Delaware, but has its principal place of business in New York. They disagree, however, regarding the consequences of these facts for the determination of Trace's "residence" and, therefore, the applicable statute of limitations.

District courts in this circuit applying New York law have held that [HN38] the residence of a corporation for purposes of New York's borrowing statute is the corporation's principal place of business. See National Union Fire Ins. Co. of Pittsburgh, PA. v. Forman 635 Joint Venture, 1996 U.S. Dist. LEXIS 13014, No. 94 Civ. 1312, 1996 WL 507317, at *4 (S. [*56] D.N.Y. Sept. 6, 1996); Allegaert, 480 F. Supp. at 820; see also McMahan & Co. v. Donaldson, Lufkin & Jenrette, 727 F. Supp. 833, 834 (S.D.N.Y. 1989) (stating same rule, in dicta).

The Defendants maintain that New York law determines a corporation's residence based on the state of incorporation, citing a New York state case, American Lumbermens Mutual Casualty Co. v. Cochrane, 129 N.Y.S.2d 489 (N.Y. Sup. Ct. 1954), in which the court stated that "a corporation is a resident of the state which creates it." Id. at 491. However, as other district courts have recognized, Lumbermens actual holding was narrower than this language suggests, as the corporate litigant argued in that case that it was a New York resident based merely on the fact that it was qualified to do business and maintained an office there, as opposed to maintaining its principal place of business. See Forman, 1996 WL 507317, at *3; Allegaert, 480 F. Supp. at 820 (same).

Therefore, Trace's state of residence for purposes of the borrowing statute is New York, where it maintains its principal place of business, and [*57] New York's six-year statute of limitations applies. n21 Thus, the motion to dismiss on statute of limitations grounds is denied.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n21 The Directors, in their reply brief, raise the argument that Trace International is a holding company and, therefore, that its residence is located where its subsidiaries conducted business, including Pennsylvania and Texas, both of which are asserted to have two-year statutes of limitation for breach of fiduciary duty claims. [HN39] Under New York law, the statute of limitations is an affirmative defense, which means that the defendant bears the burden of establishing by prima facie proof that the statutory period has expired. Overall v. Estate of L.H.P. Klotz, 52 F.3d 398 403 (2d Cir. 1995) (citing Hoosac Valley Farmers Exchange, Inc. v. AG Assets, Inc., 168 A.D.2d 822, 563 N.Y.S.2d 954 (N.Y. App. Div. 1990)).

The Directors' argument, which is based on factual allegations not contained in the complaint and asserted by counsel in a legal brief, is insufficient to meet their burden on a 12(b)(6) motion. Moreover, the Directors neither cite cases applying New York law regarding the residence of a holding company nor justify their failure to do so.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - **[\*58]**

### D. The Claims Under The Delaware General Corporation Law Are Adequately Pleaded

Count V asserts claims under the *HN40* Delaware General Corporation Law, which prohibits a corporation from paying dividends or redeeming its shares when its capital is impaired, see Del. Code. Ann. tit. 8, §§ 160, 170, 173, and which imposes liability for "wilful or negligent" violation of these provisions on "directors under whose administration the same may happen," Del. Code. Ann. tit. 8, § 174.

The Directors contend that dismissal is warranted because the Trustee has not set forth each and every date on which an unlawful dividend payment occurred. Such detail, however, is a matter for discovery. No authority has been cited by the Directors for their theory, and it is countered by *HN41* the requirement of Federal Rule of Civil Procedure 8 that all that must be contained in a complaint is a "short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2).

The Directors also insist that the Trustee has failed to allege that they actually approved of or even knew of the allegedly wrongful dividend payments and, therefore, that the Second Amended Complaint does not give rise to an inference of willfulness **[\*59]** or negligence. See Del. Code. Ann. tit. 8, § 170. However, the Second Amended Complaint alleges that the Directors knew or should have known about the illegality of these transactions. Moreover, *HN42* dividends are not declared without board action. See Del. Code Ann. tit. 8, § 170(a)); see also Del. Code Ann. tit. 8, § 174 (assigning liability against directors based on unlawful dividend payments occurring "under [their] administration").

Finally, the Directors urge that the impairment of Trace's capital has not been alleged with enough detail to sustain a claim under Sections 170 or 173 of the Delaware General Corporation Law. See Del. Code. Ann. tit. 8, §§ 170, 173. However, the allegations regarding Trace's net losses of $ 11.2 million and $ 51.7 million in 1994 and 1995, respectively, negative stockholders' equity of approximately $ 29.6 million and $ 104 million in 1995 and 1996, respectively, and a net loss of approximately $ 72 million in 1996, in conjunction with the presumption of continuance of Trace's unsound financial condition and the fact of Trace's own bankruptcy filing, are sufficient at the pleading stage.

Therefore, Count V has been adequately pleaded **[\*60]** and will not be dismissed.

### E. The Veil-Piercing Claim Will Not Be Dismissed

Count VI asserts a veil-piercing claim against Cogan, based on an alter ego theory, and seeks to hold him personally liable for the legitimate obligations of Trace. Cogan contends that the Trustee lacks standing to assert this claim and, therefore, that dismissal is required for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1). Cogan further contends that even if the Trustee has standing the claim has not been adequately pleaded under Rule 12(b)(6) because the Trustee does not allege fraud or its equivalent.

### (1) The Trustee Has Standing

*HN43* A trustee of a corporate debtor has standing to pierce the corporate veil, based on an

alter ego theory, as against the controlling stockholder if: (1) under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil," Kalb, 8 F.3d at 132, and; (2) "'the claim is a general one . . . [which] could be brought by any creditor,'" id. (quoting St. Paul, 884 F.2d at 700-01).

The Delaware courts have not yet addressed whether *HN44* a corporate debtor may pierce its own **[*61]** corporate veil. However, in Murray v. Miner, 876 F. Supp. 512, 517 (S.D.N.Y. 1995), aff'd, 74 F.3d 402 (2d Cir. 1996), another district court in this circuit held that such a claim is permitted under Delaware law, id. at 516-17. In reaching this conclusion the court analogized such claims to claims for breach of fiduciary duty brought by a subsidiary against its parent, which are recognized under Delaware law. See id. (citing cases).

The analogy drawn in Murray, 876 F. Supp. at 516-17, is persuasive, as the acts which give rise to a veil-piercing claim are also acts which give rise to a claim for breach of the fiduciary duties of loyalty and fair dealing: here, for example, Cogan is alleged to have disregarded Trace's corporate identity and to have used Trace as his "personal piggy bank" even though Trace was insolvent and undercapitalized. This claims go both to the claim for breach of fiduciary duty, see Part III.B, supra, and to the factors relevant to determining alter ego status, see Harco Nat'l Ins. Co. v. Green Farms, Inc., 1989 Del. Ch. LEXIS 114, Civ. A. No. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989) **[*62]** (*HN45* alter ego claim factors "'include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder'") (quoting United States v. Golden Acres, Inc., 702 F. Supp. 1097, 1104 (D. Del. 1988)).

Murray further held that *HN46* a veil-piercing claim is a general one which could be brought by any creditor and, therefore, that a party with standing to bring the claim is the bankruptcy trustee. See 876 F. Supp. at 517. This holding was based on the reasoning of the Second Circuit in Kalb, 8 F.3d 130, and St. Paul, 884 F.2d 688, and bankruptcy policy, as described in those cases. See Murray, 876 F. Supp. at 517. As the Second Circuit stated in Kalb:

> granting the bankruptcy trustee exclusive standing to assert alter ego claims furthers the bankruptcy policy of **[*63]** ensuring that all similarly situated creditors are treated fairly: the alter ego action is based upon allegations that if proven would benefit all [the debtor's] creditors, i.e., making more assets available to satisfy [the debtor's] debts. . . . If [the individual creditor's] action is not stayed it would collect its claim from a pool of assets that should be available to all creditors.

8 F.3d at 132; see St. Paul, 884 F.2d at 700-01.

The Third Circuit has also provided the following helpful explanation of the policy reasons in support of allowing a bankrupt corporation to pierce its own corporate veil:

> *HN47*
>
> It may seem strange to allow a corporation to pierce its own veil, since it cannot claim to be either a creditor that was deceived or defrauded by the corporation fiction, or an involuntary tort creditor. However piercing the corporate veil and

alter ego actions are allowed to prevent unjust or inequitable results; they are not based solely on a policy of protecting creditors. . . . . [Therefore] it is not incompatible with the purposes of the doctrines to allow a debtor corporation to pursue a claim based upon such a theory.


**[\*64]**

Phar-Mor, Inc. v. Coopers & Lybrand, 22 F.3d 1228, 1240 n.20 (3d Cir. 1994).

Cogan points out that the Eighth Circuit, applying Arkansas law, and the Eastern District of Missouri, applying Missouri law, have held that a bankruptcy trustee lacks standing to assert an alter ego claim. See Mixon v. Anderson (in re Ozark Restaurant Equip. Corp.), 816 F.2d 1222, 1225 (8th Cir. 1987); Mann v. Michael Indus., Inc., 90 B.R. 981, 985-86 (Bankr. E.D. Mo. 1988). However, the weight of the authority is to the contrary. See, e.g., Kalb, 8 F.3d at 133 (applying Texas law); St. Paul, 884 F.2d at 696-99 (analyzing various circuit court decisions regarding bankruptcy trustee's standing to bring alter ego claim upholding such claim under Ohio law); Steyr-Daimler-Puch of America Corp. v. Pappas, 852 F.2d 132, 135-36 (4th Cir. 1988) (applying Virginia law); Koch Refining v. Farmers Union Central Exch., Inc., 831 F.2d 1339, 1342-43 (7th Cir. 1987) (applying Illinois and Indiana law); Tsai v. Buildings by Jamie, Inc. (In re Buildings by Jamie, Inc.), 230 B.R. 36, 43-44 (Bankr. D. N. J. 1998) **[\*65]** (applying New Jersey law); Gosconcert v. Hillyer, 158 B.R. 24, 28-29 (S.D.N.Y. 1993) (applying New York law). Murray reached the same conclusion under Delaware law, and the analysis therein is persuasive here. See 876 F. Supp. at 516-17. Therefore, the Trustee has standing to bring this claim against Cogan.

## (2) The Alter Ego Claim Is Adequately Pleaded

Cogan stresses that it is an oft-repeated observation that "persuading a Delaware court to disregard the corporate veil is a difficult task," Harco, 1989 WL 110537, at \*4; see LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279, 295 (D. Del. 2000) (same), and urges that the Second Amended Complaint does not satisfy the Delaware standard. Specifically, Cogan urges that the Trustee is required, and has failed, to allege facts giving rise to an inference of fraud or equivalent injustice or unfairness.

The Second Circuit has explained the Delaware law of veil-piercing, in the different but related context of a subsidiary seeking to pierce the veil of its parent corporation, as follows:

> *HN48*
>
> Delaware law permits a court to pierce the corporate veil of a company **[\*66]** 'where there is fraud or where [it] is in fact a mere instrumentality or alter ego of its owner.' . . . Thus, under an alter ego theory, there is no requirement of a showing of fraud. . . . To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . [is] present.'

Fletcher v. Atex, Inc., 68 F.3d 1451, 1457 (2d Cir. 1995) (citations omitted).

In other words, veil-piercing may occur where, first, alter ego factors are shown, including a

lack of corporate formalities, commingling of assets between the shareholders and the corporation, and undercapitalization, see Harco, 1989 WL 110537, at *6, n22 and second, there is an element of injustice or unfairness. This standard has been applied in cases involving veil piercing as between a corporation and its shareholders or directors. See Golden Acres, 702 F. Supp. at 1104-06 (applying federal veil-piercing standard, which court concluded were compatible with Delaware law, to pierce corporate veil as between corporation and **[*67]** shareholders, directors, and officers, based on alter ego theory); see Harco, 1989 WL 110537, at *6 (following Golden Acres and holding that factors pertaining to operation of corporation and defendant's relationship to corporation, plus showing that injustice occurred because defendant directors "siphoned off corporate assets" to themselves, would suffice); see also David v. Mast, 1999 Del. Ch. LEXIS 34, *7, Civ. A. No. 1369-K, 1999 WL 135244, at *2 (Del. Ch. Mar. 2, 1999) (piercing corporate veil as between corporation and sole shareholder and observing that, in addition to issue of whether corporate formalities observed, "the cases inevitably tend to evaluate the specific facts with a standard of 'fraud' or 'misuse' or some other general term of reproach in mind"). n23

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n22 Cogan concedes that the Trustee has alleged alter ego factors, namely, failure to observe corporate formalities, commingling of assets, and inadequate capitalization.

n23 Some Delaware cases have not articulated the element of injustice as a separate requirement, but instead have subsumed it within the notion that where a corporation is in fact a mere alter ego it would be inequitable not to permit veil-piercing. See, e.g., Mabon, Nugent & Co. v. Texas American Energy Corp., 1990 Del. Ch. LEXIS 46, *15, Civ. A. No. 8578, 1990 WL 44267, at *5 (Del. Ch. Apr. 12, 1990) ("Whether [parent corporation] was [subsidiary's] alter ego or mere instrumentality may be restated to be whether [the two corporations] operated as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them."). However, the Fletcher formulation has the advantage of clarity.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*68]**

The Second Amended Complaint alleges that Cogan engaged in numerous instances of self-dealing which stripped Trace of its corporate assets, in effect using Trace as his "incorporated pocketbook." Golden Acres, 702 F. Supp. at 1106. These allegations are satisfy the requirement of pleading an "overall element of injustice or unfairness." Fletcher, 68 F.3d at 1457 (citation omitted). See Golden Acres, 702 F. Supp. at 1106; Harco, 1989 WL 110537, at *6 (*HN49* element of injustice would be satisfied if shown that corporate directors "siphoned off corporate assets" to themselves). Therefore, the veil-piercing claim is adequately pleaded.

**Conclusion**

Therefore, for the reasons set forth above, the motions to dismiss are denied.

It is so ordered.

**New York, NY**
**March 8, 2001**

**ROBERT W. SWEET**

**U.S.D.J.**

Source:  <u>My Sources</u> **>** / . . . / **> NY Federal District Courts** ☐
Terms:  **name(pereira and cogan)**  (<u>Edit Search</u>)
View:  Full
Date/Time:  Tuesday, May 17, 2005 - 4:52 PM EDT

* Signal Legend:

●  -  Warning: Negative treatment is indicated

Q  -  Questioned: Validity questioned by citing refs

⚠  -  Caution: Possible negative treatment

✦  -  Positive treatment is indicated

A  -  Citing Refs. With Analysis Available

i  -  Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

<u>About LexisNexis</u> | <u>Terms and Conditions</u>

<u>Copyright ©</u>  2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

2004 WL 1908221 (M.D.Pa.), Fed. Sec. L. Rep. P 92,899, RICO Bus.Disp.Guide 10,742

**Motions, Pleadings and Filings**

United States District Court,
M.D. Pennsylvania.
Stephen L. FLOOD, Luzerne County Controller, and the Luzerne County Retirement
Board o/b/o the Luzerne County Employee Retirement System, Plaintiffs,
v.
Thomas A. MAKOWSKI, et al., Defendants.
No. Civ.A. 3:CV-03-1803.
Aug. 24, 2004.

Albert S. Dandridge, III, Elizabeth Ainslie, Stephen J. Shapiro, Theresa E. Loscalzo, Wilbur L. Kipnes, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, Christopher P. Cullen, Dunmore, PA, for Plaintiffs.

Aaron Krauss, Cozen O'Connor, Andrew William Davitt, Denis C. Dice, Marshall, Dennehey, Warner, Coleman & Goggin, Brian E. Caine, Robert M. Cavalier, Lucas and Cavalier LLC, Anthony F. Zabicki, Jr., Stark and Stark, Charles J. Vinicombe, John B. Dempsey, Stephen C. Baker, Drinker Biddle & Reath LLP, Arlene Fickler, Lawrence T. Hoyle, Jr., Hoyle, Fickler, Herschel & Matthes LLP, David L. Braverman, Richard E. Miller, Ryan J. Durkin, Philadelphia, PA, Peter John Moses, John P. Moses, Moses & Gelso, LLP, Robert J. Gillespie, Jr., Mylotte, David & Fitzpatrick, Wilkes-Barre, PA, Adolfo Anzola, Luigi Spadafora, Matthew Tracy, Winget Spadafora & Schwartzberg, New York, NY, Cody H. Brooks, Kreder, Brooks, Hailstone & Ludwig, John J. Aponick, Jr., Marshall Dennehy Warner Coleman & Goggin, Scranton, PA, Allen M. Silk, Princeton, NJ, Jennifer A. Goaziou, Kevin M. Kinross, Randolph C. Wiseman, Bricker & Eckler, LLP, Columbus, OH, Jaime L. Theriot, James Kirk Quillian, Kevin A. Maxim, Troutman, Sanders, LLP, Atlanta, GA, Richard L. Bush, Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C., King of Prussia, PA, for Defendants.

*MEMORANDUM*

CAPUTO, J.

