# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : |
| | : |
| | : Chapter 7 |
| | : |
| STUDENT FINANCE CORPORATION, | : Case No. 02-11620-JBR |
| Debtor. | : |
| | : |
| | : |
| CHARLES A. STANZIALE, JR., | : |
| CHAPTER 7 TRUSTEE OF STUDENT | : |
| FINANCE CORPORATION, | : |
| | : |
| | : Adversary Proceeding |
| Plaintiff, | : No. |
| | : |
| v. | : JURY TRIAL REQUESTED |
| | : |
| MCGLADREY & PULLEN, LLP, and | : |
| MICHAEL AQUINO | : |
| Defendants. | : |

## COMPLAINT

Charles A. Stanziale, Jr., Chapter 7 Trustee ("Trustee") of Student Finance Corporation ("SFC" or "Debtor"), by and through his undersigned counsel, brings this Complaint under 11 U.S.C. § 544 on behalf of all creditors to the Estate and hereby represents in support of this Complaint as follows:

### Introduction

1.      This is an action for aiding and abetting fraud, fraud, fraudulent concealment, aiding and betting breach of fiduciary duty and negligent misrepresentation, brought by the Trustee on behalf of all creditors to SFC against Defendants McGladrey & Pullen, LLP, and McGladrey & Pullen accountant Michael Aquino ("Aquino") (collectively "McGladrey"), for McGladrey's knowing issuance of a materially false and misleading Independent Auditor's

Report on Consolidated Financial Statements as of and for the year ended December 31, 2000 ("Audit Report") and an Independent Accountant's Reports on Agreed-Upon Procedures dated February 21, 2001 ("Accountant's Reports") (collectively "Reports"). The Reports legitimized SFC's finances and financial practices through material misrepresentations and omissions that hid from creditors the one financial statistic creditors cared about -- and McGladrey knew they cared about -- above all others: the catastrophic level of actual student loan defaults and the secret loan payments SFC made, with McGladrey's knowledge, to disguise the true level of loan defaults in the loan pools SFC serviced and sold.

2.    SFC was a Ponzi-like scheme masquerading as a student loan business. SFC was represented to its creditors as a business that allegedly consisted of originating or purchasing sub-prime tuition loans made to students enrolled at truck-driving schools. SFC pooled the loans, securitized them and sold them to investment trusts. SFC also "serviced" the loan pools, accumulating student payments and submitting those payments to the investors who purchased the loan pools. Because these were securitized, sub-prime loans, the level of the defaults in the loan pools was a key factor in evaluating SFC's financial health for any creditor or investor. SFC promoted the alleged fact that its default rates did not exceed 20% and used this statistic to lure creditors.

3.    In fact, however, SFC's business was a Ponzi-like scheme. SFC abused its role as "loan servicer" by making payments on behalf of defaulting students which disguised the true default rate in the loan pools and allowed SFC to continue as an ongoing enterprise. The money SFC used to mask the student defaults was acquired in classic Ponzi fashion: SFC used proceeds from its borrowings and sales to later investors to make "payments" on what would otherwise be defaulting student loans purchased by prior investors. These payments on behalf of defaulting

students ("Ponzi payments") -- what SFC and McGladrey misleadingly dubbed "forbearance" payments -- were the vehicle by which SFC moved funds acquired from sales to later investors to pay earlier investors. The Ponzi payments allowed SFC to show lower, creditor-friendly, default rates in the loan pools. Lower default rates also allowed SFC to bring in more lenders and investors. More investors meant more money to pay earlier lenders and investors. More money also meant more funds from which the officers and directors could pay themselves.

4.     Essential to SFC's officers and directors' Ponzi-plan was that SFC have legitimate-seeming financial reports and that those reports hide the core of SFC's fraud. These reports were the bait SFC used to lure unsuspecting creditors and investors to the scheme. For those reports, SFC turned to McGladrey, a firm that promises "reliable, actionable financial information" and "audit excellence ... including systems to ensure consistency, objectivity and accountability, resulting in strict compliance with professional standards". McGladrey accountant Aquino was aware of the Ponzi payments as early as 1998 and knew that making the Ponzi payments "distorts the delinquency and default ratios of the [loan pool]." That wholly accurate assessment of the Ponzi payments never made it into McGladrey's Audit Report on SFC's financial statements-- a report that falsely stated "the financial statements ... present fairly, in all material respects, the consolidated financial position [of SFC] ... in accordance with generally accepted accounting principles". (Ex. A at 3.) Instead, the financial statements' "credit reserve" amount -- a proxy for the anticipated amount of loan defaults to anyone reading the financial statements -- did not reflect SFC's Ponzi payments. The distorting effect of the Ponzi payments on the credit reserve number is not mentioned anywhere in McGladrey's Audit Report or in the financial statements, despite McGladrey's knowledge that the credit reserve was

a material item in the audit and that the number reported in the financial statements was false and misleading.

5.    While McGladrey did not challenge the credit reserve figure for failing to reflect the Ponzi payments, McGladrey's Audit Report legitimized the use of the terms "forbearance" and "forbearance payments" at various points in the financial statements. The placement and wording of the "forbearance" statements in the financial statements were the product of heavy negotiation between McGladrey and SFC, reflecting both entities' awareness of its importance. Yet, McGladrey both endorsed SFC's use of the misleading and meaningless nomenclature ("forbearance") for the Ponzi payments and allowed SFC to avoid explaining what the term "forbearance" or "forbearance payment" meant. McGladrey's endorsement of SFC's cryptic mention of "forbearance" and "forbearance payments" -- a $9.5 million dollar figure in 2000 -- confirms McGladrey understood the fraudulent nature of this statement, knew the importance of the Ponzi payments to any creditor, and had a calculated desire to claim at some future date that the Ponzi payments were "disclosed". McGladrey's approval of the use of "forbearance" in the financial statements reflects McGladrey's awareness of the materiality of the Ponzi payments and is evidence of McGladrey's necessary assistance in SFC's efforts to obfuscate detection of the Ponzi payments by anyone reviewing the financial statements.

