# EXHIBIT C

LEXSEE 1997 BANKR LEXIS 2366

**IN RE: THE BENNETT FUNDING GROUP, INC., Debtors; RICHARD C. BREEDEN, as Trustee for THE BENNETT FUNDING GROUP, INC., RESORT SERVICE COMPANY, INC., and THE PROCESSING CENTER, INC., Plaintiff vs. GENERALI U.S. BRANCH, GENERALI UNDERWRITERS, INC., and JOHN DOES 1 through 15,000, Defendants; GENERALI U.S. BRANCH and GENERALI UNDERWRITERS, INC., Counterclaim/Crossclaim Plaintiffs vs RICHARD C. BREEDEN, as Trustee for BENNETT FUNDING GROUP, INC. RESORT SERVICE COMPANY, INC., et al., Counterclaim/Crossclaim Defendants**

**CASE NO. 96–61376, Chapter 11 Substantively Consolidated ADV. PRO. NO. 96–70195A, ADV. PRO. NO. 96–70196A**

**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*1997 Bankr. LEXIS 2366*

**December 19, 1997, Decided**
**December 19, 1997, Filed**

**DISPOSITION:** [*1] Trustee's Motion of Richard C. Breeden, as chapter 11 trustee (the "Trustee") of the substantively consolidated estates of The Bennett Funding Group, Inc. ("BFG"), Resort Service Company, Inc. ("RSC") and The Processing Center, Inc. ("TPC") for an order in each of the above-captioned adversary proceedings "granting leave to file a First Amended Adversary Complaint granted in its entirety.

**COUNSEL:** BRUCE E. CLARK, ESQ., Of Counsel, SULLIVAN & CROMWELL, New York, New York, for Generali U.S. Branch and Generali Underwriters, Inc., Defendants.

ERIC KOBRICK, ESQ., Of Counsel, SIMPSON, THACHER & BARTLETT, New York, New York, for 1104 Trustee

DANIEL STOLZ, ESQ., Of Counsel, WASSERMAN, JURISTA & STOLZ, Millburn, New Jersey, for Official Unsecured Creditors Committee

MICHAEL ETKIN, ESQ., Of Counsel, GOLD & WACHTELL, New York, NY.

ROBERT WEILER, ESQ., Of Counsel, GREEN & SEIFTER, Syracuse, New York, for Metrobank.

JAMES DATI, ESQ., Of Counsel, BOND, SCHOENECK & KING, Syracuse, New York, for Various Banks

**JUDGES:** Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge.

**OPINIONBY:** Stephen D. Gerling

**OPINION:**

MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER.

Before the Court [*2] are the respective Motions (the "Motions") of Richard C. Breeden, as chapter 11 trustee (the "Trustee") of the substantively consolidated estates of The Bennett Funding Group, Inc. ("BFG"), Resort Service Company, Inc. ("RSC") and The Processing Center, Inc. ("TPC") for an order in each of the above-captioned adversary proceedings "granting leave to file a First Amended Adversary Complaint . . . : (a) adding . . . [Bennett Receivables Corporation] as a debtor on whose behalf the Trustee brings the Amended Complaint; (b) adding Assicurazioni Generali S.p.A. ("Assicurazioni Generali") as a defendant; (c) identifying the defendants who were previously named in the Adversary Complaint . . . as 'John Does 1 through 15,000' [(the "John Doe defendants")] . . . ; (d) adding City National Bank of Fulton, Kentucky ("City National Bank") as a defendant; and (e) adding four causes of action against defendants Generali U.S. Branch, Generali Underwriters, Inc. (collectively, "Generali") and Assicurazioni Generali for breach of contract, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty, and negligence."

The Court heard oral argument on the Motions on

June 12, 1997, and [*3] the matters were submitted for decision that same day.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over these matters by virtue of *28 U.S.C. §§ 1334*(b), 157(a), (b)(1), (b)(2)(A) and (O). n1

> n1 The Trustee's aiding and abetting and negligence claims would arguably appear to be non-core. An argument might therefore be made that the instant Motions are also non-core matters, to the extent that they implicate such claims. However, because the instant Motions have been filed in adversary proceedings which, as they currently stand, appear to involve only core causes of action, the Court has core jurisdiction to hear the Motions. *See Eisenberg v. Bank of New York (In re Sattler's, Inc.), 73 B.R. 780, 785 n.4 (Bankr. S.D.N.Y. 1987)* (court had "the power to determine whether the pleadings should be amended to include claims which could expand the action [from a core proceeding] to . . . a non-core, related one").

## FACTS

On July 26, 1996, the Trustee filed [*4] largely identical complaints (the "Complaints") in each of the above-captioned adversary proceedings against Generali and the John Doe defendants. In the Complaints, the Trustee generally alleges that, from 1990 to 1994, Generali issued four commercial lines insurance policies naming as the insured "Aloha Leasing, a Division of Bennett Funding Group" (the "BFG Policies"), and seven commercial lines insurance policies naming as the insured "Resort Funding Inc.," predecessor to RSC (the "RSC Policies"). The BFG Policies and the RSC Policies are sometimes collectively referred to herein as the "Policies." The Complaints allege that, pursuant to the Policies, Generali insured the performance of BFG and RSC's alleged predecessor (hereinafter "RSC"), respectively, under equipment leases and other specified contracts that BFG and RSC sold and/or assigned to investors and other creditors.

The Complaints further allege that the Policies and their proceeds are property of the respective bankruptcy estates of BFG, RSC and TPC by virtue of the fact that BFG and RSC are the named insureds on the Policies, and/or by virtue of BFG, RSC and TPC, or their related companies, being listed as loss payee [*5] on certificates of insurance issued pursuant to the Policies. The Complaints each contain a single count for declaratory judgment: (a) adjudicating the rights and liabilities of the parties with respect to the Policies; (b) awarding the

Trustee such sums as to which he may be entitled under the Policies; and (c) determining that no party other than the Trustee has any right, title or interest in or to the Policies and/or their proceeds.

The John Doe defendants are described in the Complaints as persons and entities that might claim a right, title or interest in or to the Policies and/or their proceeds. By respective Orders each dated May 30, 1997, the Court certified certain of the John Doe defendants as a class (the "Insurance Class") in each of these adversary proceedings pursuant to *Fed.R.Civ.P. 23*, as incorporated by *Fed.R.Bankr.P. 7023*. Certain members of the Insurance Class have instituted suits against Generali, which have been consolidated into a class action (the "Consolidated Class Action") now pending in the United States District Court for the Southern District of New York.

The Trustee now seeks leave to amend each Complaint to, *inter alia*, allege claims for damages [*6] against Generali for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and for negligence. n2 The crux of these claims is that, in issuing the Policies, Generali knowingly assisted Patrick Bennett in running a massive Ponzi scheme involving the investment products of BFG and related companies, and in looting BFG's assets, which caused substantial damage to BFG.

> n2 Generali does not object to that portion of the Trustee's Motions which seek to (a) add BRC as a party on whose behalf the Trustee asserts his claims; (b) add City National Bank as a defendant; and (c) add a claim against Generali for breach of contract. *See Generali's Memorandum in Opposition to the Trustee's Motion for Leave to Serve and File a First Amended Adversary Complaint* ("Generali's Memorandum of Law") at p. 2, n.1. Generali appears to oppose the Trustee's request to add Assicurazioni Generali as a defendant, stating "it seems pointless to add as a defendant Assicurazioni Generali, S.p.A., when the U.S. Branch was the organization involved in the insurance program." *Id.* The Trustee points out, however, that the name "Assicurazioni Generali" appears on some of the Policies and related documents, which are attached as Exhibit A to the Amended Complaint. Because neither Generali nor Assicurazioni claim that either of them will be prejudiced by the addition of Assicurazioni Generali, this aspect of the Trustee's Motions will be granted.

[*7]

Generali and the Insurance Class oppose the Motions

on the basis that amendment of the Complaints would be futile because 1) the Trustee lacks standing to assert such claims; 2) the proposed amended complaints (the "Amended Complaints") do not plead fraud with requisite particularity; and 3) the proposed Amended Complaints do not state claims for relief.

### DISCUSSION

*Fed. R Civ.P. 15(a)*, as incorporated by *Fed. R Bankr.P. 7015*, states that leave to amend a complaint "shall be freely given when justice so requires." *See Fed. R Civ.P. 15(a)*; *Fed. R Bankr.P. 7015*. Leave to amend need not be given, however, if amendment would be futile. *See Rosenshein v. Kleban, 918 F Supp. 98, 105 (S.D.N.Y. 1996)* (citing *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct 227, 230, 9 L. Ed. 2d 222 (1962))*. An amendment is futile if, *inter alia*, the movant lacks standing to assert the proposed claim, *see Forstmann Leff Assocs . Inc. v. American Brands. Inc. 1991 U.S. Dist LEXIS 11390, 1991 WL 168002 *6 (S.D.N.Y. 1991)*, or if the proposed amendment does not state a claim for relief, *see Rosenschein v. Kleban. 918 F Supp. at 105* "To determine whether an amendment [*8] is futile, a court should perform a test comparable to that required by *[Fed.R Civ.P.] 12(b)(6)."* *Sullivan v. Schweikhard, 968 F Supp. 910, 916 (S.D.N.Y. 1997)*

As noted by the Trustee, this Court has previously in these proceedings enunciated the standard for ruling on a motion to dismiss pursuant to *Fed. R Civ.P. 12(b)(6)*:

> The court is to dismiss the complaint only if it appears that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Gagliardi v. Village of Pawling, 18 F.3d 188, 191 (2d Cir. 1994)*. The court should not weigh the evidence but should instead accept the facts as they appear in the complaint as true, to find whether the plaintiff has alleged sufficiently all of the legal elements necessary to state a claim under the law. *See Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989)*, *Christopher v. Laidlaw Transit, Inc., 899 F Supp 1224, 1226 (S.D.N.Y. 1995)* . . . . Based on the foregoing standards, this Court must analyze Plaintiff's Complaint to determine whether he has alleged any set of facts, along with any reasonable inferences which may be [*9] drawn in his favor, which are sufficient to entitle him to relief. *See Detko v. Blimpies Restaurant, 924 F Supp. 555, 556 (S.D.N.Y. 1996)*

*Alexander v. Breeden*, Adv. Pro. No. 96–70125A (Bankr. N.D.N.Y. Dec. 5, 1996), Slip Op. at 5

### Trustee's Standing

A complaint may be dismissed for lack of standing pursuant to *Fed. R Civ.P. 12(b)(6)*. *See Red Ball Interior Demolition Corp. v. Palmadessa, 874 F Supp. 576. 585 (S.D.N.Y. 1995)* (citing *Thompson v. County of Franklin, 15 F.3d 245, 247 (2d Cir.1994)*, *Rent Stabilization Assoc of New York v. Dinkins. 5 F.3d 591, 593 (2d Cir.1994)*, *Ad Hoc Committee of Concerned Teachers v. Greenburgh No. 11 Union Free School Dct , 873 F.2d 25, 26 (2d Cir.1989))* Generali and the Insurance Class argue that the Trustee lacks standing because 1) the claims which the Trustee now seeks to assert belong to defrauded investors and not to the Debtors, and 2) the Trustee has failed to allege that BFG suffered any legally cognizeable injury distinct from that for which the Insurance Class seeks redress in the Consolidated Class Action

A trustee in bankruptcy [*10] "stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy." *Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114. 118 (2d Cir. 1991)* To have standing, "'[a] plaintiff must always have suffered a "distinct and palpable injury to himself" . . . .'" *Hirsch v. Arthur Andersen & Co , 72 F.3d 1085, 1091 (2d Cir. 1995)* (quoting *Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91. 100, 99 S. Ct 1601. 1608. 60 L. Ed. 2d 66 (1979)* (quoting *Warth v. Seldin. 422 U.S. 490, 501, 95 S. Ct 2197, 2206, 45 L. Ed. 2d 343 (1975)))* Thus, "a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Shearson Lehman Hutton. Inc. v. Wagoner, 944 F.2d at 118* (collecting cases).

The question of whether a cause of action belongs to a corporation or to its creditors is governed by state law. *See The Mediators. Inc. v. Manney (In re The Mediators, Inc.). 105 F.3d 822, 825 (2d Cir. 1997)* (citing *St. Paul Fire & Marine Ins. Co v. PepsiCo, Inc , 884 F.2d 688. 700 (2d Cir. 1989)* [*11] In New York, claims against directors or officers of a corporation for breach of fiduciary duty or fraud alleged to have damaged the corporation belong to the corporation. *See Amfesco Industries. Inc. v. Greenblatt. 172 A.D. 2d 261, 264–65. 568 N.Y.S. 2d 593, 596–97* (1st Dep't 1991). Similarly, New York recognizes the right of a corporation to sue a third party for aiding and abetting another party in committing fraud on the corporation or in breaching a fiduciary duty owed to the corporation. *See Goldin v. Primavera Familienstiftung (In re Granite Partners, L. P.), 194 B.R. 318. 328 (Bankr.*

S.D.N.Y. 1996) (citing *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 999 (Bankr. S.D.N.Y. 1991); *Resnick v. Resnick*, 722 F. Supp. 27, 37 (S.D.N.Y. 1989)). *see also, e.g., Bloor v. Dansker (In re Investors Funding Corp. of N.Y. Sec. Litigation)*, 523 F. Supp. 533, 545 (S.D.N.Y. 1980). Upon a bankruptcy filing, any causes of action which the debtor may possess become assets of the estate and may be asserted only by the trustee. *See, e.g., In the Matter of Happy Time Fashions, Inc.*, 7 B.R. 665, 670 (Bankr. S.D.N.Y. 1980). [*12] *In re Granite Partners, L.P.* 194 B.R. at 328.

Notwithstanding the foregoing, the right of a bankruptcy trustee to assert claims of a debtor corporation is not absolute. In *Shearson Lehman Hutton, Inc. v. Wagoner*, the Second Circuit upheld dismissal of the trustee's claim on behalf of the debtor corporation against Shearson Lehman Hutton, Inc. for aiding, abetting and unduly influencing the corporation's sole stockholder, director and president in wrongfully dissipating corporate funds. The Second Circuit stated: "To the extent the demand alleges money damages [to the debtor corporation] itself, it is uncontested that [the debtor corporation's] sole stockholder and decisionmaker . . . not only knew of the bad investments, but actively forwarded them. A claim against a third party for defrauding a corporation with the cooperation of management accrues to the creditors, not to the guilty corporation." 944 F.2d at 120.

The Second Circuit's rationale in upholding dismissal of the aiding and abetting claim in *Wagoner* also served as the basis for its affirmance of the dismissal of professional malpractice claims in *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 [*13] In *Hirsch*, two general partners had perpetrated illegal Ponzi schemes through their partnership, involving the sale of limited partnership interest in real estate investments. *Id. at 1088.* The trustee of the consolidated estates of the two partners and the partnership sued the partnership's accountants and lawyers for, *inter alia*, professional malpractice. *See id. at 1088–92.* Ultimately, the Second Circuit concluded that the malpractice claims should be dismissed, stating that "the Wagoner rule should be applied . . . because of the Debtors' collaboration with the defendants–appellees in promulgating and promoting the [partnership's] Ponzi schemes." *Id. at 1094.*

*Wagoner* and *Hirsch*, read together, prohibit a corporation from suing a third party for damages caused to the corporation only where the corporation's sole shareholder, or all of its shareholders, participated with the defendant in the alleged wrongdoing. *See Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld*, 212 B.R. 34, 44 (S.D.N.Y. 1997). However, the Trustee's Amended Complaints allege that, "at all relevant times, Patrick Bennett was [*14] not the sole director and/or officer of BFG." *Amended*

*Complaints.* at P 51. Accepting this allegation as true, neither *Wagoner* nor *Hirsch* deprive the Trustee of standing here. *See Wechsler v. Squadron, Ellenoff. Plesent & Sheinfeld*, 212 B.R. at 44.

Nor does the Second Circuit's recent decision in *In re Mediators, Inc.*, 105 F.3d at 822. deprive the Trustee of standing. There, an insider of the debtor had purchased artwork from the debtor at a bargain price and had caused the debtor to guarantee the loan which the insider had used to finance the purchase. *See id. at 824.* The creditors' committee (acting in the name of the debtor) sued the bank that had financed the purchase and the law firm that had structured the transaction for, *inter alia*, aiding and abetting the debtor's breach of fiduciary duties to its creditors. *See id. at 824–25.* The Second Circuit ruled that the committee had no standing to bring such a claim because, under New York law, the claim belonged to creditors and not the debtor. *See id. at 826* (citing *Barnes v. Schatzkin, 215 A.D. 10, 212 N.Y.S. 536, 539* [*15] (1st Dep't 1925)).

The Trustee correctly asserts that, unlike the instant case, *Mediators* involved an allegation that third parties aided and abetted *the corporation itself* in the breach of the corporation's fiduciary duties *to its creditors*, not, as here, a claim that the corporation itself was defrauded. *See 105 F.3d at 825.* Thus, *Mediators* essentially reaffirms the pronouncement made in *Wagoner* that "'[a] bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself,'" *id. at 826* (quoting *Wagoner, 944 F.2d at 118),* and is in accord with the *Hirsch/Wagoner* rule insofar as it indicates that a trustee has no standing where the corporation is involved in perpetrating the fraud, *see id.*

Even where a bankruptcy trustee seeks to assert a claim of the debtor, such claim may be barred if it might interfere with and/or be duplicative of, litigation which has already been commenced by specific creditors. *See, e.g., E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 987 (11th Cir. 1990) (citing *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S. Ct. 1678, 32 L. Ed. 2d 195 (1972)). [*16] *see also Terlecky v. Hurd (In re Dublin Securities, Inc.)*, 197 B.R. 66, 74 (Bankr. S.D. Ohio 1996). Similarly, a bankruptcy trustee may not assert claims of a debtor corporation unless the claimed injury is distinct from any injury claimed to have been suffered by individual creditors. *See Shearson Lehman Hutton, Inc. v. Wagoner; 944 F.2d at 118–19. Hirsch v. Arthur Andersen & Co.*, 72 F.3d at 1094. Thus, Generali and the Insurance Class maintain that the Trustee lacks standing to press his aiding and abetting claims because, by prosecuting such claims, he would effectively be usurping the claims of the Insurance Class pending in the Consolidated Class

Action.

On the record before the Court, it is difficult to ascertain the precise nature of the claims being prosecuted in the Consolidated Class Action. At oral argument, counsel for the Insurance Class indicated that the Consolidated Class Action primarily involves a claim that, by issuing certificates of deposit to members of the Insurance Class, Generali defrauded, or aided and abetted BFG in defrauding, the Insurance Class into believing that they had insurance coverage for their [*17] investments. The Insurance Class' memorandum of law states: "In the Consolidated Class Action, plaintiffs allege that Generali aided and abetted the Ponzi scheme, and that the investors were damaged as a result, because their Bennett investments are in default and virtually worthless . . . . The effect of Generali's conduct was to induce investors to put money *into* BFG." *Memorandum of Law of Bennett Investors in Opposition to Trustee's Motion for Leave to Serve and File Amended Complaint*, (the "Insurance Class' Memorandum of Law") at p. 6. n3

> n3 The respective parties have filed a virtually identical memorandum, or, in the case of the Trustee, memoranda, of law in each of the above-captioned adversary proceedings. All references herein to the parties' submissions are made to their submissions in each of the above-captioned adversary proceedings.

The Trustee's claim here appears to be different from that asserted by the Insurance Class in the Consolidated Class Action. The Trustee argues that Patrick Bennett [*18] perpetrated one fraud against investors and another distinct fraud against BFG. It is the fraud against BFG for which he seeks to recover. Contrary to the relief apparently sought by the Insurance Class, the Trustee seeks to recover the monies that were improperly paid out of BFG. *See Gordon v. Basroon (In re Plaza Mortgage & Fin. Corp.). 187 B.R. 37, 44-45 (Bankr. N.D.Ga. 1995)* (noting that the appropriate measure of damages for the trustee was the "outgoing money," *i.e.*, not the "funds invested in the debtor's Ponzi scheme, but rather . . . [the] funds improperly paid out by the debtor") The basis of the Trustee's claim is that Patrick Bennett perpetrated a fraud upon BFG and ultimately plunged BFG into bankruptcy, to the detriment of all of the estates' creditors, not just the Insurance Class. It is appropriate to note here that if a claim is "a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim." *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d at 701* (citations omitted); *see also E.F. Hutton & Co., Inc. v. Hadley, 901 F.2d at 986-*

87 [*19] (citing *Koch Refining v. Farmers Union Cent. Exch, Inc., 831 F.2d 1339, 1347-48 n.11 (7th Cir. 1987)* (stating that a trustee may "bring a general action on behalf of all creditors rather than a personal one on behalf of only some")); *In re 10th Avenue Record Distribs., Inc., 97 B.R. 163, 166 (S.D.N.Y. 1989)* (stating, "since the trustee's alter ego cause of action here is without a doubt an attempt to collect property of the estate for the benefit of all creditors and is not personal to any particular creditor, it may be maintained by the bankruptcy trustee") In consideration of the foregoing, the Court must conclude that the Trustee's claim is not the same claim being asserted by the Insurance Class in the Consolidated Class Action n4

> n4 The Insurance Class asserts that Generali has filed proofs of claim in the above-captioned cases. Thus, the Insurance Class maintains that even if the Trustee's claims are separate and distinct from the those being asserted in the Consolidated Class Action, they are not properly asserted in this Court because they would expose the Insurance Class to a setoff claim that it would not face in the Consolidated Class Action. The Court agrees with the Trustee that the issue of any right to setoff is ultimately relevant to the Trustee's damages, rather than the question of whether the Trustee has standing to assert his claims. Further, the Court notes the Trustee's assertion that "Generali has included a claim for setoff in the Consolidated [Class] Action." *Supplemental Memorandum of Law in Further Support of Trustee's Motion for Leave to Serve and File Amended Adversary Complaint*, at p. 3.

