that the Family would be secured lenders and third party beneficiaries under ECM's various agreements, including having a security interest in the cash placed in ATM machines.

94. Yao dissolved ECM sometime in 2001. On information and belief, ECM repaid the loans from the Family but did not repay the money owed to SFC.

95. Yao also had a business relationship with Pamela Gagné with regard to Team Classic Golf Services, Inc.

### 2. Pepper's And The Family's Growing Awareness Of SFC's Financial Condition

96. Pepper and the Family, through Gagné, were aware or should have been aware of SFC's escalating financial problems and burgeoning inability to meet its financial obligations.

97. On information and belief, Pepper and the Family were aware or should have been aware that SFC was causing payments to be made on student loans with reserves and SFC's own funds so that the loans would appear not to be in default.

98. On information and belief, Pepper and the Family were aware or should have been aware that SFC was causing Forbearance Payments to be made to prop up the poor performance of Student Loan Accounts in order to conceal the default rate from others.

99. As early as 1998, Gagné was or should have been aware that SFC was having cash flow problems. Yao communicated with Gagné by email in December 1998, concerning his need to reach out to Gagné's uncle Bob Bast to "invest the $1.5 million shortfall for December."

100. In the above-referenced (*see* ¶ 66) April 1, 1999 email on which Gagné was copied, discussing, *inter alia*, school reserves, Yao stated that "[w]e barely [have] positive cash flow at the warehouse stage after paying Royal's premium" and other professional fees. That same day, Yao sent another email to Gagné to which he "attach[ed] SFC's bridge financing

requirements for the next 60 days" and stated that he had "underestimated our April requirement — we need $2.0M, not just $1.0M" and planned to call certain private investors.

101. Later that month, in an April 13, 1999 letter from Gagné to Royal concerning a PPM, Gagné informed Royal that SFC "cannot fund more Student Loans under the Policy until it clears out its warehouse lines with its lenders. Consequently, the quicker this deal is sold, the quicker SFC can pay future premiums."

102. In March 2000, Gagné recognized SFC's difficulty in going to market and Gagné and Yao communicated regarding the use of reserves to make monthly payments on student loans and whether it would appear to the capital markets that SFC was manipulating the pool performance.

103. Continuing into 2001 and 2002, Pepper was aware, or, as SFC's counsel, at the very least should have been aware, of various business and financing arrangements which indicated SFC's deteriorating financial condition and insolvency or impending insolvency, including, *inter alia*:

   a. A certain percentage of student loan payments to SFC were to go into an account that had been established for Royal's protection, which could only build if payments were received. In June 2001, because this account was not accumulating funds as planned, Royal took additional security for its issuance of the Royal policies in SFC's interest in the securitization trusts.

   b. As part of SFC's deal with Royal, SFC effectively paid a deductible to Royal for defaulting student loans from an account called the "Experience Account." Thereby, as student default rates grew, so would payments from the Experience Account. Between May

and September 2001, payments from this account grew four-fold; between May 2001 and January 2002, payments from this account increased six-fold.

      c.     In October, November and December 2001, Pepper prepared PPMs for the securitization trusts. Pepper's due diligence in the preparation of those documents either did, would have or should have alerted Pepper to the fact that SFC could no longer meet its obligations as they were becoming due.

      d.     As of January 2002, although SFC had customarily paid Pepper's bills in full on a monthly basis, SFC ceased doing so and went on a flat $15,000 per week payment schedule in view of Pepper's outstanding legal fees. Gagné advised SFC's David Zuluaf that Pepper's Finance Committee approved that arrangement.

      e.     A critical point for SFC's continuing financial viability came when Royal indicated that it was considering discontinuing credit enhancement coverage for SFC in the first half of 2002.

104. On information and belief, at least as of early 2002, the Family was aware or should have been aware that the assets which they had invested in SFC were in jeopardy due to SFC's precarious financial position. SFC tax returns for the year 2001, copies of which were provided to the Family, including Gagné as Trustee, report shareholder losses to the Family.

105. Pepper billed SFC for time incurred by Gagné in February 2002, for "negotiat[ing] and discuss[ing] need for private investors," "prepar[ing] issues on private lending" and "private equity raises."

      3.     **Pepper's Preparation Of PPMs And SFC's Insolvency**

106. Despite its knowledge, Pepper, as legal counsel to SFC, assisted SFC in inducing securitization lenders to acquire an interest in Student Loan Accounts that Pepper knew, or

should have known, were unlikely to be repaid, and thereby caused SFC to continue to incur debt to the eventual and foreseeable detriment of SFC and its creditors.

107. With Pepper's assistance, SFC was allowed to disguise not only the actual default rates of the Student Loan Accounts, but also the insolvency of SFC. Creditors continued to extend credit to SFC.

