## Compendium of Unreported Decisions

*In re CitX Corp.,*
No. 03-727, 03-cv-6766, 2005 WL 1388963 (E.D. Pa. June 7, 2005)

*McCrory v. Luisi,*
No. 07301 of 1998, 1989 WL 206449 (Pa. Ct. Com. Pl. June 13, 1989)

*In re Oakwood Homes Corp.,*
No. 02-13396, ___ B.R. ___, 2006 WL 864843 (Bankr. D. Del. Mar. 31, 2006)

*Official Committee of Unsecured Creditors v. Shapiro,*
No. 99-526, 2001 WL 1468250 (E.D. Pa. Nov. 16, 2001)

*Utility Metal Research, Inc. v. Generac Power Systems, Inc.,*
No. 02-CV-6205, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004)

*In re Walnut Leasing Co.,*
No. 99-526, 1999 WL 729267 (E.D. Pa. Sept. 8, 1999)

**\*The following unreported opinions cited herein are attached as Exhibit C to the Chapter 7 Trustee's Memorandum of Law in Opposition to Defendant's Motion to Dismiss and therefore are not attached hereto.**

*Baker O'Neal Holdings, Inc. v. Ernst & Young LLP,*
No. 03-CV-0132, 2004 U.S. Dist. LEXIS 6277 (S.D. Ind. Mar. 24, 2004)

*In re Bennett Funding Group, Inc.,*
No. 96-61376, 1997 Bankr. LEXIS 2366 (Bankr. N.D.N.Y. Dec. 19, 1997)

*Central Community Church of God v. Ent & Imler CPA Group, Inc.,*
No. 03-CV-0678, 2004 U.S. Dist. LEXIS 24339 (S.D. Ind. Nov. 24, 2004)

*Metropolitan Mortgage & Securities Co. v. PriceWaterhouseCoopers, LLP,*
No. 05-cv-290, 2005 U.S. Dist. LEXIS 39851 (E.D. Wa. Dec. 21, 2005)



Not Reported in F.Supp.2d                                                                                                                Page 1
Not Reported in F.Supp.2d, 2005 WL 1388963 (E.D.Pa.)
(Cite as: 2005 WL 1388963 (E.D.Pa.))

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
In re: CITX CORPORATION, INC. Debtor
Gary SEITZ, Chapter 7 Trustee for Citx Corporation,
Inc. Plaintiff,
v.
DETWEILER, HERSHEY AND ASSOCIATES,
P.C. and Robert Schoen, CPA Defendants.
No. 03-727, 03-CV-6766.

June 7, 2005.

Neal A. Jacobs, Neal A. Jacobs & Associates PC, Matthew I. Cohen, Philadelphia, PA, for Plaintiff.

Jonathan K. Hollin, Powell Trachtman Logan Carrle Et Al, King of Prussia, PA, for Defendants.

*MEMORANDUM*

GILES, J.

I. Introduction

*1 This action arises from the bankruptcy of the CitX Corporation ("CitX"), filed on July 3, 2001. Plaintiff, Gary Seitz, was appointed Trustee of CitX on September 25, 2001. On July 2, 2003, Plaintiff brought an adversary action against the accounting firm of Detweiler, Hershey and Associates and Robert Schoen, CPA (collectively "Defendants") alleging malpractice (Count I), deepening insolvency (Count II), breach of fiduciary duty (Count III), and negligent misrepresentation (Count IV). (Pl.'s Compl. at 9-11.) The bankruptcy court dismissed the breach of fiduciary claim by order on November 25, 2003. On December 9, 2004, this court granted Defendants' Motion for Partial Summary Judgment as to Counts I and IV. On December 20, 2004, Plaintiff filed a Motion for Reconsideration of the dismissal of Count I (professional malpractice), which the court granted, pending the close of discovery on January 11, 2005. Now, before the court is Defendants' Motion for Summary Judgment as to Counts I and II. For the reasons that follow, the Motion is granted.

II. Factual Background

*Professional Resources Systems International, Inc.*

CitX was formed on or about August 12, 1996 for the purposes of providing internet and software consulting services to businesses and other entities worldwide. In August and September of 1999, CitX entered into a series of agreements with Professional Resources Systems International, Inc. ("PRSI") to create an intranet shopping mall for merchants. Pursuant to the agreement, CitX was to provide PRSI with internet-based technology, called the Small Office Home Office (the "SOHO system"), which would be comprised of numerous linked websites. The websites were to be linked by a virtual private network which would allow individuals to engage in the electronic sale and purchase of goods over a secure network. In exchange, PRSI was engaged to market the SOHO product and solicit customers. Between June and December of 1999, PRSI paid CitX approximately $710,000 for its services. However, at the close of 1999, PRSI still owed CitX over $2,000,000.

