

2 Pa. D. & C.4th 406                                                                                                                                Page 1
1989 WL 206449 (Pa.Com.Pl.), 2 Pa. D. & C.4th 406

C

Court of Common Pleas of Pennsylvania, Allegheny County.
McCrory
v.
Luisi
No. 07301 of 1988.

June 13, 1989

*1 **407 Preliminary objections to complaint joining additional defendant.

West Headnotes

**Vendor and Purchaser** 327
400k327 Most Cited Cases
In an action for breach of an agreement for the purchase of residential property, defendants are not permitted to join plaintiffs' real estate agent as an additional defendant based upon its alleged misrepresentation concerning the racial composition of the neighborhood in which the property was located since the Pennsylvania Human Relations Act and the Real Estate Licensing and Registration Act prohibit a purchaser from seeking the assistance of a real estate broker or a real estate agent in determining whether the racial makeup of a neighborhood conforms to the desires of the purchaser and prohibits a real estate broker or agent from providing such assistance.

Charles E. McKissock, for plaintiff.

Jerry B. Landis, for defendant.

Edward L. Kochuba Jr., for additional defendant.

WETTICK, A.J.

This is a lawsuit to recover damages for defendant's breach of an agreement to purchase residential property from plaintiffs. After signing the sales agreement but prior to the closing, defendant informed plaintiffs that she was rescinding the agreement because plaintiffs' real estate agent had misrepresented the racial composition of the neighborhood in which the property was located. This alleged misrepresentation is defendant's only defense to this action.

Defendant has filed a complaint joining plaintiffs' real estate broker as an additional defendant. The basis for the joinder is that prior to executing the sales agreement, defendant asked the agent of the real estate broker whether the neighborhood surrounding the property was predominately white or predominately black and the agent responded that the neighborhood was predominantly white. Defendant alleges that this was a misrepresentation of an existing fact, that she was induced to execute the agreement of sale in reliance on this misrepresentation, that she would not have executed the agreement but for this representation, that the agent knew that the representation was false, and that he anticipated that defendant would rely on this representation.

**408 The additional defendant has filed a preliminary objection in the nature of a demurrer to the complaint that is the subject of this opinion and order of court.

I

The activities upon which defendant's complaint against the additional defendant is based are illegal.

While a purchaser may discriminate on the basis of race in determining locations in which he or she wishes to purchase property, the law prohibits the purchaser from seeking the assistance of a real estate broker or a real estate agent in determining whether the racial makeup of a neighborhood conforms to the desires of the purchaser. It also prohibits a real estate broker or agent from providing such assistance.

*2 Under subsection h(6) of section 5 of the Pennsylvania Human Relations Act (Act of October 27, 1955, P.L. 744, as amended, 43 P.S. § 955(h)(6)) it was illegal for defendant to contact the real estate agent and "[m]ake any inquiry [or] elicit any information . . . concerning race [or] color" in connection with this transaction involving the sale of residential property. Under the provisions of the Human Relations Act and legislation governing real estate brokers and agents, it was illegal for the real estate agent to furnish information concerning the the racial makeup of the neighborhood. See, e.g., section 5.3 of the Pennsylvania Human Relations Act (43 P.S. § 955.3); section 604 of the Real Estate Licensing and Registration Act (63 P.S. § 455.604).

Because of her wrongdoing, defendant is barred from maintaining this action against the additional defendant under the principle developed at common

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

law that a court will not lend its aid to an action grounded upon immoral or illegal conduct. The **409 scope and applicability of this principle was recently reviewed by the Pennsylvania Superior Court in Feld and Sons Inc. v. Pechner Dorfman, Wolfee, Rounick and Cabot, 312 Pa. Super. 125, 458 A.2d 545 (1983). In that case plaintiffs included individuals who had been criminally convicted for providing perjured testimony in proceedings before the National Labor Relations Board and offering a bribe to a potential witness. In this lawsuit they sued the lawyers who represented them in the NLRB proceeding. The basis of this suit was that their lawyers had advised them to furnish perjured testimony and to offer the bribe. They sought compensatory and punitive damages for professional malpractice, infliction of emotional distress, deceit and breach of contract. The lower court sustained defendants' preliminary objections in the nature of a demurrer because the damages that plaintiffs sustained resulted from plaintiffs' illegal conduct. The Superior Court upheld the lower court ruling as to plaintiff's claims for compensatory and punitive damages. The court relied on and expanded the common-law rule that a court shall not lend its aid to a person who grounds his action upon immoral or illegal action.

The common-law rule was subject to a qualification that the parties' degrees of guilt be comparable. The Feld and Sons opinion eliminated this qualification. It concluded that courts should not be involved in weighing and evaluating degrees of fault and wrongdoing but, instead, should in all cases adhere to the general principle that a court not provide relief to persons whose claims are grounded on immoral or illegal acts.

