IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| STUDENT FINANCE CORPORATION, | : | Case No. 02-11620 (KJC) |
| | : | |
| Debtor | : | **Objection Date: September 6, 2007 at 4:00 p.m.** |
| | : | **Hearing Date: September 13, 2007 at 10:00 a.m.** |
| | : | |
| CHARLES A. STANZIALE, JR., | : | |
| CHAPTER 7 TRUSTEE OF STUDENT | : | |
| FINANCE CORPORATION | : | Adv. Pro. No. 04-58003 |
| | : | |
| Plaintiff, | : | Civil Action No. 05-72 (JJF) |
| | : | |
| v. | : | |
| | : | |
| McGLADREY & PULLEN LLP, *et al.* | : | |
| | : | |
| Defendants | : | |

### MOTION OF CHAPTER 7 TRUSTEE CHARLES A. STANZIALE, JR. TO APPROVE A SETTLEMENT AGREEMENT WITH MCGLADREY & PULLEN, LLP, FREED MAXICK & BATTAGLIA CPAs PC, FREED MAXICK SACHS & MURPHY, P.C. AND MICHAEL AQUINO

Charles A. Stanziale, Jr., as Chapter 7 Trustee (the "Trustee") for Student Finance Corporation ("SFC" or "Debtor"), brings this Motion (the "Motion"), pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for the approval of a Settlement Agreement entitled the *Trustee-Royal-Accountants Settlement Agreement* (the "Settlement Agreement"), dated as of August 10, 2007, between the Trustee, on the one hand, and McGladrey & Pullen LLP, Freed Maxick & Battaglia CPAs PC, Freed Maxick Sachs & Murphy, P.C. and Michael Aquino (collectively, the "Accountants") on the other hand. The Settlement Agreement is part of a proposed global resolution of claims against the

667998-1

Accountants both by the Trustee and by Royal Indemnity Company, as described in detail below.[1] In support of the Motion, the Trustee respectfully represents as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

2. Venue of this matter is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4. The statutory predicate for the relief sought herein is Rule 9019(a) of the Federal Rules of Bankruptcy Procedure.

## INTRODUCTION

5. By this Motion, the Trustee seeks approval of the settlement of the estate's claims against the Accountants in return for the Accountants' agreement to pay a total of $9 million to the SFC bankruptcy estate. As set forth herein, the Trustee believes that the proposed settlement is a significant achievement for the SFC bankruptcy estate, satisfies all applicable legal standards and is in the best interests of all creditors of the SFC bankruptcy estate.

## PROCEDURAL BACKGROUND

6. On or about June 5, 2002 (the "Filing Date"), certain creditors of SFC filed an involuntary petition against the Debtor. Prior to the Filing Date, SFC was in the business of originating and acquiring non-guaranteed student loans and tuition installment agreements primarily from truck driving schools. The petitioning creditors asserted, in part, that SFC had failed to purchase student loans as agreed and that SFC was insolvent.

---

[1] Defined terms used but not defined herein shall have the meanings set forth in the Settlement Agreement (as defined below).

7. On or about November 4, 2002, with the consent of SFC, the Court entered an Order for Relief under Chapter 11 of the Bankruptcy Code.

8. On or about September 29, 2003, the Court appointed Mr. Stanziale as Chapter 11 Trustee for the Debtor.

9. On or about November 14, 2003, upon the expedited motion of Mr. Stanziale, this Court converted this case to one under Chapter 7 of the Bankruptcy Code. On or about November 20, 2003, Mr. Stanziale was appointed as the Chapter 7 Trustee of the SFC bankruptcy estate (the "Estate").

## FACTUAL BACKGROUND

### SFC's Scheme

10. As presented in more detail in the Amended Complaint in this matter, the Trustee alleges as follows:

   a. SFC was in the business of originating and acquiring non-guaranteed student loans and tuition installment agreements, primarily from truck driving schools.

   b. At the outset of its operations, SFC limited its activities to traditional lending arrangements, whereby it purchased bundles of pre-arranged student loans at a discount using funds borrowed from either commercial banks or private investors.

   c. As SFC expanded, its method of financing also included the use of securitization transactions.

