# EXHIBIT A

## EXPERT REPORT OF PROFESSOR GEOFFREY C. HAZARD, JR.

Pursuant to the schedule established in the Second Amended Case Management Order #1 dated June 14, 2007 and the requirements of Fed. R. Civ. P. 26(a)(2)(B), and consistent with the preliminary disclosure of subject matters of expert testimony by letter dated March 12, 2007, Defendant Pepper Hamilton LLP ("Pepper Hamilton") submits as follows the Expert Report of Professor Geoffrey C. Hazard, Jr. in response to the reports of Professor Bruce A. Green ("Professor Green") and Donald W. Glazer ("Mr. Glazer"), submitted on behalf of Plaintiff Charles A. Stanziale, Jr., Chapter 7 Trustee of Student Finance Corporation (the "Trustee"), and Plaintiff Royal Indemnity Company ("Royal"), and in support of the defenses of Pepper Hamilton and W. Roderick Gagne ("Mr. Gagne") to the claims asserted against them in both the Trustee and Royal actions.

## I.    The Qualifications of the Witness

My qualifications to serve as an expert witness in the Trustee and Royal actions are the product of my knowledge, experience, teaching, researching, writing and engaging in professional services in the area of legal ethics, and are set forth more fully in my *curriculum vitae*, which is attached hereto as Exhibit A.

I have taught at law schools since 1958, beginning at Boalt Hall (University of California, Berkeley) (1958-1964), then the University of Chicago (1964-1970), Yale University (1970-1994), the University of Pennsylvania (1994-2007) and most recently the Hastings College of the Law (2006 to present). I have been Trustee Professor of Law at the University of Pennsylvania, Sterling Professor of Law Emeritus at Yale, and am currently Thomas E. Miller Distinguished Professor of Law at Hastings College of the Law. I have taught as Visiting Professor at Stanford University, the University of Michigan, Harvard Law School and the University of Arizona, and have served as Deputy, Associate and Acting Dean of the Yale School of Organization and Management. A principal focus of my teaching for almost 50 years has been lawyers' professional responsibility and legal ethics.

I was Director (executive director) of the American Law Institute from 1984 to 1999, and previously served as Reporter for the ALI Restatement Second of Judgments. I was Reporter for the American Bar Association Model Rules of Professional Conduct (promulgated in 1983), and co-draftsman-consultant for the ABA Model Code of Judicial Conduct (promulgated in 1972).

My fields have been civil procedure, federal jurisdiction and professional ethics. I am co-author of a treatise and a casebook in civil procedure and also in professional ethics. I am author, co-author or editor of 16 books, including the two-volume treatise *The Law of Lawyering* (3rd ed. 2007). I have authored over 100 articles, many of which address issues of legal ethics and professional responsibility. I am frequently an expert witness or consultant in professional ethics, including legal malpractice.

I have received numerous professional awards, including: the American Bar Foundation Research Award (1985); the William Keck Foundation Award (1997); the Columbia University School of Law Association Medal for Excellence (1999); the American Judicature Society Award for Outstanding Contributions to Promoting Effective Administration of Justice (1999);



EXHIBIT

HAZARD

2002-II

8-17-07

the ceremony of Salute, Superior Court of Pennsylvania (1999); the International Insolvency Institute Gold Award (2004); and the ABA Robert J. Kutak Award (2005). I have seven honorary degrees.

I graduated from Swarthmore College (B.A. 1953, Phi Beta Kappa) and Columbia University (L.L.B. 1954, Columbia Law Review), and am member in good standing of both the Pennsylvania and California bars.

## II.    The Opinions to Be Expressed and the Bases and Reasons Therefore

I have no first-hand knowledge of the facts of this case. The facts recited herein have been provided to me from the pleadings in the Trustee and Royal actions and the discovery that occurred in connection therewith, and I assume them to be true for purposes of my analysis.

### A.    Background: The Two Pending Lawsuits

There are two lawsuits against Pepper Hamilton relating to SFC. The first, Civil Action No. 04-1551-JJF (the "Trustee Action"), is brought by Charles A. Stanziale, Jr. as Chapter 7 bankruptcy trustee for Student Finance Corporation ("SFC"). The second action, Civil Action No. 05-165-JJF (the "Royal Action"), is brought by Royal Indemnity Company, which I understand to be SFC's largest creditor.

#### 1.    The Trustee Action

SFC was formed in 1992 by Andrew N. Yao ("Mr. Yao"), a sophisticated businessman. SFC was privately owned and was controlled by Mr. Yao, who served as its Chief Executive Officer and, for most of the period, the sole shareholder. SFC's business was originating, purchasing and securitizing student loans from vocational schools. Pepper Hamilton served as SFC's counsel from December 1, 1996 through April 2002. Mr. Gagne was the Pepper Hamilton partner primarily responsible for the engagement.

The Trustee initially asserted eight claims against Pepper Hamilton and Mr. Gagne, four of which are now pending. *See* Opinion and Order dated December 22, 2005. Those four claims are: (i) breach of fiduciary duty against Pepper Hamilton and Mr. Gagne; (ii) professional malpractice against Pepper Hamilton and Mr. Gagne; (iii) equitable subordination of claims against the SFC bankruptcy estate by Pepper Hamilton for unpaid legal fees and expenses; and (iv) bankruptcy preference seeking repayment of sums paid to Pepper Hamilton within the bankruptcy preference period.

#### 2.    The Royal Action

Royal is a substantial insurance company. Royal was in the business, among other things, of issuing credit risk insurance in connection with securitizations of student loans. Royal does not allege that it was ever a client of Pepper Hamilton in respect of SFC, and acknowledges that Pepper Hamilton served as outside counsel for SFC, not Royal, with respect to all matters at issue. Royal alleges that, in connection with an arm's length business relationship between it and SFC, Royal issued certain credit risk insurance policies to SFC guaranteeing payment of

principal and 90 days interest on securitized student loans during the period January 1999 through November 2001. Royal alleges that, in connection therewith, it was defrauded by SFC.

Royal asserts seven claims, five of which are alleged against Pepper Hamilton. Those five claims are: (i) civil conspiracy to commit fraud; (ii) fraud, fraudulent inducement and fraudulent concealment; (iii) aiding and abetting fraud by SFC; (iv) negligence and negligent misrepresentation; and (v) aiding and abetting breach of fiduciary duty by SFC. In addition, Royal alleges two claims of civil RICO against Mr. Gagne and a defendant unrelated to Pepper Hamilton, SFC's independent auditor Michael Aquino.

### 3.    The Two Very Different Relationships at Issue

The relationships between Mr. Gagne/Pepper Hamilton on the one hand and SFC on the other, and the duties and standard of care applicable to that relationship, are different from the relationship that Mr. Gagne/Pepper Hamilton had with Royal. These differences are critical in identifying and analyzing the applicable standard of care because, in general, a lawyer does not owe duties of care, loyalty or communication to anyone other than his client.

The Trustee alleges an attorney-client relationship between Pepper Hamilton and SFC. That relationship involves duties of the attorney to the client and also duties of the client to the attorney. For example, the lawyer owes duties of care and loyalty to its client and the client owes a duty of candor to its lawyer. *See Restatement (Third) of the Law Governing Lawyers* (2000) § 17, Cmt. a ("clients also generally owe lawyers . . . the duty to avoid actionable misrepresentations").

As is recognized in Mr. Glazer's Report on behalf of Royal, it is routine in complex corporate transactions, such as the SFC securitizations at issue in this proceeding, for clients to provide to their lawyers statements of relevant facts on which the lawyer is to proceed and to rely upon in carrying out the matter for the client. (If the lawyer had independently to verify everything a client said, it would of course make any legal representation much more difficult and expensive.) Here, those statements were provided by means of Officers' Certificates from SFC to Pepper Hamilton. Accordingly, the lawyer is generally entitled to rely on the accuracy of the facts represented by responsible representatives of its client. "[T]he client's misrepresentation may constitute a defense to the client's malpractice claim." *Restatement (Third) of the Law Governing Lawyers* (2000) § 17, Cmt. d. That reliance is also a justification for the lawyer's actions if they are challenged by a third party, as Royal is challenging Mr. Gagne/Pepper Hamilton in this case.

Royal does not allege any attorney-client or similar relationship between it and Mr. Gagne/Pepper Hamilton in respect of the matters at issue. Regarding the matters at issue, Royal alleges that it was a non-client third-party who was doing business with SFC.[1] SFC was the client in the transactions, not Royal.

---

[1]    It is no doubt because Royal had no attorney-client relationship with Mr. Gagne/Pepper Hamilton

Footnote continued on next page.

I address below the standard of care that might be owed to a non-client. Suffice it to note here that the official Comments to Rule 4.1 of both the Pennsylvania and Delaware Rules of Professional Conduct (dealing with transactions with persons other than clients) recognize that although a lawyer is required to be truthful when dealing with others on a client's behalf but the lawyer "generally has no affirmative obligation to inform an opposing party of relevant facts."

### 4.    Pepper Hamilton's Other Engagements with Royal

Pepper Hamilton represented Royal in some matters having no relationship to the SFC transactions. As to these matters, Pepper Hamilton demonstrated appropriate sensitivity to possible conflicts of interest involved in providing legal services in unrelated matters to both SFC and Royal.

Royal hired Pepper Hamilton and Mr. Gagne in 2000 to represent Royal in connection with auto receivables securitizations unrelated to SFC. At the time, Pepper Hamilton was already representing SFC in connection with certain student loan securitizations insured by Royal. Pepper Hamilton obtained a signed waiver of conflicts letter from both Royal and SFC. *See* Letter dated July 12, 2000 from Mr. Gagne, countersigned on behalf of Royal by its General Counsel, Joyce W. Wheeler; *see also* Letter dated August 21, 2000 from Mr. Gagne, countersigned on behalf of SFC by its President and Chief Operating Officer, Gary J. Hawthorne. These arrangements illustrate Mr. Gagne's (and Pepper Hamilton's) sensitivity to professional responsibilities.

The representation of Royal in matters unrelated to SFC does not impose obligations on the part of Mr. Gagne or Pepper Hamilton to Royal in respect of the matters at issue in this case where Mr. Gagne/Pepper Hamilton was lawyer for SFC, not Royal. The standard of care owed by a lawyer to its client in one matter does not carry over to other unrelated matters where the lawyer is not representing that client.

### B.    Background: Multiple Sophisticated Independent Market Participants

The transactions in this litigation involve the securitization of pools of student loans. A number of sophisticated professionals were involved in each securitization. In addition to SFC, the participants included sophisticated bank lenders, professional fiduciary trustees, securities underwriters and placement agents, large insurance companies, independent auditors, independent rating agencies, and an array of in-house and outside lawyers representing each of them. Each participant played an important role in the transactions. Each participant had rights of access to SFC and its financial information. Purusing such information is usually called "due diligence," that is, preliminary investigation of relevant facts and circumstances. The rights of in-

---

Footnote continued from previous page.

in respect of the matters at issue that Royal has not asserted any claim against Mr. Gagne/Pepper Hamilton for legal malpractice. *See Zeffiro* v. *First Pennsylvania Bank, N.A.*, 566 F. Supp. 1391, 1392 (E.D. Pa. 1983) ("strict privity is a prerequisite to an action for legal malpractice in Pennsylvania") (citation omitted).

quiry arose either from their roles (e.g., the bank lenders, the securities underwriters and place-ment agents, the insurance companies, the rating agencies and independent auditors) or as part of their contracts of engagement (e.g., the professional fiduciary trustees). SFC responded to all inquiries truthfully as far as Mr. Gagne and Pepper Hamilton were aware. If SFC had denied access to information to which a participant was entitled, any participant could have derailed the transaction, especially if it was suspected that fraud or wrongdoing was taking place.

In connection with the securitizations, Mr. Gagne/Pepper Hamilton served as lawyer for SFC, not for Royal, and not for any of the other participants.

It is customary for a lawyer representing a participant in a large, multi-faceted transaction — such as Mr. Gagne/Pepper Hamilton representing SFC in the securitization transactions — to assume that the other participants in the transaction are doing their jobs. It is also customary and within the standard of care for lawyers in the position of Mr. Gagne/Pepper Hamilton to rely upon the conclusions reached by other sophisticated professionals, and their respective lawyers and financial people, working on a common transaction. Thus, by way of example, it would be customary and within the standard of care for Mr. Gagne/Pepper Hamilton to assume:

1.  that the bank lenders involved were doing due diligence of SFC and availing them-selves of all rights of access to information before lending hundreds of millions of dollars to SFC to purchase student loans, and to assume further that nothing came to their attention to suggest that any fraud or wrongdoing was taking place;

2.  that the insurance companies involved, including Royal, were doing due diligence on SFC and availing themselves of all rights of access to information before committing to hundreds of millions of dollars of credit risk insurance on the student loans pur-chased by SFC, and further to assume that nothing came to their attention to suggest that any fraud or wrongdoing was taking place;

3.  that the securities underwriters and placement agents involved were doing due dili-gence on SFC and availing themselves of all rights of access to information before committing to hundreds of millions of dollars of trust certificates backed by student loan portfolios, and further to assume that nothing came to their attention to suggest that any fraud or wrongdoing was taking place;

4.  that the rating agencies involved were doing due diligence on SFC and availing them-selves of all rights of access to information before issuing ratings on the trust certifi-cates backed by student loan portfolios, and further to assume that nothing came to their attention to suggest that any fraud or wrongdoing was taking place;

5.  that the fiduciary trustees involved were availing themselves of all information to which they were entitled in performing their contractual obligations, and further to assume that nothing came to their attention to suggest that any fraud or wrongdoing was taking place;

6.  that SFC's independent auditors were examining SFC's financial statements in accor-dance with generally accepted auditing standards to assure that SFC's financial statements presented fairly SFC's financial condition and results of operations, and

further to assume that nothing came to their attention to suggest that any fraud or wrongdoing was taking place.

In particular, SFC's independent auditors repeatedly examined and reported upon the financial statements of SFC. The auditors affirmed without exception that SFC's financial condition fairly presented SFC's financial condition and results of operations consistent with generally accepted accounting principles. There were no material or "going concern" qualifications to their auditor's reports. As observed by Mr. Glazer in his treatise, *Glazer and Fitzgibbon on Legal Opinions* (2d ed. 2006):

> "As noted in the first paragraph of this section and elsewhere in this book, lawyers are not auditors. In establishing the factual basis of a closing opinion, lawyers are responsible only for obtaining factual information from appropriate sources — not, unless the circumstances otherwise dictate, second guessing the accuracy of that information." (§ 4.2.3.2 at 100)

SFC's securitizations accordingly went forward with the parallel voluntary participation of (i) the bank lenders, (ii) the insurers, (iii) the securities underwriters and placement agents, (iv) the fiduciary trustees, (v) the independent rating agencies, and (vi) the independent auditors. It was therefore customary and reasonable for Mr. Gagne/Pepper Hamilton to have assumed that none of those sophisticated independent market participants (or any of the many in-house and outside professionals assisting them) was on notice of anything to suggest the fraud that Royal now alleges SFC perpetrated.

