# EXHIBIT D

### Page 5

```
 1
 2    A P P E A R A N C E S: (Continued)
 3    CAHILL GORDON & REINDEL LLP
      80 Pine Street
 4    New York, New York 10005
            Attorneys for Pepper Hamilton LLP
 5    BY:  DAVID MONTONE, ESQ.
           KATE SUVARI, ESQ.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 6

```
 1
 2    P E T E R  H U M P H R E Y S,
 3    called as a witness, having been first
 4    duly sworn, was examined and testified
 5    as follows:
 6    EXAMINATION BY MR. GILBERT:
 7      Q.   State your name, please.
 8      A.   My name is Peter Humphreys.
 9      Q.   Are you the Peter Humphreys who
10    has given an expert report in this case
11    involving Pepper Hamilton and other
12    parties?
13      A.   Yes.
14      Q.   On whose behalf are you
15    appearing in this case?
16      A.   On behalf of Pepper Hamilton.
17      Q.   Anybody else?
18      A.   No.
19      Q.   You are not here on behalf of
20    Mr. Gagne himself personally?
21      A.   No.
22      Q.   Are you here on behalf of
23    anyone in the Bast family or anyone
24    related to Mr. Gagne or any of the family
25    trusts?
```

### Page 7

```
 1                    HUMPHREYS
 2      A.   No.
 3      Q.   What were you asked to give an
 4    opinion on in this case?
 5      A.   I was asked to give an opinion
 6    on the nature of securitization
 7    transactions, the role of an attorney in
 8    securitization transactions, and some
 9    specific comments with respect to the
10    issues that had been raised by
11    Mr. Glucksman and Mr. Glazer.
12      Q.   What is your opinion here on
13    those matters?
14      A.   Well, I think it is in my
15    expert report.  Those are my opinions.
16      Q.   Do you have any other opinions
17    that you reached in this case that are not
18    in your expert report?
19      A.   No.
20      Q.   Were you asked to form any
21    opinions about the conduct of the Pepper
22    Hamilton law firm in connection with the
23    matters raised in this lawsuit?
24      A.   No.
25      Q.   Do you have any opinions about
```

### Page 8

