EXHIBIT A

**EXHIBIT**

Gibson 70 (I)

9/6/06    LJB

**STUDENT LOAN SERVICING LLC**
Servicer

**And**

**SFC ACCEPTANCE II, LLC**
Settlor

**And**

**FINOVA LOAN ADMINISTRATION INC.**
Master Servicer

**And**

**NORWEST BANK MINNESOTA, NATIONAL ASSOCIATION**
Trustee

**POOLING AND SERVICING AGREEMENT**
Dated as of April 19, 2000

**SFC GRANTOR TRUST, SERIES 2000-1**

PH 006370

counterparts, each of which counterpart shall be deemed to be an original, and all of which counterparts shall constitute but one and the same instrument.

Section 11.3. **Limitation on Rights of Certificateholders.** The death or incapacity of any Certificateholder shall not operate to terminate the Agreement or the Trust, or entitle such Certificateholder's legal representatives or heirs to claim an accounting or to take any action or commence any proceeding in any court for a partition or winding up of the Trust, or otherwise affect the rights, obligations, and liabilities of the parties to the Agreement or any of them.

No Certificateholder shall have any right to vote (except as provided in Section 11.1 hereof) or in any manner otherwise control the operation and management of the Trust, or the obligations of the parties to this Agreement, nor shall anything in this Agreement set forth, or contained in the terms of the Certificates, be construed so as to constitute the Certificateholders from time to time as partners or members of an association, nor shall any Certificateholder be under any liability to any third person by reason of any action taken pursuant to any provision of this Agreement.

No Certificateholder shall have any right by virtue or by availing itself or themselves of any provisions of this Agreement to institute any suit, action, or proceeding in equity or at law upon or under or with respect to this Agreement unless such Certificateholder previously shall have given to the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Majority Certificateholders shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee under this Agreement and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee, for 30 days after its receipt of such notice, request, and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding; no one or more Certificateholder shall have any right in any manner whatever by virtue or by availing itself or themselves of any provisions of this Agreement to affect, disturb, or prejudice the rights of any other Certificateholders, or to obtain or seek to obtain priority over or preference to any other such Certificateholders, or to enforce any right under this Agreement, except in the manner provided in the Agreement and for the equal, ratable, and common benefit of all Certificateholders. For the protection and enforcement of the provisions of this Section 11.3, each Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Anything herein to the contrary notwithstanding, if an MBIA Policy is in effect with respect to the Certificates and MBIA is not in default of its obligation to make payments thereunder, MBIA shall be deemed to be the owner of all Certificates then Outstanding for all purposes (including, without limitation, all approvals, consents, waivers, authorizations, directions, inspections and the institution of any action), provided that nothing in this paragraph shall impair the rights of the Certificateholders to receive all payments due under the Certificates, and MBIA shall have the exclusive right to exercise or direct the exercise of remedies on behalf of the owners of the Certificates in accordance with the terms of this Agreement following an Event of Default.

Section 11.4. **Governing Law.** This Agreement shall be construed in accordance with the laws of the State of Pennsylvania, and the obligations, rights, and remedies of the parties under this Agreement shall be determined in accordance with such laws except that the powers, obligations,

PHLEGAL: #872090 v4 ($_wq03!.DOC)

PH 006445

duties and rights of the Trustee shall be governed by the laws of the State of Minnesota and the federal law of the United States.

**Section 11.5. Notices.** All demands, notices, and communications under the Agreement shall be in writing, personally delivered or mailed by certified mail, return receipt requested, or overnight courier or facsimile transmission with original to follow and shall be deemed to have been duly given upon receipt (a) in the case of the Settlor, at 5 Radnor Corporate Center, Suite 501, 100 Matsonford Road, Radnor, Pennsylvania 19087, Attention: Andrew N. Yao, facsimile number (610) 995-2060; (b) in the case of the Servicer, at Christiana Executive Campus, 111 Continental Drive, Suite 408, Newark, DE 19713, Attention: Frank Martinez, facsimilie number (302) 391-5343, (c) in the case of the Trustee, at the Corporate Trust Office, facsimile number (612)667-3464; (d) in the case of the Master Servicer, 2650 South Decker Lake Lane, 2nd Floor, Salt Lake City, UT 84119, facsimile number (801) 924-2190, and (e) in the case of the Rating Agencies, Moody's Investor Service, Inc., A.B.S. Monitoring Dept., 99 Church Street, New York, NY 10007, facsimile number (212) 553-4948, and Fitch IBCA, One State Street Plaza, 32nd Floor, New York, NY 10004, facsimile number (212) 514-9879. Any notice required or permitted to be mailed to a Certificateholder shall be given by first class mail, postage prepaid, overnight courier or facsimile transmission at the address of such Certificateholder as shown in the Certificate Register. Any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have been duly given, whether or not the Certificateholder shall receive such notice.