TABLE OF CONTENTS

```
----------------------------------------------------------------------

FACTUAL BACKGROUND .....................................................  2

PROCEDURAL BACKGROUND ..................................................  6

LEGAL STANDARD .........................................................  8

DISCUSSION .............................................................  9

1) Justiciability ......................................................  9

2) Racketeer Influenced and Corrupt Organizations Act Claims ........... 11
        A) Statute of Limitations ...................................... 12
        B) Enterprise .................................................. 14
        C) Count III-- § 1962(c) Participating in an Enterprise Through a
   Pattern of Racketeering Activity ................................... 16
                i) Standing ............................................ 18
                ii) Two Predicate Acts ................................ 19
                        a) ASCO Affiliates ............................ 22
                        b) The Wells Agreement ........................ 23
                        c) Miscellaneous Defendants ................... 24
                iii) Rule 9(b) ........................................ 26
                iv) Private Securities Litigation Reform Act .......... 29
                        a) The Board didn't know about hidden fees .... 36
                        b) The Board knew about hidden fees ........... 38
                v) Relatedness and Continuity of Predicate Acts ....... 40
```

                a) The Board Members .................................. 41
                b) The ASCO Affiliates ................................ 44
                c) The Provident Agreements ........................... 48
                d) The Manulife Agreements ............................ 49
                e) The Wells Agreement ................................ 50
                f) Miscellaneous Defendants ........................... 51
        D) Count IV-- § 1962(d) Conspiracy to Violate § 1962(c) ............. 53
        E) Count V-- § 1962(b) Interest or Control of an Enterprise ......... 56
        F) Count VI-- § 1962(d) Conspiracy to Violate § 1962(b) ............. 59

3) Count VII--Investment Advisor Act of 1940 ............................... 62

4) State Law Claims ...................................................... 63
        A) Supplemental Jurisdiction .................................... 64
        B) Count I--Breach of Fiduciary Duty ................................ 66
        C) Count II--Aiding and Abetting Breach of Fiduciary Duty ............ 69
        D) Count VIII--Unjust Enrichment ................................... 71

CONCLUSION ............................................................... 72

*1 Presently before the Court are nine separate motions to dismiss filed by various Defendants. (Docs. 46, 91, 93, 95, 96, 98, 100, 104, and 108.) In total, every Defendant except Linsco Private Ledger Corporation (hereinafter LPL) [FN1] filed a motion to dismiss. The motions challenge Plaintiffs' standing to bring the suit and argue that the claims are time barred and that the Complaint fails to state a claim upon which relief can be granted. For the reasons set forth below, I will grant the motions in part and deny the motions in part. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

    FN1. LPL filed a Motion to Compel Arbitration and to Stay Proceedings (Doc. 102), which I will address separately.

FACTUAL BACKGROUND

The present action focuses on the events leading up to and surrounding the investment contracts made by the Luzeme County Retirement Board (hereinafter the Board) and Board members during the period of 1988 and 2002. Plaintiffs allege that various Board members engaged in a pay-to-play scheme in which contracts to invest or manage pension plan assets were awarded in exchange for campaign contributions to various Board members' reelection campaigns.

Luzerne County maintains a pension plan for employees (hereinafter the Plan). The Plan is administered by the Board. In March, 1988, the Board retained ASCO Financial Group, Inc. (hereinafter ASCO) as an investment advisor to the Plan. ASCO remained the financial advisor until September 5, 2002. During the course of the relationship with ASCO, various Board members approved contracts to invest the Plan's money. The Complaint alleges that most of the contracts were not properly approved by the Board through a vote at a public meeting and were instead signed by individual Board members. The Board members allegedly involved are Thomas A. Makowski, Thomas P. Pizano, Frank Crossin, and Joseph Jones. [FN2] The following facts are alleged in the Complaint:

    FN2. The Complaint also alleges that Board members Joseph S. Tirpak, Jim Phillips, and Frank Trinisewski acted with the aforementioned Board members in approving certain contracts (see, e.g., Doc. 1 ¶ 46), but they are not named as defendants.

The Plan entered into four contracts with Provident Mutual Life Insurance Company of Philadelphia (hereinafter Provident). The first contract was to manage $6 million of assets. The remaining three contracts were to purchase annuities totaling more than $60 million. The Plan paid more than $5 million in fees, which included commissions, over the course of the contracts. ASCO received

commissions from Provident for each of these contracts, and certain ASCO officers received commissions for two of the Provident contracts. Joseph J. Joyce Associates, Inc. (hereinafter JJJA) also received commissions for each of the contracts. These contracts will be referred to throughout the opinion as the first, second, third, and fourth Provident Agreements. Nationwide Life Insurance Company (hereinafter Nationwide) is the successor-in-interest to Provident.

The Plan entered into two contracts with The Manufacturers Life Insurance Company (U.S.A.) (hereinafter Manulife). The contracts were for Manulife to manage a total of more than $20 million. The Plan paid nearly $1.9 million in fees and commissions over the course of the contracts. JJJA and Donald Williamson, ASCO's President and CEO, received commissions for both contracts. ASCO also received a commission for the first contract. These contracts will be referred to throughout the opinion as the first and second Manulife Agreements.

*2 The Plan entered into a contract with Wells Real Estate Funds, Inc. (hereinafter Wells). The contract called for two purchases into the Wells Real Estate Investment Trust, Inc. (hereinafter Wells REIT), the first for $1 million and the second for $9 million. The $10 million was given to FSC Securities Corporation (hereinafter FSC), which in turn transmitted the funds to Wells REIT. The Plan paid more than $300,000 in fees, which included commissions. Joseph C. Perfilio, Michael Joyce, and Donald Williamson all received commissions in relation to the Wells REIT purchases. This contract will be referred to throughout the opinion as the Wells Agreement.

The Plan entered into a contract with Rochdale Investment Management, Inc., [FN3] In which Rochdale invested $1.1 million through FSC. The Plan realized losses of more than $500,000 over the life of the investment. Joseph Perfilio and Donald Williamson received commissions related to the contract. This contract will be referred to throughout the opinion as the FSC Agreement.

   FN3. Rochdale Investment Management, Inc. is not named as a defendant.

Donald Williamson signed a contract on behalf of the Plan in which First Security Investments, Inc. (hereinafter FSI) would manage $1.25 million of the Plan's assets. The funds were invested in FSI notes. The Plan realized a loss of more than $1.6 million over the life of the investment. Donald Williamson received a commission for his part in the contract. This contract will be referred to throughout the opinion as the FSI Agreement.

The Plan entered into a contract with LPL in which LPL would manage $1.5 million. The Plan paid $69,000 in fees, and realized a gain of more than $300,000. This contract will be referred to throughout the opinion as the LPL Agreement.

The Plan also entered into several contracts for investment advice and management. The Plan entered a contract with ASCO in 1988 for ASCO to act as an investment plan advisor. This arrangement lasted until 2002. In 1999, the Plan contracted with ASCO to administer the daily operations of the Plan. Maria Williamson, ASCO's Vice-President/Operations, was responsible for overseeing these daily operations. The Plan entered a contract with Safeco Life Insurance Corporation (hereinafter Safeco) in which it was given money to invest. Safeco also acted to collect the fees the Plan paid to ASCO. In September, 2002, the Board dissolved its relationship with ASCO.

Between 1988 and 2002 Donald Williamson, Maria Williamson, John J. Joyce, Joseph Joyce, Jr. (hereinafter Joseph Joyce), Jerome McHale, Joyce Jackman & Bell Insurers (hereinafter JJ & B), William Joyce, Joseph Perfilio, Gary Houseman, Steven Alinikoff, Michael Hirthler, ASCO, Safeco, Joseph Joyce Insurance (hereinafter JJI), and Devonshire Capital Management, LLC (hereinafter Devonshire) made campaign contributions to various Board members. [FN4]

   FN4. Jerome McHale, Gary Houseman, Steven Alinikoff, and Michael Hirthler are not named as defendants.

PROCEDURAL BACKGROUND

On October 9, 2003, Plaintiffs filed a ninety-eight page Complaint raising eight claims against twenty-six Defendants. Plaintiffs bring the following claims against Defendants as listed below:

(1)    Count I    Breach of fiduciary duty--Defendants Makowski, Pizano,
                  Crossin, Jones, ASCO, and Donald Williamson;

(2)    Count      Aiding and abetting breach of fiduciary duty--Defendants
       II
                  Nationwide, Manulife, Wells, Wells Investment Securities, Inc.
                  (hereinafter Wells Investment), Wells REIT, FSC, FSI, LPL,
                  Safeco, Devonshire, Perfilio, Joyce Associates, Inc., JJI, JJJA,
                  JJ & B, Joseph Joyce, William Joyce, Michael Joyce, John
                  Joyce, and Maria Williamson;

(3)    Count      Arising from 18 U.S.C. § 1964(c) for violations of § 1962(c),
       III
                  conducting and participating in an enterprise by engaging in a
                  pattern of racketeering activity--all Defendants;

(4)    Count      Arising from 18 U.S.C. § 1964(c) for violations of § 1962(d),
       IV
                  conspiring to violate § 1962(c)--all Defendants;

(5)    Count V    Arising from 18 U.S.C. § 1964(c) for violations of § 1962(b),
                  acquiring and maintaining an interest or control of an
                    enterprise
                  engaged in a pattern of racketeering activity--all Defendants;

(6)    Count      Arising from 18 U.S.C. § 1964(c) for violations of § 1962(d),
       VI
                  conspiring to violate § 1962(b)--all Defendants;

(7)    Count      Violating the Investment Advisors Act--Defendants Donald
       VII
                  Williamson and ASCO; and

(8)    Count      Unjust enrichment--Defendants ASCO, Donald Williamson,
       VIII
                  FSC, FSI, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells
                  Investment, Perfilio, JJI, JJJA, Joseph Joyce, Michael Joyce,
                  and John Joyce.

*3 All Defendants, with the exception of LPL, [FN5] filed a total of nine motions to dismiss. [FN6]
(Docs. 46, 91, 93, 95, 96, 98, 100, 104, and 108.) In sum, the motions raised the following
challenges: lack of standing, filing past the statute of limitations, lack of standing to bring the RICO
claims, failure to state a claim upon which relief can be granted for the RICO claims, lack of
supplemental jurisdiction to hear the state law claims, and failure to state a claim upon which relief
can be granted for the state law claims of aiding and abetting breach of fiduciary duty and unjust
enrichment. Plaintiffs filed a brief in opposition to one motion to dismiss (Doc. 46). (Doc. 85.)
Because of the similarity of the issues among the motions, the Court permitted Plaintiffs to file a
single brief in opposition to the remaining eight motions to dismiss. (Doc. 151.) The moving
Defendants filed reply briefs. This matter is now ripe for disposition.

    FN5. LPL filed a Motion to Compel Arbitration and to Stay Proceedings (Doc. 102) which I
    will address separately.

    FN6. Safeco's motion was actually filed as a motion to dismiss or, in the alternative, a
    motion for summary judgment. (Doc. 93.) I chose not to convert the motion to one for
    summary judgment.

LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. Dismissal is appropriate only if, accepting all factual allegations in the complaint as true and "drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations in the complaint." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir.1998).

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993). The Court may also consider "undisputedly authentic" documents where the plaintiff's claims are based on the documents and the defendant has attached a copy of the document to the motion to dismiss. *Id.* The Court need not assume that the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 (3d Cir.1998), nor credit a complaint's "bald assertions" or "legal conclusions." *Morse v. Lower Marion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997).

When considering a Rule 12(b)(6) motion, the Court's role is limited to determining whether the plaintiff is entitled to offer evidence in support of the claims. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court does not consider whether the plaintiff will ultimately prevail. *See id.* In order to survive a motion to dismiss, the plaintiff must set forth information from which each element of a claim may be inferred. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993). The defendant bears the burden of establishing that the plaintiff's complaint fails to state a claim upon which relief can be granted. *See Gould Elecs. v.. United States*, 220 F.3d 169, 178 (3d Cir.2000).

DISCUSSION

*\*4* Defendants raise many challenges to the Complaint in their motions to dismiss and supporting briefs. Most of the arguments are raised by all Defendants, while others are raised by some Defendants. In summary, the arguments raised by Defendants fall into four categories: challenges to the entire action; challenges that apply to all of the RICO claims, challenges that apply to all of the state law claims, and challenges to individual claims. I will address the general challenges first, and then I will address all of the challenges applicable to the federal claims before moving to the state law claims.

1) Justiciability

The Board member Defendants first challenge Plaintiffs' ability to bring this action. Defendants raise two arguments. First, the Board members contend that Plaintiffs lack standing to bring the suit, suggesting instead that the Plan beneficiaries must bring the action. Next, the Board members contend that the suit lacks redressability because any damages awarded against a Board member would have to be paid by the Plan.

Defendant Board members contend that Plaintiffs lack standing to bring the suit on two grounds: the Board is the Plaintiff at the same time the Board is "suing itself" (Doc. 105 at 25); and the Board has not suffered any injury. (Doc. 105 at 26.) I find both of these arguments without merit. First, the Board members mis-classify the nature of the action. The Board is not the sole Plaintiff in this action; Stephen L. Flood, the Luzeme County Controller is also a named Plaintiff. Second, there is nothing in the Complaint that ever suggests the Board is suing itself. The Board is suing individual Board members, not the legal entity that is the Luzeme County Retirement Board.

Defendants cite *McCarrell v. Cumberland County Employees Retirement Board*, 120 Pa.Cmwlth. 94, 547 A.2d 1293 (Pa.Commonw.Ct.1988), as suggesting that the only proper plaintiffs are the Plan's beneficiaries. I find *McCarrell* inapposite to the present case. *McCarrell* does not address the question whether a Board member may bring suit against other Board members on behalf of the fund. *McCarrell* likewise does not limit the fiduciary obligations of Board members to the beneficiaries of the plan. In fact, a full reading of *McCarrell* shows the Commonwealth Court was expanding the parties to whom the Board members owed duties, not restricting those duties. Pennsylvania law is clear that board members are fiduciaries of *the fund.* 16 P.S. § 11659; 20 Pa. Conn. Stat. Ann. § 7301. Therefore, because the Board members owed obligations to the fund directly, it only stands to reason that the fund can use the Board to directly enforce those duties owed to it.

Defendant Board members' argument that Plaintiffs lack an injury is equally unconvincing. The argument seems premised on the notion that the Board did not suffer any injury, only the Plan suffered an injury. As I stated previously, the Board is suing on behalf of the Plan. The Complaint

adequately alleges that the Plan suffered injuries. *See, e.g.,* discussion *supra* p. 18. Plaintiffs allege that the Board member Defendants entered into contracts which were unsound investments and which cost the Plan excessive management fees. The excessive fees allegation constitutes an actual, direct harm.

*\*5* Lastly, Defendant Board members suggest that the case against them lacks any available means of redress because any award against them would be paid by the fund, to the fund. This notion is premised upon an unusual reading of title 16, section 11654 of the Pennsylvania Code, which provides that "[the board members] shall be reimbursed for all expenses necessarily incurred in the performance of their duty." [FN7] Pennsylvania law makes clear that "necessarily incurred" expenses are only those expenses which needed to be incurred in the interest of the fund. *In re Main, Inc. ., No. 98-158, 1999 WL 330239, at \*6 (E.D.Pa. May 24, 1999)* (discussing Pennsylvania law); *see also Schwartz v. Keystone Oil Co., 25 A. 1018, 287 (Pa.1893).* Clearly, the expenditure of money to defend actions in direct violation of the act (i.e., violations of fiduciary duties) would not be necessary expenses within the meaning of section 11654. If Plaintiffs' claims succeed against the Board members, they will have an available means of redress.

> FN7. This sentence is interestingly juxtaposed to the sentences which require board members to take an oath of office that they will administer the fund fairly and without knowing violation of the provisions of the act. 16 P.S. § 11654.

2) Racketeer Influenced and Corrupt Organizations Act Claims

Plaintiffs raise four claims based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (hereinafter RICO). Under RICO, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor." 18 U.S.C. § 1964 (c). Plaintiffs allege that Defendants violated § 1962(c), § 1962(b), and § 1962(d). Defendants challenge the RICO claims generally on the grounds that they are time-barred and that Plaintiffs do not allege the existence of an enterprise. Defendants also raise challenges to the individual RICO claims. I will address the general challenges first and then move to the claim-specific challenges.

A) Statute of Limitations

RICO has no explicit statute of limitations. Analogizing RICO to the Clayton Act, the Supreme Court adopted a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs., 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987).* In 2000, the Court of Appeals for the Third Circuit adopted an injury discovery test for determining when the statute of limitations begins to run. *Forbes v. Engleson, 228 F.3d 471, 484 (3d Cir.2000).* Under the injury discovery rule, the statute of limitations begins to accure when a plaintiff knew or should have known that it suffered injuries and that the source of those injuries were the actions of another person. *Id. at 485.* [FN8] For determining the "injury" from which to analyze the statute of limitations, courts look to the allegations in the complaint. *See Prudential Ins. Co. of Amer. v. U.S. Gypsum, 359 F.3d 226, 234 (3d Cir.2004).*

> FN8. One unsettled point is whether the statute of limitations runs at the time plaintiffs should have known about the injury (the injury discovery rule), or at the time plaintiffs should have known about the injury and after all of the elements of a RICO claim exist (the injury discovery and pattern rule). *Matthews v. Kidder, Peabody & Co., 260 F.3d 239, 245 n. 7 (3d Cir.2000).* Under the injury discovery and pattern rule, when a plaintiff knows or should know about an injury before the necessary
>
> RICO elements exist, the RICO claim does not accrue until after the final element occurs, including a pattern of racketeering activity. *Id.*

Plaintiffs argue that the doctrines of fraudulent concealment and adverse domination preserve their right to file suit beyond the four year statute of limitations. Under the fraudulent concealment doctrine, knowledge of an injury caused by another still accrues the statute of limitations, but the

statute of limitations is tolled when a defendant actively misleads the victim about the cause of the injury. *Forbes,* 228 F.3d at 486. Plaintiffs are eligible for equitable tolling only if they exercised reasonable diligence in investigating their claims. *Prudential,* 359 F.3d at 283 (citing *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 194, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997)).