6.    Investors and creditors doing business with SFC were deceived by the apparent health of the company as represented by McGladrey's false Reports and continued to invest in SFC student loans and transact business with SFC as if it were a legitimate business. In the period of time between when McGladrey issued its false and misleading Reports and SFC's collapse, SFC's creditors extended hundreds of millions of dollars in credit to SFC. In certifying various SFC financial reports that failed to reflect the true impact of the Ponzi payments while

simultaneously making legitimate-seeming, but misleading, references to "forbearance",

McGladrey played a knowing, calculated and direct role in perpetuating the SFC Ponzi scheme

and in assisting SFC's officers and directors to defraud SFC's creditors and to deepen SFC's

insolvency while delaying the inevitable bankruptcy filing.

### Jurisdiction and Venue

7.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157, 1331, and 1334.

8.    This is an adversary proceeding brought pursuant to section 544(a) of title 11 of

the United States Code (the "Bankruptcy Code"), Federal Rule of Bankruptcy Procedure 7001

and other applicable state and local laws, on behalf of, and for the benefit of, SFC's creditors.

9.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

### The Parties

10.    Plaintiff, Charles A. Stanziale, Jr., is the duly-appointed Chapter 7 Trustee of

SFC, a Pennsylvania corporation with its principal place of business located at 170 Lukens

Drive, New Castle, Delaware 19720.

11.    Defendant McGladrey is an Iowa accounting firm headquartered in

Bloomington, Minnesota.

12.    Defendant Aquino is, on information and belief, a Managing Director and Partner

at RSM McGladrey, Inc., and on information and belief, is a resident of the State of

Pennsylvania.

13.    On June 5, 2002 ("Filing Date") an involuntary bankruptcy petition was filed

against the Debtor.  With the consent of SFC, on November 4, 2002, the Bankruptcy Court

entered an order for relief under chapter 11 of the Bankruptcy Code.

14.     On September 29, 2003, the Bankruptcy Court appointed Mr. Stanziale as Chapter 11 Trustee for the Debtor.

15.     On November 14, 2003 ("Conversion Date"), upon the expedited motion of Mr. Stanziale, the Bankruptcy Court converted the matter to chapter 7. On November 20, 2003, Mr. Stanziale was appointed as the Chapter 7 Trustee of SFC.

**Factual Background**

**A.    SFC and Its Fraudulent Business**

16.     SFC held itself out to investors and creditors as being in the business of originating and acquiring non-guaranteed student loans and tuition installment agreements ("Student Loans"), primarily from truck driving schools.

17.     At the outset of its operations, SFC limited its activities to traditional lending arrangements. It purchased bundles of pre-arranged Student Loans at a discount using funds borrowed from either commercial banks or private investors.

18.     As SFC expanded, its method of financing changed. With expansion, SFC financed its operation through securitization. Securitization allowed SFC to clear its credit lines, and thereby allowed the acquisition of additional Student Loans.

19.     The securitization process began with SFC's acquisition of Student Loans at a discount, using funds from a warehouse line of credit provided to certain of SFC's affiliates. SFC, through an affiliated entity, would pool the Student Loans. The warehouse lender would obtain a security interest in the acquired Student Loans.

20.     To complete the securitization transaction, SFC would sell the pooled Student Loans to an affiliated special purpose entity. The special purpose entity would transfer the Student Loans to a trust created by the special purpose entity. To fund the special purpose

entity's purchase of the Student Loans from SFC, the trust would sell either fixed-income trust certificates ("Certificates") or floating-rate notes ("Notes") to investors.

21.    Both the Certificates and Notes were backed by the principal and interest received from the Student Loans and represented an undivided interest in the Student Loans transferred to the Trusts. The Certificates and Notes were sold to investors in private placement transactions for which private placement memoranda were issued. The private placement memoranda purported to provide historical default rates on SFC student loans but, generally, such information was inaccurate.

22.    Because the Student Loans had been sold to the special purpose entities and subsequently transferred to the Trusts, payments by the borrowers underlying the Student Loans (the income stream) were remitted by SFC to the Trusts. SFC also purchased credit risk insurance policies to insure the income stream from the borrowers in case of loan default.

23.    Using the proceeds of the securitizations, the Debtor would pay the outstanding amounts owed to the warehouse lenders for SFC's acquisition of the Student Loans. Thus, through securitization, SFC replenished its warehouse line of credit.

24.    SFC and an affiliated entity retained the loan servicing function even though it had sold the loans. As servicer, SFC was to collect payments from borrowers and then submit those payments to the purchasers of the loan pools. If a borrower failed to pay, i.e., defaulted, on the loan, the purchaser would then collect on the insurance policies on the loans. All the participants -- except the schools themselves -- in the SFC program participated on the assumption that there would be a default rate of approximately 20% or less on the student loans.

25.    In fact, students failed to repay their loans in numbers much higher than the advertised 20% default rate. To ensure that the reported default rates remained below the

anticipated 20% level, however, SFC used income from its borrowings and sales to investors to make "payments" on what would otherwise be defaulting student loans. SFC was paying on loans that it had no interest in, or obligation to pay on, in order to mask the level of defaults. Internally, SFC called these payments on defaulted loans "forbearance payments". In reality, they were Ponzi payments -- payments made with money paid by the later investors in SFC's scheme to provide false "returns" to the earlier investors in SFC's scheme. SFC made these payments to obscure the true default rate in the loan pools.

26.     SFC also had a secret arrangement with the trucking schools where the borrowers were enrolled that the schools would make the initial payments on the SFC loans. Through this mechanism, SFC "seasoned" the loans so they appeared to SFC's creditors to be performing. SFC obscured the actual default rates in this way as well.

27.     SFC intentionally did not disclose the Ponzi and seasoning payments.

28.     SFC did not disclose in the private placement memoranda issued in connection with the eight securitizations or in other reports detailing the payments provided to investors and creditors that it and/or its affiliates were making payments to holders of student loans to disguise the fact that certain Student Loans were in default.