[*20]

Contrary to Generali's position, the Trustee's claimed damages of deepening insolvency, looting, and loss of reputation and goodwill, are legally cognizable injuries to BFG. The Trustee alleges that Patrick Bennett's Ponzi scheme "caused BFG to incur increasing liabilities from 1988 to 1996 that BFG could not possibly pay, thereby resulting in the (sic) BFG's deepening insolvency and filing for bankruptcy in March 1996," and also "caused serious damage to BFG's business reputation and goodwill." *Amended Complaints* at P 49. Generali cites *Bloor v. Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62 (2d Cir. 1985)*, for the proposition that, as a matter of law, a corporation is not injured when it receives funds in exchange for a future promise to pay unless the consideration received is inadequate. The Court agrees with the Trustee that even if this proposition is true, it has no bearing where, as here, the corporation is alleged to have

been injured in a Ponzi scheme which, by its very nature, involves the accumulation of obligations that increasingly surpass the amount of funds received.

The allegation here is not simply that BFG was damaged because it received [*21] inadequate funds but rather that BFG's receipt of funds artificially prolonged its existence and prevented it from minimizing losses. This is sufficient to state a claim for injury to BFG. *See, e.g., Joel v. Weber,* 166 A.D.2d 130, 134, 569 N.Y.S.2d 955, 958 (pleading was sufficient where it alleged that fraud prevented plaintiff from minimizing losses); *In re Gouiran Holdings, Inc.,* 165 B.R. 104, 106-08 (E.D.N.Y. 1994) (pleading was sufficient where it alleged that debtor "incurred debt [that] it otherwise would not have incurred and was thereafter not able to service"); *In re Investors Funding Corp. of N.Y. Securities Lit.,* 523 F.Supp. at 541 (stating that "prolonged artificial insolvency" caused by fraud did not benefit corporation); *In re Plaza Mortgage and Fin. Corp.,* 187 B.R. at 43 (holding that the trustee properly asserted claim against aiders and abettors by alleging that the debtor "incurred millions of dollars of liabilities to investors which it could not repay"); *Drabkin v. L & L Construction Assocs., Inc. (In re Latin Investment Corp.),* 168 B.R. 1, 5 (Bankr. D.D.C. 1993) (holding that [*22] the trustee, who alleged that participants in Ponzi scheme "caused the debtor to incur substantial additional obligations," had standing to sue aiders and abettors for "damages inflicted in perpetuating the debtor's existence past the point of solvency"); *see also Hannover Corp. of America v. Beckner,* 211 B.R. 849, 854-55 (M.D. La. 1997) (stating that the Second Circuit's decision in Hirsch does not contradict the principle that a corporation can suffer injury from fraudulently extended life, dissipation of assets, or increased insolvency).

### In Pari Delicto

Generali and the Insurance Class maintain that the equitable defense of *in pari delicto* would bar the Trustee from any recovery against Generali, and that the Trustee's Motion should therefore be denied because he lacks standing and/or has failed to state a claim for relief. The phrase "*in pari delicto*" means "in equal fault," and the doctrine generally prohibits a party from obtaining affirmative relief where that party has knowingly participated in the wrongdoing which caused the loss. *See Howard v. Fidelity and Deposit Co. of Md. (Matter of Royale Airlines, Inc.),* 98 F.3d 852, 855 (5th Cir. 1996) [*23] (citing *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306, 105 S. Ct. 2622, 2626, 86 L. Ed. 2d 215 (1985)) The doctrine of *in pari delicto* and the *Wagoner/Hirsch* rule, though similar, are concepts which are independent of each other and must be separately analyzed. *See Terlecky v. Hurd (In re Dublin Securities),* 197 B.R. 66, 73 n.10

*(S.D. Ohio 1996), Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld,* 212 B.R. at 44.

As recognized by the Second Circuit,

> the maxim is "*in pari delicto potior est conditio defendentis,*" that is, where the parties are equally at fault, the defending party is in the stronger position. *Black's Law Dictionary* 898 (4th ed. 1968). Generally translated, it means the plaintiff should not therefore recover, and the parties should be left where they are. This view is predicated on the principle that to grant plaintiff relief would contravene the public good by aiding one to profit from his own wrong. Where both parties are *in delicto,* but not *in pari delicto,* a trial court should make findings regarding the respective amount of blame assigned to each, granting relief [*24] to the one whose wrong is less. *17 Am.Jur.2d Contracts § 221* (1964); *see also 37 Am.Jur.2d Fraud & Deceit § 304* (1964).

*Ross v. Bolton.* 904 F.2d 819, 824 (2d Cir. 1990), accord *City of New York v. Corwen.* 164 A.D.2d 212, 218, 565 N.Y.S.2d 457, 460 (1st Dep't 1990). "In pari delicto has traditionally been applied in the interest of society, rather than that of individual litigants ...," as a result of which "the question has often arisen concerning whether the doctrine of in pari delicto should be limited in order to advance societal interests." *Berner v. Lazzaro,* 730 F.2d 1319, 1321 (9th Cir. 1984) (citations omitted), *aff'd sub nom. Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. at 299. 105 S. Ct. at 2622. 86 L. Ed. 2d at 215. The Supreme Court, has "emphasized 'the inappropriateness of invoking broad common-law barriers to relief [such as *in pari delicto*] where a private suit serves important public purposes." *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. at 307. 105 S. Ct. at 2627(quoting *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 138, 88 S. Ct. 1981, 1984. 20 L. Ed. 2d 982 (1968))  [*25] Thus, the Supreme Court has refused to recognize *in pari delicto* as a defense to a private action under the antitrust laws, *see Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. at 145. 88 S. Ct. at 1987-88, and has set forth a two-part test to ensure that the defense is narrowly applied in private causes of action under the securities laws, *see Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. at 310-11, 105 S. Ct. at 2626-28. Additionally, several federal courts have concluded that the *in pari delicto* defense is not available in suits brought under the Racketeering Influence Corrupt Organizations Act, *18 U.S.C. § 1961 et seq. See, e.g.,*

*Schwartz v. The Upper Deck Co., 956 F. Supp. 1552, 1556 (S.D.Cal. 1997) (citing In re National Mortgage Equity Securities Litigation, 636 F. Supp. 1138 (C.D.Cal. 1986), Bieter v. Blomquist, 848 F. Supp. 1446 (D. Minn. 1994))* In sum, "the *in pari delicto* defense is used sparingly, and is narrowly defined in litigation under federal regulatory statutes." *Peltz v. SHB Commodities, Inc., 115 F.3d 1082, 1090 (2d Cir. 1997)* [*26] (citations omitted).

The Bankruptcy Code is not a regulatory statute in the ordinary sense of the word. It is, however, a federal statute that embodies important societal interests which, arguably, might be furthered if *Perma Life* and its progeny were extended to suits in bankruptcy. As it is, the *in pari delicto defense* does not bar a cause of action by a trustee in bankruptcy to avoid transfers of property, but it is because in such a situation, the trustee acts, not on behalf of a culpable debtor, but in the "overshoes" of innocent creditors. *See Gallant v. Kanterman (In re Kanterman), 97 B.R. 768, 776 (Bankr. S.D.N.Y. 1989) (citing Podell & Podell v. Feldman (In re Leasing Consultants, Inc.), 592 F.2d 103, 110 (2d Cir. 1979). Wedtech Corp. v. Nofziger (In re Wedtech Corp.), 88 B.R. 619 (Bankr. S.D.N.Y. 1988)), aff'd 108 B.R. 432 (S.D.N.Y. 1989)*

A split of authority appears to be developing on the question of whether the in the defense of *in pari delicto* is available to prohibit a trustee from asserting claims of the debtor. In such a situation, the trustee is not bringing suit under the Bankruptcy Code [*27] so much as he is asserting claims – often common law claims – under the umbrella of the Bankruptcy Code. At least one court has suggested that the defense may not be available in such a situation, but has not so ruled. *See In re Plaza Mortgage and Finance Corp., 187 B.R. at 47 (suggesting that in pari delicto may not be available defense to trustee's fraud and negligence claims) (citing Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995). FDIC v. O'Melveny & Myers, 61 F.3d 17 (9th Cir. 1995))* The Tenth Circuit, in *Sender v. Buchanan (In re Hedged-Investments Assocs., Inc.). 84 F.3d 1281, 1285 (10th Cir. 1996).* ruled that a bankruptcy trustee acting in the shoes of the debtor is subject to the *in pari delicto* defense, but did so because, pursuant to Code § 541, the trustee accedes to property of the estate as it exists at the commencement of the case. With all of this in mind, the question of whether the *in pari delicto* defense is available to Generali as a matter of law need not be decided at this point in the proceedings because, as discussed below, even if it is available, it cannot be applied here on a [*28] motion to dismiss. *See Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, 212 B.R. at 44 n 8*

"The defense of in pari delicto will be allowed only in the sound discretion of the trial court, and only where

(1) the plaintiff's acts were at least as serious as those of the defendant; (2) the plaintiff acted knowingly; and (3) the application of the doctrine would not frustrate the [an important public purpose]." *Weitzman v. Stein, 436 F. Supp. 895. 905 (S.D.N.Y. 1977)* (citations omitted). It is generally inappropriate to make an *in pari delicto* finding on the pleadings. *See Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. at 311, 105 S. Ct. at 2629 n 21* (noting "the inappropriateness of resolving the question of the respondents' fault solely on the basis of the allegations set forth in the complaint"); *Xaphes v. Shearson, Hayden, Stone, Inc., 508 F. Supp. 882 (S.D.Fla. 1981)* (complaint was not susceptible on its face to *in pari delicto* defense); *Richardson v. Shearson/American Express Co., Inc., 573 F. Supp. 133, 135 (S.D.N.Y. 1983)* (refusing to dismiss complaint pursuant to [*29] Rule 12(b)(6) on basis of *in pari delicto* because at that point it was "impossible to measure the relative fault of the parties."); *see also Kirkland v. E.F. Hutton and Co., Inc., 564 F. Supp. 427, 437 (E.D. Mich. 1983)* (denying defendants' motion for summary judgment founded upon *in pari delicto* defense because "the judgment of whether the defense is appropriate cannot be made where, as here, the facts are disputed by the parties and have not yet been presented to the factfinder," and stating that "there remain issues of fact with respect to the relative fault of the parties and the *scienter* attributable to the plaintiff himself")

Here, the relative fault of Generali and BFG is effectively disputed by the parties. As acknowledged by the Insurance Class, the Trustee's Amended Complaint alleges facts which generally portray BFG as an innocent victim of the fraud perpetrated by Patrick Bennett. *See, e.g., Insurance Class' Memorandum of Law, at p. 7.* If such allegations are true, then it is doubtful whether the parties are in equal fault, and thus whether the *in pari delicto* defense is available. Accordingly, the Trustee's Motion cannot be denied [*30] on the basis that the defense of *in pari delicto* may be available. *See Berner v. Lazzaro, 730 F.2d at 1322* (stating that complaint should not have been dismissed on basis of in pari delicto because "the allegations of the complaint, if proved, would demonstrate that the [appellants] could not have been equally responsible for the injury they suffered as a result of this fraudulent scheme."), *aff'd sub nom. Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. at 299, 105 S. Ct. at 2622. 86 L. Ed. 2d at 215, Crawford v. Colby Broadcasting Corp., 387 F.2d 796 (7th Cir. 1967)* (denying motion to dismiss because complaint was not vulnerable on its face to *in pari delicto* defense, and declining to adjudicate ultimate availability of *in pari delicto* defense).

Closely connected to the issue of relative fault is the question of whether BFG knowingly participated in the alleged misconduct. For BFG to be *in pari delicto* with

1997 Bankr. LEXIS 2366, *30

Generali, it must be established that knowledge of Patrick Bennett's wrongful actions can be imputed to BFG. *See Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld*, 212 B R at 44–45 [*31] Under New York law, there exists a rebuttable presumption that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal *See id. at 45* (citing *Center v. Hampton Affiliates. Inc , 66 N Y.2d 782, 784. 497 N Y.S 2d 898, 899, 488 N E 2d 828, 829 (1985), In re Mediators, 105 F 3d at 827* The Trustee, however, argues that the "adverse interest exception" would apply to rebut this presumption The adverse interest exception provides:

"When an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person, the presumption that knowledge held by the agent was disclosed to the principal fails because he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose. To come within the exception, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes."

*Id* (quoting *Center v. Hampton Affiliates, Inc , 66 N Y.2d at 784–85. 497 N Y.S 2d 899–900, 488 N E 2d 829–30* and citing *In re Mediators, 105 F 3d at 827)* [*32]

Generali argues that the Trustee cannot avail himself of the adverse interest exception in this case because it cannot be shown that Patrick Bennett totally abandoned BFG's interest in connection with his alleged wrongdoing In support of this argument, Generali cites the Second Circuit's refusal to apply the adverse interest exception "in *Mediators*, despite the allegation that the insider 'aimed to cheat the Mediators out of receiving fair value for its assets,' *105 F.3d at 827.* and in *Wagoner*, despite an allegation that the insider 'engaged in conduct designed to strip . . . [the debtor] of its assets.' *944 F.2d at 117*" *See Generali's Memorandum of Law*, at 15.

Alternatively, Generali argues for application of the "sole actor rule." Under this rule, "the adverse interest exception does not apply in cases in which the principal is a corporation and the agent is its sole shareholder," *see In re Mediators, Inc , 105 F.3d at 827*, or to cases in which the agent is the dominant officer or shareholder of the corporation, *see id. at 827* (citing *Munroe v. Harriman. 85 F.2d 493, 495–97 (2d Cir. 1936))* [*33] Generali maintains that application of the sole actor exception to the adverse interest exception is warranted because, although Patrick Bennett was not BFG's sole shareholder, he exercised *de facto* unfettered dominion and control over BFG by virtue

of, *inter alia*, his status as a director and chief financial officer of BFG.

As with the question of parties' relative fault, the question of whether Patrick Bennett, in connection with his alleged misconduct, totally abandoned BFG's interests is a factual one which cannot be decided on a motion for leave to amend a complaint *See In re Wedtech Securities Litigation, 138 B R 5, 9 (S D N Y. 1992)* (denying motion for summary judgment on the issue of standing because material facts concerning whether agent had completely abandoned interests of principal remained in dispute) The same is true with respect to the question of whether the sole actor rule may be successfully invoked *See Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld. 212 B R at 46* (stating that "the sole actor rule cannot be applied here on a motion to dismiss," and that "the trustee is entitled to try to prove that there existed [*34] certain outside directors who, if informed by [the defendant] would have taken action to stop [the] fraudulent and improper activities.")

### Adequacy of Pleadings

Generali asserts that the Trustee's Motions should be denied because the Amended Complaints do not adequately plead the elements of an aiding and abetting claim Under New York law, three elements must be asserted to state an aiding and abetting claim: (a) the existence of the primary wrongful conduct; (b) the aider and abettor's knowledge of the wrongful conduct; and (c) substantial assistance by the aider and abettor *See Kolbeck v. LIT America, Inc , 939 F Supp 240, 245 (S D N Y. 1996)* (citing *S & K Sales Co v. Nike, Inc . 816 F 2d 843, 847–48 (2d Cir. 1987))* (setting forth elements for aiding and abetting breach of fiduciary duty); *Crowthers McCall Pattern v. Lewis. 129 B R at 999* (same); *ABF Capital Management v. Askin Capital Management, 957 F Supp 1308. 1328 (S D N Y. 1997)* (setting forth elements for aiding and abetting fraud); *see generally Department of Economic Development v. Arthur Andersen & Co (U S A ). 924 F Supp 449, 482–83 (S D N Y. 1996)* [*35] (collecting cases for the proposition that New York recognizes causes of action for aiding and abetting common law fraud)

To state a claim for aiding and abetting fraud, the underlying fraud must be pleaded with particularity pursuant to *Fed R Civ.P. 9(b) See Primavera Familienstiftung v. Askin, 1996 U S Dist LEXIS 12683, 1996 WL 494904 *22 (S.D N.Y. 1996)* An underlying breach of fiduciary duty claim sounding in fraud must also meet the requirements of Rule 9(b). *See Strougo v. Padegs. 964 F Supp 783, 804 (S D N Y 1997)* Generali argues that the Trustee has failed to plead Patrick Bennett's underlying fraud and breach of fiduciary duty with requisite specificity due to his failure "to specify a single false statement made by

Patrick Bennett."

"Rule 9(b) is rigorously enforced in this circuit." *Branch v. Tower Air, Inc., 1995 U.S. Dist. LEXIS 16390, *12–13, 1995 WL 649935.* *4 (S.D.N.Y. 1995) (citing *Shields v. Citytrust Bancorp. Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). Ross v. Bolton. 904 F.2d at 823)).* To satisfy the requirements of Rule 9(b), the "plaintiff need only allege the existence of facts and circumstances sufficient to warrant the pleaded conclusion [*36] that fraud [has] occurred " *Decker v. Massey-Ferguson. Ltd., 681 F.2d 111. 119 (2d Cir. 1982).* Under Rule 9(b) "there is no requirement that 'detailed evidentiary matter' be pleaded." *Degulis v. LXR Biotechnology, Inc., 928 F. Supp. 1301, 1310 (S.D.N.Y. 1996)* (citing *Goldman v. Belden. 754 F.2d 1059 (2d Cir. 1985), Ross v. A.H. Robins Co., 607 F.2d 545, 557 n. 20 (2d Cir. 1979)).* However, the pleading must be specific enough to serve the three purposes of Rule 9(b), which are "(1) to provide a defendant with notice of the claims against it; (2) to protect a defendant from harm to its reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits." *928 F. Supp. at 1310* (citing *DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987), O'Brien v. Price Waterhouse, 740 F. Supp. 276, 279 (S.D.N.Y. 1990). aff'd, 936 F.2d 674 (2d Cir. 1991)).* In general, "[a] fraud pleading will be deemed sufficient if under the circumstances a party is given 'fair notice' of the claim asserted against it." *Lionel Corp. v. Wetterau. Inc. (In re Lionel Corp.). 41 B.R. 804, 805 (Bankr. S.D.N.Y. 1984)* [*37] (citing *Credit Finance Corp. v. Warner & Swasey Co., 638 F.2d 563, 567 (2d Cir. 1981))*

With the foregoing principles in mind, the Court concludes that the Trustee's Amended Complaint satisfies the requirements of Rule 9(b). Each Amended Complaint avers in pertinent part:

> 48. Patrick Bennett, aided and abetted by others, orchestrated a massive Ponzi scheme involving the investment products of BFG and related companies. Beginning no later than 1988, Patrick Bennett assigned the same equipment lease contracts multiple times, used the same equipment lease contracts as both collateral for loans from financial institutions and as assignments to individual investors, and issued securities to investors through the use of materially false and misleading offering documents.

> * * * *

> 50. Patrick Bennett also engaged in sham transactions, diversions of assets, self-

dealing and waste of corporate assets with regard to the funds generated by, and obtained through, the Ponzi scheme. Among other things, Patrick Bennett and his aiders and abettors: (a) caused Bennett Management & Development Corp. ("BMDC"), from 1992 to 1995, to pay Patrick Bennett more than $10 million [*38] to which he was not entitled; (b) diverted millions of dollars from BMDC for the purchase of a controlling interest in Vernon Downs Racetrack; (c) engineered the fraudulent "repayment" of a $10.9 million loan to Gamma International, Ltd from BFG; (d) structured the sham sale to Hemlock Invesor Associates of a note in the amount of approximately $9.6 million given to BFG by Erie Island Resort & Marina; (e) participated in the fraudulent purchase and sale of leases by BFG from Scriptex, Inc. ("Scriptex"); (f) participated in the fraudulent "due diligence" payment to BFG from Aegis Holdings Corporation in the amount of approximately $2.3 million; (g) pledged a valuable asset of BFG, worth approximately $1.2 million, to secure a loan from High Mountain Associates to Comfort Associates, Inc. without obtaining any consideration for BFG in return; (h) from in or about 1990 to March 1996, diverted tens of millions of dollars from BFG to Scriptex; and (i) caused the diversion of approximately $90 million from BMDC and BFG to finance the acquisition and operation of gambling companies or properties owned in whole or significant part by Michael Bennett. As a result of these and other acts, [*39] which constituted a breach of the fiduciary duty that Patrick Bennett owed to BFG, BFG suffered serious damage.