108. The PPMs prepared by Pepper contained a section entitled "Certain Yield And Prepayment Considerations," which discussed the potential impact that delinquencies, prepayments and defaults by students on their loans could have on the value of the loan portfolios. The performance information included in each PPM reported only on the specific loans within the portfolio being securitized, but omitted reference to, and failed to inform potential investors about, the performance of earlier loans and default rates from prior securitizations.

109. Rather than revealing what was known about performance, the Pepper-prepared PPMs stated that performance was "impossible to predict" and that "no estimate can be given," notwithstanding Pepper's knowledge and responsibility concerning actual default rate and historical performance information.

110. The PPMs affirmatively represented that "[b]ecause the ... number of defaults on the Student Loans covered by the Insurance Policy will depend on future events and a variety of factors (described more fully below), no assurance can be given as to such rates or the rate of principal prepayments or defaults in particular.... The extent of prepayments of principal or defaults on the Student Loans varies from time to time and may be affected by a number of factors including, without limitation, economic, demographic, geographic, social, legal and

tax.... There can be no assurance as to the rate or frequency of ... defaults on the Student Loans in the Trust."

111.  Thus, the PPMs prepared by Pepper were further misleading in that they both (i) alluded to historic performance but failed to reveal the astronomical default rates known to it and (ii) expressly referred to the use of two specific types of forbearance but failed to mention the use of SFC's own unique forbearance practices to avoid reporting defaults by students.

112.  The PPMs also contained a section stating: "<u>Actual Cash Flow Results May Be Materially and Adversely Different: Liability of Trustee to Liquidate Student Loans</u>. The interest and principal payments received with respect to the Student Loans ... may vary greatly in both timing and amount from the payments actually due ... for a variety of economic, social and other factors, including both individual factors, such as additional periods of deferral, customary servicer forbearance or forbearance required by applicable bankruptcy or insolvency laws prior to or after a borrower's commencement of repayment, and general factors, such as a general economic downturn which could increase the amount of defaulting Student Loans.... The occurrence of one or more of these factors is impossible to predict, and no estimate can be given of the point at which the effect of such factors would impair the Issuer's ability to pay principal and interest on the Certificates."

113.  From January 1999 to April 2002, actual default rates grew from approximately 25% to close to 70%. Pepper played a crucial role in masking of this increase. (Pepper represented SFC in an action filed by Nielsen Electronics against SFC and Yao, filed by complaint dated May 6, 1999. That complaint contained allegations referring to student loan default rates, including allegations that SFC claimed that there were excessive student default

rates and that SFC claimed a 65% default rate in order to avoid some of its obligations to Nielsen Electronics.)

114. Since the income stream for the securitizations was the payments on the Student Loan Accounts, the loan pool characteristics were a material feature of the PPMs prepared by Pepper. A dominant loan pool characteristic was the historical default rates on the Student Loan Accounts, *i.e.*, if students were defaulting on their loans, potential investors would be disinclined to purchase the Certificates and Notes, and SFC could not acquire additional Student Loan Accounts.

115. Mindful of and knowledgeable about SFC's use of forbearance as a way of camouflaging the true default rate (*see* above-referenced March 2, 2000 email from Gagné to Yao regarding forbearance agreements and Pepper invoices, in ¶¶ 69 and 70), Pepper either knew about and condoned the use of Forbearance Payments, or should have known and exercised its responsibility to analyze and disclose same in the PPMs.

116. The April 2000 PPM prepared by Pepper includes Student Loan Accounts aged from 0-60 days and indicates that at least one-third of the Student Loan Accounts had been delinquent for more than 60 days, more than once. This PPM did not take into account the use of "school reserves" or Forbearance Payments to control delinquency rates.

117. Less than six months later, in December 2000, Pepper prepared another PPM for a different securitization. None of the loans comprising the December 2000 portfolio was more than three months old. In this securitization, the PPM reported loan delinquency rates of only around 1%, without any reference to historical performance including delinquency and/or default data.

118. Representation by Pepper of the delinquency rate of 1% in the PPM was misleading, because the loans being securitized were so new that they could not be in "default" as defined by the 90-day or more delinquent definition in the PPM.

119. Also, the PPMs failed to inform investors of the material fact that once aged to the time that default could occur, SFC had been utilizing and was intending to continue to utilize Forbearance Payments to camouflage the actual default rate figures for each of the securitizations.

120. The definition and discussion of "default" in the PPMs neither classified a Student Loan Account in "default" if SFC were making Forbearance Payments on behalf of the student borrowers nor disclosed defaults on loans from the prior securitizations which had been masked by third party payments.

121. Pepper had a duty, but failed in that duty, to recommend to and advise SFC that it was required to fairly portray default information in the PPMs.

122. Pepper continued to represent SFC as the PPMs continued to misrepresent default rate and performance information.

123. Notwithstanding Gagné's remarks regarding SFC's "manipulating the pool performance" (see ¶ 70, March 2, 2000 email from Gagné to Yao) and the contrived meaning of "default," the PPMs did not disclose that SFC was making Forbearance Payments or was basing its default analysis in the newer PPMs only on new loans without reference to prior performance.