On January 4, 2000, a Florida court granted the Florida Attorney General's Motion for a Temporary Injunction Without Notice to shut down all PRSI operations. The court was persuaded that PRSI was a fraudulent enterprise which never intended to produce and operate the intranet shopping network. The court froze all PRSI assets and appointed a Receiver. The next day, the offices of PRSI were closed and its computers and business records were seized.

*Relationship with Detweiler, Hershey and Associates and Robert Schoen*

CitX and Defendants began their professional relationship in 1996. The terms and conditions of the relationship were outlined in a June 29, 1998 engagement letter ("Engagement Letter") between Defendants and CitX's President, Bernie Roemmele. The Engagement Letter provided that Defendants would "compile" from information provided by CitX "the annual statements of assets, liabilities and equity." (Engagement Letter ¶ 1). The letter specifically noted that Defendants "will not audit or review such financial statements" provided by CitX.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00072-JJF    Document 58-8    Filed 04/28/2006    Page 3 of 10

Not Reported in F.Supp.2d                                                                                       Page 2
Not Reported in F.Supp.2d, 2005 WL 1388963 (E.D.Pa.)
(Cite as: 2005 WL 1388963 (E.D.Pa.))

(*Id.*) The Engagement Letter stated that:

*2 A compilation is limited to presenting in the form of financial statements and supplementary schedules information that is the representation of management. We have not audited or reviewed the accompanying financial statements and supplementary schedule and, accordingly, do not express an opinion or any other form of assurance on them. (*Id.*) [FN1]

> FN1. The American Institute of Certified Public Accountants defines a "Compilation of financial statements" as "[p]resenting in the form of financial statements information that is the representation of management (owners) without undertaking to express any assurances on the statements." AICPA, AR Section 100.04.

The Letter provided that this explanation would be included on each financial statement.

The Engagement Letter continued, that "if management elects to omit substantially all of the disclosures ordinarily included in financial statements" the Defendants would include the following paragraph in the financial statement's cover letter:

Management has elected to omit substantially all of the disclosures ordinarily included in the financial statements prepared on the income tax basis of accounting. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the Company's assets, liabilities, equity, revenue, and expenses. Accordingly, these financial statements are not designed for those who are not informed about such matters. (*Id.* ¶ 2).

The Engagement Letter further disclosed that the Defendants' "engagement cannot be relied upon to disclose errors, irregularities, or illegal acts, including fraud or defalcations that may exist," but that the Defendants would inform CitX "of any such matters that come to our attention." (*Id.* ¶ 6).

In addition to providing compiled financial statements, the Defendants also agreed to prepare CitX's state and federal tax returns and meet with management to discuss tax planning strategies or other pertinent matters. (*Id.* ¶ 7).

During the course of its engagement with CitX, Defendants provided three compiled financial statements. The first compiled statement was issued on July 17, 1998 and covered the period between June 30, 1997 and June 30, 1998. The second statement was issued on January 7, 2000 and covered the period between June 30, 1998 and June 30, 1999. The final compilation, issued on January 7, 2000, provided an interim report for June 30, 1999 to December 31, 1999. Each report contained a cover letter explaining the nature and purpose of a compiled financial statement, with the accompanying note outlined in the Engagement Letter. The first and final compilations also contained the notation regarding the omitted disclosures at the request of management.

*The January 7, 2000 statements and the PRSI notation*

On January 7, 2000 the Defendants issued their final compilation covering the period June 30, 1999 to December 31, 1999. Prior to the issue date, Defendant Schoen was notified of the legal activities associated with PRSI. In response, the compilation for this period contained the following note:

> In January 2000, the Company, along with its largest customer and several individuals, were named as defendants and charged with certain security violations by the Attorney General's Office in Florida. As of the date of these financial statements, the Company is not sure what impact, if any, these charges will have on its financial position. As of December 31, 1999, the financial statements reflect accounts receivable in the amount of $2,403,122 from this customer and related deferred revenues in the amount of $960,000. (Third Compilation, at 4).

*3 This was the last financial statement issued by Defendants on behalf of CitX. There was no follow-up regarding the progress of the PRSI litigation as it related to CitX.

III. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding the entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."). The moving party bears the initial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00072-JJF   Document 58-8   Filed 04/28/2006   Page 4 of 10

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 1388963 (E.D.Pa.)
(Cite as: 2005 WL 1388963 (E.D.Pa.))

burden of proving that no genuine issue of material fact is in dispute. Celotex, 477 U.S. at 323; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has carried this burden, the nonmoving party may not rest upon the mere allegations in its pleadings, but must set forth specific facts demonstrating that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that the "mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for plaintiff.").