The Feld and Sons opinion created one exception to this general rule. It permitted plaintiffs to maintain an action to recover the illegal fees paid to **410 defendants. The reason for this exception is that the law imposes on an attorney a higher responsibilty for acting in a moral and legal manner in legal proceedings. Consequently, attorneys should not be permitted to benefit financially from their illegal conduct even if this means that court action will benefit clients who have also acted immorally and illegally,

*3 This exception has no applicability to the present case for two reasons. First, it appears that this exception is limited to claims against attorneys who engage in wrongdoing because of an attorney's unique status as a public officer sworn to aid in the administration of justice and to act with fidelity to the court. Second, defendant is not seeking to recover commissions paid to additional defendant.

II

Defendant's claim is also barred by the Equal Protection Clause of the Fourteenth Amendment.

We recognize that additional defendant cannot show that this court's consideration of defendant's misrepresentation claim would infringe upon any rights which additional defendant has under the Equal Protection Clause. However, a court is foreclosed from creating a body of law that violates the principles of the Equal Protection Clause in litigation that will not adversely affect the equal protection rights of any party to litigation. See Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031 (1953).

Pennsylvania law does not provide relief for every misrepresentation. Defendant can recover only if the misrepresentation concerning the racial makeup of the neighborhood is material. The misrepresentation would be material only if the law permits a finding that property located in a predominately white neighborhood is more desirable than property located in a **411 predominately black neighborhood. [FN1] The only basis for such a finding is that in this society the white race is more desirable than the black race. The Fouteenth Amendment bars a state from creating a body of law based on racial supremacy. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686 (1954).

> FN1. In some situations a representation that ordinarily would not be material may be material for a particular buyer. For example, a false representation that a Catholic Church is located within walking distance of a house, while not ordinarily material, would be material to a buyer who attended Catholic services each day and had no automobile. But in the present case defendant's interests do not differ from those of other purchasers so the question for the trier of fact would be whether it would make a material difference to the ordinary buyer that the property was located in a predominantly black rather than a predominantly white neighborhood.

Also while a state may be neutral on the issue of private racial discrimination, it may not become a partner with a private party who seeks to discriminate. The involvement of the Pennsylvania courts in developing a definition of a "predominately white neighborhood," in permitting its machinery to be used to resolve the factual issue of whether the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

property is located in a predominately white or a predominately black neighborhood and in devising a remedy in the event that misrepresentation is proven constitutes impermissible state action.

Pennsylvania is not permitted under the Fourteenth Amendment to develop a color code that determines who is a member of a preferred race and who is a member of a non-preferred race. [FN2] Yet it is highly unlikely that this case could be resolved **412 without jury instructions as to how to classify persons who are neither one hundred percent "white" nor one hundred percent "black." (We note that in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138 (1896), which first upheld the doctrine of separate but equal, Plessy's first contention was that he was seven-eighths Caucasian and one-eighth African, that the mixture of colored blood in him was not discernible, and, therefore, that he was entitled to the rights, privileges and immunities secured to citizens of the white race.)

> FN2. Affirmative action programs have avoided creating restrictive color codes either by permitting persons simply to declare that they are minorities or by including within the definition of minority any one who claims that he or she has any ancestors who were members of a minority.

*4 Also it is highly likely that residents of the neighborhood could become involved involuntarily in this lawsuit through discovery. Unless they affirmatively seek protective orders, they can be compelled under threat of judicial sanction to provide information concerning their race and the race of other residents of their neighborhood.

Cases which support this court's position that Pennsylvania would no longer be neutral on the issue of private racial discrimination if it permitted a finding that the alleged misrepresentation of the real estate agent is material, if it provided a remedy for this misrepresentation, if it permitted its judicial machinery to be used to decide the factual issues raised by the misrepresentation claim and if it devised a legal framework for deciding the racial composition of the neighborhood include Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627 (1967); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856 (1961), and Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836 (1948).

For these reasons we enter the following

ORDER OF COURT

On this June 13, 1989, it is hereby ordered that additional defendant's preliminary objections in the **413 nature of a demurrer are sustained and that defendant's complaint is dismissed. The arbitration hearing on plaintiffs' claim against defendant shall be heard on September 21, 1989 at 9 a.m.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2006 WL 864843                                                                                                  Page 1
--- B.R. ----, 2006 WL 864843 (Bankr.D.Del.)
(Cite as: 2006 WL 864843 (Bankr.D.Del.))

C
Only the Westlaw citation is currently available.