   d. To complete the securitization transactions, SFC sold the pooled student loans to an affiliated entity, which transferred the student loans to a trust that it created. To fund the purchase of the student loans from SFC, the trust would sell either fixed-income trust certificates ("Certificates") or floating-rate notes ("Notes") to investors. From about 1998 until the Filing Date, SFC sold more than half a billion dollars of pooled student loans through such securitization transactions.

   e. Both the Certificates and Notes were backed by the principal and interest received from the student loans and represented undivided

3

      interests in the student loans which were transferred to the trusts. The Certificates and Notes were sold to investors in private placement transactions for which private placement memoranda ("PPMs") were issued.

f.    In order to provide additional security for the purchasers of the Notes and Certificates, the income streams created from the student loans were backed by credit risk insurance issued by Royal Indemnity Company ("Royal") (the "Royal Policies"). In accordance with the terms of the Royal Policies, Royal insured against defaults by the student borrowers on their student loan accounts.

g.    The Royal Policies covered pooled student loans sold by SFC through eight separate securitization transactions. As a result, through the Royal Policies, Royal insured against defaults on student loans with a total face value well in excess of $500 million.

h.    The student loans defaulted at staggering rates. In order to conceal those defaults, SFC systematically made payments on behalf of the borrowers on the student loans (the "Forbearance Payments"). SFC did not report the loans that were receiving such Forbearance Payments as being in default, and did not make claims on the Royal Policies with respect to those student loans.

i.    SFC did not disclose in any of the PPMs issued in connection with the eight securitizations or in any of the monthly operating reports detailing the payments received from the borrowers that SFC was making the Forbearance Payments to conceal that the borrowers had defaulted on their student loans. The Forbearance Payments therefore masked the actual default rates of the student loans.

j.    In the years leading up to the Filing Date, SFC paid hundreds of millions of dollars to trucking schools to acquire the student loans that it then pooled and sold to investors through the securitization transactions described above. As a result, the Trustee commenced adversary proceedings against more than 60 such trucking schools during 2004 in an attempt to have payments by SFC set aside as fraudulent transfers and returned to the Estate.

11.    In addition to the adversary proceedings commenced against these trucking schools, the Trustee commenced adversary proceedings against certain of the outside professionals that had been retained by SFC, including McGladrey & Pullen, LLP and Michael Aquino, as well as SFC's outside counsel. As described in more detail

below, Royal also commenced its own actions against the Accountants and against SFC's former outside counsel.

**The Adversary Proceeding and Trustee-McGladrey Litigation**

12.    On or about December 22, 2004, the Trustee commenced an adversary proceeding bearing Adversary No. 04-58003 in the United States Bankruptcy Court for the District of Delaware against McGladrey & Pullen, LLP and Michael Aquino, in which the Trustee alleged that defendants were liable for aiding and abetting fraud, fraud, fraudulent concealment, aiding and abetting breach of fiduciary duty, negligent misrepresentation, and avoidance of fraudulent transfers under federal and state law (the "Adversary Proceeding").

13.    On or about January 26, 2005 a *Motion to Withdraw The Reference* was filed on behalf of McGladrey & Pullen, LLP and Michael Aquino (collectively the "McGladrey Defendants") and was subsequently granted, and the Adversary Proceeding was removed to the United States District Court for the District of Delaware (the "District Court"), bearing Case No. 1:05-cv-00072-JJF where it is currently pending.

14.    By Order dated December 20, 2005, entered by the Honorable Joseph J. Farnan, U.S.D.J., the District Court dismissed all of the counts set forth in the Adversary Proceeding except counts VI and VII, in which the Trustee alleged that the McGladrey Defendants received fraudulent transfers pursuant to 11 U.S.C. § 548 (a)(1)(A), 11 U.S.C. § 544 and 6 Delaware Code § 1304(a)(1) (the "Fraudulent Conveyance Counts").

15.    On or about January 23, 2006, the Trustee filed an amended complaint in the District Court (the "Trustee-McGladrey Amended Complaint"). In the Trustee-

5

McGladrey Amended Complaint, in addition to the Fraudulent Conveyance Counts, the Trustee alleged that the McGladrey Defendants had committed professional malpractice.

16. On or about February 27, 2006, a motion to dismiss the professional malpractice count was filed by the McGladrey Defendants. The motion was supplemented on or about April 28, 2006.