These consistent, parallel and independent conclusions that SFC's securitizations were legitimate and appropriate are centrally relevant to the conduct of Mr. Gagne/Pepper Hamilton under the applicable standard of care.

## C.    Background: The Family Loans to and Investments in SFC

Members of Mr. Gagne's family made substantial loans to SFC. From December 1995 through March 2002, Mr. Gagne's wife (Pamela Gagne), his uncle (Robert Bast), and certain family trusts (with respect to which Mr. Bast and Mr. Gagne served as co-trustees) (collectively, the "Family") from time to time loaned money to or made short-term equity investments in SFC. These loans were made, repaid, made, repaid and made again, and in the aggregate totaled over $30 million (collectively the "Family Loans"). The Trustee and Royal characterize the Family Loan transactions as involving conflicts of interest.

In considering any potential conflict of interest, I understand the situation was as follows:

1.  Robert Bast, Mr. Gagne's uncle, is a lawyer, former partner in the Reed Smith law firm in Philadelphia, and member of the Pennsylvania and Massachusetts bars. Mr. Bast and Mr. Yao, SFC's founder and controlling shareholder, had a relationship spanning approximately 20 years. Mr. Bast was an investor in companies and partnerships set up by Mr. Yao years prior to the formation of SFC in 1992, and well before Mr. Gagne ever provided any legal services to Mr. Yao or any of his companies.

2. Pamela Gagne, wife of Mr. Gagne, is also an attorney and member of the Pennsylvania bar, and also invested in Mr. Yao's companies other than SFC. She has personal wealth from her side of the family that she maintains separate from any marital assets, and as to which she makes all investment decisions. She holds Mr. Bast in very high regard both as a family member and as an astute investor: If an investment is good enough for Mr. Bast it is good enough for her.

3. Mr. Gagne was introduced to Mr. Yao when he was an attorney at the Pelino & Lentz law firm. While at that firm, Mr. Gagne provided legal services to Mr. Yao and his companies years before the formation of SFC in 1992 and years before he joined the Pepper Hamilton law firm in 1996.

4. Pamela Gagne, Robert Bast and Mr. Gagne knew Mr. Yao personally and held him in high regard, believed him to be honest and over time loaned millions of dollars to SFC, the repayment of which was guaranteed by Mr. Yao personally.

5. Both Robert Bast and Pamela Gagne made their own investment decisions regarding SFC. Both of them acted as their own lawyers in connection with their personal loans to and investments in SFC. The funds they loaned and invested were funds as to which Pepper Hamilton had no ownership, possessory, security or other pecuniary interest or control.

6. All of the Family Loans were initiated by a request from SFC, through Mr. Yao. Mr. Yao — not the Family or Mr. Gagne — set the terms of the Family Loans.

7. Mr. Bast and Mr. Gagne were co-trustees of the family trusts that made loans to and investments in SFC, parallel to those made by Mrs. Gagne and Mr. Bast. The terms of the loans and investments by the family trusts were the same (differing only in amount) as those of Robert Bast and Pamela Gagne.

8. SFC, through Mr. Yao, asked Mr. Gagne to draw up the documentation relating to the Family Loans, having received Mr. Gagne's advice that Mr. Yao and SFC engage separate counsel. Mr. Gagne documented the loans but did not negotiate their terms. Mr. Gagne did not create new forms of loan document, but used a set that had been prepared beforehand with other outside counsel for some other private lenders. They were basically the same forms that had been used in the past by SFC with an unaffiliated third-party lender, except for amounts.

9. No preferential treatment was given to the Family Loans as a result of Mr. Gagne's legal work for SFC. Dianne Messick, SFC's former controller, has testified that, with the exception of the March 2002 loans that were never repaid, all payments on the Family Loans were paid according to their terms, and that the Family Loans were treated by SFC like any other loan. Patricia Kartha, SFC's former accounting manager, testified that all interest payments made pursuant to the Family Loans were made in the ordinary course of business.

10. Mr. Gagne understood that the purpose of the Family Loans was to allow SFC to continue to purchase loans from the schools. The loan documents provided that the funds could be used only in the ordinary course of SFC's business.

11. Mr. Gagne believed the Family Loans were fair and reasonable to SFC. He also thought the Family Loans were a special benefit to SFC because they could generally be funded more promptly, as SFC's needs arose, than those by other lenders. Quickly available financing was vital to SFC's business, particularly when SFC's warehouse facilities were extended and there was no other immediately available cash to be used for purchasing student loans.

12. The Family never sought specially beneficial terms and Mr. Yao never expressed concern that the Family Loans were unfair to SFC. SFC's former controller and former accounting manager thought the same. Nothing about the Family Loans appeared out of the ordinary or unreasonable to SFC's independent auditors.

13. The Family Loans were less expensive for SFC than those from other sources such as SWH Funding Corporation ("SWH"). SFC's former controller testified that the loans made by SWH were the most expensive loans that SFC got from any source, and were more expensive to SFC than the Family Loans. For example:

   a. The terms of the SWH loans provided for a "breakup fee" by which SFC would still owe SWH a certain percentage of the loan amount even if SFC found alternate financing. The Family Loans never included a breakup fee.

   b. The terms of the SWH loans required insurance on the underlying student loans at SFC's expense. Without the insurance requirement, the SWH loans would have been even more expensive. No insurance was ever required to be taken out on the student loans serving as collateral for the Family Loans, and yet as such were not more expensive than the SWH loans.

   c. Some of the SWH loans included both a drawdown fee and a commitment fee. The Family Loans did not include any drawdown fee.

   d. The SWH loans also involved an application fee. The Family Loans never required any application fees.

14. Mr. Gagne carried through a conflicts of interest consultation with Mr. Yao as SFC's Chief Executive Officer and sole shareholder. Mr. Gagne advised SFC and Mr. Yao to have separate counsel and both SFC and Mr. Yao signed written consent to Mr. Gagne's/Pepper Hamilton's providing the legal documentation for the Family Loans.

15. In June 2002, SFC defaulted on $6.976 million in unpaid principal on then outstanding Family Loans. Those loans remain unpaid today. SFC also failed to provide the collateral required by the terms of the March 2002 loans. Mr. Bast testified that, had he known that SFC was not going to put up the required collateral, he would have never have made the loan.

16. In response to SFC's default, the Family executed against the personal guarantees by Mr. Yao and his wife, receiving Mr. Yao's stock in the general partnerships of Day Hill Partners G.P., Inc., Premier Education Group G.P., Inc. and One Summit Place G.P., Inc. These partnership interests have a value of less than 10% of the defaulted unpaid principal. (Hecht Report at 8) Even if the value of these partnership interests increased dramatically in the future, Mr. Yao would be entitled to any amount greater than the principal owed to the Family plus the rate of return set when the investments were first made, years earlier.

These facts support the conclusion that Mr. Gagne had a genuine and good faith belief that the terms of the Family Loans were known to and understood by SFC and were fair and reasonable. This in turn supports the conclusion that his work in the transactions was honest and competent.

1. The fraudulent conduct alleged is SFC's manipulation of default rates on its student loans. Professor Green assumes that Mr. Gagne knew that default rates were far higher than the approximately 25% default rate allegedly portrayed by SFC to Royal. *See* Royal Third Amended Complaint ¶ 32(a). However, the terms of the March 2002 Family Loans required SFC to post collateral in the form of uninsured student loans having a principal value of 1.3 times the loan amount. In order for the Family to have security equal to the principal amount of their loans, the default rate on the student loans serving as collateral had to be less than 23% — .3 divided by 1.3 equals 23%. If the accounting was truthful, as Mr. Gagne assumed, that signifies his belief that the default rate was not above 25%.

2. In paragraph 20(f) of his Report, Professor Green states that the Family made a short-term equity investment in SFC in calendar year 2000 when SFC was insolvent, evidently implying that they knew of the insolvency. There is no evidence that the Family had such knowledge (assuming insolvency to have been the case). On the contrary, that investment was unsecured. No one would invest millions on an unsecured basis in an enterprise they knew to be insolvent.

3. In March 2002 — just weeks before Mr. Yao disclosed his wrongful forbearance practices — the Family loaned SFC over $3 million, increasing the total amount of their loans to almost $7 million. Mr. Gagne drew up the documentation relating to these transactions. Those facts are inconsistent with any inference that the Family or Mr. Gagne knew of any fraud, wrongdoing or insolvency at SFC.

**D.    The Jurisdiction Providing the Applicable Rule of Decision**

The standard of care applicable to lawyers is generally the same throughout the country, although there are jurisdictional differences. I am informed:

1. SFC is a Pennsylvania corporation and, throughout the period that Pepper Hamilton provided legal services to it, the office of SFC's Chief Executive Officer was located in Radnor, Pennsylvania, just outside Philadelphia.

-9-

2. Pepper Hamilton is a law partnership organized under the law of Pennsylvania with its principal office in Philadelphia, Pennsylvania, and, throughout the relevant period, Pepper Hamilton provided legal services to SFC principally from its Philadelphia offices, primarily under the guidance of Pepper Hamilton partner W. Roderick Gagne ("Mr. Gagne").

3. Mr. Gagne, who at all times relevant worked in Pepper Hamilton's Philadelphia office, resides in Wyndmoor, Pennsylvania and is a member of the Pennsylvania bar.

4. Mr. Gagne's wife, Pamela Gagne, and her uncle, Robert Bast, whose loans to and investments in SFC are at issue, reside in Pennsylvania. Both Pamela Gagne and Robert Bast are lawyers and members of the Pennsylvania bar.

5. All of the so-called family trusts, whose loans to and investments in SFC are at issue in these actions, similarly reside in Pennsylvania.

6. The claims alleged by Royal all relate to the conduct of Pepper Hamilton as attorney for SFC. All actions and omissions by Pepper Hamilton complained of by Royal are actions and omissions by Pepper Hamilton in connection with Pepper Hamilton's representation of SFC. The face-to-face meeting at which representatives of both Royal and Pepper Hamilton were both present occurred in Pepper Hamilton's Philadelphia office.

In my opinion the applicable standard of care is that in Pennsylvania.

I am a member in good standing of the Bar of Pennsylvania, and throughout the timeframe relevant to this matter was a Professor at the University of Pennsylvania School of Law, where, among other things, I taught courses in lawyers' professional responsibilities.

## E.  The Presumption of Compliance with Professional Obligations

A lawyer is presumed to have complied with his/her duties unless proven otherwise.[2]

---

[2] See Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985) ("An attorney is presumed to have discharged the duties of his representation until the opposite has been made to appear.") (applying Pennsylvania law to claim of legal malpractice; citations omitted), cert. denied, 474 U.S. 1010 (1985); Thompson v. Glenmede Trust Company, No. 92-5233, 1996 U.S. Dist. LEXIS 16248 at *14 (E.D. Pa. Oct. 31, 1996) ("[A]n attorney is presumed to have complied with his duties as an attorney unless proven otherwise.") (applying Pennsylvania law to claim of legal malpractice; citations omitted); Mazer v. Security Ins. Group, 368 F. Supp. 418, 422 (E.D. Pa. 1973) ("There is no presumption that an attorney has been guilty of a want of care, arising merely from a bad result. To the contrary, an attorney is presumed to have discharged the duties of his representation until the opposite has been made to appear.") (applying Pennsylvania law to claim of legal malpractice), aff'd, 507 F.2d 1338 (3d Cir. 1975). See also Commonwealth of Pennsylvania v. Jones, 815 A.2d 598, 612 (Pa. 2002) (there is a "presumption that lawyers are competent and effective") (ineffective assistance of counsel claim).

Review of a lawyer's fulfillment of his/her duties requires the elimination of hindsight. *See Strickland* v. *Washington*, 466 U.S. 668 (1984), where, in the context of ineffective counsel, the Supreme Court of the United States stated:

> "Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . ." (466 U.S. at 689)

*See also McLaughlin* v. *Carroll*, 270 F. Supp. 2d 490, 504-05 (D. Del. 2003) (Robinson, C.J.) ("[a] court must be highly deferential to counsel's reasonable strategic decisions when analyzing an attorney's performance") (citations omitted); *Deshields* v. *Snyder*, 829 F. Supp. 676, 681 (D. Del. 1993) (Farnan, J.) ("the Court is to presume that the attorney's conduct falls within the realm of objective reasonableness and it is the burden of the Petitioner to show otherwise.") (citations omitted); *Flamer* v. *Chaffinch*, 827 F. Supp. 2d 1079, 1101 (D. Del. 1993) (Farnan, J.) (same), *aff'd*, 68 F. 3d 710 (3d Cir. 1995); *see also Folks* v. *State of Delaware*, No. 133, 1992 Del. LEXIS 29 at *7 (Del. 1992) ('there is a strong presumption that the lawyer's conduct was professionally reasonable").

Where, as here in the case of Royal, a non-client sues a lawyer in fraud, it is generally held that the plaintiff "must prove each and every element of their claims with clear, precise and convincing evidence. This burden is greater than the burden of a preponderance of the evidence. It is not as great as the burden of beyond a reasonable doubt. . . . The 'clear, direct, precise and convincing evidence' standard means that the plaintiffs must present evidence sufficient to enable a reasonable jury to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Thompson* v. *Glenmede Trust Company*, No. 92,5233, 1996 U.S. Dist. LEXIS 16248 at *11 (E.D. Pa. Oct. 31, 1996).

Pepper Hamilton and all of its attorneys, including Mr. Gagne, are entitled to this presumption in connection with the matters alleged in this action, and are entitled to put the Trustee and Royal to their full burden of proof.

## F.    The Pennsylvania Rules of Professional Conduct

The Rules of Professional Conduct (hereinafter cited "Pa. R. Prof. Conduct") provide guidance in respect of a lawyer's relationship with clients and the legal system. Pa. R. Prof. Conduct, Preamble ¶ 1.[3]  Generally, they are not intended to create civil duties or obligations,[4] and certainly not on the part of a lawyer to non-client third parties.

---

[3]    With one exception highlighted herein, the version of the Pennsylvania Rules of Professional Conduct quoted and discussed herein throughout is the version in effect during 1996-2002, the period of Pepper Hamilton's attorney-client relationship with SFC. To the extent that focus is on

Footnote continued on next page.