```
 1                    HUMPHREYS
 2    that?
 3      A.   No.
 4      Q.   Are you planning or do you have
 5    any reason to believe you will be giving
 6    any opinions about Pepper Hamilton's
 7    conduct or Mr. Gagne's conduct in
 8    connection with this lawsuit at any time?
 9      A.   No.
10      Q.   Have you told anyone that you
11    will not opine on that?
12           MR. MONTONE:  Form.
13      A.   I don't think I've really -- I
14    think the answer is no.  I think the
15    answer is no.
16      Q.   Have you been asked by anyone
17    to give your views about the conduct of
18    Pepper Hamilton in connection with the
19    matters raised in this litigation?
20      A.   No.
21      Q.   Have you given your views on
22    the conduct of Pepper Hamilton in
23    connection with the matters raised in this
24    litigation to anyone?
25           MR. MONTONE:  Form.
```

49

1    HUMPHREYS
2    Pepper Hamilton case and what it was
3    about. And it was a sort of general
4    meeting about what they were looking for
5    and whether I could do what they wished me
6    to do.
7        Q.   At the end of the meeting, did
8    they ask you to go forth and write a
9    report and continue on?
10       A.   Yes.
11       Q.   What did they ask you to do in
12   that meeting?
13           MR. MONTONE: Form.
14       A.   Well, I think the scope of the
15   report is basically what I was asked to
16   do.
17           MR. GILBERT: Why don't we mark
18   this as the next exhibit.
19           (Exhibit 2054-I marked for
20   identification.)
21       Q.   Do you have in front of you
22   what's been marked as 2054, Track I? Is
23   that the report that you have prepared for
24   this case?
25       A.   Yes.

50

1    HUMPHREYS
2        Q.   Is it complete?
3        A.   Yes, it appears to be.
4        Q.   By the way, did you do all the
5    work on this report yourself or did you
6    have the help of others?
7        A.   I had the help of an associate
8    who works with me.
9        Q.   Who is that?
10       A.   Lisa Avalos.
11       Q.   Did anybody else help you with
12   the report?
13       A.   We may have had -- I think we
14   had a summer associate help us whose name
15   I think is Charles Davi. And I talked to
16   my partner, Howard Mulligan, I talked to
17   him about other things, general
18   discussions about the type of report I was
19   going to produce.
20       Q.   Is Howard someone else who
21   works in the securitization practice area?
22       A.   Yes.
23       Q.   Here in New York?
24       A.   Yes.
25       Q.   By the way, when did you

51

1    HUMPHREYS
2    complete the report?
3        A.   July 12th, 2007.
4        Q.   About how many hours have you
5    spent on this engagement?
6        A.   I don't know exactly. I would
7    estimate 50 or 60 so far.
8        Q.   How many hours have been spent
9    by Lisa Avalos?
10       A.   I don't know. I just don't
11   know.
12       Q.   Would she have spent an
13   equivalent number of hours?
14       A.   Probably, yes.
15       Q.   How about the summer associate,
16   do you know how many hours he spent?
17       A.   A small amount of hours.
18       Q.   How about Mr. Mulligan?
19       A.   A small amount of hours.
20       Q.   Were all those hours billed to
21   Pepper Hamilton? Who is your client here
22   for billing purposes?
23       A.   Pepper Hamilton. I don't know
24   if we billed all the hours. I don't
25   remember how much. The summer associate,

52

1    HUMPHREYS
2    I would be surprised if I billed all the
3    time.
4        Q.   Would you have billed
5    Mr. Mulligan's time?
6        A.   Yes.
7        Q.   And billed Ms. Avalos' time?
8        A.   Yes, most of it.
9        Q.   Anyone else's time billed to
10   Pepper Hamilton?
11       A.   No, I don't think so.
12       Q.   What is the rate that you are
13   charging?
14       A.   My rate?
15       Q.   Yes.
16       A.   $850 an hour.
17       Q.   What is Mr. Mulligan's rate?
18       A.   $630, I believe.
19       Q.   And how about Ms. Avalos?
20       A.   $300.
21       Q.   Do you know the summer
22   associate's rate?
23       A.   I think that is also $300.
24       Q.   What years of experience does
25   Ms. Avalos have? How far out of law

Humphreys, Peter 8/23/2007 9:40:00 AM

## Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     DISTRICT OF DELAWARE
 3   C.A. No. 02-1294-JJF
     ----------------------------------x
 4   MBIA INSURANCE CORPORATION AND
     WELLS FARGO BANK, N.A. (f/k/a
 5   WELLS FARGO BANK MINNESOTA N.A.)
     AS TRUSTEE OF SFC GRANTOR TRUST
 6   SERIES 2000-1, SFC GRANTOR TRUST,
     SERIES 2000-2, SFC GRANTOR TRUST,
 7   SERIES 2000-3, SFC GRANTOR TRUST,
     SERIES 2000-4, SFC GRANTOR TRUST,
 8   SERIES 2001-1, SFC GRANTOR TRUST,
     SERIES 2001-2, SFC OWNER TRUST,
 9   SERIES 2000-I, AND SFC GRANTOR
     TRUST, SERIES 2001-3,
10            Plaintiffs/
              Counterclaim Defendants,
11
              - vs -
12
     ROYAL INDEMNITY COMPANY,
13            Defendant/
              Counterclaim Plaintiff.
14   ----------------------------------x
     ROYAL INDEMNITY COMPANY,
15            Third-Party Plaintiff,
16            - vs -
     ANDREW N. YAO, STUDENT LOAN SERVICING
17   LLC, STUDENT LOAN ACCEPTANCE II LLC,
     STUDENT LOAN ACCEPTANCE III LLC, STUDENT
18   LOAN ACCEPTANCE V LLC, STUDENT LOAN
     ACCEPTANCE VIII LLC, STUDENT LOAN
19   ACCEPTANCE IX LLC, SFC FINANCIAL LLC I,
     SFC FINANCIAL LLC II, SFC FINANCIAL LLC
20   VI, SFC FINANCIAL LLC VII,
21            Third Party Defendants.
     ----------------------------------x
22            August 23, 2007
              9:40 a.m.
23
24   TRACK I WITNESS: PETER HUMPHREYS
25
```