**Section 11.6. Severability of Provisions.** If any one or more of the covenants, agreements, provisions, or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions, or terms shall be deemed severable from the remaining covenants, agreements, provisions, or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Certificateholders thereof.

**Section 11.7. Assignment.** Notwithstanding anything to the contrary contained herein, except as provided in Sections 3.11 and 6.2 hereof, neither the Settlor nor the Servicer may transfer or assign all, or a portion of, its rights, obligations and duties under the Agreement unless the Trustee and the Majority Certificateholders consent thereto. Any transfer or assignment with respect to the Servicer of all of its rights, obligations and duties will not become effective until a successor Servicer has assumed the Servicer's rights, duties and obligations under the Agreement. In the event of a transfer or assignment, the Rating Agencies shall be provided with notice of such transfer or assignment.

**Section 11.8. Certificates Nonassessable and Fully Paid.** Certificateholders shall not be personally liable for obligations of the Trust. The interests represented by the Certificates shall be nonassessable for any losses or expenses of the Trust or for any reason whatsoever, and, upon authentication thereof by the Trustee pursuant to Section 5.3 hereof, Certificates shall be deemed fully paid.

**Section 11.9. Third Party Beneficiaries.** Except as otherwise specifically provided herein with respect to the Certificateholders, the parties to this Agreement hereby manifest their intent that no third party other than each Certificateholder, the Insurer and MBIA shall be deemed a third party

PH 006446

EXHIBIT B

District Court for the District of Delaware

ROYAL INDEMNITY COMPANY

v.

PEPPER HAMILTON LLP, et al.

C.A. No. 05-165-JJF

MBIA INSURANCE CORPORATION, et al.

v.

ROYAL INDEMNITY COMPANY

C.A. No. 02-1294-JJF

Expert Report

of

Donna Lee Williams

**Purpose of this Report**

I have been engaged by counsel for Royal Indemnity Company ("Royal") to respond to the report of Constance Foster and offer an opinion concerning the application of section 909 of the Delaware Insurance Code to the credit risk policies issued by Royal to Student Finance Corporation ("SFC"), predominately insuring student loans made to students attending truck driving training schools. Specifically, I have been asked to opine on whether such loans are properly considered "1 subject of insurance" for purposes of 18 Delaware Code § 909.

**Background and Basis of Opinion**

From 1993 through 2005, I was the Insurance Commissioner for the State of Delaware. Prior to being elected Insurance Commissioner, I practiced law in the areas of insurance defense, regulation, licensing and compliance for 8 years in Delaware. I am currently employed at the AAA Mid-Atlantic. Headquartered in Delaware, the AAA Mid-Atlantic is the fifth largest club in a national federation known as the American Automobile Association. I am the director of government and industry affairs at the AAA Mid-Atlantic. My primary responsibility is directing legislative and regulatory affairs for our insurance group, including three proprietary insurance companies. My duties include monitoring and directing legislative and regulatory activities of the AAA Mid Atlantic in its six state territory.

I became a member of the National Association of Insurance Commissioners ("NAIC") in 1993. I was active in committee leadership for much of my tenure as Insurance Commissioner. I was a member of the NAIC executive committee for a total of eight years. I also served on the Financial Standards and Accreditation Committee ("FSAC") and was its chair in 2003. Among other things, the FSAC established and enforced the uniform standards for financial solvency oversight by state insurance departments over insurers.