*\*6* Thus, ordinarily when plaintiffs seek to demonstrate a case for equitable tolling, and defendants seek *summary judgment* on the issue, a court must determine (1) whether there is sufficient evidence to support a finding that defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their [RICO] claim, (2) whether there is sufficient evidence to support a finding that plaintiffs exercised reasonable diligence, and (3) whether there is sufficient evidence to support a finding that plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim until a time within the limitations period measured backwards from when the plaintiffs filed their complaint.

*Forbes,* 228 F.3d at 487 (emphasis added). When evaluating fraudulent concealment, it requires a fact-specific analysis which is best reserved for summary judgment, rather than a motion to dismiss. *Shapo v. O'Shaughnessy,* 246 F.Supp.2d 935, 951 (N.D.Ill.2002) (citing *Johnson Controls, Inc. v. Exide Corp.,* 129 F.Supp.2d 1137, 1142 (N.D.Ill.2001)).

Under the doctrine of adverse domination, the statute of limitations is tolled when the plaintiff is controlled or dominated by wrongdoers. *See Shapo,* 246 F.Supp.2d at 953 (citing *Resolution Trust Corp. v. Gallagher,* 800 F.Supp. 595, 600 (N.D.Ill.1992)). The principle underlying adverse domination is that officers or directors engaging in activities that harm an entity will not bring suit against themselves. *Id.; see also Resolution Trust Corp. v. Gardner,* 798 F.Supp. 790, 795 (D.D.C.1992) (adopting adverse domination and citing other federal jurisdictions that have). The statute of limitations does not begin to run until the entity is no longer controlled by the wrongdoers. *Shapo,* 246 F.Supp.2d at 953.

Reading the Complaint in the light most favorable to Plaintiffs, they allege the three elements necessary to prove fraudulent concealment: Defendants actively mislead Plaintiffs; the misleading prevented Plaintiffs from discovering the injury; and Plaintiffs did not fail to engage in reasonable due diligence. Plaintiffs allege that the investment companies conspired with the Board members to defraud the Plan, and in doing so they actively concealed the nature of the relationships between the Board, the investment companies, and ASCO employees. Plaintiffs also allege that the Board members adopted contracts outside of the public eye, without proper voting and not during public meetings. They further allege that the financial statements were concealed from the beneficiaries of the Plan by being sent to ASCO instead of the Board. All of these actions prevented the beneficiaries of the Plan from discovering the nature of the investment contracts in which the Plan's funds were being invested. Furthermore, because the Board was adversely dominated by the alleged wrongdoers, the statute of limitations was tolled until the Board was no longer controlled by those parties.

*\*7* Whether Plaintiffs will be successful in proving fraudulent concealment or adverse domination is a fact-specific analysis which is inappropriate for a motion to dismiss, *Shapo,* 246 F.Supp.2d at 951, but it is clear to the Court that Plaintiffs sufficiently pled fraudulent concealment and adverse domination to survive a motion to dismiss. Therefore, I will not dismiss Plaintiffs' action for failure to file within the prescribed statute of limitations.

B) Enterprise

An essential requirement of RICO is the existence of an enterprise. *See, e.g.,* 18 U.S.C. § 1962(b) and (c). An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S .C. § 1961(4). An enterprise must be an "entity separate and apart from the pattern of racketeering activity in which it engages." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

The existence of an enterprise can be proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* The Court of Appeals for the Third Circuit has expanded *Turkette* by requiring that the enterprise is an ongoing organization with a framework for making or carrying out decisions, that the various associates function as a continuing unit, and that the enterprise is separate and apart from the pattern of racketeering activity. *United States v. Irizarry,* 341 F.3d 273, 286 (3d Cir.2003) (quoting *United States v. Riccobene,* 709 F.2d 214, 222 (3d Cir.1983)). The ongoing nature of an enterprise does not require that all of the members participate from beginning to end. *United States v. Parise,* 159 F.3d 790, 795 (3d Cir.1998) (quoting *United States v. Feldman,* 853 F.2d 648, 659 (9th Cir.1988)). The enterprise must maintain a shared organizational pattern and system of authority. *Id.* (citing *United*

*States v. Lemm,* 680 F.2d 1193, 1199 (8th Cir.1982)).

Plaintiffs argue that the enterprise consisted either of the Board (Doc. 1 ¶ 184), or an association-in-fact of the Board members. (Doc. 1 ¶ 185.) Plaintiffs' claims are that the Board, which is responsible for administering the Plan's funds, engaged in racketeering activity that victimized the Plan. The present action is not unlike a situation in which board members of a corporation rob the corporation of its assets. In such instances, the wrongdoers and the victim are both internal to the corporation. However, the Court of Appeals for the Third Circuit has made clear that a corporation can be either the victim or the enterprise, not both. *See discussion, Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 267 (3d Cir.1995) (resolving conflict between *Nat'l Org. for Women v. Scheidler,* 510 U.S. 1215, 114 S.Ct. 1340, 127 L.Ed.2d 688 (1994) and *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)). Thus, in instances in which the racketeering activity is committed by people within the company and the victim of the racketeering activity is the corporation, the enterprise is not the corporation itself; an association-in-fact of the board members or corporate officers constitutes the enterprise. *Id.* In the present case, the Plan was the victim, therefore, the Board of the Plan could not also be the enterprise. Instead, the association-in-fact of the Board members as alleged in the Complaint constituted the enterprise.

*\*8* An association-in-fact can be separate from the criminal activities by the fact that it engages in more than one scheme. *See Town of Kearny v. Hudson Meadows Urban Corp.,* 829 F.2d 1263, 1266 (3d Cir.1987). Thus, the twelve separate schemes alleged in the Complaint suggest that the Board members' association-in-fact was separate from the racketeering activities. Because the organizational pattern and system of authority remained the same, the enterprise alleged was continuous over the course of the fourteen years, even though some of the members of the Board changed. See *Parise,* 159 F.3d at 795.

C) Count III-- § 1962(c) Participating in an Enterprise Through a Pattern of Racketeering Activity
Count III is based in 18 U.S.C. § 1964(c) and alleges that Defendants violated 18 U.S.C. § 1962(c). Section 1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." A pattern of racketeering activity is established by showing at least two predicate acts that occurred within ten years of each other. 18 U.S.C. § 1961(5).

Any crime enumerated in 18 U.S.C. § 1961(1) may constitute a predicate act, which includes mail and wire fraud. 18 U.S.C. § 1961(1)(B). Where fraud is alleged as a predicate act, the plaintiff must allege the fraud with particularity. See *generally* Fed. R. Civ. P. 9(b). Any crime which constitutes a securities fraud is expressly excluded by the Private Securities Litigation Reform Act. 18 U.S.C. § 1964(c). Although two predicate acts are necessary to establish a pattern of racketeering activity, they are not necessarily sufficient. *H.J. Inc. v. Northwestern Bell Tele. Co.,* 492 U.S. 229, 237, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The predicate acts must be related and amount to or threaten to become continued criminal activity. *Id.* at 239.

Thus, to survive a motion to dismiss, Plaintiffs' Complaint must allege, with particularity where fraud is alleged, at least two non-securities-related predicate acts which can be attributed to each Defendant, and those acts must be related and amount to continued criminal activity. Furthermore, Plaintiffs must have suffered an injury as a result of the racketeering activity. 28 U.S.C. § 1964(c). Defendants argue that Plaintiffs do not allege an injury from a violation of § 1962, nor do they allege a violation of § 1962 itself. Defendants argue that Plaintiffs do not allege predicate acts, that any acts alleged are not alleged with particularity, that any acts alleged are barred by the Private Securities Litigation Reform Act, and that any acts alleged do not constitute a pattern of racketeering activity. I will address each of these challenges in turn.

i) Standing
Although Plaintiffs have established the threshold requirement that they have standing to bring the present action, there is an independent question whether they have standing to bring a claim under RICO's civil remedies provision § 1964(c). *See, e.g., Maio v. Atena, Inc.,* 221 F.3d 472, 482 (3d Cir.2000) (citing *DeMauro v. DeMauro,* 115 F.3d 94, 96 (1st Cir.1997)). Standing to bring a RICO claim exists when there is an injury to a plaintiff's business or property and the injury was proximately caused by a violation of § 1962. *Maio,* 221 F.3d at 483; *see also Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("[T]he plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation [of RICO]."). An injury must be a concrete financial loss to the plaintiff. *Maio,* 221 F.3d at 483-84. An out-of-pocket monetary loss satisfies this requirement. *Id.*

Failure to perform a paid-for contractual right can constitute an injury. *Id.* at 490; *see also Mehling v. N.Y. Life Ins. Co.*, 163 F.Supp.2d 502, 507 (E.D.Pa.2001).

*\*9* In the present case, the Plan, through its Board, is suing Defendants for entering into contracts which resulted in the Plan paying excessive fees, as well as suffering economic losses through bad investments. The payment of excessive fees was a loss suffered by the Plan directly, which it paid for out of its pocket. Likewise, the Complaint alleges the injury is the direct result of the frauds stemming from Defendant Board members and Defendant investment managers' collusion to enter the Plan into inappropriate contracts. I find Plaintiffs sufficiently allege an injury resulting from a pattern of racketeering activity.

ii) Two Predicate Acts

Defendants next argue that Plaintiffs' RICO claims fail to state a claim upon which relief can be granted because they fail to allege a violation of § 1962(c). Section 1962(c) requires that a defendant engage in a pattern of racketeering activity. A pattern of racketeering activity requires at least two predicate acts that occurred within ten years of each other. 18 U.S.C. § 1961(5). Any crime enumerated in 18 U.S.C. § 1961(1) may constitute a predicate act, which includes mail and wire fraud. 18 U.S.C. § 1961(1)(B).

In the present case, Plaintiffs' Complaint alleges that various Defendants committed acts of mail or wire fraud. Mail and wire fraud occur when there is: (1) a scheme to defraud; (2) use of the mails (for mail fraud) or interstate wire communications (for wire fraud) in furtherance of the scheme; and (3) fraudulent intent. *United States v. Pharis*, 298 F.3d 228, 234 (3d Cir.2002) (citing *United States v. Strum*, 671 F.2d 749, 751 (3d Cir.1982)).

Mail and wire fraud schemes to defraud do not require an actual misrepresentation of fact. *See discussion, McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.1990). Fraudulent schemes include schemes to deprive another of the "intangible right of honest services." 18 U.S.C. § 1346. State and local officials and public employees can be held accountable under the statute when they deprive "the citizens they serve of their right to honest services." *United States v. Antico*, 275 F.3d 245, 262 (3d Cir.2001). This doctrine is applied when an official takes bribes for official decisions or actions, or when an official fails to disclose a conflict of interest. *See United States v. Panarella*, 277 F.3d 678, 690 (3d Cir.2002).

The mailing does not have to contain a misrepresentation. " '[I]nnocent' mailings--ones that contain no false information--may supply the mailing element." *Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Moreover, the scheme itself does not have to contemplate the use of mails. *Pharis*, 298 F.3d at 234. "All that is required is that the defendants knowingly participated in a scheme to defraud and caused a mailing to be used in furtherance of the scheme." *Id.* (citing *Strum*, 671 F.2d at 751 and *United States v. Pearlstein*, 576 F.2d 531, 534 (3d Cir.1978)). "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can be reasonably foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira v. United States*, 347 U.S. 1, 8-9, 74 S.Ct. 358, 98 L.Ed. 435 (1954) (citing *United States v. Kenofskey*, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836 (1917)). Because the federal violation is the mailing, each use of the mails which is "incident to an essential part of the scheme" is a separate violation. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1413 (3d Cir.1991) (quoting *Pereira*, 347 U.S. at 8).

*\*10* Plaintiffs allege that Board members were induced to award management and investment contracts on the basis of campaign contributions made to the Board members by people affiliated with the contract recipients. Plaintiffs further allege that these contracts were improper for the fund and Defendants concealed the fees and costs of the contracts. These allegations of deceit are clearly sufficient to constitute a fraudulent scheme under the mail and wire fraud statutes. Particularly, there are at least two, if not three, separate fraudulent schemes occurring: a denial of honest dealings, intentional concealment of the contracts, and concealment of the terms of the contracts. Plaintiffs also allege more than fifty uses of mail or wire communications to further these schemes. Thus, Plaintiffs allege the basic elements of mail and wire fraud.

While Plaintiffs allege the basic elements of mail and wire fraud, it is less clear against which Defendants these allegations are made. Plaintiffs contend all Defendants conspired in the single scheme of pay-to-play contract granting and, therefore, the actions of any party within the scheme constitutes mail or wire fraud committed by every Defendant. Plaintiffs base this argument on three separate allegations in the Complaint. First, the conclusory allegations in Paragraphs 196 and 213 that "defendants conspired to perpetuate a scheme" and the blanket allegations in Paragraph 188 which describe the scheme in general terms and refer to Defendants collectively as "the

collaborators." These conclusory allegations in Plaintiffs' Complaint are insufficient to permit the Court to hold each Defendant accountable for the actions of every Defendant. The dealings alleged by Plaintiffs show a series of fraudulent schemes, each involving various Defendants.

As alleged in the Complaint, the schemes actually involved two sets of actors. First, there was a core group of participants who ran the pay-to-play schemes, these parties include the Board members, who approved the contracts, ASCO, which brokered the contracts and oversaw the daily financial operations of the Plan's funds, and various ASCO employees. The second set of actors were the parties who "purchased" contracts in the pay-to-play schemes. This includes the investment companies themselves, various people and entities who assisted in the purchase of the contract by making campaign contributions, as well as those who benefitted from the contract through commissions.

There is nothing in Plaintiffs' Complaint which alleges that defendants were universally involved with the activities of every contract, or that Defendants even were aware that the other contracts existed. In essence, each contract purchase was a separate fraudulent scheme. As such, the use of mail or wire communications by one Defendant did not necessarily forward a scheme in which all of the Defendants were implicated. When evaluating whether there are two predicate acts alleged, I will review the allegations according to the activities alleged against an individual Defendant. For ASCO, Donald Williamson, Nationwide, JJ & B, Joseph Joyce, John Joyce, William Joyce, Manulife, FSI, and Safeco, the Complaint alleges two or more acts of mail or wire fraud committed by each Defendant directly. (Doc. 1 ¶ 189.)

*11 For the remaining Defendants, although the Complaint does not allege that they personally used the mail or wires twice, the Complaint may allege two or more predicate acts of mail or wire fraud against a defendant. A defendant can be held accountable for each use of mail or wire communications that forwards a scheme in which the defendant participated, as long as the use of the mail or wires was reasonably foreseeable by the defendant. See *Pereira,* 347 U.S. at 8-9.

a) ASCO Affiliates

For the Board members (Defendants Makowski, Pizano, Crossin, and Jones), the Complaint alleges that each campaign contribution was mailed. Although these Defendants did not initiate the mailings, it is clear that the mailing of the contributions furthered the pay-to-play scheme. The use of the mail is reasonably foreseeable in a pay-to-play scheme. Additionally, because the Complaint alleges that the Board members were all involved in the scheme for each contract, any use of mail or wire communications in furtherance of the schemes is an allegation of mail fraud against all of the Board members. Plaintiffs' Complaint alleges at least two predicate acts committed by Defendants Makowski, Pizano, Crossin, and Jones.

In regards to Maria Williamson, the Complaint alleges that she used the mail only once. (Doc. 1 ¶ 189mm.) However, the Complaint clearly alleges that Maria Williamson acted as the Vice President/Operations for ASCO during the time in which ASCO administered the dally operations of the Plan. (Doc. 1 ¶ 53.) It is a reasonable inference that Maria Williamson was involved with ASCO in the alleged fraudulent schemes which took place during this time period, thus, the uses of the mail related to those schemes [FN9] constitutes mail fraud by Maria Williamson. Plaintiffs' Complaint alleges at least two predicate acts committed by Defendant Maria Williamson.