29.     Over time, the number of students failing to make timely payments on the Student Loans began to rise. With the rise in default rates, the rate and amount of Ponzi payments increased, and SFC used more and more funds from new bank loans and securitizations to make Ponzi payments. Proceeds from new bank loans and securitizations were being used to make Ponzi payments rather than to fund SFC's obligations to creditors.

30.     Using funds from new investors to pay earlier investors to make earlier student loans appear to be performing is a classic Ponzi-type scheme. Like all Ponzi schemes, SFC

could not have survived since it was not capable of paying its ever-increasing debts except with new monies that would eventually run out.

31.    Eventually, as was inevitable, SFC could not to pay its obligations as they came due. As of May, 2001, SFC was technically insolvent -- it liabilities exceed its assets. By September 2001, SFC was unable to fund its payments for student loan agreements from trucking schools. The monies that would be used to fund this purchase had been allocated to making Ponzi payments. Not until SFC was able to securitize newer loans was SFC able to fund its past purchases of Student Loans.

32.    Despite its inability to fund Student Loans, SFC sought to continue its practice of making Ponzi payments. To this end, before it was finally forced into bankruptcy, SFC obtained a number of multi-million dollar loans to continue its fraudulent business.

33.    The Ponzi payments were made with the intent to hinder, delay, or defraud SFC's creditors.

34.    McGladrey, by providing the necessary assistance in maintaining the appearance of SFC as a healthy, going concern notwithstanding knowledge of the hidden Ponzi and seasoning payments, aided and abetted SFC's officers' and directors' inducement of investors and other creditors to continue to do business with SFC and thus increased its indebtedness and damage to SFC's creditors.

**B.    McGladrey's Duties And Obligations As SFC's Independent Accountant and Auditor**

35.    Before the passage of the Sarbanes-Oxley Act of 2002 ("Act"), the preparation and issuance of audit reports was required to be in accordance with the American Institute of

Certified Public Accountants ("AICPA") Code of Professional Conduct and standards promulgated by the AICPA Auditing Standards Board ("ASB").[1]

36.    The ASB is the committee of the AICPA designated to issue auditing, attestation and quality control standards and guidance.  Rule 202 of the AICPA Code of Professional Conduct requires AICPA members who perform professional audit services, like McGladrey, to comply with standards promulgated by the ASB.

37.    The ASB develops and issues standards in the form of Statements on Auditing Standards ("SAS"), Statements on Standards for Attestation Engagements and Statements on Quality Control Standards.  "AU" refers to the sections in the AICPA *Professional Standards* which codify Generally Accepted Auditing Standards ("GAAS").  GAAS provides ground rules for audits, including McGladrey's audit of SFC.  Indeed, McGladrey's Audit Report claims to have been prepared pursuant to GAAS.  Likewise, McGladrey's Accountant's Reports claim to have been prepared in accordance with AICPA standards.

38.    There are ten GAAS auditing standards.  The ten standards are categorized in three categories:  general standards, standards of field work and standards of reporting.  Under the general standards, McGladrey was to maintain an "independent" state of mind "in all matters relating to the assignment" and to exercise "[d]ue professional care . . . in the performance of the audit and the preparation of the report."  Under the field work standards, McGladrey had to determine "the nature, timing, and extent of tests to be performed" based on a "sufficient understanding of internal control."

---

[1] Background information from AICPA Professional Standards - *Applicability and Integration of AICPA Professional Standards and PCAOB Standards.*

39.    Under GAAS' four standards of reporting, McGladrey's Reports had to, among other things: (1) state whether the financial statements were presented in accordance with generally accepted accounting principles (GAAP); (2) ensure the financial statements contained informative disclosures that were "reasonably adequate" by negative affirmation; and (3) express McGladrey's true opinion regarding the financial statements, taken as a whole.

40.    The AICPA Professional Standards are not limited to the basic auditing standards. GAAS includes many other requirements affecting all aspects of the professional services rendered by auditors.

41.    AU § 333.02 expressly warns that client representations cannot "substitute for the auditing procedures necessary to afford a reasonable basis for" the auditor's "opinion on the financial statements."

42.    Regarding fraud, GAAS requires auditors to be aware of intentional wrongdoing by management.  Specifically, an auditor has "a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud," *see* AU § 110, and to assess the risk of fraudulent financial reporting and accounting irregularities and to respond appropriately.  *See* AU § 316. McGladrey instead did neither.  McGladrey endorsed financial statements McGladrey knew were fraudulent and misleading.

43.    Additionally, GAAS also requires auditors to exercise "professional skepticism" in conducting an audit, to plan for the possibility of fraud, to report potential wrongdoing to appropriate levels of authority, and to avoid reliance upon client representations with respect to important audit issues.

44.    One of the key responsibilities of an auditor is to identify material areas for the audit based on the nature of the business of the audited entity. AU § 312, *Audit Risk and Materiality in Conducting an Audit*, provides guidance on the consideration that should be given to material matters in audit planning, execution of audit procedures and reporting on financial statement matters by the independent accountant.

45.    AU § 312.10 provides:

"The auditor's consideration of materiality is a matter of professional judgment and is influenced by his or her perception of the needs of a reasonable person who will rely on the financial statements. The perceived needs of a reasonable person are recognized in the discussion of materiality in Financial Accounting Standards Board Statement of Financial Accounting Concepts No. 2, Qualitative Characteristics of Accounting Information, which defines materiality as 'the magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.'"

46.    In addition, AU § 312.34 provides:

"In evaluating whether the financial statements are presented fairly, in all material respects, in conformity with generally accepted accounting principles, the auditor should consider the effects, both individually and in the aggregate, of misstatements that are not corrected by the entity. In evaluating the effects of misstatements, the auditor should include both qualitative and quantitative considerations...."

47.    The credit process including underwriting, bad debt reserving and payments was the most material activity at SFC and should have been deemed a "Critical Audit Area", warranting the greatest level of focus and attention, the largest portion of the audit budget, the most experienced level of personnel, and the highest level of review of the audit work. McGladrey, in knowing violation of its professional and ethical obligations, endorsed SFC's materially misleading financial statements.