*Amended Complaints*, at PP 48, 50

In addition to arguing that the foregoing allegations are sufficient to satisfy Rule 9(b), the Trustee asserts that documents and other information supporting his claims are in the possession of Generali and third parties. According to the Trustee, as of the date this Motion was heard, Generali had not responded to the Trustee's request for production of documents and a key deposition, though noticed, had yet to be taken. "Where manipulation is alleged, as opposed to affirmative misrepresentation, some or all of the facts may be in the control of the defendants and inaccessible to the plaintiffs without discovery." *Degulis v. LXR Biotechnology, Inc., 928 F. Supp. at 1311*

(citation omitted). Therefore, the requirements of Rule 9(b) are relaxed where the individual defendant is a corporate insider and discovery is incomplete. *See id., In re Bausch & Lomb, Inc. Securities Litigation, 941 F. Supp. 1352, 1361 (W.D.N.Y. 1996)* (quoting *Sunrise Industrial Joint Venture v. Ditric Optics, Inc., 873 F. Supp. 765, 772 (E.D.N.Y. 1995)* [*40]   (other citations omitted)). The Court further notes that "courts generally evaluate averments of fraud in the bankruptcy context more liberally than in other civil actions charging fraud." *Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. 488, 498 (N.D.Ill. 1988).* With these considerations in mind, the Court finds that the Trustee's aiding and abetting claims satisfy Rule 9(b).

Furthermore, the Trustee requests that the Court take judicial notice of, *inter alia*, the allegations of the First Amended Adversary Proceeding Complaint which the Trustee filed in this Court under the caption of *Breeden v. Patrick Bennett, et al., 220 B.R. 743* (the "Breeden Complaint"), which more fully describes the Ponzi scheme. As the Trustee asserts, the Court may take judicial notice of pleadings filed in other judicial proceedings when considering a motion to dismiss, *see Brass v. American Film Tech. Inc. 987 F.2d 142, 150 (2d Cir. 1993); Village on Canon v. Bankers Trust Co., 1997 U.S. Dist. LEXIS 1112, 1997 WL 47804 *1 (S.D.N.Y. 1997),* and may do so without converting the motion into a motion for summary judgment, *see Fed.R.Civ.P. 12(b)(6); Ansonia Tenants' Coalition, Inc. v. Ansonia Assocs., 163 F.R.D. 468 (S.D.N.Y. 1995)* [*41]   (citing, *inter alia. Kramer v. Time Warner Inc., 937 F.2d 767, 773–75 (2d Cir. 1991).* Whether the Court could properly take judicial notice of the Breeden Complaint here would perhaps be questionable were it not for the fact that Generali appears to refer to the Breeden Complaint in its memorandum of law. *See Generali's Memorandum of Law,* at p. 16 (citing "*Breeden v. Bennett, 1997 Bankr. LEXIS 2366").* The Court also notes that the Insurance Class refers to the Breeden Complaint throughout its memorandum of law. Therefore, even if it could be said that the Amended Complaint itself fails to satisfy Rule 9(b) with respect to the underlying fraud, the Amended Complaint can be properly read in conjunction with the Breeden Complaint to satisfy Rule 9(b).

Notwithstanding the issue of whether the underlying fraud is pleaded with particularity, Generali contends that Amended Complaint does not adequately plead the aiding and abetting claims because, *inter alia*, it contains conclusory allegations of Generali's knowledge without a supporting factual basis.

The Amended Complaints allege in pertinent part:

1. The Policies contained provisions pursuant [*42]   to which BFG and RSC agreed to reimburse Generali in full for any payments made under the Policies, *see Amended Complaints*, at P 44, and that BFG, RSC and Generali "executed hold harmless agreements for the period July 1990 to July 1994 in which BFG and RSC's predecessor agreed to indemnify and hold Generali harmless for any payments made under the BFG and RSC policies," *id.* at P 45;

2. After the first BFG policy had been issued, Patrick Bennett "caused or authorized" that policy to be modified to include a provision providing: "[Generali] is not liable for payment under this policy if any fraudulent act by [BFG] brings about default. Any fraudulent act by [BFG] shall not affect [Generali's] obligation to the Loss Payee." *Id.* at P 42.

3. A subsequent BFG Policy was issued containing a provision identical to that discussed above, and that two others were issued providing that "any fraudulent act by [BFG] which brings about a default under this Policy will not affect [Generali's] obligation to make payments to Loss Payees. However, [BFG] will be liable to [Generali] to reimburse [Generali] for any payments made to Loss Payees arising out of any [*43]   fraudulent act by [BFG]." *Id.* at P 43.

4. Under the BFG Policies, Generali had a right to audit and inspect BFG's books and records, *id.* at P 46, and did so during the relevant time period, *id.* at P 47.

5. "In 1994, Generali required that BFG establish an escrow account and deposit $1 million into the account so as to assure that Generali would be repaid by BFG. Also in or around 1993 and 1994, Generali insisted on a 'cap' of its liability under the BFG and RSC policies covering the period July 1, 1993 through July 1, 1994. It arranged for the liability under the RSC policies to be limited to $25 million and the liability under the BFG policy to be limited to $50 million." *Id.* at P 54.

6. "Generali cut short the duration of its insurance program with BFG and RSC's predecessor. Under the original arrangement, Generali

was to have issued annual policies to BFG and RSC's predecessor for the period 1990 through 1995. Instead, Generali ended the program as of July 1, 1994, and did not issue policies to BFG and RSC's predecessor for the fifth and final year." *Id* at P 55.

Thus, the Trustee argues that "evidence of Generali's actual or constructive [*44] knowledge of the fraud is the fact that Generali and BFG entered into the hold harmless agreements described above . . . pursuant to which Generali would be reimbursed for any payments it made under the BFG policy. Those agreements demonstrate that BFG was self-insured and that Generali was essentially a front for BFG." *Id.* at P 53. The Trustee further maintains that "because of the fraud provisions in the BFG policy . . through which Patrick Bennett essentially obtained insurance to cover his own fraud, Generali knew or should have known, that Patrick Bennett and others were committing, or planned to commit, fraud on BFG." *Id* at P 52.

Generali correctly asserts that the Trustee's allegations of constructive knowledge are insufficient to state an aiding and abetting claim under New York law. *See Kolbeck v. LIT America 939 F. Supp. at 245–47* (collecting cases). The Trustee's allegations of actual knowledge are subject to Rule 9(b), which provides that "malice, intent, knowledge and other conditions of mind of a person may be averred generally." *Fed R Civ.P. 9(b)*; *Fed R Bankr.P. 7009.* "All that is required under Rule 9(b) is that there exist a 'minimal factual [*45] basis for . . . conclusory allegations of scienter'" *ABF Capital Management v. Askin Capital Management, L. P., 957 F. Supp. at 1318* (quoting *Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir. 1994))* "Conclusory allegations of scienter are sufficient if supported by facts giving rise to a strong inference of fraudulent intent." *IUE AFL–CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1057 (2d Cir. 1993)* (internal quotations omitted). A plaintiff may establish a "strong inference" in one of two ways: (a) by alleging facts showing a motive for committing fraud and a clear opportunity for doing so, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior by the defendant. *ABF Capital Management v. Askin Capital Management, L. P., 957 F. Supp. at 1318* (citing *Shields v. Citytrust Bancorp. Inc., 25 F.3d at 1128, Cosmas v. Hassett, 886 F.2d at 11)* The Trustee has sufficiently alleged scienter under both of these methods.

Generali appears to argue that the Trustee has failed to expressly plead motive in the Amended Complaints However, it is only necessary to [*46] allege facts to sufficiently infer a plausible motive. *See Cohen v. Koenig, 25 F.3d at 1174.* The motive which the Trustee ascribes to Generali is:

> In 1990 and 1991, it is entirely plausible that Generali saw BFG as a healthy company Thus, Generali accepted the steady stream of premiums from BFG, with the knowledge that BFG was essentially self–insured, until it became clear sometime in 1993 that the fraud threatened BFG's financial health . . . Generali received premiums over the course of several years, yet BFG retained most of the insurance risk. Thus, Generali had an incentive to continue the insurance program so long as BFG could reimburse Generali.

*Memorandum of Law in Further Support of Trustee's Motion for Leave to Serve and File Amended Adversary Complaint,* at p. 18–19.

The Court concludes that the motive proffered by the Trustee can be fairly inferred from the facts alleged in the Amended Complaints. As a general rule, allegations establishing ordinary financial incentive, without more, do not support an improper motive because ordinary financial incentive is an inherent feature of legitimate commerce. *See, e.g., San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 814 (2d Cir. 1996)* [*47] (company's desire to maintain high bond or credit rating not sufficient); *Shields v. Citytrust Bancorp, Inc., 25 F.3d at 1130* (executives' desire to prolong benefits of their positions insufficient); *Salinger v. Projectavision, Inc., 934 F. Supp. 1402, 1414 (S.D.N.Y. 1996)* (abstract desire to enable company to maintain high stock price insufficient motive). The implication of each Amended Complaint, however, is that Generali sought to profit by receiving insurance premiums from BFG while at the same time minimizing its risk to a degree not ordinarily possible by arranging to effectively avoid having to pay claims under the Policies, notwithstanding the continuing fraud. This is sufficient to show that Generali had a motive and an opportunity to aid and abet the Ponzi scheme for purposes of alleging scienter under *Fed R Civ.P. 9(b). Cf. Turkish v. Kasenetz, 27 F.3d 23, 28–29 (2d Cir. 1994)* (desire to avoid making loan payments was sufficient motive); *ABF Capital Management v. Askin Capital Management, L. P., 957 F. Supp. at 1331* (brokers had opportunity to engage in fraudulent sale of securities as well as extraordinary [*48] economic motives in form of high fees and special sales commissions).

Additionally, the Trustee's allegations that Generali entered into an agreement for BFG to reimburse it for any claims Generali would be called upon to pay under the Policies is sufficiently indicative of conscious behavior on the part of Generali. It would strike the Court as unusual, at

best, for an insurance company to obtain a policyholder's agreement to reimburse it for any payments made under such policy. Such allegations are sufficient to plead scienter under Rule 9(b). *See, e.g., Acito v. Imcera Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995)* (citation omitted) (indicating that unusual activity is circumstantial evidence of conscious behavior for Rule 9(b) purposes).

### Proximate Cause

Generali maintains that the Trustee's "looting" claims, *i.e.*, the claims for aiding and abetting Patrick Bennett's breach of fiduciary duty, must be barred for lack of proximate cause. An aiding and abetting claim will be dismissed where it is clear that the plaintiff's injury was not proximately caused by the alleged wrongful conduct. *See Kolbeck v. LIT America, Inc., 939 F. Supp. at 249* [*49] One court has summarized the concept of proximate cause:

> "Under New York law, 'an injury is proximately caused if it is the natural and probable consequence of the defrauder's misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud'" *Citibank, N.A. v. K–H Corp., 968 F.2d 1489, 1496 (2d Cir. 1992)* (quoting *Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1044 (2d Cir. 1986))* "In the context of predicate acts grounded in fraud, the proximate cause requirement means that the plaintiff must prove both transaction and loss causation." *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994). cert. denied, 513 U.S. 1079, 115 S. Ct. 728. 130 L. Ed. 2d 632 (1995), see also Revak v. SEC Realty Corp., 18 F.3d 81, 89–90 (2d Cir. 1994)* (dismissing common law claims for failure to demonstrate loss causation); *Continental Grain Co. v. Meridien Int'l Bank, Ltd., 894 F. Supp. 654, 661 (S.D.N.Y. 1995)* Transaction causation requires that the fraud cause the victim to engage in the transaction in question. [*50] *Id.*

> With respect to loss causation, a defendant's fraudulent conduct must cause the plaintiff's eventual loss, and that (sic) "'when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions.'" *Powers v. British Vita, P.L.C., 57 F.3d 176, 189 (2d*

Cir. 1995)* (quoting *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d at 769). see also Securities Investor Protection Corp. v. Vigman, 908 F.2d 1461, 1467 (9th Cir. 1990)* ("'Loss causation' is simply a label used to describe the standard rule of tort law that a plaintiff must allege and prove a sufficient causal connection between the defendant's wrongdoing and the plaintiff's harm."), *rev'd on other grounds, 503 U.S. 258. 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992)*

*Ross v. Patrusky, Mintz & Semel. 1997 U.S. Dist. LEXIS 5726.* *49, 1997 WL 214957. *16 (S.D.N.Y. 1997)*

Generali maintains that the Trustee has not adequately alleged Generali's conduct proximately caused Patrick Bennett's breach of fiduciary duty because (a) Generali is not alleged to have [*51] been a party to the looting, nor is any basis alleged for charging Generali with knowledge of the looting transactions; (b) Patrick Bennett's looting was not a reasonably foreseeable result of the Ponzi scheme; and (c) Patrick Bennett's misconduct was an intervening and superseding cause of the harm to BFG.

Generali's focus on looting alone overlooks the fact that there are two components to the Trustee's claim for breach of fiduciary duty and resulting damages. The Trustee alleges that Patrick Bennett breached his fiduciary duty to BFG by engineering the massive Ponzi scheme as well as by looting BFG. *See* Amended Complaint at PP 81, 84. As discussed above, the Trustee has sufficiently alleged that Generali had knowledge of the Ponzi scheme.

The element of causation alleged by the Trustee is that "the insurance provided by Generali was a key component in the marketing, sale and promotion of BFG's investments," and that "the insurance feature allowed Patrick Bennett to continue and expand the Ponzi scheme, plunging BFG deeper and deeper into debt." *Id.* at 73. Generali relies on *In re Investors Funding Corp. of N.Y., 523 F. Supp. at 533,* to argue that Patrick [*52] Bennett's actions were not reasonably foreseeable. In that case, the debtor's accountants were charged with having assisted corporate insiders' looting of the assets of the debtor corporation. *See id.* at 536–37. The basis of the claim was that by virtue of having certified financial statements which materially overstated the debtor's assets, the accountants enabled the debtor to obtain funds which were ultimately improperly diverted to the debtor's principals. *See id.* The court dismissed this claim, holding that the looting was not the reasonably foreseeable result of the preparation of misleading financial statements. *See id.* at 540 (holding that "it is certainly not a direct or reasonably foreseeable result of such financial statements that inside management will

embezzle such surplus funds for their personal use")

In *Investors Funding*, there does not appear to have been an allegation that the accountants had any actual knowledge of the underlying fraud. In fact, the accountants were alleged to have "performed in reckless disregard of the facts," and to have "failed to discover [the debtor's] true financial condition." *Id. at 537* [*53] (internal quotations omitted). Here, the contention is that Generali had actual knowledge of the Ponzi scheme. The case of *Gouiran Holdings, Inc. v. DeSantis, Prinzi, Springer, Keifer & Shall (In re Gouiran Holdings, Inc.), 165 B.R. 104 (E.D.N.Y. 1994)* illuminates this distinction. In that case, the committee of unsecured creditors sued the debtor's accounting firm for negligence in "repeatedly certifying the veracity of [the debtor's] financial statements without due care and by failing to correct such statements even though it knew or should have known that they were false." *Id. at 106* (internal quotation omitted). The debtor allegedly used the financial statements to raise funds from existing debenture holders and to solicit new debenture accounts, which were thereafter misappropriated by insiders of the debtor. *See id.* The complaint alleged that the accounting firm, due to its "extensive knowledge" of the debtor's business, was aware or should have been aware that the misappropriation was occurring. *See id.* Thus, the complaint alleged that the accountants' negligent preparation of the financial statements proximately caused [*54] (a) the debtor's incurrence "of debt [that] it otherwise would not have incurred and was thereafter not able to service" and (b) the insiders' misappropriation of funds, both of which ultimately caused the debtor's bankruptcy. *See id.*

The bankruptcy court in *Gouiran Holdings* dismissed the committee's claims on the basis that it had not sufficiently alleged proximate cause. *See In re Gouiran Holdings, Inc., 158 B.R. 3, 8–9 (Bankr. E.D.N.Y. 1993)*. The district court reversed, stating that it could "not say it is impossible that under some set of facts two years of negligently prepared financial statements could have been a substantial cause of [the debtor's] incurring unmanageable debt and filing for bankruptcy protection." *165 B.R. at 107* (citation omitted). The district court held that because the complaint alleged that the accountants were thoroughly familiar with the debtor's finances (unlike the situation in the *Investors Funding* case), the misappropriation of funds was not unforeseeable as a matter of law. *See id.*

Further, the district court overruled the bankruptcy court's conclusion that the misappropriation of funds by the debtor's [*55] principals was an unforeseeable intervening act that cut off the accountants' liability. *See id. at 107–08*. The district court stated:

Criminal intervention will generally sever the causation between the defendant's negligence and the plaintiff's injury. But proximate cause is not automatically removed by criminal intervening acts. *Kush v. City of Buffalo, 59 N.Y.2d 26. 33. 462 N.Y.S.2d 831. 835, 449 N.E.2d 725, 729 (1983)*. Rather, the liability of the defendant "turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence." *Derdiarian [v. Felix Contracting Corp.], 51 N.Y.2d [308], 315, 434 N.Y.S.2d [166], 169, 414 N.E.2d [666]. 670 [(1980)]*. That inquiry is generally one for the factfinder at trial. *See, e.g. Kush, 59 N.Y.2d at 33–34, 462 N.Y.S.2d at 835, 449 N.E.2d at 729* (trial judge charged jury on "reasonably prudent person" standard and foreseeability).

*See 165 B.R. at 107*. The district court stated that, even if the looting was unforeseeable, the complaint sufficiently alleged that the looting was a [*56] concurrent cause of the debtor's bankruptcy. *See id. at 108*.

Thus, the Court agrees with the Trustee that the looting of a corporation involved in a Ponzi scheme is not uncommon and may be foreseeable. *See, e.g. In re Plaza Mortgage and Fin Corp., 187 B.R. at 43–44* (noting that corporate insider had diverted funds); *In re Latin Investment Corp., 168 B.R. at 5* (same). It is noteworthy that in cases cited to the Court involving claims for aiding and abetting a Ponzi scheme, such claims are not found to suffer from a lack of proximate causation. *See generally, e.g., In re Granite Partners. L.P., 194 B.R. at 318; In re Plaza Mortgage and Fin Corp., 187 B.R. at 37. In re Latin Investment Corp., 168 B.R. at 1*. The Court also agrees with the Trustee that Patrick Bennett's alleged misconduct cannot be deemed an intervening and superseding cause of BFG's alleged damages, but rather, must be viewed as the predicate wrongdoing which Generali is alleged to have substantially assisted. Based upon the foregoing, the Court concludes that the Trustee has adequately alleged proximate causation.

[*57] *The Negligence Claims*

The basis for the Trustee's negligence claims is that 1) Generali undertook audits and inspections of BFG's books and records, *see* Amended Complaint at P 90, 91, 2) as a result of which "it had a duty to conduct those audits and inspections in a proper, skillful, diligent and reasonable manner," *id. at 92, and 3)* that Generali breached that duty

"by failing to detect . . . the Ponzi scheme and/or the sham transactions, diversion of assets, self-dealing and waste of corporate assets . . . and/or by failing to reveal to BFG or any other BFG-related entity the activities of Patrick Bennett and his aiders and abettors," *id. at P 93*

The elements of a common law claim of negligence are 1) duty of defendant to conform to certain standard of conduct with respect to the plaintiff; 2) failure of defendant to so conform; and 3) reasonably foreseeable injury to the plaintiff. *See Cresser v. American Tobacco Co., 174 Misc. 2d 1, 662 N.Y.S 2d 374, 379* "Unlike foreseeability and causation, both generally factual issues to be resolved on a case-by-case basis by the fact finder, the duty owed by one member of society to another is [*58] a legal issue for the courts." *Eiseman v. State of New York, 70 N.Y.2d 175, 187, 518 N.Y.S 2d 608, 613, 511 N.E 2d 1128, 1134 (1987)* (citing *De Angelis v. Lutheran Med. Center, 58 N.Y.2d 1053, 1055, 462 N.Y.S 2d 626, 449 N.E 2d 406))*

Generali argues that it owed no duty to BFG because, under the Policies, it had the right, but not the obligation, to audit and inspect BFG's books and records. The Trustee argues, however, that its claims that Generali owed a duty of care to BFG are not based upon any contractual provision, but rather upon the position that Generali voluntarily undertook the audits and inspections. In New York, "the caselaw is clear that, even when no original duty is owed to the plaintiff to undertake affirmative action, once it is voluntarily undertaken, it must be performed with due care." *Parvi v. City of Kingston. 41 N.Y.2d 553, 559, 394 N.Y.S 2d 161, 362 N.E 2d 960 (1977)* Generali also argues that, under *§ 324(a) of the Restatement (Second) of Torts*, cited by the Trustee, a negligent undertaking must result in physical harm to person or property in order to be actionable. Physical harm is not necessary in this [*59] situation. As stated by the New York Court of Appeals in *Eiseman v. State of New York*,

Liability in negligence may of course rest on some form of written misrepresentation or nondisclosure on the part of defendant by which plaintiff or a third party is misled, resulting in injury or damage to plaintiff. The basis of liability is the fact that the misrepresentation or nondisclosure has led the person to whom it was made to forego action that might otherwise have been taken for the protection of the plaintiff.