124. The pool of loans in each new securitization consisted of loans to students from the same trucking schools as in earlier securitizations, such that default rates in earlier transactions would be material predictors for default rates on loans in later securitizations.

556615_4

26

125. Pepper knew, or should have known, that characterizing "default" rates without adequate explanation, would manipulate and mislead investors in the purchase of the Certificates and Notes and, through that means, induce creditors to provide credit.

126. The PPMs prepared by Pepper again misleadingly reported that the delinquency rates were around 1% in November 2001, a time when Pepper knew or should have known that the loans in the earlier securitizations were actually defaulting at much higher rates and that it was likely that the default rates would be much higher on the loans in the instant securitization.

127. In September 2001, after SFC used the proceeds from securitizations to make Forbearance Payments on aging loans, SFC could no longer fund the purchase of Student Loan Accounts. Pepper knew or should have known at that time that SFC was insolvent or operating in the zone of insolvency.

128. Pepper was aware of SFC's use of the relevance of historic performance and of SFC's use of forbearance by virtue of SFC's underwriting policies and policy and procedures manual which were maintained in Pepper's files and referred to and incorporated into documents prepared and/or reviewed by Pepper.

129. An insurance agreement prepared by Pepper, made as of October 5, 2001, defined "underwriting policies" as the policies of SFC with respect to "underwriting of Student Loans as reflected in the policy and procedures manual dated January of 2001 and the credit scoring model revised January 24, 2000."

130. The January 24, 2000 credit scoring model was included in underwriting documents which were attached and incorporated as an exhibit to a certificate signed by Yao and executed as of February 11, 2000, and maintained in Pepper's files. That document contained various references to student defaults and delinquencies, including the statements that "[t]he SFC

credit scoring model treats present delinquency as a strong indicator of lending risk" and that "[t]he SFC credit-scoring model treats *historical delinquency* during the *prior 24 months* as a strong indicator of lending risk." (Italics, underscoring and bold all in original.)

131.  These materials, maintained by and known to Pepper, show that SFC considered historical performance to be a strong risk indicator; yet Pepper prepared PPMs which omitted historical performance data.

132.  At best, Pepper failed to review the financial statements or perform due diligence with respect to factual information being disclosed in the PPMs and, thus, failed in its obligation to advise the issuer that it must not mislead potential securitization investors and creditors.

133.  The PPMs prepared by Pepper represented to investors that SFC affiliate Student Loan Servicing LLC ("SLS") would furnish the Issuer, Royal, MBIA Insurance Corporation and the Certificate holders with monthly and quarterly reports of collection, defaults, payments and other data in written or computer form.

134.  Gagné knew that if actual default rates were high, credit enhancement insurance coverage could be withdrawn and the company would fail.

135.  In view of the information possessed, knowledge of Yao's intentions concerning forbearance and the unexplained drops in reported delinquency rates, Pepper at the very least should have reviewed the monthly and quarterly servicer reports and other records, knowing that there could be serious repercussions.

    4.  **Pepper's Withdrawal From Representing SFC**

136.  Although Pepper had represented SFC under a cloud of conflict for a number of years when the Family was reaping high interest payments on their loans and Pepper was collecting legal fees (of approximately $3.2 million), as SFC's financial wherewithal collapsed

and as it became unlikely that his Family's investment would be entirely viable or that Pepper would be paid its outstanding fees in the event of bankruptcy, Gagné belatedly suggested to his partners that Pepper withdraw from representing SFC.

137. In an April 18, 2002 memorandum from Gagné to his partners, Gagné expressed growing concerns regarding Pepper's representation of SFC.

138. In that memo, Gagné addressed, *inter alia*, fee issues, the forbearance account, destruction of SFC Executive Committee minutes, lack of disclosure to investors and misrepresentations made by SFC as reasons justifying withdrawal.

139. Gagné also acknowledged therein that performance data distributed by SFC did not identify the Forbearance Payments made by SFC, but rather reported the payments as if they were collections received from the students.

140. Gagné identified a series of competing considerations regarding withdrawal in this memo, including that: (i) Yao would not pay Pepper's fees; (ii) withdrawal may raise a cloud over SFC with the capital markets and impair its ability to bring itself out of its liquidity crisis; (iii) the lack of financing could cause many of the truck driving schools, for whose students SFC made or purchased 80% of the loans, to go bankrupt, potentially causing damage to the trucking industry as a whole due to a shortage of drivers; (iv) the asset-backed securitization market could be impacted; and (v) Pepper's client Royal could be significantly damaged by the losses which had been estimated at between $150-$200 million.

141. Gagné's April 18, 2002 memo further remarked upon the conflicts with the Family: "Adding to the ethical considerations is the fact that members of my family and trusts in which I am a beneficiary have made loans to Student Finance Corporation from time to time and most recently on March 5, at the request of Andrew Yao."