IV. Discussion

A. *Professional Malpractice*

In Pennsylvania, claims for professional malpractice framed in terms of breach of professional care constitute an action for negligence sounding in tort. See Official Comm. of Unsecured Creditors of Corell Steel v. Fishbein & Co., P.C., Civ.A.No. 91-4919, 1992 WL 196768 at *5 (E.D.Pa. Aug.10, 1992); Jack Greenberg, Inc. v. Grant Thorton L.L.P., 212 B.R. 76, 92-93 (Bankr.E.D.Pa.1997). To establish a cause of action for negligence, plaintiff must demonstrate that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, (3) the breach resulted in injury to the plaintiff, and (4) the plaintiff suffered an actual loss or damage. Martin v. Evans, 551 Pa. 496, 711 A.2d 458, 461 (Pa.1998).

Accountants, like other professionals, have a duty to perform their services with the "skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." [FN2] Restatement (Second) of Torts § 299A (1965). See also Robert Wooler Co. v. Fidelity Bank, 330 Pa.Super. 523, 479 A.2d 1027, 1031 (Pa.Super.Ct.1984) (defining the standard of care for accountants according to § 299A of the Restatement); Neuberger v. Shapiro, 110 F.Supp.2d 373, 384 (E.D.Pa.2000) (finding that in Pennsylvania "an accounting firm can be liable for professional negligence where it violates its duty 'to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." '). When, as here, the accountants have an express service contract, the scope of their duty to plaintiff is defined by the terms of contract, so long as they perform the contract like a reasonable accountant would in their position. See O'Neill v. Atlas Automobile Fin. Corp., 139 Pa.Super. 346, 11 A.2d 782, 785 (Pa.Super.Ct.1940) (holding that defendants' counterclaim against plaintiff accountants was properly dismissed by the jury because the plaintiffs acted within the parameters of their contract and did not fall below the standard of care for accountants by failing to discover that the defendants bookkeeper was acting irregularly); Restatement (Second) of Torts § 299A cmt. c (1965) (defining the scope of the accountant's undertaking by the express or implied terms of the service contract).

> FN2. This standard is substantially similar to Article V, "Due Care," of the American Institute of Certified Public Accountants' *Principles of Professional Conduct:* "Due care requires a member to discharge professional responsibilities with competence and diligence. It imposes the obligation to perform professional services to the best of a member's ability with concern for the best interest of those for whom the services are performed and consistent with the profession's responsibility to the public."

*4 Although the scope of the accountants' duties are defined by contract, accountants can breach their professional duties to their client if they encounter glaring irregularities or illegal activities--"red flags"-- and fail to disclose them. See Wooler, 479 A.2d at 1032 (holding that accountant's contract disclaimers did not shield it from liability if it ignored "suspicious circumstances which would have raised a 'red flag' for a reasonably skilled and knowledgeable accountant."); Computer Personalities Sys., Inc. v. Stockton Bates, LLP, No.01-14231DWS, 2003 WL 22844863 at *6 (Bankr.E.D.Pa. Nov.13, 2003) (finding that despite limiting their services to a compilation, accountants maintained a duty to point out suspicious circumstances which would raise red flags for a reasonable accountant). The American Institute of Certified Public Accountants ("AICPA") similarly notes that when compiling financial statements:
> The accountant is not required to make inquiries or perform other procedures to verify, corroborate, or review information supplied by the entity. However, the accountant may have made inquiries or performed other procedures. The results of such inquiries or procedures, knowledge gained from prior engagements, or the financial statements on their face may cause the accountant to become aware that information supplied by the entity is incorrect, incomplete, or otherwise unsatisfactory. In such circumstances, the accountant should

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 4
Not Reported in F.Supp.2d, 2005 WL 1388963 (E.D.Pa.)
(Cite as: 2005 WL 1388963 (E.D.Pa.))

obtain additional or revised information. If the entity refuses to provide additional or revised information, the accountant should withdraw from the engagement. AR Section 100.09.

The terms of Defendants' accounting services to CitX were set out in two documents--the Engagement Letter and the cover letters accompanying the three compiled financial statements. Defendants contracted with CitX to compile the financial statements provided by CitX management. Therefore, the extent of Defendants' duty was to provide compilation services to CitX with the skill and diligence of a reasonable accountant.

The primary difference between a compilation and an audit "is the degree and amount of responsibility undertaken by the accountant ." *Wooler*, 479 A.2d at 530. "In an audited engagement, the accountant assumes responsibility for the accuracy of the figures," in effect "warrant[ing] the reliability of the report which he prepares." *Id.* By contrast, in "an unaudited engagement, the accountant does not warrant and is not responsible for the ultimate accuracy of the report if the figures supplied by the client are erroneous." *Id.* For these reasons, a compilation is understood as "the 'lowest level of assurance' regarding an entity's financial statements", whereas an audit "provides 'the highest level of assurance." ' *Otto v. Pennsylvania State Educ. Ass'n-NEA*, 330 F.3d 125, 133 (3d Cir.2003).