United States Bankruptcy Court,
D. Delaware.
In re: OAKWOOD HOMES CORPORATION, et al.,
Debtors.
OHC Liquidation Trust, Plaintiff,
v.
Credit Suisse First Boston, a Swiss banking
corporation, Credit Suisse First
Boston LLC, a Delaware limited liability corporation,
Credit Suisse First
Boston, Inc., Credit Suisse First Boston (U.S.A.),
Inc., a Delaware corporation
and a wholly owned subsidiary of Credit Suisse First
Boston, Inc., the
subsidiaries and affiliates of each, and Does 1
through 100, Defendants.
Bankruptcy No. 02-13396(PJW).
Adversary No. 04-57060 (PJW).

March 31, 2006.

**Background:** Liquidation trust established under debtors' confirmed Chapter 11 plan brought adversary proceeding against debtors' banks that acted as debtors' underwriters, financial and restructuring advisors and lead lenders to set aside alleged fraudulent or preferential transfers, and to recover from banks on breach of fiduciary duty, breach of contract, negligence, unjust enrichment, and deepening insolvency theories.

**Holdings:** On motions to dismiss and to compel, the Bankruptcy Court, Walsh, J., held that:
(1) allegations in complaint regarding banks' misuse of authority that they allegedly exercised over debtors to cause debtors to continue and expand unprofitable loan assumption program solely for purpose of generating fees for banks were sufficient to state breach of fiduciary duty claim;
(2) trust sufficiently alleged negligence and unjust enrichment claims;
(3) trust sufficiently alleged preference and insider preference claims;
(4) Delaware, New York and North Carolina law, as predicted by bankruptcy court, would recognize deepening insolvency claim; and
(5) trust would be ordered to provide disclosure regarding its damages in greater detail.
Motion to compel granted; motion to dismiss denied.

**[1] Banks and Banking** 🗝100
52k100 Most Cited Cases
Allegations in complaint regarding banks' misuse of authority that they allegedly exercised over corporate borrowers in their capacity as borrowers' underwriters, financial and restructuring advisors, and lead lenders, in purportedly causing borrowers to continue and expand unprofitable loan assumption program in order to generate fees for banks, sufficiently alleged existence of fiduciary relationship between borrowers and banks based on authority that banks exercised and position of trust that they occupied vis-a-vis borrowers to state claim under New York law for breach of fiduciary duty.

**[2] Banks and Banking** 🗝100
52k100 Most Cited Cases
Under New York law, relationship between borrower and bank is not, without more, a fiduciary relationship.

**[3] Fraud** 🗝7
184k7 Most Cited Cases
"Fiduciary relationship" exists anytime one person obligates him/herself to act for, or to give advice for, benefit of the other. Restatement (Second) of Torts § 874, cmt. a.

**[4] Fraud** 🗝7
184k7 Most Cited Cases
Fiduciary liability is not dependent solely on contract, but rests on nature of parties' relationship.

**[5] Banks and Banking** 🗝100
52k100 Most Cited Cases
Allegations in complaint regarding banks' misuse of authority which they allegedly enjoyed over corporate borrowers, in causing borrowers to continue and expand unprofitable loan assumption program in order to generate fees for banks while borrowers became increasingly insolvent, sufficiently alleged claim for breach of duty of care by banks that went beyond mere ordinary negligence, such as, if proven at trial, would not be barred by exculpatory clause in financial advisory agreement between parties.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[6] Negligence** 🗝219
272k219 Most Cited Cases
Under New York law, one party to contract may properly bring claim of negligence against the other, where legal duty independent of contract itself has been violated.

**[7] Negligence** 🗝219
272k219 Most Cited Cases
As general rule, New York law does not recognize cause of action for negligent performance of contract.

**[8] Banks and Banking** 🗝100
52k100 Most Cited Cases
Allegations in complaint regarding banks' misuse of authority which they allegedly enjoyed over corporate borrowers to cause borrowers to continue and expand unprofitable loan assumption program in order to generate fees for banks sufficiently alleged breach of legal duty by banks which was independent of financial advisory agreement between parties, as required to state negligence claim under New York law.

**[9] Negligence** 🗝463
272k463 Most Cited Cases
Under New York law, while economic loss is generally not recoverable under theory of negligence, party may recover purely economic loss damages in tort malpractice action when underlying contract is for rendering of professional services, or when party is seeking to recover economic loss damages on theory of negligent performance of contract for services.

**[10] Banks and Banking** 🗝100
52k100 Most Cited Cases
Allegations in complaint regarding banks' misuse of authority that they allegedly enjoyed as corporate borrowers' underwriters, financial and restructuring advisors, and lead lenders in order to cause borrowers to continue and expand unprofitable loan assumption program, solely for purpose of generating fees for banks, sufficiently alleged breach of duty of care by banks in performance of professional services, as required under New York law to state claim to recover for resulting economic loss.