17. On or about August 10, 2006, the motion to dismiss the professional malpractice count was denied in its entirety.

18. On or about October 26, 2006, the McGladrey Defendants filed an answer to the Trustee-McGladrey Amended Complaint.

19. The McGladrey Defendants have vigorously denied all of the Trustee's allegations set forth in the Adversary Proceeding and the Trustee-McGladrey Amended Complaint (collectively, the "Trustee-McGladrey Action"), including but not limited to the allegation that they breached their contractual obligations to SFC and the standard of care that reasonable accountants would have exercised under the circumstances.

**The Royal-Accountants Litigation**

20. On or about March 18, 2005, Royal commenced its own action in the District Court against the Accountants and against SFC's former outside counsel, entitled *Royal Indemnity Company v. Pepper Hamilton LLP, et al.*, Civ. No. 05-165-JJF (the "Royal-Accountants Action"). The factual allegations underlying the Royal-Accountants Action were substantially the same as those underlying the Trustee-McGladrey Action, although the Royal-Accountants Action asserts certain theories of recovery and applicable law not asserted by the Trustee in the Trustee-McGladrey Amended Complaint.

21. The Accountants have vigorously denied all of the allegations and claims set forth in the Royal-Accountants Action.

22. The Trustee-McGladrey Action and the Royal-Accountants Action have been consolidated by the District Court.[2] The parties to those actions have engaged in substantial and coordinated discovery over the past 18 months, including attendance at more than 130 days of deposition testimony; the exchange, review and analysis of many hundreds of thousands of pages of electronic and paper discovery materials; and the preparation and exchange of expert reports. Trial is currently scheduled to begin in the District Court on October 10, 2007.

## THE PROPOSED SETTLEMENT AGREEMENT

23. The Settlement Agreement represents a global agreement between and among the Trustee, Royal and the Accountants to consensually resolve all of the claims asserted against the Accountants by the Trustee in the Trustee-McGladrey Action, and by Royal in the Royal-Accountants Action, by means of a compromise and Settlement Agreement. Other than by the Contribution Bar/Joint Tortfeasor Release discussed in Paragraph 25 below, the claims asserted against the remaining defendants in the Royal-Accountants Action (principally Pepper Hamilton LLP, SFC's former outside counsel) and the other consolidated actions would be unaffected by the Settlement Agreement.

24. A copy of the Settlement Agreement is attached hereto as Exhibit "A". The principal terms of the Settlement Agreement are as follows:[3] The Estate will receive

---

[2] Also consolidated with these two actions are the matters encaptioned Charles A. Stanziale, Jr. v. Pepper Hamilton LLP, et al., 04-1551 (JJF) and MBIA Insurance Corp. and Wells Fargo Bank N.A. v. Royal Indemnity Co., 02-1294 (JJF).

[3] The description of the Settlement Agreement herein is qualified in its entirety by reference to the Settlement Agreement which is attached hereto as Exhibit A. In the event of any discrepancy between the description of the Settlement Agreement contained herein and the Settlement Agreement, the terms of the attached Settlement Agreement control.

7

667998-1

total cash payments of $9 million from the Accountants (the "Settlement Amount"), in exchange for complete releases of the Estate's claims against the Accountants. The entire $9 million Settlement Amount is to be delivered in escrow to JPMorgan Chase Bank, as escrow agent, by the Accountants within ten (10) business days of the execution of the Settlement Agreement, and is to be released to the Trustee upon the Effective Date (as defined in the Settlement Agreement). Also upon the Effective Date, the Trustee will file a stipulation in the United States District Court for the District of Delaware, dismissing with prejudice all claims asserted against the Accountants in the Trustee-McGladrey Amended Complaint. The Effective Date is, essentially, either the date on which the Order granting this Motion becomes a final Order, if no timely appeal is filed, or, if a timely appeal of that Order is filed, the date on which all such appeals have been withdrawn, dismissed or denied.

25. The Settlement Agreement also provides (at Section 5(h)) for a Contribution Bar/Joint Tortfeasor Release, an essential term of the global settlement. That mechanism, consistent with the provisions of applicable law, is intended to ensure that none of the settling Accountants will incur further liability for contribution or indemnity, however denominated, by any other alleged joint tortfeasor relating to claims which were or could have been brought by the Trustee. Parties barred from contribution are fairly compensated, as necessary under applicable law, through the judgment reduction provision. The Settlement Agreement also contains a release pursuant to *Griffin v. United States*, 500 F.2d 1-59 (3d Cir. 1974) intended to obviate the necessity of any of the Accountants remaining party to this action, or becoming party to any other

8

action related to SFC, for the purpose of determining whether they are a joint tortfeasor with any other party.