The only Pepper Hamilton lawyer sued by either the Trustee or Royal is Mr. Gagne.  I am informed:

1.  Mr. Gagne graduated with high honors from Ithaca College in 1976, obtained his law degree from Dickinson School of Law in 1980, and in 1983 obtained a Masters of Laws in Taxation from Georgetown University Law Center.

2.  Mr. Gagne is Chairman of the Federal Tax Committee of the Philadelphia Bar Association, and at all times relevant hereto was a member in good standing of the Bar of Pennsylvania.

"A lawyer shall provide competent representation to a client.  Competent representation requires the legal knowledge, skill, thoroughness and preparation necessary for the representation."  Pa. R. Prof. Conduct, Rule 1.1.  The Comment to Rule 1.1 provides guidance in the interpretation of the Rule and states that in determining whether a lawyer employs requisite knowledge and skill in a particular matter, relevant factors include, but are not limited to, the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question and the preparation and study the lawyer is able to give the matter.

Asset-backed securitization transactions are complex securities offerings with significant tax implications.  The report submitted on behalf of Plaintiffs by Professor Green does not challenge Mr. Gagne's competence to provide legal counsel to SFC in connection with its securitizations.  The fact that Royal, a sophisticated consumer of legal services, independently retained Mr. Gagne in July 2000 to act as its legal counsel in connection with auto receivables securitizations unrelated to SFC is acknowledgement of Mr. Gagne's reputation for competence in this complex area of law.

---

Footnote continued from previous page.

certain legal services provided to SFC by Pepper Hamilton through attorneys working out of its Wilmington, Delaware office, Delaware law may provide the appropriate rule of decision and standard of care.  Like Pennsylvania, Delaware has adopted Rules of Professional Responsibility patterned after the Model Rules of Professional Conduct promulgated in 1983 for which I served as Reporter.  During the relevant timeframe, the Rules of Professional Conduct in Pennsylvania and Delaware were substantially the same as to the matters at issue.  The opinions express herein would be the same if I were to address the standard of care under the Delaware Rules of Professional Conduct.  I believe that I am qualified to speak to the standard of care for which the Delaware Rules of Professional Conduct provide guidance, and I reserve the right to testify as to the comparable Delaware Rules of Professional Conduct, should the Court deem it appropriate.

[4]  "[S]imply because a lawyer's conduct may violate the rules of ethics does not mean that the conduct is actionable."  *Maritrans GP Inc.* v. *Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277, 1284 (1992).  "It is well-established that the Rules of Professional Conduct do not provide an independent basis for civil liability."  *Garland* v. *U.S. Airways, Inc.*, No. 05-140, 2006 U.S. Dist. LEXIS 73980 at *10 (W.D. Pa. Oct. 11, 2006).

As a general proposition, a lawyer's duties to clients do not run in favor of non-clients such as Royal. Thus, there are generally no duties of loyalty or confidentiality to a non-client. There is a duty not to commit fraud on anyone, but fraud requires knowing that misrepresentations are involved.[5] I have encountered no evidence that Mr. Gagne or Pepper Hamilton lawyers had information that fraud was involved.

There is also no evidence that Mr. Gagne or anyone else at Pepper Hamilton "averted their eyes" or were "willfully blind" to signs of fraud in the SFC transactions. I agree that the concept of willful blindness can apply when the facts justify its application. But it risks serious confusion and misapplication of the standard of care to do so when there are no such facts. It is simply unbelievable that the Family would loan SFC $3 million as they did in March 2002 while Mr. Gagne was "averting his eyes" to facts showing the Family was also being defrauded.

In this connection, it is relevant to consider more fully the Connecticut Bar ethics opinion cited by Professor Green. In his quotation, Professor Green omits the following two sentences found immediately after the portion of the opinion that he quotes:

> "However, we do not believe that a lawyer has a separate, independent duty to third persons to investigate what the client's intent is or to cross examine the client in order to prevent fraudulent transfers from occurring. The lawyer owes the duties of competence, loyalty and confidentiality to the client, not to the client's creditors." (emphasis added)

The Connecticut Bar opinion goes on to state:

> "If a lawyer has elicited information from the client that is sufficient to discharge the lawyer's duty to the client in providing legal counsel and the lawyer is still uncertain about whether the transfer is intended to deceive or has no substantial purpose other than [to] delay or burden creditors, we believe the lawyer is entitled if not obligated to give the client the benefit of the doubt." (emphasis added)

Moreover, the concept of "studied ignorance" to which Professor Green refers by reference to the Wolfram text relates to "ignorance of a readily ascertainable fact." C. Wolfram, *Modern Legal Ethics* 696 (1986) (emphasis added) Royal alleges that it performed all required due diligence of SFC before issuing its credit risk insurance. Mr. Gagne/Pepper Hamilton certainly could properly assume that Royal had in fact done so. The fact that Royal — like the bank lenders, like the securities underwriters and placement agents, like the fiduciary trustees, like the in-

---

[5]    Rule 1.2(d) of the Pennsylvania Rules of Professional Conduct states: "a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law." (emphasis added)    Rule 1.0(f) defines "knowingly," "known," and "knows" to mean "actual knowledge of the fact in question." Pa. R. Prof. Conduct 1.0(f) (emphasis added).

dependent rating agencies, like the independent auditors — did not discover the true facts suggests that they were not "readily ascertainable."[6]

### G.     Conflicts Occasioned by Concurrent Representations

There is no evidence of improper conflicts of interest on the part of Mr. Gagne or Pepper Hamilton. Mr. Yao on behalf of himself and SFC was fully informed of Mr. Gagne's relationships with the Family and waived any conflict, both expressly and by implication. In any event, the presence of a supposed conflict of interest does not indicate wrongdoing. It is very common with closely held companies for outside counsel (such as Pepper Hamilton) to represent both the corporation (SFC) and its sole shareholder and Chief Executive Officer (Mr. Yao). "[A] lawyer for an organization may also represent a principal officer or major shareholder." Pa. R. Prof. Conduct, Rule 1.13, Comment ¶ 9. While "a lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents" (*Id.*, Rule 1.13(a)), "[a] lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders." *Id.*, Rule 1.13(e). Mr. Yao was SFC's sole shareholder, except for a short time in 2000 when Mr. Yao and the Family were the sole shareholders.

I have addressed the Family Loans above. As to the transactions involving Robert Bast and Pamela Gagne, there appears to be no instance of Pepper Hamilton (or Mr. Gagne) representing multiple clients. Pamela Gagne and Robert Bast were both lawyers and represented themselves in transactions involving their own funds. As to the loans to and investments in SFC made by the family trusts, these appear to have been parallel and identical to those accepted by Mr. Bast.

Under Pennsylvania Rule 1.8, a conflict of interest can also arise as between the interests of a client and the personal interests of the lawyer, such as the interests of Mr. Gagne in the present case. However, it seems to me that in documenting the Family Loans Mr. Gagne did not have a conflict within the meaning of Rule 1.8 because Mr. Bast and Pamela Gagne were lawyers who represented themselves. Mr. Bast also served as co-trustee of the family trusts. The funds invested were funds as to which Pepper Hamilton had no ownership, possessory, security or other pecuniary interest. Even if there was a conflict of interest, it is not legally wrongful as regards a third party such as Royal. In any event, it is not improper for a lawyer to have a finan-

---

[6] There is a critical distinction to be made between providing legal advice to a client about a proposed or possible course of conduct on the one hand and counseling a client to commit a crime or fraud on the other. Rule 1.2(d) "does not preclude the lawyer from giving an honest opinion about the actual consequences that appear likely to result from a client's conduct. Nor does the fact that a client uses advice in a course of action that is criminal or fraudulent of itself make a lawyer a party to the course of action. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity." Pa. R. Prof. Conduct 1.2, Comment ¶ 9.

cial investment in a client. (Doing so is fairly common practice.) The issue is one of informed consent.

### H.    Waiver of Conflicts Based on Informed Consent

The conflicts of interest in Pepper Hamilton's concurrent representation of Royal along with SFC and Mr. Yao, if there were any, could be waived and were properly waived. As noted above, both Royal and SFC were familiar with the concept of waiver of conflicts, having consented in writing to Pepper Hamilton's concurrent representation of each in matters unrelated to the other.

With regard to representation of SFC and Mr. Yao, "common representation is permissible where the clients are generally aligned in interest even though there is some difference in interest among them." *Id.*, Rule 1.7, Comment ¶ 28. As stated in the Comment to Rule 1.7:

> "Thus, a lawyer may seek to establish or adjust a relationship between clients on an amicable and mutually advantageous basis, for example, in helping to organize a business in which two or more clients are entrepreneurs, working out the financial reorganization of an enterprise in which two or more clients have an interest or arranging a property distribution in settlement of an estate. The lawyer seeks to resolve potentially adverse interests by developing the parties' mutual interests. Otherwise, each party might have to obtain separate representation, with the possibility of incurring additional costs, complication or even litigation. Given these and other relevant factors, the clients may prefer that the lawyer act for all of them." *Id.*, Rule 1.7, Comment ¶ 28.

Rule 1.7 permits concurrent representation of two or more clients in the same transaction "if (i) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client, (ii) the representation is not prohibited by law, (iii) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal, and (iv) each affected client gives informed consent." Pa. R. Prof. Conduct, Rule 1.7(b).

Under Rule 1.8 lawyer-client business transactions are permitted where "(i) the transaction and terms on which the lawyer acquires the interest are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client; (ii) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and (iii) the client gives informed consent in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction." Pa. R. Prof. Conduct 1.8.

Essential to the consent provisions found in both Rule 1.7 and Rule 1.8 is the concept of informed consent. "Informed consent" is defined in Rule 1.0(e), and "denotes the consent by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." *Id.*, Rule 1.0(e). Informed consent "requires that each affected client be

-15-

aware of the relevant circumstances and of the material and reasonably foreseeable ways the conflict could have adverse effects on the interest of that client." *Id.*, Rule 1.0(e), Comment ¶ 18).[7] As stated in the official Comment to Rule 1.0(e):

> "A lawyer need not inform a client or other person of facts or implications already known to the client or other person; nevertheless, a lawyer who does not personally inform the client or other person assumes the risk that the client or other person is inadequately informed and the consent is invalid. In determining whether the information and explanation provided are reasonably adequate, relevant factors include whether the client or other person is experienced in legal matters generally and in making decision of the type involved, and whether the client or other person is independently represented by other counsel in giving the consent. Normally, such persons need less information and explanation than others, and generally a client or other person who is independently represented by other counsel in giving the consent should be assumed to have given informed consent." *Id.*, Rule 1.0(e), Comment ¶ 6.

In Pennsylvania, "[t]he client's consent need not be confirmed in writing to be effective." *Id.*, Rule 1.7, Comment ¶ 20. It is very common for lawyers and clients to discuss conflicts and agree orally on waivers thereof. Doing so is routine where the lawyer and the client have known each other for a long time, as in the present situation. Such waivers are effective. Where a business transaction between lawyer and client is involved, Rule 1.8, as noted above, requires the consent to be in a writing signed by the client.

## I.    Written Consent

Professor Green was "asked to assume" that "Gagne and Pepper never explained to SFC representatives that they had a conflict of interest arising both from their representation of Mr. Yao and from Gagne's and his family's financial relationships with SFC; nor did they explain the risks involved; nor did they obtain SFC's consent to the representation given the conflicts and the attendant risks." I am informed that the facts are very different.

Mr. Gagne has testified about the several conversations he had personally with SFC's sole shareholder and Chief Executive Officer, Mr. Yao, concerning conflicts of interest. Mr. Gagne informed SFC and Mr. Yao on several occasions about the need for separate counsel and the conflict of interest present involved in the Family's loans to SFC. Mr. Gagne explained the potential for conflicts of interest in connection with his documenting the loans. Mr. Yao was an

---

[7]    The version of the Pennsylvania Rules of Professional Conduct in effect during the period that Pepper Hamilton had an attorney-client relationship with SFC did not contain any Comment with respect to Rule 1.0(e). The Comment to Rule 1.0(e) quoted in this and the next paragraph is found in the 2005 version of the Pennsylvania Rules. Rule 1.0(e) was the same.

intelligent man and experienced in business and employment of lawyers. The conversations were detailed and conveyed what needed to be conveyed for an informed decision.[8]

Mr. Gagne memorialized the consent in writing. As recognized in the Comment to Rule 1.7: "a writing tends to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing." *Id.*, Rule 1.7, Comment ¶ 20. That written confirmation is in the form of a letter on Pepper Hamilton letterhead from Mr. Gagne to Mr. Yao dated August 27, 1998, which is countersigned "Agreed to and accepted by" Mr. Yao on behalf of both SFC and himself. A copy of this written waiver is attached hereto as Exhibit B.

Mr. Gagne continued to have conversations with Mr. Yao on the subject of conflicts, and obtained renewed waivers. These conversations are referred to in a letter from Mr. Gagne to Mr. Yao on Pepper Hamilton letterhead dated March 5, 2002. That letter is countersigned "Agreed to and accepted by" Mr. Yao on behalf of both SFC and himself. A copy of this written waiver is attached hereto as Exhibit C.

In my opinion, conversations that Mr. Gagne had with SFC and Mr. Yao and the August 27, 1998 and March 5, 2002 letters fully satisfied the applicable standard of care by informing SFC and Mr. Yao of the circumstances relevant to informed consent.

In paragraph 26 of his Report, Professor Green argues that the August 27, 1998 and March 5, 2002 letters violate Rule 1.8(h) because, as he reads them, they purport to release claims of legal malpractice. I believe that this argument applies to the Trustee, not Royal. In any event, neither waiver letter contains any mention of "malpractice." Any interpretation that it did address legal malpractice would be legally inoperative, and neither Mr. Gagne nor Pepper Hamilton has asserted release as a bar to the claims of SFC asserted by the Trustee.

## J.    The Securitization Opinions

Pepper Hamilton rendered several opinions in connection with each of the eight securitizations closed by SFC. These are the subject of Mr. Glazer's Report.

As I have addressed above, the relationships between Mr. Gagne/Pepper Hamilton on the one hand, and SFC on the other, was an attorney-client relationship, and the duties and standard of care applicable to that attorney-client relationship, are different from the relationship that Mr.