## Page 2

```
 1
 2   ----------------------------------x
     ROYAL INDEMNITY COMPANY,
 3            Counter-Claimant,
 4            - vs -
 5   MBIA BANK and WELLS FARGO BANK MINNESOTA
     N.A.,
 6            Counter-Defendants.
     ----------------------------------x
 7
     C.A. No. 04-1551-JJF
 8   ----------------------------------x
     CHARLES A. STANZIALE, JR., CHAPTER 7
 9   TRUSTEE OF STUDENT LOAN FINANCE
     CORPORATION,
10            Plaintiff,
11            - vs -
12   PEPPER HAMILTON LLP, et al.,
              Defendants.
13   ----------------------------------x
14   C.A. No. 05-72-JJF
     ----------------------------------x
15   CHARLES A. STANZIALE, JR., CHAPTER 7
     TRUSTEE OF STUDENT LOAN FINANCE
16   CORPORATION,
              Plaintiff,
17
              - vs -
18
     McGLADREY & PULLEN LLP AND MICHAEL AQUINO,
19            Defendants.
     ----------------------------------x
20
     C.A. No. 05-165-JJF
21   ----------------------------------x
     ROYAL INDEMNITY COMPANY,
22            Plaintiff,
23            - vs -
24   PEPPER HAMILTON LLP, et al.,
              Defendants.
25   ----------------------------------x
```

## Page 3

```
                    August 23, 2007
                    9:40 a.m.

             Videotaped Deposition of PETER
   HUMPHREYS, held at the offices of Cahill
   Gordon & Reindel LLP, 80 Pine Street, New
   York, New York, before Todd DeSimone, a
   Registered Professional Reporter and
   Notary Public of the State of New York.
```

## Page 4

```
   A P P E A R A N C E S:

   SONNENSCHEIN NATH & ROSENTHAL, ESQ.
   233 South Wacker Drive
   Chicago, Illinois 60606
       Attorneys for Royal Indemnity
       Company
   BY:  ALAN GILBERT, ESQ.
        JOHN GROSSBART, ESQ.

        - and -

   SONNENSCHEIN NATH & ROSENTHAL, ESQ.
   1221 Avenue of the Americas
   New York, New York 10020
   BY:  DANIEL PANCOTTI, ESQ.


   McELROY, DEUTSCH, MULVANEY
   & CARPENTER, LLP
   Three Gateway Center
   100 Mulberry Street
   Newark, New Jersey 07102-4079
       Attorneys for the Bankruptcy
       Trustee for SFC
   BY:  LOIS GOODMAN, ESQ.


   SCHNADER HARRISON SEGAL & LEWIS LLP
   1600 Market Street
   Philadelphia, Pennsylvania 19103-7286
       Attorneys for Pepper Hamilton LLP
   BY:  DAVID PELLETIER, ESQ.
```

53

1   HUMPHREYS
2   school is she?
3   A.   She is a first year. She is
4   starting her second year.
5   Q.   What work did Ms. Avalos do for
6   you in connection with this matter?
7   A.   She summarized the deposition
8   of Mr. Gagne, the long deposition, and she
9   checked that the PPMs were substantially
10  similar in form and that the opinions were
11  substantially similar in form. That's
12  probably the main scope of the work she
13  did.
14  Q.   Did Ms. Avalos provide you a
15  written summary of the Gagne deposition?
16  A.   She did.
17  Q.   Do you have a copy of that with
18  you?
19  A.   No.
20       MR. GILBERT: Do you have a
21  copy of that?
22       MR. MONTONE: No. Are you
23  requesting it?
24       MR. GILBERT: I would like it,
25  yes. In fact, I believe there is a