As Insurance Commissioner, I was responsible for the solvency oversight of over 150 Delaware domestic insurance companies, including Royal. I was also responsible for regulating the activities of hundreds of insurers doing business in the state. My Curriculum Vitae is attached as exhibit A. A list of the materials I relied upon in forming my opinions is attached as exhibit B.

I have formed my opinions expressed in this report to a reasonable degree of professional certainty. I am being compensated at the rate of $350/hour and $400/hour (testimony) for my time. My compensation is not tied to or dependent upon the results obtained by Royal in these actions. I reserve the right to supplement this report.

**Opinion**

I have reviewed George Bernstein's report and I concur with both the reasoning of his report and his conclusions. I agree that each of the student loans insured by Royal in this case represented a single risk for purposes of 18 Delaware Code § 909. Each loan insured by Royal here presented a unique risk. Based on my education and experience I find no reason to aggregate these risks.

Like Mr. Bernstein, at no time in my 12 years as Delaware Insurance Commissioner, including my participation in the NAIC committee concerning solvency oversight, have I ever heard it suggested that the risk of "economic downturn" be the basis for aggregating the sort of risk Royal insured here, or similar risks.

While I was the Delaware Insurance Commissioner, I conducted monthly meetings with the senior members of my financial solvency oversight team. The purpose of these monthly meetings was to review the schedule for triennial examinations, triennial examinations in progress, market conduct examinations (scheduled or in progress), and annual and quarterly

-2-

financial statements. In those meetings, we would discuss issues and problems, including any issues of concern discovered by the examiners in the field, related to the insurers we were regulating, primarily Delaware domestic insurance companies, such as Royal. We also discussed the quarterly and annual financial statements and other filings as may have been required under Delaware law, and any issues or concerns that would come to light as a result of the information contained in such filings, including, among other things, issues regarding aggregation of risk. At no time did any of the senior members of my team raise any concerns regarding Royal's concentration of risk in regards to SFC. If the policies at issue in this case were perceived as one risk, then that aggregation issue would have been raised with me; it never was.

July 27, 2007
Date

Donna Lee Williams

-3-

EXHIBIT C

1

```
1    IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF DELAWARE
2
     MBIA INSURANCE CORPORATION  :
3    and WELLS FARGO BANK,        :
     N.A. (f/k/a WELLS FARGO      :
4    BANK MINNESOTA N.A.) as      :
     TRUSTEE OF SFC GRANTOR       :
5    TRUST, SERIES 2000-1, SFC    :
     GRANTOR TRUST, SERIES        :
6    2000-2, SFC GRANTOR TRUST  : C.A. NO.
     SERIES 2000-3, SFC GRANTOR : 02-1294-JJF
7    TRUST, SERIES 2000-4, SFC    :
     GRANTOR TRUST, SERIES 2001-1:
8    SFC GRANTOR TRUST, SERIES    :
     2001-2, SFC OWNER TRUST      :
9    2001-1, AND SFC GRANTOR      :
     TRUST, SERIES 2001-3,        :
10       Plaintiffs/Counterclaim  :
            Defendants,           :
11                               : TRACK(0)WITNESS:
                                 : DONNA LEE WILLIAMS
12   vs.                        :
     ROYAL INDEMNITY COMPANY,    : DATE:
13      Defendant/Counterclaim   :
        Plaintiff.               : AUGUST 27, 2007
14   ─────────────────────────────────────────
     ROYAL INDEMNITY COMPANY,
        Third-Party Plaintiff,
15
16   vs.
17   ANDREW N. YAO, STUDENT LOAN
     SERVICING LLC, STUDENT LOAN
18   ACCEPTANCE III LLC, STUDENT LOAN
     ACCEPTANCE II LLC, STUDENT LOAN
19   ACCEPTANCE V LLC, STUDENT LOAN
     ACCEPTANCE VIII LLC, STUDENT LOAN
20   ACCEPTANCE IX LLC, SFC FINANCIAL LLC
     I, SFC FINANCIAL LLC II, SFC
21   FINANCIAL LLC VI, SFC FINANCIAL LLC
     VII,
22      Third-Party Defendants.
     ─────────────────────────────────────────
23   ROYAL INDEMNITY COMPANY,
        Counter-Claimant,
24   vs.
     MBIA BANK and WELLS FARGO BANK
25   MINNESOTA, N.A.,
        Counter-Defendants.
```