> FN9. For instance, ASCO mailed an administration agreement to Defendant Makowski allegedly in furtherance of a fraudulent scheme (Doc. 1 ¶ 189oo), and ASCO mailed a Special Agent's Agreement to Provident allegedly in furtherance of a fraudulent scheme. (Doc. 1 ¶ 189pp.)

b) The Wells Agreement

Perfilio is directly alleged to have committed a single act, in that he mailed a campaign contribution to Defendants Makowski and Pizano. (Doc. 1 ¶ 189gg.) Neither Michael Joyce nor FSC is directly alleged to have committed any acts. Wells, Wells REIT, and Wells Investment are directly alleged to have committed a single act, they mailed the Wells Agreement to the Plan. (Doc. 1 ¶ 189bb.) While the Complaint does not allege two acts against each of these Defendants directly, the Complaint clearly Implicates all of the these Defendants in the scheme to defraud the Plan related to the Wells Agreement. (Doc. 1 ¶¶ 116-- 125.)

The uses of the mails alleged were reasonably foreseeable as part of the Wells Agreement scheme. Because these Defendants are identified in a scheme together, the use of mail or wire to by any of these Defendants in furtherance of the scheme satisfies the use of mail or wire communications for all of these Defendants. Thus, the allegations that one Defendant used the mail or wires constitutes an allegation of mail or wire fraud against all of these Defendants. Plaintiffs' Complaint alleges at least two predicate acts committed by Defendants Perfilio, Michael Joyce, FSC, Wells, Wells REIT, and Wells Investment.

c) Miscellaneous Defendants

*12 For JJJA, there are no allegations that it directly used the mail or wires. The Complaint clearly implicates JJJA in the four Provident Agreements entered into between December, 1991, and June, 2000, (*see, e.g.,* Doc. 1 ¶¶ 66, 75, 85, 93) and the two Manulife Agreements. (Doc. 1 ¶¶ 103 and 109.) These allegations create a foundation to substantiate the blanket allegation that JJJA acted with other Defendants in a scheme. In particular, it is a reasonable inference that JJJA acted with Defendants ASCO, Donald Williamson, Nationwide, Manulife, William Joyce, Makowski, Pizano, Crossin, and Jones. The Complaint alleges multiple uses of the mail and wires by these Defendants to further the schemes in which JJJA was involved. These uses of the mail were reasonably foreseeable in the course of the schemes. Plaintiffs' Complaint alleges at least two predicate acts committed by Defendant JJJA.

In regards to Devonshire, the Complaint alleges that the Devonshire mailed a campaign contribution to Defendants Makowski and Pizano. [FN10] The Complaint does create some tangential connection between Devonshire and other named Defendants. The Complaint alleges that Donald Williamson, who made campaign contributions to Defendants Makowski, Pizano, Crossin, and Jones, was affiliated with Devonshire. The Complaint also links Devonshire with Perfilio, who is alleged to be involved in the FSC transaction campaign contributions to Defendants Makowski and Pizano.

> FN10. The allegation that Devonshire mailed the campaign contribution is in itself questionable because the Complaint alleges "a mailing on or about April 9, 1999 by Perfilio or Devonshire...." (Doc. 1 ¶ 189gg.) This allegation arguably lacks specificity required under Rule 9(b), *see, e.g., Lum v. Bank of Am. ., 361 F.3d 217, 224-25 (3d Cir.2004),* but I don't need to reach that issue because the Complaint's allegations fail
>
> against Devonshire on other grounds.


Aside from these connections, the Complaint fails to explain how Devonshire was in anyway connected with any of the transactions between the Board, ASCO, and the investment companies. The Complaint also does not indicate that either Defendants Donald Williamson or Perfilio were acting on behalf of Devonshire at the time they made the campaign contributions. The fact that Devonshire was tangentially connected to two named Defendants who were allegedly involved in a scheme to defraud does not create any inference that Devonshire was involved in the scheme. While the fact that Devonshire made a political contribution may suggest its involvement in the pay-to-play scheme, the Complaint does not link Devonshire to a particular fraudulent scheme. Therefore, I cannot infer that it caused any mailings other than those which it made directly. I find that Plaintiffs' Complaint fails to allege two predicate acts and, consequently, fails to allege a pattern of racketeering activity by Defendant Devonshire.

JJI is alleged to have mailed a single campaign contribution. (Doc. 1 ¶ 188h.) Aside from this contribution, the Complaint fails to explain how JJI was in anyway connected with any of the transactions between the Board, ASCO, and the investment companies. While the fact that JJI made a political contribution may suggest its involvement in the pay-to-play scheme, the Complaint does not link JJI to a particular fraudulent scheme. Therefore, I cannot infer that it caused any mailings other than those which it made directly. I find that Plaintiffs' Complaint fails to allege two predicate acts, and, therefore, the Complaint fails to allege a pattern of racketeering activity by Defendant JJI.

*13 For Joyce Associates, Inc., I found no alleged connection between it and any criminal activity, let alone the requisite two predicate acts. The Complaint fails to allege that Joyce Associates, Inc. was in anyway connected with any of the allegedly fraudulent schemes between the Board, ASCO, and the investment companies. I find that Plaintiffs' Complaint fails to allege two predicate acts against

Defendant Joyce Associates, Inc.

iii) Rule 9(b)

The next step in the analysis is to determine if the predicate acts alleged in the Complaint satisfy the requirements of Rule 9(b). Where fraud is alleged as a predicate act, Rule 9(b) requires that the plaintiff allege the fraud with particularity. Fed. R. Civ. P. 9(b). The particularity requirement can be satisfied through alleging the date, time, or place of the fraud, or by giving "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984); *see also Lum v. Bank of Am.,* 361 F.3d 217, 224 (3d Cir.2004). Plaintiffs must always allege who made the fraudulent representation, to whom the representation was made, and the general content of the misrepresentation. *Saporito v. Combustion Eng'g Inc. .,* 843 F.2d 666, 675 (3d Cir.1988), *vacated on other grounds,* 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989).

Based on the above requirements, I find certain allegations are lacking in specificity. In particular, the allegation in Paragraph 189a lacks any specificity regarding who made the communication, to whom, or when the communication occurred. Similarly, the allegations in Paragraphs 189b, 189c, and 189d lack any specificity about when the conversations took place, and the allegations lack specificity about which fraudulent transaction was furthered by the communication. *See Lum,* 361 F.3d at 224. The allegations in Paragraphs 189e, 189f, 189n, and 189dd fail because they use the term "and/or" to identify the defendant initiating the communication. This connector does not identify who sent the communication, and it causes an ambiguity which does not satisfy Rule 9(b). Similarly, the allegations in Paragraphs 189y and 189gg fail to satisfy Rule 9(b) because they identify two Defendants as possible persons who initiated the communication. Like the use of "and/or" the use of "or" creates an ambiguity in the allegation that violates Rule 9(b). Paragraph 189tt fails to establish how the communication furthered the fraud, and it fails to establish the fraudulent nature of the statements in the communication.

The remainder of the allegations in Paragraph 189 satisfy the pleading requirements of Rule 9(b). The Complaint's allegations clearly define each of the campaign contributions, when they were mailed, by whom, and to whom. (*See* Doc. 1 ¶¶ 189 g, h, j, k, *l,* q, r, s, u, x, ee, ff, hh, ii, kk, mm, rr, and ss.) The Complaint also alleges with specificity the mailings in which the contracts were sent to the companies and the Board. These allegations include the date of the mailing, the contents of the mailing, who sent the mailing, and to whom it was sent. (*See* Doc. 1 ¶¶ 189 m, p, t, v, w, z, aa, bb, cc, jj, *ll,* nn, oo, pp, and qq.) There are further allegations that certain Defendants used wire communications in furtherance of the schernes. These allegations include the date of the call, the subject of the conversation, and the parties in the conversation. (*See* Doc. 1 ¶¶ 189 l and o.)

*\*14* Certain Defendants argue in their briefs that the allegations of fraud lack specificity because the allegations do not explain how the use of mail or wire communications furthered the fraudulent scheme. While Rule 9(b) requires pleading with specificity, it does not erase the general standard that the Court should draw reasonable inferences in favor of Plaintiffs. *See Lum,* 361 F.3d at 22 (analyzing allegations of mail fraud for particularity while still drawing reasonable inferences in favor of plaintiffs). Although Plaintiffs' Complaint does not expressly identify how each particular mail or wire communication furthered the scheme, the Complaint clearly alleges facts which create an unquestionable inference that the alleged communications furthered the scheme.

Throughout the Complaint, Plaintiffs clearly explain the fraudulent scheme and how each Defendant is involved with the various contracts. (*See* Doc. 1 ¶¶ 44-- 143 and 188.) Plaintiffs' Complaint goes so far as to identify each contract, the campaign contributions linked to that contract, and the Defendants involved in that contract's creation, execution, and commissions which were awarded. (Doc. 1 ¶¶ 44--143.) The Complaint then alleges that certain mail and wire communications furthered the fraudulent scheme and lists those communications in Paragraph 189. The details of each communication in Paragraph 189 are given in a manner that injects precision and some measure of substantiation into their allegations of fraud.

The purpose of Rule 9(b) is to give Defendants notice of the precise misconduct claimed and to prevent false or unsubstantiated charges. *Seville Indus. Machinery,* 742 F.2d at 791. There is no ambiguity that in a pay-to-play scheme, a campaign contribution furthers the scheme. Likewise, there is no confusion that a fraudulent scheme to gain a contract with the Plan is furthered by mailing the contract to the Plan. I find the allegations give Defendants notice of the misconduct and meet the specificity requirements of Rule 9(b).

iv) Private Securities Litigation Reform Act

The next argument advanced by Defendants is that the frauds alleged cannot constitute predicate

acts under RICO because they are securities violations. Mail and wire frauds may constitute predicate acts under RICO, but there is an exception created by the Private Securities Litigation Reform Act (hereinafter PSLRA), which excludes frauds that constitute securities fraud. 18 U.S.C.1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court … except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."); *see also Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.,* 189 F.3d 321, 327 (3d Cir.1999) (citing *Matthews v. Kidder, Peabody & Co., Inc.,* 161 F.3d 156, 157 (3d Cir.1998)). Any conduct which is actionable as fraud in the purchase or sale of securities cannot constitute a predicate offense under RICO, whether or not the Complaint expressly alleges securities fraud. *Bald Eagle Area Sch. Dist.,* 189 F.3d at 330.

*15 Securities fraud is a scheme to defraud, a misleading statement, or an omission of a material fact in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). [FN11] Plaintiffs seeking relief for securities fraud under Rule 10b-5 must show:

FN11. 15 U.S.C. § 78j reads in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of

any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

…

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

The securities and Exchange Commission has promulgated rules which clarify the meaning of 15 U.S.C. § 78j:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the

purchase or sale of any security.


17 C.F.R. § 240.10b-5 (hereinafter Rule 10b-5).


(1) a misrepresentation or omission of a material fact in connection with the purchase or sale of a security;
(2) scienter on the part of the defendant;
(3) reliance on the misrepresentation; and
(4) damage resulting from the misrepresentation.
*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 173 (3d Cir.2001)* (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 135 F.3d 266, 269 (3d Cir.1998)* and *Semerenko v. Cendant Corp., 223 F.3d 165, 174 (3d Cir.2000)*).
In addition, there is a second form of securities fraud, actionable under the Securities Act of 1933, 15 U.S.C. § 77, which permits recovery for certain misrepresentations in connection with a sale of securities:
Any person who--
(1) offers or sells a security in violation of section 77e of this title, or
(2) offers or sells a security … by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
shall be liable … to the person purchasing such security from him….
15 U.S.C. § 77l. Under the Securities Act of 1933, this form of securities fraud involves either a prospectus or an oral communication. Because the alleged facts of this case indicate that no prospectus was involved in the transactions and all of the fraudulent actions involved written contracts rather than oral statements, this type of securities fraud is inapplicable to the present case. I will limit my analysis to the Rule 10b-5.
Plaintiffs contend that the alleged actions are not actionable as securities fraud, or, that the Court should not make an analysis at this time because of the fact-specific analysis required to determine if the alleged acts constitute securities fraud. I disagree that a fact-specific analysis prevents me from addressing this question at this time. Dismissal is appropriate only if, accepting all factual allegations in the complaint as true and "drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations in the complaint." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir.1998).* No relief could be granted under RICO if the predicate acts alleged are prohibited by the PSLRA. Because the Complaint is read in Plaintiff's favor, if the alleged facts can be read in a manner in which the allegations do not constitute a securities fraud, then I should rule in favor of Plaintiffs and permit the action to continue. Therefore, the question for me to decide is whether the allegations in the Complaint would always constitute a cause of action for securities fraud.
*16 There is an initial question whether the investments involved were actually securities. The term "security" means any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months,

exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited. 15 U.S.C. § 78c(a)(10) (Securities Act of 1934); *see also United Housing Found., Inc. v. Forman, 421 U.S. 837, 847, n. 12, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)* (the definition of security is essentially the same for the Securities Act of 1934 and the Securities Act of 1933). In determining whether a transaction involves a security, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)* (citing *SEC v. W.J. Howey Co., 328 U.S. 293, 298, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)*).

In the present case, the allegations refer to secured notes, REITs, annuities, and other unidentified investments. While notes are usually securities, there are instances in which the nature of a particular transaction labeled a "note" prevents it from being treated as a security, for instance, when it is issued as collateral for a loan. *Reves v. Ernst & Young, 494 U.S. 56, 65, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990)* (citing *Exch. Nat. Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1138 (2d Cir.1976)*). As for annuities, they are generally not treated as securities, although there are also exceptions to this. 15 U.S.C § 77c(a)(8) (exempting annuity contracts from definition of security); *but see SEC v. Variable Annuity Life Ins. Co. of Am., 359 U.S. 65, 79, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959)* (variable annuity which did not guarantee pay-out unless investments succeeded was a security); *SEC v. United Benefit Life Ins. Co., 387 U.S. 202, 211, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967)* (flexible fund annuity which provided pay-out relative to investment success was a security). Contracts with brokers to invest in securities are not securities themselves, although they are often actionable because they are "in connection with" a security. *See Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 943 (3d Cir.1985).*

*\*17* It is apparent to me that whether the particular investments in the alleged frauds were securities would entail a fact-specific analysis of each particular investment. The facts alleged in the Complaint do not permit this analysis, nor do they need to. Plaintiffs' primary allegations relate to the manner in which contracts with the investment companies were entered into by the Board members. The specific investments resulting from those contracts do not need to be plead with particularity. Construing the Complaint in the light most favorable to Plaintiffs, at least some (e.g., transaction involving annuities), if not all, of the transactions in question did not involve securities and, thus, could not form the basis of a securities fraud claim.

Moreover, even if some of the investments constituted securities, this does not end the Court's analysis. Defendants argue that since the alleged scheme is related to securities, any related fraud is precluded from forming the basis of a RICO violation because of the PSLRA. Only fraud which is *actionable as securities fraud* is precluded from forming the basis of a RICO claim. 18 U.S.C. § 1964 (c). A fraud related to the purchase or sale of a security is not always actionable as a securities fraud; there must be a misrepresentation or omission of a material fact in connection with the purchase or sale of a security, scienter, reliance on the misrepresentation (reliance causation), and an injury proximately caused by the fraudulent misrepresentation (loss causation). *Newton, 259 F.3d at 173.* For all Defendants, the Complaint alleges variations of the same factual scenario, that Defendants engaged in a relationship wherein contracts to invest money in securities were entered into in exchange for campaign contributions to Board members' reelection funds. The generic transaction is alleged as follows:

(1) A person connected with ASCO or an investment company would make a campaign contribution to a Board member's reelection fund. [FN12]

FN12. In some of the transactions, the campaign contribution was made after the Board members signed the contract.

(2) A contract to invest the Plan's funds would be presented to Board members. The contract contained inappropriately risky investment strategies considering the Plan's purpose as a pension fund.

(3) One or more Board members would sign the contract, without presenting the contract at a public meeting, without the contract being reflected on the minutes of any meeting, and without holding a formal vote on the contract.

(4) The investment company would receive the Plan's funds and invest it in accordance with the contract.

(5) Persons connected with the investment company and/or ASCO would receive commissions for the contract. The cost of the commissions were excessive and built into the contract price, in other words, hidden from the face of the contract.

(6) The investment manager or investment advisor would collect excessive fees.

(7) Interstate mails and/or wires were used in the furtherance or commission of the transaction.

*18 There are several steps to this transaction which are potentially fraudulent, and it is unclear from the Complaint which parties are involved in those fraudulent acts. [FN13] What is clear to the court is there are two possible scenarios:

> FN13. This would seemingly violate the pleading requirements of Rule 9(b), but that is not the case. Plaintiffs properly plead with particularity the fraudulent *acts* of mail and wire fraud. *See* discussion

> *supra* p. 27. Because Plaintiffs are not alleging securities fraud, they were not required to plead the *scheme* with particularity. However, this leaves the Court with slightly vague details about the exact nature of the fraudulent scheme, which is necessary to analyze whether the fraud is in connection with the purchase or sale of securities.

(1) The Board members were unaware of the excessive fees, hidden commissions, and inappropriate investment strategies.

(2) The Board members and the investment manager or investment advisor acted in complete unison, and the Board members were aware of the excessive fees, hidden commissions, and inappropriate investment strategies. [FN14]

> FN14. The Complaint states: "The Defendant Board Members permitted the Plan to pay excessive fees and commissions to the co-defendants in exchange for political contributions." (Doc. 1 ¶ 188c.) I am uncertain whether "permitted" expresses that the Board members knowingly adopted contracts with hidden fees, or that the Board members failed in their fiduciary obligations by not properly reviewing contracts before approving them because their approval was purchased in the pay-to-play scheme.