48.     Paragraph 41 of Statement on Auditing Standards No. 75, *Engagements to Apply Agreed-Upon Procedures to Specified Elements, Accounts, or Items of a Financial Statement*, which was applicable during the period covered by McGladrey's Accountant's Reports, provides guidance on "Knowledge of Matters Outside Agreed-Upon Procedures": "... if, in connection with the application of agreed-upon procedures, matters come to the accountant's attention by other means that contradict the basis of accounting for the specified elements, accounts, or items of a financial statement referred to in the accountant's report, the accountant ordinarily should include this matter in his or her report...".

49.     While McGladrey's accountant, Aquino, knew of the distorting effects of the Ponzi-payments on the loan pools since at least 1998, McGladrey made no mention of SFC's practice of making "forbearance" payments in McGladrey's Accountant's Reports. The nature of the forbearance payments and its impact should have been disclosed in the Accountant's Reports in accordance with professional standards.

50.     The AICPA *Professional Standards* also require an auditor to evaluate and test an entities' status as a going concern. AU § 341, *The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern*, "... provides guidance to the auditor in conducting an audit of financial statements in accordance with generally accepted auditing standards with respect to evaluating whether there is substantial doubt about the entity's ability to continue as a going concern." (AU § 341.01). Likewise, AU § 341.02 provides: "The auditor has a responsibility to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited." And, AU § 341.12 states: "If, after considering identified conditions and events and management's plans, the auditor concludes that substantial doubt about the

569214v1

- 13 -

entity's ability to continue as a going concern for a reasonable period of time remains, the audit report should include an explanatory paragraph (following the opinion paragraph) to reflect that conclusion." McGladrey failed to comply with its professional obligations to disclose that SFC was on the brink of insolvency at the time McGladrey issued its Audit Report in April, 2001.

### C. McGladrey Retained By SFC In 1998: McGladrey Knows Payments By SFC "On Behalf" Of Borrowers "Distorts The Delinquency And Default Ratios Of The Pool"

51.    At least as early as 1998, SFC retained defendant Michael Aquino to perform accounting and audit services for SFC. While Mr. Aquino changed employers several times, he consistently provided these services to SFC through at least 2001. Thus, his knowledge of SFC's practices is imputed to McGladrey, who employed him from approximately 2000 through the present.

52.    In 1998, as part of his work, Aquino, and his associate Jeff Westad, reviewed student loan files and loan servicer reports that SFC provided to investors and creditors in connection with the securitizations and transactions relating to the maintenance of SFC's business. For example, the servicer reports were provided to the insurance company that insured the loss that would result from defaulting student loans.

53.    In particular, in 1998, Aquino and Westad reviewed SFC's servicer reports for SFC Grantor Trust Series 1996-1, SFC's first securitization. On May 22, 1998, Westad, then working with Aquino, faxed to SFC a draft of a report that shows that Aquino already knew that (a) SFC was making loan payments on behalf of students and (b) such payments materially altered the appearance of SFC's finances:

> The Servicer [SFC] has made a payment on behalf of two of the students tested in 1996. The effect of this is that the certificate holders receive a better yield than they would have, had the loan defaulted and the claim been filed. Also the insurance company does not have to pay on a claim at that time. Another effect of the practice is that it distorts the delinquency and default ratios of the pool.

54. Tellingly, the payments SFC is making on behalf of students are not described as "forbearance payments". They are described as exactly what they are: servicer payments on behalf of students. This 1998 communication shows that the Aquino team was aware of: (1) SFC's central fraudulent act -- paying defaulted loans on behalf of borrowers; (2) that SFC's payments on behalf of defaulted borrowers "distorted" SFC's financial report; and (3) that entities extending credit to SFC would be concerned about the practice.

55. The May 22, 1998 draft triggered an internal SFC memo dated June 2, 1998, expressing concern about the auditor's discovery:

> From all indications, the foundation of the auditor's opinion is that SFC (Servicer) is making payments on behalf of the borrowers using the Servicer's own funds and is relieving the borrower of having to make [these] payments. This tends to imply that the Servicer is implementing a new process after the fact specifically for the purpose [of] curing delinquencies and avoiding insurance claims. . . . This being said, compliance with the requirements should not be construed to distort, as if something is being done that shouldn't, but rather as an integral function in deriving the actual performance ratios.

The May 22, 1998 memo is evidence of SFC's attempts to improperly, and successfully, influence McGladrey's reports in violation of McGladrey's professional responsibilities that would last through 2001.

56. On June 17, 1998, Westad faxed another draft of the report containing substantially the same statement as that listed in paragraph 45. On July 24, 1998, following requests for revisions from SFC, the Aquino team sent a third draft of the report to SFC. The revised draft attempted to justify the payments for students, but still retained the plain language regarding the distorting effect such payments had on default rates:

> Another effect of this practice is that it distorts the delinquency and default ratios of the pool. However, the distortion is comparable to the payments being made by any other co-maker of the loans.

The July 24, 1998 draft also discloses that the McGladrey accountants were aware that (1) loans were being paid by SFC using "liquidity reserves", but wrongly not reported as delinquent, (2) loans were past due and not funded from any reserve, but were not being classified as delinquent, and (3) claims were not being filed on defaulted loans. All the above practices formed the core of SFC's fraud -- pay on behalf of borrowers so true default rates are not exposed -- and the McGladrey accountants were both aware of the practices and of their distorting effect on SFC's financial reporting in 1998.

### D. McGladrey's 2001 "Independent Auditor's Report": McGladrey's Materially False And Misleading "Opinion" Blessing SFC's Fraudulent Financial Statement

57.    On April 6, 2001, McGladrey issued the Audit Report that provided McGladrey's opinion of SFC's 2000 financial statements. McGladrey, who pronounced in the Audit Report that it had complied with GAAS, stated:

> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Student Finance Corporation and subsidiaries as of December 31, 2000, and the consolidated results of their operations and their cash flows for the year ended in conformity with generally accepted accounting principles.