*70 N.Y.2d at 187, 518 N.Y.S 2d at 614, 511 N.E 2d at 1135* (citing Prosser and Keeton, Torts § 33, at 207 (5th ed.)) Under the foregoing standards, the Trustee has adequately pleaded negligence claims.

Based upon all of the foregoing, the Trustee's Motion is granted in its entirety, and it is

ORDERED that the Trustee shall file and serve the Amended Complaint in the substantively consolidated adversary proceeding within twenty (20) days of the date of this Order. n5

n5 By Order dated October 10, 1997, the Court substantively consolidated the within adversary proceedings.

[*60]

Dated at Utica, New York

this 19th day of December 1997

STEPHEN D. GERLING

Chief U.S. Bankruptcy Judge

LEXSEE 2004 US DIST LEXIS 24339

**CENTRAL COMMUNITY CHURCH OF GOD, on behalf of itself and others similarly situated, and JEFF MARWIL, RECEIVER of the CHURCH EXTENSION OF THE CHURCH OF GOD, INC., and UNITED MANAGEMENT SERVICES, INC., Plaintiffs, v. ENT & IMLER CPA GROUP, PC, Defendant.**

**CASE NO. 1:03–cv–0678–DFH–VSS**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION**

*2004 U.S. Dist. LEXIS 24339*

**November 24, 2004, Decided**

**NOTICE:**    [*1]    NOT INTENDED FOR PUBLICATION IN PRINT

**SUBSEQUENT HISTORY:** Motion granted by, Class certification granted by *Cent Cmty Church of God v. Ent & Imler CPA Group, PC. 2005 US Dist LEXIS 8679 (S D Ind, May 9, 2005)*

**DISPOSITION:** Defendant's motion to dismiss the Amended Complaint denied.

**COUNSEL:** For JEFF MARWIL, Conservator of the CHURCH EXTENSION OF THE CHURCH OF GOD, INC, Plaintiff: Elliott D Levin, RUBIN & LEVIN, PC, Indianapolis, IN; Jeff Jacob Marwil, JENNER & BLOCK LLC, Chicago, IL; John C. Hoard, RUBIN & LEVIN, PC, Indianapolis, IN; Shelley Malinowski, JENNER & BLOCK LLC, Chicago, IL; Sue Figert Meyer, RUBIN & LEVIN, Indianapolis, IN; Heather L. Kramer, JENNER & BLOCK, Chicago, IL; Peter Jonathon Young, JENNER & BLOCK, LLC, Chicago, IL.

For CENTRAL COMMUNITY CHURCH OF GOD, on behalf of itself and others similarly situated, Plaintiff: Elliott D. Levin, RUBIN & LEVIN, PC, Indianapolis, IN; John C Hoard, RUBIN & LEVIN, PC, Indianapolis, IN; Sue Figert Meyer, RUBIN & LEVIN, Indianapolis, IN; Mary Terese Doherty, SOMMER BARNARD ATTORNEYS, PC, Indianapolis, IN.

For ENT & IMLER CPA GROUP, PC, Defendant: Heather L Emenhiser, STUART & BRANIGIN LLP, Lafayette, IN; Nicholas Christo Nizamoff, STUART & BRANIGIN, Indianapolis, IN; Susan K. Roberts, STUART & BRANIGIN LLP, Lafayette, IN.

**JUDGES:** DAVID F. HAMILTON, JUDGE.

**OPINIONBY:** DAVID F. HAMILTON

**OPINION:**

ENTRY ON MOTION TO DISMISS

In the case of *Securities & Exchange Commission v. Church* [*2] *Extension of the Church of God, Inc*, No. 1:02–cv–1118, this court appointed Jeff J Marwil conservator and receiver for Church Extension of the Church of God, Inc. ("CEG") and United Management Services, Inc. ("UMS"). CEG is a financial arm of the Church of God. UMS is a subsidiary of CEG that managed real estate and businesses for CEG. The SEC alleged in its civil enforcement action that CEG was insolvent and had raised millions of dollars unlawfully by making false statements to prospective purchasers of investment notes, the vast majority of which were sold to members of the Church of God.

Pursuant to an agreement approved by this court between the SEC, CEG and UMS, and under supervision by this court and Marwil, CEG has undertaken a plan to liquidate its assets. The goal is to meet as many of its obligations to creditors as possible, including its obligations to holders of the investment notes. In his capacity as receiver, Marwil has filed several actions in this court, including this action. In the original complaint in this action, Marwil as receiver was the only plaintiff. The defendant is Ent & Imler CPA Group, an accounting firm with its principal place of business in [*3] Indianapolis. Ent & Imler provided accounting services to CEG and UMS from 1997 to 2002.

In the original complaint, Marwil alleged that defendant Ent & Imler CPA Group had violated federal securities fraud and had committed malpractice. On December

2004 U.S. Dist. LEXIS 24339, *3

11, 2003, the court granted Ent & Imler's motion to dismiss the securities fraud claim because Marwil, as receiver of the issuer of the securities in question, did not have standing to assert claims directly on behalf of the noteholders. See *Marwil v. Ent & Imler CPA Group*, No. 1:03-cv-0678 (S.D. Ind. Dec. 11, 2003). The court granted Marwil leave to amend and said that noteholders could assert the securities fraud claims on their own behalf. n1

> n1 On the same day, the court decided a nearly identical issue in a related case, *Marwil v. Farah*, 2003 U.S. Dist. Lexis 23140, 2003 WL. 23095657 (S.D. Ind. Dec. 11, 2003) (holding that Marwil lacked standing to assert fraudulent conveyance claims directly on behalf of noteholders but could assert those claims on behalf of CEG).

[*4]

Marwil responded by filing an amended complaint. The Amended Complaint joins claims by Marwil as receiver for CEG and UMS and by the Central Community Church of God, a non-profit corporation headquartered in Wichita, Kansas. The Central Community Church seeks to represent a class of investors who purchased investment notes offered by CEG through a series of Offering Circulars between at least 1997 and April 2002. In Count I of the Amended Complaint, Central Community Church alleges that Ent & Imler violated federal securities law under Section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C. § 78j(b)*, and *Rule 10b–5* promulgated under the Act, *17 C.F.R. § 240.10b–5*, when it certified financial statements and helped to prepare Offering Circulars containing fraudulent misrepresentations that misled noteholders about the true financial condition of CEG. In Count II, Marwil alleges that Ent & Imler breached its accounting services contract with CEG by failing to perform properly its obligations under the contract.

This court has subject matter jurisdiction over this action under *28 U.S.C. § 1331*. The court's supplemental jurisdiction [*5] over Marwil's state law claim is authorized by *28 U.S.C. § 1367(a)*. His claim is part of the same case or controversy as Central Community Church's federal claim, for it arises from the same series of transactions and events and is against the same defendant. In addition, Marwil's claim falls within the reasoning of *Tcherepnin v. Franz*, which approved of the exercise of ancillary jurisdiction over state law claims brought by a receiver to accomplish the ends sought and directed by the SEC action in which he had been appointed a receiver. *485 F.2d 1251, 1255–56 (7th Cir. 1973)*, citing *Esbitt v. Dutch-American Mercantile Corp., 335 F.2d 141, 142 (2d Cir. 1964)* n2

> n2 *Tcherepnin* is perhaps best understood today as a practical and convenient method of exercising supplemental jurisdiction over a claim that could easily have been brought as a third party action as part of the SEC's enforcement action. CEG is a defendant in that action, and its claim against Ent & Imler asserts in essence that Ent & Imler may be liable for all or part of the SEC's claims against CEG. See *Fed. R. Civ. P. 14(a)*.

[*6]

Ent & Imler has moved to dismiss plaintiffs' Amended Complaint. Ent & Imler argues that Central Community Church's securities fraud claims should be dismissed for misjoinder, failure to plead fraud with sufficient specificity, and violation of this court's holding that Marwil has no standing to sue on behalf of noteholders. Ent & Imler moves to dismiss receiver Marwil's breach of contract claim based on the doctrine of in *pari delicto* and the argument that a claim for accounting malpractice lies exclusively in tort. For the reasons explained below, defendant's motion is denied in its entirety.

*Dismissal Standard*

By moving to dismiss under *Rule 12(b)(6)*, the defendant has invited the court to consider the case under a legal standard that is one of the most generous to plaintiffs under the law. The court must treat as true all well pleaded facts set forth in the complaint, construe the allegations liberally, and view all inferences reasonably drawn from the alleged facts in the light most favorable to the plaintiffs. *Forseth v. Village of Sussex. 199 F.3d 363, 368 (7th Cir. 2000)*; *Gould v. Artisoft, Inc., 1 F.3d 544, 548 (7th Cir. 1993)*. Dismissal [*7] is warranted only if it is clear that the plaintiffs can prove no set of facts consistent with the complaint that would entitle them to relief. *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 152 L. Ed. 2d 1. 122 S. Ct. 992 (2002)*; *Nance v. Vieregge, 147 F.3d 589. 590 (7th Cir. 1998)*, quoting *Hishon v. King & Spalding. 467 U.S. 69, 73, 81 L. Ed. 2d 59. 104 S. Ct. 2229 (1984)*.

The court's consideration of a *Rule 12(b)(6)* motion is limited to the pleadings, which generally consist of the complaint and any exhibits or documents attached to or referenced in the complaint, as well as the parties' briefs on the motion. See *Thompson v. Illinois Department of Professional Regulation. 300 F.3d 750, 753 (7th Cir. 2002)*; *Rosenblum v. Travelbyus.com Ltd., 299 F.3d 657, 661 (7th Cir. 2002)*; *Menominee Indian Tribe v. Thompson, 161 F.3d 449, 456 (7th Cir. 1998)*. Plaintiffs may posit facts in their brief. So long as those facts are not inconsistent with the complaint, the court must assume they are true for purposes of deciding the motion. See, e.g., *Chavez v. Illinois State Police, 251*

*F 3d 612. 650 (7th Cir. 2001); Trevino v. Union Pacific Railroad Co., 916 F 2d 1230. 1239 (7th Cir. 1990)* [*8]

### Plaintiffs' Allegations

For the purpose of deciding defendant's motion to dismiss, the court accepts the following allegations contained in the Amended Complaint as true. CEG is an Indiana not-for-profit corporation established to raise funds for the Church of God, a church with over 2,000 affiliated congregations and over 230,000 members nationwide. CEG's primary business purpose is to fund the construction of new churches and the renovation of existing churches affiliated with the Church of God. From 1996 to April 2002, CEG raised millions of dollars by selling investment notes to Central Community Church and others. CEG offered the notes for sale through five Offering Circulars. The Offering Circulars included consolidated financial statements with detailed information about CEG and its finances and operations. Through the Offering Circulars, CEG represented to investors that the funds from the investment notes would be used primarily to make interest-bearing loans to local churches, and that CEG had a policy of maintaining liquid reserves equal to or greater than a specified percentage of its outstanding notes.

On December 27, 1999, Central Community Church purchased a note [*9] from CEG for $250,000. In reliance on statements made in the Offering Circular, including statements regarding the financial condition of CEG, Central Community Church continued to make deposits as permitted under the terms of the note. On April 20, 2002, the balance of Central Community Church's note was $1,968,641.

From December 1997 until September 2002, CEG retained defendant Ent & Imler to prepare its audited financial statements and to help CEG prepare the Offering Circulars. Ent & Imler prepared the independent auditor's reports and consolidated financial statements that were included, with Ent & Imler's consent, in the Offering Circulars. Plaintiffs allege that during the relevant period, the Offering Circulars contained a number of affirmative misrepresentations and that they omitted material facts regarding the investment notes, the financial condition of CEG and its subsidiaries, the primary use of the investment note proceeds, and the risks associated with the notes. Plaintiffs identify three sets of such misrepresentations and omissions that concealed CEG's mounting financial difficulties.

First, plaintiffs allege that CEG engaged in a series of high-risk "bargain [*10] sale" transactions from 1996 through early 2002 using inflated appraisals and other devices to exaggerate the value of the properties or businesses acquired n3 Ent & Imler in turn used these inflated appraisal values to certify CEG's consolidated financial statements, which reflected non-cash contributions of over $24 million in phantom income during those years. In 2001, Ent & Imler opined that the financial statements fairly represented the financial position of CEG and related entities. This phantom income, according to plaintiffs, allowed CEG to claim that it was solvent when it was insolvent, and therefore to deceive prospective investors into buying still more notes. In reality, CEG was experiencing substantial losses. Most of its reported income was the artificial product of the bargain sale transactions.

> n3 Bargain sale transactions can be a lawful and prudent mechanism allowing a charitable organization to recognize income from non-cash contributions. In a typical and legitimate bargain sale, a seller sells property to the charitable organization for less than full market value. For accounting purposes, the charity records the difference between the sale price and market value as income. The seller, in turn, can treat the difference between the market value and sale price as a charitable contribution for income tax purposes. The determination of market value is obviously critical to the tax and accounting legitimacy of the transaction.

[*11]

Second, plaintiffs allege that from 1998 through June 30, 2001, the Offering Circulars represented that the proceeds from the sale of investment notes would be used primarily to fund church loans. Instead of going toward loans to churches, however, most of the note proceeds were used to pay debts owed to prior CEG investors and to fund the bargain sale transactions. Ent & Imler had access to financial records that disclosed CEG's actual use of the note proceeds.

Third, plaintiffs allege that although the Offering Circulars claimed that CEG maintained a reserve of liquid assets equal to eight percent of its outstanding note obligations, the amount actually available as liquid reserves fell well below eight percent. Again, Ent & Imler had access to financial records that disclosed the difference between reality and the claims in the Offering Circulars.

### Discussion

#### I. Class Plaintiff: Central Community Church of God

Seeking to represent a plaintiff class of noteholders, Central Community Church alleges that Ent & Imler violated federal securities law under *Section 10(b) of the Securities Exchange Act* and *Rule 10b-5. Section 10(b) of the Act* makes it unlawful "to use or [*12] employ, in connection with the purchase or sale of any security . ., any

2004 U.S. Dist. LEXIS 24339, *12

manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." *15 U.S.C. § 78j(b)*. Rule 10b-5 makes it unlawful "To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." *17 C.F.R. § 240 10b-5*. Defendant's three proffered grounds for dismissal of Central Community Church's claim are not persuasive.

### A. *Misjoinder of Plaintiffs*

First, Ent & Imler contends that Central Community Church's claim for securities fraud should not be joined with receiver Marwil's claim for breach of contract. *Rule 20 of the Federal Rules of Civil Procedure* covers permissive joinder of parties and states in relevant part:

> All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, [*13] occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.

Defendant maintains that the claims, defenses, and issues under Central Community Church's fraud action lack the commonality with Marwil's contract claim that is necessary for *Rule 20* joinder. The court disagrees.

CEG contracted with Ent & Imler from December 1997 to September 2002 to prepare CEG's audited financial statements and to help prepare the Offering Circulars. Receiver Marwil claims that Ent & Imler failed to perform its obligations under the contract by failing to perform its audit in accordance with generally accepted accounting standards ("GAAS"), by failing to test and confirm the existence of assets and the validity of transactions, and by failing to render financial statements free of material misstatements. Amended Complaint P 113. Marwil's contract claim and Central Community Church's fraud claim involve exactly the same course of conduct and the same transactions by defendant: preparing and certifying audited financial statements and helping to prepare the Offering Circulars. Marwil's claim and Central Community Church's [*14] claim thus also share common issues of fact, including the valuation of CEG assets, the existence and availability of financial records disclosing CEG's use of note proceeds and liquidity of reserves, the assumptions and data underlying the valuations of assets obtained in the bargain sales, and the procedures and

assumptions Ent & Imler used when auditing CEG's financial statements and reviewing the Offering Circulars. The joinder of the plaintiffs' claims meets the requirements of *Rule 20*.

### B. *Pleading Fraud with Particularity*

Defendant Ent & Imler also argues that Central Community Church's securities fraud claim fails to meet the heightened pleading standards of both *Rule 9(b) of the Federal Rules of Civil Procedure* and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified in *15 U.S.C. § 78u-4(b)*. Ent & Imler contends that the Amended Complaint does not sufficiently plead fraudulent "scienter." Ent & Imler also argues that the complaint alleges only "fraud by hindsight," which does not state a claim for securities fraud. See *Asher v. Baxter International Inc.*, *377 F.3d 727, 730 (7th Cir. 2004)* ("fraud by hindsight" [*15] is not actionable).

To state a claim for securities fraud under *Section 10(b)*, plaintiffs must allege among other elements that the defendant acted with fraudulent "scienter," which refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, *425 U.S. 185, 193 n.12, 47 L.Ed.2d 668, 96 S.Ct 1375 (1976)*. n4 The Seventh Circuit has long held that reckless disregard for the truth is sufficient to meet the scienter requirement of *Section 10(b)*. "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chemical Corp.*, *553 F.2d 1033, 1045 (7th Cir. 1977)*. A plaintiff may plead scienter "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Chill v. General Electric Co.*, *101 F.3d 263, 268 (2d Cir. 1996)*, quoting *Acito v. IMCERA Group, Inc.*, *47 F.3d 47, 52 (2d Cir. 1995)* [*16]

> n4 In an action under *section 10(b)* and *Rule 10b-5*, the plaintiff must establish that: (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied, and (6) the false statement proximately caused the plaintiff's damages. *Caremark, Inc. v. Coram Healthcare Corp.*, *113 F.3d 645, 648 (7th Cir. 1997)*.

*Rule 9(b)* requires that when fraud is alleged in a complaint, "the circumstances constituting fraud . . . shall be stated with particularity," but *Rule 9(b)* allows states

of mind to be alleged generally. *E g., United States v. Northern Trust Co., 372 F.3d 886, 888 (7th Cir. 2004).* The PSLRA raised the pleading standard by requiring a plaintiff's complaint to specify each statement alleged to have been misleading and the reasons why the statement is misleading. *15 U S C. § 78u-4(b)(1).* With respect to each act or omission alleged, [*17] the complaint must state with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." *§ 78u-4(b)(2).* n5

> n5 In cases decided before the PSLRA took effect, the Seventh Circuit had interpreted *Rule 9(b)* to require that scienter be pled with a sufficient level of factual support to "afford a basis for believing that plaintiffs could prove scienter"—namely, "the who, what, when, where, and how: the first paragraph of any newspaper story." *In re HealthCare Compare Corp Securities Litigation. 75 F.3d 276, 281 (7th Cir. 1996),* quoting *DiLeo v. Ernst & Young. 901 F 2d 624. 627. 629 (7th Cir. 1990).* Whether that requirement was consistent with *Rule 9(b)*'s provision that state of mind can be averred generally is now largely moot in light of the requirements of the PSLRA.

To avoid the damning label of "fraud by hindsight," a plaintiff must plead a factual basis for believing that the defendant knew or was reckless in not knowing [*18] about misleading representations or omissions at the time the actions allegedly occurred, prior to any later disclosure. See, *e g., Arazie v. Mullane, 2 F.3d 1456. 1468 (7th Cir. 1993)* (finding that plaintiff stockholders failed to allege with the particularity required by *Rule 9(b)* that defendant's predictions lacked a reasonable basis at the time they were made, making the action a claim for "fraud by hindsight"); *Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)* (adopting phrase "fraud by hindsight" where plaintiff had "simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones").

The Amended Complaint in this case states the circumstances constituting Ent & Imler's alleged fraud with a particularity sufficient to meet the requirements of *Rule 9(b).* Central Community Church also has identified details of alleged misstatements and omissions sufficient to meet the more rigorous requirements of the PSLRA. Central Community Church's allegations, if true, could support a strong inference that Ent & Imler recklessly disregarded obvious evidence that the statements it reviewed, prepared, and [*19] certified contained material misrepresentations. Central Community Church refers to data, allegedly available to Ent & Imler over the course of

its relationship with CEG, that were directly inconsistent with the bargain sale valuations, the represented use of note proceeds, and the actual liquidity of CEG's funds. For example, the Offering Circulars represented that the proceeds from the sale of investment notes would be used primarily to fund church loans. Central Community Church alleges that Ent & Imler had access to financial records showing that in 1998, 1999, and 2000, only about 35 percent, zero percent, and six percent of the proceeds, respectively, went toward funding church loans. Amended Complaint PP 39-43. Courts have found that a "strong inference" of recklessness may be supported by allegations that a defendant knew facts or had access to information suggesting that its public statements were not accurate. See *Florida State Board of Admin v. Green Tree Financial Corp., 270 F.3d 645, 665 (8th Cir. 2001)* ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access [*20] to information suggesting that their public statements were materially inaccurate"); *Novak v. Kasaks. 216 F.3d 300, 308 (2d Cir. 2000)* ("securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements"); *Chill. 101 F.3d at 269* ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness"), quoting *Goldman v. McMahan. Brafman, Morgan & Co . 706 F Supp 256, 259 (S D N Y 1989); Miller v. Material Sciences Corp., 9 F Supp 2d 925, 927-928 (N D Ill 1998)* (denying motion to dismiss where plaintiff alleged that defendants publicly reported sales and earnings using artificially inflated figures and defendants were aware at the time of substantial evidence that the figures were inflated).