Plaintiff argues that Defendants provided a "wide range of accounting services" which went beyond the terms of Engagement Letter. Specifically, plaintiff argues that Defendants' duty to CitX was broader than the Engagement Letter because Defendants provided the following services:
  *5 1. General accounting services
  2. Review of bank accounts
  3. Tax advice
  4. Preparation of federal and state tax returns
  5. Maintenance of the company's general ledger
  6. Maintenance of the company's fixed asset schedules
  7. Assistance with books of original entry
  8. Attendance at one shareholder meeting.

First, with regard to the tax advice and preparation services performed by Defendants, the Engagement Letter specifically states that the engagement covers these services. Therefore, Defendants' performance of these tasks does not extend the scope of their duty to plaintiff. Second, the remaining services were incidental to the Defendants' performance of its obligation to compile the financial statements of CitX. Accountants are required by the AICPA, when compiling financial statements, to:
> ... possess a general understanding of the nature of the entity's business transactions, the form of its accounting records, the stated qualifications of its accounting personnel, the accounting basis on which the financial statements are to be presented, and the form and content of the financial statements. The accountant ordinarily obtains knowledge of these matters through experience with the entity or inquiry of the entity's personnel. On the basis of that understanding, the accountant should consider whether it will be necessary to perform other accounting services, such as assist in adjusting the books of account or consult on accounting matters, when her or she compiles financial statements. AR Section 100.08.

The services that Defendants provided CitX were encompassed within its general duty to compile the financial statements of CitX as expressed in the Engagement Letter. Therefore, the Defendants' did not owe a "heightened" or "enhanced" duty to CitX beyond the scope of the Engagement Letter.

Plaintiff alleges that Defendants breached their duty to CitX by failing to disclose a number of "red flags" which the Defendants either knew or should have known. Specifically, plaintiff asserts that the Defendants (1) failed to inquire into the educational background of CitX's bookkeeper, which would have evidenced a lack of internal controls; (2) issued compilations reflecting a solvent company when, according to Plaintiff, CitX was insolvent or on the verge of insolvency; (3) included the $2,000,000 owing from PRSI as a good receivable on the third compilation statement; (4) should have known that their statements were being used by management to entice new investors to make stock purchases; and (5) failed to recall the final compilation statement when it became clear that the PRSI receivable would not be paid.

In support of these allegations, Plaintiff submitted a report from a certified public accountant. That affadivit, however, notes the following "red flags": (1) Defendants knew that PRSI was CitX's largest customer with substantially all of its revenue and profits attributed to this relationship; (2) Defendants failed to recognize that if the compilation figures are "materially misstated"--including the PRSI receivable rather than backing it out-a compilation disclosure is not adequate notice; (3) Defendants were aware that the financial statements were going to be used at an upcoming shareholders meeting with the PRSI receivable included; (4) Defendants failed to delay

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00072-JJF    Document 58-8    Filed 04/28/2006    Page 6 of 10

Not Reported in F.Supp.2d                                                                                           Page 5
Not Reported in F.Supp.2d, 2005 WL 1388963 (E.D.Pa.)
(Cite as: 2005 WL 1388963 (E.D.Pa.))

the issuance of the financial statements upon learning of the illegal troubles surrounding PRSI; and (5) Defendants failed to recall or withdraw the statements once it became clear that the PRSI receivable could not be collected. Taken together, the Defendants are alleged to have breached their duty to CitX by including the PRSI receivable, failing to conduct further investigations into the status of PRSI, and not insuring that the financial statements were not used by CitX to entice new investments. These accusations, however, do not constitute a breach of Defendants' duty to CitX.

*6 First, Defendants' duty to CitX was explicitly outlined in the Engagement Letter. Defendants contracted to compile the financial statements of CitX. Pursuant to this responsibility, they were obligated to prepare financial statements based on the information supplied by CitX management. The Defendants were under no obligation to delve into the internal finances of CitX or to conduct an independent investigation of events, such as the PRSI relationship, which could affect CitX's finances going forward. AR Section 100.09 of the AICPA specifically notes that when performing compilation services, accountants are "not required to make inquiries or perform other procedures to verify, corroborate, or review information supplied by the entity."

Defendants had a duty to CitX to perform their compilations with the degree of skill and responsibility normally undertaken by members of the accounting community. This duty encompasses alerting the client to "red flags" which were discovered during the course of the engagement. When confronted with such "red flags," Defendants had a responsibility to "point out" any suspicious circumstances to the client, _In re Computer Personalities,_ 2003 WL 22844863 at *6, rather than "ignoring [such] circumstances." _Wooler,_ 479 A.2d at 1032. In this case, the client, CitX, was fully aware of its legal problems with or through PRSI. To the extent that Defendants learned of PRSI's troubles, it was from CitX management. Therefore, the client was already aware of the PRSI "red flag." [FN3] Moreover, Defendants noted on the complied financial statements both the legal charges facing PRSI and the specific amounts PRSI still owed CitX. When these statements were distributed to CitX's shareholders, the Defendants had ensured that the shareholders were aware of the limited nature of Defendants' engagement and the specific financial connection between CitX and PRSI. These actions discharged Defendants' duty to alert the client to potential red flags that they became aware of through the course of the engagement. Defendants did not have a duty to take further steps to investigate subsequent events surrounding PRSI. The compilations accurately reflected what CitX's records showed PRSI owed it at the time.