**[11] Implied and Constructive Contracts** 🗝3
205Hk3 Most Cited Cases
In order to state viable claim for unjust enrichment under New York law, plaintiff must allege that defendant was enriched at plaintiff's expense, and that circumstances are such that equity and good conscience require that defendant make restitution.

**[12] Implied and Constructive Contracts** 🗝3
205Hk3 Most Cited Cases

**[12] Implied and Constructive Contracts** 🗝55
205Hk55 Most Cited Cases
Under New York law, "unjust enrichment" is quasi-contractual remedy, that is ordinarily unavailable when valid and enforceable written contract exists governing the same subject matter.

**[13] Implied and Constructive Contracts** 🗝81
205Hk81 Most Cited Cases
Allegations in complaint regarding banks' misuse of authority that they allegedly enjoyed as corporate borrowers' underwriters, financial and restructuring advisors and lead lenders, in order to cause borrowers to continue and expand unprofitable loan assumption program solely for purpose of generating fees for banks, sufficiently alleged unfair enrichment of banks as result of activity not covered by any express contract between parties, as required to state claim under New York law for unjust enrichment of banks.

**[14] Bankruptcy** 🗝2724
51k2724 Most Cited Cases

**[14] Bankruptcy** 🗝3570
51k3570 Most Cited Cases
Allegations in complaint filed by liquidation trust established under debtors' confirmed Chapter 11 plan, regarding property transfers that banks received within 90 days of petition date from debtor corporations in payment of antecedent debts, alleged preferential transfers with sufficient detail to provide banks with fair notice of preference claims against them, though preference complaint merely identified debtors collectively as transferors and failed to precisely identify each debtor with each transfer, where complaint detailed the relationship between parties and provided exact dates, precise dollar amounts and, in some cases, the check numbers for each transfer. 11 U.S.C.A. § 547(b).

**[15] Bankruptcy** 🗝2724
51k2724 Most Cited Cases

**[15] Bankruptcy** 🗝3570
51k3570 Most Cited Cases
Allegations in complaint filed by liquidation trust established under debtors' confirmed Chapter 11 plan, regarding banks' alleged use of authority that they exercised over debtors as their underwriters, financial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and restructuring advisors and lead lenders, and ultimately as holders of warrants to purchase debtors' stock, in reportedly causing debtors to make transfers on account of antecedents debts that benefited banks, sufficiently alleged degree of control by banks over debtors to state claim for avoidance of transfers occurring more than 90 days prior to petition date on insider preference theory. 11 U.S.C.A. § § 101(31), 547(b)(4)(B).

**[16] Bankruptcy 🗝2021.1**
51k2021.1 Most Cited Cases
"Insider" status under the Bankruptcy Code is flexible concept, that includes broad range of parties who have close relationship with debtor. 11 U.S.C.A. § 101(31).

**[17] Bankruptcy 🗝2608(2)**
51k2608(2) Most Cited Cases
Factors that bankruptcy courts consider in deciding whether transferee qualifies as "insider," a debtor's transfers to which are subject to extended scrutiny under one-year insider preference period, are closeness between transferee and debtor, degree of control or influence which transferee exerts over debtor, and whether transactions were conducted at arm's length. 11 U.S.C.A. § § 101(31), 547(b)(4)(B).

**[18] Bankruptcy 🗝2021.1**
51k2021.1 Most Cited Cases
"Insider" status under the Bankruptcy Code is fact-intensive question, that can be answered only on case-by-case basis. 11 U.S.C.A. § 101(31).

**[19] Bankruptcy 🗝2724**
51k2724 Most Cited Cases

**[19] Bankruptcy 🗝3570**
51k3570 Most Cited Cases
Allegations in complaint filed by liquidation trust established under debtors' confirmed Chapter 11 plan against banks that acted as underwriters, financial and restructuring advisors, and lead lenders to debtors, that professional services provided by banks did not constitute reasonably equivalent value for transfers that they received from debtors, were sufficient to state constructive fraudulent transfer avoidance claim against banks under fraudulent transfer provision of the Bankruptcy Code. 11 U.S.C.A. § 548.

**[20] Bankruptcy 🗝2650(1)**
51k2650(1) Most Cited Cases
Quality of professional services is within scope of constructive fraudulent transfer action against professional. 11 U.S.C.A. § 548.

**[21] Bankruptcy 🗝2724**
51k2724 Most Cited Cases

**[21] Bankruptcy 🗝3570**
51k3570 Most Cited Cases
Liquidation trust established under debtors' confirmed Chapter 11 plan did not have to identify particular state fraudulent transfer statute under which it was proceeding in order to state strong-arm claim for avoidance of transfers under state fraudulent transfer law.