26. Pursuant to the terms and conditions of the Bankruptcy Court's *Order Approving Settlement Agreement Between the Chapter 7 Trustee and Royal* dated October 29, 2004 and the Settlement Agreement Term Sheet annexed thereto, a $2 million advance of administrative expenses was made to the SFC Estate by Royal. A partial repayment of $1 million was made towards that advance in late 2005, leaving a balance of $1 million still outstanding to Royal. The Trustee will use $1 million of the $9 million Settlement Amount to complete the repayment of the $2 million advance of administrative expenses. The repayment of that outstanding balance from the Settlement Amount will reduce the Estate's ultimate administrative expenses, all of which will eventually be required to be paid in full before any distributions can be made to unsecured creditors in these cases.

27. As set forth above, the Settlement Agreement is part of a global compromise of the SFC-related claims against the Accountants, including the claims asserted against the Accountants by Royal in the Royal-Accountants Action, reached following a confidential mediation involving the Accountants, the Trustee, and Royal. As a result, and separate and apart from the $9 million that they have agreed to pay to the Estate, the Accountants have also agreed to terms with Royal in settlement of Royal's direct claims against them, including the claims asserted in the Royal-Accountants Action. The terms of the settlement between Royal and the Accountants are embodied in a separate agreement (the "Royal-Accountants Settlement Agreement"), which contains confidentiality provisions restricting the disclosure of the terms of the settlement between

9

Royal and the Accountants. Consequently, and consistent with those confidentiality provisions, the Royal-Accountants Settlement Agreement has not been filed with the Court, and is not attached hereto. However, and as expressly permitted by those confidentiality provisions, the Royal-Accountants Settlement Agreement has been shared with the Trustee. In addition, counsel for the Accountants have also advised the Trustee that the Accountants would be unwilling to agree to the Settlement Agreement with the Trustee without simultaneously settling with Royal. The Court's granting of this Motion is an explicit condition precedent to the obligations of Royal and the Accountants under the Royal-Accountants Settlement Agreement.

## RELIEF REQUESTED

28. By this Motion, the Trustee is requesting that the Court (i) approve the terms of the Settlement Agreement; (ii) authorize the Trustee to settle the Trustee-McGladrey Action on the terms set forth in the Settlement Agreement; and (iii) authorize the Trustee to take any and all necessary steps, including the execution of appropriate documents, necessary to consummate the Settlement Agreement.

## BASIS FOR RELIEF

29. The Trustee believes strongly that the approval of the Settlement Agreement is in the best interests of the Estate and all of its creditors. The Trustee, his legal counsel and other advisors have carefully analyzed the Trustee-McGladrey Action, reviewed many thousands of pages of documents, as well as voluminous electronic discovery materials, which impact or relate to that action, conducted and participated in numerous depositions, met with counsel for the Accountants and considered the potential recoveries, as well as potential defenses to those recoveries, in great detail. The Trustee has also monitored the Royal-Accountants Action, and recognizes that a global resolution

of the Trustee-McGladrey Action and the Royal-Accountants Action is the only realistic manner in which to settle this matter in the best interests of the Estate, and without the continuation of costly, uncertain and complex litigation, so as to reap the substantial financial benefits that the Settlement Agreement will provide to the Estate.

30. As set forth herein, the Settlement Agreement will provide for the payment of $9 million in cash into the Estate. The Settlement Agreement thus represents a substantial recovery for the Estate. Moreover, and as set forth below, the Trustee believes that the Settlement Agreement is an appropriate compromise of the Trustee-McGladrey Action, particularly given the cost, delay and uncertainty associated with prosecuting that action to its conclusion.

31. Bankruptcy Rule 9019(a) provides, in pertinent part, as follows:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or Settlement Agreement

Section 105(a) of the Bankruptcy Code further provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process. 11 U.S.C. § 105(a).