---

[8]    To the extent that Professor Green suggests that when a closely held company is insolvent or near the zone of insolvency the interests of its sole shareholder may differ from the interests of its creditors, Mr. Gagne and Pepper Hamilton were not representing the creditors of SFC. In any event, it is questionable whether creditors have a right to bring direct claims for breach of fiduciary duty against a corporation's directors based on insolvency or zone of insolvency arguments. *See North American Catholic Educational Programming Foundation, Inc.* v. *Gheewalla*, No. 521, 2006, 2007 Del. LEXIS 227 (Del. May 18, 2007) (holding no such cause of action exists under Delaware law).

Gagne/Pepper Hamilton had with nonclient, third-party Royal. These differences are critical in identifying and analyzing the applicable standard of care because, in general, a lawyer does not owe duties of care, loyalty or communication to anyone other than his client.

As stated in *Restatement (Third) of the Law Governing Lawyers* (2000):

"[A] lawyer representing a client in an arm's-length business transaction does not owe a duty of care to opposing nonclients, except in the exceptional circumstances described in this Section." *Id.* § 51, Cmt. c.

The "exceptional circumstances" described in Section 51 of the *Restatement* relate to where the lawyer "invites" a nonclient to rely on the lawyer's opinion, and the nonclient reasonably does so. However, a lawyer may avoid liability to nonclients under this exception "by making clear that an opinion or representation is directed only to a client and should not be relied on by others." *Restatement (Third) of the Law Governing Lawyers* (2000) § 51 Cmt. e. Mr. Glazer acknowledges this very point in his treatise, *Glazer and Fitzgibbon on Legal Opinions* (2d ed. 2006): "To avoid any question as to who may rely, lawyers often expressly prohibit reliance by anyone other than the addressee." *Id.* § 2.3.2. That is precisely what the facts show to be the case here.

Pepper Hamilton delivered several opinions in connection with the closings of each securitization transaction. Pepper Hamilton's opinion letters were addressed to: (i) the trustees of the grantor trust holding the pooled student loans; (ii) MBIA, the company that insured the trust certificates; (iii) the rating agencies that rated the trust certificates; and (iv) the qualified institutional buyers who purchased the trust certificates. That Royal was not "invited" to rely on any of the Pepper Hamilton opinion letters is made clear by the fact that:

1.  <u>none</u> of the Pepper Hamilton opinion letters is addressed to Royal; and

2.  <u>all</u> of the Pepper Hamilton opinion letters contain express disclaimers making clear that no one other than an addressee should rely on it.

Thus, each of Pepper Hamilton's Perfection of Security Interest, Authority and Enforceability Opinions states:

"This opinion is rendered only to the addressees set forth above and is solely for the benefit of such addressees. This opinion may not be quoted to or relied upon by any other person or entity without the express prior written consent of a partner of this firm."

Each of Pepper Hamilton's True Sale and Nonconsolidation Opinions states :

"The opinions expressed herein are rendered only to those to whom this opinion letter is specifically addressed except as hereinafter expressly provided. Without our express prior written consent, neither our opinions nor this opinion letter may be disclosed or relied on in connection with any transactions other than the transactions contemplated by the Transaction Documents except for disclosure to the parties named in the Transaction Documents and their respective agents and pro-

fessional advisors, which shall be permissible.  However, an assignee of the Buy-ers may review the opinion in performing its due diligence, but may not rely on this opinion without our express prior written consent.  Without our express prior written consent, neither our opinions nor this opinion letter may be relied upon for any other purpose or relied upon by any other person or entity."

"This opinion letter is being furnished by us as special counsel to Acceptance solely and exclusively for the benefit of the addressees hereof, and is not to be used, circulated, quoted or otherwise referred to for any other purpose without our express written permission.

Each of the separate Pepper Hamilton Nonconsolidation Opinions in respect of the Servicer states:

"The opinions expressed herein are rendered only to those to whom this opinion letter is specifically addressed except as hereinafter expressly provided.  Without our express prior written consent, neither our opinions nor this opinion letter may be disclosed or relied on in connection with any transactions other than the trans-actions contemplated by the Transaction-Documents except for disclosure to the parties named in the Transaction Documents and their respective agents and pro-fessional advisors, which shall be permissible.  However, an assignee of the Lender may review the opinion in performing its due diligence, but may not rely on this opinion without our express prior written consent.  Without our express prior written consent, neither our opinions nor this opinion letter may be relied upon for any other purpose or relied upon by any other person or entity."

"This opinion letter is being furnished by us as special counsel to the Servicer solely and exclusively for the benefit of the addressees hereof, and is not to be used, circulated, quoted or otherwise referred to for any other purpose without our express written permission."

Each of Pepper Hamilton's Tax Opinions states:

"This opinion letter is solely for the benefit of the original addressees hereof, and any subsequent holder of the Certificates issued pursuant to the Pooling and Ser-vicing Agreement, to the same extent as if it had been an addressee hereof.  This opinion letter may not be used, circulated, quoted, relied upon or otherwise re-ferred to for any other purpose or by any other person without our prior written consent."

Royal issued its credit risk insurance before each securitization — that is to say, before Pepper Hamilton wrote and delivered its closing opinions.  As a matter of fact, Royal could not have relied in issuing its insurance on opinion letters not yet written.  In any event, in my opinion Pepper Hamilton clearly addressed its opinion letters and clearly limited the universe of those who could rely on them consistent with the guidance provided by Section 51 of the *Restatement (Third) of the Law Governing Lawyers* (2000).  Because none of Pepper Hamilton's opinion let-ters was addressed to Royal, and because all of Pepper Hamilton opinion letters clearly state that

no one other than those to whom they are addressed may rely on them, Royal was not invited by Pepper Hamilton to rely on its opinions and Pepper Hamilton. The "exceptional circumstances" of a nonclient invitee are not applicable here. The general rule of the *Restatement* governs:

> "[A] lawyer representing a client in an arm's-length business transaction does not owe a duty of care to opposing nonclients, except in the exceptional circumstances described in this Section." *Id.* § 51, Cmt. c.

Assuming for argument's sake, however, that Royal was a recipient of one or more of the Pepper Hamilton opinion letters, the *Restatement (Third) of the Law Governing Lawyers* (2000) makes clear that "the lawyer does not thereby undertake all duties owed to a client, such as . . . avoidance of conflicting interests." *Id.* § 95, Cmt. c. Mr. Glazer confirms this point in his treatise, *Glazer and Fitzgibbon on Legal Opinions* (2d ed. 2006):

> "[I] closing opinions lawyers are not required as a matter of customary practice to disclose relationships with and interests in clients — *e.g.*, directorships or stock ownership — that, if they were accounting firms, would be deemed to compromise their independence. . . .

> "Lawyers are not supposed to be independent of their clients but are expected to further their clients' interests by providing diligent representation. Delivery of a closing opinion is part of that representation. . . .

> "Disclosure of relationships with and interests in a client, if required, could create the mistaken impression that such relationships or interests constitute a departure from the norm. . . . Disclosures have no relevance because opinion recipients know that opinion givers are not independent of their clients and do not expect them to disclose relationships with and interests in their clients in opinion letters. . . .

> "'There has never been a requirement that the opinion giver disclose to the third-party recipient any interest or relationship that might tend to influence the opinion.'" *Id.* § 2.5.5 and 2006 supplement (citations omitted)

The standard of care discussed above is equally applicable to the specific preparation of Pepper Hamilton's opinion letters, and in my opinion Pepper Hamilton satisfied the standard of care.

As Mr. Glazer recognizes, it is common in complex transactions such as the SFC securitizations for clients to set forth the relevant facts to their lawyers. Here, that was done through Officers' Certificates from SFC to Pepper Hamilton. The lawyers properly accept such statements in the absence of circumstances arousing reasonable suspicion or some recognized procedure of further inquiry. Neither of these latter circumstances appears to have existed. The propriety of the lawyer's reliance on the client makes it unnecessary that the lawyer exhaustively (and expensively) investigate his own client.

The lawyer is entitled to rely on the accuracy of the facts represented by its client. As Mr. Glazer states in his treatise, *Glazer and Fitzgibbon on Legal Opinions* (2d ed. 2006):

"[O]pinion preparers rely not on their firsthand knowledge of facts but on factual information they obtain from others. . . . [I]n a typical closing opinion, opinion preparers rely principally for factual information on company officers and other knowledgeable sources. . . . Opinion preparers are permitted to rely on factual information provided by sources they believe to be appropriate and reliable. For information in the possession of the company they normally will look to the corporate officers who have responsibility for the information being provided. . . . Alternatively, the opinion preparers may seek information from a corporate officer to whom those officers report, directly or indirectly, including the chief executive officer." (§ 4.2.1 at 85-86; footnotes omitted)

\*              \*              \*

"If reliance is permitted (as discussed below), opinion preparers are entitled, as a matter of customary practice, to base opinions on factual information furnished to them by officers of the company without taking any steps to verify that information. Lawyers who render closing opinions are not auditors. In establishing the factual basis of a closing opinion, they are not expected to investigate whether facts represented to them by company officers to be true are not true. As part of an opinion recipient's 'due diligence,' it normally conducts its own investigation of the facts before entering into a transaction. Receipt of a closing opinion is not intended to serve as a substitute for that investigation." (§ 4.2.3 at 93; footnotes omitted)

\*              \*              \*

"Over the last ten years . . . a principle has emerged that is articulated in remarkably similar language in most of the bar association reports issued during that period. The principle is that, in rendering a closing opinion, the opinion preparers are entitled to rely on factual information provided by an appropriate source if they do not <u>know</u> the information to be untrue, the information does not appear irregular on its face and they do not <u>know</u> of circumstances that make reliance unwarranted." (§ 4.2.3 at 94-96, footnotes omitted; emphasis added)

I have discussed above the definition of "knows" in Rule 1.0(f) of the Pennsylvania Rules of Professional Conduct — "knows" means nothing less than "actual knowledge of the fact in question." Pa. R. Prof. Conduct 1.0(f). Mr. Glazer makes clear in his treatise that the term "know" in connection with the preparation of closing opinions similarly means "actual knowledge."

"A lawyer is not accountable for facts the lawyer once knew but has forgotten or that the lawyer has failed to recognize as being applicable to factual information the lawyer believes to be reliable. As a matter of customary practice, the facts a lawyer is held to know for purposes of reliance are facts of which the lawyer is consciously aware. A lawyer is not deemed to know facts that are lodged somewhere in a lawyer's memory but lost to present recollection. Customary practice reflects the realities of the opinion process. The lawyers who work on a closing

-21-

opinion usually possess a wealth of information about a client. Each piece of information is analogous to a piece of a puzzle and the pieces collectively are analogous to pieces of many different puzzles. Which pieces fit together and how may be obvious, but often only with the benefit of hindsight after they are assembled. To hold a lawyer accountable for facts of which the lawyer is not consciously aware would elevate the factfinding aspect of the opinion process from an ancillary to a central role. As noted in the first paragraph of this section and elsewhere in this book, lawyers are not auditors. In establishing the factual basis of a closing opinion, lawyers are responsible only for obtaining factual information from appropriate sources — not, unless the circumstances otherwise dictate, second guessing the accuracy of that information." (§ 4.2.3.2 at 98-100, footnotes omitted)

When closing opinions are delivered by a law firm, as in the present situation, the issue arises as to whose knowledge counts. Mr. Glazer addresses this as well in his treatise. He makes it clear that the standard of care looks to the knowledge of the individual attorney(s) involved in preparing the opinion and not to the knowledge of others in the law firm:

"In most transactions in which a law firm is delivering a closing opinion, a group of several lawyers takes responsibility for preparing the opinion. If any of those lawyers 'knows' (as discussed in § 4.2.3.2) that factual information on which the opinion is based is untrue or are aware of circumstances that make reliance unwarranted, that information may not be used as a basis for an opinion. Suppose, however, that the lawyers working on an opinion are not aware of contrary information but another lawyer in the firm is. Should the knowledge of that other lawyer preclude reliance? The answer to that question is no. To conclude otherwise would be to impose on the lawyers preparing an opinion a duty to canvass everyone in the firm for information that might contradict the factual information on which they are relying. That would be unrealistic as a practical matter, requiring that each person contacted first be educated about the transaction, the opinions being rendered and the factual certificates on which they are being based. Moreover, even if a full-scale inquiry of other lawyers in the firm could be conducted, it would likely consume dozens of hours and thousands of dollars without producing any benefit. Lawyers who are not involved in preparing a closing opinion rarely if ever will know of anything that calls into question factual information provided by appropriate and reliable sources; and, even if they did, no one normally would be in a position to assemble the isolated pieces of information each has into the coherent pattern that may be needed to reveal an inaccuracy." (§ 4.2.3.3 at 100-02)

As I have discussed above, clients owe a duty of candor to their lawyers and lawyers are entitled to rely on the representations of their client. This principle applies in the case of closing opinions in securitization transactions. A lawyer is entitled to rely on the representations of his client, and is not obligated to ferret through the client's files to ascertain if contrary information exists. As Mr. Glazer states in his treatise:

"Files for a regular firm client are often yards wide, many years old and in varying states of disarray. A review would likely consume many days and still reveal nothing of value. Thus, the opinion preparers are not normally expected to check the firm's files for information that might contradict factual information from an appropriate source that appears regular on its face and that they believe to be reliable. The only exception is for files they have identified as being reasonably likely to contain information they need and do not otherwise have to support an opinion." (§ 4.2.3.4 at 103)

In my opinion, Pepper Hamilton was entitled to rely on the statements of fact provided to it by SFC and certified as accurate by responsible representatives of SFC. In addressing its opinion letters to a restricted group and making clear that no one else should rely on them, Mr. Gagne/Pepper Hamilton satisfied the standard of care in the preparation and delivery of its opinion letters, and owed no duty of care to Royal in connection therewith.

### III.    Exhibits

I may use as exhibits or demonstrative aids during testimony at trial relevant provisions of the Pennsylvania Rules of Professional Conduct, the Delaware Rules of Professional Conduct, excerpts from learned treatises, and exhibits received in evidence at trial or summaries thereof.

### IV.    Compensation

My compensation in this matter is an engagement fee of $5,000 plus an hourly fee of $800 per hour. In addition, I will be reimbursed for all reasonable out-of-pocket expenses. Payment for my services in connection with this engagement is not contingent upon the conclusions I draw or the outcome of this litigation.

### V.    Prior Testimony

A listing of the cases in which I have testified as an expert at trial or by deposition within the preceding four years is attached hereto as Exhibit D.

### VI.    Materials Considered

In connection with the preparation of this Report and the opinions set forth herein, I considered the materials listed on Exhibit E.

## VII.    Reservation

I reserve the right to supplement this Report and to respond to the opinions that may be offered by experts on behalf of the Trustee, Royal or other parties to the Trustee and Royal actions.