54

1   HUMPHREYS
2   request for other documents that were
3   prepared in connection with the work.
4   Q.   That's not listed on your list
5   of documents reviewed, correct?
6   A.   No, it is not.
7        MR. GILBERT: I would request a
8   copy of that. Can you provide me a copy
9   of that?
10       MR. MONTONE: We will take that
11  under advisement. We can talk about it at
12  lunch.
13       MR. GROSSBART: If you are
14  going to produce it, can you produce it at
15  lunchtime so we can use it in the
16  deposition?
17       MR. MONTONE: Why don't we talk
18  about it at lunch.
19       MR. GILBERT: We will make a
20  request for it.
21       MR. GROSSBART: It should have
22  been listed. We are requesting it. And
23  it has been requested. And it should have
24  been listed.
25  Q.   Did Ms. Avalos or anybody else,

55

1   HUMPHREYS
2   Mr. Davi or Mr. Mulligan, provide you any
3   written communications in connection with
4   this engagement?
5   A.   Yes, I'm sure I have e-mails
6   that were being sent to me.
7        MR. GILBERT: We would request
8   those as well.
9   Q.   Those, I take it, would still
10  be available?
11  A.   Yes.
12  Q.   Have any bills been sent to
13  Pepper Hamilton?
14  A.   Yes.
15  Q.   How much have the bills been?
16  Do you know what your bills to date have
17  been?
18  A.   I think the first bill was
19  $70,000. I think there is a second bill
20  for about 18.
21  Q.   Do you know what the unbilled
22  time is to date?
23  A.   About 30.
24  Q.   Are you charging your regular
25  rate for your testimony here today or some

56

1   HUMPHREYS
2   different rate?
3   A.   No, I'm charging my regular
4   rate.
5   Q.   Do your bills that were sent
6   contain information about the work that
7   was done by the lawyers and anyone else
8   who worked on the matter?
9   A.   Yes.
10       MR. GILBERT: I request copies
11  of those, too.
12       MR. GROSSBART: Could we go off
13  the record for a minute? I want to
14  consult with Mr. Gilbert.
15       MR. MONTONE: Sure.
16       (Recess taken.)
17  BY MR. GILBERT:
18  Q.   Did you read the Gagne
19  deposition yourself?
20  A.   Yes.
21  Q.   Did you rely on the summary
22  that you were given by Ms. Avalos?
23       MR. MONTONE: Form.
24  Q.   Let me ask it another way. Did
25  you review the summary that she gave you?

57

1     HUMPHREYS
2    A.    Yes.
3    Q.    And you considered that in
4  connection with your work on your report?
5        MR. MONTONE: Form.
6    A.    I read the Gagne deposition
7  myself. It was helpful as an index to
8  that deposition.
9        MR. GILBERT: Given that we
10 haven't been produced that summary and
11 that was a document that you looked at in
12 connection with the work that you did here
13 and that we don't want to have to come
14 back, we want to finish this deposition
15 today, why don't we take a short break now
16 and have you or whoever needs to at least
17 get a copy of that summary so that we can
18 have it and be able to use it if there are
19 any questions we have about it, so we can
20 have it at lunch to take a quick look at
21 it and see if there are any questions we
22 have on it.
23       Why don't we do that now so we
24 don't get in a time crunch later. You can
25 make your determination at lunch to

58

1     HUMPHREYS
2  produce it or not. How does that sound?
3        MR. MONTONE: That's fine.
4        MR. GILBERT: Let me add to
5  that any substantive e-mails, not if you
6  got e-mails just scheduling things, but if
7  you have any e-mails, for instance, if she
8  gave you an e-mail that says "All these
9  opinions look like they are the same" or
10 "This one looks different from this one,"
11 we would request that as well.
12       MR. PELLETIER: Can I ask what
13 the prior request was?
14       MR. GROSSBART: It doesn't
15 really matter, because under the rule, the
16 material was required to be listed. If he
17 read it or reviewed it or considered it or
18 relied upon it, it needed to be listed.
19 We have assumed that the lists were
20 complete. We now found out that the list
21 is not complete. That's the genesis of
22 the request.
23       MR. PELLETIER: It was just
24 mentioned there was a prior request in
25 writing.