2

```
1    ─────────────────────────────────────────
     CHARLES A. STANZIALE, JR.,
2    Chapter 7 Trustee of Student Finance
     Corporation,
3       Plaintiff,
4    vs.      C.A. No. 04-1551-JJF
5    PEPPER HAMILTON LLP, et al,
        Defendants.
6    ─────────────────────────────────────────
     CHARLES A. STANZIALE, JR.,
7    Chapter 7 Trustee of Student Finance
     Corporation,
8       Plaintiff,
9    vs.      C.A. No. 05-72-JJF
10   McGLADREY & PULLEN LLP
     and MICHAEL AQUINO,
11      Defendants.

12   ─────────────────────────────────────────
     ROYAL INDEMNITY COMPANY,
        Plaintiff,
13
     vs.      C.A. No. 05-165-JJF
14
     PEPPER HAMILTON LLP,
15   W. RODERICK GAGNE',
     FREED MAXICK & BATTAGLIA CPAs,
16   McGLADREY & PULLEN LLP,
     and MICHAEL AQUINO,
17      Defendants.

18
19
20
21
22
23
24
25
```

3

```
1         Oral Deposition of
2    DONNA LEE WILLIAMS was taken
3    pursuant to notice at 500 Delaware
4    Avenue, Wilmington, Delaware, on
5    Monday, August 27, 2007, beginning
6    at 1:30 p.m., before Jeanne
7    Christian, Court Reporter-Notary
8    Public, there being present.
9
10   APPEARANCES:
11   SONNENSCHEIN NATH & ROSENTHAL, LLP
     BY: STEVEN L. MEROUSE, ESQUIRE
12   8000 Sears Tower
     233 South Wacker Drive
13   Chicago, Illinois 60606
     Phone: (312) 876-8079
14   Representing Royal Indemnity Company
15
16   SCHNADER HARRISON SEGAL & LEWIS, LLP
     BY: ELIZABETH AINSLIE, ESQUIRE
17   BY: DAVID PELLETIER, ESQUIRE
     1600 Market Street
18   Philadelphia, Pennsylvania 19103
     Phone: (215) 751-2259
19   Representing Pepper Hamilton, LLP
20
21
22
23
24
25
```

4

```
1          I N D E X
2          - - -
3    DONNA LEE WILLIAMS
4    EXAMINATION        PAGE
5      BY MS. AINSLIE     5
6      BY MR. MEROUSE    138
7
8          - - -
9       E X H I B I T S
10         - - -
11   EXHIBIT NO. DESCRIPTION    PAGE
12   Exh 2066-I   Report     14
13
14
15
16
17
18
19
20
21
22
23
24
25
```

81

1      THE WITNESS: Persons with
2    worse credit scores generally
3    present a higher risk of default.
4    BY MS. AINSLIE:
5    Q.  Under what kinds of
6    circumstances would there be any
7    aggregation of risk in credit
8    enhancement insurance?
9        Again, I'm trying to --
10   let me make it a little clearer.
11   I'm trying to step back from this
12   circumstance.  I understand that
13   your opinion is that they are not --
14   the loans in this case are not
15   aggregated, so as to make them one
16   risk; is that right?
17   A.  That's correct.
18   Q.  Is there a circumstance that you
19   can think of where they would be
20   aggregated in the credit enhancement
21   arena?
22   A.  I don't know.  I mean, I can't
23   think of any off the top of my
24   head.
25   Q.  If something occurs to you later

103

1    THE WITNESS: No.
2    BY MS. AINSLIE:
3    Q. One of the — going on to the
4    next paragraph of your opinion on
5    Page 2, you say that you have not
6    heard it suggested in the course of
7    your time as insurance commissioner
8    that the risk of economic downturn
9    might be the basis for aggregating
10   the sort of risk that Royal insured
11   here or similar risks.
12       Am I paraphrasing at least
13   that accurately?
14   A. I think so, yes.
15   Q. What sorts of risks have you
16   seen be the basis for aggregating
17   the sort of risk that Royal insured
18   here?
19       MR. MEROUSE: Objection,
20   form.
21       THE WITNESS: To the best
22   of my recollection, this issue --
23   the specific issue of the
24   aggregation of credit risk was never
25   brought to my attention.