In both of the scenarios above, the allegations in the Complaint do not meet all of the elements of a securities fraud.

a) The Board didn't know about hidden fees

If the Board members were unaware of the hidden fees, then there were actually two separate frauds occurring simultaneously: (1) the investment companies were concealing the excessive fees, commissions and unsuitable investments from the Board and the beneficiaries; and (2) Board members were concealing the pay-to-play scheme from the beneficiaries. In this scenario, the alleged fraudulent pay-to-play scheme does not constitute an actionable securities fraud because the misrepresentations or omissions were too attenuated to be in connection with the sale or purchase of securities.

A fraud is in connection with a purchase or sale of securities when there are "deceptive practices touching [upon the purchase or] sale of securities." *Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12-13, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Frauds involving the trading process can be actionable under 10b-5. *Angelastro,* 764 F.2d at 943; *see also Denison v. Kelly,* 759 F.Supp. 199, 207 (3d Cir.1991). Hidden commissions in broker contracts can constitute securities fraud. *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 835 F.2d 1031, 1033 (3d Cir.1987). Misrepresentations regarding the terms of margin accounts are actionable securities frauds. *Angelastro,* 764 F.2d at 945. Even broker mismanagement of an account through investments inconsistent with the stated goals of the investor can constitute securities fraud when accompanied by assurances from the broker that the goals are being met. *Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1031 (3d Cir.1992).

The brokerage relationships are not securities transactions, but they are actionable in the securities fraud context because the relationships touch upon a securities transaction. *Bankers Life,* 404 U.S. at

10, 12-13. In the present case, the connection is even more removed from securities purchase or sale than a simple broker contract. [FN15] The pay-to-play scheme is a fraud between the fiduciaries who entered into the brokerage contracts and the beneficiaries of the plan. While the Supreme Court demonstrated in *Bankers Life,* that "in connection with" a securities transaction would be read broadly, there is one limitation which the Court created--securities fraud should not be applied to internal corporate mismanagement. 404 U.S. at 12; *see also Landy v. Fed. Deposit Ins. Corp.,* 486 F.2d 139, 155 (3d Cir.1973). I have been unable to find any comparable factual scenario to the present case which suggests that fraudulent omissions in this relationship are in connection with the purchase or sale of a securities fraud. This twice-removed relationship from the purchase or sale of a security is too attenuated to constitute a connection with the purchase or sale of securities. Both the Board members and the investment companies are still responsible for the second fraud because, as alleged, the investment companies engaged in the pay-to-play scheme by "purchasing" the contracts.

> FN15. First, there was the purchase or sale of securities, which was done by the investment company and independent parties in the market. There was no fraud alleged in this transaction. Next, there was the contract between the Plan (represented by the Board) and the investment company. Clearly, if the investment companies concealed hidden commissions and other terms of the investment agreements, that fraud constitutes an actionable securities fraud. *See, e.g., Ettinger,* 835 F.2d at 1033. Any use of mail or wire communications in furtherance of this scheme is excluded by the PSLRA from acting as a RICO predicate act. Lastly, there was the Board members' denial of honest dealings scheme in the form of the alleged pay-to-play system of granting contracts.

b) The Board knew about hidden fees
*19 Alternatively, if the Board knew about the hidden fees, the allegations of mail and wire fraud are not actionable as a securities fraud because, as discussed in the previous section, the securities transactions are two transactions removed from any misrepresentations or omissions related to the pay-to-play scheme. [FN16] Arguably, the pay-to-play scheme is more closely related to the purchase or sale of securities in this scenario than if the Board didn't know about the hidden fees because the Board members were involved in the fraud of the concealed hidden fees. However, even if the pay-to-play scheme was connected with a securities transaction, the fraud would still not be actionable under securities laws because there is no reliance causation.

> FN16. First, there was the purchase or sale of securities, which was done by the investment company and independent parties in the market. There was no fraud alleged in this transaction. Next, there was the contract between the Plan (represented by the Board) and the investment company. Lastly, there was the Board members' denial of honest dealings scheme in the form of the alleged pay-to-play system of granting contracts.

Reliance causation requires that a plaintiff reasonably rely upon the fraudulent representation or omission when making the decision to purchase or sell a security. *EP Medsystems, Inc. v. Echocath, Inc.,* 235 F.3d 865, 882 (3d Cir.2000); *Newton,* 259 F.3d at 172 (using the term "reliance causation"). In the facts alleged, the beneficiaries made no decision to purchase or sell; it was the Board members who entered into the contracts. If the Board members knew about the hidden fees, neither party to the contract was misled or intentionally uninformed as to the terms of the contract. The omissions were not relied upon to enter into the contract, nor did that concealment cause any detrimental reliance. [FN17]

> FN17. The Court notes that the beneficiaries lack any ability to appoint, terminate, or otherwise control the Board members. Even if they were fully aware of the contracts' terms, the beneficiaries would have been unable to prevent the Board members from

entering into the contracts.


One might see my present holding as conflicting with the Supreme Court's holding in *Bankers Life.* *404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128.* In *Bankers Life,* a new majority share holder installed a new president in the company, with the intent of defrauding the company of its assets. The president then convinced the board of directors to sell its nearly $5 million worth of bonds. The proceeds of that sale were eventually used to purchase a new bond for the company, but the president used that bond as collateral against a private loan. Although the deceit involved separate transactions from the sale of the bonds, the Supreme Court concluded that the actions were sufficiently connected with the securities sale to constitute securities fraud.

*Bankers Life* is distinguishable from the present case. In *Bankers Life,* the scheme influenced the board of directors' decision to sell the securities. The fraudulent actors induced the innocent company's board of directors to sell the securities on the misrepresentation that the company would receive the proceeds, when in fact the benefit was passed to a private party. In contrast, in the present case, the Board members were not induced to enter the investment management contract on the basis of a fraud. The Board members were completely aware of the terms of the contract, and the fraud was only perpetrated against the beneficiaries of the plan.

In sum, viewing the Complaint in the light most favorable to Plaintiffs, allegations in the Complaint are not actionable as securities fraud. Therefore, the Complaint's predicate acts of mail and wire fraud are not barred by the PSLRA. However, because the analysis above is based on assumptions about the nature of the fraudulent scheme, I may be willing to reevaluate the issue on a motion for summary judgment if the facts differ materially from the assumptions in my analysis.

v) Relatedness and Continuity of Predicate Acts

*\*20* Lastly, in determining whether a Complaint alleges a pattern of racketeering activity, I must evaluate whether the predicate acts alleged create a pattern. When evaluating whether a pattern exists, the Court of Appeals for the Third Circuit advises courts to look at "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *Barticheck v. Fid. Union Bank/First Nat'l State,* 832 F.2d 36, 39 (3d Cir.1987); *see also Marshall-Silver Constr. Co. v. Mendel,* 894 F.2d 593, 596 (3d Cir.1990) (finding *Barticheck* factors still applicable after *H.J. Inc. v. Northwestern Bell Tele. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). [FN18] The predicate acts must be related and amount to or threaten to become continued criminal activity. *H.J. Inc.,* 492 U.S. at 239.


>    FN18. In *Tabas v. Tabas,* the Court of Appeals for the Third Circuit recognized that
>    *Marshall-Silver* was overruled insofar as it required a societal threat to prove a pattern of
>    racketeering activity. 47 F.3d 1280, 1293 n. 17 (3d Cir.1995). That holding has no
>    impact on the issue discussed above.


Criminal conduct is related "if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (applying definition of pattern from 18 U.S.C. § 3575(e) to RICO). In instances, such as the present case, where the conduct in question occurred in a closed period of time, continuity is established by showing conduct that occurred over a "substantial period of time." *Id.* at 242.

When the predicate acts are mail fraud, the mailings are less helpful in ascertaining continuity, and the underlying frauds are more determinative. *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1414 (3d Cir.1991). The RICO statute does not require more than one scheme to establish continuity, but "proof of multiple schemes is 'highly relevant' to the question of continuity." *Id.* at 1412 (quoting *H.J. Inc.,* 492 U.S. at 240). In the Court of Appeals for the Third Circuit, schemes spanning up to one year have been found to be too short-term to establish continuity. *Tabas,* 47 F.3d at 1293; *see also Hughes v. Consol-Pa. Coal Co.,* 945 F.2d 594, 610-11 (3d Cir.1991) (conduct lasting twelve months); *Hindes v. Castle,* 937 F.2d 868, 875 (3d Cir.1991) (eight month period); *Kehr Packages,* 926 F.2d at

1413 (same); *Banks v. Wolk*, 918 F.2d 418, 422-23 (3d Cir.1990) (same); *Marshall-Silver Constr. Co., 894 F.2d at 597* (seven month period).

a) The Board Members

Plaintiffs allege that Defendants Makowski, Pizano, Crossin, and Jones used their positions on the Board to grant contracts in exchange for campaign contributions. They engaged in these activities in twelve separate contracts, spanning a time period of more than twelve years (from 1988 until 2001). For Defendant Makowski, the Complaint alleges that he personally received at least nine campaign contributions (Doc. 1 ¶¶ 189 x, ee, ff, hh, ii, kk, mm, rr and ss) related to six different contracts. (Doc. 1 ¶¶ 77, 87, 105, 116, 126, 136 and 189kk.) In addition, because the Complaint alleges Makowski was involved in the scheme for every contract that the Board members entered into, there are potentially other legitimate allegations of mail fraud based on the uses of mail by other Board members which furthered the fraudulent scheme in which Makowski was involved. Regardless of these other mail frauds, the actions alleged are clearly related because they all share the same purpose, results (granting of contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that Makowski was engaged in a pattern of racketeering activity.

*21* For Defendant Pizano, he personally received at least nine campaign contributions (Doc. 1 ¶¶ 189 ee, ff, hh, ii, kk, mm, rr, and ss) related to six different contracts. (Doc. 1 ¶¶ 77, 87, 105, 116, 126, 136 and 189kk.) There are potentially other legitimate allegations of mail fraud because the Complaint also alleges Pizano was involved in the scheme for every contract that the Board members entered into. Regardless of these other mail frauds, the actions alleged are clearly related because they all share the same purpose, results (granting of contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that Pizano was engaged in a pattern of racketeering activity.

For Defendant Crossin, he personally received at least eight campaign contributions (Doc. 1 ¶¶ 189 j, k, l, q, r, s, u, and x) related to at least five different contracts. (Doc. 1 ¶¶ 48, 55, 68, 98, and 126.) There are potentially other legitimate allegations of mail fraud because the Complaint alleges Crossin was involved in the scheme for every contract that the Board members entered into. Regardless of these other mail frauds, the actions alleged are clearly related because they all share the same purpose, results (granting of contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that Crossin was engaged in a pattern of racketeering activity.

Although Jones did not personally receive campaign contributions, there are allegations of mail fraud against Defendant Jones. Because the Complaint alleges Jones was involved in the scheme for every contract that the Board members entered into, and because the mail was used to furthered the fraudulent schemes, those uses of the mail constitute allegations of mail fraud against Defendant Jones. See discussion *supra* p. 22. The campaign contributions alleged in Paragraph 189mm related to Jones' approval of the third Provident Agreement. (Doc. 1 ¶ 80.) The campaign contributions alleged in Paragraphs 189ee, 189ff, and 189hh related to Jones' approval of the Wells Agreement (Doc. 1 ¶ 118), and the campaign contributions alleged in Paragraph 189kk related to Jones' approval of the LPL Agreement. (Doc. 1 ¶ 136.)

For Defendant Jones, the actions alleged are clearly related because they all share the same purpose, results (granting of contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case nearly four years. The Complaint sufficiently alleges that Jones was engaged in a pattern of racketeering activity.

b) The ASCO Affiliates

*22* Plaintiffs allege that Defendant ASCO and its officers and affiliates acted in the scheme with the Board members and facilitated the pay-to-play scheme by making campaign contributions and brokering the contracts in exchange for collecting hidden fees. They engaged in these activities in twelve separate contracts, spanning a time period of more than twelve years (from 1988 until 2001).

For Defendant ASCO, the actions alleged are clearly related because they all share the same purpose (receiving commissions), results (brokering contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). ASCO directly made at least three campaign contributions (Doc. 1 ¶¶ 189 g, r, and u) related to two different contracts. (Doc. 1 ¶¶ 48 and 68.) The Complaint also alleges that ASCO used mail or wire communications on at least three occasions (Doc. 1 ¶¶ 189 m, oo, and pp), which furthered three schemes. (Doc. 1 ¶¶ 56, 90, and 53, respectively.) In addition, because the Complaint alleges ASCO was involved in the scheme for every contract that the Board members entered into, there are potentially other legitimate allegations of mail fraud based on the uses of mail by the investment companies and related parties that furthered the fraudulent scheme in which ASCO was involved. [FN19] Regardless of these other mail frauds, continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that ASCO was engaged in a pattern of racketeering activity.

> FN19. Most notably are the fourteen acts of mail and wire fraud alleged against Donald Williamson, the President and CEO of ASCO, Maria Williamson, the Vice President/Operations of ASCO, John Joyce, the
>
> Secretary of ASCO, and Joseph Joyce, the Treasurer of ASCO. (Doc. 1 ¶¶ 189 i, o, u, j, k, p, l, w, mm, aa, ff, hh, nn, and ss.)

Defendant Donald Williamson is by far the defendant who is accused of personal involvement in the most number of transactions. It is alleged that at various times between 1988 and 2002, Donald Williamson was the President and CEO of ASCO (Doc. 1 ¶ 7), a representative for Safeco (Doc. 1 ¶ 49), a broker for Provident (Doc. 1 ¶ 59), a broker representative for FSC (Doc. 1 ¶ 119), an account representative for FSC (Doc. 1 ¶ 141), and a broker for FSI. (Doc. 1 ¶ 128.) He personally made three campaign contributions (Doc. 1 ¶¶ 189 k, hh, and ss) related to four different contracts. (Doc. 1 ¶¶ 55, 87, 105, and 116.) The Complaint also alleges that Donald Williamson used mail or wire communications on at least five occasions (Doc. 1 ¶¶ 189 i, o, w, aa, and nn), which furthered five schemes. Aside from his direct actions, the Complaint alleges that Donald Williamson was involved in the scheme for every contract that the Board members entered into. The acts alleged are clearly related because they all share the same purpose (facilitating the pay-to-play scheme), results (brokering contracts), participants (the Board members and ASCO affiliates), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that Donald Williamson was engaged in a pattern of racketeering activity.

*23 For Defendant Maria Williamson, the Complaint alleges that Maria Williamson acted as the Vice President/Operations for ASCO during the time in which ASCO administered the daily operations of the Plan. (Doc. 1 ¶ 53.) Thus, it is a reasonable inference that Maria Williamson was involved in the allegedly fraudulent schemes with ASCO from December, 1999, until October, 2002. During this time, ASCO was implicated in two schemes: the contract for ASCO to administer the daily operations of the Plan and the fourth Provident Agreement. [FN20] The Complaint also alleges that Maria Williamson committed an act of mail fraud related to the third Provident contract. (Doc. 1 ¶ 189mm.) The actions alleged are clearly related because they all share the same purpose (purchasing contracts), results (contracts with the Plan), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Over a time span of approximately two years and ten months, Maria Williamson participated in three fraudulent schemes, and there were eight uses of mail communications to further those schemes, thus, the Complaint sufficiently establishes continuity and alleges that Maria Williamson was engaged in a pattern of racketeering activity.

> FN20. Acts of mail fraud related to those schemes includ ASCO mailing an administration agreement to Defendant Makowski (Doc. 1 ¶ 189oo) and ASCO mailing a Special Agent's

Agreement to Provident. (Doc. 1 ¶ 189pp.)

The Complaint alleges that Safeco committed one act of mail fraud (Doc. 1 ¶ 189q) and one act of wire fraud (Doc. 1 ¶ 189i), both of which were connected to Safeco's contract with the Plan. Plaintiffs also attempt to link Safeco with ASCO's schemes, because Safeco collected ASCO's fees from the Plan. However, the fact that Safeco collected ASCO's fees does sufficiently allege that Safeco was itself engaged in fraudulent conduct under the heightened pleading requirements of Rule 9(b). Thus, the only predicate acts alleged are the mail fraud and the wire fraud related to the single fraudulent scheme. These allegations do not establish the necessary. The Complaint fails to alleges that Safeco was engaged in a pattern of racketeering activity, and Count III will be dismissed against Safeco. Joseph Joyce, ASCO's Treasurer, is alleged to be involved in two separate fraudulent schemes: the second Provident Agreement (Doc. 1 ¶ 68) and the ASCO contract. (*See* Doc. 1 ¶¶ 48 and 189u.) The Complaint alleges that Joseph Joyce used mail communications on at least two occasions to further these schemes. (Doc. 1 ¶¶ 189 j and u.) These transactions occurred over a period of nearly three years. (*Id.*) In addition, there are allegations that nine additional acts of mall fraud were committed to further the schemes in which Joseph Joyce participated. (Doc. 1 ¶¶ 189 h, g, *l*, o, r, s, w, z, and oo.) The actions alleged are clearly related because they all share the same purpose (inducing the Board members to grant contracts), results (contracts), participants (the Board members and ASCO), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Eleven predicate acts to forward two schemes over the course of three years does sufficiently allege continuity in the predicate acts which suggests that Joseph Joyce was engaged in a pattern of racketeering activity.