This statement is false and McGladrey knew it was false when McGladrey issued the Audit Report in 2001. The SFC financial statements, as the Aquino team recognized three years earlier in 1998, distorted the delinquency and default ratios of the SFC program by not clearly accounting for or disclosing the Ponzi-like nature of the payments SFC was making to cover borrower defaults and of which McGladrey was fully aware.

#### Allowance For Credit Losses

58.    SFC was, at least in name, a loan business. The default rate of the loans SFC was securitizing and selling was highly material to any creditor or investor of SFC. The default rate, more than any other piece of financial information, reflected the quality and health of the loan

pools SFC sought to sell. In the Financial Statements, SFC's representation of its default rate was reflected in its "Allowance For Credit Losses". For McGladrey, this should have been a "Critical Audit Area."

59.    Section 2 of the Notes to the Financial Statements relates to "Receivables and Allowance for Credit Losses" which were loans that SFC had available for sale. For the year 2000, the Notes disclose that there are $60.471 M in "loans receivable available for sale" and that there is a 10% -- $6.047 M -- "allowance for credit losses". McGladrey audited the figure in the Notes to the Financial Statements, describing the allowance as "based upon . . . [the] historical credit loss experience" of SFC. Properly reported, the allowance for credit losses would tell a potential creditor or investor the amount of funds that SFC is setting aside to cover future loan defaults based on the past performance of its loan pools. McGladrey knew that the 10% figure SFC listed in the Audit Report as allowance for credit losses for 2000 -- $6,047,000 -- was material, grossly understated, and false. Indeed, given that SFC had been manipulating the reported default rate -- by making Ponzi-payments -- since at least 1998, there was no true "historical" or predictive credit loss experience on which "allowance for credit losses" could be based.

60.    As McGladrey knew, SFC had been paying on loans itself on a massive scale to mask defaults since at least 1998, so the 10% "allowance for credit losses" figure in the financial statements did not reflect an allowance for true defaults, but only the defaults not covered-up by SFC's Ponzi payments. McGladrey did not disclose, and permitted SFC to cover-up, that the 10% figure for loan defaults -- "credit losses" -- in 2000 was based on SFC's Ponzi payments. Neither in the "Receivables" section of the Financial Statement nor in the definition of "Credit Losses" is there any reference to SFC's having made "forbearance payments" or any other type of

payment on behalf of borrowers that would, as the McGladrey accountants had stated three years before, "distort[] the delinquency and default ratios of the [loan pool]."

61.     The 10% "allowance for credit losses" figure is also flawed because it represents an approximate 9% reduction in "allowance for credit losses" by SFC at a time when loan defaults on loans SFC had sold, and SFC's Ponzi-payments on those defaults, were skyrocketing, as McGladrey was aware. Yet, despite knowing that defaults impacting a Critical Audit Area were exploding, and despite knowing that SFC was covering up those defaults, McGladrey blessed SFC's reduction in "allowance for credit losses".

                                   "Forbearance"

62.     McGladrey no only blessed the 10% allowance for credit losses in the "Receivables" section of the Financial Statements without any mention or reference of the impact of SFC's Ponzi payments on the allowance for credit losses, McGladrey endorsed the misleading and oblique references to "forbearance" contained in the "Securitization and Retained Beneficial Interest" section of the Financial Statements. The "Securitization" section of the Financial Statements addressed older loan pools that SFC had already sold but in which SFC still maintained a limited financial interest. Because SFC was the loan servicer on these pools, SFC was aware when a borrower defaulted. Rather than permit all borrower's defaults to be recognized by the purchasers of the loan pools, SFC made Ponzi payments on these pools -- that is, SFC made loan payments when borrowers defaulted, even though SFC had zero obligation to do so -- in order to mask the true default rate in the pools. SFC wanted to mask the defaults in these pools to be able to advertise a creditor-friendly default rate that enticed creditors to participate in the SFC program. McGladrey's Audit Report allowed SFC to continue to draw

creditors into the SFC program because McGladrey allowed SFC to mask the true rate of defaults.

63.    McGladrey knew that SFC was making the Ponzi payments and that the payments "distorted" the default rates in the pools by making it appear that the pool default rates were much lower than they actually were. If the impact of the Ponzi payments were understood by investors and creditors and the true level of defaults were revealed, SFC could not sell more loan pools and the scheme would collapse. At the same time, since the McGladrey accountants knew about the Ponzi payments, some level of disclosure -- enough for the McGladrey accountants to say disclosure was made while not enough to inform any investor or creditor of the true nature of SFC's business -- was needed. This resulted in the use of the word "forbearance" in the Financial Statements.

64.    SFC had dubbed its Ponzi payments "forbearance payments", a term that only had meaning to SFC's insiders and its accountants. "Forbearance payments" does not describe what the payments were. No forbearance agreement was in place with the borrower. Even if one were, forbearance in the student loan context typically means a temporary cessation of payments *by the borrower*, or an extension of time provided *to the borrower* for making payments, not making full, voluntary, and undocumented payments on behalf of a defaulted borrower. SFC's Ponzi-payments were not "forbearance" of any kind. The "forbearance" payments were simply full loan payments made by SFC instead of the borrower to hide the actual default rate in the sold loan pools. SFC had no obligation whatsoever to make these payments and they were made solely to deceive SFC's creditors.

65.    Nevertheless, McGladrey "blessed" SFC's misleading and meaningless term -- "forbearance" and, in one instance, "forbearance payments" -- in the financial statements and

then failed to define or explain it anywhere in the Audit Report or to insist on an explanation in the footnotes to the financial statements. Given that "forbearance" treads on a Critical Audit Area -- indeed *the* Critical Audit Area of McGladrey's SFC audit -- "forbearance" should have been subject to McGladrey's highest level of scrutiny as well as the highest level of disclosure and explanation in the Audit Report. Instead, "forbearance" receives none. SFC devoted an entire paragraph in its Notes to the Financial Statements to describing "allowance for credit losses", a $6 M figure in the financial statements and a term familiar in the accounting profession, but does not offer a single word of explanation for the term "forbearance payments", a $9.5 M figure in the Audit Report and a meaningless and misleading term in the context of the financial statements.