Moreover, unlike plaintiffs in typical fraud-by-hindsight cases, Central Community Church has not asked the court to infer defendant's knowledge or reckless disregard of facts based on a later discovery [*21] that statements or omissions turned out to be false. Central Community Church has cited data that were available to Ent & Imler at the time of its financial audits and that were directly inconsistent with the representations incorporated by Ent & Imler. Nor are these cited data simply "red flags" that could have indicated CEG's misconduct. The cited data allegedly would have provided Ent & Imler with direct evidence that CEG's representations were amiss, if Ent & Imler had looked.

Drawing all reasonable inferences in favor of the plaintiff, Central Community Church's allegations would, if proven, allow a fact finder to infer that Ent & Imler at least recklessly disregarded data that were materially

inconsistent with CEG's representations. The securities fraud claim is sufficient to withstand defendant's motion to dismiss.

### C. Simultaneous Representation of Receiver and Noteholders

As defendant notes, this court has already held that Marwil, in his capacity as receiver for CEG and UMS, lacks standing to bring claims directly on behalf of noteholders. The response to that decision was the addition of Central Community Church as a plaintiff in its own right and as representative [*22] of a putative plaintiff class. Defendant contends that this response to the court's earlier decision was some kind of ruse to avoid the court's ruling. Defendant suggests that the appropriate response is dismissal of the noteholder's claim, or disqualification of its attorneys, or both. In the court's view, however, the addition of a noteholder as a named plaintiff to assert its own claims in its own name directly responds to and cures the standing problem the court found in the initial complaint. There also is no reason to disqualify the noteholder's law firm.

There are of course potential conflicts between the receiver and the noteholders. The receiver's duty is to act in the best interests of all of CEG's creditors. The noteholders are entitled to act in their own best interests. But the potential conflicts do not disqualify one of plaintiffs' law firms from representing both the noteholder and the receiver. The interests of the noteholders and the receiver are sufficiently aligned that there is at best only a hypothetical potential for a conflict of interests. Such a potential conflict does not require disqualification, let alone dismissal or severance of the underlying claims [*23] for relief.

The court may order disqualification of attorneys upon a motion from a party or on its own initiative. *Philips Medical Systems Int'l B. V. v. Bruetman, 8 F.3d 600, 606 (7th Cir. 1993)*. Disqualification is a drastic measure "which courts should hesitate to impose except when absolutely necessary," *Freeman v. Chicago Musical Instrument Co., 689 F.2d 715, 721 (7th Cir. 1982)*, and courts must also be cautious about an opponent's effort to seek disqualification, perhaps as a tactical or delaying device. The party moving for disqualification has the burden of showing facts requiring such a drastic step. *Weeks v. Samsung Heavy Industries Co., 909 F.Supp. 582, 583 (N.D. Ill. 1996)* (the party moving for disqualification "has the burden of showing facts requiring disqualification").

Defendant has not met its burden to present facts showing that disqualification of Rubin & Levin as counsel for Central Community Church is warranted in this case. Conflicts associated with simultaneous representation of co-plaintiffs are governed by Rule 1.7(b) of the Indiana

Rules of Professional Conduct. The conflicts claimed by Ent & Imler are [*24] at most only potential conflicts. A potential conflict does not itself preclude representation. "The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." Comments to Rule 1.7(b), Indiana Rules of Professional Conduct, Adopted Effective January 1, 1987. Moreover, opposing counsel may properly raise the question of a conflict of interest under Rule 1.7 only where the conflict is such "as clearly to call in question the fair and efficient administration of justice." *Id.*

*Scholes v. Tomlinson, 1991 U.S. Dist. Lexis 10486, 1991 WL 152062 (N.D. Ill. July 29, 1991)*, upon which Ent & Imler relies, provides a useful comparison with the present case. n6 In *Tomlinson*, Scholes filed actions in his dual capacity as receiver for entities subject to SEC litigation and as class representative for defrauded account holders. The same law firm represented Scholes in both capacities. n7 The *Tomlinson* court noted that Scholes would likely [*25] be confronted with a dilemma which would require him to weigh the interests of the class plaintiff against other creditors of the receivership entities. If Scholes then sought the advice of the law firm, the court reasoned, his counsel could not exercise independent judgment on behalf of Scholes as receiver while simultaneously representing the class. *Id. at * 22-23.*

> n6 *Scholes v. Tomlinson* was one of several cases where Scholes, in his capacity as receiver for several entities, brought claims to recover assets lost in an illegal Ponzi scheme. See also *Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995)*.

> n7 Like Marwil, Scholes was a partner with the law firm representing both receiver and class representative.

Treating as true Central Community Church's factual claims presented in the brief and consistent with the complaint, the risk of the type of conflict that concerned the *Tomlinson* court would be alleviated in this case. Central Community Church has presented facts supporting [*26] its assertion that in this case, its interests and those of CEG's other creditors are not likely to raise a conflict in counsel's representation. The Plan for Noteholder Repayment by CEG and UMS, approved by this court on January 31, 2003, sets forth the priorities of creditors' claims to CEG's assets. The Plan ensures that noteholders cannot be favored over CEG's other creditors in the distribution of CEG's assets. At the same time, Marwil's

interests as receiver of CEG and UMS and his obligations to protect the interests of all creditors, including the note-holders, mean that his responsibilities here are virtually congruent with the interests of the noteholders. To the extent there might be some potential for conflicting interests between co–plaintiffs Marwil and the prospective class of noteholders, that prospect is so remote that there is simply no basis for disqualification, let alone dismissal of the underlying claim. Accordingly, the court denies defendant's motion to dismiss Central Community Church's claim.

## II. *Marwil as Receiver*

### A. *In Pari Delicto Defense*

Defendant asserts that the doctrine of *in pari delicto* bars Marwil's breach of contract claim on behalf [*27] of CEG. This Latin phrase literally means "of equal fault." *Theye v. Bates*, 166 Ind. App. 652, 337 N.E.2d 837, 844 (Ind. App. 1975). "The expression *in pari delicto*' is a portion of the longer Latin sentence, *In pari delicto potior est conditio defendentis*,' which means that where the wrong of both parties is equal, the position of the defendant is the stronger." *Id.* Corporations are subject to the *in pari delicto* defense, although to some extent the doctrine "loses its sting when the person who is *in pari delicto* is eliminated." *Scholes v. Lehmann*, 56 F.3d 750, 754–55 (7th Cir. 1995), citing *McCandless v. Furlaud*, 296 U.S. 140, 160, 80 L. Ed. 121, 56 S. Ct. 41 (1935).

It is important to keep in mind that defendant seeks dismissal under *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim upon which relief may be granted. The doctrine of *in pari delicto* is an affirmative defense. See, e.g., *Knauer v. Jonathon Roberts Financial Group, Inc.*, 348 F.3d 230, 237 n.6 (7th Cir. 2003). A plaintiff need not try to plead around affirmative defenses. *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003); accord, *Deckard v. General Motors Corp.*, 307 F.3d 556, 560 (7th Cir. 2002) [*28] ("The existence of a defense does not undercut the adequacy of the claim."). In unusual cases where the challenged complaint shows beyond dispute that an affirmative defense is valid, courts may dismiss under *Rule 12(b)(6)*. See, e.g., *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) ("when the existence of a valid affirmative defense is so plain from the face of the complaint that the suit can be regarded as frivolous, the district judge need not wait for an answer before dismissing the suit"); Wright & Miller Federal Practice & Procedure: Civil 3d § 1349 (2004). Such cases remain the exception, however. Under *Rule 12(b)(6)*, receiver Marwil is entitled to a generous reading of the Amended Complaint and to the benefit of possible facts that may be consistent with it.

Marwil has alleged that CEG officers embarked on a fraudulent scheme to cover up CEG's financial difficul-

ties. Ent & Imler therefore contends that the fraudulent conduct of those officers is imputed to CEG so as to make CEG itself at least as culpable as Ent & Imler might be. Under this view, Marwil, as receiver of CEG, should be barred from pursuing his breach of contract claim against the corporation's [*29] auditors. See *Knauer*, 348 F.3d at 236 (explaining the general rule in Indiana that the receiver is subject to all the defenses — including *inpari delicto* — that would have been available against the receivership entity); *Marwil v. Farah*, 2003 U.S. Dist. Lexis 23140 at * 25–26 (S.D. Ind. Dec. 11. 2003) (same).

Two Seventh Circuit decisions — *Knauer*, 348 F.3d 230, and *Scholes v. Lehmann*, 56 F.3d 750 — clarify the scope of the *in pari delicto* defense. Both *Knauer* and *Scholes* involved actions by equitable receivers against defendants implicated in Ponzi schemes where corporate officers defrauded investors. The Seventh Circuit held in *Scholes* that the *in pari delicto* defense did not apply to the plaintiff's fraudulent conveyance action, whereas in *Knauer* the court applied the defense to bar the plaintiff's tort claims. The cases highlighted that the equitable alignment of plaintiff and defendant is crucial in applying the *in pari delicto* defense. *Knauer*, 348 F.3d at 236. In the Seventh Circuit's view, the key distinction between *Scholes and Knauer* was that in [*30] *Scholes*, the plaintiff receiver sought to recover diverted funds from the people who benefitted from the diversions, whereas in *Knauer* the receiver sued defendants who had derived no benefit from the embezzlements. *Id.* The application of the *in pari delicto* defense was appropriate in *Knauer* because the equitable balancing in that case favored the defendants; they had not seen a cent of the diverted funds and their "involvement in the Ponzi scheme as a whole was quite minor." *Id at 237*. The Seventh Circuit emphasized that under the facts alleged in *Knauer*, there was "no allegation whatsoever that the defendants were directly involved in the embezzlements or benefitted from them." *Id.* "Had the [defendant] broker dealers been directly involved in the embezzlements, or attained some tangible benefit from them, this would be a different case." *Id. at 237 n.6*.

At least at the pleading stage, the equitable alignment alleged here appears to resemble *Scholes v. Lehmann* more closely than *Knauer*. Marwil has alleged that Ent & Imler was directly involved in CEG's fraudulent misrepresentations to noteholders by recklessly [*31] ignoring and perpetuating those misrepresentations. Accepting Marwil's allegations as true, as the court must at this stage, Ent & Imler engaged in a course of conduct that went beyond simply facilitating the fraudulent bargain sale valuations and other alleged misrepresentations. Unlike the situation in *Knauer*, a fair inference from Marwil's allegations is that Ent & Imler participated or played a substantial role

in defrauding investors. Thus even if the former CEG officers' wrongdoings are imputed to CEG and UMS, the court could not find as a matter of law that CEG's and UMS's alleged fault in the overvaluation of bargain sale assets and other alleged misrepresentations exceeded that of Ent & Imler. n8 Accordingly, defendant's *in pari delicto* defense does not support dismissal at this stage under *Rule 12(b)(6)*.

### B. *Tort versus Contract Claims*

Defendant also argues that Count II of the Amended Complaint, although labeled as breach of contract, is actually a tort claim for accountant malpractice. Defendant contends that Indiana law treats all allegations of professional malpractice as arising in tort absent a specific agreement between the parties to perform beyond the [*32] legally implied standard of care. Therefore, defendant asserts, Marwil's breach of contract claim should be dismissed for failure to state a claim upon which relief can be granted. The court disagrees.

> n8. This case also resembles *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP, 2004 U.S. Dist. Lexis 6277, 2004 WL 771230 (S.D. Ind. March 24, 2004)*, a case recently decided by this court, where the plaintiffs alleged that the accounting firm Ernst & Young was directly involved in the fraudulent transfer of assets from Baker O'Neal Holdings by president and CEO O'Neal. The court denied defendant's motion to dismiss based on the *in pari delicto* defense.

In Count II of the Amended Complaint, Marwil alleges that Ent & Imler failed to perform its obligations under its service contract with CEG in that it failed, among other things, to:

> a. perform its audit in accordance with procedures that complied with [generally accepted accounting standards];
>
> b. test the documentary evidence supporting [*33] the transactions recorded in the accounts, test the physical existence of assets, and confirm the investments, receivables and certain other assets and liabilities; and
>
> c. render the financial statements free of material misstatements.

Amended Complaint P 113. These allegations mirror to a large extent, although not perfectly, the promises set forth in the engagement letter of December 31, 1997. See Pl.

Ex. C.

On this state law question, this court's role is to apply Indiana law as the court predicts the Supreme Court of Indiana would apply it to the facts in this case. See, e.g., *State Farm Mutual Auto. Ins. Co. v. Pate, 275 F.3d 666, 669 (7th Cir. 2001)*. Decisions of intermediate appellate courts also deserve great weight in predicting state law unless there are persuasive reasons to believe the state's highest court would disagree with them. *Id.*

Ent & Imler cites no Indiana case holding specifically that accounting malpractice cannot support a breach of contract claim. Defendant has built its argument using Indiana cases on statutes of limitations for attorney malpractice claims, plus cases from other jurisdictions extending the law on attorney [*34] malpractice to accountant malpractice claims. In *Shideler v. Dwyer, 275 Ind. 270, 417 N.E.2d 281 (Ind. 1981)*, the Indiana Supreme Court considered, among other issues, whether the trial court properly denied an attorney's motion for summary judgment against a client's heir's allegations of breach of contract, negligence, fraud, constructive fraud, and breach of fiduciary duty. The summary judgment motion primarily addressed whether the action was barred by the statute of limitations. The court held that, notwithstanding the labels of the claims, the substance of the client's heir's action was for legal malpractice and injury to personal property, and thus her action was barred by the two-year statute of limitations for tort claims under Ind. Code § 34–1–2–2(1) (recodified at *Ind. Code § 34–11–2–4*). *Id. at 280-81.* A series of subsequent decisions by the Indiana courts reaffirmed the ruling in *Shideler.*

*Shideler* and its progeny stand for the proposition that "legal malpractice claims are governed by tort principles regardless of whether they are brought as a tort, a breach of contract, or both." *American International Adjustment Co. v. Galvin, 86 F.3d 1455, 1459 (7th Cir. 1996)* [*35] The determinative issue in those cases was how to reach beyond the pleading's labels and characterize the underlying substantive claim in order to determine which statute of limitations period to apply. *Shideler* provided a process for doing so. See *Davis v. Geo. S. Olive & Co., 731 F. Supp. 1380, 1383–84 (S.D. Ind. 1990)* ("Fortunately, the Indiana Supreme Court has provided a process by which a court can select the appropriate statute of limitations," citing *Shideler*).

Even if the court accepts the contention that tort principles apply to a claim that an accountant breached generally accepted accounting standards, Marwil's contract claim should not be dismissed. The Indiana cases on this subject did not hold that professional malpractice claims must be dismissed unless labeled correctly in the complaint. All of the cited Indiana cases were decisions on

motions for summary judgment, and in all of the cases defendants raised statute of limitations issues or other defenses.

At the motion to dismiss stage, the court's duty is "to consider whether a plaintiff's allegations could provide relief under *any* available legal theory." *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund, 25 F.3d 417, 421 (7th Cir. 1994)* [*36] (emphasis added); see also *Bartholet v. Reishauer, 953 F.2d 1073, 1078 (7th Cir. 1992)* ("A drafter who lacks a legal theory is likely to bungle the complaint (and the trial); you need a theory to decide which facts to allege and prove. But the complaint need not identify a legal theory, *and specifying an incorrect theory is not fatal.*" [emphasis added]). Marwil's claim in Count II alleges conduct that could entitle him to relief, whether under tort or contract theories. The label he has attached to his claim does not govern the decision on defendant's motion to dismiss. Ent & Imler has not challenged Marwil's claim on statute of limitations grounds, nor has it raised any defense that would require the court to characterize Marwil's claim at this stage as arising under either tort or contract. n9

n9 *Fed. R. Civ. P. 15(a)* gives the district court discretion whether to grant a litigant leave to amend a complaint. Unless factors such as undue delay come into play, "if the underlying facts or circumstances relied upon by the plaintiff may be a proper subject of relief, he ought to be afforded an op-

portunity to test his claim on the merits." *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962).*

[*37]

Moreover, Marwil also asserts that the agreement between CEG and Ent & Imler contains specific obligations beyond the legally implied standard of care as expressed by generally accepted accounting standards. Without further factual development, it is not clear from the language of the December 2, 1997 engagement letter that Marwil's assertion is incorrect. If it turns out that the agreement contains terms and standards over and above the general standard of care applied to accountants, Marwil's claim could be viable as a breach of contract for the purposes of trial. *Lewis v. Methodist Hospital, Inc., 326 F.3d 851, 854 (7th Cir. 2003).*

*Conclusion*

For the foregoing reasons, defendant's motion to dismiss the Amended Complaint is hereby denied.

So ordered.

Date: November 24, 2004

DAVID F. HAMILTON, JUDGE

United States District Court

Southern District of Indiana

4 of 13 DOCUMENTS

**METROPOLITAN MORTGAGE & SECURITIES CO., INC. and SUMMIT SECURITIES, INC. Plaintiffs, v. PRICEWATERHOUSECOOPERS, LLP Defendant.**

**No. CV-05-290-FVS**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WASHINGTON**

*2005 U.S. Dist. LEXIS 39851*

**December 21, 2005, Decided**
**December 21, 2005, Filed**

**COUNSEL:** [*1] For Metropolitan Mortgage & Securities Co Inc, a Washington corporation, Summit Securities Inc, an Idaho corporation that maintains its principal place of business in Spokane, WA, Plaintiffs: Edgar G Sargent, Parker C Folse, III, Susman Godfrey LLP, Seattle, WA; Lee H Godfrey, Susman Godfrey LLP, Houston, TX

For PricewaterhouseCoopers LLP, a Delaware limited liability partnership doing business in the State of Washington, Defendant: Kenneth P Herzinger, M Todd Scott, Robert P Varian, Orrick Herrington & Sutcliffe LLP — CA(SF), San Francisco, CA; Frank (Francis) J Gebhardt, Feltman Gebhardt Greer & Zeimantz PS, Spokane, WA.

For Summit Bondholders Committee Members, Interested Party: Kevin Daniel O'Rourke, Southwell & O'Rourke PS, Spokane, WA.

For Official Unsecured Creditors' Committee of Metropolitan Mortgage & Securities Co., Inc., Interested Party: Peter Jennings Grabicki, Randall & Danskin PS, Spokane, WA.

**JUDGES:** Fred Van Sickle, United States District Judge

**OPINIONBY:** Fred Van Sickle

**OPINION:**

ORDER DENYING MOTION TO DISMISS

**BEFORE THE COURT** is Defendant's Motion to Dismiss, Ct. Rec. 18. The Court heard oral argument on this matter on December 13, 2005. Plaintiffs were [*2] represented by Parker Folse; Defendant was represented by Robert Varian.

**I. BACKGROUND**

Defendant served as Plaintiffs' independent auditor in connection with the financial statements Plaintiffs issued for fiscal years ending September 30, 1999 and 2000. On February 4, 2004, Plaintiffs filed for bankruptcy. On September 21, 2005, Plaintiffs filed this action against Defendant, alleging that the 1999 and 2000 financial statements audited by Defendant violated Generally Accepted Accounting Principles ("GAAP"), standards of professionalism, and standards of field work. Plaintiffs' Complaint asserts claims for professional negligence, negligent misrepresentation, and breach of contract. Pursuant to *Federal Rule of Civil Procedure 12(b)*, Defendant moves to dismiss these claims. First, Defendant contends Plaintiffs' claims are barred by Washington's three-year statute of limitations. Second, Defendant alleges Plaintiffs' claims are barred by the doctrine of *in pari delicto* and imputation. Third, Defendant contends Plaintiffs' claims fail because they cannot establish causation, damages or injury. Finally, Defendant contends Plaintiffs' [*3] negligent misrepresentation claim must be dismissed because Plaintiffs cannot establish they reasonably relied on Defendant's audits or reports.

**II. DISCUSSION**

### A. Applicable Standard

*Federal Rule of Civil Procedure 12(b) (6)* provides that an action will be dismissed for failure to state a claim upon which relief may be granted. A court will grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45–46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).* When the legal sufficiency of a complaint's allegations are tested with a motion under *Rule 12(b) (6),* "[r]eview is limited to the complaint." *Cervantes v. City of San Diego, 5 F.3d 1273, 1274 (9th Cir. 1993).* All factual allegations set forth in the complaint are taken as true and construed in the light most favorable to the plaintiff. *Epstein v. Wash. Energy Co., 83 F.3d 1136, 1140 (9th Cir. 1996).* The Court must give the plaintiff the benefit of every inference that reasonably may be drawn from well-pleaded [*4] facts. *Tyler v. Cisneros, 136 F.3d 603, 607 (9th Cir. 1998).* However, the Court is not required to accept as true unreasonable inferences, conclusory allegations that are contradicted by documents referred to in the complaint. *Steckman v. Hart Brewing Inc., 143 F.3d 1293, 1295 (9th Cir. 1998).* As a general rule, the Court "may not consider any material beyond the pleadings in ruling on a *Rule 12(b) (6)* motion. *Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001).* n1

> n1 Although Defendant sought judicial notice of several documents in its written submissions, Defendant appeared to withdraw its request during oral argument. Thus, the Court does not rule on Defendant's Request for Judicial Notice.