> FN3. The misstatement of the charges by the State of Florida as being "securities violations" as opposed to "fraud charges" is immaterial. What is material is that the reader was advised that it was not known as of the date of the financial statements what impact the Attorney General's charges would have on CitX.

In addition to failure to show a breach of duty, the Plaintiff has failed to proffer evidence of causation. In order to present a valid cause of action for professional malpractice, a plaintiff must establish that the alleged breach of the defendant's duty actually resulted in injury to plaintiff. See _Martin,_ 711 A.2d at 461. In other words, "[t]he party who claims damages by reason of the negligent act of another must show, not only that the other party was negligent, but that his injuries are the result of such negligence. The complaining party has no cause of action, unless the wrongdoer's act produces the injuries complained of." _Reddington v. City of Philadelphia,_ 253 Pa. 390, 98 A. 601 (Pa.1916). See also _Openbrier v. General Mills,_ 340 Pa. 167, 16 A.2d 379, 380 (Pa.1940) (holding that to "constitute a tort, there must be an injury; mere negligence establishes no right of action."); _Composition Roofers Local 30/30B v. Katz,_ 398 Pa.Super. 564, 581 A.2d 607, 609 (Pa.Super.Ct.1990) ("In any cause of action for malpractice, some harm must be shown to have occurred to the persons bringing the action.").

*7 Plaintiff alleges that Richard Marks, a member of CitX's Board of Directors and the company's Chief Operating Officer, relied on Defendants' financial statements and that such reliance caused him to forego the option of winding up and dissolving CitX during early 2001. Specifically, it is asserted that, had Marks been properly informed of the financial consequences of the PRSI matter, he would have taken steps to wind-up CitX, which would have prevented CitX from incurring more debt and further safeguarded the company's assets. In support of this claim, plaintiff has submitted an affidavit by Marks in which he asserts that he "now understands" that the inclusion of the PRSI receivable in the January 2001 compilation was a gross misstatement, given that collection of the PRSI receivable was highly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

doubtful. (Marks Aff. ¶ 13, 15). Marks' affidavit further states that he was misled by Defendants' financial statements and that, had he been given accurate information he would have immediately taken action to correct the problem, such as conducting further investigations in the financial situation of the company and possibly seeking an involuntary winding up or dissolution of CitX. (*Id.* ¶ 20, 23-25, 30). Unfortunately for plaintiff, Marks' assertions in the affidavit are directly contradicted and undermined by the nature and extent of his involvement in the management of CitX and, indeed, by his previous sworn deposition testimony in this case.

At all relevant times, Marks was the Chief Operating Officer of CitX, a member of its Board of Directors, and a shareholder. He cannot now contend that he lacked intimate knowledge of the financials of the company, particularly the degree of uncertainty in the collection of the PRSI indebtedness. Marks may not have been involved in the routine tracking of CitX's finances, but, even as a board member, he was aware of large transactions, such as the PRSI account and all other significant, hoped for, capital infusions for the company. (Marks 2003 Dep. at 102-03).

More importantly, Marks' position as the COO and Board member of CitX afforded him insider access to the developing PRSI situation and its affect on CitX. On January 5, 2000, in response to the permanent injunction entered against PRSI and the appointment of a receiver, Marks recommended to the CitX board that they contact the Pennsylvania State Attorney General's Office to inquire whether CitX was being investigated in relation to the alleged fraudulent activity of PRSI. (*Id.* at 81, 581 A.2d 607). At Marks' direction, CitX's public relations department drafted a press release explaining that CitX was only a distributor or vendor for PRSI and therefore was not involved in the alleged fraudulent activities. (*Id.*) During this same time, Marks and other board members met with PRSI's Receiver, Lewis Freeman, to discuss the continuation of CitX services to PRSI customers. (Marks 2000 Dep. at 56-57); (Marks 2005 Dep. at 111). Marks was kept informed of the developing PRSI situation and its legal consequences for CitX, by Mr. Maliszewski, CitX's attorney. (Marks 2003 Dep. at 80). Specifically, counsel spoke with Marks regarding issues surrounding the PRSI Receiver and his position. (*Id.*)

*8 Marks was also well aware of the difference between a compilation and an audit. Marks described a compilation as:

basically a regurgitation of the financial information that's provided to the accountant to be put into a orderly fashion that's acceptable under GAP ... an accounting of the company's financial condition as of that date. It doesn't include any opinion or evaluation by the person preparing the financial statement. It reflects what was given to that preparer who is to put it in an orderly fashion for reporting it as such. (Marks 2005 Dep. at 96-97).