**[22] Bankruptcy 🗝2162**
51k2162 Most Cited Cases

**[22] Bankruptcy 🗝3570**
51k3570 Most Cited Cases
Allegations in complaint filed by liquidation trust established under debtors' confirmed Chapter 11 plan, regarding banks' use of authority which they allegedly enjoyed, as debtors' underwriters, financial and restructuring advisors and lead lenders, in order to cause debtors to continue and expand unprofitable loan assumption program solely for purpose of generating fees for banks, sufficiently alleged breach by banks of their contractual duties to debtors to state claim for relief, without identifying which specific provisions of financial advisory agreement were violated.

**[23] Corporations 🗝547(1)**
101k547(1) Most Cited Cases
Under Delaware, New York and North Carolina law, as predicted by Bankruptcy Court for the District of Delaware, courts will recognize cause of action for deepening corporation's insolvency.

**[24] Bankruptcy 🗝2162**
51k2162 Most Cited Cases

**[24] Bankruptcy 🗝3570**
51k3570 Most Cited Cases
Allegations in complaint filed by liquidation trust established under corporate debtors' confirmed Chapter 11 plan against banks that had acted as underwriters, financial and restructuring advisors, and lead lenders to corporations, regarding banks' alleged misuse of extensive authority that they had over corporations to cause them to continue and expand unprofitable loan assumption program solely for purpose of generating fees for banks while

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

corporations slid even more deeply into insolvency, were sufficient to state deepening insolvency cause of action.

**[25] Corporations** ⊗⃯547(1)
101k547(1) Most Cited Cases
Under Delaware, New York and North Carolina law, as predicted by Bankruptcy Court for the District of Delaware, plaintiff must demonstrate fraudulent conduct, as opposed to mere negligence, in order to successfully assert claim for deepening corporation's insolvency.

**[26] Corporations** ⊗⃯547(1)
101k547(1) Most Cited Cases
Under Delaware, New York and North Carolina law, as predicted by Bankruptcy Court for the District of Delaware, fraud alleged must be a harm to corporation, and not to individual corporate creditor, in order to state deepening insolvency claim.

**[27] Action** ⊗⃯4
13k4 Most Cited Cases
Under equitable doctrine of in pari delicto, plaintiff may not assert claim against defendant if plaintiff bears fault for the claim.

**[28] Action** ⊗⃯4
13k4 Most Cited Cases
*In pari delicto* is in nature of affirmative defense.

**[29] Bankruptcy** ⊗⃯2162
51k2162 Most Cited Cases
Ordinarily, court cannot consider affirmative defense on motion to dismiss, unless the defense appears on face of complaint.

**[30] Corporations** ⊗⃯354
101k354 Most Cited Cases
Corporate insiders may not successfully assert in pari delicto defense to claim for injury to corporation.

**[31] Federal Civil Procedure** ⊗⃯1752.1
170Ak1752.1 Most Cited Cases
Whether banks which allegedly used the control that they had over corporate borrowers, as borrowers' underwriters, financial and restructuring advisors, and lead lenders, to cause borrowers to continue and expand unprofitable loan assumption program, solely for purpose of generating fees for banks while corporations became more deeply insolvent, were entitled to assert in pari delicto defense to deepening insolvency claims against them was not something that appeared on face of complaint, as required for court to dismiss complaint as barred by in pari delicto doctrine, given allegations of banks' control and authority over borrowers to a degree sufficient to make them, if allegations of complaint were proven at trial, corporate insiders.

**[32] Bankruptcy** ⊗⃯3040.1
51k3040.1 Most Cited Cases
Federal Rule of Civil Procedure requiring plaintiff, in absence of contrary court order or stipulation, to provide defendant, as part of his initial disclosures, with computation of any category of damages claimed is applied by courts in a common sense fashion, so as to avoid gamesmanship. Fed.Rules Civ.Proc.Rule 26(a)(1)(C), 28 U.S.C.A.

**[33] Bankruptcy** ⊗⃯3040.1
51k3040.1 Most Cited Cases
While plaintiff, to comply with his initial discovery obligations as regards damages claimed, need not provide a calculation of damages that depends on information in possession of another party, plaintiff should disclose the best information then available regarding his calculation of damages. Fed.Rules Civ.Proc.Rule 26(a)(1)(C), 28 U.S.C.A.

**[34] Bankruptcy** ⊗⃯3040.1
51k3040.1 Most Cited Cases

**[34] Bankruptcy** ⊗⃯3570
51k3570 Most Cited Cases
Banks' response, when liquidating trust established under Chapter 11 plan complained about its alleged inability to provide damages computation with respect to all of its causes of action, including breach of contract, breach of fiduciary duty, negligence, preferential and fraudulent transfer, and deepening insolvency claims, that trust could estimate its contract damages by considering amounts paid under contract, was not stipulation to relieve trust of discovery obligations with respect to other counts if it used amounts paid under contract in order to estimate its breach of contract damages, and did not relieve trust of obligation to use best available information to calculate its damages on each count of its complaint. Fed.Rules Civ.Proc.Rule 26(a)(1)(C), 28 U.S.C.A.