32. The standards by which courts evaluate a proposed compromise and settlement are well-established. In essence, the settlement standards balance the probable success and potential costs of pursuing a claim or defense against the benefits and costs of the proposed settlement. However, courts need not conduct an independent investigation in formulating an opinion as to the reasonableness of a settlement. Rather,

11

the court is permitted to defer to the judgment of the trustee, and the court's responsibility is then to canvass the issues to see whether the proposed settlement "falls below the lowest point in the range of reasonableness." In re Pennsylvania Truck Lines, Inc., 150 B.R. 595, 601 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir. 1993); In re Grant Broadcasting of Phila., Inc., 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987) Accordingly, courts will approve a compromise and settlement if it is fair and equitable and in the best interests of the estate and the debtor's creditors. See Kranzdorf v. Green, 76 B.R. 974, 979 (E.D. Pa. 1987); In re Culmtech, Ltd., 118 B.R. 237, 240 (Bankr. M.D. Pa. 1990).

33. In reviewing settlements, courts apply the following factors, in addition to reviewing the terms and conditions of the Settlement Agreement itself:

    a. The probability of success in the litigation;

    b. The difficulty in collecting any judgment which may be obtained;

    c. The complexity of the litigation involved and expense, inconvenience and delay necessarily attendant to it; and

    d. The interest of creditors and stockholders with a proper deference to their reasonable views of the settlement.

See, e.g., Protective Comm. for Independent Stockholders for TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); In re Paolino, 87 B.R. 8, 10 (E.D. Pa. 1988); In re Columbia Gas System, Inc., Case No. 91-803, 1995 Bankr. LEXIS 936, at *1-2 (Bankr. D. Del. June 16, 1995); In re Culmtech, Ltd., 118 B.R. at 238; In re Grant Broadcasting, 71 B.R. at 395.

34. In addition to these criteria, courts have considered additional factors, including: (a) the competency and experience of counsel who support the settlement; (b) the relative benefits to be received by individuals or groups within the class; (c) the

667998-1

nature and breadth of releases to be obtained by the parties to the settlement; and (d) the extent to which the settlement is the product of arm's length bargaining. In re 47-49 Charles Street, Inc., 209 B.R. 618, 620 (S.D.N.Y. 1997); In re Spielfogel, 211 B.R. 133, 144 (Bankr. S.D.N.Y. 1997); In re Dow Corning Corp., 198 B.R. 214, 223 (Bankr. E.D. Mich. 1996).

35. When applying the above criteria to the facts of a particular case, a bankruptcy court does not have to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement. Cajun Electric Power Cooperative, Inc., 119 F.3d at 356. Nor is a bankruptcy court required to conduct an evidentiary hearing as a prerequisite to approving a settlement. In re Depositer, 36 F.3d 582, 586 (7th Cir. 1994). The bankruptcy court must, however, gather all of the relevant facts and law so that it can make an informed, intelligent, and objective decision with respect to approving the Settlement Agreement. Depositer, 36 F.3d at 586. See also Cajun Electric Power Cooperative, 119 F.3d at 356.

36. The above factors strongly support the Court's approval of the Settlement Agreement.

### Probability of Success

37. The Trustee believes that he could establish through the Trustee-McGladrey Action (i) that the Accountants were, or should reasonably have been, aware of SFC's scheme at the time they were rendering professional services to SFC and (ii) that, given all of the facts and circumstances, the Accountants committed professional malpractice and were the recipients of fraudulent conveyances, all of which resulted in significant damage and financial losses to SFC. However, the Accountants have raised a

13

number of defenses to the Trustee-McGladrey Action, and have made clear through their actions thus far in the litigation that they intend to defend themselves vigorously against that action and that they believe that the Trustee will not ultimately prevail. Consequently, it is unclear whether the Trustee would ultimately prevail in the Trustee-McGladrey Action, and if he did prevail, what the amount of any ultimate recovery by the Estate might be.

### Complexity and Expense of Litigation

38. The issues raised in the Trustee-McGladrey Action are complex, both factually and legally, and would require a considerable amount of additional work by all parties before the matter was actually tried. That additional work would include the continued review and analysis of the massive volume of paper and electronic discovery materials that have already been exchanged by the parties, the conduct of additional depositions, and would require significant and costly efforts by the Trustee's retained professionals and experts to prepare for, and ultimately conduct, the trial of this action. All of these activities would impose significant and certain administrative costs on the Estate, even though ultimate recovery on the Trustee-McGladrey Action would be far from certain.