Dated: ~~July~~ June 27, 2007

Geoffrey C. Hazard, Jr.

# Exhibit A

## CURRICULUM VITAE

12/21/06

### GEOFFREY C. HAZARD, JR

Miller Distinguished Professor of Law, University of California,
    Hastings       College of the Law
Trustee Professor of Law, University of Pennsylvania Law School
Director Emeritus, American Law Institute

Address:   2263 California Street
           San Francisco, CA 94115
           Tel:415-292-6535(home);415-565-4800(office)

           Hastings College of the Law
           200 McAllister St., San Francisco, CA 9410

### EDUCATION

Swarthmore College, B.A. 1953 (Phi Beta Kappa)
Columbia University, LL.B. 1954 (Columbia Law Review)

### PROFESSIONAL APPOINTMENTS

Member, California State Bar, Pennsylvania Bar
Admitted to practice: Oregon, 1954; California, 1960;
Connecticut, 1982; Pennsylvania, 1994
Practiced in Oregon, 1954-57; Deputy Legislative Counsel, State
of Oregon, 1956-57; Executive Secretary, Oregon Legislative
Interim Committee on Judicial Administration, 1957-58
Executive Director, American Bar Foundation, 1964-70
Consultant, American Bar Association Special Committee on Code
     of Judicial Conduct, 1970-72
Reporter, American Bar Association Special Commission on
     Standards of Judicial Administration, 1971-77
Reporter, American Law Institute, Restatement of Judgments,
     Second, 1973-81
Reporter, American Bar Association Special Commission on
     Evaluation of Professional Standards, 1978-83
Reporter, Committee on Ethical Standards, National Association of
     Bond Counsel, 1983-84
Director, American Law Institute, 1984-1999
Reporter, American Law Institute and International Organization
     for Unification of Private Law, Principles of Transnational
     Civil Procedure, 1999-2005
Member and Consultant, Standing Committee on Rules of

Practice and Procedure, Judicial Conference of the United
     States, 1994–
Member, Judicial Conference Ad Hoc Committee on Mass Torts, 1997–
     99
Member, American Bar Association Resource Team for High Profile
     Trials 1996–1998
Member, American Bar Association Commission on Ethics 2000,
     1997–2002
Member, Associazione Italiana fra gli Studiosi del Processo
     Civile, 1998–

## ACADEMIC APPOINTMENTS

Miller Distinguished Professor of Law, University of California
     Hastings College of the Law, 2005–
Trustee Professor of Law, University of Pennsylvania, 1994–
Professor of Law, Yale University, 1971–94; Sterling Professor of
     Law Emeritus 1994–
Associate Professor of Law, University of California,
     Berkeley, 1958–61; Professor of Law, 1961–64
Visiting Professor, University of Michigan, 1963
Professor of Law, University of Chicago, 1964–71
Visiting Professor, Stanford University, 1974
Acting Dean, Yale School of Organization and Management,
     1980–81; Associate Dean, 1979–80; Deputy Dean, 1981–82
Visiting Professor, Universite d'Aix-Marseille, 1982
Visiting Professor, Harvard University, 1983
Visiting Professor, University of Arizona, 1997–2001

## TEACHING SUBJECTS

Civil Procedure, Legal Ethics, Federal Jurisdiction

## BOARD MEMBERSHIPS

Board of Trustees, Supreme Court Historical Society, 1989–2004
Board of Directors, Avatar Holdings, Inc., 1980–94
Board of Directors, Smyth, Sanford & Gerard Professional
     Liability, L.L.C. 1995–97
Member, Board of Directors, Friends of the Library of the Supreme
     Court of Israel 1998–
Board of Governors, International Insolvency Institute, 2004–

## PROFESSIONAL ACTIVITIES

page   3
Geoffrey C. Hazard, Jr.

Member, Administrative Conference of United States, 1972-78
Adviser, American Bar Association, Standing Committee on Ethics
        and Professional Responsibility, Subcommittee on Code
        of Judicial Conduct, 1988-89
Member, Board of Overseers, Institute for Civil Justice, RAND
        Corp.,1985-90
Advisory Council, Trinity Church (New York) Center for Ethics and
        Corporate Policy, 1983-1990
Legal Advisory Committee, New York Stock Exchange,1989-92
Member, American Bar Association Committee on Professional
        Discipline, 1985-91
Member, American Bar Association, Committee on Lawyers'
        Responsibility for Client Protection, 1991-1994
Member, National Association of Corporate Directors, Blue
        Ribbon Commission, 2005
Member, Pennsylvania Bar Ass'n, California State Bar, American
Bar Ass'n, American Law Institute, American Judicature Society,
National Legal Aid and Defender Ass'n, Fellows of American Bar
Foundation, American Academy of Arts and Sciences, American
Philosophical Society

PROFESSIONAL AWARDS

American Bar Foundation, Research Award, 1985
American Bar Foundation, William Keck Foundation Award,1997
Columbia University School of Law Association, Medal for
        Excellence, 1999
American Judicature Society, Outstanding Contributions to
        Promoting Effective Administration of Justice. 1999
Ceremony of Salute, Superior Court of Pennsylvania, 1999
Gold Medal, International Insolvency Institute, 2004
American Bar Association Section of Legal Education, Kutak Award,
        2005

HONORARY DEGREES

M.A., Yale University 1971
LL.D., Gonzaga University, 1985
LL.D., University of San Diego, 1985
LL.D., Swarthmore College, 1988
LL.D., Illinois Institute of Technology, 1990
LL.D., Nova University, 1992
LL.D., Republica Italiana (faculta di Urbino), 1998
Reconocimiento, Universidad National Autónoma de
        Mexico, 2006

BOOKS

page   4
Geoffrey C. Hazard, Jr.

RESEARCH IN CIVIL PROCEDURE (1963; Walter E. Meyer Research
        Institute of Law).
LAW IN A CHANGING AMERICA (1968; editor).
QUEST FOR JUSTICE (1973; editor, American Bar Association).
GOING TO LAW SCHOOL? (1974;editor, with Thomas Ehrlich).
CIVIL PROCEDURE (5th ed. 2001, with Fleming James, Jr. and John
        Leubsdorf).
ETHICS IN THE PRACTICE OF LAW (1978).
PLEADING & PROCEDURE, STATE & FEDERAL (8th ed. 1999; with
        D. W. Louisell, Colin Tait and Wm. Fletcher).
MANAGING COMPLEX LITIGATION:  A PRACTICAL GUIDE TO THE USE OF
        SPECIAL MASTERS (1983; with Wayne Brazil and Paul Rice).
THE LEGAL PROFESSION:  RESPONSIBILITY AND REGULATION (3d ed.
        1994; editor, with Deborah Rhode).
THE LAW OF LAWYERING:  A Handbook on the Model Rules of
        Professional Conduct (3d ed. 2004 with William Hodes).
PERSPECTIVES ON CIVIL PROCEDURE (1987; editor, with Jan Vetter).
BOARD GAMES: The Changing Shape of Corporate Power (1988; with
        Arthur Fleisher, Jr. and Miriam Z. Klipper).
THE LAW AND ETHICS OF LAWYERING (4th ed. 2005; with Susan Koniak,
        Roger Cramton and George Cohen)
LA GUISTA CIVIL NEGLI STATI UNITI (1993; with Michele Taruffo)
AMERICAN CIVIL PROCEDURE:  AN INTRODUCTION (1993, with Michele
        Taruffo)
AMERICAN CIVIL PROCEDURE: AN INTRODUCTION (Japanese ed., Tanabe
        Tr. 1997)
LA JUSTICIA CIVIL IN LOS ESTADOS UNIDOS (Spanish ed., Gascón
        Inchausti Tr. 2006)
POKUS`ENI` SPRA `NI` CHI RAD (Prague, 1996; translation of
        BOARD GAMES, with Arthur Fleisher, Jr. and Miriam Z.
        Klipper)
PROFESSIONAL RESPONSIBILITY AND REGULATION (Foundation Press,
        2002) (with Deborah Rhode)
LEGAL ETHICS: A COMPARATIVE STUDY (Stan. U. Press. 2004)(with
        Angelo Dondi)
ETICHE della PROFESSIONE LEGALE (il Mulino 2005) (with Angelo
Domdi)

REPORTS
(as reporter or draftsman)

Oregon Legislative Interim Commission on Judicial Administration,
        Vol. I (Judicial Administration), Vol. II (Juvenile Code)
        (1958)
California Special Legislative Commission on the Insanity
        Defense, Report (1962).

page  5
Geoffrey C. Hazard, Jr.

American Bar Association, Code of Judicial Conduct (1972).
American Bar Association, Standards of Judicial Administration
        (3 vol., 1974-77).
Legal Services for the Average Citizen, Report of A.B.A.
        Consortium on Legal Services (1977).
American Law Institute, Restatement Second of Judgments (1982).
American Bar Association, Model Rules of Professional Conduct
        (1983).
National Association of Bond Lawyers, Function and Professional
        Responsibilities of Bond Counsel (1984).
American Law Institute and International Organization for
        Unification of Private Law, Principles of Transnational
        Civil Procedure (2005).


                    ARTICLES

May v. Anderson:  Preamble to Family Law Chaos,
        45 Va. L. Rev. 379 (1959)

Oregon Administrative Procedure Act -- Status and Prospects,
        39 Ore. L. Rev. 97 (1960).

Indispensable Party:  The Historical Origin of a Procedural
        Phantom, 61 Colum. Law Rev. 1254 (1961).

Insanity as a Defense:  The Bifurcated Trial,
        49 Calif. L.Rev. 805 (1961) (with D. W. Louisell).

Death, the State, and the Insane:  Stay of Execution,
        9 U.C.L.A. Rev. 381 (1962) (with D. W. Louisell).

Early Evolution of the Common Law Writs:  A Sketch,
        6 Am. J. Legal Hist. 114 (1962).

An Historical and Critical Analysis of Interpleader,
        52 Calif. L. Rev. 706 (1963) (with Myron Moskovitz).

The Research Program of the American Bar Foundation,
        51 A.B.A.J. 539 (1965).

Reflections on Four Studies of the Legal Profession, in
        Law and Society, A Supplemental to Social Problems
        (Summer, 1965).

After the Trial Court -- The Realities of Appellate Review,

in Jones, Harry W., ed., The Courts, the Public and the
Law Explosion (1965).

A General Theory of State-Court Jurisdiction,
1965 Sup. Ct. Rev. 241.

Rationing Justice, 8 J. Law & Econ. 1 (1965).

Limitations on the Uses of Behavioral Science in the Law,
19 Case Western L. Rev. 71 (1967).

The Ombudsman: Quasi-Legal and Legal Representation in Public
Assistance Administration, in Sherrard, ed.,Social
Welfare and Urban Problems (1968).

Challenges to Legal Education, in Sutherland, ed.
The Path of the Law from 1967 (1968), pp. 185-194.

Epilogue to the Criminal Justice Survey, 55 A.B.A.J. 1048 (1969).

Social Justice Through Civil Justice, 36 U. Chi. L. Rev. 699
(1969).

Law Reforming in the Anti-Poverty Effort, 37 U. Chi. L. Rev. 242
(1970).

Legal Problems Peculiar to the Poor, 26 J. Social Issues 47
(1970).

Securing Courtroom Decorum, 80 Yale L. J. 433 (1970)(book
review).

Res Nova in Res Judicata, 44 So. Calif. L. Rev. 1036 (1971).

Court Finance and Unitary Budgeting, 81 Yale L. J. 1286
(1972)(with Martin B. McNamara and Irwin F. Sentilles,
III).

Attorneys' Responsibilities and Duties Under the Securities
Laws, in Goldberg, Stuart C., ed., Expanding
Responsibilities Under the Securities Laws (1973).

The Effect of the Class Action Device Upon the Substantive Law,
58 F.R.D 299 (1973).

Legal Services in the U.S.A., 2 Internat'l J.of Crim. and

Pen. 43 (1974).

Chancery Procedure and the Seventh Amendment: Jury Trial of
Issues in Equity Cases before 1791, 83 Yale L. J. 999
(1974) (with Harold Chesnin).

Law School "Law" and Sociolegal Research,
50 Denver L. J. 403 (1974).

Rethinking Legal Ethics, 26 Stan. L. Rev. 1227 (1974).

Conscience and Circumstance in Legal Ethics, in Hodges, ed.,
Social Responsibility: Journalism, Law, Medicine
(Wash. & Lee Univ., 1975).

Administration of Supporting Services in the Trial Court,
1 Justice System Journal 3 (1975).

Representation in Rule-Making, in Schwartz, ed.,
Law and the American Future (1975).

The Tennessee Administrative Procedure Act:  An Outsider's
Perspective, 6 Memphis State U. L. Rev. 143 (1976).

Standards of Judicial Administration:  Appellate Courts,
62 A.B.A.J. 1015 (1976).

The Jurisprudence of Juvenile Deviance, in Rosenheim, ed.,
Pursuing Justice for the Child (1976).

Requisites of a Valid Judgment, 24 Practical Lawyer 35 (1978).

The Supreme Court as Legislature, 64 Cornell L. Rev. 1 (1978).

An Historical Perspective on the Lawyer-Client Privilege,
66 Calif. L. Rev. 1061 (1978).

Talking to Your Lawyer, MBA, May 1978, 17.

The Legal and Ethical Position of the Code of Professional
Ethics, V Social Responsibility: Journalism, Law, Medicine
(Wash. & Lee Univ., 1979).

Interstate Venue, 64 Nw. L. Rev. 711 (1979).

Proposed Revision of the Rules of Legal Ethics in the United
      States, in Am. Bar Ass'n, American/Australian/New Zealand
      Law: Parallels and Contrasts (1980).

Guidelines for Claims of Privilege, United States v. Am. Tel.
      & Tel. Co., 86 F.R.D. 603 (1980) (with Paul Rice).

Rules of Legal Ethics: The Drafting Task, 36 The Record 77
      (1981).

Revisiting the Second Restatement of Judgments: Issue Preclu-
      sion and Related Problems, 66 Cornell L. Rev. 564
      (1981).

The Lawyer's Obligation to be Trustworthy When Dealing with
      Opposing Parties, 33 South Carolina L. Rev. 181 (1981).

How Far May a Lawyer Go in Assisting a Client in Legally
      Wrongful Conduct?, 35 U. of Miami L. Rev. 669 (1981).

Will the ABA Draft Model Rules of Professional Conduct Change
      the Concept of the Lawyer's Role?, Association of the Bar
      of the City of New York (Third Orison Marden Memorial
      Lecture,1981).