59

1     HUMPHREYS
2        MR. GROSSBART: I believe that
3  the prior request --
4        MR. MONTONE: Do you have it?
5        MS. GOODMAN: There was an
6  agreement by e-mail.
7        MR. GROSSBART: There was an
8  agreement that said if the witness --
9        MR. MONTONE: Do you have it?
10       MR. GROSSBART: No, I don't
11 have it, but it is memorialized in e-mails
12 with Steve Shapiro, so you have it.
13       MR. MONTONE: I don't have it
14 in front of me. That's why we are asking.
15       MR. GROSSBART: That is why I
16 was trying to describe it. Do you want me
17 to describe it or not?
18       MR. MONTONE: No. I would
19 actually like to see it.
20       MR. GROSSBART: I don't have
21 it. Would you like the next best thing or
22 not?
23       MR. GILBERT: Let's take a
24 break and go off the record.
25       (Recess taken.)

60

1     HUMPHREYS
2  BY MR. GILBERT:
3    Q.    Mr. Humphreys, you mentioned
4  there was this summary of the Gagne
5  deposition that was done by Ms. Avalos and
6  you mentioned there were some e-mails.
7        Were there any other memoranda
8  or writings that were prepared by you or
9  your colleagues in connection with this
10 engagement other than the ones you have
11 talked about and obviously your report?
12   A.    No, I don't remember other
13 e-mails. I don't remember how many
14 e-mails were produced. But the answer is
15 no, there were no memoranda.
16   Q.    Did the summer associate do any
17 kind of a memorandum for you of anything?
18   A.    I don't believe so. I don't
19 think so. I don't remember seeing one.
20   Q.    Turning to your report, which
21 is Exhibit 2054, in front of you, if you
22 could turn to page B-1, the material
23 considered, and there is a three-page
24 listing there?
25   A.    Yes.

77

```
 1        HUMPHREYS
 2    Q.   And you took these facts as
 3   true when preparing your report?
 4    A.   Yes.
 5    Q.   In looking, again, at page C-4,
 6   in that fourth paragraph, would you agree
 7   with me that the $45 million in credit
 8   enhancement insurance that is listed there
 9   on November 27th, 2000 would have been a
10   warehouse line and that the $55.6 million
11   listed in the amended policy later would
12   have been a securitization policy?
13        MR. MONTONE:  Form.
14    A.   I would definitely agree with
15   you, because it says that it was in
16   connection with the securitization.  I
17   don't know specifically if the $45 million
18   was for a warehouse line or not.
19    Q.   But would you agree with me
20   that what this seems to say, if this is
21   true, is that prior to Royal issuing the
22   April 24, 2001 securitization policy for
23   $55.6 million, that Royal had only insured
24   $45 million of those loans?
25        MR. MONTONE:  Form.
```

78

```
 1        HUMPHREYS
 2    A.   Yes.  But I don't know whether
 3   the $55.6 million includes $10 million of
 4   loans that had already been insured under
 5   other policies.
 6    Q.   Did you investigate that?
 7    A.   No, I did not.
 8    Q.   So as you sit here today, is it
 9   possible that $55.6 million may not have
10   been covered by other policies?
11        MR. MONTONE:  Form.
12    Q.   The loans that were insured in
13   that April 24th policy may not have been
14   covered by other insurance policies?
15        MR. MONTONE:  Form.
16    A.   It is possible, but I don't
17   know.
18    Q.   You didn't look into that?
19    A.   I did not.
20    Q.   Isn't it possible that the
21   securitization policy in this instance
22   included additional amounts of loans that
23   weren't insured previously?
24        MR. MONTONE:  Form.
25    A.   Yes, it is possible.
```