104

1    BY MS. AINSLIE:
2    Q. So you have never heard it
3    suggested that the risk of economic
4    downturn be the basis, but you have
5    not heard any other risk being
6    suggested as the basis for
7    aggregating the sort of risk that
8    Royal insured here; is that correct?
9    A. Aggregation issues come up very
10   infrequently.
11   Q. I'm just asking what --
12   A. So the answer to that — repeat
13   your question.
14   Q. I think you did answer it, but I
15   will try again, to be sure.
16       Am I correct in
17   understanding that you have not
18   heard the risk of economic downturn
19   suggested as the basis for
20   aggregating the sort of risk that
21   Royal insured here, but you have
22   likewise not heard any other risk be
23   suggested as the basis for
24   aggregating the sort of risk that
25   Royal insured here, either?

105

1    A. That's correct, because
2    aggregation issues are very
3    infrequent.
4    Q. Now, the next paragraph, you
5    point to the fact that you had
6    monthly meetings with the senior
7    members of your financial solvency
8    oversight team? I take it, that's
9    BERG?
10   A. Yes.
11   Q. And you say that in those
12   meetings, we would discuss issues
13   and problems, including issues of
14   concern discovered by examiners in
15   the field, and that at no time did
16   any of the senior members of your
17   team raise any concerns concerning
18   Royal's concentration of risk in
19   regards to SFC?
20   A. That's true.
21   Q. These meetings were held 12
22   times a year?
23       MR. MEROUSE: I object to
24   form.
25       THE WITNESS: They were

EXHIBIT D

1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF DELAWARE
 2
    MBIA INSURANCE
 3  CORPORATION AND WELLS
    FARGO BANK, N.A. (f/k/a
 4  WELLS FARGO BANK
    MINNESOTA N.A.) AS
 5  TRUSTEE OF SFC GRANTOR  :
    TRUST, SERIES 2000-1, SFC :
 6  GRANTOR TRUST, SERIES
    2000-2, SFC GRANTOR
 7  TRUST, SERIES 2000-3, SFC :
    GRANTOR TRUST, SERIES
 8  2000-4, SFC GRANTOR
    TRUST, SERIES 2001-1, SFC :
 9  GRANTOR TRUST, SERIES
    2001-2, SFC OWNER TRUST
10  2001-I, AND SFC GRANTOR
    TRUST, SERIES 2001-3,
11    Plaintiffs/Counterclaim-
          Defendants.
12
            vs.              :
13
    ROYAL INDEMNITY COMPANY, :
14    Defendant/Counterclaim :C.A. NO.
          Plaintiff.   :02-1294-JJF
15    ----------------------------
    ROYAL INDEMNITY COMPANY,
16    Third-Party Plaintiff, :
17            vs.
18  ANDREW N. YAO, STUDENT   :
    LOAN SERVICING LLC,
19  STUDENT LOAN ACCEPTANCE II:
    LLC, STUDENT LOAN
20  ACCEPTANCE III LLC,
    STUDENT LOAN ACCEPTANCE
21  III LLC, STUDENT
    LOAN ACCEPTANCE V LLC,
22  STUDENT LOAN ACCEPTANCE
    VIII LLC, STUDENT LOAN
23  ACCEPTANCE IX LLC, SFC  :WITNESS:
    FINANCIAL LLC I, SFC    :CONSTANCE B. FOSTER
24  FINANCIAL LLC II, SFC   :TRACK I
    FINANCIAL LLC VI, SFC
25  FINANCIAL LLC VII,      :DATE:
      Third-Party Defendants.:AUGUST 28th, 2007
```

2