*\*24* John Joyce, ASCO's Secretary, is alleged to be involved in two separate fraudulent schemes: the first Provident Agreement (Doc. 1 ¶ 55) and the second Provident Agreement. (*See* Doc. 1 ¶ 68.) The Complaint alleges that John Joyce used the mail twice to further these schemes. (Doc. 1 ¶¶ 189 p and *l*, respectively.) These transactions occurred over a period of less than five months. (*Id.*) In addition, there are allegations that eight additional acts of mail fraud were committed to further the schemes in which John Joyce participated. (Doc. 1 ¶¶ 189 j, k, m, p, r, s, w, and z.) Although the actions alleged are clearly related, the short time period over which the frauds occurred, five months, does not sufficiently allege continuity in the predicate acts to establish a pattern of racketeering activity. Count III will be disrnissed against John Joyce.

c) The Provident Agreements

Defendant Nationwide is alleged to be involved with four separate fraudulent schemes, the four Provident Agreements created between December 18, 1991 and June 6, 2000. (Doc. 1 ¶¶ 58, 69, 80, and 89.) The Complaint alleges that Nationwide used mail or wire communications on at least three occasions (Doc. 1 ¶¶ 189 z, jj. and qq) which furthered three schemes. (*Id.*) There are allegations that thirteen additional acts of mail and wire fraud were committed to further the schemes in which Nationwide participated. (Doc. 1 ¶¶ 189 j, k, m, p, *l*, r, s, w, mm, aa, rr, ss, and pp.) The actions alleged are clearly related because they all share the same purpose (receiving contracts), results (contracts), participants (the Board members and ASCO), victims (the Plan and its beneficiaries), and methods of commission (third parties making donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case nearly a decade. The Complaint sufficiently alleges that Nationwide was engaged in a pattern of racketeering activity.

JJJA is equally implicated in all of the Provident Agreements. [FN21] (*See, e.g.,* Doc. 1 ¶¶ 65, 75, 81, and 90.) Like Nationwide, there are allegations that sixteen acts of mail and wire fraud were committed to further the schemes in which JJJA participated. (Doc. 1 ¶¶ 189 j, k, m, p, *l*, r, s, w, z, aa, jj, mm, pp, qq, rr, and ss.) The actions alleged are clearly related because they all share the same purpose (receiving commissions), results (contracts), participants (the Board members, ASCO), victims (the Plan and its beneficiaries), and methods of commission (third parties making donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time. The Complaint sufficiently alleges that JJJA was engaged in a pattern of racketeering activity.

FN21. In addition to the Provident Agreements, JJJA is implicated in the Manulife

Agreements. (*See* Doc. 1 ¶¶ 103 and 109.) These additional schemes reaffirm the pattern of racketeering activity by JJJA alleged in relation to the Provident Agreements.

d) The Manulife Agreements
Defendant Manulife is directly alleged to have committed three acts of mail fraud (Doc. 1 ¶¶ 189 v, cc, and ii) related to two separate transactions. (Doc. 1 ¶¶ 189v and 106.) These acts took place over almost six years. (Doc. 1 ¶¶ 189 v, cc, and ii.) In addition, there are four other acts of mail fraud related to the Manulife Agreements. (Doc. 1 ¶¶ 189 s, ee, ff, and hh.) The actions alleged are clearly related because they all share the same purpose (receiving contracts), results (contracts), participants (the Board members and ASCO), victims (the Plan and its beneficiaries), and methods of commission (third parties making donations to campaign funds). More than one scheme is not required to establish continuity, although "proof of multiple schemes is 'highly relevant." ' *Kehr Packages, Inc., 926 F.2d at 1412* (quoting *H.J. Inc., 492 U.S. at 240).* The Complaint alleges that Manulife participated in two fraudulent schemes over the course of six years, which involved seven acts of mail fraud to further those schemes. I find that seven predicate acts committed to forward two schemes sufficiently alleges a continuity in the predicate acts. The Complaint sufficiently alleges that Manulife was engaged in a pattern of racketeering activity.

e) The Wells Agreement
*\*25* Defendant FSC is linked with two separate transactions, the FSC Agreement and the Wells Agreement. The Complaint does not list any related uses of mail or wire communications in furtherance of the FSC Agreement. (Doc. 1 ¶¶ 141-143.) Therefore, the only predicate acts alleged against FSC are the ones related to the Wells Agreement. Defendants Perfilio, Michael Joyce, Wells, Wells REIT, and Wells Investment will be analyzed the same as FCS because each Defendant is only implicated in the Wells Agreement scheme. The Wells Agreement lists four separate uses of mail or wire communications in furtherance of the fraudulent scheme which transpired between February 2, 1999, and April 12, 1999--two months and ten days. (Doc. 1 ¶¶ 189 bb, ee, ff, and hh.)
While these acts of mail and wire fraud are clearly related, they lack the necessary continuity to establish a pattern of racketeering activity. When ascertaining whether the predicate acts establish continuity, the specific acts of mail fraud are less determinative than the number of schemes. *Kehr Packages, Inc., 926 F.2d at 1414.* Schemes lasting less than a year are too short-term to create continuity. *See Hughes, 945 F.2d at 610-11* (conduct lasting twelve months). The allegations against Defendants fail on both counts. The Complaint alleges that Defendants were involved in a single scheme with acts of fraud only occurring over two months and ten days. The Complaint does not sufficiently allege that FSC, Perfilio, Michael Joyce, Wells, Wells REIT, or Wells Investment were engaged in a pattern of racketeering activity. Count III will be dismissed against Defendants FSC, Perfilio, Michael Joyce, Wells, Wells REIT, and Wells Investment.

f) Miscellaneous Defendants
FSI is in a situation similar to the Wells Agreement Defendants. The Complaint alleges that FSI engaged in two acts of mail fraud related to the FSI transaction. (Doc. 1 ¶¶ 189 t and x.) These transactions occurred over a period of seven months. (*Id.*) The Complaint does not link FSI to any other schemes. Because the alleged predicate acts occurred in a time period of less than a year and they were both related to a single fraudulent scheme, the allegations fail to establish the necessary continuity. The Complaint does not sufficiently allege that FSI was engaged in a pattern of racketeering activity. Count III will be dismissed against FSI.
JJ & B is alleged to be involved with four separate fraudulent schemes: the second Provident Agreement (Doc. 1 ¶ 68), both Manulife Agreements (Doc. 1 ¶¶ 98 and 105), and the Wells Agreement. (Doc. 1 ¶ 116.) The Complaint alleges that JJ & B used mail communications on at least two occasions to further these schemes. (Doc. 1 ¶¶ 189 s and ee.) These transactions occurred over a period of nearly five years. (*Id.*) In addition, there are allegations that nine additional acts of mail fraud were committed to further the schemes in which JJ & B participated. (Doc. 1 ¶¶ 189 *l*, r, w, v, z, bb, cc, ff, and hh.) The actions alleged are clearly related because they all share the same purpose (inducing the Board members to grant contracts), results (contracts), participants (the Board members and ASCO), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the four schemes over nearly five years furthered by eleven acts of mail fraud. The Complaint sufficiently alleges that JJ & B was engaged in a pattern of racketeering activity.

*26 William Joyce is alleged to be involved with three separate fraudulent schemes: the fourth Provident Agreement (Doc. 1 ¶ 87), the second Manulife Agreement (Doc. 1 ¶ 105), and the Wells Agreement. (Doc. 1 ¶ 116.) The Complaint alleges that William Joyce used mail communications on at least two occasions to further these schemes. (Doc. 1 ¶¶ 189 ff and rr.) These transactions occurred over a period of more than fourteen months. (*Id.*) In addition, there are allegations that eight additional acts of mail and wire fraud were committed to further the schemes in which William Joyce participated. (Doc. 1 ¶¶ 189 bb, cc, ee, hh, ii, pp, qq, and ss.) While the alleged acts are clearly related, the short duration of the acts, approximately fourteen months, does not establish the requisite continuity in the predicate acts. The Complaint fails to allege that William Joyce was engaged in a pattern of racketeering activity. Count III will be dismissed against William Joyce.

In summary, the RICO § 1964(c) claim for alleged violations of § 1962(c) will be dismissed against the following Defendants because the Complaint fails to allege a pattern of racketeering activity: FCS, Perfilio, Joyce Associates, Inc., JJI, John Joyce, William Joyce, Michael Joyce, Wells, Wells REIT, Wells Investment, FSI, Safeco, and Devonshire. The Complaint sufficiently alleges a pattern of racketeering activity for the RICO § 1964(c) claim for alleged violations of § 1962(c) against the following Defendants: Makowski, Pizano, Crossin, Jones, ASCO, Donald Williamson, Maria Williamson, JJJA, JJ & B, Joseph Joyce, Manulife, and Nationwide.

D) Count IV-- § 1962(d) Conspiracy to Violate § 1962(c)

In Count IV of the Complaint, Plaintiffs allege that all Defendants conspired to violate § 1962(c), in violation of 18 U.S.C. § 1962(d). To sustain an action under § 1962(d), a plaintiff must prove:

(1) that the defendant adopted the goal of furthering or facilitating the criminal endeavor, *Salinas v. United States*, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997);

(2) that the conspiracy, if completed, would satisfy all of the elements of either § 1962(a), (b), or (c), *Rehkop v. Berwick Healthcare Corp.*, 95 F.3d 285, 290 (3d Cir.1996); and

(3) that an injury resulted from an act related to the conspiracy which is enumerated in § 1961(1). *Beck v. Prupis*, 529 U.S. 494, 505, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).

*See generally Smith v. Berg*, 247 F.3d 532, 536 (3d Cir.2001).

The Supreme Court has been very clear that RICO conspiracy under § 1962(d) should be analyzed consistent with common law concepts of conspiracy.

"One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense....

It makes no difference that the substantive offense under § 1962(c) requires two or more predicate acts. The interplay between subsection (c) and (d) does not permit us to excuse from the reach of conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense."

*27 *Salinas*, 522 U.S. at 65. Moreover, the complaint need not contain specifics allegations of overt acts committed by each defendant. *See id.* at 63-4 (explaining that federal conspiracy does not require an overt act, and comparing with RICO's even broader definition of conspiracy). All that is required is that the conspirator "adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 65.

"A conspiracy claim must also contain supportive factual allegations. The allegations must be sufficient to describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy." *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir.1989) (internal quotations and citations omitted). This analysis does not rise to the level of particularity required by Rule 9(b) for allegations of fraud. *Id.*

"All defendants conspired to violate 18 U.S.C. § 1962(c). Among other things, defendants conspired to perpetuate a scheme to intentionally defraud the Plan for their own monetary benefit. In furtherance of that Agreement, defendants engaged in at least the following overt acts: ..." (Doc. 1 ¶ 196.) "Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further their schemes." (*Id.* ¶ 197.) In Count IV, the Complaint not only alleges that Defendants adopted the goal of furthering or facilitating the criminal endeavor, it outlines the composition of the conspiracy (the Board members, ASCO and affiliates, and the contract companies and affiliates), the broad objectives of the conspiracy (the pay-to-play scheme), and what role Defendants played in the scheme.

The allegations in the Complaint are extremely thorough, with the exception of Defendant Joseph Associates, Inc. As I stated previously in my § 1962(c) analysis, the Complaint failed to allege that Joyce Associates, Inc. was in anyway connected with any of the allegedly fraudulent schemes between the Board, ASCO, and the investment companies. Aside from the similarity in names with

other corporate and real Defendants, there is no connection between Joyce Associates, Inc. with any of the transactions, the companies involved in those transactions, the Board members, any campaign contributions, or any commissions. As such, I find that the Complaint does not sufficiently allege Defendant Joyce Associates, Inc.'s role in that conspiracy to sustain a claim under § 1964(c) for violations of § 1962(d). Count IV will be dismissed against Joseph Associates, Inc.

As I discussed in the previous section, the Complaint properly alleges a cause of action under § 1964 (c) for violations of § 1962(c) against Defendants Makowski, Pizano, Crossin, Jones, ASCO, Donald Williamson, Maria Williamson, JJJA, JJ & B, Joseph Joyce, Manulife, and Nationwide. Thus, because the Complaint alleges that all Defendants conspired with the aforementioned Defendants against whom violations of 1962(c) are alleged, the completed conspiracy would satisfy all of the elements of § 1962(c). [FN22]

>    FN22. "Under our interpretation, a plaintiff could, through a § 1964(c) suit for a violation of § 1962(d), sue co-conspirators who might not themselves have violated one of the substantive provisions of § 1962." *Beck*, 529 U.S. at 507.

*28 The Complaint also alleges that Plaintiffs sustained an injury resulting from the § 1962(c) violations, specifically, the Plan had to pay excessive fees, as well as suffer economic losses through bad investments, as a direct result of the frauds committed by the Board member Defendants and the investment manager Defendants' collusion to enter the Plan into inappropriate contracts. I find Plaintiffs sufficiently allege an injury resulting from a predicate act enumerated in § 1961(1). I find that the Complaint sufficiently alleges a claim under § 1964(c) for violations of § 1962(d) against all Defendants except Joyce Associates, Inc.

E) Count V-- § 1962(b) Interest or Control of an Enterprise

Plaintiffs allege that all Defendants violated 18 U.S.C. § 1962(b), which states that "it shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." To establish a claim under § 1962(b), a plaintiff must allege that the defendant has an interest in control over an enterprise engaged in racketeering activity, that the defendant acquired the interest or control through racketeering, and that the plaintiff was injured from the defendant's interest or control of the enterprise. *See Lightning Lube, Inc., v. Witco Corp.*, 4 F.3d 1153, 1190-1191 (3d Cir.1993). To state a RICO claim, the Complaint must contain more than mere conclusory accusations that a defendant controlled an enterprise. *Glessner v. Kenny*, 952 F.2d 702, 714 (3d Cir.1991), *overruled on other grounds*, *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, *Inc.*, 46 F.3d 258 (3d Cir.1995); *see also Kaiser v. Stewart*, No. Civ. A. 96-6643, 1997 U.S. Dist. LEXIS 12788, at *6 (E.D.Pa. Aug. 19, 1997) (citing *Glessner* ).

Control over a RICO enterprise requires more than participation in the operation or management of the enterprise. *Kalser*, 1997 U .S. Dist. LEXIS 12788, at *4 (E.D.Pa. Aug. 19, 1997) (mere managerial control not enough); *see also Browne v. Abdelhak*, No. Civ. A. 98-6688, 2000 U.S. Dist. LEXIS, at * 31-2 (E.D.Pa. Aug. 23, 2000). A person controls a RICO enterprise when he has significant power over the functioning of the enterprise, comparable to that of a majority shareholder or someone with managerial control. *See, e.g., T.I Construction v. Kiewit Eastern Co.*, No. Civ. A. 91-2638, 1992 U.S. Dist. LEXIS 11607, at *22 (E.D.Pa. Aug. 6, 1992). An interest in an RICO enterprise must rise to the level of a proprietary Interest. *Kaiser*, 1997 U.S. Dist. LEXIS 12788, at *9. "In addition, the plaintiff must establish that the interest or control of the RICO enterprise by the person is a result of racketeering .... it must be established firmly that there is a nexus between the interest and the alleged racketeering activities." *Lightning Lube*, 4 F.3d at 1190.

*29 Just as with the § 1964(c) claim stemming from a § 1962(c) violation, there is a threshold question whether Plaintiffs have standing to bring a claim for a violation of § 1962(b). In order to bring an action under § 1964(c) for a violation of § 1962(b), the injury must result from the acquisition or control of the enterprise, not merely a racketeering activity. *Lightning Lube*, 4 F.3d at 1190. "[A] plaintiff must show injury from the defendant's acquistion or control of an interest in a RICO enterprise, *in addition to* injury from the predicate acts." *Id.* (emphasis added). Merely repeating the same injuries that resulted from an alleged § 1962(c) violation is insufficient. *Id.* at

1191. The injury must be the result of the actions of the defendant in acquiring or maintaining control of the enterprise. The fact that a defendant could not have harmed the plaintiff "but for" the fact that he controlled the enterprise does not satisfy this test. *Casper v. Webber Group, Inc.,* 787 F.Supp. 1480, 1495 (D.N.J.1992).

While Plaintiffs allege a nexus between racketeering activity and control of an enterprise, they fail to establish how they were injured as a result of Defendants' control of the enterprise independent of the injuries from the racketeering activities. Plaintiffs repeated the same injury for both their § 1962 (c) and § 1962(b) claims:

192. As a direct and proximate result of the defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), the Plan has been injured in its business and property, in that, without limitation:

a. the Plan suffered a net loss of millions of dollars as a result of the performance of the inappropriate investments into which the defendants placed the Plan's funds;

b. the Plan paid millions of dollars in excessive fees and commissions in connections with the inappropriate investments into which the placed the Plan's funds; and

c. the Plan paid millions of dollars in expense recovery charges when the Plan liquidated the inappropriate investments into which the placed the Plan's funds.