66.    "Forbearance" and "forbearance payments" are used three places in the Financial Statements in relation to "Securitized" sold loans. SFC mentioned "forbearance" after a table presenting "quantitative information about delinquencies, net credit losses and components of securitized financial assets", stating: "The above information reflects reserve forbearance." In the context of a section discussing loans 60 or more days past due and also discussing net credit losses, calling SFC's Ponzi payments to cover up loan defaults "forbearance" -- not even "forbearance payments" -- is intentionally misleading, given what McGladrey knew about the distorting effect of SFC's Ponzi payments.

67.    The phrase "the above information reflects school reserve forbearance" is a purposely misleading, selective and cryptic disclosure that does not tell any investor or creditor reviewing the financial statements what they really needed to know (and what McGladrey knew they needed to know): That the principal balance of loans past due and the credit losses for the

pools were all false because the true amounts of loans past due and percentage of credit losses were all "distorted" by the Ponzi payments.

68. The Financial Statements do not provide any clarification of "school reserve forbearance" in the "Summary of Significant Accounting Policies" section on "School Reserves." In the notes on "School Reserves" SFC states:

> The school reserve may include additional amounts designated to absorb forbearance made in accordance with school and borrower agreements and potential credit losses for sold loans based upon the deemed credit quality of the borrower.

The use of the term "forbearance" in the above sentence is meaningless and does not comport with the commonly understood definition of "forbearance". SFC, with McGladrey's blessing, did not include the one word -- payments -- that would have lent the sentence some meaning ("to absorb forbearance payments made in accordance . . . ") and would have at least remotely connected "forbearance" with the use of the phrase "forbearance payments" in the "School Reserves" summary of activity later in the financial statements.

69. Finally, the Financial Statements state, in the "School Reserves" summary of activity, that approximately $9.5 M in "forbearance payments" were made in 2000. (Financial Statements at 22.) While "forbearance payments" are $4 M greater than the "allocations to allowance for credit losses" listed in the school reserves activity summary, and just as material as "allowance for credit losses", "allowance for credit losses" were addressed in the Financial Statement's "Summary Of Significant Accounting Policies" but "forbearance payments" were not. The omission was material and purposeful.

70. "Forbearance payments" are a separate line item from "allowance for credit losses". This created the impression that they represented two different things when in fact they were the same thing: money set aside (credit losses) or paid (forbearance) to address student

569214v1

loan defaults. Thus, the true amount of funds SFC allotted toward addressing student loan defaults in sold pools in 2000 was nearly $15 M, not the $9 M in "forbearance" or the $ 5 M in "allowance for credit losses". Separating "forbearance" from "credit losses" would only have been meaningful if McGladrey had insisted on an explanation of the term in the Financial Statements. They did not.

### E. McGladrey's Negotiation With SFC On "Forbearance" Terminology For The Audit Report

71.    The use of the term "forbearance" in the Financial Statements that McGladrey audited, evaluated, tested and reported on, was no accident. The use of "forbearance" was carefully calculated and thoroughly negotiated by SFC and McGladrey. Both McGladrey and SFC knew that using the term "forbearance" in the Financial Statements was materially important and ultimately meaningless.

72.    On April 28, 2000, SFC's president, sole-shareholder and the force behind the Ponzi scheme, Andrew Yao, sent an agenda to Aquino. On the Agenda for their May 2, 2000 meeting was "School Agreement - forbearance".

73.    The following year, on March 27, 2001, on the eve of McGladrey issuing the Audit Report, Diane Messick, SFC's controller and assistant treasurer conveyed Mike Aquino's concern that there be something in writing indicating that Royal Indemnity, SFC's largest creditor, "under[stood] [SFC's] forbearance policy." At the time neither Royal nor any other creditor understood that SFC was making Ponzi payments, let alone put it in writing.

74.    The next day, on March 28, 2001, Diane Messick again conveyed Aquino's interest in "forbearance":

> Mike Aquino has requested a meeting with you to discuss forbearance in further detail. He would like a management letter explaining how the process is being managed, in light of the increase in forbearance applied from 1999 to 2000.

Aquino's reference is apparently to page 22 of the financial statements, reflecting an over $7 M increase in "forbearance payments" from 1999 to 2000. From 1999 to 2000, "forbearance payments" more than quadrupled -- from $2 M to over $9M -- and yet Aquino did not insist on an expanding disclosure in the financial statements explaining that "forbearance payments" actually reflects that SFC's payments on defaulted loans quadrupled in a single year, with a consequent distortion of SFC's actual default rates.

75.   McGladrey clearly knew and understood that the term "forbearance" was both material and misleading. Yet, in violation of GAAS standards, McGladrey allowed "forbearance" to be used in the financial statements, and then provided a false opinion in the Audit Report that the financial statements "fairly" presented SFC's financial picture in "all material respects" when McGladrey knew and believed the contrary: that the use of "forbearance payments" "distorts the delinquency and default ratios of the [loan pool]".

### F. McGladrey's Knowingly False Accountant's Report

76.   SFC issued Monthly Servicer Reports ("MSRs") that were supposed to reflect the current financial state, including the default rate, of the loans SFC was servicing. McGladrey issued its Accountant's Reports, allegedly pursuant to AICPA standards, verifying the MSRs. While McGladrey was following agreed-upon procedures in its Accountant's Reports, under AICPA standards, McGladrey had disclosure obligations regarding "knowledge of matters outside agreed-upon procedures".