### B. Jurisdiction

Since federal jurisdiction in this case is based on diversity of citizenship, the Court must apply the substantive law of the State of Washington. *Erickson v. Desert Palace, Inc., 942 F.2d 694, 695 (9th Cir. 1991)* (citing [*5] *Erie R.R. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).*

### C. Statute of Limitations

For the reasons discussed herein, the Court concludes that Plaintiffs' breach of contract claim is governed by the six-year statute of limitations for written contracts, *RCW 4.16.040(1).* Further, the Court concludes Plaintiffs' claims for professional negligence and negligent misrepresentation, governed by the three-year statute of limitations, are not time-barred.

1. Six-Year Statute of Limitations

Defendant contends all of Plaintiffs' claims sound in tort and are therefore governed by Washington's three-year statute of limitations. *See RCW 4.16.080.* Plaintiffs contends their breach of contract claim is governed by the six-year statute of limitations applicable to actions based "upon a contract in writing, or liability express or implied arising out of a written agreement." *RCW 4.16.040(1)*

In deciding whether an action sounds primarily in contract or tort, the Court must examine the essential allegations of the complaint. *Yeager v. Dunnavan, 26 Wash.2d 559, 562, 174 P.2d 755 (1946)* [*6] "When an act complained of is a breach of specific terms of the contract, without any reference to the legal duties imposed by law upon the relationship created thereby, the action is in contract." *Id.* On the other hand, when a contract for services forms a relationship between the parties and, in attempting to perform the promised services, one of the parties violates a duty imposed by law as a result of the relationship, then the action sounds in tort. *Id.* In such cases, the contract is considered merely the "inducement" of the relationship that gave rise to the legal duty, and the basis of the claim is the breach of the duty, not a breach of the contract. *Id.*

Defendant relies on *Davis v. Davis Wright Tremaine, L.L.P., 103 Wash. App. 638, 14 P.3d 146 (Div. 1. 2000),* to argue that Plaintiffs' claim for breach of contract actually sounds in tort and is therefore governed by the three-year statute. In *Davis,* Division One of the Washington State Court of Appeals held that the six-year limitations period did not apply to the plaintiff's claim that his attorney, who had been retained to represent the plaintiff in the purchase of an opthamology practice, [*7] committed legal malpractice by failing to properly perform legal services contracted for by the parties. *Davis, 103 Wash. App. at 641, 14 P.3d 146 (2000).* The attorney sent the plaintiff a letter of engagement stating, in part, that the law firm "will do our best to provide you with prompt, high quality legal counsel." A separate document enclosed with the letter stated that "[the law firm] will at all times act on your behalf to the best of our ability." *Id. at 642, 14 P.3d 146.* The plaintiff later sued his attorney for legal malpractice, asserting claims for negligence and breach of contract.

2005 U.S. Dist. LEXIS 39851, *7

based on allegations that his attorney had failed to conduct due diligence to check for claims against the seller of the practice. *Id. at 643, 14 P.3d 146.* The plaintiff argued his breach of contract claim was governed by the six-year statute of limitations because his action was based on the attorney's breach of the terms of the letter of engagement. *Id. at 645, 14 P.3d 146.* The Court of Appeals disagreed, holding that the action was not based on a contract in writing because the agreement at issue did not contain any express [*8] promises that served as the basis for the pending claims. *Id. at 652, 14 P.3d 146.* Further, the court held that the plaintiff's claims were not based upon "a liability express or implied arising out of a written agreement" because the attorney's duty to comply with the relevant standard of care arose "from sources external to the agreement." *Id. at 654, 14 P.3d 146.* Because the plaintiff's claim was based on implied duties of counsel to client rather than the written agreement itself, the six-year statute of limitation did not apply. *Id.*

In the present action, Defendant relies on *Davis* to argue that the gravamen of Plaintiffs' breach of contract claim is actually Defendant's alleged negligence and that therefore, the three-year statute of limitations for tort actions must apply. However, the terms of Defendant's engagement letters stand in stark contrast to the engagement letter in *Davis.* For example, Defendant expressly promised in its 1999 and 2000 engagement letters that it would:

> (1) "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements"

> (2) [*9] examine "evidence supporting the amounts and disclosures in the financial statements"

> (3) assess "accounting principles used and significant estimates made by management"

> (4) evaluate "the overall financial statement presentation"

> (5) "consider [Plaintiff's] internal control over financial reporting"

> (6) design the audit to obtain reasonable assurance of detecting errors or fraud "that would have material effect on the financial statements"

> (7) communicate to the board of directors "any significant deficiencies relating to internal control over financial reporting identified during [the] audit" and "any illegal act, material errors, or evidence that fraud may exist identified during [the] audit."

Complaint, at PP 73-78. Plaintiffs' Complaint expressly alleges it has suffered damages as a result of Defendant's breach of each of these specific provisions.

Thus, unlike *Davis,* Plaintiffs' claim for breach of contract does arise from specific provisions of the agreement and does not depend entirely on importing implied tort duties of care extraneous to the obligations of the written agreement. Plaintiffs' breach of contract claim is not based [*10] solely on Defendant's agreement to perform the audit in accordance with auditing standards generally accepted in the United States. Rather, Plaintiffs' Complaint specifically alleges it has suffered damages as a result of Defendant's breaches of the specific terms of the 1999 and 2000 agreements. To conclude that Plaintiffs' claim sounds only in tort would effectively render the written agreement between the parties meaningless and unenforceable. Thus, the Court determines Plaintiffs' breach of contract claim is governed by the six-year statute of limitations. Even if Plaintiffs' claim accrued when Defendant issued its audit reports in November 1999 and December 2000, the six-year statute of limitations expires no earlier than November 2005 and December 2006. Thus, Plaintiffs' breach of contract claim is not barred by the statute of limitations.

2. Three-Year Statute of Limitations

*RCW 4.16.080* prescribes a three-year statute of limitation on tort claims (i.e., professional negligence and negligent misrepresentation). Defendant argues Plaintiffs' claims for negligent misrepresentation and professional negligence began to run on November 19, 1999, and [*11] December 28, 2000, the date of Defendant's audit opinions, and are therefore barred by the three-year statute of limitations. Plaintiffs argue the discovery rule applies to their claims and they did not, and in the exercise of due diligence, could not have discovered the alleged material deficiencies in Defendant's 1999 and 2000 audit reports until the time immediately preceding Plaintiffs' bankruptcy filings in February 2004.

Under Washington's discovery rule, a cause of action does not accrue and the statute of limitations does not start to run "until a party knew or should have known the essential elements of the cause of action — duty, breach, causation and damages." *Niven v. E.J. Bartells Co., 97 Wash. App. 507, 514, 983 P.2d 1193 (Div. 1, 1999)* (citation omitted). "The determination of when the plaintiff discovered or through the exercise of due diligence should have discovered the factual basis for a cause of action is a factual question for the jury." *Crisman v. Crisman, 85 Wash. App. 15, 23, 931 P.2d 163 (1997)* (citing *Samuelson v. Community College Dist. No. 2, 75 Wash. App. 340, 346, 877 P.2d 734 (1994)*). "A motion to dismiss [*12] based on the running of the statute of limitations period may be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Supermail Cargo, Inc. v. United States, 68 F.3d 1204, 1206 (9th Cir. 1995)* (citation and internal quotation omitted). A "complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Id. at 1207* (citation omitted).

Plaintiffs' Complaint expressly alleges that the accounting irregularities in question were discovered only when Paul Sandifur resigned as Metropolitan's president, CEO, and Chairman of the Board and Plaintiffs filed for bankruptcy in February 2004. Complaint, at P 10. Further, Plaintiffs contend there is a genuine issue of fact as to when Plaintiffs suffered a cognizable injury flowing from Defendant's alleged negligence and as to when Plaintiffs learned about the injury. *See Richardson v. Denend, 59 Wash. App. 92, 96, 795 P.2d 1192 (1990)* (explaining that the discovery rule has consistently been applied by Washington [*13] courts "to toll the statute of limitations until the plaintiff discovers, or should have discovered, his or her damage or injury resulting from the professional malpractice."). Defendant argues that because Paul Sandifur and other members of Plaintiffs' former management, who were responsible for preparing the financial statements, actively concealed Plaintiffs' financial condition in those statements, Plaintiffs must be deemed to have been aware of their own misconduct at the time it occurred. Therefore, Defendant contends Plaintiffs must be deemed to have been aware of Defendant's alleged failure to detect violations of auditing principles at the time its reports were issued. Thus, Defendant argues Plaintiffs' claims are time-barred because the statute of limitations on Plaintiffs' claims began to run on the date Defendant issued the audit reports, November 19, 1999, and December 28, 2000.

The Complaint, however, does not allege, with the exception of Paul Sandifur, that Plaintiffs were aware of accounting irregularities that Defendant failed to detect. And, with respect to Paul Sandifur, Plaintiffs have not alleged he was aware that Defendant's conduct constituted a breach of applicable [*14] accounting standards of care. Additionally, with respect to Plaintiffs' allegation that the audited financial statements failed to conform to GAAP, Plaintiffs specifically allege the 1999 and 2000 statements "violated standards concerning recognizing gains on related party transaction, reporting gains on commercial real estate transactions, recognizing loan fees and interest income, and relying on overly optimistic appraisals in valuing real estate in assessing the carrying value of assets." Complaint, at P 21. Plaintiff cites two transactions as examples: the Koa Timber Transaction and the FLIP Tax Shelter. Plaintiffs' Complaint does not allege that Defendant was deceived with respect to these transactions or assets in the financial reports.

Defendants claiming the action is time-barred have the initial burden of showing the absence of an issue of material fact. *Niven, 97 Wash. App. at 514, 983 P.2d at 1197* (citation omitted). Here, Defendant has not shown on the basis of the Complaint's allegations that Plaintiffs will never, under any state of facts, be able to prove they could not have discovered their tort claims against Defendant until February 2004. Accepting [*15] as true Plaintiffs' allegations, the Court assumes, for purposes of this motion to dismiss, that Plaintiffs' claims for negligence and negligent misrepresentation did not accrue until February 2004. The actual determination of when Plaintiffs discovered or through the exercise of due diligence should have discovered their cause of action is a factual question for the jury. *Crisman, 85 Wash. App. at 23, 931 P.2d 163.* Thus, the Court cannot rule, as a matter of law, that these claims are barred by the statute of limitations. Accordingly, Defendant's motion to dismiss on this basis is denied.

*D. Doctrine of In Pari Delicto*

Defendant contends Plaintiffs' claims must be dismissed under the doctrine of *in pari delicto*. "The general rule of *in pari delicto* is that when the parties are of equal guilt, the defendant will prevail." *Walsh v. Brousseau, 62 Wash. App. 739, 745, 815 P.2d 828 (Div. 1, 1991)* (citing *Golberg v. Sanglier, 96 Wn.2d 874, 882, 639 P.2d 1347 (1982)* ("The maxim in pari delicto potior est conditio defendentis' declares that the defendant will prevail when the parties are of equal guilt.")). "Where [*16] the parties are not equally culpable, the defense of in pari delicto is not appropriate." *Golberg, 96 Wn.2d at 883–84, 639 P.2d 1347.*

Defendant bases its reliance on this defense on the fact that Sandifur concealed the financial performance of the Plaintiff companies. Plaintiffs' Complaint does allege this fact, but it also alleges the companies' financial statements

2005 U.S. Dist. LEXIS 39851, *16

failed to conform to applicable accounting principles and did not fairly present the true financial condition of the Plaintiff companies. *See* Complaint, at PP 3, 12–14, 18. Whether both parties are indeed of "equal guilt" is a factual issue that precludes granting a motion to dismiss. Whether Defendant is as blameworthy as Sandifur and Plaintiffs' management is an issue of fact that cannot be decided based on the Complaint alone. Therefore, the Court denies Defendant's motion to dismiss under the doctrine of *in pari delicto*.

### E. Causation, Damage & Injury

To survive a motion to dismiss, Plaintiffs need only allege a basis for concluding that Defendant's breach of its duties, "in a direct sequence unbroken by any new independent cause, produced the injury complaint of, and without [*17] which such injury would not have happened." *Fisher v. Parkview Properties, 71 Wn. App. 468, 476, 859 P.2d 77 (1993)*. Defendant argues Plaintiffs' claims should be dismissed because they cannot establish proximate cause, damage, or injury. Specifically, Defendant contends Plaintiffs' claimed injuries are self-inflicted and therefore, Plaintiffs cannot establish Defendant was the proximate cause of a compensable injury to Plaintiffs.

Here, taken as true, Plaintiffs' allegations are sufficient to adequately plead causation to survive a motion to dismiss. Plaintiffs' Complaint alleges that if Defendant had discharged its duties, damages to Plaintiffs would have been averted, despite the companies' deficient internal controls and accounting systems. The Complaint alleges that independent directors and officers and regulators were unaware of the companies' true financial condition because they relied on the allegedly inaccurate audit reports. Further, Plaintiffs allege that Defendant's failure to alert them of those and other deficiencies prevented independent directors, officers, and regulators from acting to save the companies. *See* Complaint, at PP 14, 43–44, 51–52, 57–59, 62, [*18] 68–69. Furthermore, Defendant's argument ignores the possibility that "[t]here may be more than one proximate cause of an injury . . . [a]nd the concurrent negligence of a third party does not break the chain of causation between original negligence and the injury," *Travis Bohannon, 128 Wash. App. 231, 242, 115 P.3d 342 (Div. 3, 2005)*, because Plaintiffs do not allege that deficiencies in their internal controls and accounting systems were the sole cause of Plaintiffs' damages.

Thus, the Court concludes Plaintiffs' Complaint does not support a lack of proximate cause as a matter of law. Whether Plaintiffs can ultimately establish proximate cause is an issue of fact not ripe for resolution in a motion to dismiss. Accordingly, Defendant's motion to dismiss is denied on this basis.

### F. Reliance

To prove a claim for negligent misrepresentation under Washington law, Plaintiffs must show reasonable reliance. *ESCA Corp. v. KPMG Peat Marwick, 135 Wash 2d 820, 959 P.2d 651, 654 (1998)*. Defendant moves to dismiss Plaintiffs' negligent misrepresentation claim, arguing Plaintiffs cannot show they justifiably relied on the allegedly inaccurate audit [*19] reports because they had sufficient prior notice that the financial statements relied upon by Defendants to create the audit reports were inaccurate. Defendant alleges the Complaint shows just the opposite–that if anything, Defendant over–relied on Plaintiffs' management's misrepresentations in certifying the financial statements audited by Defendant. Defendant relies in large part on *Smolen v. Deloitte, Haskins & Sells, 921 F.2d 959 (9th Cir. 1990)*.

In *Smolen*, the sellers of a business brought suit against their auditors for negligent misrepresentation after the company adjusted its financial statements to account for grossly overstated inventory. *921 F.2d at 961–63*. The district court dismissed the claim on summary judgment. On appeal, the plaintiffs argued that because they relied on the financial misstatements in connection with selling the business, they were entitled to recover the value lost on the company's sale price after the adjustment to inventory. *Id. at 963*. The Ninth Circuit affirmed the district court, concluding that "[e]xtensive evidence . . . established that Smolen did not actually rely" on the audit reports and [*20] that the plaintiffs' prior knowledge of the overstatements gave them "sufficient notice" of the misstatements in their financial statements "and thus made any reliance by appellants, unreasonable." *Id. at 964–65*.

Here, Plaintiffs' Complaint does not allege Plaintiffs were aware of Defendant's alleged wrongdoing or that Plaintiffs knew Defendant's audits of the companies' financial statements allegedly violated GAAP and GAAP. Although the Complaint alleges Sandifur concealed the Plaintiff companies' financial condition, it does not allege, as Defendant contends, that Plaintiffs engaged in fraudulent business activities. Rather, the Complaint alleges that the Plaintiff companies were plagued with accounting irregularities, inexperience, and internal control deficiencies; that independent directors and officers did not know the true gravity of the companies' financial condition; and that those directors and officers trusted Defendant and justifiably relied on its representations to reveal the true condition of the companies' finances. *See* Complaint, at PP 4, 13, 14, 69. Assuming the truth of Plaintiffs' allegations, the Court cannot conclude

2005 U.S. Dist. LEXIS 39851, *20

Plaintiffs had sufficient [*21] prior notice that the information Defendant relied upon was incorrect such that any reliance by Plaintiffs was unreasonable. Thus, the Court concludes that Plaintiffs' allegations are sufficient to adequately plead reasonable reliance and Defendant's motion to dismiss on this basis is denied. Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss, **Ct. Rec. 18**, is **DENIED**.

**IT IS SO ORDERED.** The District Court Executive is hereby directed to enter this Order and furnish copies to counsel.

**DATED** this 21st day of December, 2005.

Fred Van Sickle

United States District Judge

LEXSEE 2004 US DIST LEXIS 6277

BAKER O'NEAL HOLDINGS, INC. and AMERICAN PUBLIC AUTOMOTIVE
GROUP, INC., Plaintiffs, v. ERNST & YOUNG LLP and CHARLES J. ROACH,
Defendants.

CASE NO. 1:03-cv-0132-DFH

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
INDIANA, INDIANAPOLIS DIVISION

*2004 U.S. Dist. LEXIS 6277*

March 24, 2004, Decided

DISPOSITION: [*1] Plaintiffs' objection sustained. Defendants' motion to dismiss granted in part and denied in part. Plaintiffs' motion for leave to amend the complaint granted. Defendants' motion to dismiss granted in part and denied in part.

COUNSEL: For Ernst & Young LLP, Charles Roach, APPELLANTS: Brian W Welch, Bingham McHale, Scott R Leisz, Bingham McHale, LLP, Indianapolis, IN USA.

For Ernst & Young LLP, Charles Roach, APPELLANTS: John J Tharp, Jr, Stanley J Parzen, Mayer Brown Rowe & Maw, Chicago, IL USA.

For Charles Roach, APPELLANT: Roger E Zuckerman, Steven M Salky, Zuckerman Spaeder LLP, Washington, DC USA.

For Baker O'Neal Holdings, Inc, American Public Automotive Group, Inc, APPELLEES: Andrew W Hull, Sean T White, Hoover Hull Baker & Heath LLP, Indianapolis, IN USA.

JUDGES: DAVID F. HAMILTON, JUDGE, United States District Court, Southern District of Indiana.

OPINIONBY: DAVID F. HAMILTON

OPINION:

ENTRY ON PENDING MOTIONS

Defendants Ernst & Young and Charles J. Roach, an Ernst & Young partner, provided accounting services to [*2] plaintiffs Baker O'Neal Holdings, Inc. (BOH) and its wholly owned subsidiary, American Public Automotive Group, Inc. (APAG). BOH and APAG have sued defendants on claims arising from their alleged role in participating in or aiding and abetting the fraudulent transfer of assets from BOH and APAG by James O'Neal, President and Chief Executive Officer of BOH and APAG. O'Neal is alleged to have transferred more than $3.7 million from BOH and APAG under the guise of officer "loans" he could not and did not repay.

BOH and APAG both filed for bankruptcy protection on October 9, 1998, tolling any applicable statutes of limitations. The bankruptcy court confirmed the debtors' plan of reorganization on February 23, 2000. This action was filed as an adversary proceeding within the bankruptcy proceeding. The reference to the bankruptcy court was withdrawn so that the case would proceed in the district court.

The case is now before the court on plaintiffs' objection to the magistrate judge's denial of leave to file a Fourth Amended Complaint and defendants' motion to dismiss for failure to state a claim upon which relief can be granted. For the reasons discussed below, plaintiffs' objection [*3] is sustained, and plaintiffs are granted leave to file the Fourth Amended Complaint. Defendants' motion to dismiss is granted in part and denied in part.

I. *Plaintiffs' Objection to Magistrate Judge's Order Denying Leave to File Fourth Amended Complaint*

Plaintiffs amended their complaint three times prior to this entry. Two amendments came while the parties were contesting before the bankruptcy court defendants' motion to compel arbitration. After the case arrived in the district court, the magistrate judge permitted plaintiffs to file a third amended complaint on May 29, 2003. In July 2003, defendants filed their pending motion to dismiss Counts VI to XVII. That motion to dismiss has been defendants' first substantive response to plaintiffs' claims.

As part of their response to the motion to dismiss, plaintiffs sought leave to file a Fourth Amended

Complaint. The magistrate judge denied plaintiffs' motion to file a fourth amended complaint on October 28, 2003. Plaintiffs objected pursuant to *28 U.S.C. § 636(b)(1)*, which authorizes a district judge to reconsider such a decision if the magistrate judge's decision was clearly erroneous or contrary to [*4] law. Because the proposed Fourth Amended Complaint is plaintiffs' first response to defendants' first substantive attack on the plaintiffs' claims, the court finds that the magistrate judge's decision was clearly erroneous and contrary to law.