This description evidences Marks' understanding that the financial statements prepared by Defendants were compilations, as opposed to audits, and that the Defendants, therefore, were engaged only to "regurgitate" the financial data supplied by CitX.

In February of 2000, Marks participated in a CitX shareholders meeting. At the meeting, Marks "knew" that PRSI was shut down. (Marks 2005 Dep. at 223). He testified at his deposition that he believed that the "truth" should be shared with CitX shareholders at the meeting, and that the truth was that PRSI had been shut down, that the PRSI receivable was at risk, and that CitX was still working to collect it. (*Id.* at 121-22, 581 A.2d 607). Based on his knowledge that PRSI was in trouble and that the receivable was in doubt, but not believed by CitX management to be beyond hope of collection, in whole or in part, Marks actively solicited funds from current shareholders in an attempt to keep CitX afloat. (*Id.* at 124, 266, 581 A.2d 607). *See also* (Levine Dep. at 22-23). Marks testified that at no time did he conclude that the PRSI receivable could not be collected. (*Id.* at 137, 581 A.2d 607). Defendants did nothing to create that belief and hope in CitX management. This opinion, he said, was not based on the Defendants' inclusion of the PRSI receivable in its final compilation, but instead on his own understanding of the contractual relations between CitX and PRSI. (*Id.* at 163, 581 A.2d 607).

Finally, the circumstances surrounding the issuance of Marks' affidavit negate any weight for the creation of a triable issue of fact. According to his deposition testimony, Marks met with plaintiff's attorneys for an hour and a half and was given only the final compilation and plaintiff's two expert reports, which stated that the inclusion of the PRSI receivable was a gross misstatement of CitX's financial status and that therefore CitX board members should have shut down the company. (*Id.* at 180, 581 A.2d 607). Marks was instructed to focus only on the time-period between the issuance of the compilation statement (January 7, 2000) and the subsequent shareholders meeting (February 12, 2000) in deciding

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00072-JJF    Document 58-8    Filed 04/28/2006    Page 8 of 10

Not Reported in F.Supp.2d                                                                                  Page 7
Not Reported in F.Supp.2d, 2005 WL 1388963 (E.D.Pa.)
(Cite as: 2005 WL 1388963 (E.D.Pa.))

what actions he would have taken had the PRSI receivable not been included. (*Id.* at 282-83, 581 A.2d 607). When asked under oath about the conclusions in his affidavit--to the effect that without the inclusion of the PRSI receivable in the financial statements Marks would have taken action to dissolve CitX--Marks testified that these conclusions were "hypothetical." Specifically, he testified that his conclusions in the affidavit were based on suppositions that

*9 had the expert witnesses opinions been presented to me at the time that the financial statement was filed ... and also, if, back then, I was apprised by legal counsel that, as a director of the company, I had an obligation to seriously consider what the ramifications were at that time should the opinions of these two expert witnesses be accurate, and since at that time, if those legal opinions were accurate and I did have counsel--outside legal counsel ascertaining that my obligation or my duties to have to pursue winding up the company, discontinuing business or not seeking further capitalization, would I have done so. And, obviously, I made the affidavit on that position. (*Id.* at 191-92, 581 A.2d 607).

In essence, Marks testified, not that had the PRSI receivable been taken out of the financial statement he would have pursued dissolution of the company, but rather that he would have followed the instructions of others--namely experts and legal counsel--if, at the time, he had been told to take such action. This "hypothetical" affidavit amounts to no more than pure, after-the-fact wishful thinking. It skips over entirely who Marks was in CitX management, his responsibilies, and his intimate knowledge of the status of the PRSI account.

In summary, Marks' position with CitX, his understanding of the difference between a compilation and an audit, his familiarity with the PRSI litigation as it progressed, and his own characterization of his affidavit as "hypothetical," demonstrate that no genuine issue of material fact exists as to whether he relied on Defendants' financial statements to forego the possibility of taking steps to wind up the company. He always knew precisely the status of the PRSI receivable and relied upon his own faith in CitX to try to keep the company going. The choice to try to collect the PRSI receivable under the circumstances of a court shut down order of PRSI cannot be laid at Defendants' feet as a matter of fact or law. Plaintiff has thus failed to present cognizable proof of reliance and causation, leaving no issue to submit to a factfinder.