**[35] Bankruptcy** ⊗⃯3040.1
51k3040.1 Most Cited Cases
To comply with his initial discovery obligations as regards damages claimed, plaintiff must provide a specific computation of damages, that includes disclosing specific dollar figure. Fed.Rules Civ.Proc.Rule 26(a)(1)(C), 28 U.S.C.A.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[36] Bankruptcy ☞3040.1**
51k3040.1 Most Cited Cases
While plaintiff, to comply with initial discovery obligations as regards damages claimed, must disclose a specific dollar figure, simply reciting a dollar figure is not enough; rather, plaintiff must provide at least some analysis of how the relevant facts led plaintiff to estimate his damages in that amount. Fed.Rules Civ.Proc.Rule 26(a)(1)(C), 28 U.S.C.A.

**[37] Bankruptcy ☞3040.1**
51k3040.1 Most Cited Cases
Plaintiff's initial discovery obligation as regards damages claimed is not onerous one; rather, plaintiff must merely disclose the best information then available to him concerning the claim, however limited and potentially changing it may be. Fed.Rules Civ.Proc.Rule 26(a)(1)(C), 28 U.S.C.A.

**[38] Bankruptcy ☞3040.1**
51k3040.1 Most Cited Cases

**[38] Bankruptcy ☞3570**
51k3570 Most Cited Cases
Liquidation trust's initial disclosure regarding damages that it claimed, in indicating that its avoidance damages were in amount of alleged preferential and fraudulent transfers set forth in its complaint, and that it also sought damages in unspecified amount for banks' alleged breach of fiduciary duty, breach of contract and wrongful acts in artificially prolonging debtors' corporate existence, as well as disgorgement of all unjust profiteering, fell woefully short of satisfying trust's initial disclosure obligations under the Rules of Civil Procedure, and warranted grant of banks' motion to compel, notwithstanding trust's contention that it lacked sufficient information to estimate damages. Fed.Rules Civ.Proc.Rule 26(a)(1)(C), 28 U.S.C.A.

Mark D. Collins, Russell C. Silberglied, Cynthia L. Collins, Richards, Layton & Finger, P.A., Wilmington, R. Paul Wickes, Mary K. Warren, Michael J. Osnato, Jr., J. Justin Williamson Linklaters, New York, NY, for Defendants, Credit Suisse First Boston, et al.

Marla Rosoff Eskin, Kathleen J. Campbell, Campbell & Levine, LLC, Wilmington, Tony Castanares, Stephan M. Ray, Pamala J. King, Margreta M. Sundelin, Stutman, Treister & Glatt P.C., Los Angeles, CA, Special Counsel for the OHC Liquidation Trust.

MEMORANDUM OPINION

WALSH, J.

*1 This opinion is with respect to the defendants Credit Suisse First Boston's motion to dismiss and motion to compel. Part I discusses the motion to dismiss, while Part II addresses the motion to compel. For the reasons stated below, the Court will deny the motion to dismiss (except as to Count X, which the Court will leave pending), but will grant the motion to compel.

Part I MOTION TO DISMISS

This part of the opinion is with respect to Credit Suisse First Boston's motion (Adv.Doc. # 21) seeking to dismiss the adversary proceeding commenced against it by the OHC Liquidating Trust. For the reasons set forth below, the motion will be denied as to Counts I through III and V through IX. With respect to Count X, the Court will treat the motion as pending.

BACKGROUND
The facts, as summarized in this section, are drawn from the complaint, which at this stage must be accepted as true. For purposes of this motion, the Court will adopt the complaint's terminology. As such, the Court will refer to the four defendants as the defendants or "CSFB" and will refer to the Oakwood Homes Corporation (the "Debtor") and all of its debtor subsidiaries and affiliates as "OHC" or the "Debtors."

Since 1947, the Debtors had provided modest or affordably priced housing to their customers (Adv.Doc. # 1, ¶ 12). More specifically, the Debtors designed, manufactured and marketed manufactured and modular homes (Adv.Doc. # 1, ¶ 5). The Debtors also provided financing to their customers in the form of retail sale installment contracts (Adv.Doc. # 1, ¶ 5).

Since at least 1994, CSFB was the Debtors' securities underwriter. (Adv.Doc. # 1, ¶ 11). Over the years in this capacity, CSFB would come to underwrite more than $7.5 billion in Oakwood Companies (including OHC) securities (Adv.Doc. # 1, ¶ 11).