### Interests of the Creditors

39. The Settlement Agreement represents a fair and reasonable compromise of the claims between the Debtor and the Accountants, and is in the best interests of the creditors of SFC's Estate. Under the Settlement Agreement, the Estate will receive $9 million in cash. Up to $8 million of that amount can be used by the Estate to continue to pursue and collect on its valuable claims against other third parties, for the benefit of all

creditors of the Estate. At the same time, the Settlement Agreement will save the Estate the enormous ongoing expenses that it would otherwise incur by continuing its litigation against the Accountants. Also, by providing funds for the repayment of the $1 million balance of Royal's remaining administrative advance claim, the Settlement Amount eliminates a significant administrative claim against the Estate, which would otherwise have to be paid in full before distributions could be made to unsecured creditors on account of their allowed claims.

40. The Trustee continues to prosecute valuable Estate claims against third parties, including SFC's former outside counsel, at least one major trucking school and others associated with SFC, in his continuing effort to recover value for SFC's creditors. The prosecution of those other claims is important and in the best interests of the Estate and its creditors, but is also costly to the Estate. If the Settlement Agreement is not approved, and the Trustee is left to prosecute the Trustee-McGladrey Action to its conclusion, the substantial costs associated with that prosecution will severely diminish the resources available to actively and appropriately pursue these other valuable claims for the benefit of all stakeholders of the Estate as well as diminish funds which would otherwise be available to creditors. In addition, the continued prosecution of the Trustee-McGladrey Action will require the substantial efforts and attention of the Trustee's litigation counsel, who could otherwise focus all of their efforts on successfully prosecuting the Trustee's remaining unresolved adversary proceedings, and on resolving the many millions of dollars in asserted claims that have been filed against the Estate. The Settlement Agreement provides the Estate with certain and significant resources that can be used to investigate, pursue, litigate and/or settle these other claims of the Estate,

while eliminating the continuing effort associated with the ongoing prosecution of the Trustee-McGladrey Action

### Relative Benefits

41. As set forth above, the Trustee believes that the proposed Settlement Agreement represents a fair and appropriate settlement of the Estate's claims against the Accountants and provides a significant recovery for the Estate. In addition, the proposed Settlement Agreement will aide the Estate to properly pursue those other claims, both by providing necessary funding for that effort, and by resolving a very significant litigation that would otherwise occupy substantial time and attention of the Trustee and his professionals. The funds from the Settlement Agreement also resolve or reduce other claims against the SFC Estate, which in turn benefits all creditors of the Estate. Specifically, the proceeds of the settlement will reduce by $1 million the administrative expense amounts currently owed by the Estate to Royal on account of Royal's prior advance of administrative expenses to the Estate. Finally, the settlement will result in reductions in Royal's claims against the Estate, resulting in a corresponding increase in the ratable recoveries for all of the Estate's other creditors. The settlement thus provides an enormous benefit to the Estate.

### NOTICE

42. Notice of this Motion has been given to: (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel for the Accountants, and (iii) all parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the relief requested herein, the Trustee respectfully submits that no other or further notice of the Motion is required.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that this Court enter an Order: (i) granting the Motion in its entirety; (ii) authorizing the Trustee to enter into the Settlement Agreement on behalf of the Debtor's bankruptcy Estate; (iii) authorizing the Trustee to compromise and settle the Trustee-McGladrey Action pursuant to the terms set forth in the Settlement Agreement; (iv) authorizing the Trustee to take any and all necessary actions to consummate the Settlement Agreement according to its terms, including but not limited to the execution of any documents required in connection with consummation and implementation of the Settlement Agreement; and (v) granting such other relief as the Court deems just and appropriate under the circumstances.

Dated: August 21, 2007

THE BAYARD FIRM

By: /s/ Charlene D. Davis
Charlene D. Davis (No. 2336)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Tel: (302) 655-5000

and

McELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP
Charles A. Stanziale, Jr.
Michael S. Waters
Lois H. Goodman
Jeffrey T. Testa
Three Gateway Center
100 Mulberry Street
Newark, NJ 07102
Tel: (973) 622-7711

*Counsel to Charles A. Stanziale Jr.,
Chapter 7 Trustee for Student Finance
Corporation*

667998-1