The Lawyer's Pro Bono Obligation, in ABA Proceedings of the
      Second National Conference on Legal Services and the Public
      (1981).

Do Lawyers Really Need New Disciplinary Rules?,
      53 Cleveland Bar J. 1 (1981).

Legal Ethics: Legal Rules and Professional Aspiration,
      30 Cleveland State L. Rev. 4 (1982).

Liability of Attorneys Involved in the Preparation of
      Disclosure Statements, in Fleischer, et al. eds.,
      Thirteenth Annual Institute on Securities Regulation
      (1982).

Arguing the Law: The Advocate's Duty and Opportunity,
      16 Georgia L. Rev. 821 (1982).

Judicial Management of the Pretrial Process in Massive Litiga-

tion: Special Masters as Case Managers, 1982 <u>Am. Bar
Found. Res. J.</u> 375 (with Paul R. Rice).

The Criminal Justice System: Overview, in Encyclopedia of
Criminal Justice (1982).

Competing Aims in Legal Education, 59 <u>No. Dakota L. Rev.</u>
533 (1983).

Why Lawyers Should be Allowed to Advertise: A Market Analysis
of Legal Services, 58 <u>N.Y.U.L. Rev.</u> 1084 (1983), (with
Russell Pearce and Jeffrey Stempel) republished in Italian,
Perche Agli Avvocati Dovrebbe Essere Consentito L'Uso Della
Pubblicita, 32 Rivista Di Diritto Civile 277 (1986).

Preclusion as to Issues of Law:  The Legal System's Interest,
70 <u>Iowa L. Rev.</u> 81 (1984).

A Question of Scale, Harvard Law School Bulletin, Winter, 1984
(review of Bok report on legal education).

The Technical Expert in Procedure: U.S. National Report, in
Nicklisch, ed., Der Technische Sachverstandige im Prozess,
VII.Internationaler Kongress fur Prozessrecht, p. 207
(1984).

Legal Ethics, in Gillers, ed., Looking At Law School (1984,
3d ed. 1990).

Rectification of Client Fraud: Death and Revival of a
Professional Norm, 33 <u>Emory L.J.</u> 271 (1984).

Reflections on the Substance of Finality, 70 <u>Cornell L.
Rev.</u> 642 (1985).

Curriculum Structure and Faculty Structure, 35 <u>J. Legal Ed,</u>
326 (1985).

The Position of the Supreme Court in the Contemporary
Constitutional System of the United States, in Lombardi,
Constituzione e Giustizia Constituzionale nel Diritto
Comparato (Centro Italiano per lo Sviluppo della
Ricerca, 1985).

Ethical Considerations in Withdrawal, Expulsion, and Retirement

page 10
Geoffrey C. Hazard, Jr.

[from a Firm], in Berger, ed., Withdrawal, Retirement &
   Disputes, Am. Bar Ass'n Section of Economics of Law
   Practice (1986).

Court Delay: Toward New Premises, 5 Civil Justice Q. 236
   (1986), republished in Italian, Costo e Durata del Processo
   in Italia e in U.S.A., 32 Rivista di Diritto Civile 271
   (1986).

Quis custodiet ipsos custodes?, 95 Yale L.J. 1523 (1986)
   (book review).

Principles in Legislation, 41 The Record 685 (1986) (Cardozo
   Lecture).

Rising Above Principle, 135 U.Penn.L.Rev. 153 (1986)
   (Roberts Lecture).

A Lawyer's Privilege Against Self-Incrimination in Professional
   Disciplinary Proceedings, 96 Yale L.J. 1060 (1987) (with
   Cameron Beard).

Triangular Lawyer Relationships: An Exploratory Analysis,
   1 Georgetown J. Legal Ethics 15 (1987).

Permissive Affirmative Action for the Benefit of Blacks, 1987
   U.Illinois L.Rev. 379 (David C. Baum Memorial
   Lecture).

Professional Ethics, Rules and Conduct, in Conference Papers,
   ALI-ABA Arden House III National Conference on the
   Continuing Education of the Bar (November 13, 1987),
   reprinted 34 CLE Journal and Register 5 (1988).

The Public Nature of Private Adjudication, 6 Yale L. & Pol'y
   Rev. 42 (1988) (with Paul D. Scott).

Communitarian Ethics and Legal Justification, 59 U. of Colo. L.
   Rev. 721 (1988).

Forms of Action Under The Federal Rules of Civil Procedure,
   63 Notre Dame L. Rev. 628 (1988).

Four Portraits of Law Practice, 57 UMKC L. Rev. 1 (1988).

Ethics and Politics in the Corporate World, 6 Yale J. on

page 11
Geoffrey C. Hazard, Jr.

Regulation 155 (1989) (book review).

Discovery Vices and Trans-Substantive Virtues in the Federal
    Rules of Civil Procedure, 137 U. Penn. L. Rev. 2237
    (1989).

Authority in the Dock, 69 Boston U. L. Rev. 469 (1989).

My Station as a Lawyer, 6 Georgia State U. L. Rev. 1 (1989).

Per un approcio manageriale al problema dei ritardi
    nell'amministrazione della guistizia, 43 Rivista
    Trimestrial di Diritto e Procedura Civile, No. 4, p. 960
    (Dicembre 1989), translated by Dttr. Angelo Dondi.

After Professional Virtue, 1989 Supreme Court Rev., 213.

Law and Business Ethics, in Reitzel, et al. Contemporary
    Business Law (4th ed. 1990).

The Role of the Legal System in Response to Public Risk, Fall
    1990 Daedalus, 229.

Ethical Opportunity in the Practice of Law, 27 San Diego L.Rev.
    127 (1990).

It Smacks of Elitism, Am. Law Inst. Remarks and Addresses, May
    15-18, 1990.

The Future of Legal Ethics, 100 Yale L.J. 1239 (1991).

Il processo con giuria come modello processuale," 45 Rivista
    Trimestrial di Diritto e Procedura Civile,
    No. 2, p. 479(Giugno, 1991), translated by Dttr. Angelo
    Dondi.

Swimwear for the Ethics Goldfish Bowl, 26 Int'l Soc'y of
    Barristers Quarterly 297 (1991).

Equality in Civil Litigation, In Kojima, ed., America no
    Daishihou Shisutemu ("Grand Justice System: American
    Style"), Chiou University Institute of Comparative Law
    (1992).

L'avvocato e l'etica professionale: gli aspetti giuridici, Il
    Foro Italiano, June, 1992, V, 215, translated by Dttr.
    Angelo Dondi

Justice Marshall in the Medium of Civil Procedure: Portrait of a
    Master, 80 Georgetown L.J. 2063 (1992).

Doing the Right Thing, 70 Washington U.L.Q. 691 (1992).

Alvin B. Rubin: Man of the Law, 52 Louisiana L. Rev. 1481
    (1992).

Lawyers and Client Fraud: They Still Don't Get It,
    6 Georgetown J. of Legal Ethics 701 (1993).

Sources of Delays, Motions to Disqualify Could be Handled
    Promptly Through ADR, July 1993 Alternatives to the High
    Cost of Litigation (Center for Public Resources).

The Role of the Legal System in Responses to Public Risk, in E.
    Burger, ed., Risk (U. Michigan Press 1993).

Dimensions of Ethical Responsibility: Relevant Others, 54 U.
    Pittsburgh L. Rev. 965 (1993).

Lawyer Liability in Third Party Situations:  The Meaning of the
    Kaye Scholer Case, 26 U. Akron L. Rev. 395.

Reflections on Judge Weinstein's Ethical Dilemmas in Mass Tort
    Litigation, 88 Northwestern U. L. Rev. 569 (1994).

The American Law Institute: What it is and What it Does, Centro
    do Studi e Ricerche di Diritto Comparato e Straniero,
    Saggi, Conferenze e Seminari, (1994).

Azioni di Responsabilita Verso gli Amministratori di Societa
    Commerciali nel Diritto Statunitense, 39 Rivista delle
    Societa 441 (1994).

Conflict of Interest in Estate Planning for Husband and Wife,
    20 The Probate Lawyer 1 (1994).

page 13
Geoffrey C. Hazard, Jr.

Equality and Selectivity in American Civil Litigation, in T.
Kojima, T. Atsumi, H. Hokama, and M. Shimuzu, eds., The
Grand Design of America's Justice System, Institute of
Comparative Law in Japan (1995).

Law, Morals, and Ethics, 19 So. Illinois U.L.J. 447 (1995).

La Nozione di "Substantial Evidence" nel Processo Civile
Statunitense, 1-1996 Rivista Trimestrale di Diritto e
Procedura Civil 251 (1996).

Conflict of Interest in the Classic Professions, in R. Spece, D.
Shimm and A. Buchanan, Conflicts of Interest in Clinical
Practice and Research (1996).

The Settlement Black Box, 75 Boston Univ. Law Review. 1257
(1996).

The Client Fraud Problem: A Justinian Quartet, 1 J. Institute for
Study of Legal Ethics 43 (1996)

The Privity Requirement Reconsidered, 37 So. Texas L. Rev. 967
(1996).

Commentary: Policy Implications [of Lawyers Problems with
Alcohol], 10 J. Law and Health 79 (1995-96).
Un Codice di Etica Professionale per gli Avvocati Italiani?
Rivista Trimestrale di Diritto e Procedura Civile, Anno L
Fasc. 4-1996.

An Examination Before and Behind the "Entire Controversy"
Doctrine, 28 Rutgers L.J. 7 (1996).

A Lawyer's Moral and Ethical Discretion, 8 Researching Law No.2
(1997).

Transnational Rules of Civil Procedure, 30 Cornell Int'l. L.F.
495 (1997, with M. Taruffo).

State Supreme Court Regulation of Professional Ethics, 72 Notre
Dame L. Rev. 1177 (1997).

Protecting the Environment: Finding the Balance Between *Delaney*
and Free Play, 18 U. Penna. J. Of Int'l Economic Law 487
(with H. Kunreuther, 1997).
Ethical Dilemmas of Corporate Counsel, 46 Emory L.J. 1011, 1053

(1997).

Professional Legal Education and Citizen Education, 25 J.
    Japanese Institute of Int'l Bus. Law 1181 (1997) (in
    Japanese, translation by Professor Koichi Miki).

Harmonization of Procedural Law, 44 J. Of Civil Procedure 70
    (Japanese Ass'n of the Law of Civil Procedure) (translated
    into Japanese by Professor Koichi Miki).

Non-Silences of Professor Hazard on "The Silences of the
    Restatement": A Response to Professor Menkel-Meadow." 10
    Georgetown L. Legal Ethics 1997).

Per L'Indipendenza Professionale Dell'Avvocatura, 1997 Rivista
    Trimestrale di Diritto e Procedura Civile 407.

Discovery and the Role of the Judge in Civil Law Jurisdictions,
    73 Notre Dame L. Rev. 1017 (1998).

The American Law Institute is Alive and Well, 26 Hofstra L. Rev.
661 (1998).

From Whom No Secrets are Hid, 76 Texas L.Rev. 1665 (1998).

The Duty or Option of Silence, 23 Law & Social Inquiry 139
    (1998).

Reflections on Self-Study [of the American Law Institute], 23 Law
& Social Inquiry 641 (1998).

The County Courthouse No Longer Looms Over the Community, 51 SMU
L. Rev. 1559 (1998).

Foreward, Symposium, The Legal Profession: The Impact of law and
Legal Theory, 67 Fordham L. Rev. 239 (1998).

Substance, Procedure and Practice in Comparative Law, in T.
Shiibashi, ed., Toward Comparative Law in the 21st Century (Chuo
Univ. Press 1998).

Preliminary Draft of the ALI Transnational Rules of Civil
Procedure, 33 Texas Int'l L.J. 489 (1998)

An Historical Analysis of the Binding Effect of Class Suits, 146

page 15
Geoffrey C. Hazard, Jr.

U. Penna L. Rev. 1849 (1998) (with John L. Gedid and Stephen Sowle)

The Underlying Causes of Withdrawal and Expulsion of Partners from Law Firms, 55 Washington and Lee Rev. 1073 (1998)

Individual Justice in a Bureaucratic World, 7 Tulane J. of Int'l and Comparative Law 73 (1999)

From Whom No Secrets are Hid [Segretezza e Ricerca della verita nel Processo Civile], Rivista Trimestrale di Diritto e Procedura Civile,
Anno LIII Fasc. 2 – 1999

Responsibility, Professional and Otherwise, 31 Connecticut L. Rev 1139 (1999)

Regulation of Banking in the United States, in F. Riolo and D. Maschiandaro, Il Governe delle Banche in Italia (Fondazione Rosselli, Rome 1999).

Abuse of Procedural Rights: A Summary View of the Common Law Systems, and Abuse of Procedural Rights: Regional Report for the United States, in M. Taruffo, ed. Abuse of Procedural Rights: Comparative Standards of Procedural Fairness(1999).

Under Shelter of Confidentiality, 50 Case Western Law Rev. 1 (1999).

Tribute to Harvey Perlman, 78 Nebraska L.Rev. 744 (1999).

Litigio civil sin fronteras: armonizacion y unificacion del derecho procesal, Derecho PUC (Revista de la Facultad de Derecho del la Pontoficia Universidad Catolica del Peru), No. 52, 583 (Abril 1999)

The Future of the Legal Profession, in American Bar Association, Common Law, Common Values, Common Rights 357-365 (2000)

The Futures Problem, 148 U.Penn.L.Rev. 1901 (2000).

Foreword: The Future of the Profession, 84 Minn.L.Rev. 1083 (2000).

The Future of the Legal Profession, in American Bar Ass'n, Common

Law, Common Values, Common Rights, 357-363 (2000).

Globalization, National States, and the Rule of Law, in Jose
Ciprut, ed., Of Fears and Foes: Security and Insecurity in an
Evolving Global Political Economy (2000).

Law Practice and the Limits of Moral Philosophy, in Deborah
Rhode, ed., Ethics in Practice (2000).

Tribute in Memory of Herbert Wechsler, 100 Columbia L. Rev. 1362
(2000).

Changing Structure in the Practice of Law, 62 Louisiana L.Rev.167
(2000).

Equality and Affiliation as Bases for Ethical Responsibility, 61
Louisiana L.Rev.173 (2000).

Environmental Contracts in the United States (with Eric Orts), in
E. Orts and K. Dekelelaere, Environmental Contracts: Comparative
Approaches to Regulatory Innovation in the United States and
Europe (Kluwer 2001)

Transnational Rules of Civil Procedure: A Challenge to Judges and
Lawyers, 68 Estratto Studi Urbinati, Nuova Serie A-N. 51,3 247
(1999/2000)

Introduction to the Principles and Rules of Transnational Civil
Procedure, 33 N.Y.U. J. of International Law and Politics 769
(with M. Taruffo. R. Sturner and A. Gidi (2001)

Conflicts of Interest in Representation of Public Agencies in
Civil Matters, 9 Widener J. Public Law 211 (2000).