79

```
 1        HUMPHREYS
 2    Q.   Wouldn't you have wanted to
 3   check into that before forming your
 4   reliance opinion that Royal could not have
 5   relied on the securitization structure in
 6   that instance?
 7        MR. MONTONE:  Form.
 8    A.   I'm not sure I understand what
 9   the relevance of the securitization is to
10   what is being called here the
11   securitization policy.  The structural
12   aspects of the securitization didn't
13   provide Royal with any particular benefit.
14    Q.   What's the basis for your
15   opinion that the structure of the
16   securitization didn't provide Royal with
17   any particular benefit?
18    A.   Although, related to this, I
19   believe there is a premium paid out of the
20   cash drawn on the securitization, but
21   whether the securitization worked or not,
22   Royal was still liable for the losses on
23   the loans.
24    Q.   So you investigated the entire
25   structure of the securitization before
```

80

```
 1        HUMPHREYS
 2   forming that opinion; is that correct?
 3    A.   Yes.
 4    Q.   And you are an expert in the
 5   structure of securitizations?
 6    A.   Yes.
 7    Q.   If it turned out that Royal had
 8   an interest in the securitizations beyond
 9   the little bit of premium that might be
10   paid, could that change your opinion about
11   whether Royal would be concerned about the
12   structure of the securitizations?
13        MR. MONTONE:  Form.
14    A.   Yes.  It depends on what that
15   interest was, but yes.
16    Q.   In forming your opinions here
17   in this case, you've made various
18   assumptions; isn't that correct?
19    A.   Yes.
20    Q.   You've assumed facts, correct?
21   You've assumed facts were true?
22    A.   Yes.
23    Q.   You've heard facts from the
24   lawyers for Pepper Hamilton which you've
25   relied upon in forming your opinions,
```

81

1   HUMPHREYS
2   correct?
3   A.   Yes.
4   Q.   You read this statement that
5   Pepper Hamilton gave you that we are
6   looking at here, Exhibit C, correct?
7        MR. MONTONE:  Form.
8   A.   Yes.
9   Q.   And you relied on what you were
10  told there as being true as an assumption
11  upon which you formed your opinion,
12  correct?
13  A.   Yes.
14  Q.   Now, if assumptions that you
15  relied upon in forming your opinion turned
16  out to be untrue, that could mean your
17  opinions may be changed or may not be
18  accurate anymore; isn't that correct?
19  A.   Yes.
20  Q.   When did you reach your
21  opinions in this case?
22  A.   I think July 12th, 2007.
23  Q.   Did you form any of those
24  opinions before then?  Forget that.
25       That's your report.  By the

82

1   HUMPHREYS
2   way, did you do any drafts of your report?
3   A.   Yes.
4   Q.   By the way, who wrote the first
5   draft of the report?
6   A.   I think I did, actually.  I
7   did, yes.
8   Q.   Were you the one who wrote the
9   entire report?
10  A.   Yes, pretty much.
11  Q.   Anybody else help you with any
12  of the language in the report?
13  A.   I showed drafts to the lawyers
14  at Cahill.  But primarily, yes, I showed
15  drafts to the people at Cahill.
16  Q.   Did they comment on the drafts
17  that you showed them?
18  A.   Yes.
19  Q.   Did you make any changes after
20  they commented?
21  A.   Yes.
22  Q.   When did you get the first
23  draft to them?
24  A.   I don't remember specifically.
25  Probably June, late June.  Maybe earlier.

83

1   HUMPHREYS
2   Q.   How many drafts did you do?
3   A.   I don't remember.
4   Q.   Did you save your drafts?
5   A.   Yes.
6   Q.   Now, from the time you did your
7   first draft until your final report, was
8   there anything that was removed from any
9   of the drafts at Cahill's request?
10  A.   I don't remember.
11  Q.   You don't remember anything?
12  A.   I don't remember specific
13  removals, no.
14  Q.   Do you remember anything in
15  general?
16  A.   No.
17  Q.   But there were things that you
18  removed as a result of comments that you
19  received from Cahill?
20       MR. MONTONE:  Form.
21       MR. PELLETIER:  I object to
22  form.
23  A.   Yes.  We changed some words and
24  probably took some words out and put some
25  words back in.