```
 1  ROYAL INDEMNITY COMPANY, :
      Counter-Claimant,    :
 2
            vs.              :
 3
    MBIA BANK AND WELLS FARGO :
 4  BANK MINNESOTA, N.A.,
      Counter-Defendants.   :
 5    ----------------------------
    CHARLES A. STANZIALE, JR.,:
 6  CHAPTER 7 TRUSTEE OF
    STUDENT FINANCE
 7  CORPORATION,
      Plaintiff,     :C.A. NO.
 8            vs.        :04-1551-JJF
 9                        :
    PEPPER HAMILTON LLP,     :
10  et al.,
      Defendants.         :
11    ----------------------------
    CHARLES A. STANZIALE, JR.,:
12  CHAPTER 7 TRUSTEE OF
    STUDENT FINANCE
13  CORPORATION,
      Plaintiff,     :C.A. NO.
14            vs.        :05-72-JJF
15                        :
    McGLADREY & PULLEN LLP AND:
16  MICHAEL AQUINO,
      Defendants.         :
17    ----------------------------
    ROYAL INDEMNITY COMPANY, :
18    Plaintiff,
19                        :
            vs.        :C.A. NO.
20  PEPPER HAMILTON LLP, W. :05-165-JJF
    RODERICK GAGNE, FREED
21  MAXICK & BATTAGLIA CPAs, :
    McGLADREY & PULLEN LLP,
22  AND MICHAEL AQUINO,
      Defendants.         :
23
24
25
```

3

```
 1        Oral deposition of CONSTANCE
 2  B. FOSTER, Track I, taken pursuant to notice,
 3  at the Law Offices of Schnader, Harrison,
 4  Segal & Lewis, LLP., 1600 Market Street, Suite
 5  3600, Philadelphia, Pennsylvania 19103, on
 6  Tuesday, August 28th, 2007, beginning at
 7  approximately 10:00 a.m., before David Walsh,
 8  Registered Professional Reporter and Notary
 9  Public, there being present:
10
11        ---
12
    APPEARANCES:
13
14
15        SONNENSCHEIN, NATH & ROSENTHAL,
          LLP.
16        BY:  STEVEN L. MEROUSE,
          ESQUIRE
17        7800 Sears Tower
          233 South Wacker Drive
18        Chicago, Illinois  60606
          Phone:  (312) 876-8079
19        Representing Royal Indemnity
          Company
20
          SCHNADER, HARRISON, SEGAL &
21        LEWIS, LLP.
          BY:  ELIZABETH AINSLIE, ESQUIRE
22        1600 Market Street, Suite 3600
          Philadelphia, Pennsylvania  19103
23        Phone:  (215) 751-2359
          Representing Pepper Hamilton,
24        LLP and W. Roderick Gagne as
          Partner
25
```

4

```
 1  APPEARANCES CONTINUED:
 2
 3        PROSKAUER, ROSE, LLP.
          BY:  LISA A. BAUER, ESQUIRE
 4        (Appearing via telephone)
          1585 Broadway
 5        New York, New York  10036
          Phone:  (212) 969-3221
 6        Representing MBIA Insurance
          Corporation and Wells Fargo Bank
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Foster, Constance  8/28/2007  10:00:00 AM

135

1   Q.   Okay.  I understand we have had some
2   discussions today about exactly how to
3   characterize the Royal policies.
4        So, setting that aside, are you aware in
5   your experience as a regulatory lawyer or as a
6   commissioner of the one risk rule ever being
7   applied to credit risk policies where the
8   aggregating factor used was the threat of
9   economic downturn?
10            MS. AINSLIE:  Objection.
11            THE WITNESS:  I'm not
12  aware -- and we looked, but I am not aware
13  that this issue has come up.  As the attorney
14  general opinion notes, despite the fact that
15  versions of these rules have been around for
16  a long time, there's very little that's out
17  there that assists in making these
18  determinations.  So, no, I'm not aware of any
19  situation where it was applied specifically
20  to a credit enhancement policy.
21  BY MR. MEROUSE:
22  Q.   Okay.  So, this is sort of an insurance
23  issue of first impression, if you will?
24  A.   I don't know if first impression is the
25  issue of how you treat asset backed -- asset