193. As a result of the defendants' violations of 18 U.S.C. § 1962(c), the Plan has been damages in its business or property in an amount to be proven at trial, but not less than $25 million. claims.

                              * * *

209. As a direct and proximate result of the defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), the Plan has been injured in its business and property, in that, without limitation:

a. the Plan suffered a net loss of millions of dollars as a result of the performance of the inappropriate investments into which the defendants placed the Plan's funds;

a. the Plan paid millions of dollars in excessive fees and commissions in connections with the inappropriate investments into which the placed the Plan's funds; and

b. the Plan paid millions of dollars in expense recovery charges when the Plan liquidated the inappropriate investments into which the placed the Plan's funds.

*\*30* 210. As a result of the defendants' violations of 18 U.S.C. § 1962(b), the Plan has been damages in its business or property in an amount to be proven at trial, but not less than $25 million. (Doc. 1.)

Repeating the same injury is insufficient. *Lightning Lube,* 4 F.3d at 1191 ("Such an allegation is insufficient because it merely parrots the same injury that § 1962(c) is meant to remedy and fails to explain what *additional injury* resulted from the person's interest or control of the enterprise." (emphasis added)); *see also Cheatle v. Katz,* No. Civ. A. 02-4405, 2003 WL 21250583, at \*6 (E.D.Pa. April 1, 2003). Moreover, the Injuries alleged stem from the underlying racketeering activity committed by Defendants, i.e., the mail and wire frauds, not from Defendants' control of the enterprise. Plaintiffs have failed to plead a claim under § 1962(b). I will dismiss Count V against all moving Defendants.

F) Count VI-- § 1962(d) Conspiracy to Violate § 1962(b)

As I stated before in my discussion of Count IV, to sustain an action under § 1962(d), a Plaintiff must prove:

(1) that the defendant adopted the goal of furthering or facilitating the criminal endeavor, *Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997);

(2) that the conspiracy if completed, would satisfy all of the elements of either § 1962(a), (b), or (c), *Rehkop v. Berwick Healthcare Corp.,* 95 F.3d 285, 290 (3d Cir.1996); and

(3) that an injury resulted from an act related to the conspiracy which is enumerated in § 1961(1). *Beck v. Prupis,* 529 U.S. 494, 505, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).

*See generally Smith v. Berg,* 247 F.3d 532, 536 (3d Cir.2001).

Although a conspiracy claim requires that the element of a § 1962(a), (b), or (c) violation are met, there does not need to be a successful claim under § 1962(a), (b), or (c) in order for a § 1962(d) claim to survive. *Beck,* 529 U.S. at 507. Moreover, In situations in which the claim for the substantive violation fails for failure to establish the injury requirement imposed by § 1964(c), the substantive allegations can still sustain a cause of action for a § 1962(d) violation. *Rehkop,* 95 F.3d at 290.

"A conspiracy claim must also contain supportive factual allegations. The allegations must be sufficient to describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy." *Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989) (internal quotations and citations omitted). However, this analysis does not rise to the level of particularity required by Rule 9(b) for allegations of fraud. *Id.*

"All defendants conspired to violate 18 U.S.C. § 1962(b). Among other things, defendants conspired to perpetuate a scheme to acquire and maintain interests in and control of the enterprise through a pattern of racketeering activity." (Doc. 1 ¶ 213.) "Defendants have intentionally conspired to acquire or maintain their interests in the enterprise through a pattern of racketeering activity. Defendants knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further their schemes." (*Id.* ¶ 214.) In Count VI, the Complaint not only alleges that Defendants adopted the goal of furthering or facilitating the criminal endeavor, it outlines the composition of the conspiracy (the Board members, ASCO and affiliates, and the contract companies and affiliates), the broad objectives of the conspiracy (the pay-to-play scheme), and what role Defendants played in the scheme.

*\*31* The allegations in the Complaint are extremely thorough, with the exception of Defendant Joseph Associates, Inc. As I stated previously in my § 1962(c) analysis, the Complaint failed to allege that Joyce Associates, Inc. was in anyway connected with any of the allegedly fraudulent schemes between the Board, ASCO, and the investment companies. Aside from the similarity in names with other corporate and real Defendants, there is no connection between Joyce Associates, Inc. and any of the transactions, the companies involved in those transactions, the Board members, any campaign contributions, or any commissions. As such, I find that the Complaint does not sufficiently allege Defendant Joyce Associates, Inc.'s role in that conspiracy to sustain a claim under § 1964(c) for violations of § 1962(d).

As I discussed in the previous section, a § 1962(b) violation is established when the defendant has an interest in control over an enterprise engaged in racketeering activity which the defendant acquired the interest or control through racketeering. *See Lightning Lube,* 4 F.3d at 1190-1191. To state a RICO claim, the Complaint must contain more than mere conclusory accusations that a defendant controlled an enterprise. *Glessner,* 952 F.2d at 714, *overruled on other grounds, Jaguar Cars,* 46 F.3d 258: *see also Kaiser,* 1997 U.S. Dist. LEXIS 12788, at \*6 (citing *Glessner* ).

Control over a RICO enterprise requires more than participation in the operation or management of the enterprise. *Kaiser,* 1997 U .S. Dist. LEXIS 12788, at \*4 (mere managerial control not enough); *see also Browne,* 2000 U.S. Dist. LEXIS, at \*31-2. A person controls a RICO enterprise when he has significant power of the functioning of the enterprise, comparable to that of a majority shareholder or someone with managerial control. *See, e.g., T.I Construction,* 1992 U.S. Dist. LEXIS 11607, at \*22. An interest in an RICO enterprise must rise to the level of a proprietary interest. *Kaiser,* 1997 U.S. Dist. LEXIS 12788, at \*9. "In addition, the plaintiff must establish that the interest or control of the RICO enterprise by the person is a result of racketeering ....it must be established firmly that there is a nexus between the interest and the alleged racketeering activities." *Lightning Lube,* 4 F.3d at 1190.

The Complaint properly alleges that the Board members, and possibly ASCO, controlled the enterprise or maintained a proprietary interest in the enterprise. Specifically, the Board members benefitted financially from the transactions of the enterprise, as did ASCO. Moreover, the Board members had the ability to grant or deny a contract at whim. Therefore, they were in a position in which they controlled the very actions of the enterprise, comparable to that of a shareholder with a controlling interest. Even if the actions alleged do not themselves rise to the level of control, Plaintiffs allege facts which could support the inference that Defendants intended to control an enterprise, which satisfies the pleading requirements for a conspiracy. *See Salinas,* 522 U.S. at 478 ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues...."). Thus, the completed conspiracy satisfies all of the elements of § 1962(b).

*\*32* The Complaint also alleges that Plaintiffs sustained an injury resulting from the § 1962(b) violations, specifically, the Plan had to pay excessive fees, as well as suffer economic losses through bad investments, as a direct result of the frauds committed by the Board member Defendants and the investment manager Defendants' collusion to enter the Plan into inappropriate contracts. I find Plaintiffs sufficiently allege an injury resulting from a predicate act enumerated in § 1961(1). I find that the Complaint sufficiently alleges a claim under § 1964(c) for violations of § 1962(d) against all Defendants except Joyce Associates, Inc.

3) Count VII--Investment Advisor Act of 1940

Count VII alleges that ASCO and Donald Williamson violated the Investment Advisors Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (hereinafter IAA). Defendants ASCO and Williamson challenge this claim on the grounds that it is untimely. The IAA does not contain an express statute of limitations. However, the Sarbanes-Oxley Act of 2002, 28 U.S.C. § 1658(b), created a statute of limitations applicable to the IAA.

(a) Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after

the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

(b) Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)) [which includes the IAA], may be brought not later than the earlier of--

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation.

28 U.S.C. § 1658(b).

In the present case, Plaintiffs allege that ASCO and Donald Williamson began acting as agents in 1988. (*See* Doc. 85 at 18-19 .) Typically, courts have held that violations of the IAA are not continuing crimes. *See discussion Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1040-42 (1992) ("[The unregistered investment advisor] harms the purchaser of his investment advice at the time he enters into a contract that commits the purchaser to pay for the advice."). However, the Complaint clearly alleges multiple violations committed during the course of the relationship between ASCO and the Board, each of which would create a separate time for the statute of limitations to accrue. The allegations of the Complaint are not clear about the timing of each of the violations. Therefore, at the present time, I will not dismiss Count VII. I will reserve ruling on the matter of the statute of limitations until the facts are more clearly developed to permit an appropriate analysis of when the statute of limitations accrued for the IAA claims.

4) State Law Claims

Now that the federal law claims are resolved, I move to the state law claims. Plaintiffs raise a claim of breach of fiduciary duty against Defendants Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson. They also raise a claim of aiding and abetting breach of fiduciary duty against Defendants Nationwide, Manulife, Wells, Wells REIT, Wells Investment, FSC, FSI, LPL, Safeco, Devonshire, Perfilio, Joyce Associates, Inc., JJI, JJJA, JJ & B, Joseph Joyce, William Joyce, Michael Joyce, John Joyce, and Maria Williamson, Finally, Plaintiffs raise a claim is for unjust enrichment against ASCO, Donald Williamson, FSC, Perfilio, JJI, JJJA, Joseph Joyce, John Joyce, Michael Joyce, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells Investment, and FSI. All of these claims are governed by Pennsylvania law.

A) Supplemental Jurisdiction

*\*33* As a preliminary matter, Defendants argue either that the Court should decline to exercise jurisdiction.

[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental Jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). Cases that "derive from a common nucleus of operative fact" with federal claims are part of the same case or controversy. *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

In the present case, Plaintiffs allege federal claims against every Defendant in Counts III thought VI. The state law claims raised by Plaintiffs derive from the same operative facts as the federal law claims, giving me Jurisdiction under § 1367(a). The fact that I dismissed the federal claims against some Defendants does not destroy my supplemental jurisdiction over the state law claims raised against those Defendants. *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.,* 101 F.3d 1492, 1508 (3d Cir.1996); *see also Fralin v. County of Bucks,* 296 F.Supp.2d 609, 616-617 (E.D.Pa.2003).

While I have supplemental jurisdiction, I also have discretion to decline to exercise that jurisdiction in certain circumstances.

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ...

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In deciding whether to retain supplemental jurisdiction, a court "should take into

account generally accepted principles of "judicial economy, convenience, and fairness to the litigants." ' *Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1284 (3d Cir.1993) (quoting *Gibbs,* 383 U.S. at 726).

This case is principally a RICO case, and the state law claims do not substantially predominate over the RICO claims. Likewise, although I have dismissed the federal claims against one Defendant, Joyce Associates, Inc., twenty-five of the twenty-six Defendants continue to have at least one federal claim pending. Given the complexity of the case and the interconnected nature of the transactions involved, it would be wasteful to dismiss Joyce Associates, Inc. on the basis that no federal claims survive. Judicial economy dictates that the case should be decided in a single forum. As such, I will not decline to exercise my supplemental jurisdiction.

B) Count I--Breach of Fiduciary Duty

*\*34* In Count I, Plaintiffs raise a claim of breach of fiduciary duty against Defendants Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson. All Defendants challenge the claim on the basis that it is time-barred. Defendants ASCO and Williamson further challenge Count I as failing to state a claim upon which relief can be granted because neither of them ever had a fiduciary relationship with the Plan. Breach of fiduciary duty has a statute of limitations of two years. 42 Pa. Conn. Stat. Ann. § 5524. As with the federal claims, Plaintiffs argue that the injuries occurred within the two-year statute of limitations, and, even if the injury occurred before then, the statute of limitations was tolled by fraudulent concealment and adverse domination. Assuming, *arguendo,* that the injuries occurred outside of the two-year statute of limitations, Plaintiffs' claims survive because they have sufficiently pled grounds for fraudulent concealment, adverse domination, or both.

Pennsylvania applies a broader test [FN23] for fraudulent concealment than the federal test that I applied in the RICO analysis. *See* discussion *supra* p. 12.

> FN23. Pennsylvania's test, which is known as the "discovery rule" is broader than the RICO fraudulent concealment standard because it does not require active concealment. It only requires that a Plaintiff cannot discover the injury with the exercise of reasonable due diligence.

The "discovery rule" provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible. The "discovery rule" arises from the inability of the injured party, despite the exercise of reasonable diligence, to know of the injury or its cause.

*Hayward v. Med. Ctr. of Beaver County,* 530 Pa. 320, 608 A.2d 1040, 1043 (Pa.1992) (internal citations omitted). It is clear that the discovery rule applies to the present case given Plaintiffs' allegations that the Board members actively concealed the contracts from the public. Therefore, the conclusion from my fraudulent concealment analysis is unchanged; Plaintiffs' claims are not time-barred because they successfully allege facts that trigger the discovery rule.

It is less clear whether Pennsylvania has adopted the doctrine of adverse domination. *See discussion Resolution Trust Corp. v. Farmer,* 865 F.Supp. 1143, 1152 n. 7 (E.D.Pa.1994); *see also In re Lloyd Sec., No.* 90-0985S, 1992 WL 119362, at *10 (Bankr.E.D.Pa. May 21, 1992).

Considering the domination by Dahlen of the entire corporate management, as well as the confidence long placed in him by the members of the Association and later by the shareholders of Lutherland, it is natural that even when suspicion had been aroused it did not ripen into conviction in the minds of the dissident shareholders until an investigation by counsel revealed the true state of affairs and thereupon this action was promptly instituted.

*Lutherland, Inc. v. Dahlen,* 357 Pa. 143, 53 A.2d 143, 157 (Pa.1947). Some courts have read the language in *Lutherland* as Pennsylvania's recognition of adverse domination. *Harper v. Superior Tool and Die Co.,* Civ. A. No. 86- 4188, 1987 WL 18414, at *3 (E.D.Pa.1987). Other courts have read it as a variation of fraudulent concealment. *Resolution Trust Corp.,* 865 F.Supp. at 1152.

*\*35* Whatever name the principle in *Lutherland* takes, it is clear that the facts in Plaintiffs' Complaint allege a similar situation, where the Board was dominated by participants of the pay-to-play scheme who actively concealed the nature of the financial arrangements from the public view. These facts are sufficiently analogous to the facts in *Lutherland* to permit Plaintiffs to proceed. Thus, I will not dismiss

Count I against Defendants Makowski, Pizano, Crossin, Jones because the claim is not time-barred. However, this decision is can be revisited on a motion for summary judgment because the analysis requires a fact-specific evaluation to determine the applicability to a case. *Hayward,* 608 A.2d at 1043.

ASCO and Donald Williamson further assert that Court I should be dismissed because they never owed a fiduciary obligation to the Plan. ASCO and Donald Williamson assert that they do not met the definition of a fiduciary under title 20, section 7301 of the Pennsylvania Code, [FN24] which regulates how fiduciaries make investments for a principal. Pennsylvania's title 20 also contains a broader definition of fiduciary which is applied more generally. That definition "[i]ncludes personal representatives, guardians, and trustees, whether domiciliary or ancillary, individual or corporate, subject to the jurisdiction of the orphans' court division." 20 Pa. Conn. Stat. Ann. § 102. ASCO and Donald Williamson meet neither of these definitions.

> FN24. "The term 'fiduciary' as used in this chapter shall include an administer of a municipal pension or retirement plan and any other person whose fiduciary duties are, by statute, governed by the principles of this chapter." 20 Pa. Conn. Stat. Ann. § 7301. "The term 'fiduciary', as defined in [20 Pa. Conn. Stat. Ann. § 102] does not expressly include an 'attorney-in-fact' or an 'agent'." *In re Estate of Nicely,* No. 184 OF 1995, 2003 WL 22183940, at *5 (Pa.Com.Pl. April 1, 2003).

Aside from the statutory fiduciaries, there is a long-standing common law definition of fiduciary in Pennsylvania. *Basile v. H & R Block, Inc.,* 563 Pa. 359, 761 A.2d 1115 (Pa.2000) (*Basile I*); *see discussion Basile v. H & R Block, Inc.,* 777 A.2d 95, 101 (Pa.Super.Ct.2001) (*Basile II*). "An agency relationship is a fiduciary one, and the agent is subject to the duty of loyalty to act only for the principal's benefit." *Basile I,* 761 A.2d at 1120 (quoting *Sutiff v. Sutliff,* 515 Pa. 393, 528 A.2d 1318, 1323 (Pa.1987)). The agent [FN25] has a duty to act "with the utmost good faith," which includes a duty to disclose "all relevant information" to the principal. *Id.* (citing *Sylvester v. Beck,* 406 Pa. 607, 178 A.2d 755, 757 (Pa.1962)).

> FN25. The three elements of agency are: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) understanding of the parties that the principal is to be in control of the undertaking. *Basile I,* 761 A.2d at 1120 (quoting *Scott v. Purcell,* 490 Pa. 109, 415 A.2d 56, 60 (Pa.1980)).