77.   Since at least 1998, McGladrey accountant Aquino knew that SFC was making "forbearance" payments that allowed SFC to manipulate the default rate in the loan pools. The MSRs, as McGladrey knew, did not disclose the true default rate of the loan pools, but instead reflected default rates that were "distorted". Regardless of McGladrey's use of agreed-upon

569214v1

- 23 -

procedures, McGladrey had knowledge of material information that contradicted the basis for the accounting in the MSRs. Under the AICPA standards that McGladrey was purporting to issue its Accountant Reports, McGladrey had a duty to disclose its knowledge of the distorting effect of the "forbearance" payments. McGladrey did not do so. Instead, as it did every other time it had the opportunity, McGladrey decided not to disclose SFC's Ponzi payments and blessed SFC's misleading financial reporting, which allowed SFC to continue as a going concern to the further harm of SFC's creditors.

### G. McGladrey's Failure To Address SFC's Inability To Continue As A Going Concern

78.     McGladrey issued its Audit Report in April, 2001. By May, 2001 -- one month later -- SFC's liabilities exceeded its assets, *i.e.*, it was insolvent. McGladrey's Audit Report does not disclose, as it should have under AICPA *Professional Standards*, that SFC was on the brink of insolvency. McGladrey's misleading Audit Report offered SFC's officers and directors the ability to sustain SFC as a going concern for approximately another year while SFC deepened its insolvency and while SFC's creditors, lacking McGladrey's knowledge of SFC's true financial state, poured hundreds of millions of dollars into SFC.

### COUNT I

### AIDING AND ABETTING FRAUD

79.     The Trustee incorporates paragraphs 1-78 as though fully set forth herein.

80.     The directors and officers of SFC issued servicer reports and audited financial statements to SFC's creditors that failed to disclose the Ponzi payments. In part through use of McGladrey's Reports, the directors and officers defrauded SFC's creditors into believing that they were doing business with a legitimate business when in actuality, they were entering into transactions with a fraudulent Ponzi scheme.

81. The directors and officers knew that McGladrey's Reports were false because they failed to disclose the true default rate of the student loans that formed the foundation of SFC's business and also failed to disclose SFC's practice of paying itself on defaulted loans to mask true default rates.

82. The directors and officers intended to induce creditors to do business with SFC by misrepresenting SFC as a legitimate business and hiding its true nature as a Ponzi scheme.

83. SFC's creditors relied on the inaccurate financial reports issued by SFC's directors and officers that failed to disclose the impact of SFC's Ponzi payments on the justifiable belief that SFC was a legitimate business and were damaged thereby when they consequently did business with SFC.

84. Because of its work on SFC's financial statements, McGladrey knew (1) SFC was a Ponzi scheme that would inevitably end in SFC's insolvency, (2) that the financial reports provided to SFC's creditors misrepresented the financial impact of SFC's Ponzi payments, and (3) SFC's creditors were not told this information. By certifying financial Reports McGladrey knew were misleading and deceptive and that McGladrey knew would be used by SFC with creditors, and by not requiring that SFC disclose its misrepresentations to creditors, McGladrey aided and abetted SFC's directors' and officers' fraud on SFC's creditors.

## COUNT II

## FRAUD

85. The Trustee incorporates paragraphs 1-84 as though fully set forth herein.

86. In 2001, McGladrey issued its Audit Report which contained both SFC's consolidated financial statements and notes thereon. The Audit Report and financial statements contain the following false statements made by McGladrey: (1) McGladrey's false opinion that

the financial statements fairly presented SFC's financial position in all material respects in conformity with GAAP and (2) McGladrey's statement that the audit was conducted in accordance with GAAS. Likewise, McGladrey's Accountant's Reports state that they were performed according to AICPA standards and that statement was false.

87.    McGladrey knew that its opinion expressed in its Audit Report was not its true opinion because McGladrey knew that the financial statements disguised the fact that loan defaults were miscategorized on the balance sheet to create the impression that SFC had lower defaults than was actually the case.

88.    Likewise, McGladrey knew that SFC was making payments on loans on which SFC had no obligation to pay solely to disguise the true default rate in the loan pools. McGladrey knew this "distorted" the financial statements yet expressed the "opinion" that the financial statements were materially accurate.

89.    McGladrey also knew that it had not conducted its audit in accordance with GAAS. Among other things, McGladrey knew that materially false information was included in SFC's financial statements, a violation of GAAS and GAAP, and McGladrey knew that it allowed SFC to manipulate the language and content of the financial statements to obscure the impact of SFC's Ponzi payments, also a violation of GAAS. All of McGladrey's failures to abide by GAAS and GAAP centered in a Critical Audit Area.

90.    McGladrey also knew its Account's Reports were not performed in accordance with AICPA standards because they failed to disclose McGladrey's knowledge of the Ponzi-payments and the payment's impact on the Account's Reports. McGladrey not only did not conform to AICPA standards, they violated those standards.

91.     As a certified public accounting firm, McGladrey intended that the public, including the creditors of SFC, rely on McGladrey's materially misleading Audit Report, and that SFC's creditors continue to do business with SFC.

92.     SFC's creditors justifiably relied on McGladrey's misleading Audit Report because McGladrey was a certified public accounting firm which was in the business of certifying financial statements.

93.     Injury to SFC's creditors resulted from McGladrey's misleading Audit Report because they continued to do business with and extend credit to a company, SFC, whose business was a sham and whose financial statements did not, has McGladrey knew, "present fairly, in all material respects, the consolidated financial position of [SFC]".

## COUNT III

## FRAUDULENT CONCEALMENT

94.     The Trustee incorporates paragraphs 1-93 as though fully set forth herein.

95.     McGladrey claimed that the Accountant's Reports were performed pursuant to AICPA standards and procedures. Those standards required that where McGladrey had material information that contradicted the information shown by the agree-upon procedures applied in McGladrey's Accountant's Report that McGladrey disclose it.

96.     While McGladrey knew the impact of the SFC's Ponzi-payments and had an obligation to disclose its knowledge, McGladrey deliberately concealed that information in its Accountant's Reports. McGladrey knew that by not disclosing its knowledge of the Ponzi-payments, the Accountant's Reports on the misleading MSRs would themselves be misleading, when also claiming that they were performed according to AICPA standards and procedures.