Plaintiffs' proposed Fourth Amended Complaint makes a number of substantive changes. It expands on the allegations made in the previous version of the complaint, but does not assert any new causes of action. The proposed complaint adds new allegations designed to support plaintiffs' theory that a fiduciary relationship existed between Ernst & Young and BOH and APAG. The Fourth Amended Complaint also alleges that plaintiffs were fraudulently induced to enter into the engagement letters that formed the contract between the parties regarding Ernst & Young's accounting and financial services. Finally, the Fourth Amended Complaint removes language tending to suggest that BOH and APAG were aware of or participated in the fraudulent transfer scheme allegedly undertaken by O'Neal and Roach.

*Rule 15(a) of the Federal Rules of Civil Procedure* provides that leave to amend pleadings "shall be freely given when justice [*5] so requires," but leave to amend is not automatic. *Johnson v. Methodist Medical Ctr. of Ill*, 10 F.3d 1300, 1303 (7th Cir. 1993) (affirming denial of leave to file third amended complaint). "In *Foman v. Davis*, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962), the Court determined that leave to amend should be granted under *Federal Rule of Civil Procedure 15(a)* unless there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'" *Ferguson v. Roberts*, 11 F.3d 696, 706 (7th Cir. 1993); accord, *Perrian v. O'Grady*, 958 F.2d 192, 194 (7th Cir. 1992) (affirming denial of leave to amend). When determining leave to amend, the court should also consider judicial economy. *Perrian*, 958 F.2d at 195; *Bohen v. East Chicago*, 799 F.2d 1180, 1184-85 (7th Cir. 1986). All of those factors must be balanced against any potential harm that could befall a moving party if leave is [*6] not granted. 3 Moore's Federal Practice § 15.15(1) (3d ed. 2003).

After reviewing the course of the proceedings, the court sees no valid reason for denying leave to file the Fourth Amended Complaint. In considering the *Foman* factors, first, there has been no undue delay by plaintiffs.

Substantial time has passed since the suit was first filed in December 1999. Most of this delay, however, is attributable to the parties' dispute as to whether plaintiffs' claims should be arbitrated. That dispute, which was the subject of an interlocutory appeal, lasted into 2003.

Second, there is no pattern of repeated failures to cure deficiencies by previous amendments. Although this will be plaintiffs' fourth amended complaint, it is still their first request to amend in response to a challenge to the sufficiency of their pleading. Plaintiffs' request to amend is a direct response to defendants' motion to dismiss, which is the first time that defendants have attacked the complaint on the merits. Fairness requires that plaintiffs be allowed an opportunity to cure the perceived defects in their complaint. "The Federal Rules reject the approach that pleading is a game of skill in which one misstep [*7] by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*. 355 U.S. 41, 48, 2 L. Ed. 2d 80, 78 S. Ct. 99(1957). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 U.S. at 182.

The court also finds no evidence of bad faith on the part of plaintiffs in proposing the amendment. There are of course serious issues on the merits here. Those issues should not prevent plaintiffs from responding to the motion to dismiss, including deletion of allegations that plaintiffs contend the defendants have misconstrued in an effort to secure dismissal.

Defendants are not significantly prejudiced by allowing plaintiffs to amend. The arguments presented in defendants' motion to dismiss are still relevant because plaintiffs' substantive claims have not changed. n1 Indeed, the majority (if not all) of the changes made in the Fourth Amended Complaint are consistent with the allegations of the Third Amended Complaint. Under these circumstances, [*8] BOH and APAG could have asserted these new allegations in a brief, without seeking leave to amend their complaint. See *Hrubec v. Nat'l R.R. Passenger Corp*, 981 F.2d 962, 963-64 (7th Cir. 1992) (in responding to a motion to dismiss, "[a] plaintiff need not put all of the essential facts in the complaint. He may add them by affidavit or brief – even a brief on appeal."); see also *Chavez v. Illinois State Police*, 251 F.3d 612, 650 (7th Cir. 2001) (stating that "the well-established law of this circuit provides that, when reviewing a dismissal under *Rule 12(b)(6)*, 'we will consider new factual allegations raised for the first time on appeal provided they are consistent with the complaint.'"), quoting *Veazey v. Communications & Cable of Chicago, Inc*, 194 F.3d 850. 854. 861 (7th

2004 U.S. Dist. LEXIS 6277, *8

*Cir. 1999), quoting in turn Highsmith v. Chrysler Credit Corp., 18 F.3d 434, 439 (7th Cir. 1994).*

> N1 Because the court grants plaintiffs' motion to amend the complaint, defendants' motion to dismiss the Third Amended Complaint technically is moot. However, to prevent a wasteful repetition of the briefing, the court's ruling today applies to the Fourth Amended Complaint.

[*9]

The only new allegations that defendants contend are inconsistent with the Third Amended Complaint are those relating to the fraudulent inducement theory. The new allegations respond to a partial affirmative defense. With rare exceptions, a plaintiff is not required to anticipate affirmative defenses in a complaint. *U.S. Gypsum Co. v. Indiana Gas Co., 350 F.3d 623, 626 (7th Cir. 2003)*; accord, *Gomez v. Toledo, 446 U.S. 635, 64 L. Ed. 2d 572, 100 S. Ct. 1920 (1980)*. When a defense is raised, the plaintiff is entitled to respond. These allegations do no more than that. To the extent they are arguably inconsistent with other allegations in the complaint, which assume the validity of the engagement letters as contracts, the plaintiff is entitled to plead in the alternative. See *Fed. R. Civ. P. 8(e)(2)*. Moreover, since services were provided and money was paid, there clearly was a contract for professional services that could be the basis of a professional malpractice claim, even if one party's agreement to that contract was fraudulently induced and even if there is a dispute concerning the specific terms of the contract.

The court [*10] sees no prejudice to defendants by allowing the amendment. The court recognizes that defendants have spent significant time in drafting their motion to dismiss. Such effort, however, does not amount to "prejudice" sufficient to deny a plaintiff leave to amend his pleadings at least once in response to those briefs. As a general rule, a plaintiff whose complaint has been dismissed by the court is ordinarily entitled to amend it to try to cure the defects, unless it is apparent that such an effort would be futile. *E.g., Hart v. Bayer Corp., 199 F.3d 239, 247 n.6 (5th Cir. 2000)* (district court erred by denying leave to amend); *Frey v. City of Herculaneum, 44 F.3d 667, 672 (8th Cir. 1995)* (reversing denial of leave to amend); *Polich v. Burlington Northern, Inc., 942 F.2d 1467, 1472 (9th Cir. 1991)* (reversing denial of leave to amend). That's one major reason why *Rule 12(b)(6)* motions often seem to be more effective for educating the opposing party rather than narrowing the claims or issues. As explained below, however, the vast majority of the defendants' motion to dismiss still applies to the Fourth Amended Complaint. Under these circumstances, [*11] defendants are not unduly prejudiced by plaintiffs'

proposed amendments to the complaint.

Upon consideration of all the factors under *Foman v. Davis*, therefore, the court sees no sound basis for denying plaintiffs leave to amend their complaint. The court sustains the plaintiffs' objection to the magistrate judge's order denying such leave, and the Fourth Amended Complaint shall be deemed filed today.

II. *Motion to Dismiss*

The Fourth Amended Complaint includes three groups of claims. Counts I to V seek to treat the fees that were paid by BOH and APAG to Ernst & Young as avoidable preferences or fraudulent conveyances, which BOH and APAG are entitled to recover. Defendants have not challenged these counts in their motion to dismiss.

Counts VI to XI and XVII assert a variety of common law claims against defendants, including breach of fiduciary duty, fraud, constructive fraud, civil action by a crime victim, negligence and breach of contract. Defendants have moved to dismiss all of these counts arguing that the doctrine of *in pari delicto* bars BOH and APAG from asserting these common law claims. Defendants additionally contend that the one-year statute of limitations [*12] period of the *Indiana Accountancy Act of 1993* applies here to bar plaintiffs' common law claims. Finally, defendants attack several of the common law claims on an individual basis.

Counts XII to XVI allege that the O'Neal loan transfers were avoidable preferences and fraudulent conveyances. Defendants have moved to dismiss these counts on the ground that they were neither transferees nor beneficiaries of the transfers, so they cannot be held liable under the federal *Bankruptcy Act* or the *Indiana Uniform Fraudulent Transfer Act* (IUFTA).

For the reasons explained below, the court denies defendants' motion to dismiss with respect to Counts VI to XI and XVII, and grants defendants' motion to dismiss with respect to Counts XII to XVI.

A. *Factual Allegations*

In ruling on a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, the court must assume as true all well-pleaded facts set forth in the complaint, construing the allegations liberally and drawing all inferences in the light most favorable to the plaintiffs. See, e.g., *Jackson v. E.J. Brach Corp., 176 F.3d 971, 977–78 (7th Cir. 1999)*; *Zemke v. City of Chicago, 100 F.3d 511, 513 (7th Cir. 1996)*; [*13] *McMath v. City of Gary, 976 F.2d 1026, 1031 (7th Cir. 1992)*.

For purposes of the motion, the court determines whether the plaintiffs might be able to prove any set

2004 U.S. Dist. LEXIS 6277, *13

of facts consistent with the allegations that would give the plaintiffs a right to relief. *Wudtke v. Davel, 128 F.3d 1057, 1061 (7th Cir. 1997)*, citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993)*. Dismissal is appropriate only if it appears beyond a doubt that the plaintiffs can prove no facts that would entitle them to relief. *Kennedy v. National Juvenile Detention Ass'n, 187 F.3d 690, 694 (7th Cir. 1999)*.

For the purpose of considering this motion, the court accepts the following allegations as true. Patrick Baker is the sole shareholder and Chairman of the Board of Directors of both BOH and APAG. APAG was created with the objective of developing and operating auto malls. The BOH and APAG business plan called for the purchase of automobile dealerships owned by Donald Massey. To this end, BOH and APAG raised money through loans from investors who were given promissory notes that [*14] were convertible into APAG stock. The notes were personally guaranteed by Baker and O'Neal.

O'Neal and Charles Roach had a close relationship prior to O'Neal's employment with BOH and APAG. In the late 1980s and early 1990s, O'Neal and Roach had both been officers of the Arnold Palmer Automotive Group (here, "the Palmer Group"). While with the Palmer Group, O'Neal had misappropriated corporate assets for his own personal use, including a significant amount of cash, which was taken under the guise of officer loans. The owners of the Palmer Group eventually obtained a multi-million dollar judgment against O'Neal for these misappropriations. Arising from his tenure with the Palmer Group, O'Neal was also prosecuted by the State of Florida on felony counts for theft of more than $300,000 in state sales tax funds that were held in trust for the state. Roach, who also worked for the Palmer Group during this period, was aware of O'Neal's malfeasance and the judgments against him.

After leaving the Palmer Group, O'Neal joined BOH and APAG. Roach left the Palmer Group and joined Ernst & Young as a partner. Beginning in 1994, O'Neal hired Roach and Ernst & Young to perform accounting, consulting [*15] and tax services for BOH and APAG. During this time, Roach operated as the "*de facto* CFO" for both BOH and APAG." Cplt. P 36. O'Neal directed all accounting–related questions to Roach. O'Neal directed BOH's and APAG's bookkeeper Paul Mohabir to follow Roach's instructions on all financial matters. Roach prepared BOH's tax returns in 1994 and 1995, and prepared APAG's tax returns in 1995. In 1996, BOH and APAG retained Ernst & Young to audit and report on APAG's financial statements and the consolidated financial statements of the Massey auto dealership group. In 1997, BOH

and APAG retained Ernst & Young to act as its exclusive financial advisor in the majority acquisition of Massey's auto dealership group.

At BOH and APAG, O'Neal removed large sums of money from the business. The transfers of cash were recorded as officer loans. Baker claims to have had no knowledge of these transfers. Roach had O'Neal execute promissory notes to account for the loan transactions. Roach had these loans listed as company assets in the BOH and APAG financial statements and tax filings even though he knew that O'Neal had no income and could not afford to repay the loans. Roach was aware of O'Neal's [*16] insolvency. In 1996 Roach had prepared a financial affidavit for O'Neal in an effort to show Florida probation officials that he should be given leniency on the state tax charges because he was unable to repay the stolen money. The affidavit showed no unencumbered assets, and liabilities exceeding $18 million. Also in 1996, prior to accepting the engagement with BOH and APAG, Ernst & Young conducted an internal review of BOH and APAG that revealed O'Neal's insolvency and checkered business history. Nevertheless, Roach recommended the engagement, personally vouching for O'Neal's integrity. Ernst & Young accepted the engagement.

O'Neal withdrew over $3.7 million from BOP and APAG through the officer loans. Ernst & Young was paid over $600,000 in fees by BOP and APAG. In 1995, Roach was appointed to the APAG board of directors. He was also expected to be the CFO and a director of the new entity to be created following the expected Massey acquisition. The Massey acquisition, however, never was consummated. When Baker discovered the loan transactions in 1988, he removed O'Neal from his positions with BOH and APAG. Additional allegations are noted below.

B. *Counts VI to XI and XVII* [*17]  – *Common Law Claims*

1. *Imputation of O'Neal's Wrongdoing and Knowledge*

Defendants argue that knowledge of the O'Neal loan transfers should be imputed to BOH and APAG. Since the transfers form the basis of plaintiffs' common law claims, defendants argue that the doctrine of *in pari delicto* – literally, "of equal fault" – bars these claims since the corporate plaintiffs were complicit in O'Neal's wrongdoing. While the court agrees that knowledge of and responsibility for the O'Neal transfers must be imputed to BOH and APAG, the court is unable to say based solely on a review of the pleadings that the defense of *in pari delicto* applies to bar the claims asserted in Counts VI to XI and XVII.

O'Neal's conduct is imputable to BOH and APAG in several different ways. First, based on a bankruptcy court judgment, BOH and APAG are estopped from denying

that they were complicit in O'Neal's wrongdoing. Federal law applies to collateral estoppel issues when, as here, the judgment to be given preclusive effect was a federal judgment. *Havoco of America, Ltd. v. Freeman, Atkins & Coleman, Ltd., 58 F.3d 303, 307 n.7 (7th Cir. 1995).* For issue preclusion to apply: (1) [*18] the issue must be the same as the one involved in the prior action; (2) the issue must actually have been litigated in the prior action; (3) the determination of the issue must have been essential to the prior final judgment; and (4) the party against whom issue preclusion is asserted must have been fully represented in the prior action. *Id. at 307.*

In the proceeding brought by BOH and APAG against O'Neal and his family to void the loan transfers as fraudulent conveyances, the bankruptcy court adopted the argument urged by BOH and APAG, holding as a matter of law that "O'Neal's fraudulent intent may be imputed to the Debtors [BOH and APAG]." Def. Ex. 12, Bankruptcy Court Findings of Fact and Conclusions of Law and Final Judgment PP 30, 33. This finding was essential to the court's judgment that the O'Neal transfers amounted to a fraudulent conveyance. BOH and APAG were seeking relief under *Section 14(1) of the IUFTA, Ind. Code § 32–18–2–14(1),* which required a finding that the debtors, BOH and APAG, had "actual intent to hinder, delay or defraud" their creditors.

Plaintiffs contend that the issue decided by the bankruptcy court is [*19] different from the issue to be decided here. In the prior proceeding, they argue, the bankruptcy court considered whether O'Neal's conduct with respect to the fraudulent transfers could be imputed to BOH and APAG, while in this proceeding the issue is whether O'Neal's entire wrongdoing may be imputed to plaintiffs. The allegations of the complaint, however, contain no mention of any wrongdoing on the part of O'Neal that could be considered separate and apart from the fraudulent transfers. When pressed at this court's hearing to identify additional wrongful conduct by O'Neal outside of the fraudulent loans, plaintiffs' counsel was able to cite only the improper capitalization of certain "expenses" alleged in paragraph 53 of the Third Amended Complaint (paragraph 63 in the Fourth Amended Complaint). But as plaintiffs' counsel conceded, these "expenses" were in fact the fraudulent loans obtained by O'Neal. The bankruptcy court – at the request of BOH and APAG – imputed O'Neal's fraudulent conduct to BOH and APAG. As a result, BOH and APAG are estopped from denying the same imputation in this proceeding.

BOH and APAG also had constructive knowledge of the O'Neal loans. Paul Mohabir, the [*20] internal accountant for BOH and APAG, was completely familiar with the loans and their dubious accounting treatment –

so much so that Mohabir repeatedly expressed concern to Roach on the issue. Mohabir Aff. P 6. Nor were the loans in any sense "hidden." The loans were recorded in the plaintiffs' key financial records – financial statements, promissory notes, and tax returns – of which Baker, as sole shareholder and Chairman of the Board of Directors, is deemed to have knowledge. See *FDIC v. Lauterbach, 626 F.2d 1327, 1334 (7th Cir. 1980)* ("A corporate director may not claim total ignorance of the corporation's affairs, particularly those matters fairly disclosed by the directors' meetings and those corporate records to which directors had access."). n2

> n2 In arguing that O'Neal's conduct should be imputed to BOH and APAG, defendants also rely on the "sole actor" doctrine. That doctrine teaches that even where an agent has acted to defraud the principal, the principal may still be charged with the agent's fraud where that agent is "the sole representative of the principal in the transaction in question." *First Nat'l Bank of Cicero v. Lewco Sec. Corp., 860 F.2d 1407, 1417–18 (7th Cir. 1988)* ("This 'sole actor' exception is founded on the notion that, where a principal cannot embrace a transaction except through the acts of an unsupervised agent, the principal must accept the consequences of the agent's misconduct because it was the principal who allowed the agent to operate without accountability."). The Seventh Circuit has held, however, that the "sole actor" exception may not apply where the adverse party was aware of the agent's fraud and even participated in it. *Ash v. Georgia–Pacific Corp., 957 F.2d 432, 436 (7th Cir. 1992)* (affirming verdict in favor of corporation's successor against party who persuaded corporation's chief operating officer to act to defraud the corporation). Accordingly, the court does not rely on the "sole actor" exception to impute O'Neal's alleged wrongdoing to BOH and APAG.

[*21]

## 2. The In Pari Delicto Defense

Even given the imputation of O'Neal's wrongdoing to BOH and APAG, whether plaintiffs' claims are barred by the *in pari delicto* doctrine is a different question. "The doctrine known by the latin phrase *in pari delicto* literally means 'of equal fault.'" *Theye v. Bates. 166 Ind. App. 652. 337 N.E.2d 837, 844 (Ind. App. 1975),* quoting *Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 135, 20 L. Ed. 2d 982, 88 S. Ct. 1981 (1968).* "The expression 'in pari delicto' is a portion of the longer Latin sentence, 'In pari delicto potior est conditio defendentis,' which means that where the

wrong of both parties is equal, the position of the defendant is the stronger." *Theye, 337 N.E.2d at 844*, quoting W.M. Moldoff, Annotation, *Purchaser's Right To Set Up Invalidity of Contract Because of Violation of State Securities Regulation as Affected by Doctrines of Estoppel or Pari Delicto. 84 A.L.R.2d 479, 491*. As legal entities, corporations are subject to the *in pari delicto* defense, although to some extent the doctrine "loses its sting when the person who is *in pari delicto* is [*22] eliminated." *Scholes v. Lehmann. 56 F.3d 750. 754–55 (7th Cir. 1995)*, citing *McCandless v. Furlaud, 296 U.S. 140, 160, 80 L.Ed. 121. 56 S. Ct. 41 (1935)*.

Two recent Seventh Circuit decisions have addressed in detail the scope of the *in pari delicto* defense. In *Scholes v. Lehmann*, the Seventh Circuit was faced with a Ponzi scheme in which the perpetrator of the fraud, a Michael Douglas, had carried out the scheme through the use of three wholly owned corporations that he had created specifically for that purpose. The corporations solicited funds from "investors." Those funds were used to pay dividends to previous investors and to maintain the Ponzi scheme. Douglas also caused the corporations to pay funds to himself, his ex–wife, and his favorite charities. Douglas's scheme was eventually exposed, and he pled guilty to federal fraud charges. In the wake of the criminal proceedings, the court appointed Scholes as a receiver for Douglas and the corporations.

Scholes filed a fraudulent conveyance action under Illinois law against the entities that had received payouts from the Ponzi corporations. The Seventh Circuit was asked to consider whether the *in* [*23] *pari delicto* defense barred Scholes from pursuing the Illinois fraudulent conveyance action. The court held that it did not. The court found that the rationale behind *in pari delicto* – "that the wrongdoer must not be allowed to profit from his wrong" – did not apply to the receiver's action since "Douglas himself did not stand to benefit from the receiver's suit." *Scholes, 56 F.3d at 754*. The wrong invoked to support the defense of *in pari delicto* was chargeable to the Ponzi perpetrator. After the receivership entities were "freed from his spell[,] they became entitled to the return of the moneys ... that Douglas had made the corporations divert to unauthorized purposes." *Id*.