The last element that a plaintiff would have to prove for professional malpractice is that a Defendant's actions resulted in actual loss or damage to the plaintiff. *Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744, 749 (Pa.1983). The loss must be greater than nominal damages, speculative harm, or the threat of future harm. *Kituskie v. Corbman*, 552 Pa. 275, 714 A.2d 1027, 1030 (Pa.1998); *Rizzo v. Haines*, 520 Pa. 484, 555 A.2d 58, 68 (Pa.1989). "The test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages.... Thus, damages are speculative only if the uncertainty concerns the *fact* of damages rather than the amount." *Rizzo*, 555 A.2d at 68 (emphasis in original).

Plaintiff alleges that CitX was harmed by the Defendants because their actions (1) robbed CitX's independent directors of the knowledge they would have had if the Defendants lived up to their professional obligations; (2) deepened the insolvency of CitX by allowing the company to wrongfully expand its debt; and (3) robbed CitX's independent directors of the opportunity to take action to safeguard the remaining assets of CitX. (Pl.'s Compl. ¶¶ 31- 32). The first and third theories have already been discussed at length. In short, CitX management and independent director Marks knew of the PRSI account status. Plaintiff simply cannot proffer genuine evidence that raises a material issue of fact that Richard Marks actually relied upon Defendants' financial statements in assessing the true financial chances of CitX to succeed as a collector of its debts and that, had the PRSI receivable been excluded from the final statement, Marks would have acted differently. Marks' corporate position and familiarity with CitX and PRSI show conclusively that he had independent, and, greater, information than did Defendants, regarding the financial consequences of the PRSI situation. His actions and testimony reveal that he did not, and would not have, taken action to dissolve the company because he believed the PRSI account was collectible, despite the ongoing State Attorney General's charges and investigation.

*10 The remaining damages theory is that the Defendants' actions deepened the insolvency of CitX by allowing it to continue incurring debt. [FN4] Deepening insolvency is defined as "the fraudulent expansion of corporate debt and prolongation of corporate life." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 347 (3d Cir.2001). Plaintiff's theory for deepening insolvency is identical to its other damages theories;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00072-JJF    Document 58-8    Filed 04/28/2006    Page 9 of 10

Not Reported in F.Supp.2d                                                     Page 8
Not Reported in F.Supp.2d, 2005 WL 1388963 (E.D.Pa.)
(Cite as: 2005 WL 1388963 (E.D.Pa.))

namely, that by including the PRSI receivable in the final compilation statement the company was encouraged to continue its operations. However, plaintiff has failed to offer competent evidence that the actions of Defendants were causally connected to the prolongation of the company's life. The only proof of reliance proffered is Marks' affidavit. That has already been discussed as non-evidence. Plaintiff has no other evidence to support its claim that the Defendants' actions deepened the insolvency of CitX, e.g., that any other independent director relied upon Defendants' compilation in any material way. Therefore, judgment must be entered in favor of Defendants as a matter of law.

> FN4. The plaintiff has also asserted deepening insolvency as a separate cause of action against Defendants.

B. *Deepening Insolvency*

Plaintiff asserts a separate count for deepening insolvency. That concept is defined as "the fraudulent expansion of corporate debt and prolongation of corporate life." Lafferty, 267 F.3d at 347. Although there is no current support for the deepening insolvency theory under Pennsylvania law, the third circuit opined in *Lafferty* that "if faced with the issue, the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a cognizable injury." Id. at 349. The third circuit reasoned that the theory is "essentially sound," given that fraudulent and concealed incurrence of debt can damage the value of corporate property by allowing an otherwise insolvent corporation to continue to incur debt, resulting in eventual bankruptcy. Id. at 549-50.

Plaintiff's substantive allegations regarding deepening insolvency are identical to those found in its claim for professional malpractice. The court has previously outlined its holding that the Defendants did not breach their professional obligations to CitX by failing to inquire further into the circumstances surrounding the dissolution of PRSI and that plaintiff has failed to proffer competent evidence that the Defendants' actions caused injury to the company.

Plaintiff's claim for deepening insolvency would fail even if plaintiff had provided sufficient evidence of causation. First, deepening insolvency refers to *fraudulent,* rather than, negligent conduct. In *Lafferty* the defendant accountants were accused of conspiring with the company's principals to engage in a Ponzi scheme. Id. at 345. In other words, the accountants were alleged to be active participants in a scheme to defraud the debtor and its creditors. See also Schacht v. Brown, 711 F.2d 1343, 1345 (7th Cir.1983) (denying denying defendants' motion to dismiss given the allegations that defendants "knew" of the corporation's insolvency at the time they issued financial statements and that the defendants "joined with" the corporation's principals "in a multifaceted, fraudulent scheme" to prolong the corporation's life past insolvency). Plaintiff alleges that, from its relationship with CitX and its review of CitX's books, Defendants should have known that CitX was insolvent. Such failure amounts to no more than negligence. Nowhere does the plaintiff even allege, much less offer evidence, that Defendants were involved in a fraudulent scheme with the directors and officers of CitX falsely to prolong the company's life.