In 1998, the manufactured and modular home industry hit an all-time high (Adv.Doc. # 1, ¶ 18). But by 1999, the industry was experiencing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

challenging market conditions (Adv.Doc. # 1, ¶ 18). The Debtors' revenue declined due to weakness in both wholesale and retail sales (Adv.Doc. # 1, ¶ 18). As a result, the Debtors were insolvent or were within the vicinity of insolvency since at least 2000 (Adv.Doc. # 1, ¶ 11). Unsurprisingly, the Debtors also faced a liquidity crunch during this period (Adv.Doc. # 1, ¶ 18).

Liquidity played a key role in the Debtors' ability to offer their customers mortgage financing on the retail installment sales contracts (Adv.Doc. # 1, ¶ 14). To obtain the funds necessary to provide their customers with financing, the Debtors primarily relied on a two-step, asset-backed securitization process (Adv.Doc. # 1, ¶ 14). The process was conceived, arranged, controlled, implemented, and underwritten by CSFB, who as early as 2000 was also serving as the Debtors' de facto restructuring and financial advisor (Adv.Doc. # 1, ¶ 11, 14).

As the first step in the securitization process, an OHC subsidiary would obtain cash by using the retail installment sales contracts as collateral to borrow against the warehouse facility (Adv.Doc. # 1, ¶ 14). Once a sufficient amount of installment contracts was accumulated, the contracts would be bundled and transferred to private and institutional investors through a series of complex transactions (Adv.Doc. # 1, ¶ 14).

*2 The investors would be paid from the principal and interest payments of the initial obligors on the underlying installment contracts (Adv.Doc. # 1, ¶ 15). However, as economic conditions weakened, default rates rose. (Adv.Doc. # 1, ¶ 15). To induce investors to purchase the securities despite the high default rates, OHC began to guarantee certain shortfalls in the payments on the installment contracts (Adv.Doc. # 1, ¶ 15, 16, 20).

In addition, with the encouragement of CSFB, the Debtors ramped up the use of the Loan Assumption Program (hereinafter, the "LAP") (Adv.Doc. # 1, ¶ 21). Under the LAP, the original obligor would find a third-party to purchase the home and assume the remaining payments on the installment contract (Adv.Doc. # 1, ¶ 21). Prior to 2000, the Debtors infrequently used a distant variant of the LAP only in cases where the existing obligor found a third-party with satisfactory credit (Adv.Doc. # 1, ¶ 21). The LAP, however, was not so picky (Adv.Doc. # 1, ¶ 21).

From 2000 forward, CSFB encouraged the Debtors' use of the LAP to subsidize the increasing defaults (Adv.Doc. # 1, ¶ 22). As a result of CSFB's inducements, the LAP morphed into a grossly overused program that became not only unsustainable but also resulted in the expenditure of a significant amount of the Debtors' cash that it could otherwise have used in its operations (Adv.Doc. # 1, ¶ 21). Despite the fact that CSFB had insider information and knew that the LAP was unsustainable, (Adv.Doc. # 1, ¶ 21, 25), it still induced the Debtors to use and expand the LAP (Adv.Doc. # 1, ¶ 19, 37). According to the complaint, CSFB did this for the purpose of enriching itself, through exorbitant fees and other remuneration, by prolonging the life of the Debtors' securitization program that not only deepened the insolvency of the Debtors, but eventually drove them into bankruptcy (Adv.Doc. # 1, ¶ 19, 37).

In February 2001, CSFB became a secured lender to the Oakwood Companies pursuant to what the plaintiff refers to as the $200 million "CSFB Warehouse Facility" (Adv.Doc. # 1, ¶ 11). In connection with its lending, CSFB demanded and received warrants to purchase just under 20% of OHC's common stock (Adv.Doc. # 1, ¶ 11). Thus, as of 2001, CSFB was not only the Debtors' underwriter, financial advisor and secured lender but also a powerful warrant holder (Adv.Doc. # 1, ¶ 11). On August 19, 2002, CSFB formalized its advisory role pursuant to a letter agreement and became the Debtors' exclusive restructuring and financial advisor (Adv.Doc. # 1, ¶ 11).

On November 15, 2002, the Debtor and its related entities filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") (Doc. # 1). On March 31, 2004, this Court confirmed the Debtors' "Second Amended Joint Consolidated Plan of Reorganization of Oakwood Homes Corporation and Its Affiliated Debtors and Debtors in Possession" (the "Plan") (Doc. # 3937). The Plan became effective as to all but one of the Debtors on April 13, 2004 (Adv.Doc. # 1, ¶ 7). The Plan became effective as to the remaining Debtor on April 27, 2004 (Adv.Doc. # 1, ¶ 7).