Globalization, National States and the Rule of Law, in J. Ciprut,
ed., Of Fears and Foes: Security and Insecurity in an Evolving
Global Political Economy at 209 (2001)

Whistleblowing is a Non-issue, Legal Intelligencer (of
Philadelphia), Feb. 25, 2002, p. 9.

Law and Justice in the Twenty-First Century, 70 Fordham L. Rev.
1739 (2002)

Fundamentals of Civil Procedure, 6 Uniform Law Review 753 (Revue
de Droit Uniforme) (2001-4)

page 17
Geoffrey C. Hazard, Jr.

Class Certification Based on Merits of the Claims, 69 Tennessee L. Rev. 1 (2001)

The Changing Professional Environment and the Ideal of General Practice, 30 Hofstra Law Review 759 (2002)

A Short Historical Sketch of the Legal Profession, ZZPInt (Zeitschrift fur Zivilprozess International) 6 Band 2001, 205-238 (with Angelo Dondi)

Principios fundamentales del Proceso Civil Transnacional, 54 Derecho PUC 253 (Revista de la Facultad de Derecho de la Pontificia Universdad Catolica del Peru)(2001)(with M. Taruffo, R. Sturner and A. Gidi)

Judicial Redress for Historical Crimes: Procedure, 5 International Law FORUM 36(2003)

Seeking Justice, Preserving Liberty, 54 Hastings L.J. 695 (2003)

Modeling Class Counsel, 81 Nebraska L. Rev. 1397 (2003)

International Civil Procedure and Transnational Civil Procedure: The Impact of Regional Economic Integration—An Overview, 8 Uniform Law Review 437 (2003-1/2)

Lawyer as Wise Counselor, 49 Loyola Law Rev. 215 (2003)

The ALI/UNIDROIT Project, in M. Andenas, N. Andrews and R. Nazzini, eds., The Future of Transnational Civil Litigation (2004)

Constitutional Law and Professional Regulation: Reflections on Sarbanes-Oxley, King County (Washington) Bar Bulletin, August 2004

A New Player in the Boardroom: The Emergence of the Independent Directors' Counsel, 59 The Business Lawyer 1389 (with Edward Rock)

Humanity and the Law, 16 Yale J. Law and the Humanities 79 (2004).

page 18
Geoffrey C. Hazard, Jr.

"Announcement" by Federal Judicial Nominees, 32 Hofstra L. Rev.
        1281 (2004)

Lawyer for the Situation, 39 Valparaiso U. L. Rev. 377 (2004).

Advertising and Intermediaries in Provision of Legal Services:
        *Bates* in Retrospect and Prospect, 37 Ariz. State L. J. 309
        (2005).

Lawyers for Lawyers: The Emerging Role of Law Firm Legal Counsel,
        23 Kans. L. Rev. (2005).

Harmonization of Civil Procedure, 4 Washington U. Global Studies
        Law Review 639 (2005)(with Michele Taruffo).

Law, Ethics and Mystery, 82 U. Detroit Mercy L. Rev. 509 (2005).

Two Valuable Treatises on Civil Procedure, 37 New York U. J. of
        International Law and Politics 611 (2005).

Responsibilities of Judges and Advocates in Civil and Common Law:
        Some Lingering Misconceptions Concerning Civil Lawsuits,
        (with Angelo Dondi) 39 Cornell Int'l L.J. 59 (2006)

The Rhetoric of Disputes in Courts, the Media, and the
        Legislature, 40 Georgia L. Rev. 559 (2006).

Various Newspaper Articles, National Law Journal, 1987–2001

# Exhibit B

# Pepper Hamilton LLP
#### Attorneys at Law

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

215.981.4650
gagner@pepperlaw.com

August 27, 1998

**PERSONAL & CONFIDENTIAL**

Mr. Andrew N. Yao
Student Finance Corporation
Five Radnor Corporate Center
100 Matsonford Road
Suite 501
Radnor, PA 19087

      Re:    Waiver of Conflicts of Interest

Dear Andrew:

      As we discussed, in light of my family's recent loan of substantial additional funds to Student Finance Corporation, I feel it is incumbent upon me to reiterate my prior admonitions to you about the need for separate counsel and the inherent conflicts of interest present despite your prior waiver of any conflicts of interest.

      As you and I have discussed, you should obtain separate counsel in connection with the loans made to SFC by my family and/or entities in their control and with respect to the execution of this letter, which acts as release of liability and a waiver of conflicts of interest. You have opted not to obtain separate counsel. Accordingly, you acknowledge, waive and release Pepper Hamilton LLP from any conflict of interest that may be present with Pepper Hamilton LLP representing Student Finance Corporation, Andrew N. Yao and Lore N. Yao in connection with loans made by Robert L. Bast, Esquire, the Elizabeth B. Brennan Trust, Pamela B. Gagné and other members of my family in the past several years to Student Finance Corporation and any loans which may occur in the future. You acknowledge the advice of Pepper Hamilton LLP and myself to obtain separate counsel. You have independently decided against the use of separate counsel. All negotiations for the terms, prices and rates of interest have been negotiated and agreed to by you without the need for counsel and you are not relying on Pepper Hamilton LLP or me for separate legal counsel in connection therewith. Accordingly, Pepper Hamilton LLP and I have not advised as to the merits of entering into the loans or the terms thereof, but we are merely acting as the scriveners of the loan documents negotiated by the parties. You concur that Pepper Hamilton LLP and I have not taken a position on behalf of

PHLEGAL: #562730 v1 (C27#01I.WPD)

PH 026740

| Washington, D.C. | Detroit, Michigan | New York, New York | Pittsburgh, Pennsylvania |
|---|---|---|---|
| Wilmington, Delaware | Harrisburg, Pennsylvania | Berwyn, Pennsylvania | Cherry Hill, New Jersey |

**Pepper Hamilton LLP**
Attorneys at Law

Mr. Andrew N. Yao
Page 2
August 27, 1998

Student Finance Corporation or the lenders and waive any conflicts of interest in connection therewith, causes of action which may have or which may arise in the future against myself or Pepper Hamilton LLP by virtue of the representation described herein. In addition, you hereby release me and Pepper Hamilton LLP from any and all liability in connection with preparing these documents.

Please acknowledge receipt of this letter and your waiver of any conflicts of interest that may arise and the release of Pepper Hamilton LLP and myself by endorsing the enclosed copy of this letter and returning it to me in the self-addressed envelope provided. Again, you should obtain separate counsel in reviewing this letter as well as any of the other transactions. Please call should you have any questions.

Sincerely,

W. Roderick Gagné

WRG/bdw
Enclosures

Agreed to and accepted by:

Andrew N. Yao as President of
Student Finance Corporation and
Individually

PHLEGAL: #562730 v1 (C27#011.WPD)

PH 025741

# Exhibit C

**Pepper Hamilton LLP**
*Attorneys at Law*

RECEIVED '" 2 2 2002

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

215.981.4650
gagner@pepperlaw.com

March 5, 2002

**VIA FEDERAL EXPRESS**
**PERSONAL & CONFIDENTIAL**
Mr. Andrew N. Yao
Student Finance Corporation
Five Radnor Corporate Center
100 Matsonford Road
Suite 501
Radnor, PA 19087

                    Re:     Waiver of Conflicts of Interest

Dear Andrew:

          As we discussed, in light of my family's recent loan of substantial additional
funds to Student Finance Corporation, I feel it is incumbent upon me to reiterate my prior
admonitions to you about the need for separate counsel and the inherent conflicts of interest
present despite your prior waiver of any conflicts of interest.

          As you and I have discussed, you should obtain separate counsel in connection
with the loans made to SFC by my family and/or entities in their control and with respect to the
execution of this letter, which acts as release of liability and a waiver of conflicts of interest.
You have opted not to obtain separate counsel. Accordingly, you acknowledge, waive and
release Pepper Hamilton LLP from any conflict of interest that may be present with Pepper
Hamilton LLP representing Student Finance Corporation, Andrew N. Yao and Lore N. Yao in
connection with loans made by Robert L. Bast, Esquire, the Elizabeth B. Brennan Trust FBO
Elizabeth L. Gagné, the Elizabeth B. Brennan Trust FBO Philip B. Gagné, the James T. Brennan
Trust FBO Philip B. Gagné, the James T. Brennan Trust FBO W, Roderick Gagné, the James T.
Brennan Trust FBO Elizabeth L. Gagné, Pamela B. Gagné and other members of my family in
the past several years to Student Finance Corporation and any loans which may occur in the
future. You acknowledge the advice of Pepper Hamilton LLP and myself to obtain separate
counsel. You have independently decided against the use of separate counsel. All negotiations
for the terms, prices and rates of interest have been negotiated and agreed to by you without the
need for counsel and you are not relying on Pepper Hamilton LLP or me for separate legal
counsel in connection therewith. Accordingly, Pepper Hamilton LLP and I have not advised as

PHLEGAL: #1247606 v1 (QQNQ01LWPD)

PH 027089

| Philadelphia | Washington, D.C. | | Detroit | New York | Pittsburgh |
|---|---|---|---|---|---|
| Berwyn | Cherry Hill | Harrisburg | Princeton | Tysons Corner | Wilmington |

www.pepperlaw.com

Pepper Hamilton LLP
Attorneys at Law

Mr. Andrew N. Yao
Page 2
March 5, 2002

to the merits of entering into the loans or the terms thereof, but we are merely acting as the scriveners of the loan documents negotiated by the parties. You concur that Pepper Hamilton LLP and I have not taken a position on behalf of Student Finance Corporation, you or the lenders and waive any conflicts of interest in connection therewith, causes of action which may have or which may arise in the future against myself or Pepper Hamilton LLP by virtue of the representation described herein. In addition, you hereby release me and Pepper Hamilton LLP from any and all liability in connection with preparing these documents.

Please acknowledge receipt of this letter and your waiver of any conflicts of interest that may arise and the release of Pepper Hamilton LLP and myself by endorsing the enclosed copy of this letter and returning it to me in the self-addressed envelope provided. Again, you should obtain separate counsel in reviewing this letter as well as any of the other transactions. Please call should you have any questions.

Sincerely,

W. Roderick Gagné

WRG/vam
Enclosures

Agreed to and accepted by:

Andrew N. Yao as Chief Executive Officer and Treasurer of
Student Finance Corporation and Individually

PHLEGAL: #1247606 v1 (QQNQ01!.WPD)

PH 027090

# Exhibit D

## CASES IN WHICH GEOFFREY HAZARD HAS TESTIFIED

| | | | | |
|---|---|---|---|---|
| Jay Lefkowitz<br>Washington, D.C. | Bampoe-Parry v. General Motors Corp. Fulton County, GA Civ. 98VS138297J | D<br>3/99 | Pro | Disclosure of Alleged Perjury |
| Stuart Parsons<br>Milwaukee, WI | French v. Gegios Circuit Milwaukee Cty. #97-CV-000473 | D<br>4/99 | Pro | Fee division agreement |
| Jeff Shumway<br>Scottsdale, AZ | Newburg v. Meyer, Hendricks, Sup. Ct., Maricopa Cty., CV 97-24095 | D<br>4/99 | Con | Conflict of interest |
| Curtis Cheyney<br>Philadelphia, PA | Barker v. Nationwide Ins. Co., Cir. Ct. Marshall Cty., W.Va. No. 96-C-92M | T<br>7/99 | N/A | Certification of class suit |
| Daniel Goforth<br>Houston, TX | Liberty Mut. Ins. Co. v. Gardere & Wynne, 395 CV 1330L U.S. Dist. Ct., N.D. TX | D<br>7/99 | Con | Disloyalty to client |
| John Curry, II<br>Charleston, WV | Harris v. Continental Cas. Co., 98-C-90M Cit. Ct. Marshall Cnty. W. VA | D<br>8/99 | Con | Conflict of interest |
| Howard Jacobs<br>New Haven, CT | Camuto v. Camuto, Sup. Ct. CT FA 960329816 S | D, 8/99<br>T, 9/99 | Con | Conflict of interest |
| John Elstead<br>Pleasanton, CA | Zavalney v. Wilson, Sonsini, Sup. Ct. Santa Clara Cnty No. CV 757356 | D<br>10/99 | Con | Failure to communicate |
| Jeffrey Smith<br>Denver, CO | Halmos v. Cherry, Wyoming Cir. Ct. | D<br>10/99 | Pro | Fee collection |
| Steven De Wolf<br>Dallas, TX | Consolidated Nat'l Corp. v. Winstead, Sechrest & Minick, U.S. Dist. Ct., N.D. TX #3-9CV1353-L | D<br>10/99 | Con | Conflict of interest |
| Hugh Keefe<br>New Haven, CT | Pepe & Hazard v. Jones, CT Sup. Ct. #CV-96-0559401-S | D<br>10/99 | Pro | Lateral move from firm |
| Gregory Sioris<br>New York, NY | BCI Pancake House, Inc. v. Morris, James Hitchens & Williams, U.S. Bkrptcy Ct., Del. Adv. #A-96-198-(MFW) | T<br>11/99 | Con | Failure to inform client |

| Steven Tillery<br>St. Louis, MO | Sparks v. Lucent Technologies, Inc. III Cir. Ct., Marion Cnty. | D<br>11/99 | Pro | Receipt of whistleblower infor |
| Deborah Skakel<br>New York, NY | Wein & Malkin/Helmsley-Spear Arbitration, AAA #131800097697 | D, 11/99<br>T, 11/99 | Con | Conflict of interest |
| Ward B. Coe<br>Baltimore, MD | In re: Merry Go Round Enterprises, Inc., U.S. Bnkrptcy Ct., Dist. of Baltimore, #94-5-0161-SD | T<br>11/99 | Pro | Reasonableness of fees |
| Mark Solak<br>Rockville, CT | State v. Marion, CT Sup. Ct. Tolland Dist., CR-11-99-106081 | T<br>11/99 | Pro | Lawyer as witness |
| Shelley Don<br>Denver, CO | Flemmer v. Holme, Roberts & Owen, Dist. Ct., Boulder Cnty. 96 CV 1101 | D<br>12/99 | Con | Attorney-client privilege |
| Paul Shelowitz<br>Miami, FL | Global Bus. Holdings, Inc. v. Ross, Broward Cnty Cir. Ct. No. 98-015946 (07) | T, D<br>12/99 | Pro | Conflict of interest |
| Gerald Steinberg<br>Cleveland, OH | Fairfield Machine Co. v. Aetna Casualty Co., Ct. of Common Pleas, Columbiana Cty., OH #98CV127 | D, 8/99<br>T, 1/00 | Con | Conflict of interest |
| Hal D. Meltzer<br>Overland Park, KS | Community Bank v. Sloan, Listrom, Dist. Ct., Johnson County KS #973908 | D, T<br>1/00 | Pro | Conflict of interest |
| Stephen Whinston<br>Philadelphia, PA | HRPT v. Brennick Arbitration, Boston, MA | D, 1/00<br>T, 2/00 | Con | Fairness in transaction with cli |
| Bruce Broillet<br>Los Angeles, CA | Botez v. Hertzfeld, L.A. Sup. Ct. | D<br>2/00 | Con | Conflict of interest |
| Gerald Brooks<br>Honolulu, HI | Tanaka v. First Hawaiian Bank, U.S. Dist. Ct. Hawaii #96-00734-SPK | D<br>5/00 | Con | Conflict of interest |
| Peter Forman<br>Boca Raton, FL | Zohlman v. Zoldan, Cir. Ct. Dade Cnty, #96-24764-CA-01 | D<br>5/00 | Con | Conflict of interest |