84

1   HUMPHREYS
2   Q.   Were they all just editorial
3   type changes?
4        MR. MONTONE:  Form.
5   A.   They were sometimes
6   clarification type changes.
7   Q.   Were there any substantive
8   areas that you included in drafts of the
9   report that were not included in the final
10  report?
11  A.   No.
12  Q.   Who at Cahill did you talk to
13  about the report?
14  A.   David Montone, David
15  Januszewski.
16  Q.   Where are the prior drafts?
17  Are those on your computer system or in
18  your office?
19  A.   Yes.
20  Q.   Any comments you got, were they
21  given to you orally or were they given to
22  you by writing in some form?
23  A.   Some were given orally and some
24  were given by e-mail.
25  Q.   By the way, is the amount --

85

```
 1                HUMPHREYS
 2   the rate that you are charging for
 3   yourself and others in the firm, are those
 4   your normal billing rates or are they
 5   different for this engagement?
 6      A.   Normal billing rates.
 7      Q.   Let's talk about Exhibit C
 8   again. When did you receive Exhibit C?
 9      A.   I don't remember specifically.
10   Sometime during the period I was preparing
11   the report, before it was prepared
12   obviously.
13      Q.   Was there a prior version of
14   this that you got, or was this the only
15   version that you got?
16      A.   Of the facts?
17      Q.   Yes, of what's Exhibit C here.
18      A.   There is a prior version.
19      Q.   That is different from this
20   one?
21      A.   Different from this one, yes.
22      Q.   And you reviewed that in
23   connection with your work?
24      A.   Yes.
25           MR. GILBERT: I would request
```

86

```
 1                HUMPHREYS
 2   that as well, Mr. Montone.
 3      Q.   Is there more than one prior
 4   version?
 5      A.   I don't remember. I remember
 6   one prior version. I don't remember if
 7   there was more than one.
 8      Q.   Was there anything else that
 9   was given to you -- the prior version was
10   given to you by the Cahill firm, I take
11   it?
12      A.   Yes.
13      Q.   Was there any other written
14   materials, and that would include e-mails,
15   given to you by the Cahill firm other than
16   the prior version of Exhibit C, the
17   version of Exhibit C that is here, and the
18   list of documents that are in Exhibit B?
19      A.   Yes, I'm sure I received
20   e-mails from Cahill.
21      Q.   Any of those e-mails provide
22   you any substantive information that you
23   considered in connection with your report?
24      A.   No, I don't believe so. I
25   mean, some of them would attach documents,
```

87

```
 1                HUMPHREYS
 2   some of the documents that are listed on
 3   the report.
 4      Q.   To your knowledge, are there
 5   any e-mails that attached documents -- let
 6   me back up.
 7           Are there any documents that
 8   you were provided by e-mail that are not
 9   included on the list here or as Exhibit C?
10      A.   I don't think so. I don't
11   believe so. We tried to list everything
12   on Exhibit C. I'm sorry, Exhibit B.
13      Q.   Exhibit B is a list of all the
14   documents that you were provided or saw in
15   connection with this matter?
16           MR. MONTONE: Form.
17      A.   Exhibit B is a list of all the
18   documents I relied on in writing my
19   report.
20      Q.   Apart from reliance, did you
21   consider or review any other documents in
22   connection with your report?
23      A.   I don't believe so. I don't
24   believe so.
25      Q.   You did not say that with
```

88

```
 1                HUMPHREYS
 2   complete conviction. What leads you to
 3   say "I don't believe so" as opposed to
 4   "no"?
 5           MR. MONTONE: Form.
 6      A.   I'm just not sure.
 7      Q.   Did you consider, apart from
 8   what's listed here, did you consider any
 9   materials from other sources such as
10   treatises, articles, materials from the
11   Internet, anything else in connection with
12   your report?
13      A.   Yes. The introductory part
14   about the nature of securitization, I used
15   parts of an article I had written, which
16   is listed. I looked at that because it is
17   a general article about securitization
18   authored by me.
19      Q.   Which article is that, sir?
20      A.   It is the article "Structured
21   Finance Challenges for New Issues and New
22   Assets: An Overview," on page A-2.
23      Q.   Apart from that article, is
24   there anything else that you considered or
25   reviewed in connection with your opinion
```