EXHIBIT E

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF DELAWARE

3    ROYAL INDEMNITY COMPANY,          )

4          Plaintiff,          )

5          v.            ) No. 05-165-JJF

6    PEPPER HAMILTON LLP, et al.,       )

7          Defendants.          )

8    MBIA INSURANCE CORPORATION, et al., )

9          Plaintiffs,          )

10         v.            ) No. 02-1294-JJF

11   ROYAL INDEMNITY COMPANY,          )

12         Defendant.          )

13   - - - - - - - - - - - - - - - - - - -

14

15    DEPOSITION OF TRACK I WITNESS:  GEORGE K. BERNSTEIN

16         Wednesday, August 8, 2007

17          Washington, D.C.

18

19

20

21   Reported by:  Cheryl A. Lord, RPR, CRR

22

71

1    downturn, and I've never seen an insurance department

2    apply the concept of economic downturns to those lines

3    any more than I've seen it applied to credit risk

4    lines.

5        Q.    So the fact that you haven't seen -- well,

6    have you seen insurance departments -- take the

7    workers' comp example that you just gave us.

8            Have you seen insurance departments apply

9    the 909 analysis to workers' comp one way or the

10   other?

11       A.    No.

12           I'm trying to think of -- let me think that

13   through.

14           The answer is, I have not seen it done for

15   any line.

16       Q.    Okay.

17           MR. MEROUSE:  Liz, we can stop when it

18   makes sense?

19           We've been going almost an hour and a half,

20   so whenever is a logical time.

21           MS. AINSLIE:  Sure.

22           Let me just ask 1 or 2 more questions along

104

1  insureds is aggregated -- that company may go broke
2  because it wrote bad business or a lot of bad
3  business, but that's not an aggregation issue. I'm
4  talking aggregation.
5      You want to talk underwriting, that's a
6  totally different thing. You want to talk wisdom,
7  that's a totally different thing.
8      But in terms of aggregation, you can't
9  aggregate this until the statute says you have to
10 aggregate it, and I've never seen a statute that says
11 you have to aggregate it. I've never seen an
12 insurance department that said you had to aggregate
13 it.
14     And many companies writing credit risk
15 insurance would be in violation of 909 if the Foster
16 proposal were adopted.
17     BY MS. AINSLIE:
18 Q.   Do you know, then, that Constance Foster --
19 do you know her, by the way?
20 A.   I'm sure I've met her.
21 Q.   In what context?
22 A.   What were her years in the department in

105

1  Pennsylvania?
2      I don't have her report here.
3      (Pause.)
4      BY MS. AINSLIE:
5  Q.   Why don't we just go on.
6  A.   Okay.
7  Q.   It's not important.
8      Do you understand her to be proposing that
9  all credit risk insurance involving student loans
10 should always be aggregated or that this particular
11 book of business should have been aggregated?
12 A.   I don't think you can have the latter
13 without the former.
14     I mean, she can't just pick on Royal and
15 say, Royal is subject to this, and everybody else who
16 does the same thing isn't doing it.
17 Q.   That wasn't the question, Mr. Bernstein.
18 A.   Well, I think it is.
19     I think that's -- you can't have one
20 without the other. She's making a representation that
21 economic downturn is a factor that makes -- that
22 requires an insurance department to apply 909 the way

106

1  no other department has ever applied a statute like
2  909, whether you're talking about prime risks or
3  subprime risks.
4      Prime risks are also subject to economic
5  downturns. They may not be as subject. Are you going
6  to have the insurance departments evaluating the book
7  of business of a company and saying, now wait a
8  minute, this is prime risk, we're going to
9  aggregate -- this is subprime risk, we're going to
10 aggregate, these are prime risks, we're not going to
11 aggregate?
12     That's nonsense. I mean, she created this
13 theory for this case as far as I can see. I've never
14 heard it before. I've never heard anything resembling
15 it before.
16     And for her to apply it to Royal means
17 you've got to apply it to all credit insurance, all
18 credit risk insurance, and to mortgage guaranty
19 insurance, to all phases of insurance that have any --
20 are impacted at all by economic downturn.
21 Q.   Is it your understanding that -- well,
22 let's get back to your opinion.