The Complaint alleges that ASCO and Donald Williamson were "agents" of the Board and "investment advisors." (Doc. 1 ¶ 171 .) As alleged in the Complaint, ASCO and Donald Williamson acted as agents of the Eoard and the Plan in many, if not all, of the twelve contracts at issue in this case. The further allegations that ASCO and Donald Williamson received commissions and withheld information from the Board and/or the Plan (e.g., the investment account statements were sent to ASCO, not the Board) amount to allegations of breaches of their common-law fiduciary duties. I find that the Complaint alleges a claim for which relief can be granted for breach of fiduciary duty against ASCO and Donald Williamson.

C) Count II--Aiding and Abetting Breach of Fiduciary Duty

*\*36* In Count II, Plaintiffs allege that various Defendants "aided and abetted" the breaches of fiduciary duties allegedly committed by Defendants Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson. All Defendants named in Count II challenge the claim on the grounds that the cause of action is not recognized in Pennsylvania. Plaintiffs acknowledge that the Pennsylvania Supreme Court has not recognized aiding and abetting breach of fiduciary duty, but they urge the Court to expand the law.

For issues of state law, the Court acts as if it were a state court, applying the state law as the state has constructed it, and interpreting novel questions in the manner the Court believes the state high court would interpret the issue. *Rolick v. Collins Pine Co.,* 925 F.3d 661, 664 (3d Cir.1991). However,

"it is not the role of a federal court to expand state law in ways not foreshadowed by state precedent." *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir.2002) (citing *Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 123 F.Supp.2d 245 (D.N.J.2000)). "[F]ederal courts may not engage in judicial activism. Federalism concerns require that we permit state courts to decide whether and to what extent they will expand state common law.... Our role is to apply the current law of the jurisdiction, and leave it undisturbed." *Leo v. Kerr-McGee Chem. Corp.*, 37 F.3d 96, 101 (3d Cir.1994) (quoting *City of Philadelphia v. Lead Indus. Ass'n*, 994 F.2d 112, 123 (3d Cir.1993)).

While some lower courts in Pennsylvania have recognized a cause of action for aiding and abetting breach of fiduciary duty, the number of cases is not overwhelming. *Lichtman v. Taufer*, 2004 WL 1632574 (Pa.Com.Pl. July 13, 2004) and *Koken v. Steinberg*, 825 A.2d 723 (Pa.Com.Pl.2003); *see also Burnside v. Abbott Lab.*, 351 Pa.Super. 264, 505 A.2d 973, 982-83 (Pa.Super.Ct.1985) (favorably discussing aiding and abetting, but then holding "this case is an improper vehicle for the initial consideration of this cause of action by a court of this Commonwealth").

I am hesitant to create an entirely new cause of action on the basis of two cases from the lower courts in Pennsylvania and dictum from a third court. I am not alone in my hesitation. In 2002, the United States District Court for the Western District of Pennsylvania dismissed a claim of aiding and abetting a breach of fiduciary duty on the same grounds. *Daniel Boone Area Sch. Dist. v.. Lehman Brothers, Inc.*, 187 F.Supp.2d 400, 413 (W.D.Pa.2002). I am aware that the United States District Court for the Eastern District of Pennsylvania has been more willing to expand Pennsylvania law to include aiding and abetting breach of fiduciary duty. *Adena, Inc. v. Cohn*, 162 F.Supp.2d 351, 357-58 (E.D.Pa.2001); *Stone Street Servs., Inc. v. Daniels*, Civ. A. No. 00-1904, 2000 WL 1909373, at *3 (E.D.Pa. Dec.29, 2000); *Kaiser v.. Stewart*, Civ. A. No. 96-6643, 1997 U.S. Dist. LEXIS 12788, at *53 (E.D.Pa. Aug. 20, 1997); *Schuylkill Skyport Inn, Inc. v. Rich*, Civ. A. No. 95-3128, 1996 U.S. Dist. LEXIS 12655, at *120 (E.D.Pa. Aug.21, 1996); *Wilbur W. Pierce v. Rosetta Corp.*, Civ. A. No. 88-5873, 1992 U.S. Dist. LEXIS 9065, at *6-7 (E.D. Pa. June 12, 1992). However, I am more persuaded by the caution urged by the Court of Appeals for the Third Circuit than I am by the non-biding decisions of the United States District Court for the Eastern District of Pennsylvania. Pennsylvania has not recognized a cause of action for aiding and abetting breach of fiduciary duty, and neither will I. Count II will be dismissed against all moving Defendants.

D) Count VIII--Unjust Enrichment

*37 The last claim in this action is for unjust enrichment against ASCO, Donald Williamson, FSC, Perfilio, JJI, JJJA, Joseph Joyce, John Joyce, Michael Joyce, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells Investment, and FSI.

Unjust enrichment is ... an equitable doctrine[, with the following elements:] benefits conferred on one party by another, appreciation of such benefits by the recipient, and acceptance and retention of these benefits under such circumstances that it would be inequitable [or unjust] for the recipient to retain the benefits without payment of value.

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir.2000) (quoting 16 SUMMARY OF PA. JUR.2D COMMERCIAL LAW § 2.2 (1994)) (alterations in original). Whether unjust enrichment is appropriate in a particular case "depends on the unique factual circumstances of each case." *Styer v. Hugo*, 422 Pa.Super. 262, 619 A.2d 347, 350 (Pa.Super.Ct.1993).

Plaintiffs allege that the Plan conferred the benefit of fees and commissions upon Defendants in this claim, and they allege that Defendants received those benefits. Plaintiffs further contend that these benefits were received unjustly because of the fraud and bribery involved in their procurement. At this early stage in the case, I cannot make the factual analysis required to determine whether the circumstances constitute an inequity warranting unjust enrichment, but it would be inappropriate to dismiss the equitable claim at this time. [FN26]

FN26. An unjust enrichment claim can be an equitable stand-in for a tort claim. *Allegheny Gen. Hosp.*, 228 F.3d at 446-7 (discussing

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 917-18 (3d Cir.1999), *cert. denied*, 528 U.S. 1105, 120 S.Ct. 844, 145 L.Ed.2d 713, (2000)). In the present case, Plaintiffs properly allege multiple tort claims, which strongly suggest that the unjust enrichment claim should remain in the action.

CONCLUSION

In summary, I will dismiss Count III against FCS, Perfilio, Joyce Associates, Inc., JJI, John Joyce, William Joyce, Michael Joyce, Wells, Wells REIT, Wells Investment, FSI, Safeco, and Devonshire because the Complaint fails to state a claim upon which relief can be granted. Counts IV and VI will be dismissed against Defendant Joyce Associates, Inc. because the Complaint fails to state a claim upon which relief can be granted. Count V will be dismissed against all moving Defendants because the Complaint fails to state a claim upon which relief can be granted. Count II will be dismissed against all moving Defendants because there is no such cause of action. The remaining claims will not be dismissed. Because of the complexity of the case, I include the summary of the remaining claims:

```
(1)    Count I      Breach of fiduciary duty--Defendants Makowski, Pizano,
                     Crossin, Jones, ASCO, and Donald Williamson;

(2)    Count II     Aiding and abetting breach of fiduciary duty--Defendant LPL;

(3)    Count III    Violating RICO § 1962(c), conducting and participating in an
                     enterprise by engaging in a pattern of racketeering activity -
                     Makowski, Pizano, Crossin, Jones, ASCO, Donald Williamson,
                     Maria Williamson, JJJA, JJ & B, Joseph Joyce, Manulife,
                     Nationwide, and LPL;

(4)    Count IV     Violating RICO § 1962(d), conspiring to violate § 1962(c)--all
                     Defendants except Joyce Associates, Inc.;

(5)    Count V      Violating RICO § 1962(b), acquiring and maintaining an
                     interest or control of an enterprise engaged in a pattern of
                     racketeering activity--Defendant LPL;

(6)    Count VI     Violating RICO § 1962(d), conspiring to violate § 1962(b)--all
                     Defendants except Joyce Associates, Inc.;

(7)    Count VII    Violating the Investment Advisors Act--Defendants Donald
                     Williamson and ASCO.

(8)    Count        Unjust enrichment--Defendants ASCO, Donald Williamson,
       VIII
                     FSC, FSI, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells
                     Investment, Perfilio, JJI, JJJA, Joseph Joyce, Michael Joyce,
                     and John Joyce.
```

*38 An appropriate Order follows.

ORDER

NOW, this 24th day of August, 2004, IT IS HEREBY ORDERED that Defendants' nine motions to dismiss (Docs. 46, 91, 93, 95, 96, 98, 100, 104, and 108) are GRANTED in part and DENIED in part as follows:

(1) Count II is DISMISSED against Nationwide Life Insurance Company, The Manufacturers Life Insurance Company (U.S.A.), Wells Real Estate Funds, Inc., Wells Investment Securities, Inc., Wells Real Estate Investment Trust, Inc., FSC Securities Corporation, First Security Investments, Inc., Safeco Life Insurance Corporation, Devonshire Capital Management, LLC, Joseph C. Perfilio, Joyce Associates, Inc., Joseph Joyce Insurance, Joseph J. Joyce Associates, Inc., Joyce Jackman & Bell Insurers, Joseph Joyce, Jr., William Joyce, Michael Joyce, John J. Joyce, and Maria Williamson;

(2) Count III is DISMISSED against Defendants FCS Securities Corporation, Joseph C. Perfilio, Joyce Associates, Inc., Joseph Joyce Insurance, John J. Joyce, William Joyce, Michael Joyce, Wells Real Estate Funds, Inc., Wells Real Estate Investment Trust, Inc., Wells Investment Securities, Inc., First Security Investments, Inc., Safeco Life Insurance Corporation, and Devonshire Capital Management, LLC;

(3) Count IV is DISMISSED against Defendant Joyce Associates, Inc.

(4) Count V is DISMISSED against all Defendants except Linsco Private Ledger Corporation;

(5) Count VI is DISMISSED against Defendant Joyce Associates, Inc.

(6) The motions are otherwise DENIED.

M.D.Pa.,2004.

Flood v. Makowski

2004 WL 1908221 (M.D.Pa.), Fed. Sec. L. Rep. P 92,899, RICO Bus.Disp.Guide 10,742

### Motions, Pleadings and Filings  (Back to top)

• 2004 WL 2151588 (Trial Motion, Memorandum and Affidavit) Defendants Joyce Associates, Inc., Joseph Joyce Insurance, Joseph J. Joyce Associates, Inc., Joyce Jackman & Bell Insurors, Joseph Joyce, Jr., John J. Joyce and William Joyce ("Moving Defendants") Reply Brief in Support of Their Motion to Dismiss P laintiffs' Complaint Pursuant to F.R.C.P. 12(b)(6) (Mar. 09, 2004)

• 2004 WL 2151592 (Trial Motion, Memorandum and Affidavit) Reply Brief of Defendant Fsc Securities Corporation in Support of its Motion to Dismiss the Complaint (Mar. 09, 2004)

• 2004 WL 2151597 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law of Asco Financial Group, Inc, Donald P. Williamson, Maria Williamson, Joseph C. Perfilio, Michael Joyce and Devonshire Capital Management, LLC in Response to Plaintiff's Consolidated Opposition (Mar. 09, 2004)

• 2004 WL 2151602 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of the Motion to Dismiss of Defendants Thomas A. Makowski, Thomas P. Pizano, Frank Crossin, And Joseph Jones (Mar. 09, 2004)

• 2004 WL 2151607 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of the Motion to Dismiss by Defendants Wells Real Estate Funds, Inc., Wells Real Estate Investment Trust, Inc., And Wells Investment Securities, Inc. (Mar. 09, 2004)

• 2004 WL 2151620 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of the Motion to Dismiss of the Manufacturers Life Insurance Company (U.S.A.) Pursuant to F.R.C.P. 12(b)(6) (Mar. 09, 2004)

• 2004 WL 2151623 (Trial Motion, Memorandum and Affidavit) Revised Reply in Support of Motion of Defendant Nationwide Life Insurance Company to Dismiss Plaintiff's Complaint (Mar. 09, 2004)

• 2004 WL 2151575 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of First Security Investments Inc.'s Motion to Dismiss (Mar. 08, 2004)

• 2004 WL 2151578 (Trial Motion, Memorandum and Affidavit) Reply Brief of Safeco Life Insurance Company to Plaintiffs' Consolidated Brief in Opposition to Motions to Dismiss Filed by Multiple Defendants (Mar. 08, 2004)

• 2004 WL 2151584 (Trial Motion, Memorandum and Affidavit) Defendants Joyce Associates, Inc., Joseph Joyce Insurance, Joseph J. Joyce Associates, Inc., Joyce Jackman & Bell Insurors, Joseph Joyce, Jr., John J. Joyce and William Joyce ("Moving Defendants") Reply Brief in Support of Their Motion to Dismiss P laintiffs' Complaint Pursuant to F.R.C.P. 12(b)(6) (Mar. 08, 2004)

• 2004 WL 2151564 (Trial Motion, Memorandum and Affidavit) Brief in Support of Plaintiffs' Motion to Strike Duplicative Motion to Dismiss Filed by Defendant Michael Joyce (Feb. 17, 2004)

• 2004 WL 2151569 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Consolidated Brief in Opposition to Motions to Dismiss Filed by Multiple Defendants (Feb. 17, 2004)

• 2004 WL 2151560 (Trial Motion, Memorandum and Affidavit) Response of Defendants Wells Real Estate Funds, Inc., Wells Real Estate Investment Trust, Inc., and Wells Investment Securities, Inc. to Plaintiffs' Emergency Motion for a Temporary Stay (Jan. 21, 2004)

• 2004 WL 2151553 (Trial Motion, Memorandum and Affidavit) Response of Defendants Thomas Makowski, Thomas Pizano, Frank Crossin, And Joseph Jones to Stephen Flood's Emergency Motion for a Temporary Stay (Jan. 20, 2004)

• 2004 WL 2151551 (Trial Motion, Memorandum and Affidavit) Brief in Support of Plaintiffs' Emergency Motion for Temporary Stay Pending Resolution of State Court Injunction Proceedings (Jan. 16, 2004)

• 2004 WL 2151545 (Trial Motion, Memorandum and Affidavit) Defendant Linsco Private Ledger Corporation's Reply in Support of its Motion to Compel Arbitration and to Stay Proceedings (Jan. 05, 2004)

• 2003 WL 23788233 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion to Dismiss of the Manufacturers Life Insurance Company (U.S.A.) Pursuant to F.R.C.P. 12 (b)(6) (Dec. 29, 2003)

• 2003 WL 23788227 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Brief in Opposition to

Defendant Linsco Private Ledger Corporation's Motion to Compel Arbitration and to Stay Proceedings (Dec. 24, 2003)

• 2003 WL 23788205 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Motion to Dismiss of Asco Financial Group, Inc, Donald P. Williamson, Maria Williamson, Joseph C. Perfilio, Michael Joyce and Devonshire Capital Management, LLC Pursuant to Frcp 12(b)(6) (Dec. 22, 2003)

• 2003 WL 23788210 (Trial Motion, Memorandum and Affidavit) Brief in Support of the Motion to Dismiss by Defendants Wells Real Estate Funds, Inc., Wells Real Estate Investment Trust, Inc., And Wells Investment Securities, Inc. (Dec. 22, 2003)

• 2003 WL 23788217 (Trial Motion, Memorandum and Affidavit) Defendants Joyce Associates, Inc., Joseph Joyce Insurance, Joseph J. Joyce Associates, Inc., Joyce Jackman & Bell Insurors, Joseph Joyce, Jr., John J. Joyce, William Joyce and Michael Joyce's ("Moving Defendants") Memorandum of Law in Support of Th eir Motion to Dismiss Plaintiffs' Complaint Pursuant to F.R.C.P. 12(b)(6) (Dec. 22, 2003)

• 2003 WL 23788221 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of Defendant Nationwide Life Insurance Company to Dismiss Plaintiff's Complaint (Dec. 22, 2003)

• 2003 WL 23788200 (Trial Motion, Memorandum and Affidavit) Safeco Life Insurance Company's Memorandum of Law in Support of its Motion to Dismiss Complaint or, Alternatively, For Summary Judgment (Dec. 19, 2003)

• 2003 WL 23788197 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion to Dismiss of Defendants Thomas A. Makowski, Thomas P. Pizano, Frank Crossin, And Joseph Jones (Dec. 12, 2003)

• 2003 WL 23788193 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Brief in Opposition to Motion to Dismiss of Defendants Asco Financial Group, Inc., Donald P. Williamson, Maria Williamson, Joseph C. Perfilio, Michael Joyce and Devonshire Capital Management, LLC (Dec. 05, 2003)

• 2003 WL 23788177 (Trial Pleading) Complaint (Oct. 09, 2003)

• 3:03CV01803  (Docket) (Oct. 09, 2003)

• 2003 WL 23788246 (Trial Motion, Memorandum and Affidavit) Defendant First Security Investments, Inc.'s Opposition to Plaintiff's Emergency Motion for a Temporary Stay (2003)

• 2003 WL 23788250 (Trial Motion, Memorandum and Affidavit) Defendants, Linsco Private Ledger Corporation and Fsc Securities Corporation's Response to Plaintiff's Emergency Motion for a Temporary Stay of Proceedings (2003)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.