97.  As with McGladrey's Audit Report, as a public accounting firm, McGladrey knew, understood and expected that SFC's investors and creditors would rely on the Accountant's Reports.

98.  SFC's investors and creditors justifiably relied on the Accounting Reports in extending further credit to SFC and were injured by their reliance.

## COUNT IV

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

99.  The Trustee incorporates paragraphs 1-98 as though fully set forth herein.

100.  As of May, 2001, SFC was technically insolvent, that is, its assets exceeded its liabilities. Once a company is insolvent, its officers and directors have a fiduciary duty to the company's creditors to, among other things, not deepen the insolvency of the company.

101.  McGladrey issued its Audit Report in April, 2001, one month before SFC became insolvent. Under the GAAS, McGladrey had a duty to evaluate SFC's ability to continue as a going concern for the coming year and to express McGladrey's "substantial doubt" as to SFC's ability to continue. Given that SFC was insolvent approximately a month after McGladrey issued its Audit Report, McGladrey knew of SFC's impending insolvency but failed to disclose this fact in its Audit Report.

102.  As public accountants, McGladrey, upon information and belief, knew that SFC's officers and directors had a fiduciary duty to SFC's creditors not to further SFC's insolvency. By continuing to take on hundreds of millions of dollars in credit obligations, SFC's officers and directors did deepen SFC's insolvency and breached their fiduciary duty to SFC's creditors. McGladrey was aware in their role as SFC's independent accountants and auditors that SFC's

officers and directors were breaching their duties to SFC's creditors by furthering SFC's insolvency.

103.    McGladrey offered substantial assistance to SFC's officers and directors in their breach of fiduciary duties by issuing the Reports. The Reports legitimized SFC's financial practices and were used by SFC's officers and directors to lure creditors into the scheme. But for McGladrey's imprimatur, SFC's directors would not have been able to lure creditors and deepen SFC's insolvency for approximately a year.

104.    By issuing and then failing to amend or revise their Reports, McGladrey aided and abetted SFC's officers and directors breach of their fiduciary duties to SFC's creditors during SFC's period of insolvency.

## COUNT V

### NEGLIGENT MISREPRESENTATION

105.    The Trustee incorporates paragraphs 1-104 as though fully set forth herein.

106.    SFC necessarily paid McGladrey to certify its financial statements with the Audit Report. McGladrey also certified the SFC's MSRs. McGladrey, as a public accountant, provided such reports in the normal course of business.

107.    In 2001, McGladrey issued its report of its audit of SFC's consolidated balance sheet as of December 31, 2000, which contained the misrepresentation that it was McGladrey's opinion that the financial statements fairly presented SFC's financial position in all material respects and that McGladrey's audit of SFC was done pursuant to GAAS; in fact, McGladrey had no such opinion and its audit was inconsistent with GAAS standards.

108.  Likewise, McGladrey issued its Accountant's Report on the MSRs in 2001 that contained the misrepresentation that it was conducted pursuant to AICPA standards. The report also failed to disclose material information that McGladrey had a duty to disclose.

109.  McGladrey necessarily knew that SFC would provide the Reports to major creditors and that such major creditors would rely on the Reports in connection with doing business with SFC.

110.  SFC's creditors were damaged when they relied on McGladrey's Reports because they continued to do business with and extend credit to a company, SFC, whose business was a sham.

## COUNT VI

### AVOIDANCE OF FRAUDULENT TRANSFERS
### (11 U.S.C. § 548(a)(1)(A))

111.  The Trustee incorporates paragraphs 1-110 as though fully set forth herein.

112.  During McGladrey's tenure as SFC's independent auditor and accountant, SFC made transfers to McGladrey in the amount of $2,288,000 in the period from June 1, 2001 through June 5, 2002.

113.  SFC made the transfers to McGladrey with the actual intent to hinder, delay and defraud SFC's creditors.

114.  When SFC made the transfers to McGladrey, SFC was insolvent, and the transfers deepened SFC's insolvency. SFC was unable to pay its current obligations as they came due without resorting to additional financing.

115.  The transfers to McGladrey occurred within one year of SFC's bankruptcy filing date.

116.  The transfers to McGladrey were made voluntarily by SFC.

569214v1

## COUNT VII

### AVOIDANCE OF FRAUDULENT TRANSFERS
### (11 U.S.C. § 544, 6 Delaware Code § 1304(a)(1))

117.    The Trustee incorporates paragraphs 1-116 as though fully set forth herein.

118.    SFC made transfers to McGladrey in the amount of $2,388,000 in the period from June 6, 1998 through June 5, 2002.

119.    SFC made the transfers to McGladrey with the actual intent to hinder, delay and defraud SFC's creditors.

120.    The transfers to McGladrey occurred shortly before and shortly after substantial debts were incurred.

121.    The transfers to McGladrey occurred within four years of SFC's bankruptcy filing date.

122.    The transfers to McGladrey were made voluntarily by SFC.

569214v1

WHEREFORE, the Trustee requests that the Court grant the following relief:

1.    Judgment against the defendants for compensatory and punitive damages sustained in an amount to be determined at trial, plus prejudgment interest;

2.    An award of reasonable costs and attorneys' fees; and

3.    An award of such other and further relief as the Court may deem just and proper.

Dated: December 22, 2004            Respectfully submitted,

                                    THE BAYARD FIRM


                                    /s/  Christopher A. Ward
                                    Christopher A. Ward (No. 3877)
                                    222 Delaware Avenue
                                    Suite 900
                                    P.O. Box 25130
                                    Wilmington, DE  19899
                                    (302) 655-5000

                                    -- and --

                                    Donald J. Crecca
                                    Jeffrey T. Testa
                                    SCHWARTZ, TOBIA, STANZIALE, SEDITA &
                                    CAMPISANO, P.A.
                                    Kip's Castle - 22 Cresmont Road
                                    Montclair, NJ  07042
                                    (973) 746-6000

                                    Attorneys for Charles A. Stanziale, Jr.,
                                    Chapter 7 Trustee of Student Finance Corp

569214v1

- 32 -