The Seventh Circuit revisited this issue in *Knauer v. Jonathon Roberts Financial Group. Inc., 348 F.3d 230, 234 (7th Cir. 2003)*. Like *Scholes, Knauer* arose out of a classic Ponzi scheme. Kenneth Payne and several other individuals, operating under the auspices of Heartland Financial Services and JMS Investment Group, defrauded nearly a thousand investors of millions of dollars. *Knauer* differed from *Scholes,* however, in that the receiver in *Knauer* [*24] was not seeking to void a fraudulent con-

veyance but rather was pursuing tort damages against several securities broker–dealers for failing to adequately supervise Payne, who was a registered representative of the broker–dealers. *Id. at 234*. Judge Tinder had granted a motion to dismiss based on the *in pari delicto* defense, and the Seventh Circuit affirmed.

In *Knauer,* the Seventh Circuit held that *in pari delicto* barred the receiver's tort claims. However, as Judge Tinder expressed in his district court opinion, see *2002 U.S. Dist. LEXIS 20978, 2002 WL 31431484, *10 (S.D. Ind. 2002)*, and as the Seventh Circuit confirmed, the equitable context in which the *in pari delicto* defense is asserted is crucial. In the Seventh Circuit's view, the key distinction between *Scholes* and *Knauer* was that in *Scholes* the receiver had been seeking to recover "diverted funds from the beneficiaries of the diversions," while the broker–dealer defendants in *Knauer* "had derived no benefit from the embezzlements." *Knauer; 348 F.3d at 236. In pari delicto* was appropriate in *Knauer* because the equitable balancing favored the defendants. They had not seen [*25] a cent of the diverted funds, and their "involvement in the Ponzi scheme as a whole was quite minor." *Id. at 237*. On the other side of the equation, the Ponzi entities, as a result of the machinations of Payne, "were very much at the forefront of the Ponzi scheme." *Id*. It must also be noted that *Knauer* was decided on the pleadings.

For present purposes, however, the court must acknowledge the limits the Seventh Circuit placed on its reasoning. The Seventh Circuit emphasized that under the facts alleged in *Knauer* "there is no allegation whatsoever that the defendants were directly involved in the embezzlements or benefitted from them." *Id*. "Had the broker dealers been directly involved in the embezzlements, or attained some tangible benefit from them, this would be a different case." *Id. at 237 n.6*.

The case before the court is a different case from the one the Seventh Circuit decided in *Knauer* and, at least on the pleadings, could fit within the situation described in footnote 6. Here the plaintiffs have alleged that Roach (and thus Ernst & Young) were *directly* involved in O'Neal's wrongdoing. Applying the reasoning of [*26] *Scholes* and *Knauer,* the court cannot hold as a matter of law, based on the pleadings alone, that *in pari delicto* applies here. In weighing plaintiffs' culpability, O'Neal's misconduct is imputed to BOH and APAG. O'Neal's removal from BOH and APAG lessens the "sting" of *in pari delicto* to some degree, see *Scholes v. Lehmann, 56 F.3d at 754*, but does not totally exculpate the entity. *See Knauer, 348 F.3d at 237* (applying *in pari delicto* even where the fraud perpetrator had been removed from the receivership entity).

Accepting plaintiffs' allegations, as the court must at

Case 1:05-cv-00072-JJF    Document 57-4    Filed 03/27/2006    Page 37 of 40

Page 7
2004 U.S. Dist. LEXIS 6277, *26

this point, defendants engaged in a course of conduct that went far beyond simply facilitating O'Neal's fraudulent loans. Plaintiffs allege that Roach and Ernst & Young committed several torts in the course of their relationship with BOH and APAG. Plaintiffs also allege that Roach and Ernst & Young acted negligently and fraudulently in not disclosing what they knew of O'Neal's financial and professional history and how these circumstances would affect the accounting treatment of the loans. n3 According to BOH and APAG, defendants also had a duty, as established by [*27] the Statement on Standards for Accounting and Review Services, to report the lack of "management integrity" within the company. Moreover, plaintiffs claim that Roach and Ernst & Young had a duty to blow the whistle on themselves. Plaintiffs' view is that defendants were so compromised by their prior dealings with O'Neal that they committed a tort just by agreeing to provide advisory services.

> n3 While knowledge of the O'Neal loans is fairly imputed to BOH and APAG, the court cannot say on this record on a motion to dismiss that Baker himself should be charged with knowledge that the O'Neal loans would not be collectable.

Also, at least under the allegations of the complaint, Roach and Ernst & Young stood to benefit from their alleged wrongful conduct. Defendants disagree, citing *Knauer* for the proposition that the professional service fees an alleged tortfeasor receives during the course of his fraudulent conduct do not count as a "tangible benefit" for the purposes of the *in pari delicto* consideration. [*28] That is not a correct reading of *Knauer*. First, the broker-dealers in *Knauer* were alleged to have been the *employers* of Payne and the other Ponzi perpetrators. *348 F.3d at 232.* The broker-dealers' alleged duty to supervise originated from their employment of the Ponzi perpetrators, not from any fees they received. Nowhere in the *Knauer* opinion are fees mentioned. Second, in this case the fees and benefits received by Roach and Ernst & Young are alleged to have been obtained directly as *a result* of fraudulent conduct. Ernst & Young secured its auditing engagement through O'Neal. Roach was appointed to the Board of Directors of APAG and was allegedly intended to serve on the Board of the new entity created to facilitate the Massey acquisition. Cplt. PP 29, 31. Plaintiffs have further alleged that O'Neal promised Roach future business opportunities with BOH and APAG. Cplt. P 24. Plaintiffs are entitled to the inference that the benefits O'Neal distributed to Roach and Ernst & Young were the result of defendants' involvement in O'Neal's allegedly fraudulent scheme to enrich himself.

As the Seventh Circuit recognized in *Knauer*, "in pari

*delicto* is an [*29] affirmative defense and generally dependent on the facts, and so often not an appropriate basis for dismissal." *Knauer, 348 F.3d at 237 n.6* (affirming dismissal, though, based on the facts "thoroughly alleged" in the complaint"). Within the confines of deciding the *Rule 12(b)(6)* motion, the court cannot find as a matter of law that BOH's and APAG's alleged fault in the O'Neal transactions exceeded that of defendants. Unlike the situation in *Knauer*, there are allegations in this case that defendants both were involved in the fraudulent conduct and benefitted from it.

The risk of a liberal application of *in pari delicto* is that tortfeasors preparing to defraud an entity could potentially immunize themselves from liability simply by enlisting the help of an executive in the victim-corporation. That seems to be improbable, as the Seventh Circuit has indicated in a similar situation. See *Ash v. Georgia-Pacific Corp., 957 F.2d 432, 436 (7th Cir. 1992)* ("Georgia-Pacific's argument implies that anyone who suborns the chief operating officer of a corporation has by virtue of that success purchased immunity from liability to the principal victim. We [*30] cannot believe that Illinois treats successful schemes as self-protecting."). Outside of a fraudulent conveyance scenario, the best case for *not* applying the *in pari delicto* defense is where the insider and the third-party tortfeasor were essentially acting as co-conspirators. That is a fair summary of plaintiffs' allegations here, though it remains to be seen whether they can be proved. The doctrine of *in pari delicto* does not require dismissal at this stage of the litigation.

### 3. Accountancy Act Statute of Limitations

The Indiana Accountancy Act, *Ind. Code § 25-2.1-1-1, et seq.*, imposes a one-year statute of limitations on all claims governed by the Act. The Accountancy Act applies to all actions

> based on negligence or breach of contract brought against an accountant, a partnership of accountants, or an accounting corporation registered, licensed, or practicing in Indiana by an individual or a business entity claiming to have been injured as a result of financial statements or other information examined, compiled, certified, audited, or reported on by the defendant accountant as a result of an agreement to provide professional [*31] accounting services.

*Ind. Code § 25-2.1-15-1.* By its terms, the Act does not apply to Counts VI to IX because these counts allege neither negligence nor breach of contract.

Defendants argue that *Crowe, Chizek, and Co. v. Oil*

2004 U.S. Dist. LEXIS 6277, *31

*Tech., Inc., 771 N.E.2d 1203, 1211 (Ind. App. 2002)*, and *Shideler v. Dwyer, 275 Ind. 270, 417 N.E.2d 281, 286 (Ind. 1981)*, support a more expansive reading of the Accountancy Act's scope. In *Crowe, Chizek* the Indiana Court of Appeals applied the Accountancy Act's statute of limitations to a simple negligence action. In addressing the plaintiff's claim that constructive fraud operated to toll the statute of limitations, the court held that no evidence of constructive fraud had been presented. *Crowe, Chizek, 771 N.E.2d at 1210.* Contrary to defendants' argument, the bar to the constructive fraud claim in *Crowe, Chizek* was not the Accountancy Act but rather a lack of evidence.

In *Shideler,* the Indiana Supreme Court reaffirmed the general rule that plaintiffs cannot avoid otherwise applicable statutes of limitations by artful pleading. The court held that despite [*32] the plaintiff's pleading of multiple counts, each asserting a different theory of recovery for the same injury, plaintiff's claim was essentially one of legal malpractice. As such, it was subject to the general two-year statute of limitations applicable to personal injuries and property damage. *417 N.E.2d at 286–87.*

The difference between *Shideler,* see Ind. Code § 34–1–2–2, and this case is that the Accountancy Act statute of limitations explicitly limits the causes of actions that it governs. The statute of limitations embedded in the Accountancy Act deliberately uses limited terms to give special treatment to certain types of claims that otherwise would have been governed by the general two-year limitations period or other more general statutes of limitation. Claims that are not specifically encompassed by the Act – such as plaintiffs' claims of fraud, constructive fraud, breach of fiduciary duty and civil action by crime victim – are governed by the more general rule. They are not within the deliberately narrower scope of the Accountancy Act's statute of limitations. With the Accountancy Act, the Indiana legislature crafted a purposefully [*33] narrow statute of limitations. This court is obliged to respect the Act's limits. n4

> n4 The pending motion does not call on the court to decide which of the more general limitations periods should apply to these claims.

Additional analysis is necessary to decide whether the Accountancy Act applies to Counts X and XI, which allege negligence and breach of contract respectively. Defendants argue that the Act applies to these counts because Roach and Ernst & Young were engaged in the "practice of accountancy," as defined in the Act. See *Ind. Code § 25–2 1–1–10.* This phrase, however, is not employed in the one-year statute of limitations section of the Act. Under the statutory language, the relevant inquiry is significantly narrower: whether BOH and APAG are "claiming to have been injured as a result of financial statements or other information examined, compiled, certified, audited, or reported on by the defendant accountant as a result of an agreement to provide professional accounting [*34] services." *Ind. Code § 25–2 1–15–1.* At least some of plaintiffs' allegations, such as defendants' alleged failure to disclose to Baker what they knew about O'Neal's background and his personal financial situation, do not, at least obviously, amount to claims of injury resulting from "financial statements or other information examined, compiled, certified, audited, or reported on by the defendant accountant as a result of an agreement to provide professional accounting services."

The statute specifically distinguishes between activities within the "practice of accountancy" and the narrower range of activities that are covered under the section of the Act dealing with negligence and breach of contract actions. Drawing that line accurately presents a challenge, especially at the pleadings stage. At this point, plaintiffs are entitled to the benefit of a range of favorable inferences and hypotheses. It would not be prudent at this point to try to map the boundary between the broader "practice of accountancy" and the covered claims for negligence and breach of contract without significantly more factual development. At this stage in the litigation, the court [*35] does not hold as a matter of law that the Accountancy Act's statute of limitations applies to Counts X and XI.

*4. Objections to Individual Tort Counts*

Count IX asserts that BOH and APAG are entitled to recover in tort for various crimes perpetrated upon them by Roach and Ernst & Young. While the court has its doubts about certain of the crimes that plaintiffs have alleged, the allegations of the complaint do present facts that generally conform to the elements of the crimes of fraud and conversion. Defendants' argument that there is no tort liability for aiding and abetting or conspiring to commit a crime is irrelevant because plaintiffs have also alleged that Roach and Ernst & Young actually committed the crimes as principals. Further, *Cenco. Inc. v. Seidman & Seidman, 686 F.2d 449, 453 (7th Cir. 1982)*, does not stand for the proposition that there can be no aiding and abetting liability under tort law, only that no separate tort of "aiding and abetting" is required since an aider and abettor is necessarily liable as a participant in the criminal venture. See *Eastern Trading Co. v. Refco. Inc. 229 F.3d 617, 623 (7th Cir. 2000).* Count IX asserts [*36] a viable theory of recovery.

Count XVII alleges that defendants aided and abetted O'Neal and conspired with him to breach his fiduciary duties. Defendants are correct that no *separate* tort for aiding and abetting the breach of a fiduciary duty has been estab-

lished by Indiana law, but again this is not determinative. There are very few cases on point in Indiana, but it appears from the cases that do exist that a non-fiduciary can be liable for aiding and abetting another party's breach of its fiduciary duty.

> The law is well established that, when a trustee of an express trust has taken advantage of his fiduciary relationship to cheat and defraud the cestui que trust out of the property held by him in trust, the cestui que trust is not limited to an action for the breach of the trust agreement; he may elect to prosecute an action against the trustee in his individual capacity, in tort, for the damages sustained. *Holderman v. Hood (1904) 70 Kan. 267, 78 P. 838; Brys v. Pratt (1909) 55 Wash. 122, 104 P. 169; Sherwood v. Saxton (1876) 63 Mo. 78; Lathrop v. Bampton (1866) 31 Cal. 17, 89 Am. Dec. 141* It is also [*37] the law that a third party, who has aided and abetted the trustee in carrying out the fraudulent scheme, may be joined as defendant in the same action. *Holderman v. Hood, supra*

*Sharts v. Douglas, 94 Ind. App. 201, 163 N.E. 109. 111 (Ind. App. 1928)* (en banc) (affirming verdict against trustee and non-fiduciary who participated in fraudulent scheme). Though the law in other jurisdictions is not uniform, the majority view is that a third-party non-beneficiary can be liable for aiding and abetting the breach of a fiduciary duty, especially where the third party is in privity with the fiduciary or has benefitted from the breach in some way. See Restatement (Second) of Torts § 874 cmt. c (1979) ("A person who knowingly assists a fiduciary in committing a breach of trust is himself guilty of tortious conduct and is subject to liability for the harm thereby caused."); 3 Am. Jur. 2d Torts § 299 (1986) ("A person who intentionally causes or assists an agent to violate a duty to the principal is subject to liability in tort for the harm he has caused to the principal . . ."). Accordingly, [*38] dismissal of Count XVII is unwarranted.

The court is not persuaded by defendants' other objections to the common law counts. BOH and APAG have sufficiently pled a breach of fiduciary duty claim. Plaintiffs' negligence and breach of contract claims do not assert claims for negligent misrepresentation, but rather for professional malpractice. Finally, it is unnecessary to decide whether Indiana assigns liability for aiding and abetting negligent acts since plaintiffs have alleged that Roach and Ernst & Young were themselves negligent. Defendants' motion to dismiss Counts VI to XI and XVII

is denied.

C. *Counts XII to XVI – Accessory Liability for Fraudulent Transfers Under the Bankruptcy Code and IUFTA*

Counts XII and XIII assert fraudulent transfer claims under *sections 548 and 550* of the federal Bankruptcy Code. *11 U.S.C. §§ 548(a), 550.* BOH and APAG concede that Roach and Ernst & Young are not "transferees" within the meaning of the statute. See *11 U.S.C. § 550(a); Bonded Financial Services. Inc. v. European American Bank, 838 F.2d 890, 893 (7th Cir. 1988)* ("we think the minimum requirement of status as a 'transferee' [*39] is dominion over the money or other asset, the right to put the money to one's own purposes."). BOH and APAG contend, however, that with respect to the O'Neal loans, defendants are "entit[ies] for whose benefit such transfer was made," and that they are therefore subject to liability under the Bankruptcy Code. Plaintiffs' view is that Roach and Ernst & Young were beneficiaries of the fraudulent loan transfers because they allegedly received fees and promises of future engagements in return for aiding O'Neal.

Plaintiffs' interpretation of who constitutes a beneficiary is too broad. The purpose of the fraudulent transfer provisions of the Bankruptcy Act "is clearly to preserve the assets of the bankrupt; they are not intended to render civilly liable all persons who may have contributed in some way to the dissipation of those assets." *Mack v. Newton, 737 F.2d 1343, 1358 (5th Cir. 1984)*, quoting *Elliott v. Glushon, 390 F.2d 514, 516 (9th Cir. 1967)*. Because these provisions are designed to facilitate the recovery of all of the fraudulently transferred property, the contemplated "benefit" of the transfer should be proportionate to the transfer itself. [*40] For instance, the Seventh Circuit's "paradigm 'entity for whose benefit such transfer was made'" is the guarantor of a debt that the transfer extinguished: "someone who receives the benefit but not the money." *Bonded Financial Services, 838 F.2d at 895.*

The fact that Roach and Ernst & Young might have received a remote benefit as a result of the transfer does not mean that the transfer was made for their benefit. "Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a benefit from the initial transfer is within this language." *Id. at 896.* All of the loan transfers at issue here were received by O'Neal and his family. Whatever benefits Roach and Ernst & Young might have obtained after the transfers would have been "incidental, unquantifiable, and remote . . . bearing no necessary correspondence to the value of the property transferred or received." *Mack, 737 F.2d at 1359–60* n5

n5 In rejecting the characterization of Roach and Ernst & Young as "entit[ies] for whose benefit such transfer was made" the court does not mean to suggest that monies paid as compensation for facilitating a fraudulent transfer – even if that compensation is provided under the guise of fees for legitimate services – will never amount to a "benefit" under *section 550 of the Bankruptcy Code.* Nevertheless, in this case, to the extent that BOH and APAG seek to recover the fees paid to Ernst & Young as a "benefit" of the fraudulent conveyances, these claims would only duplicate Counts I through V, which seek to achieve the same result by characterizing the fees themselves as avoidable preferences and fraudulent conveyances.

[*41]

BOH and APAG argue that even if the Bankruptcy Code does not impose liability for the fraudulent transfers on Roach and Ernst & Young as accessories, they are still liable under the Indiana Uniform Fraudulent Transfer Act (IUFTA), *Ind. Code § 32–18–2–17,* which is more expansive than the Bankruptcy Code. Essentially adopting the argument of the plaintiffs in *Freeman v. First Union Nat'l, 329 F.3d 1231, 1233–34 (11th Cir. 2003),* BOH and APAG contend that the "catch–all" provision in IUFTA grants the court broad equitable powers to provide for a right of recovery against an aider and abettor of a fraudulent transfer. n6 The Eleventh Circuit certified this question to the Florida Supreme Court, which recently joined the multitude of other courts in holding that there is no accessory liability for fraudulent transfers under the Uniform Fraudulent Transfer Act. n7 _____ *So.2d ___, 865 So. 2d 1272, 2004 Fla. LEXIS 106 2004 WL 178598 (Fla. Jan. 29, 2004);* accord, *Wortley v. Camplin, 2001 U.S. Dist. LEXIS 20441, 2001 WL 1568368, *9 (D. Me. 2001); FDIC v. White. 1998 U.S. Dist. LEXIS 3020. 1998 WL 120298. *2 (N.D. Tex. March 5. 1998); Litchfield Asset Mgmt. Corp. v. Howell. 70 Conn. App. 133, 799 A.2d 298, 309 (Conn. App. 2002)* [*42]

n6 *Section 17(a)(3)(C)* provides that in an action for relief from a fraudulent transfer, a creditor may obtain, subject to applicable principles of equity and rules of civil procedure, "any other relief the circumstances require."

n7 Florida, like Indiana, has adopted the Uniform Fraudulent Transfer Act. The statute examined in *Freeman* is identical to the IUFTA in all relevant respects.

The court agrees with the results these other courts have reached. At most, IUFTA's "catch–all" provision gives a court flexibility to fashion remedies not explicitly provided for in the statute. The provision does not permit the court to assign liability where the Act did not, or to create out of whole cloth "substantive rights of action with accompanying damages which are not otherwise implied or stated in the statute." *FDIC v. White. 1998 U.S. Dist. LEXIS 3020, 1998 WL 120298 at *2.* Accessory liability for fraudulent transfers cannot be supported by either the Bankruptcy Code or the IUFTA. Accordingly, Counts XII through XVI [*43] are dismissed.

*Conclusion*

Plaintiffs' motion for leave to amend the complaint is granted and the tendered Fourth Amended Complaint shall be deemed filed today. Defendants' motion to dismiss, as applied to the Fourth Amended Complaint, is denied with respect to Counts VI to XI and XVII, and granted with respect to Counts XII through XVI. Defendants shall respond to the remaining counts of the Fourth Amended Complaint no later than April 30, 2004.

So ordered.

Date: March 24, 2004

DAVID F. HAMILTON, JUDGE

United States District Court

Southern District of Indiana