*11 Further, plaintiff's claim for deepening insolvency would be barred by the doctrine of *in pari delicto*. The doctrine of *in pari delicto* holds that "a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." Lafferty, 267 F.3d at 354. The third circuit has held that "in actions brought by the trustee as successor to the debtor's interest under section 541, the 'trustee stands in the shoes of the debtor and can only assert those causes of actions possessed by the debtor.' " Id. at 356 (quoting Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149, 1154 (3d Cir.1989)). In a separate proceeding before this court, Docket. No. 03-MC-00210, the plaintiff trustee brought suit against the principals of CitX alleging that they were "intimately involved in the PRSI fraud and used CitX to advance the PRSI fraudulent scheme." The complaint alleges that "the PRSI fraudulent scheme became a joint venture between PRSI and CitX with CitX providing the veneer of legitimacy to PRSI to substantiate why PRSI could not deliver on the promised internet shopping mall." As the successor to CitX, plaintiff can only assert those causes of action available to CitX which existed at the commencement of the bankruptcy. Id. at 356-57. At that time, according to plaintiff's own representations to this court, the officers and directors were intimately and actively involved in the PRSI scheme, the same scheme for which the plaintiff is seeking recovery from Defendants in this proceeding. Therefore the doctrine of *in pari delicto* applies to bar plaintiff's claim for deepening insolvency in this action.

The plaintiff argues without basis that its claim is not barred by the doctrine of *in pari delicto* because it is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 9
Not Reported in F.Supp.2d, 2005 WL 1388963 (E.D.Pa.)
**(Cite as: 2005 WL 1388963 (E.D.Pa.))**

an innocent successor to the wrongful acts of CitX's principals. Plaintiff posits that *Lafferty* is not controlling and that, instead, this court should be guided by the third circuit's decision in *In re: The Personal & Bus. Ins. Agency,* 334 F.3d 239 (3d Cir.2003). The court disagrees. In *Lafferty* the third circuit considered the defense of an innocent successor in the context of actions brought pursuant to section 541 of the Bankruptcy Code. 11 U.S.C. § 541. Trustees are authorized to "commence and prosecute any action or proceeding on behalf of the estate before a tribunal." Fed. R. Bankr.P. 6009. "Such actions fall into two categories: (1) those brought by the trustee as successor to the debtor's interest included in the estate under Section 541, and (2) those brought under one or more of the trustee's avoiding powers." *Lafferty,* 267 F.3d at 356. The third circuit specifically held that because the explicit language of § 541 limits the bankruptcy estate to "all legal or equitable interests of the debtor in property *as of the commencement'* of bankruptcy," courts are prevented from taking into account post-petition events, such as the appointment of an innocent trustee. *Id.* at 356, 357. The plaintiff is asserting claims on behalf of CitX in its capacity as CitX's successor in interest and is therefore bound by the explicit language of § 541 and the third circuit's ruling in *Lafferty.* Moreover, plaintiff's reliance on the third circuit's decision in *Personal & Bus. Ins. Agency* is inapposite. That decision was limited to an analysis of the trustee's claim for a fraudulent conveyance under 11 U.S.C. § 548. The appellate court decided that the doctrine of *in pari delicto* did not apply to bar the trustee's claim for a fraudulent conveyance because, unlike § 541, the plain language of § 548 did not direct the courts to evaluate the defenses as they existed at the commencement of the bankruptcy. *In Personal Bus. Ins. Agency,* 334 F.3d at 245.

V. Conclusion

*12 For the foregoing reasons, the Defendants' Motion for Summary Judgment is granted.

*JUDGMENT ORDER*
AND NOW, this 7th day of June, 2005, in accordance with the attached memorandum, it is hereby ORDERED that:

1. Defendants' Motion for Summary Judgment is GRANTED;

2. Judgment is entered in favor of defendant, and against plaintiff.

Not Reported in F.Supp.2d, 2005 WL 1388963 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2716600 (Trial Pleading) Defendants' Answer to Plaintiff's Motion to Quash Subpoena for Deposition of Howard Lapensohn, CPA (May. 24, 2004)

• 2004 WL 2716597 (Trial Motion, Memorandum and Affidavit) Miemorandum of Law in Support of Motion of Gary Seitz to Ouash Subpoena of Defendants Detweiler Hershey and Robert Schoen (May 2004)

• 2004 WL 2716593 (Trial Motion, Memorandum and Affidavit) Motion to Compel Compliance with the Court's Order of February 18, 2004 (Apr. 2, 2004)

• 2003 WL 24274177 (Trial Pleading) Complaint of Gary Seitz, Chapter 7 Trustee for Citx Corporation, Inc. Against Detweiler, Hershey and Associates, P.C. and Robert Schoen (Jul. 2, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.