*3 Pursuant to Section 6.3(b) of the Plan, Paragraph 40 of the Confirmation Order, and the Liquidating Trust Agreement, the OHC Liquidating Trust ("Liquidating Trust" or the plaintiff) was deemed established as of the Plan's effective date (Doc. # 3937, ¶ 40; Doc. # 3503, § 6.3(b)). The Liquidating Trust is vested with the power to prosecute, compromise, or settle adversary proceedings (Doc. #

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3503, § 6.3(b)).

On November 13, 2004, the Liquidating Trust instituted this proceeding by objecting to CSFB's proofs of claim and asserting numerous counterclaims (Adv.Doc. # 1). On May 6, 2005, the defendants filed the instant motion seeking to dismiss Counts I through III and V through X of the complaint (Adv.Doc. # 21).

DISCUSSION

A motion to dismiss for failure to state a claim upon which relief can be granted serves to test the sufficiency of the complaint. _Kost v. Kozakiewicz,_ 1 F.3d 176, 183 (3d Cir.1993). When deciding such a motion, a court accepts as true all allegations in the complaint and draws all reasonable inferences from it which the court considers in a light most favorable to the plaintiff. _Rocks v. City of Philadelphia,_ 868 F.2d 644, 645 (3d Cir.1989). A court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." _Conley v. Gibson,_ 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." _Maio v. Aetna, Inc.,_ 221 F.3d 472, 482 (3d. Cir.2000) (quotations and citation omitted).

I. First Counterclaim--Breach of Fiduciary Duty

[1][2][3][4] The plaintiff's first claim alleges a breach of fiduciary duty. The defendants counter that no fiduciary duty existed as a matter of law; therefore, no such duty could be breached. To support this conclusion, the defendants state the uncontroversial principle that "the usual relationship of bank and customer is that of debtor and creditor" (Adv.Doc. # 22, p. 29). This does little to advance the defendants' argument. Unquestionably, the relationship between borrower and bank will not create a fiduciary relationship by itself. However, a fiduciary relationship will exist anytime one person obligates himself or herself to act for or to give advice for the benefit of the other. RESTATEMENT (SECOND) OF TORTS § 874, cmt. a (1979). In other words, fiduciary liability is not dependent solely on the contract; rather, liability rests on the nature of the relationship. _Id._ cmt. b. In this case, the complaint sufficiently alleges a fiduciary relationship.

In coming to this conclusion, the Court is guided by a most recent decision of the New York Court of Appeals. [FN1] In _EBC I, Inc. v. Goldman Sachs & Co.,_ 5 N.Y.3d 11, 799 N.Y.S.2d 170, 832 N.E.2d 26 (N.Y.2005), New York's highest court determined that "[t]o the extent that underwriters function, among other things, as expert advisors to their clients on market conditions, a fiduciary duty may exist." _EBC I,_ 799 N.Y.S.2d 170, 832 N.E.2d at 32. The court reasoned as follows:

*4 It may well be true that the underwriting contract, in which Goldman Sachs agreed to buy shares and resell them, did not in itself create any fiduciary duty. However, a cause of action for breach of fiduciary duty may survive, for pleading purposes, where the complaining party sets forth allegations that, apart from the terms of the contract, the underwriter and issuer created a relationship of higher trust than would arise from the underwriting agreement alone.

Here, the complaint alleges an advisory relationship that was independent of the underwriting agreement. Specifically, plaintiff alleges eToys was induced to and did repose confidence in Goldman Sachs's knowledge and expertise to advise it as to a fair IPO price and engage in honest dealings with eToy's best interest in mind. Essentially, according to the complaint, eToys hired Goldman Sachs to give it advice for the benefit of the company, and Goldman Sachs thereby had a fiduciary obligation to disclose any conflict of interest concerning the pricing of the IPO.

* * *

This holding is not at odds with the general rule that fiduciary obligations do not exist between commercial parties operating at arms' length--even sophisticated counseled parties--and we intend no damage to that principle. Under the complaint here, however, the parties are alleged to have created their own relationship of higher trust beyond that which arises from the underwriting agreement alone, which required Goldman Sachs to deal honestly with eToys and disclose its conflict of interest--the alleged profit-sharing arrangement with prospective investors in the IPO.

_Id._ at 31-33; see _LaSala v. Needham & Co., Inc.,_ 399 F.Supp.2d 466, 475, n. 68 (S.D.N.Y.2005) (noting in dictum a similar result); _Breakaway Solutions, Inc. v. Morgan Stanley & Co.,_ No. 19522, 2005 WL 3488497, at *3, 2005 Del. Ch. LEXIS 200, at *11 (Del. Ch. Dec. 8, 2005) (following _EBC I_ and interpreting it to impose both a duty to disclose and a separate duty to deal honestly).

In this case, the defendants were not only the