| David Pluchinsky Houston, TX | Teco Pipeline Co. v. Valero Energy Corp., Am. Arbitration Ass'n Houston, #70 198 0011896 | D 10/00 | Con | Conflict of interest |
|---|---|---|---|---|
| Anthony Muri Providence, RI | Hometown Properties, Inc. v. Fleming, Washington Cty. Sup. Ct., CA WC-92-689 | D 10/00 | Pro | Frivolous litigation |
| Gaye Rothman Austin, TX | Benchmark Land Devel., Inc. Dist. Ct., Travis Cnty., TX 96-14398 | D 10/00 | Pro | Corporate officer duties |
| Hartley Hampton Houston, TX | Clements, O'Neill, LLP v. Eichenhorst, Dist. Ct. Harris Cnty., TX #2000-38018 | D 12/00 | Con | Disloyalty to law firm |
| Barry Klayman Wilmington, DE | Matter of Allpoints; Burtch, Trustee v. Wendel, U.S. Dist. Ct. Del. C.A.#00-217 | D 12/00 | Pro | Conflict of interest |
| Sheldon E. Richie Austin, TX | Minton v. Amalgamated Acme Affiliates, Inc., Dist. Ct. Travis Cnty. #99-12045 | D 12/00 | Con | Misuse of confidences |
| Paul F. Hultin Denver, CO | Hoffinger v. AT&T Corp., Dist. Ct. Denver Cnty., Colorado No. 01CV0021 | D 2/01 | Pro | Conflict of interest |
| Brandon T. Hurley Ft. Worth, TX | Francis v. Gaylord Broadcasting, Dist. Ct. Dallas | D 2/01 | Con | Judicial ethics |
| Miles Cortez Denver, CO | Bartlit Beck v. Echostar Co. Am. Arbitration Ass'n #77Y 194 00001 00 | D 2/01 | Pro | Reasonable fees |
| Leonard Frankel St. Louis, MO | N.M.O. v. D.P.O., Cir. Ct. Cnty. of St. Louis #00FC-005710 | D, T 3/01 | Con | Duties of a fiduciary |
| Calum Anderson Hartford, CT | Randolph Foundation v. Tate, U.S. Dist. Ct. D Conn. #3:99:CV 2147 (DJS) | D 4/01 | Pro | Conflict of interest |
| Michael Silbersack Cincinnati, OH | Amway Corp. v. Procter & Gamble, U.S. Dist. Ct. WD Mich. #1:98 CV726 | D 4/01 | Pro | Improper litigation tactics |

| | | | | |
|---|---|---|---|---|
| Paul Shelowitz<br>Miami, FL | Garcia-Toledo v. Victec Environmental Services, Inc., Fl. Cir. Ct. Miami-Dade County #00-9522 CA 21 | D<br>6/01 | Con | Conflict of interest |
| John Dunlap<br>Baton Rouge, LA | Lewis v. State of Louisiana, No. 377-713-M Dist. Ct., Parish of East Baton Rouge | T<br>7/01 | Con | Conflict of interest |
| Gary Logan<br>Las Vegas, NV | Nault v. Mainor, Dist. Ct., Clark Cnty, NV, #A401657 | D<br>8/01 | Con | Conflict of interest |
| Mark Cohn<br>Cleveland, OH | Abundant Life Christian Center v. Thompson, Hines & Flory, Cuyahoga Cty. Common Pleas, #404045 | D, 9/01<br>T, 10/01 | Con | Failure to communicate |
| Lawrence Portnoy<br>New York, NY | McNamara v. Bre-X Minerals, Ltd. U.S. Dist. Ct., E.D. Tex. #597CV159 | D<br>11/01 | Con | Communication with client |
| Paul A. Shelowitz<br>Miami, FL | Doss v. Leiva, Cir. Ct. Miami-Dade Cnty, FL #00-31289 CA 10 | D<br>2/02 | Con | Escrow agent responsibilities |
| Rebecca Lamberth<br>Atlanta, GA | Hays v. Equitex, U.S. Dist. Ct., N.D. GA #00-1065 | D<br>4/02 | Pro | Conflict of Interest |
| Fred Davis<br>Austin, TX | Andrade v. Citizens Ins. Co., Dist. Ct. Travis Cnty, TX #99-09099 | T<br>4/02 | N/A | Class certification |
| Robert E. Heggestad<br>Washington, D.C. | Finzel v. Cantalupo Cir. Ct. Montgomery Cnty. MD#210-561-V | D<br>4/30/02 | Con | Abandoning client |
| Peter Leyh<br>Philadelphia, PA | McAleese v. Carson Concrete Corp., Montgomery Cnty. Cm. Pls. #94-10983 | T<br>5/02 | Con | Fee dispute |
| James Beasley<br>Philadelphia, PA | Sprague v. American Bar Assn. U.S.E.D. Pa #01-CV-382 | D<br>5/02 | Pro | Defamation |
| Alan Wasserman<br>Woodbridge, NJ | Dennis v. Giordano, et al., N.J. Sup. Ct. Monmouth Cnty., MON-L-2052-94 | D<br>8/02 | Con | Conflict of interest |
| John Moscow<br>New York, NY | New York County District Attorney Grand Jury | T<br>8/02 | Con | Corporate responsibility |

| | | | | |
|---|---|---|---|---|
| Julie O'Daniel<br>Atlanta, GA | JDN Realty Corp. v. Nichols, N.D. GA #2001-CV-39193 | D<br>3/03 | Con | Conflict of Interest |
| David K. Williams<br>Houston, TX | Vega Roofing Co. v. Brown & Brown, Dist.Ct. Hidalgo Cnty.,TX #1250-02B | D<br>8/03 | Con | Assisting in Misrepresentation |
| Lawrence D. Mass,<br>St. Louis, MO | Oetting v. Lewis, Rice & Fingersh, St. Louis Cnty Cir. Ct. 02CC-004084 8/03 | D<br>8/03 | Con | Conflict of Interest |
| Ronald F. Kehoe<br>Boston, MA | Brown Rudnick v. C'mm'nw'lth of Massachusetts, Sup. Ct. Suffolk Cnty 01-5883 B.L.S. | T<br>12/03 | Con | Reasonable Fees |
| James Hullverson,<br>Jr. St. Louis, MO | Stockmann v. Frank, Cir.Ct. St. Louis #012-8946 | D<br>4/04 | Con | Statute of Limitations |
| Brett Wagner,<br>Houston, TX | PCS Nitrogen, Inc. v. Bracewell & Patterson, Harris Cnty, TX, #2002-31,393 | D<br>4/04 | Con | Failure in Drafting |
| Michael Caddell<br>Houston, TX | In re Britestarr Homes, Inc., Bnkr. Ct. D. Conn. No. 02-50811 | D<br>8/04 | Con | Trust Account Disbursements |
| Cynthia Leppert<br>Baltimore, MD | Merry-Go Round Ch 11 Bankruptcy, Bnkr. Ct. D. MD, #94-5-0161-SD | D<br>8/04 | Con | Conflict of Interest |
| David R. Melton<br>Chicago, Illinois | Tristrata Technology, Inc. v. Long's Drug Stores U.S. Dist. Ct. Del. No.01-127-JJF | T<br>8/04 | Pro | Disqualification |
| Herschel Richard<br>Shreveport, LA | Ramsey v. Robles Fifth Jud. Dist. Ct. Richland Parish, LA #BC35981 | D<br>11/04 | Pro | Aggregate Settlement |
| Bruce A. Broillet<br>Santa Monica, CA | Cedars-Sinai Medical Center v. Mitchell, Silberberg & Knupp Superior Ct. LA #BC287823 | D<br>11/04 | Con | Delay in Performance |

| | | | | |
|---|---|---|---|---|
| Kenneth Votre, New Haven, CT | Zimmerman v. Cohen U.S.Dist.Ct., CT 302CV0181 (AVC) | D 12/03 T 2/05 | Con | Reasonableness of fee |
| Kenneth B. Morgan Birmingham, MI | Lear Corp. v Harness, Dickey &Pierce, Cir. Ct., Oakland Cnty, MI #03-054226-CK | D 3/05 | Con | Withholding information From client |
| Edwin J. Jacobs, Jr. Atlantic City, N.J. | Donofry v. Levine, Staller, Sklar, Chan, Brodsky & Donnelly, P.A., Sup. Ct., Atlantic Cnty, #ATL-L-1157-03 | D 3/05 | Pro | Reasonableness of Fee |
| Steven Feldman Chicago, IL | Minebea Co. v. Papst, U.S. Dist. Ct. D.C. 97-0590 (PLF) | D 5/05 T 6/05 | Pro | Contact with Opposing Party |
| Robert Golden Lathrup Village, MI | Cook v. Caruso, Com. Pleas Lucas Cnty., Ohio G-4801-CI-200403644 | D 5/05 | Con | Inadequate Representation |
| Harrison Richardson Portland, ME | Glenwood Farms v. Ivey, U.S. Dist. Ct. ME #03-CV-227-PS | D 5/05 | Pro | Conflict of Interest |
| Scott Carr Santa Monica, CA | Majd v. Anik, Sup.Ct., Los Angeles Cnty, BC249201 | D 6/05 | Con | Lawyer-Client Relationship |
| Barrett Reasoner Houston, Texas | Burch v. Vinson & Elkins Dist. Ct. Travis Cnty, TX GN402319 | D 7/05 | Pro | Conflict of Interest |
| Charles Curran, Washington, D.C. | Celanese Corp. v. Jo Tankers, Inc.,Private Arbitration | T 10/05 | Con | Conflict of Interest |
| Lloyd Pedersen Hartford, CT | Alderman & Alderman v. Kroll, etc., Sup. Ct. Hartford, CT, CV-03-0828266S | D 10/05 | Con | Fee Dispute |
| Larry Gaydos, Dallas, TX | Cooper & Scully v. Summy, Dist. Ct. Dallas Cnty. #03-04408-J | D 11.05 | Con | Exit from Firm |

| | | | | |
|---|---|---|---|---|
| Michael Guzman, Washington, D.C. | Chance v. U.S. Tobacco Co., Dist. Ct. Seward Cnty., KN #05-CV-112 | D 11/05<br>T 1/06 | Pro | Reasonableness of Fee |
| Robert Hood, Charleston, S.C. | Frankstone v. Morris, S.C. Common Pleas, 03-CP-40-2611 | D<br>2/06 | Pro | Conflict of Interest |
| Stanley Chesley, Cincinnati, OH | Knowlton v. Schultz, Ct. Cmn. Pleas, Hamilton Cnty, OH, #2003005071 | D<br>5/06 | Con | Conflict of Interest |
| John Villa, Washington, D.C. | Newby v. Enron Corp., U.S.Dist.,Ct., S.D. TX #-01-3624 | D<br>5/06 | Pro | Disclosure of Fraud |
| Charles A. Boyle, Chicago, IL | Pinnick v. Corboy & Demetrio, Cir.Ct. Will Cnty, IL #00L. 674 | D<br>5/06 | Con | Failure to Investigate |
| Peter A. Clark, New Haven, CT | In re Honorable William Sullivan, Judicial Review Council of CT, #J2006-023 | T<br>11/06 | Con | Judicial Conduct |
| Lyle Harada, Honolulu, HA | Hyman v. Title Guaranty Escrow Services, Inc., Cir. Ct. Fifth Cir., Hawaii #05-1-0042 | D<br>12/06<br>T<br>4/07 | Pro | Escrow Agent Conduct |
| Robert Kory Beverly Hills, CA | Wall Marjama & Bilinski v. Tablemax  AAA#15 194 00115 06 | T<br>1/07 | Con | Suing Client |
| David Farren, Phoenix, AZ | Cecala v. Newman, U.S.Dist.Ct., Dist.AZ #CV04-2612 PHX NVW | D<br>1/07 | Con | Sexual Relations |
| Glenn M. Young, Washington, D.C. | Crawford v. Katz, Sup. Ct., D.C. #2004 CA 009635M | D<br>4/07 | Con | Wrong advice re employment claim |
| | | | | |

# Exhibit E

## MATERIAL CONSIDERED

Order for the Protection of Confidential Information, dated March 15, 2006

Report of Bruce A. Green

Report of Donald W. Glazer

Trustee's First Amended Complaint

Answer and Affirmative Defenses of Pepper Hamilton LLP and W. Roderick Gagné, in his capacity as an attorney practicing at Pepper Hamilton LLP, to Trustee's First Amended Complaint

Answer and Affirmative Defenses of Defendants Robert L. Bast, Pamela Bashore Gagné, W. Roderick Gagné, As Trustee of the Trusts and the Trusts, to Trustee's First Amended Complaint

Royal Indemnity Company's Third Amended Complaint

Answer and Affirmative Defenses of Defendants Pepper Hamilton, LLP and W. Roderick Gagné, to Royal's Third Amended Complaint

Transcripts of the deposition of W. Roderick Gagné

July 12, 2000 conflict waiver letter signed by Royal Indemnity Company

August 21, 2000 conflict waiver letter signed by Student Finance Corporation ("SFC")

August 27, 1998 conflict waiver letter signed by Mr. Yao on behalf of himself and SFC

March 5, 2002 conflict waiver letter signed by Mr. Yao on behalf of himself and SFC

Pennsylvania Rules of Professional Conduct

Delaware Rules of Professional Conduct

The authorities and materials cited in my Expert Report