Page 321

```
 1   HUMPHREYS
 2        MR. GILBERT: I have no more
 3   questions.
 4        We, of course, as we said
 5   before, reserve the right to ask further
 6   questions given that there have been at
 7   this point a number of items that we have
 8   not received that we believe we should
 9   have received. So once we get those, we
10   would reserve the opportunity to ask more
11   questions of Mr. Humphreys.
12        MR. MONTONE: With respect to
13   the request for the deposition summary,
14   which we have taken under advisement, with
15   respect to that specific request, because
16   it was not a document that was considered
17   by Mr. Humphreys in the formation of his
18   report, we do not believe you are entitled
19   to disclosure of it.
20        MR. GILBERT: Can I have the
21   rules that are in front of you, please?
22        MR. GROSSBART: I want to ask
23   him some questions about it. I want to
24   make a record for my motion.
25   EXAMINATION BY MR. GROSSBART:
```

Page 322

```
 1   HUMPHREYS
 2   Q.    Did the memo that you are
 3   refusing to produce that was prepared by
 4   your associate contain any comments on the
 5   quality of the testimony given by
 6   Mr. Gagne?
 7   A.    I don't remember.
 8   Q.    Did it contain any impressions
 9   regarding the credibility of his
10   testimony?
11   A.    I don't remember. I didn't
12   review it substantively. I only used it
13   as an index to help me when I was reading
14   Mr. Gagne's deposition myself.
15   Q.    How many hours did Ms. Avalos
16   spend on the summary?
17   A.    I don't know. I'm sorry, I
18   don't know.
19   Q.    Have you charged Pepper
20   Hamilton for those hours, whatever they
21   may be?
22   A.    Yes, perhaps subject to some
23   minor adjustment when I went through the
24   bill. I don't know if I reduced the time
25   or not.
```

Page 323

```
 1   HUMPHREYS
 2   Q.    When is the last time you
 3   reviewed the summary?
 4   A.    When I read Gagne's deposition,
 5   which was sometime in June.
 6   Q.    Did you use the summary to help
 7   you determine what portions of Mr. Gagne's
 8   deposition would be of more interest to
 9   you or less interest to you?
10        MR. MONTONE: Form.
11   A.    Yes, I used it to help me
12   identify which were of more interest or
13   less interest, that's true.
14   Q.    So you didn't sit down with all
15   of Gagne's deposition and simply read it
16   from one end to the other, correct?
17   A.    Yes, I guess I read the whole
18   thing, but I moved more rapidly through
19   some parts.
20   Q.    So the memo was an aid in
21   helping you hone in on that testimony that
22   you thought would be more pertinent as
23   opposed to less pertinent to the matters
24   that you have been asked to opine about,
25   correct?
```

Page 324

```
 1   HUMPHREYS
 2        MR. MONTONE: Form.
 3   A.    Yes.
 4   Q.    How long is the summary?
 5   A.    I don't remember. Ten pages
 6   maybe. Eight pages, ten pages.
 7   Q.    Does the summary also purport
 8   to summarize exhibits as well as
 9   deposition testimony?
10   A.    No, I don't think we had the
11   exhibits at that point.
12   EXAMINATION BY MR. GILBERT:
13   Q.    Is Mr. Montone your lawyer here
14   today?
15   A.    No, I guess not.
16   Q.    So you are here without your
17   own lawyer?
18   A.    Yes.
19   Q.    The request to produce this has
20   been made of you as an expert in this
21   case. Are you refusing to produce this
22   summary to us?
23        MR. MONTONE: Form.
24   A.    No, I think I don't -- I guess
25   I'm not refusing to do anything. I don't
```